**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| AMERIFIRST FINANCIAL, INC.,[1] | Case No. 23-11240 (TMH) |
| Debtors. | (Joint Administration Requested) |

**PRELIMINARY OBJECTION OF**
**ERIC BOWLBY TO DEBTORS' FIRST DAY MOTIONS**

Eric Bowlby, on behalf of himself and other displaced shareholders of AmeriFirst

Financial, Inc. ("Mr. Bowlby" or the "CEO"), by his undersigned counsel, hereby objects to

Debtors' First Day Motions (as defined below) and respectfully states as follows:[2]

**The Parties and the Motions**

1.      On August 24, 2023, the above-captioned debtors and debtors in possession

(collectively, the "Debtors") filed their respective petitions for relief under chapter 11 of the

Bankruptcy Code.  On August 29, 2023, the Debtors filed the following motions (together, the

"First Day Motions"):

- Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapters 11 Cases and (II) Granting Related Relief [D.I. 16] ("Joint Administration Motion");

- Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief [D.I. 18] (the "Employee Wage Motion");

---

[1] The Debtors and the last four (4) digits of their respective taxpayer identification numbers include: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 1550 McKellps Road, Suite 117, Mesa, AZ 85203.

[2] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the *Declaration of T. Scott Avila in Support of First Day Motions* (the "First Day Declaration"), the First Day Motions, or the body of this objection, as applicable.

- Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Operating Cash Management System. (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Granting Related Relief [D.I. 19] (the "<u>Cash Management Motion</u>");

- Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protections to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [D.I. 21] (the "<u>DIP Motion</u>"); and

- Debtors' Motion for Interim and Final Orders Under Sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code (I) Authorizing the Debtor to Continue in the Ordinary Course of Business, (A) Sale Activities Related to Certain "CIK" Properties, (B) Originating and Funding Mortgage, Loans (C) Selling "Scratch and Dent Loans," (D) Servicing Loans, and (II) Granting Related Relief [D.I. 22] (the "<u>Loan Sale Motion</u>").

### <u>Preliminary Statement</u>

2.      At the status conference in this case just yesterday, Debtors' proposed counsel stated to the Court that this case comes to the Court 'in a bit of a different manner.'  The CEO could not agree more.  The facts of these chapter 11 cases and what has transpired over the past couple of weeks are both remarkable and unbelievable, and while final decisions will not be made with respect to these cases and these Debtors today, the requested relief by the Debtors, if approved, could strengthen RCP's and the Debtors' scheme to the point where it may be difficult to unwind.

3.      At essence, this is a corporate takeover directed by junior secured lender RCP, amounting to something akin to an involuntary petition by a secured lender.  Even before the execution of the Prepetition Credit Agreement and related documents, RCP has operated in bad faith, deliberately manufacturing "Sophie's choice" emergency situations to cause AFI and its directors and officers to either accede to RCP's demands or default on their obligations to other creditors.  This included sweeping large amounts of cash from AFI's bank accounts on several

occasions, despite AFI's placing RCP on notice that those sums had been designated as necessary for AFI to meet other obligations. RCP would then wait until the eleventh hour before AFI's obligations became due to dangle a financing lifeline in front of AFI, subject to oppressive and unconscionable conditions.

4.     When AFI finally had enough of RCP's bad faith conduct with its latest refusal to fund payroll earlier this month, which also constituted material breaches of the Prepetition Credit Agreement and related documents, it issued a Notice of Default to RCP to force RCP to stop playing games. This Notice of Default caused RCP to begin effecting its own premeditated attempt to conduct a hostile takeover of AFI. Within the span of a single day, RCP:

- Issued its own Notice of Default, making unsubstantiated and/or manufactured claims that AFI had itself materially breached those agreements, as a pretext for wresting control of all the shareholder equity pledged by the AFI Shareholders;

- Used the pledged AFI shares to oust all of AFI's then-current directors and officers and to install RCP's own people in their stead;

- Sent a team of RCP agents and affiliates—accompanied by guards armed with guns—to AFI's Arizona headquarters in order to forcibly restrain AFI's then-current directors and officers while they changed AFI's office locks, corporate passwords and credentials, and IT access; and

- Transferred the pledged AFI shares to a newly-created Delaware corporate affiliate (Debtor Phoenix 1040 LLC) so as to create the guise of arms' length corporate transactions, artificially manufacture venue in Delaware, and plunge AFI into "voluntary" bankruptcy.

5.      Because RCP's behind-the-scenes bad faith acts have effectively puppeteered AFI into entering this improperly venued "voluntary" bankruptcy, the Court should reject the Debtors' First Day Motions to the extent that such relief would permit RCP to further entrench itself and its installed agents and affiliates into these chapter 11 proceedings.

## **Counterstatement of Facts and Procedural History**

**A.      Background**

6.      At all relevant times prior to the Petition Date, Eric Bowlby was the CEO, President, Director, Chairman of the Board, and majority shareholder of AFI.  The only other shareholder was Eric Bowlby's father, Kenneth (collectively with Eric Bowlby, the "AFI Shareholders").

7.      On or about May 15, 2023, AFI entered into a series of agreements, including but not limited to, an Amended and Restated Credit and Security Agreement (the "Prepetition Credit Agreement"), a Limited Waiver and Second Amendment to Credit and Security Agreement (the "Second Amendment"), a Pledge Agreement, and a Security Agreement (collectively, the "Agreements"), with RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. as Administrative Agent, and RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. as Lenders.[3]  Copies of those Agreements are attached as **Exhibits A, B, C**, and **D**, respectively**.**

8.      Under the Pledge Agreement, the AFI Shareholders pledged their equity ownership of AFI as collateral security for the Prepetition Credit Agreement, and further agreed to appoint RCP as proxy and attorney-in-fact for such collateral, provided that RCP would be able to vote

---

[3] Upon information and belief, RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. are affiliates of Reverence Capital Partners (collectively, "RCP").

such collateral *only* "upon the occurrence of an Event of Default and so long as [the Event of Default] is continuing." *See Ex. C* ¶ 7.

9.       Under the Agreements, RCP's secured creditor status was recognized to be subordinate to first priority liens by warehouse lenders under warehouse financing agreements. *See Ex. D* § 1.

**B.       Events Immediately Preceding the Petition Date**

10.       According to the First Day Declaration, Debtor Phoenix 1040 LLC retained Mr. Avila and Paladin, the Debtors' purported independent chief restructuring officer, on August 21, 2023.  To date and other than the pleadings in this case, the CEO has no knowledge of Phoenix 1040 LLC or its relation to AFI.

11.       After RCP's latest refusal to fund payroll as is required under the Prepetition Credit Agreement, on August 22, 2023, AFI, through its counsel, issued a formal Notice of Default to RCP (the "AFI Notice"), laying out in detail RCP's bad faith actions constituting material breaches under Sections 5.01(e) (adoption of Approved Budgets) and 10.05(b) (disbursement of funds in AFI's Collection Account) of the Prepetition Credit Agreement.[4]  A copy of the AFI Notice is attached as **Exhibit E**.  The AFI Notice also notified RCP of AFI's intention to litigate its rights under the various Agreements if RCP did not immediately cure its blatant and material breaches.

12.       Two days after the AFI Notice was issued, on August 24, 2023—that is, the Petition Date—RCP issued its own reciprocal Notice of Default to AFI (the "RCP Notice").  A copy of the RCP Notice is attached as **Exhibit F**.

---

[4] A more detailed explanation of the material breaches identified in the AFI Notice as well as the alleged breaches cited in the RCP Notice will be provided in Mr. Bowlby's forthcoming motion to dismiss or in the alternative, to appoint a chapter 11 trustee.

13.     Notably, the RCP Notice failed to cite any specific dates or events constituting Events of Default as required by the Prepetition Credit Agreement.  Moreover, the RCP Notice mischaracterized the AFI Notice's underlying substance as somehow "challeng[ing] the enforceability of Section 10.05(b)", when in fact the AFI Notice sought to enforce AFI's rights *pursuant to* Section 10.05(b) of the Prepetition Credit Agreement.

14.     RCP arranged to "hand-deliver" its Notice that same day, by way of a team of RCP employees and agents accompanied by multiple guards armed with guns.  In other words, RCP used delivery of its Notice as a manufactured excuse to lock down AFI headquarters and to forcibly confine the CEO as well as AFI's officers and employees while its team changed locks, company passwords, IT access, and took other means to wrest away total control of the company.

15.     Mr. Avila and other members of Paladin accompanied the RCP agents and guards to the premises of AFI.  To the CEO's knowledge, this was the first time Mr. Avila or Paladin set foot in any AFI office.

16.     RCP further took steps to lock the CEO out of his company email account, which resulted in a widespread panic when AFI employees were confronted by RCP's armed guards and Mr. Bowlby was unable to send out any company-wide communications to employees to explain the situation and advise them to cooperate for the time being.  RCP finally arranged to return email access to Mr. Bowlby hours later so that he could calm AFI's panicked employees and apprise them of the situation, via a company-wide email that was drafted and vetted by RCP's attorneys and agents.

17.     On that same day of August 24, 2023, RCP executed an Assignment and Assumption Agreement assigning its rights to AFI shares under the Pledge Agreement to Debtor

Phoenix 1040 LLC, a Delaware limited liability company.  A copy of the Assignment and Assumption Agreement is attached as **Exhibit G**.

18.      According to its Certificate of Formation, Phoenix 1040 LLC, was formed on June 28, 2023, only 57 days before the Petition date.  A copy of Phoenix 1040 LLC's Certificate of Formation is attached as **Exhibit H**.

19.      The signatory to Phoenix 1040 LLC's Certificate of Formation is Milton R. Berlinski.  Upon information and belief, Milton R. Berlinski is the managing partner and co-founder of RCP.

20.      Similarly, the Certificate of Formation for Phoenix 1040 Holdings, LLC, the sole member of Phoenix 1040 LLC, is dated August 18, 2023, only 6 days before the Petition Date, and is also signed by Milton R. Berlinski as authorized person.  A copy of Phoenix 1040 Holding LLC's Certificate of Formation is attached as **Exhibit I**.

21.      Again, on that same day of August 24, 2023, David Sloane ("Sloane"), the Director of Finance of RCP and Managing Director of Phoenix 1040 LLC, caused Phoenix 1040 LLC as the purported new sole shareholder of AFI to execute a corporate resolution titled "Unanimous Written Consent of the Sole Shareholder of AmeriFirst Financial, Inc." (the "Shareholder Resolution"), in which it removed the AFI Shareholders from their respective positions as directors of AFI's two-person Board, and installed Sloane and Jeffrey Dane ("Dane") in their place.  A copy of the Shareholder Resolution is attached as **Exhibit J**.

22.      Again, on that same day of August 24, 2023, Sloane and Dane, as the purported newly-appointed directors of AFI, executed another corporate resolution titled "Unanimous Written Consent of the Board of Directors of AmeriFirst Financial, Inc." (the "Director Resolution"), which removed all of AFI's existing officers from their positions.  In their place, the

Director Resolution appointed Sloane as Chairman of the Board; Thomas Scott Avila ("Mr. Avila") as President, Treasurer, and Secretary; and Dane was appointed as Independent Director. The Director Resolution also canceled the AFI stock certificates issued to the AFI Shareholders and issued a new stock certificate to Phoenix 1040 LLC, representing all issued and outstanding shares of AFI's equity capital. A copy of the Director Resolution is attached as **Exhibit K**.

23.     Again, on that same day of August 24, 2023, Sloane and Dane further executed another corporate resolution also titled "Unanimous Written Consent of the Board of Directors of AmeriFirst Financial, Inc." (the "Petition Resolution"), in which they authorized Mr. Avila as Chief Restructuring Officer to initiate and file the instant Petition.

**C.     Post-Petition**

24.     Since the Petition Date, the CEO has diligently cooperated with Mr. Avila in an effort to preserve AFI's remaining assets and protect AFI's employees from further disruption and financial harm, all at the request of Mr. Avila and Paladin and without compensation. Specifically, Mr. Bowlby's post-petition involvement with AFI has involved setting up, preparing for, and fielding calls with investors with whom AFI had historically done business, such as Fannie Mae, Freddie Mac, and PHH Mortgage, in order to preserve AFI's ability to operate as well as to sell some of AFI's current loans. Mr. Bowlby mostly handled such calls on his own (with permission from Mr. Avila) and only as of yesterday has Mr. Avila began to attend the calls with Mr. Bowlby.

25.     On August 29, 2023, the Debtors filed their First Day Motions. With respect to the DIP Motion, the Debtors are seeking approval of $5M in post-petition financing from RCP, including $2,775,000 on an interim basis.

26.     Also included with the First Day Motions is the Loan Sale Motion. Mr. Bowlby assisted Mr. Avila and the Debtors with preparing this motion at Mr. Avila's direction. Upon information and belief, if such motion is approved, the sales to be realized would equal roughly

$3.8M in the near term, or <u>$1.1M more</u> than the Debtors are receiving from the interim DIP financing.

**Objections**

**A.      Objection to Joint Administration Motion**

27.      Debtor Phoenix 1040 LLC ("<u>Phoenix</u>") is a Delaware limited liability company and Debtor AFI is an Arizona corporation.   The Debtors purportedly established venue through Phoenix, and now seek to jointly administer the cases here in Delaware.

28.      However, Phoenix was an entity formed on June 28, 2023, i.e. only *57 days* prior to the Petition Date.   "[A] case under title 11 may be commenced in the district court for the district . . . in which the domicile, residence, principal place of business . . . have been located for the **one hundred and eighty days** immediately preceding such commencement . . . ."  28 U.S.C. § 1408(1) (emphasis added).   Clearly, Phoenix does not meet this temporal requirement.

29.      Even worse, as shown in the Certificates of Formation of Phoenix 1040 LLC and its parent Phoenix 1040 Holdings LLC, both entities were formed by Mr. Milton R. Berlinski, who, upon information and belief, is a co-founder and managing partner of RCP; these were not entities formed by AFI or any of its affiliates or insiders.  *See* Exs. H and I.

30.      Further, while not an issue for today, it is unclear from the record if Phoenix was in financial distress on the Petition Date, or even when it hired Mr. Avila and Paladin to be chief restructuring officer.

31.      As the Prepetition Lenders are attempting to manufacture venue solely for their benefit and to pull in AFI as a co-debtor through this motion, the Court should deny the relief requested in the motion and keep each Debtor's case separate.   By granting the motion, the Court may prejudice and hinder further relief that the other parties in interest may seek in the respective cases.

**B.    Objection to Employee Wage Motion**

32.    Mr. Bowlby cares deeply about his employees and the business generally, and understands the need for the employees to be paid what they are owed.  Indeed, he would not continue to be working for free for the Debtors if his employees were not important to him. However, to the extent that the payments requested through the Employee Wage Motion are being funded by the DIP Financing proposed by RCP, Mr. Bowlby objects to such payments.

33.    The CEO must emphasize the irony of RCP *now* allowing payment to employees now that its orchestrated bankruptcy is in place, yet it was RCP's sweep of AFI's collection account earlier this month which prevented AFI's payment of employees at that time and led to the August 22 Notice of Default.  Much has changed in a week.

34.    Nevertheless, RCP needs employees to be paid and AFI to continue operating as a going concern in order for them to see any recovery.  Therefore, any and all payments to employees under the terms of the interim order should not be tethered to RCP's DIP financing or any other funds that may further entrench RCP in these cases.  Instead, such payments should be made from any post-petition receipts from AFI or other funding sources, including the sales of loans through the Loan Sale Motion.

35.    Moreover, the CEO objects to paragraph 4 in the interim order as it ties in any employee payments to the RCP financing.  This paragraph should be stricken.

**C.    Objection to Cash Management Motion**

36.    It is unclear from the papers which individuals will be responsible for monitoring and managing AFI's Cash Management System.  As noted above, David Sloane (an RCP employee) and Steve Avila (an officer appointed by RCP) are currently the *only* officers of AFI and are the only individuals that have purported control on the company's cash and where it goes.

37.     Accordingly, to the extent the motion seeks to entrench Messrs. Sloane and Avila as the only individuals responsible for AFI's Cash Management System, the CEO vehemently objects as each individual is working solely for the benefit of RCP in these cases.

**D.      Objection to DIP Motion**

38.     The DIP is highly objectionable on its face because RCP are on both sides of the transaction.  In determining whether to approve postpetition financing, courts typically will not substitute their own views regarding a proposed transaction as long as it is supported by a reasonable exercise of the debtor's business judgment.  *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").  However, where, as here, the transaction involves an insider or insiders stand to benefit, the standard for approval is the much higher "entire fairness" review.  *In re Zenith Elecs. Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999).  Under the "entire fairness" standard of judicial review, the Debtors must demonstrate that the challenged transaction is entirely fair to creditors both in terms of (a) "fair dealing," which entails an examination of when the transaction was timed and how it was initiated, structured, negotiated and disclosed to the directors, and (b) "fair price," which entails an examination of the economic and financial considerations of the transaction.  *Id.* (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)).  Other courts have also held that transactions with a debtor's insiders, including postpetition financing, are subject to heightened scrutiny by the Court.  *See WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("[S]ince there is an incentive and opportunity to take advantage, dominant shareholders' and others insiders' loans in a bankruptcy must be subject to rigorous scrutiny."), aff'd, 198 F.3d 234 (2d Cir. 1999); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are

subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."), aff'd, 160 F.3d 982 (3d Cir. 1998).

39.     Viewed through this lens, the DIP Term Sheet and the Debtors' requested relief falls on its face.  RCP hired advisors for the Debtors-to-be on August 21 with the retention of Paladin (and potentially funded its retainer from purely RCP funds).  Despite being in default itself on August 22, it then exercised its hostile takeover of AFI on August 24.  Assuming the Debtors' facts are true, starting when Mr. Avila arrived on the premises of August 24 (when he had no information about the company or its operations let alone its financing needs) he then proceeded over the weekend to search out DIP financing from other sources, determine none was available, and proceed with agreeing to an 11-page DIP Term Sheet and 25-page interim order that appears on its face to be fully-baked.  While this may be feasible, what is more likely is that the terms of this DIP Term Sheet were already formulated by RCP even before the hostile takeover on the 24th, and that all that was needed was signoff from a purported independent fiduciary.  The CEO has his doubts, and so should this Court and all other parties in interest.

40.     In addition to or supplemental to the foregoing, the CEO objects to the following:

*General Issues with DIP Financing*

(a)     **DIPs Are Available on More Favorable Terms**.  AFI was hijacked by RCP on August 24, 2023, at which point Mr. Sloane (an RCP employee) was made a Director, and Messrs. Sloane and Avila (a professional hired by RCP) filled all officer roles.  Mr. Avila did not search out *any* other financing source as he is beholden to RCP who put him into power.  Unless the Debtors can prove they exercised actual fiduciary duties in searching for the best terms for the Debtors, this financing should be denied.

(b)     **The Terms of the Proposed DIP Term Sheet Are Not Fair and Appropriate**. The Proposed DIP Term Sheet was <u>not</u> negotiated in good faith or at arm's length because RCP was on both sides of the deal.  If Mr. Avila only showed up on the Debtors' doorstep with armed guards on August 24 (at which point he knew nothing of the business or its cash needs), it strains credulity that he and the entity that

placed him (RCP) were able to negotiate fair terms of an 11-page term sheet and a 25-page interim DIP order. Instead, the CEO submits the DIP Term Sheet and the Interim DIP Order were prebaked by RCP leading up to the events of August 24, waiting only for the rubber stamp of the newly appointed directors and officers of the company put there by RCP.

(c)     **The DIP Lenders Should Not Be Deemed Good Faith Lenders**.  As noted throughout this Objection, RCP has not acted in good faith in its hostile takeover of AFI when it was already in material breach of its loan documents. This will be further briefed and argued in the CEO's forthcoming motion to dismiss or in the alternative, appointing a chapter 11 trustee. In the interim, the Court should not approve any provisions that find RCP is a good faith lender under section 364(e) of the Bankruptcy Code so that any DIP financing that may be approved may be reversed on appeal.

(d)     **The Court Should View the DIP Under a Strict Scrutiny Standard and not the Business Judgment Standard**.  The Debtors claim this DIP should be judged under the business judgment standard (*see* ¶ 35). Not true. As noted above, this is an insider DIP, as all of the directors and officers are RCP affiliates or agents. Accordingly, the Court should apply strict scrutiny when analyzing the terms of the DIP, and the Debtors need to put on a record that supports their contention.

(e)     **Not all Cash Collateral is Prepetition Cash Collateral**.  The DIP Motion is materially misleading as it claims RCP is the senior secured lender. In fact, it is AFI's numerous warehouse credit facility lenders in their various mortgage loans that are senior secured and above RCP. The Debtors and RCP need to prove that there is a necessary equity cushion in order to prime the liens of the warehouse facilities without those lenders' consent. They have not put on such a record.

*Issues with Interim Order*

(f)     **The Challenge Period is Truncated and Inappropriate [¶5f of the Interim Order]**.  The proposed Challenge Period is truncated and in violation of the Court's Local Rules. Local Rule 4001-2(a)(Q) requires all "parties in interest, including, but not limited to, any official committee appointed in the[] cases, at least seventy-five (75) days from entry of the initial interim order . . . ." Here, the Debtors are only providing parties in interest with 21 days from entry of the Final Order, and if a chapter 7 or 11 trustee is appointed, the later of 21 days from entry of the Final Order and 30 days from their appointment. This time period is highly prejudicial to parties' and the estates' rights to challenge the liens of RCP and investigate the multitude of bad acts (including lender liability) that may be brought by the estate of AFI.

(g)     **Strike the "No Control" Provision [¶5g of the Interim Order]**.  The Debtors and RCP attempt to sneak in this paragraph which is an unequivocal misrepresentation of the facts leading up to this case. RCP, through Phoenix, Mr. Sloane, and Mr. Avila, purportedly took control of AFI on August 24. Mr. Avila said as much in

his own declaration.  Yet the Debtors are attempting to include a provision in the Interim DIP Order to have this Court find otherwise.

(h)  **Findings Regarding the DIP Loan Should be Subject to a More Robust Record [¶6 of Interim Order]**.  For reasons stated previously, the Court is not in a position now to make findings of good cause, the market for more favorable terms of the DIP, good faith, etc., considering the actions taken by RCP leading up to these cases and the limited record before it.  Any such findings should be stricken until the myriad issues with the Debtors' purported filing are litigated.

(i)  **AFI Cannot be Bound to the DIP Term Sheet Now [¶8 of Interim Order]**.  Paragraph 8 of the Interim Order reads as if the DIP Term Sheet becomes a binding obligation upon entry of the Interim Order.  As parties in interest have not had requisite notice or time to analyze all aspects and ramifications of the DIP Term Sheet, such obligations cannot be binding on the Debtors' and their estates as of today.

(j)  **The DIP Liens, DIP Superpriority Claims, and the Adequate Protection Obligations Must be Subject to the Challenge Period and Voidable [¶¶9-11 of Interim Order]**.  The DIP Liens, DIP Superpriority Claims, and the Adequate Protection Obligations all become valid and binding on entry of the Interim Order.  For the reasons stated previously, such liens and claims cannot be binding on the Debtors' estates until the expiration of the Challenge Period (as requested to be revised).

(k)  **Preservation of Rights Provisions are Inappropriate [¶18 of Interim Order]**.  This paragraph is highly inappropriate considering the facts of these cases and further entrench RCP as a purported independent actor.  Specifically, paragraph 18(a) chills AFI from seeking financing from a neutral third party on equal or better terms that RCP.

(l)  **Certain Events of Default are Case Dispositive [¶21 of Interim Order]**.

    i.  Paragraph 21(a):  It is an Event of Default if Phoenix is not the sole owner of the equity in AFI.  By this provision, the Debtors and RCP foresee the CEO's challenge to their purported change of control on August 24.  This provision should be stricken as this issue will be litigated in this case.

(m)  **Exculpation Provision is Inappropriate [¶25 of Interim Order]**.  This provision purports to remove any liability of the DIP Agent and the DIP Lenders for "any claims arising from the prepetition and postpetition activities of the Debtor."  RCP is currently in control of the Debtors.  Therefore, this provision should be stricken.

*Issues with DIP Term Sheet*

(n)  **Facility Size**.  The $5M amount is excessive based on the budget and what AFI needs in the near term.  Moreover, as noted below, the revenue that will be recognized from ordinary course sales requested in the sale motion (approximately

$3.8M) will be sufficient to fund these cases should the proceed.  Accordingly, the Debtors do not need $5M (or $2.7M on an interim basis) from a deeply conflicted insider such as RCP.

(o)    **Interest Rate and Fees**.  As the DIP Term Sheet was not negotiated at arm's length, the economics of the DIP must be heavily scrutinized as RCP was on both sides of the deal.

(p)    **Maturity and Repayment**:  Much of the maturity is tied to the conversion of Phoenix.  As that issue remains ripe, such provisions are inappropriate.

(q)    **Use of Proceeds**:  This section is more focused on protections afforded to RCP as prepetition and DIP Lender then anything else.  By taking this money, AFI and its estate is bound to not litigate against RCP.  Considering the material damage RCP has caused AFI over the past year, this provision alone provides the basis for the DIP to be denied.

(r)    **Roll-Up is Inappropriate**.  Although not an issue to be determined until the Final Hearing (if any), it should be noted that any Roll-Up of insider debt is highly inappropriate and should be subject to the Challenge Period (as requested be revised).  Moreover, the Debtors have already put on the record by its top 20 creditor list that RCP is undersecured.  Query whether the portion the Debtors will seek to roll-up is in fact unsecured debt.

(s)    **Events of Default are Inappropriate**.  Once again, the Events of Default in the DIP Term Sheet were drafted by RCP with anticipation of future events.  The following, among others, if approved, would entrench RCP and defeat any challenge to their hostile takeover and involuntary bankruptcy before any challenge could be brought:

   (i)     Paragraph (f), a Change in Control;

   (ii)    Paragraph (h), any dismissal or conversion of the chapter 11 case of Phoenix 1040 LLC, an entity that is not in financial distress, is in direct control by RCP, and establishes venue in Delaware;

   (iii)   Paragraph (i), prohibiting the Debtors from filing another DIP motion with a new, independent lender;

   (iv)    Paragraph (n), prohibiting the appointment of an independent chapter 11 trustee;

   (v)     Paragraph (s), prohibiting venue transfer from Delaware, RCP's manufactured venue.

(t)    **Milestones**.  These are unknown and will purportedly be included in the Final Order.  If RCP is already in control of the Debtors and its professionals, they should be able to set their own timing without such terms being set forth in a Final Order.

D.        **Reservation of Rights with respect to Loan Sale Motion**

41.        As noted above, Mr. Bowlby assisted Mr. Avila and his team in preparing this motion as it goes to heart of AFI's core business.  To Mr. Bowlby's knowledge, the sales that will result from approval of this motion will bring more than $3.7M into the company for general corporate uses.

42.        Accordingly, Mr. Bowlby believes that if these cases are to proceed, at least in the interim, that such motion should be approved so that such sales can be completed and the $3.7M in revenue can be realized by the company and be used for payroll and other critical expenses.

43.        More importantly, the $3.7M in sale revenue obviates the Debtors' purported need of harmful DIP financing from RCP.  By simple math, the $3.7M in sales exceed the interim draw by $1.1M.

44.        Should the Court approve the relief requested in the Loan Sale Motion, however, language should be added to the interim and final order none of RCP's prepetition liens and claims attach to such funds.  Mr. Bowlby will separately object to the Debtors' waiver of their 552(b) rights at a separate time, but, for now, the funds collected for such sales should not be predisposed to be collectible by RCP as a lender.

*[Remainder of Page Intentionally Left Blank]*

Dated: August 30, 2023
      Wilmington, Delaware

**PASHMAN STEIN WALDER HAYDEN, P.C.**

 */s/ Joseph C. Barsalona II*          
William R. Firth, III (No. 4356)
Joseph C. Barsalona II (No. 6102)
1007 North Orange Street, 4th Floor, #183,
Wilmington, DE 19801
Telephone: (302) 592-6497
Facsimile: (201) 488-5556
Email:  jbarsalona@pashmanstein.com

*Counsel to Eric Bowlby, on behalf of himself and other displaced shareholders of AmeriFirst Financial, Inc.*