# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | ) Case No. 23-11240 (TMH) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' SUPPLEMENTAL OMNIBUS REPLY IN SUPPORT OF MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A | FINAL HEARING, AND (V) GRANTING RELATED RELIEF

AmeriFirst Financial, Inc. ("AmeriFirst") and Phoenix 1040, LLC ("Phoenix"), as debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases"), hereby file this supplemental omnibus reply (this "Reply") in support of their postpetition financing motion [Dkt. No. 21] (the "DIP Motion").[2] The following parties have filed objections to the DIP Motion: (1) the Official Committee of Unsecured Creditors in these cases (the "Committee") at Dkt. Nos. 256 and 310, (2) the Office of the U.S. Trustee (the "U.S. Trustee") at Dkt. No. 254, and (3) Eric Bowlby ("Mr. Bowlby"), on behalf of himself and other displaced shareholders of AmeriFirst,[3] at Dkt. Nos. 44 and 116. The U.S. Trustee's objection is limited to the elimination of the challenge period. The Debtors previously filed a reply to the objections of Mr. Bowlby. As noted there, the Debtors dispute that Mr. Bowlby is a legitimate creditor or has standing to object to the DIP Motion.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 575 W. Chandler Boulevard, Suite 225, Unit 236, Chandler, AZ 85225.

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the DIP Motion.

[3] The only other "displaced shareholder" of AmeriFirst is Eric Bowlby's father, Kenneth Bowlby.

In support of this Reply, the Debtors respectfully represent as follows:

**<u>REPLY</u>**

1.      The Committee objects to the DIP Loans and consensual use of cash collateral in favor of a "scorched earth" litigation strategy against the Debtors and the Prepetition Lenders.  The Committee seems intent on running up litigation costs and shutting these cases down, yet the Committee apparently has invested little time, if any, in investigating what litigation claims actually exist against third parties, including Mr. Bowlby, his relatives, and other former insiders.

2.      The Committee makes the same tired argument that it made last week at the hearing on venue transfer:  that AmeriFirst is controlled by the Prepetition Lenders / DIP Lenders and therefore the DIP Loans are not fair or reasonable.  The factual record reflects quite the opposite.

3.      AmeriFirst has an independent director, Jeffrey Dane, who is charged with express authority over conflict matters (*i.e.*, matters involving the Prepetition Lenders / DIP Lenders).  He has actively exercised such independent authority.  The Debtors also have an independent chief restructuring officer, T. Scott Avila, who negotiated the economic terms of the DIP Loans for the benefit of these estates.  It was not the Prepetition Lenders or DIP Lenders who directed AmeriFirst to enter into the DIP Loans, but rather AmeriFirst did so at the direction of Messrs. Dane and Avila who acted in the sound exercise of their business judgment.

4.      The Committee also ignores economic realities.  The need for a bankruptcy filing and postpetition financing were not a close call for Messrs. Dane and Avila to make. AmeriFirst barely made payroll throughout August 2023 and only did so by cannibalizing its assets.  There was no certainty that sufficient proceeds from further asset sales would be received

by the next payroll due in early September 2023. The bankruptcy filing and contemplated financing were therefore the only viable means to fund AmeriFirst's business. The DIP Loans are also inherently fair. They have economic terms that are far better than market with an interest rate of only SOFR + 2% and fees totaling less than 1% of the commitment.

5.     The Committee notes that its constituents will not receive the proceeds of assets pledged in favor of the Prepetition Lenders / DIP Lenders, but that does not mean that the DIP Motion should be denied and these cases immediately converted. Many Delaware cases involve *undersecured* creditors and the likelihood that unsecured creditors may recover nothing. From the Debtors' perspective, the goal of the process now is to maximize the value of estate assets for the benefit of all constituents. That includes evaluating litigation claims against third parties, including former insiders, that could lead to some distributions to unsecured creditors. Under the Debtors' proposed plan, the Prepetition Lenders and DIP Lenders have already agreed to leave certain assets for the benefit of unsecured creditors.

6.     The Committee's objections to the DIP Motion should be overruled because the Debtors need access to additional financing and use of cash collateral in order to continue their wind-down efforts. The Debtors still have valuable assets that must be maintained pending a sale, including mortgage servicing rights, various loans, and real estate. The Debtors currently employ 17 employees and have proposed a retention plan for 10 employees. The Debtors need to be able to continue to pay these employees in order to garner maximum value for their estates. The Debtors also must pay professionals, including the Committee's professionals, for the proper administration of these cases. There can be no doubt that the Debtors require the DIP Loans and access to cash collateral in order to maintain an administratively solvent estate.

7.      Both the Committee and the U.S. Trustee object to the proposed estate release of the Prepetition Lenders, without challenge.  The Prepetition Lenders have understandably insisted on a global estate release binding on all parties given the litigious nature of these cases to date.  The Debtors have agreed that such release is appropriate under the unique circumstances of these cases based on the thorough investigation conducted by Jeffrey Dane, which is described in detail below.

8.      In sum, after reviewing extensive documentation and interviewing all relevant parties, Mr. Dane has concluded that there are no material actionable claims to pursue against the Prepetition Lenders.  Further, in the sound exercise of the Debtors' business judgment, the proposed financing to be provided by the Prepetition Lenders as DIP Lenders is absolutely necessary for the Debtors to continue their ongoing efforts of maximizing the value of the Debtors' estates and confirming a chapter 11 liquidating plan that will preserve all potential claims against third parties except the Prepetition Lenders, including Mr. Bowlby and other former insiders.

9.      As addressed further below, the remaining objections of the Committee to the DIP Motion are standard objections to liens on avoidance actions, the timing of lender remedies, waivers of surcharge, equities of the case, and marshaling rights, and other protective provisions, each of which should be overruled given that the Prepetition Lenders, as DIP Lenders, are advancing up to $5 million of new money to these estates and consenting to the use of cash collateral.

## **INVESTIGATION**

### A.      **Background and Conclusion**

10.      Jeffrey Dane is an experienced financial and restructuring professional who has served on a numerous boards as independent director since 2019, including for NBG Homes,

Nordic Aviation Capital, Vantage Commodities, Steiner Education, BJ Services, and Apex Parks Group. Mr. Dane has a bachelor's degree in business from Emory University where he graduated in 1996.

11. Mr. Dane was initially retained as an independent director for AmeriFirst on the Petition Date, following the Prepetition Lenders' exercise of rights under a stock pledge. Mr. Dane has no prior relationship or affiliation with the Prepetition Lenders or their affiliates at Reverence Capital.

12. Mr. Dane commenced his formal investigation of potential estate claims against the Prepetition Lenders in late September 2023. Mr. Dane's investigation was conducted with the assistance of Debtors' counsel. He and Debtors' counsel have reviewed copious amounts of documents, including the relevant credit and security documents, and communications between and among the Debtors and the Prepetition Lenders, including hundreds of privileged and non-privileged emails. Mr. Dane also conducted lengthy interviews of Mr. Bowlby, attorneys at Kasowitz, and representatives of the Prepetition Lenders.

13. Based on his investigation, Mr. Dane has concluded that the Debtors' estates do not have any actionable claims to pursue against the Prepetition Lenders. Further, any affirmative claims against the Prepetition Lenders would have to exceed the outstanding claims against AmeriFirst asserted by the Prepetition Lenders for loans advanced.

**B.    Original Credit Agreement and Defaults**

14. Amerifirst, as borrower, RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., as administrative agent (the "Prepetition Agent"), and RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. (the "Prepetition Lenders") entered into a Credit and Security Agreement, dated as of April 21, 2021 (the "Original

Credit Agreement"). **Exhibit A** (Original Credit Agreement). Pursuant to the terms of the Original Credit Agreement, AmeriFirst borrowed $50 million from the Prepetition Lenders. The stated maturity date was February 28, 2025. AmeriFirst granted a security interest in a collection account and related cash and financial assets to the Prepetition Agent to secure AmeriFirst's obligations under the Original Credit Agreement. The Prepetition Agent filed a UCC-1 financing statement in Arizona to perfect its security interest under the Original Credit Agreement on January 9, 2023, prior to the ninety (90) days before the Petition Date. **Exhibit B** (Original UCC Financing Statement).

15.     Eric Bowlby used $6 million of the loan proceeds from the Original Credit Agreement to purchase a majority stake in AmeriFirst from his father, Kenneth Bowlby.

16.     As part of the execution of the Original Credit Agreement, AmeriFirst, the Prepetition Agent, the Prepetition Lenders, as junior lenders, and Flagstar Bank, FSB, as senior lender (the "Senior Lender"), entered into a Subordination Agreement, dated as of April 21, 2021 (the "Subordination Agreement"). **Exhibit C** (Subordination Agreement). Pursuant to the Subordination Agreement, the Prepetition Lenders agreed to subordinate their liens and claims to the Senior Lender's liens and claims against AmeriFirst arising under a warehouse revolving loan facility. The Subordination Agreement required the Prepetition Agent or the Prepetition Lenders to notify the Senior Lender within one (1) business day of an event that gives the Prepetition Agent or the Prepetition Lenders the right to accelerate their loan or exercise remedies. *See* Subordination Agreement at §2.

17.     AmeriFirst was profitable in 2021 and repaid $22 million of the obligations under the Original Credit Agreement.

18.     The mortgage industry began to suffer in 2022 as interest rates increased substantially.  AmeriFirst was no exception.  AmeriFirst's financial performance deteriorated rapidly throughout 2022 and continuing into 2023, generating approximately $17 million in losses from January 2022 through December 2022 and $28 million of losses from January 2022 through August 2023.  **Exhibit D** (Monthly Income Statements).

19.     One major problem was that AmeriFirst's overhead costs, including payroll and rent obligations, did not align with the reduced level of mortgage origination activity in a high interest rate environment.  AmeriFirst failed to cut costs to take into account the new mortgage environment and continued to incur substantial losses month after month.

20.     By August 1, 2022, AmeriFirst triggered a financial covenant tied to a minimum net worth to loan ratio under the Original Credit Agreement.  *See* Original Credit Agreement at §6.11(d).  Pursuant to the Original Credit Agreement, AmeriFirst had ninety (90) days to pay down the outstanding loan in order to become compliant with the required covenant. The required pay-down as of August 2022 was $9 million, but ongoing losses in subsequent months, increased the required pay-down amount by another $2.4 million.

21.     Mr. Bowlby, who controlled AmeriFirst throughout the relevant time period until just prior to the Petition Date, attempted to sell AmeriFirst's mortgage servicing rights and other non-core assets, such as scratch & dent loans and real estate, in order to realize sufficient proceeds to pay down the loan.  No such sales were consummated, and no pay-down was made, by the December 1, 2022, deadline, triggering an event of default under the Original Credit Agreement.

22.     Accordingly, as of December 1, 2022, the Prepetition Lenders were entitled to accelerate the loan and exercise remedies.  On December 2, 2022, as required under the

Subordination Agreement, the Prepetition Agent delivered a notice to the Senior Lender identifying the covenant default (the "Default Notice to Senior Lender"), but also noting that the Prepetition Agents had agreed to forbear from exercising remedies through December 9, 2022 and potentially longer. **Exhibit E** (Default Notice to Senior Lender). On information and belief, similar letters were sent to AmeriFirst's other warehouse lenders with subordination agreements.

23. Mr. Bowlby contends that the delivery of the Default Notice to Senior Lender and the other warehouse lenders impaired AmeriFirst's ability to access the warehouse facilities provided by the Senior Lender and other lenders to originate loans and adversely impacted AmeriFirst's ability to sell its mortgage servicing rights. Regardless of whether Mr. Bowlby's contention is correct, AmeriFirst had agreed to the provisions of the Original Credit Agreement and the Subordination Agreement and the Prepetition Lenders had the contractual right to exercise remedies as they saw fit and deliver the Default Notice to Senior Lender. **Moreover, as addressed below, any claims AmeriFirst and the Prepetition Lenders may have had against each other arising prior to May 15, 2023, were waived through a global settlement agreement and mutual release.**

24. After the Prepetition Lenders delivered the Default Notice to Senior Lender, Mr. Bowlby caused AmeriFirst to retain Kasowitz Benson & Torres LLP ("Kasowitz") as litigation counsel. On December 27, 2022, Kasowitz delivered a demand letter to the Prepetition Lenders asserting that the Default Notice to Senior Lender had caused the Senior Lender and other warehouse lenders to immediately terminate their advances to AmeriFirst and had caused a substantial decrease in the value of the mortgage servicing rights and scratch & dent loans that AmeriFirst was in the process of marketing. **Exhibit F** (Kasowitz Demand Letter). Kasowitz also threatened legal action and asserted $50 million in potential claims, unless the Prepetition Lenders

8

immediately advanced $15 million in new money to AmeriFirst in consideration of an equity stake in AmeriFirst and accepted $10 million in full and final satisfaction of the $28 million in outstanding obligations under the Original Credit Agreement.

25.     On January 4, 2023, counsel to the Prepetition Lenders, Quinn Emanuel, sent a letter to Kasowitz responding to the demand letter and rejecting any assertion of wrongdoing on the part of the Prepetition Lenders.  **Exhibit G** (Quinn Response Letter).

26.     On January 11, 2023, the Prepetition Agent delivered a notice of default to AmerFirst asserting a failure to pay interest due on January 3, 2023, and various additional covenant breaches (the "Default Notice to AmeriFirst").  **Exhibit H** (Default Notice to AmeriFirst).  Through the Default Notice to AmeriFirst, the Prepetition Agent accelerated the obligations under the Original Credit Agreement and demanded the delivery of all collateral to the Prepetition Agent.

**C.     Amended Credit Agreement, Settlement Agreement, and Mutual Releases**

27.     In the weeks following the delivery of the Default Notice to AmeriFirst, the parties engaged in extensive discussions regarding, among other things, a sale of AmeriFirst's non-core assets, a pay-down schedule for the loan, possible waiver or equitization of portions of the loan, and additional collateral that may be granted to the Prepetition Agent.  Ultimately, after robust negotiations and numerous calls and meetings between Mr. Bowlby and his team at AmeriFirst, attorneys from Kasowitz, and AmeriFirst's outside transactional counsel, Jeffrey George, on the one hand, and the Prepetition Lenders and their representatives, including attorneys from Quinn Emanuel, on the other, the parties reached agreement on a binding term sheet dated as of March 31, 2023 (the "Term Sheet").  **Exhibit I** (Term Sheet).

9

28.     Six weeks of intense negotiations followed in an effort to reach agreement on definitive documentation consistent with the Term Sheet.  Ultimately, in order to implement the provisions of the Term Sheet, AmeriFirst, as borrower, the Prepetition Agent, and the Prepetition Lenders entered into: (i) an Amended and Restated Credit and Security Agreement, dated as of May 15, 2023 (the "Amended Credit Agreement"), (ii) a Limited Waiver and Second Amendment to Credit and Security Agreement, dated as of May 15, 2023 (the "Second Amendment"), and (iii) a Settlement Agreement, dated as of May 15, 2023 (the "Settlement Agreement").  *See* **Exhibit J** (Amended Credit Agreement), **Exhibit K** (Second Amendment), and **Exhibit L** (Settlement Agreement), respectively.  There is no evidence that the foregoing agreements were the result of anything other than extensive good faith and arms' length negotiations between sophisticated parties who were each represented by experienced and qualified counsel.

29.     Pursuant to the Amended Credit Agreement, AmeriFirst agreed and acknowledged that the principal amount then due and owing to the Prepetition Lenders was $28 million.  *See* Amended Credit Agreement at §2.01.  AmeriFirst agreed to pay-down the obligations under the Amended Credit Agreement by $20 million on or before September 16, 2023 (subject to extension under certain circumstances to October 16, 2023), and to sell certain non-core assets in order to realize sufficient proceeds to pay-down the Prepetition Lenders subject to certain milestones.  *See* Amended Credit Agreement at Art. VII(a), Exhibit B (Milestones).  Importantly, the Amended Credit Agreement required AmeriFirst to keep all of its cash in accounts subject to control agreements in favor of the Prepetition Agent and permitted the Prepetition Agent to sweep cash from such accounts constituting the proceeds of non-core assets and any other available cash at the end of each month less certain "Reserved Cash" (as defined in the Amended Credit

Agreement).  *See* Amended Credit Agreement at §2.07(b)-(c), §10.02.  The definition of Reserved

Cash took into account that AmeriFirst had projected operating losses under an agreed budget for

the months of May, June, and July 2023.  It was intended that AmeriFirst would obtain an infusion

of up to $8 million of subordinated debt in order to re-start its mortgage origination business and

obtain a new warehouse loan facility on reasonable terms.  *See* Amended Credit Agreement at

§6.04, Exhibit B (Milestones).

   30. Pursuant to the Settlement Agreement, in consideration for the execution of

the Amended Credit Agreement, the Second Amendment, and a restatement of the "bad boy"

guaranty agreement of Eric Bowlby, AmeriFirst's then majority shareholder, in favor of the

Prepetition Secured Parties, the Prepetition Lenders, AmeriFirst, and Mr. Bowlby entered into

certain mutual releases, including the release of all Existing Defaults (as defined in the Settlement

Agreement), subject to the terms and conditions set forth therein.  **These global releases, which

went into effect over 90 days prior to the Petition Date, had the effect of eliminating any

purported claims that the Debtors may have had with respect to any conduct that pre-dated

the Settlement Agreement on May 15, 2023, including the various allegations of wrongdoing

made by Mr. Bowlby against the Prepetition Lenders dating back to the original Default

Notice to Senior Lender delivered on December 2, 2022.**

   31. In connection with the Amended Credit Agreement, the shareholders of

AmeriFirst, Eric Bowlby and Kenneth Bowlby, entered into a Pledge Agreement, dated as of May

15, 2023, with the Prepetition Agent (the "Pledge Agreement"), which granted liens and security

interests in 100% of the common equity stock of AmeriFirst (the "Pledged Shares") in favor of the

Prepetition Agent.  *See* **Exhibit M** (Pledge Agreement).

32.     AmeriFirst also entered into a Security Agreement, dated as of May 15, 2023, with the Prepetition Agent (the "Security Agreement"), which granted a first priority lien on and security interest in substantially all of AmeriFirst's assets to the Prepetition Agent, subject to certain permitted liens.  *See* **Exhibit N** (Security Agreement).  Pursuant to the Amended Credit Agreement and the Security Agreement, AmeriFirst's obligations to the Prepetition Lenders are secured by valid, binding, perfected first priority security interests and liens (the "Prepetition Liens") in and on the "Collateral," as defined in the Amended Credit Agreement and Security Agreement (the "Prepetition Collateral").  The Prepetition Agent filed a UCC-3 amended financing statement in Arizona to perfect its security interest under the Amended Credit Agreement and Security Agreement on May 17, 2023, prior to the ninety (90) days before the Petition Date.  **Exhibit O** (Amended UCC Financing Statement)

33.     The Prepetition Lenders also made certain concessions.  For example, they agreed to convert a portion of the outstanding loan to equity.  Specifically, as of May 15, 2023, the Prepetition Lenders agreed to reduce the principal balance of their loan from $28 million to $24 million in consideration for the issuance of 40,000 shares of preferred stock in AmeriFirst, with an aggregate liquidation value of $4 million.  Further, if AmeriFirst met its obligation to pay down $20 million of the outstanding loan, the Prepetition Lenders agreed to adjust the remaining $4 million balance by converting (a) $2 million of the outstanding obligation to preferred stock, with an aggregate liquidation value of $2 million, and (b) the remaining $2 million to two new "Hope Notes."  *See* Amended Credit Agreement at §2.19.  The Prepetition Lenders also agreed to waive any other claims that they may otherwise have had under the Original Credit Agreement for prepayment fees and accrued interest.

34. Pursuant to the Amended Credit Agreement, AmeriFirst could not incur any indebtedness or grant liens on its assets except for certain permitted liens and warehouse facilities. *See* Amended Credit Agreement at §6.04, §6.15. In connection with any warehouse facility, AmeriFirst was required to deliver a subordination agreement acceptable to the Prepetition Agent. *Id.* at §6.04.

35. Finally, AmeriFirst, Mr. Bowlby, the Prepetition Agent, and the Prepetition Lenders executed a side letter dated May 15, 2023, requiring the parties to execute such other amendments or waivers as may be necessary for AmeriFirst to remain compliant with regulatory requirements and able to enter into customary warehouse arrangements, subject to limitations on any amendments or waivers that could cause a material adverse effect. *See* **Exhibit P** (Side Letter).

**D.    Defaults Under Amended Credit Agreement and Exercise of Stock Pledge**

36. On May 25, 2023, in accordance with section 2.07(b) of the Amended Credit Agreement and with Mr. Bowlby's advance knowledge, the Prepetition Agent swept $5 million from a controlled account of AmeriFirst and applied such amount against AmeriFirst's outstanding loan obligations.

37. Beginning on May 31, 2023, AmeriFirst began to miss milestones under the Amended Credit Agreement.

38. Pursuant to the Second Amendment, the Prepetition Lenders agreed that AmeriFirst could pledge its mortgage servicing rights in favor of one warehouse lender, Customers Bancorp, Inc. ("Customers"), along with any loans funded through such warehouse facility, provided that the terms of any such facility, including the form of an intercreditor agreement, were commercially reasonable and reasonably acceptable to the Prepetition Agent, and Customers

agreed to marshal its recoveries away from the mortgage servicing rights, until its funded loans were liquidated.  *See* Second Amendment at §9.

39.     After May 15, 2023, there were delays in effectuating a warehouse facility with Customers.  The Prepetition Lenders assert that they were not presented with a written proposal for a warehouse facility from Customers until June 14, 2023.  On June 23, 2023, counsel for Customers sent an email to the Prepetition Lenders and AmeriFirst insisting that the Prepetition Lenders waive all rights to exercise remedies, presumably until the Customers' facility has been paid in full and refusing to agree to marshal away from any of Customers' contemplated collateral or to allow the Prepetition Lenders to have any junior liens on such collateral.  *See* **Exhibit Q** (Email from Customers).  Customers' proposed terms conflicted with the agreed-upon warehouse terms under the Second Amendment and the Prepetition Lenders refused to agree to Customers' demands.

40.     Mr. Bowlby contends that Customers' proposed terms were customary and that the Prepetition Lenders' failure to approve the Customers' warehouse facility damaged AmeriFirst by delaying its ability to re-start operations and meet the projections under an agreed budget.

41.     However, on June 28, 2023, less than one week after Customers sent the email described above, AmeriFirst obtained a superior warehouse facility from Centier Bank that (a) did not require any liens on mortgage servicing rights, (b) reduced by $1 million the required deposit, and (c) increased by $30 million the total facility to be provided.  The Prepetition Lenders approved the Centier Bank facility and allowed AmeriFirst to use otherwise available cash to fund the deposit.

42.     On June 29, 2023, in accordance with section 2.07(c) of the Amended Credit Agreement and with Mr. Bowlby's advance knowledge, the Prepetition Agent swept approximately $3.3 million from a controlled account of AmeriFirst and applied such amount against the outstanding loan obligations. The Prepetition Agent did not sweep any cash at the end of July 2023 because there was insufficient cash on hand to do so.

43.     During July and August 2023, the new warehouse facility with Centier Bank did little to improve AmeriFirst's financial prospects. The mortgage industry continued to struggle as high interest rates impeded new loan originations, and AmeriFirst continued to lose money.

44.     By early August 2023, AmeriFirst was operating on fumes and did not have sufficient cash to even make payroll. Mr. Bowlby approached the Prepetition Lenders with a request to advance new money in order make payroll – not something contemplated under the Amended Credit Agreement. On August 3, 2023, the Prepetition Lenders proposed to make such advance for the sole purpose of funding payroll provided that AmeriFirst and Mr. Bowlby agree to hire a broker to immediately sell the mortgage servicing rights, indemnify the Prepetition Lenders in connection with any such sale, and terminate all compensation to Mr. Bowlby until AmeriFirst generated positive net income in a quarter. *See* **Exhibit R** (Payroll Funding Offer from Prepetition Lenders). Mr. Bowlby rejected this offer and apparently obtained the required funds elsewhere.

45.     Later in August 2023, AmeriFirst again could not make payroll and Mr. Bowlby again approached the Prepetition Lenders. Those discussions did not lead to any agreement. Mr. Bowlby claims that he obtained a loan from a friend (Jon Jackson) to make payroll. Mr. Bowlby apparently mortgaged his residence as collateral for such loan—even though AmeriFirst owns the residence, not Mr. Bowlby. On August 17, 2023, the Prepetition Agent swept

15

approximately $593,000 from a controlled account of AmeriFirst and applied such amount against the outstanding loan obligations.

46.     On August 22, 2023, AmeriFirst, through Kasowitz, took the unorthodox step of delivering a notice of default to the Prepetition Lenders. *See* **Exhibit S** (AmeriFirst Default Notice). Referencing section 5.01(e) of the Amended Credit Agreement, which sets forth the requirement that the Prepetition Agent reasonably approve amended budgets, Kasowitz asserted that the Prepetition Lenders breached the Amended Credit Agreement by refusing to fund expenses set forth in the approved budget and improperly swept funds. As noted above, the Prepetition Lenders were entitled to payment of excess funds at the end of each month and had no affirmative obligation to advance funds to AmeriFirst if there was insufficient cash to make payroll or fund other expenses. Kasowitz also claimed that the Prepetition Lenders violated section 10.05(b) of the Amended Credit Agreement by refusing to release funds from a controlled account and violated the Side Letter by failing to allow AmeriFirst to satisfy net worth covenants in order to meet regulatory requirements. But Section 10.05(b) provides that the Prepetition Agent is not required to release funds in excess of the Reserved Cash. The Prepetition Lenders also were not obligated to fund AmeriFirst to ensure that net worth covenants would be met.

47.     The Prepetition Lenders submit that they allowed AmeriFirst to retain over $600,000 of cash in excess of the Reserved Cash contemplated by the Amended Credit Agreement. Further, the Prepetition Lenders allowed AmeriFirst to use another $1 million of cash to fund the required deposit with Centier Bank to support the new warehouse loan facility.

48.     On August 24, 2023, following various events of default under the Amended Credit Agreement, including failures to meet milestones and pay-down the loan, the Prepetition Agent gave a Notice of Events of Default under the Amended Credit Agreement and

declared that the obligations of AmeriFirst under the Amended Credit Agreement were immediately due and payable. *See* **Exhibit T** (Prepetition Agent Default Notice). The Prepetition Agent thereafter exercised its rights under the Pledge Agreement, including transferring the Pledged Stock and assigning the Prepetition Agent's rights under the Pledge Agreement to Phoenix. Pursuant to the Pledge Agreement, the certificates for the Pledged Shares were then canceled and a new stock certificate issued to Phoenix. As the sole shareholder of AmeriFirst, Phoenix executed a Unanimous Written Consent as the sole shareholder of AmeriFirst (the "Phoenix Consent"). The Phoenix Consent (a) removed the former directors of AmeriFirst, including Eric Bowlby; and (b) elected two new directors (including Jeffrey Dane as independent director) to AmeriFirst's board of directors. Jeffrey Dane is delegated exclusive authority with respect to any conflict matters involving any affiliates of the Debtors. The reconstituted board of AmeriFirst executed a unanimous consent removing all former officers of AmeriFirst, including Eric Bowlby, and electing new officers (the "AmeriFirst Consent", together with the Phoenix Consent, the "Change in Control"). The AmeriFirst Consent was filed with and accepted by the Arizona Corporation Commission.

49. Following the Change of Control, also on August 24, 2023, Phoenix and AmeriFirst commenced these bankruptcy cases. AmeriFirst needed to file for bankruptcy immediately because it had no available funding sources, aside from the possibility of debtor-in-possession financing, and there was concern that the regulatory agencies would take action to suspend AmeriFirst's mortgage servicing rights. As of the Petition Date, the aggregate principal amount outstanding under the Amended Credit Agreement is at least $15,798,087 (plus accrued

and unpaid interest, additional fees, costs, expenses, and other obligations as provided under the Amended Credit Agreement).[4]

**E.** **The Allegations of Mr. Bowlby and Kasowitz Have Been Investigated and Lack Merit**

50.    As addressed above, Mr. Bowlby and Kasowitz have made various allegations regarding potential claims that exist against the Prepetition Lenders.  Mr. Dane has considered each of these allegations closely and concluded that they lack merit.

- *Allegation #1*:  the Default Notice to Senior Lender that was delivered by the Prepetition Agent to the Senior Lender on December 2, 2023, effectively killed AmeriFirst's mortgage origination business.

  *Conclusion*:  this claim lacks merit because (1) all claims arising prior to May 15, 2023, were waived by AmeriFirst and Mr. Bowlby under the Settlement Agreement, (2) the Prepetition Agent was contractually required to deliver the Default Notice to Senior Lender under the Subordination Agreement, and (3) AmeriFirst was already losing money throughout 2022 and had few prospects given the state of the mortgage industry at the time, hence there is no evidence of damage.

- *Allegation #2*:  following consummation of the Amended Credit Agreement, the Prepetition Agent swept funds that were necessary for the operation of AmeriFirst's business.

  *Conclusion*:  this claim lacks merit because the Amended Credit Agreement permitted the Prepetition Agent to sweep cash constituting the proceeds of non-core assets and any other available cash at the end of each month less certain Reserved Cash.  The Prepetition Lenders also allowed AmeriFirst to (1) retain over $600,000 of cash in excess of the Reserved Cash contemplated by the Amended Credit Agreement and (2) use another $1 million of cash to fund the required deposit with Centier Bank to support the new warehouse loan facility. AmeriFirst also failed to obtain an infusion of up to $8 million of subordinated debt which had been anticipated in order to re-start its mortgage origination business.

- *Allegation #3*:  following consummation of the Amended Credit Agreement, the Prepetition Agent unreasonably withheld its consent to a new warehouse facility from Customers that damaged AmeriFirst.

---

[4]   This amount does not appear to take into account the $593,000 sweep on August 17, 2023.

DOCS_DE:245499.1

**Conclusion**: this claim lacks merit because the proposal from Customers required the Prepetition Agent to an indefinite standstill with respect to the exercise of remedies and Customers refused to agree to any marshaling away from any liens on mortgage servicing rights. In any case, a warehouse facility from Centier Bank on substantially better terms was obtained within a matter of days and, even with such facility in place, AmeriFirst failed to generate enough loans to generate a profit or sustain the business.

- *Allegation #4*: following consummation of the Amended Credit Agreement, the Prepetition Lenders failed to fund expenses set forth in the approved budget.

  **Conclusion**: this claim lacks merit because, as noted above, the Prepetition Lenders were entitled to payment of excess funds at the end of each month and had no affirmative obligation to advance funds to AmeriFirst if there was insufficient cash to make payroll or fund other expenses.

- *Allegation #5*: following consummation of the Amended Credit Agreement, the Prepetition Lenders violated the Amended Credit Agreement by refusing to release funds from a controlled account and violated the Side Letter by failing to allow AmeriFirst to satisfy net worth covenants in order to meet regulatory requirements.

  **Conclusion**: Section 10.05(b) of the Amended Credit Agreement provides that the Prepetition Agent is not required to release funds in excess of the Reserved Cash. The Prepetition Lenders also were not obligated to fund AmeriFirst to ensure that net worth covenants would be met.

51. The foregoing facts and analysis establish that the Prepetition Lenders did not engage in any material actionable wrongdoing that would form the basis of a colorable estate claim, or a claim that would come close to offsetting the outstanding principal obligations asserted by the Prepetition Lenders against AmeriFirst. The Prepetition Lenders exercised their legal rights, both before and after the Settlement Agreement was signed on May 15, 2023. The evidence establishes that AmeriFirst's business was in the midst of a death spiral since January 2022 due to the effects of high interest rates and reduced demand for new mortgage loans. Yet, throughout 2022 and into 2023, Mr. Bowlby and AmeriFirst's management failed to take appropriate steps to reduce expenses or to pivot to an alternative operating strategy. In the end, AmeriFirst could not meet its commitments and milestones under the Amended Credit Agreement. Clear defaults

19

existed and the level of distrust between Mr. Bowlby and the Prepetition Lenders had reached an all-time high by August 2023, when competing notices of default were exchanged. The Prepetition Lenders therefore took steps consistent with the Pledge Agreement to exercise control over the Pledged Shares.

52.     Based on the foregoing investigation conducted by Mr. Dane, it is entirely appropriate under the unique circumstances of these cases to approve an estate release in favor of the Prepetition Lenders, without any further challenge.

## **ARGUMENT**

### A.     **The DIP Loans and Access to Cash Collateral Should Be Approved Under the Business Judgment Standard**

53.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

54.     The Committee, like Mr. Bowlby before it, asserts that the DIP Lenders are insiders and therefore the DIP Loans should be subject to a higher level of scrutiny. However, this Court has already rejected the notion that the "entire fairness" standard applies here. At the Interim Hearing, the Court ruled instead that the proper standard is whether the Debtors have properly exercised their business judgment, and based on the uncontroverted evidence, found that this standard was met. *See* Transcript of Hearing dated August 30, 2023, p. 76, ln. 16-21.

55.     The proper standard in the Third Circuit has been described by Judge Gross

as follows:

> Debtors correctly posit that courts will almost always defer to the business
> judgment of a debtor in the selection of the lender. The business judgment rule is a
> standard of judicial review designed to protect the wide latitude conferred on a
> board of directors in handling the affairs of the corporate enterprise. The rule refers
> to the judicial policy of deferring to the business judgment of corporate directors in
> the exercise of their broad discretion in making corporate decisions. Under the rule,
> courts will not second-guess a business decision, so long as corporate management
> exercised a minimum level of care in arriving at the decision. The business
> judgment rule under Delaware law and the law of numerous other jurisdictions
> establishes a presumption that in making a business decision, the directors of a
> corporation acted on an informed basis, in good faith, and in the honest belief that
> the action taken was in the best interests of the company.
>
> Under this formulation, the business judgment rule governs unless the opposing
> party can show one of four elements: (1) the directors did not in fact make a
> decision, (2) the directors' decision was uninformed; (3) the directors were not
> disinterested or independent; or (4) the directors were grossly negligent.

*In re L.A. Dodgers, LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011), *see also Official Comm. of*

*Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In re Midway Games Inc.)*,

428 B.R. 303, 320 (Bankr. D. Del. 2010) ("a heightened scrutiny of a transaction between a parent

and subsidiary, 'entire fairness,' is appropriate only when a controlling stockholder uses its control

to negate the judgment of the subsidiary's independent board and both causes the transaction and

dictates the terms."); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 839 (3d Cir. 2010)

("The business judgment rule presumption can be rebutted by establishing that the board was either

interested in the outcome of the transaction or lacked the independence to consider objectively

whether the transaction was in the best interest of its company and all of its shareholders.  To

establish that a board was interested[,] . . . a plaintiff must allege facts as to the interest . . . of the

individual members of that board.").

56.     There is no heightened scrutiny required here with respect to the DIP Loans

because AmeriFirst's independent board member, Jeffrey Dane, and chief restructuring officer, T.

Scott Avila, approved the DIP Loans without any input or influence of the Prepetition Lenders or DIP Lenders. The DIP Loans also were the outcome of good faith, arms' length negotiation between the DIP Lenders and their counsel, on the one hand, and AmeriFirst and its counsel, on the other.

**B.     The DIP Liens and Adequate Protection Liens on Previously Unencumbered Assets Are Necessary to Obtain the Financing**

57.     Section 550 of the Bankruptcy Code provides that the debtor-in-possession may recover property in connection with avoided transfers "for the benefit of the estate." 11 U.S.C. §550; *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003) ("Lest this way of resolving the issue be taken to assume that § 550(a) requires that some benefit flow to unsecured creditors, we add that the statute does not say this. Section 550(a) speaks of benefit to *the estate*— which in bankruptcy parlance denotes the set of all potentially interested parties—rather than to any particular class of creditors."); *see also Calpine Corp. v. Rosetta Res. Inc.* (*In re Calpine Corp.*), 377 B.R. 808, 813 (Bankr. S.D.N.Y. 2007) (citing *Mellon Bank* with approval). Section 364 of the Bankruptcy Code, in turn, allows a debtor in possession to encumber "property of the estate" in order to obtain postpetition financing that meets the requirements set forth therein. *See* 11 U.S.C. §§ 364(c)(2), (3), and (d)(1). In the case of adequate protection liens, section 361(2) of the Bankruptcy Code expressly contemplates the imposition of "additional liens" as a form of adequate protection to the extent of any diminution in value. 11 U.S.C. § 361(2). Thus, on its face, the Bankruptcy Code empowers a chapter 11 debtor to encumber estate property in the form of commercial tort claims and the proceeds of avoidance actions in connection with court-approved postpetition financings.

58.     Sections 363(c)(2) and 363(e) of the Bankruptcy Code are clear that secured claimants with an interest in cash collateral are entitled to adequate protection against such

projected diminution in value. Moreover, the grant of a replacement lien is an appropriate means of providing such adequate protection. *See* 11 U.S.C. §§ 361–363. The Debtors commenced these cases with a tight budget and a timeline that accounted for the liquidity pressures facing them. These are not artificial limitations – the DIP Lenders are only willing to fund up to $5 million in new advances to the Debtors and even that took substantial effort on the Debtors' part to obtain. The Prepetition Lenders already had liens on most of the Debtors' assets, leaving unencumbered assets such as proceeds of avoidance actions as one of the only categories of assets upon which the Debtors could grant a replacement lien that is not already encumbered. *See In re Swedeland Development Grp., Inc.*, 16 F.3d 552, 565-67 (3d Cir. 1994) (holding that the adequate protection was insufficient where a debtor provided a secured creditor with nothing more than it was entitled to receive).

59. Here, the encumbrance of proceeds of avoidance actions was negotiated in good faith and at arm's length among the Debtors and the DIP Lenders / Prepetition Lenders as a necessary inducement to provide the DIP Loans and consent to the use of Cash Collateral, as applicable. The Court should give effect to the negotiated agreement struck by the Debtors in their business judgment with the lenders and overrule the Committee's objection.

**C.     Waivers of Marshaling, Section 506(c) Surcharge, and Section 552(b) "Equities of the Case" Rights are Routinely Granted and Appropriate Here**

60. The Committee's argument against the Debtors' waiver of the equitable doctrine of marshaling, Section 506(c), and Section 552(b)'s "equities of the case exception" of the Bankruptcy Code should be rejected.

61. As a threshold matter, marshaling is a remedy available only to certain secured creditors and is not available to general unsecured creditors. *In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007). Courts in this District have routinely approved a

debtor's waiver of marshaling. *See e.g., In re Ector Cnty. Energy Ctr. LLC*, Case No. 22-10320 (JTD) (Bankr. D. Del. June 3, 2022) [Docket No. 195]; *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr. D. Del. May 6, 2020) [Docket No. 286]; *In re KiOR, Inc.*, Case No. 14-12514 (CSS) (Bankr. D. Del. Jan. 16, 2015) [Docket No. 275]; *In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. Mar. 1, 2016) [Docket No. 372]; *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Oct. 15, 2015) [Docket No. 382].

62.     The Committee's objections to the Section 506(c) and 552(b) waivers should also be overruled. Such waivers are routinely granted as a *quid pro quo* where, as here, the Prepetition Lenders with blanket liens on substantially all of the Debtors' assets have: (a) consented to the use of collateral in order to fund administration of these chapter 11 cases through an approved budget; (b) agreed to priming liens and obligations under the DIP Loans; and (c) agreed to subordinate their liens and claims to the Carve-Out. *See e.g., In re VJGJ, Inc.*, Case No. 21-11332 (BLS) (Bankr. D. Del. 2021 Nov. 15, 2021) [Docket No. 174]; *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr. D. Del. May 6, 2020) [Docket No. 286]; *In re True Religion Apparel, Inc.*, Case No. 20-1510941 (CSS) (Bankr. D. Del. May 29, 2020) [Docket No. 278]; *In re HDR Holdings, Inc.*, Case No. 19-11396 (MFW) (Bankr. D. Del. Aug. 7, 2019) [Docket No. 164].

63.     Debtors alone have the authority to waive their rights under section 506(c) of the Bankruptcy Code. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000); 11 U.S.C. § 506(c) ("the trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property, to the extent of any benefit to the holder of such claim.") (emphasis added). The Supreme Court in *Hartford Underwriters* expressly held "[t]he question thus becomes whether it is a proper

inference that the trustee is the only party empowered to invoke the provision [section 506(c)]. We have little difficulty answering yes." *Hartford Underwriters*, 530 U.S. at 6; *see also In re Smart World Techs., LLC*, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception . . . . We read *Hartford Underwriters* to stand for the proposition that § 1109(b) does not entitle parties in interest, such as . . . creditors, to usurp the debtor-in-possession's role as legal representative of the estate."). *Hartford Underwriters* supports the Debtors' view that the proposed waiver of section 506(c) surcharge rights is an appropriate exercise of the Debtors' business judgment, especially given the substantial benefits the Debtors will receive under the DIP Loans.

64. The Committee's conclusory allegations are wholly insufficient to deny the lenders certain appropriate and customary protections under the DIP Loans, which comprise material components of an integrated agreement to obtain DIP financing and the consensual use of Cash Collateral. Accordingly, the Court should approve the Debtors' decision to provide such protections to the DIP Lenders and the Prepetition Lenders in exchange for a critical financing lifeline to support these chapter 11 cases.

## D. The Committee's Other Miscellaneous Objections Should Be Rejected

65. The Committee objects that no DIP credit agreement has been provided. As the Committee has been told repeatedly, there is no DIP credit agreement here and that is a good thing. The DIP Lenders are lending pursuant to the DIP Term Sheet and financing orders.

66. Apparently ignoring all of the documents produced on this point, the Committee makes the blatant false assertion that there is no evidence of good faith, arms' length negotiations between the Debtors and the DIP Lenders, and that the Prepetition Lenders remain in control of these estates. The evidence is directly to the contrary. The material decisions in these

25

cases are being made by the independent director, Jeffrey Dane, and the chief restructuring officer, T. Scott Avila. There is also nothing inherently unfair or inappropriate about the economics of the DIP Loans. To the contrary, the terms are better than market with an interest rate of only SOFR + 2% and fees totaling less than 1% of the commitment.

67. Finally, the Committee takes issue with the remedies notice period. Paragraph 22(b) of the proposed Final Order is actually more generous to the Debtors' estates than the typical remedies provision in a financing order. The DIP Lenders are required to seek Court approval before exercising any remedies – nothing is automatic. "Upon the occurrence and during the continuance of any Event of Default and following the delivery of a Carve-Out Trigger Notice, the DIP Agent and the DIP Lenders shall be required to obtain the authority of this Court to exercise any rights and remedies of the DIP Agent and the DIP Lenders set forth in the DIP Term Sheet or in this Final Order." *See* proposed Final Order at ¶22(b).

WHEREFORE, the Debtors urge the Court to overrule the objections to the DIP Motion, enter the proposed form of Final Order previously filed with the Court, and grant such other and further relief as may be appropriate.

DOCS_DE:245499.1

Dated: October 24, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
tcairns@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

DOCS_DE:245499.1