## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | Case No. 23-11240 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 21, 61, 231 & 256** |

### AMENDED AND RESTATED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee"), appointed in the chapter 11 bankruptcy cases of the above-captioned debtors and debtors in possession (the "Debtors"), by and through its proposed undersigned counsel, hereby submits this amended and restated[2] objection (the "Amended Objection") to *Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 21) (the

---

[1]     The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Phoenix 1040 LLC (2550); and AmeriFirst Financial, Inc. (4557). The location of Debtor AmeriFirst Financial, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 1550 McKellips Road, Suite 117, Mesa, Arizona 85203.

[2]     Because discovery is still ongoing concerning this contested matter, and as agreed with the Debtors, the Committee hereby reserves and preserves its rights to file any necessary supplement to this Amended Objection prior to any hearing on the DIP Motion.

"DIP Motion"). [3]   In support of this Amended Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

> ...there comes a time when to liquidate one's collateral.  The secured creditor needs to control the company. * * * This is what secured lenders did.  They can accelerate their debt.  They can take control of a company, and then they can do what they need to do to liquidate the assets of the borrower. * * * …as a DIP lender, RCP made the choice that the case should be filed here, and we're not going to be shy about that.  A DIP lender has good reason to want its borrower to be in proceedings before this Court.  No slight intended to other courts, but the rules are very well known here.  The local rules spell out how the financing is done.  It is a process that lender can be familiar with and it is a process that is smooth and swift.

*October 20, 2023 Hearing Transcript for In re AmeriFirst Financial, Inc., et al.* (Case No. 23-11240 (TMH)) (Rough) ("Hr'g Tr."), at 193:16-17, 195:5-8, 198:18-25 (attached hereto as **Exhibit 1**).

1.      As the above statements made by counsel to Reverence Capital Partners and its affiliated entities (collectively, "RCP") at the hearing in these cases on Friday, October 20, 2023 make clear, RCP controls these cases.

2.      Although discovery is ongoing as of the date of this Amended Objection, it is clear that these cases only exist to benefit RCP.[4]  This has been reinforced by the documents and

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in DIP Motion, the order granting the DIP Motion on an interim basis (D.I. 61) (the "Interim DIP Order"), or the *Notice of Filing of Proposed Revised Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition lenders, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (D.I. 231) (the "Final DIP Notice"), as applicable.

[4]     The discovery underway is principally directed to issues relevant to the Final DIP Notice.  The Committee or a true independent fiduciary, would undertake broader discovery on this issue to evaluate claims against a lender such as RCP.

communications obtained in discovery, the depositions taken to date, and the hearings held in front

of this Court.  What makes this fact particularly troubling is just how overreaching RCP has been

in these cases, including with the relief requested in the Proposed Final DIP Order (as defined

below).  This overreach is exemplified by the elimination of the Challenge Period in the Proposed

Final DIP Order.

3.      It is further exemplified by the control stipulation the Debtors are trying to

have approved in the Proposed Final DIP Order.  The Debtors seek to stipulate that (a) the board

of debtor AmeriFirst Financial, Inc. ("AmeriFirst" or "AFI") includes an independent director

"who has been delegated authority over all matters in the Bankruptcy Cases" and (b) RCP does

not control debtor AmeriFirst or "control persons or insiders of AmeriFirst."  Proposed Final DIP

Order, ¶ 6(g).  This stipulation has no basis in fact.

4.      First, RCP controls the board of Debtor AmeriFirst through Debtor Phoenix

1040 LLC ("Phoenix").  The board of AmeriFirst is made up of David Sloane (who is an employee

of RCP) and a so-called independent director Jeffrey Dane (the "Independent Director").

However, as the deposition testimony of Mr. Dane makes clear, Mr. Dane has not been given the

corporate authority to act independently.[5]

---

[5]

5.       Thus, through RCP's control of the board of debtor AmeriFirst, RCP has controlled these bankruptcy cases since the filing of the petitions and continues to dictate the administration of these cases.  RCP's clear objective is to secure benefits for itself at the expense of all other parties—including unsecured creditors.  By controlling these cases, RCP seeks to have the Court award RCP complete releases upon entry of the Proposed Final DIP Order along with further benefits that courts in this district are generally unwilling to grant.

6.       More generally, absent a showing by the Debtors of a clear benefit to the estates, there should be no postpetition financing in these cases.  The alleged collateral of RCP apparently consists of a "scratch and dent" loan portfolio, certain loan master servicing rights (the "MSRs") and several residences known as the Cash Is King properties (the "CIK Properties").  As described in more detail below, none of this collateral has any apparent value to the general unsecured creditors in these cases.  *See, generally, Declaration of Matthew Dundon in Support of the Amended and Restated Objection of the Official Committee of Unsecured Creditors to Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Dundon Declaration") (attached hereto as **Exhibit 3**), ¶¶ 8-11.

7.       The estates' other assets include potential causes of action against RCP, the Debtors' directors and officers and others.  Under the Proposed Final DIP Order, RCP would be granted liens on the proceeds of such causes of action, among others.  But there is no need to grant RCP postpetition liens on assets that it is not currently entitled to when the Debtors could simply allow RCP to liquidate its alleged collateral at its own expense.

8.     In fact, based on information the Committee has received to date, the estates would likely obtain a greater benefit if RCP were allowed to exercise its remedies (subject to reservations of rights to recover from RCP the value of property ultimately adjudged not to be subject to liens in favor of RCP) than if the Proposed Final DIP Order is granted and the estate is burdened with additional liens that redound solely to the benefit of RCP.  Denying entry of the Proposed Final DIP Order would permit the Debtors, or an appointed trustee, to maximize the value of these causes of action and their proceeds for the estates, unsecured creditors and other parties in interest.

9.     Additionally, as described in more detail in the Dundon Declaration, the value of the Debtors' assets to be sold do not exceed the value of RCP's collateral.  *See* Dundon Declaration, ¶¶8, 10.  The value of the prepetition secured debt owed to RCP as of the Petition Date is approximately $15.8 million.  *See Declaration of T. Scott Avila in Support of First Day Motions* (D.I. 20) (the "First Day Declaration"), ¶ 9.  Including the prepetition secured debt, the DIP and the roll-up, RCP will be owed approximately $22.1 million by December 29, 2023 according to the First Day Declaration.  The First Day Declaration was filed on August 29, 2023 and was submitted under penalty of perjury that the statements contained therein were true.  *See* First Day Declaration.  Yet on October 12, 2023, the Debtors filed their Schedules of Assets and Liabilities which stated that RCP affiliates RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IVA), L.P. were owed prepetition secured claims in the amount of $23,867,857.  *See* Schedules of Assets and Liabilities (D.I. 251) (the "Schedules"), Schedule D, 2.14 & 2.16.  Thus, according to the numbers provided in the Schedules, the total (including prepetition debt, the DIP and the roll-up) that the Debtors will owe RCP by December 29, 2023 will be approximately $29.2 million.  *See* Dundon Declaration, ¶¶ 8-11.  Yet the Debtors'

estimated collateral proceeds from asset sales will only be, at most, less than $15 million as of December 29, 2023.  *See* Dundon Declaration, ¶ 10.

10.     These numbers reveal the theme of these chapter 11 cases once again—these cases are all about benefiting RCP.  RCP is acquiring liens on collateral that it has not provided value for in order to make a profit.  The benefit of this DIP bargain only favors RCP, no one else, not the estates as a whole nor the unsecured creditors.

11.     On October 6, 2023, the Debtors filed a revised proposed final DIP order (the "Proposed Final DIP Order").  Simply stated, the Proposed Final DIP Order is not in the best interests of the Debtors and their estates, but only in the best interests of RCP.  In addition to the unprecedented and wholly improper action by the Debtors (at the behest of RCP) to completely eliminate the challenge period (the "Challenge Period"), the Debtors and RCP also include the following objectionable provisions in the Proposed Final DIP Order:

- First and foremost, even if the Challenge Period that exists under the Interim DIP Order were to be adopted, the 75-day-period is too short because it requires the commencement of adversary proceedings or contested matters within the 75-day Challenge Period—either the Challenge Period needs to be expanded to encompass a motion for standing, or the challenge period must be substantially longer.[6] Additionally, the Proposed Final DIP Order only provides for a $50,000 investigation budget.[7]

- No DIP credit agreement has been filed or provided to the Committee as of the objection deadline.

- No evidentiary basis to support the need for DIP financing on the terms and conditions set forth in the Term Sheet has been presented by the Debtors, and there has been no showing of a valid exercise of the Debtors' conflicted business judgment or for the proposed "lack of control" finding in the Proposed Final DIP

---

[6]     Interim DIP Order, ¶ 5(f); Interim Term Sheet, 5-7.

[7]     Term Sheet, 2.

Order.[8]   Moreover no evidentiary basis has been presented for the Debtors' proposed "lack of control" finding.   Indeed, as an insider DIP Financing, the Debtors are subject to the entire fairness standard.[9]   Further, based on the results of discovery conducted thus far, it is clear that RCP has controlled these chapter 11 cases since the prepetition period during which it orchestrated the filings, hand-selected the Independent Director mere days before the filing of the petitions and, to this day, continue to dictate the bankruptcy process in order to derive as much benefit as it can for itself – at the expense of the Debtors and unsecured creditors.

- The Proposed Final DIP Order impermissibly seeks a Section 364(e) "good faith" finding regarding the Proposed Final DIP Order.[10]   The Committee objects to such a finding as there has been no factual basis presented by the Debtors to support it.

- The Committee objects to the releases of claims between the Debtors and RCP, or between RCP and third-parties.[11]   There is no evidence to support such releases, they are not arms-length, and they are destructive of potential value that can fund unsecured creditor recoveries.

- There is no basis to permit waivers of Sections 506(c) and 552(b)'s "equities of the case" exception or marshalling.[12]

- The Proposed Final DIP Order seeks to leverage the outcome of disputed issues in the cases by making conversion of the chapter 11 cases, appointment of a chapter 11 trustee, transfer of the cases to another venue or change in control events of default when all of these issues are under investigation and consideration, including a pending motion to transfer venue filed by the U.S. Trustee.[13]

12.    At present, the Committee and the U.S. Trustee are still in the process of completing discovery relating to the DIP Loans and the filing of these chapter 11 cases. Accordingly, the Committee reserves its rights to supplement this Amended Objection.

---

[8]    Proposed Final DIP Order, ¶¶ 5(a), 5(g), 6(a).

[9]    Proposed Final DIP Oder, ¶ 6(f).

[10]   *Id.* ¶ 6(g).

[11]   *Id.* ¶¶ 6(c)-(e); Term Sheet, 5-7.

[12]   Proposed Final DIP Order, ¶¶ 13, 15; Term Sheet, 7.

[13]   Proposed Final DIP Order, ¶ 21; Term Sheet, 9-10.

## BACKGROUND

13.     On August 24, 2023 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

14.     On August 29, 2023, the Debtors filed the DIP Motion.  Under the DIP Motion, the Debtors sought interim approval of, among other things, the terms of the DIP Loans, a challenge period of only twenty-one (21) days, superpriority administrative expense claim status for RCP on the proceeds of avoidance actions and waiver/modification of the automatic stay to allow RCP to take any action necessary to implement the terms of the interim or final orders and to perfect the liens of RCP absent a notice period.  *See* DIP Motion, Term Sheet.

15.     On August 31, 2023, the Court entered a modified form of interim DIP order with a challenge period of seventy-five (75) days.  The final hearing was originally scheduled for September 18, 2023.  *See* Interim DIP Order, ¶ 28.

16.     On September 15, 2023, the U.S. Trustee appointed the Committee.

17.     The Debtors filed a series of revised proposed final orders, each time briefly continuing the date of the final hearing.  *See* D.I. 138, D.I. 231.  The Debtors filed the most recent notice, the Final DIP Notice, on October 6,2023.  It contains a redlined Proposed Final DIP Order *which completely eliminates the Challenge Period*.

18.     The new Proposed Final DIP Order authorizes the Debtors to burden the estates to the detriment of the unsecured creditors by borrowing an additional $2,225,000 from RCP on a secured basis, for an aggregate amount of $5,000,000.

19.     In addition to the above, other essential terms of the Proposed Final DIP Order, to which the Committee objects, include, among others:

- The granting of a first priority lien on the proceeds of avoidance actions. *See* Proposed Final DIP Order, ¶ 10(a).

- The granting of a superpriority administrative claim subject to the Carve-Out which includes the proceeds of avoidance actions. *See* Proposed Final DIP Order, ¶¶ 11, 12(b).

- The lack of a notice period during which either the Debtors, the Committee, or any other party in interest may challenge the noticing of an event of default by RCP. *See* Proposed Final Order, ¶ 22(b); *see* Term Sheet, 6.

- The lack of clarity as to what other documents are related to the Proposed Final Order, the DIP Term Sheet, or the DIP Loans. *See* Proposed Final DIP Order, ¶ 26.

- The inclusion of Events of Default that do not serve any other purpose than to protect RCP to the detriment of unsecured creditors and other interested parties. *See* Term Sheet, page 8, subsection (f); *Id.*, page 8, subsection (h); *Id.*, page 9, subsection (s); *Id.*, page 9, subsection (n).

- Only RCP is entitled to budget variance reports. *See* Proposed Final DIP Order, ¶ 6(d).

- The inability of the Committee and U.S. Trustee to challenge the materiality of changes to any entered final DIP order. *See* Proposed Final DIP Order, ¶ 20.

20.     The Committee accordingly objects to approval of the proposed DIP Financing and entry of the Proposed Final DIP Order.

## OBJECTIONS

**A.     The Final DIP Order Should Not Grant Liens and Claims on the Proceeds of Avoidance Actions and Other Causes of Action of the Estate**

21.     The Committee objects to the DIP Liens and the DIP Superpriority Claims attaching to the proceeds of avoidance actions as well as commercial tort claims (including any director and officer liability claims and lender liability claims) because the value of such assets should be preserved for the benefit of the Debtors' general unsecured creditors. The Proposed Final DIP Order provides that RCP is entitled to a first priority lien on "all tangible and intangible prepetition and postpetition property of AmeriFirst . . . that, on or as of the Petition Date, is not

subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date . . . other than avoidance actions and the Carve-Out, but including proceeds of avoidance actions." *See* Proposed Final DIP Order, ¶ 10(a).

22.     The Proposed Final DIP Order further provides that RCP is entitled to a superpriority administrative expense claim "payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding avoidance actions, but including, without limitation, proceeds of avoidance actions." *See* Proposed Final DIP Order, ¶ 12(b).  Furthermore, the Carve-Out does not include commercial tort claims or other such actions against RCP because it is limited only to professionals' fees and obligations owed to employees. *See* Proposed Final DIP Order, ¶ 17.  Thus, these ambiguous provisions open the door to RCP securing first priority liens and superpriority administrative expense claims on the proceeds of avoidance actions and unenumerated causes of action—causes of action that may lie against RCP itself.

23.     Avoidance actions and the proceeds of such actions are rights that the Debtors should maintain for the benefit of the estates. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (en banc) (noting that the underlying intent of the avoidance powers is the recovery of valuable for the benefit of a debtor's estate); *Official Comm. of Unsecured Creditors v. Goold Elecs. Corp. (In re Goold Elecs. Corp.)*, 1993 WL 408366, *3-4 (N.D. Ill. Sept. 22, 1993) (vacating order approving postpetition financing to the extent the order granted the lender a security interest in preference actions).  The intent underlying the avoidance powers is to allow a debtor's estate to recover payments on behalf of all creditors. *See In re Sweetwater*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner

that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike."); *In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover preference payments).  This likewise goes for any commercial tort claims held by the Debtors (including any director and officer liability claims and lender liability claims).  *See Polk 33 Lending, LLC v. Schwartz*, 555 F. Supp. 3d 38, 43 (D. Del. 2021).  These causes of action should also remain for the benefit of general unsecured creditors.

24.     Regarding the avoidance actions, the Debtors may hold potentially valuable causes of action against various parties which should not be simply handed over to RCP.[14]  In addition to potential preference actions and fraudulent transfer actions that may exist for the benefit of the general unsecured creditors, the Committee also believes that there may be viable director and officer liability and lender liability claims, and the proceeds of any such claims, including any applicable insurance, should be preserved as assets for the benefit of unsecured creditors and not for the benefit of RCP.

25.     As described below, the Committee believes that the Debtors may have engaged in insider transactions with RCP that benefitted insiders.  The Committee is also concerned that RCP's precipitous takeover of the Debtors' assets and operations and commencement of a free-fall chapter 11 process thereafter may have given rise to significant lender liability, including liability that would, to the extent supported by investigation, support the subordination or disallowance of some or all of the prepetition loans.

---

[14]     The Committee is still analyzing the potential universe of ninety-day and one-year insider payments or fraudulent transfers based on the Debtors' recently-filed schedules and statement of financial affairs.  The Committee should have the ability to investigate these causes of action and, if appropriate, prosecute them, for the benefit of the general unsecured creditors.









28.     The Committee will investigate the appropriateness of these arrangements and any potential claims for breach of fiduciary duties and claims related to lender liability.  As such, it is critical to preserve any director and officer liability claim proceeds so that they may provide a source of recovery for all unsecured creditors.  RCP should also not be permitted to obtain a backdoor release of potentially valuable claims against them and their affiliates through the provision of postpetition liens or superpriority administrative expense claims on those proceeds.  *See, e.g.*, *In re Penn Transp. Co.*, 458 F. Supp. 1346, 1356 (E.D. Pa. 1978) ("The bankruptcy laws are intended to be a shield, not a sword.").

29.    Thus, the Debtors' avoidance actions, commercial torts (including potential lender liability claims and director and officer claims), and any proceeds deriving therefrom should be preserved for the benefit of the Debtors' general unsecured creditors.

**B.    The Removal of the Challenge Period Eliminates the Committee's Ability to Fulfill its Fiduciary and Statutory Duties and the Independent Director has not Fulfilled his Fiduciary Duties**

30.    The Proposed Final DIP Order entirely eliminates the Challenge Period for the Debtors' stipulations as to the validity of RCP's debt and actions taken prior to and in connection with these bankruptcy cases. The stipulations here are deserving of rigorous scrutiny—if the Court even considers permitting them at all—because this is an insider DIP facility, negotiated among affiliates.

31.    Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") provides that a committee shall have at least seventy-five (75) days from the entry of the interim order to investigate such matters. Del. Bankr. L.R. 4001-2(a)(i)(Q). The Debtors are aware of this requirement because at the first day hearing the Court took issue with the Motion's proposed twenty-one (21) day challenge period, which would have run from the date of entry of the final DIP order. *See* Motion Term Sheet, 13. At the first day hearing this Court stated as follows:

> "The challenge period concerns me too. I mean, the rule in this district is seventy-five days after entry of the interim order. And I can tell you right now, I wouldn't approve anything other than that, particularly on an interim basis. If, on a final, all the parties come in, hand in hand, and say they agree to something less, I suppose that's something I could think about. But I'm not – even if it is subject to a final order, I would not be comfortable entering it on an interim basis."

August 30, 2023 Hr'g Tr. for *In re AmeriFirst Financial, Inc., et al.* (Case No. 23-11240 (TMH)) (D.I. 64), at 57:13-21. The Debtors and RCP assured the Court that the challenge period would be seventy-five (75) days after the entry of the Interim DIP Order. *See* Hr'g Tr. 72:2-13 ("Excellent,

Your Honor.  So we'd be happy to add that.").  The Interim DIP Order was entered with a seventy-five (75) day challenge period.  *See* Interim DIP Order, ¶ 5(f).  The Debtors then filed the Final DIP Notice removing the Challenge Period entirely.

32.   As the Court noted, "the rule in this district is seventy-five days after entry of the interim order."  Striking the Challenge Period is unprecedented.  Even Debtors' counsel privately agrees it is "[c]ompletely unprecedented to strip all challenge provisions by other parties in interest . . . ."  *See Email dated September 30, 2023* (attached hereto as **Exhibit 11**).



35.     Delaware bankruptcy courts have consistently stated their unwillingness to truncate challenge periods. *See In re Constellation Enterprises, LLC*, Case No. 16-11213 (Bankr. D. Del.) (CSS) (D.I. 54) Hearing Transcript, at 60:23-61:4 ("And on the challenge period, again, my comment there is the challenge period is what it is.  It's going to be 60 days from committee formation.  And we can't have a proviso that says the earlier of 60 days or the hearing on the sale. If that means the sale take a little bit longer, that's just the reality, and you're going to have to figure out your funding to accommodate that."); *See In re PGX Holdings, Inc.*, Case No. 23-10718 (Bankr. D. Del.) (CTG) (D.I. 153) at ¶ 20(d), (D.I. 332) at ¶ 16. (Following the committee's

objection to a sixty (60) day challenge period, the Court entered a final DIP order providing for an eighty-one (81) day challenge period for the committee).

36.     The Committee has a fiduciary duty to investigate, among other things, the prepetition conduct and assets of the Debtors.  11 U.S.C. § 1103(c)(2); *see  In re PWS Holding Corp.*, 228 F.3d 224, 246 (3rd Cir. 2000) ("[s]ection 1103(c) of the Bankruptcy Code, which grants to the Committee broad authority to formulate a plan and perform 'such other services as are in the interest of those represented,' 11 U.S.C. § 1103(c), has been interpreted to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members"); *see also In re Advisory Comm. of Major Funding Corp.* (*Advisory Comm. of Major Funding Corp.* v. *Sommers*), 109 F.3d 219, 224-25 (5th Cir. 1997) (providing that "[w]hen a power granted under section 1103 is needed for the committee to fulfill its overriding duty of protecting the creditors' interest, the committee is obligated to employ the power").

37.     The Committee's investigation must be permitted to include all of the proposed factual stipulations of the Debtors set forth in the Proposed Final DIP Order.  The Committee's challenge rights must include at a minimum the stipulations contained in paragraphs 5(a), 5(b), 5(c), 5(d), 5(e), 5(f), 5(g) and 5(h) of the Proposed Final DIP Order.[16]  Furthermore, the Committee objects to any provisions in the Proposed Final DIP Order that attempt to limit the universe of the Committee's investigation, including, without limitation, such so-called binding provisions contained in paragraphs 23 and 27 of the Proposed Final DIP Order.

---

[16]     Moreover, the Committee should be given the opportunity as part of the Challenge Period to not only investigate the stipulations, but whether RCP's exercise of the pledge and related actions were a valid exercise of Rights by RCP.

38.     If the Committee is foreclosed or limited in its ability to conduct its investigation, the entire unsecured creditor body will suffer.  *In re ABC Auto. Prods. Corp.*, 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997) (favorably citing *Sommers* and noting that "[i]n essence, the function of the creditors' committee is to act as a watchdog on behalf of the larger body of creditors which it represents") (citations omitted); *see In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315 (1st Cir. 1993) ("[the committee] is charged with pursuing whatever lawful course best serves the interests of the class of creditors represented.").

39.     This Court should rule the same way in this case and not enter a final order unless it restores a challenge period to cover all of the Debtors' proposed stipulations.  Indeed, given the non-arms-length nature of the stipulations, and the Committee's grave concerns about prepetition misconduct by RCP, the Challenge Period should in fact be longer than the statutory minimum of seventy-five (75) days.  Courts in this jurisdiction have extended challenge periods for cause.  *See In re Mallinckrodt PLC*, No. 20-12522 (JTD), Oct. 12, 2020 (D.I. 2039) (extending the challenge period by thirty days to investigate targeted matters relating to avoidance actions); *See In re IMX Acquisition Corp., et al.*, No. 16-12238 (BLS), Oct. 10, 2016 (D.I. 305) (extending the challenge period by thirty days while discovery was ongoing).  As of the filing of this Amended Objection, the parties are still in the discovery process and, in fact, are in the middle of depositions.  This process has been delayed considerably by the Debtors' and RCP's reluctance to produce documents and their withholding of documents and communications that they assert are subject to the attorney-client privilege.  Moreover, the Debtors and RCP have not, to date, provided a privilege log to the Committee.  Instead, the Debtors and RCP have continued to assert privilege while providing non-Bates stamped documents and communications on a rolling basis that has resulted in the production of thousands of documents in a disorderly fashion.

40.     These tactics mean that the Committee has not yet completed reviewing the discovery received to date and has not yet completed depositions.  While the Committee is continuing to review the discovery, its above-noted concerns regarding potential prepetition misconduct have only grown graver.  Thus, because the parties are still conducting discovery, and because the discovery conducted so far has provided evidence of possible prepetition wrongdoing by RCP and its affiliates, the Committee requests an extension of at least thirty (30) days to the Challenge Period.



43.    The Committee also objects to the requirement that it obtain standing prior to the expiration of the Challenge Period if it wishes to pursue a challenge.  *See* Interim DIP Order Term Sheet, 14.  The Committee should not be required to expend the time and expense necessary

---

[17]

to obtain standing prior to commencing a challenge.  Courts have granted standing to creditors'

committees without the need for a standing motion.  *See, e.g.*, *In re YogaWorks, Inc.*, No. 20-12599

(KBO) (Bankr. D. Del. Nov. 9, 2020), ¶ 19(a) (D.I. 133) ("The Committee shall have automatic

standing to commence a Challenge as to the validity, extent, priority, perfecting and enforceability

of the Prepetition Liens.").

44.    If the Court does require the Committee to obtain standing, this provision

should be revised to permit the Committee to file a motion for standing with a draft complaint

attached within the Challenge Period, at which point the Challenge Period should be tolled pending

a determination on the standing motion.  This is the standard accommodation and practice in this

district and others as it is designed to promote judicial efficiency and to permit the Committee to

actually obtain the benefit of the investigation period.[18]

45.    Here, the Challenge Period was entirely removed from the Proposed Final

DIP Order.  Because of the unnecessary delay associated with these tactics, the Committee

respectfully requests that it be allowed at least sixty (60) days from the entry of any final DIP order

to commence a challenge.

46.    Finally, the Committee requests that any budget approved by entry of a final

DIP order include at least $100,000 budgeted for the Committee to investigate any challenge.  If

automatic standing is not granted, the Committee additionally requests that the budget also

includes $100,000 for prosecution of any standing motion.

---

[18]    *See, e.g., In re Ryze Renewables II, LLC*, No. 23-10289 (BLS) (Bankr. D. Del. April 11, 2023) ¶ 37(a) (D.I. 96); *In re Starry Grp. Holdings, Inc.*, No. 23-10219 (KBO) (Bankr. D. Del. Mar. 31, 2023) ¶ 11 (D.I. 263); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Mar. 3, 2023) ¶ 12 (D.I. 242); *In re EYP Grp. Holdings, Inc.*, No. 22-10367 (MFW) (Bankr. D. Del. May 25, 2022) ¶ 38(iii) (D.I. 149).

**C.**    **The Court Should Not Permit Waiver of Surcharge Rights under Bankruptcy Code § 506(c)**

47.    The law on Section 506(c) waivers is clear: a chapter 11 restructuring should not be run for the sole benefit of a secured lender.  *See, e.g.*, *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (prohibiting "convert[ing] the bankruptcy process from one designed to benefit all creditors to one designed for unwarranted benefit of the postpetition lender"); *see also In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1093 (9th Cir. 1991) (prohibiting benefiting a lender at the expense of the other unsecured creditors); *In re Ames Dep't. Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Tenney Village Co., Inc.*, 104 B.R 562, 568 (Bankr. D.N.H. 1989); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (creditors should not be required to bear the cost of protecting property that is not theirs; the secured party must bear the cost of preserving or disposing of its own collateral).

48.    The 506(c) waiver also contravenes the intent behind Section 506(c), which is to protect general unsecured creditors from bearing the costs of administering a chapter 11 case. *In re Codesco, Inc.,* 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs."); *see also In re Motor Coach Indus. Int'l, Inc.*, Case No. 08-12136 (Bankr. D. Del. Oct. 22, 2008) (D.I. 244) (removing a Section 506(c) waiver from the final post-petition financing order after the creditors' committee objected to its inclusion); *In re Fedders North America, Inc.,* Case No. 07-11176 (Bankr. D. Del. Oct. 5, 2007) (D.I. 272) (a Section 506(c)

24

waiver in the interim post-petition financing order was removed from the final post-petition financing order after the creditors' committee objected to its inclusion).

49.    In this district, courts have refused to enforce waivers of Section 506(c) surcharge rights when a creditors' committee expressly objects to the waiver.  *See, e.g.*, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS), Hr'g Tr. 212:12-22, D.I. 3927 (Bankr. D. Del. June 5, 2014) (declining to approve a 506(c) waiver over objection and stating that "Judge Walsh once told me that he'd never approve a 506(c) waiver on a non-consensual basis"); *In re NEC Holdings Corp.*, No. 10-11890 (CSS), Hr'g Tr. 101:7-9, D.I. 224 (Bankr. D. Del. July 13, 2010) (stating that "you don't give a 506 waiver over an objection by the committee"); *In re Mortg. Lenders Network USA, Inc.*, No. 07-10146 (PJW), Hr'g Tr. 21:7-9, D.I. 346 (Bankr. D. Del. Mar. 27, 2007) ("Well, let me tell you what the law in this Court's been for at least the last five years. If the Committee doesn't agree with the waiver, it doesn't happen.").

50.    Because this case is clearly being run for the sole benefit of RCP, the Committee submits that this Court should not approve the Debtors' waiver of their surcharge rights under Section 506(c).  Additionally, the Debtors' attempt to include a backdoor 506(c) waiver or "equities of the case" exception to Section 552(b) should also be denied.  *See* Proposed Final DIP Order, ¶ 14.  These provisions further seek to undercut the financial position of unsecured creditors.  No such waiver should be permitted at this juncture in the cases.  Therefore, the Court should deny a Section 506(c) waiver.

### D.    The DIP Facility is an Insider Transaction Subject to the "Entire Fairness" Standard and Should not be Approved

51.    Under Section 364(c) of the Bankruptcy Code, a court may not approve proposed financing unless a debtor proves that: (1) it is unable to obtain unsecured credit pursuant to Section 364(b) of the Bankruptcy Code; (2) the credit transaction is necessary to preserve assets

of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (citing *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988)).

52.    Transactions between a debtor and an insider, including postpetition financing arrangements, must be subjected to heightened scrutiny. *See, e.g.*, *L.A. Dodgers*, 457 B.R. at 313 ("[T]he Court must review Debtors' decision to accept the [insider financing] applying the entire fairness standard."); *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) ("[C]ourts apply a 'heightened scrutiny' test in assessing the bona fides of a transaction among a debtor and an insider of the debtor.") (collecting cases); *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939) (stating that controlling shareholder's "dealings with the corporation are subjected to rigorous scrutiny"); *Schubert v. Lucent Techs., Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 412 (3d Cir. 2009) (dealings between a debtor and an insider must be rigorously scrutinized by the courts). Insider transactions are inherently suspect and require careful scrutiny to ensure fair dealing in a proposed transaction. *See L.A. Dodgers*, 457 B.R. at 313 (holding business judgment rule inapplicable where debtor's principal personally benefitted from the proposed transaction); *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (stating that insider transactions "are rife with the possibility of abuse"); *In re Anchorage Boat Sales, Inc.*, 29 B.R. 275, 278 (Bankr. E.D.N.Y. 1983) (noting that insider transactions present "opportunities which tempt the principals of interlocking businesses to forsake and loot the bankrupt estate in an effort to enhance their personal interests.").

53.    To approve a proposed insider transaction, a debtor has the burden of proving the "entire fairness" of the transaction. This burden has two prongs, requiring a showing

that both (a) the process leading up to the transaction and (b) the terms of the transaction are inherently fair. *Pepper*, 308 U.S. at 306 (holding that good faith of the transactions and inherent fairness to the corporation must be shown in an insider transaction); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims* (*In re Papercraft Corp.*), 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."), *aff'd*, 160 F.3d 982 (3d Cir. 1998); *L.A. Dodgers*, 457 B.R. at 313 (insider DIP financing "requires proof of fair dealing and fair price and terms"); *see also Bidermann*, 203 B.R. at 549 ("[T]he conduct of bankruptcy proceedings not only should be right but must seem right."). This scrutiny ensures the "protection of the entire community of interests in the corporation—creditors as well as stockholders." *Pepper*, 308 U.S. at 307.

54.    In this case, even putting aside the myriad pieces of evidence that the Committee has cited above that RCP is controlling the Debtors' cases, the Debtors concede that RCP is an insider because the Debtors are affiliates of RCP through RCP's ownership of debtor Phoenix, which in turn took control of debtor AmeriFirst's common stock on the Petition Date. *See* First Day Declaration, ¶¶ 7-12. However, the Debtors do not even attempt to satisfy the entire fairness standard. It has become apparent that the Independent Director was handpicked by RCP immediately prior to filing. Simply appointing independent directors does not necessarily satisfy the entire fairness standard. *See In re UCI Int'l., LLC*, No. 16-11354 (MFW), Hr'g Tr. 199:19-21, D.I. 303 (Bankr. D. Del. June 2, 2016) ("You can't screw up the debtor completely, and then appoint an independent director and make everything all right, by letting the independent director

have free reign in doing what it can to clean up the mess.").  The court must look to the prepetition

events leading to the bankruptcy filing to determine whether the process was fair.

56.     Furthermore, the Debtors have asserted they considered other sources of potential DIP funding, but have provided only limited or untimely information concerning these alternatives.  *See* Hr'g Tr. 37:7.  Additionally, only very limited and untimely evidence has been provided to the Committee regarding anticipated sales proceeds from the *Final Order (I) Authorizing the Debtors to Continue in the Ordinary Course of Business: (A) Sale Activities Related to Certain "CIK" Properties, (B) Originating and Funding Mortgage Loans, (C) Selling "Scratch and Dent Loans", (D) Servicing Loans, and (II) Granting Related Relief* (D.I. 114) (the "Final Sale Order").  However, as noted above, the proceeds of the sales are sufficient to fund these cases and any short delay in the receipt of proceeds is of no matter in a non-operating chapter 11 case, such as this.



58.     Although discovery is still ongoing on these and other points, the Committee specifically objects to the findings in the Proposed Final DIP Order including the findings contained in paragraph six.

**E.     Additional Objections to the Final DIP Order**

59.     In addition to the objections raised above, the Committee also submits that the following objections and concerns should be addressed in any final DIP order:

(a)     Paragraph 5(g) of the Proposed Final DIP Order stipulates that none of the RCP entities control debtor AmeriFirst or control insiders of debtor AmeriFirst.  This stipulation is not correct, and the Debtors have conceded as much.

(b)     The Committee should be afforded the same financial reporting as RCP, *i.e.* the actual disbursements compared to the DIP Budget.  *See* Proposed Final DIP Order, ¶ 6(d).

(c)     Paragraph 6(f) of the Proposed Final DIP Order stipulates that the Term Sheet was negotiated in good faith and at arm's-length between debtor AmeriFirst and RCP.  However, the Debtors have not offered evidence of these good faith negotiations and, absent such a showing, should not be entitled to the full protection of Section 364(e) of the Bankruptcy Code.

(d)     Paragraph 26 of the Proposed Final DIP Order needs to be clarified.  This provision should be clarified to (1) define what are "any other document

related to the DIP Loans" and (2) that reference to the DIP Agent and DIP Lenders is only in such capacity, and does not exculpate prepetition priorities from prepetition acts.

(e)      Paragraph 20 of the Proposed Final DIP Order permits the Debtors and RCP to implement any non-material amendments to and modifications of the Term Sheet without further approval or order of the Court. The rights of the Committee and the U.S. Trustee to challenge whether an amendment is or is not material must be preserved to prevent modifications to the entered final DIP order that may be prejudicial to general unsecured creditors but deemed non-material by the Debtors and RCP.

(f)      The Term Sheet and the Proposed Final DIP Order contain numerous vague provisions including the unexplained absence of a notice period during which the Committee, the Debtors, or any other party in interest may challenge the calling of an Event of Default by RCP. *See* Term Sheet, 6; Proposed Final DIP Order, ¶ 22(b). The Committee requests that this be clarified to include a five-day notice period as is consistent with Local Rule 4001-2(a)(i)(S). Additionally, the Debtors should not be permitted to rely only upon the Term Sheet to dictate the terms of the Final Proposed DIP Order.

(g)      Four Events of Default in the Term Sheet are improper. *First*, page 8, subsection (f) makes "Any Change in Control" an Event of Default. The Proposed Final DIP Order provides that "Change in Control" means debtor Phoenix stops being the sole owner of the equity interests in debtor AmeriFirst. This provision is objectionable because the Committee has valid concerns about how debtor Phoenix came to be the sole equity owner. Further, this provision is ultimately meant to protect RCP. *Second*, page 8, subsection (h) of the Term Sheet provides that the dismissal of debtor Phoenix's chapter 11 case or the conversion of its case to chapter 7 is an Event of Default. This term should not be an Event of Default given that there are legitimate questions regarding whether debtor Phoenix is a proper debtor and whether its filing for bankruptcy was in bad faith because, among other things, it is a holding company whose only asset is the equity in debtor AmeriFirst. *Third*, page 9, subsection (s) of the Term Sheet makes it an Event of Default if an order is entered by the Bankruptcy Court transferring venue of these chapter 11 cases to any other court. This term, among other things, undercuts the *United States Trustee's Motion to Transfer Venue* (D.I. 142). *Fourth*, page 9, subsection (n) of the Term Sheet provides that the appointment of a trustee under either chapter 7 or chapter 11 in either of the Debtors' cases is an Event of Default. Similar to the objections raised above, this provision should not be an Event of Default because of the questionable circumstances surrounding the commencement of these chapter 11 cases. The Committee requests additional language in Paragraph 22(a) of the Proposed Final DIP Order and the Term Sheet clarifying that these sections are not Events of Default under any entered final DIP order, the Term Sheet,

or any other DIP Loan documents.

(h)     No DIP credit agreement has been filed or provided to the Committee as of the objection deadline (and the Committee's request for an extension of the deadline to object has been denied).  It is unclear whether there is an undisclosed credit agreement, or simply no credit agreement with the credit parties intending to rely on any entered DIP order as the source of terms.

(i)      The final page of the Term Sheet contains a marshalling waiver and the elimination of the "equities of the case" exception provided in Section 552(b) of the Bankruptcy Code.  These terms should be disapproved by the Court and removed from the Term Sheet.  These provisions benefit RCP at the expense of the unsecured creditors.

## **RESERVATION OF RIGHTS**

60.     The Committee reserves all of its rights to supplement or amend this Amended Objection at or prior to the Final Hearing.  The Committee also reserves all of its rights with respect to any filing by the Debtors or RCP prior to the Final Hearing.  Nothing contained in, or omitted from, this Amended Objection constitutes an admission or stipulation by the Committee, any member of the Committee or any other party with respect to any alleged claims against the Debtors, the Prepetition Lenders or RCP, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtors or the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' assets.

## **CONCLUSION**

61.     For the foregoing reasons, the Committee respectfully requests that the Court deny approval of the DIP Motion on a final basis, unless the Debtors and the secured lenders address the numerous issues identified in this Amended Objection, and grant such other and further relief as the Court deems appropriate.

Dated:  October 22, 2023
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Daniel B. Butz*
Donna L. Culver (No. 2983)
Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Daniel B Butz (No. 4227)
Evanthea Hammer (No. 7061)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email:  dculver@morrisnichols.com
      rdehney@morrisnichols.com
      eschwartz@morrisnichols.com
      dbutz@morrisnichols.com
      ehammer@morrisnichols.com

**PROPOSED COUNSEL FOR OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

## Exhibit 1

1              P R O C E E D I N G S

2              All right.  Please be seated.  Good morning, Ms.

3     Jones.

4              S2:  Good morning, Your Honor.  Good seeing.

5              S1:  You.  Good seeing you.

6              S2:  Your Honor, for the record, Laura David Jones

7     chose to be staying Zeeland Jones on behalf of Meyer First

8     Financial and the related debtor.  Your Honor, you should have

9     before you now a second amended agenda.

10             S1:  Yes, I do.

11             S2:  And Your Honor, just briefly, looking through

12    that agenda, matter one, you entered an order.  Thank you for

13    that.  Matters two and three are continued matter.  For Your

14    Honor, is the U.S. Trustee motion to transfer venue matter five

15    and six.  I think we treat together, Your Honor, as the

16    committee objection to our application.  Excuse me.  To retain

17    the Kasowitz firm, the US trustee's objection and the debtor's

18    objection and our motion to disqualify.  And then you run the

19    discovery letter that you asked that we add to the agenda for

20    today.  Your Honor.  Not surprisingly, the various parties have

21    told me that they seek the Court to hear venue first, the

22    debtors, Your Honor, frankly, to seek a decision on both

23    matters and obviously the related discovery letter.  So we

24    stand at the pleasure of the Court.  Yeah.

25             S1:  Do you think that we need to start with the the

1   letter?  Are we going to be in other words, are we going to

2   need this in order to get through the evidentiary presentations

3   in support of the Kasowitz retention application and the venue

4   motion?

5           S2:  And I'm going to yield to counsel on that.

6           S1:  Yes.  Thank you very much.

7           S3:  Good morning, Your Honor.  Bennett, Murphy,

8   Quinn, Emanuel, Ricard and Sullivan.  Four Landers.

9           S1:  Good morning, Mr. Murphy.

10          S3:  Good morning.  Our co-counsel wrote to the Court

11  last night.  Forgive us.  It was rather late concerning the

12  request to claw back certain documents that were inadvertently

13  produced that contained privileged matter and privileged

14  communications as between RCP and its counsel.  The occasion

15  for the letter was that the request had not been agreed to by

16  opposing counsel.  Your Honor, these emails were the privilege

17  matter was included up the chain and emails that were

18  inadvertently sent by various individuals.  I think what they

19  did is something we're quite familiar with all of us, which was

20  rather than to create a new email, to use a reply to all and

21  something that was already there as as is often the case, and I

22  do this personally, we're not fully aware of the entire chain

23  of an email that that lies behind the one we see at the top.

24  And so we did request and we were disappointed the request

25  wasn't honored to claw back these materials that were

1   inadvertently produced.  For that reason, we would ask if the

2   Court would please that the emails be that were annexed to the

3   to the letter to the Court.  That is the unredacted versions of

4   those emails we sent you, the redacted ones.  We would ask that

5   the unredacted be clawed back and that the recipients of those

6   inadvertently produced emails be required as is done in the

7   clawback to destroy them and that they not be used going

8   forward.  There is one email that does cause me to need to rise

9   with respect to today's hearing.  Exhibit two to our letter to

10  the Court is also Exhibit W and Mr. Goldie's list of exhibits.

11  We have a redacted form of that exhibit, and for today's

12  purposes, we would ask that the redacted be substituted for

13  exhibit W If it isn't okay.

14          S1:  Let me hear from Well, let me hear from the

15  committee first, please.

16          S4:  Good morning, Your Honor.  Robert Downey from

17  Mars, Nichols for the committee.

18          S1:  Good morning, Mr. Danny.

19          S4:  We sent a letter over later this morning, and I

20  wanted to make sure you had an opportunity to look at it, so

21  I'm not going to waste time regurgitating.  Have you had a

22  chance to look at that?

23          S1:  I did look at it.

24          S4:  Okay.  Robert, I think our perspective is set

25  forth in the letter.  It's really pretty simple.  Inadvertence

1    does not mean I'm sad.  Thirty or forty-five days after the

2    fact, everything that was done was purposeful.  The volume of

3    emails and communications between rep parties then hired

4    professionals.  There was nothing about privilege, there was

5    nothing about preserving it.  In our meeting confers with the

6    debtors about production on this expedited basis.  We wanted to

7    confirm nothing was being withheld.  We were told nothing is

8    being withheld.  So in the first instance, Your Honor, we think

9    there is no privilege.  We think they waived it long before the

10   filing.  And as we set forth in our letter, they're talking

11   about a clawback, but it doesn't even apply.  Clawback is in

12   the context of discovery production from them to us.  And

13   that's not what happened.  So there is no rule that governs us,

14   that provides them with the relief they want.  They simply

15   waived it long ago as part of their planning for the case.  It

16   is relevant, we believe, when you get to the venue motion,

17   because we believe interests of justice is one of the prongs

18   and it all goes into that.  So we believe it's relevant for the

19   hearing.  We believe that they don't even cite to a rule that

20   would apply.  We covered that in our letter and we make clear,

21   Your Honor, it's too late.  So we don't see any basis to strike

22   them from the record.

23          S3:  I could respond for a moment.

24          S1:  Yesterday, Mr. Downey, did you wish to complete a

25   thought?  No.

1          S4:  Your Honor.  You've read the letter.  I think

2     we're good.  Okay.

3          S5:  Well, I mean.

4          S3:  I'll hold my tongue.

5          S6:  Good morning, Your Honor.  Morning, Linda.

6     Richard Shaffer from the US Trustee's Office.  I just wanted to

7     echo the comments that were made by Mr. Denny as as a person

8     who has been litigating in this jurisdiction for more decades

9     than I will recount, I know what it means to have an

10    inadvertent production and to do a clawback.  I've had to

11    request it before during my private practice days.  This is not

12    an inadvertent production.  This is something that pre-petition

13    went from certain parties or C.P.S. counsel to other

14    individuals such as Mr. Avila and the documents, the emails

15    that they're putting in front of Your Honor are just one of

16    many, many email chains we see like that where they're all in

17    it together.  There's emails involving Kirkland, Ellis and

18    Quinn, Emanuel and Piotrowski and Mr. Avila, and they're just

19    going back and forth.  And it's my understanding that debtors

20    have said that they're not claiming any common interest

21    privilege.  And again, these are all pre-petition things that

22    occurred.  So I don't see how the clawback rules apply here at

23    all.  It wasn't an inadvertent production.  The debtor did and

24    met all of its obligations by making the production because

25    this fit within the categories of information that were

1   requested by the committee and by Mr. Baldwin.

2   　　　S1:  Okay.

3   　　　S5:  Your Honor.  If I may, John Kim from PASHMAN

4   Stein On behalf of interested party, Bob and I would just again

5   reiterate and underscore the comments of my colleagues here.

6   We all understand what clawback provisions mean, whether that's

7   by scheduling order or by rule.  It's when you have an

8   inadvertent production of documents that are privileged.  Here.

9   We're talking about documents that were sent back August 23rd.

10  Mr. Avila's name is all over these.  And the and his knowledge

11  is at issue in this case.  And so that directly is relevant to

12  to the facts, to the substance of this.  So this is it's not an

13  inadvertent production to your adversary or something

14  privileged.  This is something where any privilege that may

15  have existed, I'm not conceding that it existed at all, but to

16  the extent that existed, it got waived when somebody from RCP

17  sent it to somebody who they say is a completely separate

18  party.

19  　　　S1:  Thank you, Mr. Ken.  Mr. Murphy.

20  　　　S3:  Thank you, Judge.  I appreciate counsel's

21  remarks.  I did want to clarify a couple of things.  The claim

22  of privilege here has nothing to do with a joint defense or

23  common interest privilege.  The portions that we would seek to

24  redact go only to the privilege between RCP and its counsel.  I

25  think it's clear from the context of the emails that none of

1    the senders of the email at the top of the chain intended to

2    communicate privilege matter between RCP and its counsel when

3    they hit the send button.  The fact that the that the emails

4    were produced by the debtor, I submit, is not relevant here.

5    It would have been appropriate for the debtors to confer with

6    RCP and to discuss redaction of these emails before they were

7    produced, but that didn't happen.  Inadvertent.  There were two

8    inadvertent events.  There was that and the initial sending of

9    the emails where the senders apparently did not appreciate nor

10   take steps to allude to the note was there that the privilege

11   of communications up the chain or were perhaps careless and

12   didn't and didn't take a look.  So we don't think that the that

13   any of the arguments really change the fact that this was an

14   inadvertent production.  The portions of the communications we

15   seek to protect go solely to privilege between my client and

16   his counsel.

17        S1:  To be clear, Mr. Murphy, the the production was

18   made by the debtors, is that correct?

19        S3:  That's correct.

20        S1:  And the debtors came into possession because

21   you're saying that the the emails were mistakenly or

22   inadvertently or unintentionally forwarded on to the debtors.

23        S3:  I believe that either individuals associated with

24   the debtors business people or that are counsel were on the

25   email chains.  Now, that's my understanding of how they were

1    produced.  So they were on the debtor system.

2         S1:  Okay.  Now I'm going to find that the privilege

3    was waived when the documents were sent outside of reference to

4    to third parties.  And for that reason, I find that the

5    privilege was raised and was was waived and not going to.

6         S7:  Require.

7         S1:  Clawback.  Thank you.  Ms. Richard, are you

8    stepping forward for the motion and transfer venue?

9         S6:  Yes, Your Honor.

10        S1:  I appreciate.

11        S6:  It.  I am presuming that Your Honor wants to do

12   that one first.

13        S1:  Yes, please.

14        S6:  Your Honor, I have had discussions with counsel

15   for the debtors and also for the committee and also counsel for

16   Mr. Bowlby.  And I believe this is where we are right now with

17   how we would propose proceeding this morning.  If it is to your

18   courts, to the courts like it, we believe, and we have come to

19   rely on Your Honor's diligence in preparing before the

20   hearings.  So we don't feel that opening statements are

21   necessary.  And so we would like to go straight into the

22   evidentiary portion, if you will.  It's my understanding that

23   the DA is going to call Mr. Avila and they will do so and then

24   he will be available for cross.  And then it's also my

25   understanding that the debtors, the committee and Mr. Bobby

1    will seek to move into admission, the various documents that

2    were on their list of their exhibit list.  Excuse me, Your

3    Honor, the exhibit list that was filed by the U.S. Trustee.  I

4    had the great fortune of being able to rely on the work product

5    of others.  And so there was no need for me to recreate the

6    wheel.  Anything I sought to use was already listed by others.

7    And so I think that once we accomplish the examination of Mr.

8    Avila moving in to the exhibits, I don't think there should be

9    any issues with the exhibits, but that remains to be seen.

10   Then we will do our argument before, Your Honor.

11        S1:  Okay.  That sounds like a good plan to me.

12        S6:  Thank you, Your Honor.  So I guess then I'll

13   leave it to Mr. Litvack, who I believe will be doing the

14   examination of Mr. Avila.

15        S1:  Okay.  Very good.  Good morning, Mr. Litvack.

16   Good to see you.

17        S3:  Good morning, Your Honor.

18        S8:  Great to see you.  Max LIPTAK for Charles Stang,

19   Zeeland Jones on behalf of the debtors.  Your Honor, I do have

20   a binder with the debtors exhibits, if I may approach.  Unless

21   you have it already.

22        S1:  I have an exhibit binder goes to exhibit fifteen.

23   Is that the same one?

24        S8:  No, ours actually goes through twenty-seven.

25        S1:  Okay.  I'm sorry.

1          S7:  I'm looking at the committee.

2          S8:  And I believe Mr. Bowlby had had a binder as

3     well.  So the debtors is the one that's left and we have

4     twenty.

5          S1:  So I have a copy of that binder.  So I'll.  I'll

6     use the one that I have here.

7          S8:  Okay.  Excellent.  Just as necessary.  I'll get

8     to that at the conclusion of the examination.  Your Honor, I

9     agree with everything that Mrs. Rich and Rich and Draper said.

10    We would like to call Mr. Scott Avila as the debtors first

11    witness and only witness today.

12         S1:  Okay.  Mr. Avila, would you step forward, please?

13    Okay.  And could you remain standing for a moment, please?

14         S2:  Please raise your right hand.  Do you affirm to

15    tell the truth, the whole truth, and nothing but the truth to

16    the best of your knowledge and ability?

17         S9:  Yes, I do.

18         S6:  Do you please state your full name and spell your

19    last name for the record?

20         S9:  Thomas Scott Avila.  Last names.  AB, I'll send

21    you.

22         S3:  Good morning, Mr. Avila.

23         S9:  Hello.

24         S8:  What is your title with the debtors?

25         S9:  The managing director with Phoenix 1040 LLC with.

1          S1:  I'm sorry, Mr. Avila, I hate to interrupt you.

2    Would you mind maybe pulling the microphone closer?  Let's do

3    this.  Thank you.

4          S9:  Sir.  Okay.  Sorry.  So I'll repeat that.  So

5    with Phoenix 1040 LLC, I am the CFO and the Managing managing

6    Director with American Financial Inc.  I am the President,

7    secretary, treasurer, and CFO.

8          S8:  Just those two debtors in this case.

9          S9:  Is that correct?

10         S8:  Where are you employed?  Outside of the debtors?

11         S9:  A managing partner of Paladin Management Group.

12         S8:  What is your title there?

13         S9:  Managing partner.

14         S8:  Okay.  Are you also a founder?

15         S9:  That's correct.

16         S8:  Would you characterize yourself as a

17   restructuring professional?

18         S9:  Yes, sir.

19         S8:  Would you give the Court a little bit about your

20   professional background?

21         S9:  Yes, I started and I think restructuring related

22   in color restructuring.  And it was probably in the early

23   nineties.  Most of my like ninety-five percent of my work has

24   been in on the company side.  I'd probably serve Crowe twenty-

25   six, seven times.  I lost track over those thirty years.  Many

1    of those are in court.  Many of those are out of court.  A

2    variety of industries.  Size ranges from probably a $50 million

3    business to a billion or two billion.  I lose track buys

4    companies in a variety of industries from service

5    manufacturing.  Retail hospitality across the spectrum.

6          S8:  Okay.  Thank you.  And with respect to this case,

7    Mr. Ablow, when did you first hear about this matter?  On what

8    day?

9          S9:  It was a Saturday.  I don't know if I know the

10   was informed of the name.  It was a phone call on Saturday the

11   19th.

12         S8:  The 19th of what month?

13         S9:  Excuse me, of August.

14         S8:  Who contacted you initially.

15         S9:  Ms. Jones?

16         S8:  Did you or your firm, Paladin, have any prior

17   relationship with RCP?

18         S9:  No, we did not.

19         S8:  Have you ever been involved in any bankruptcy

20   cases in which RCP and by RCP I'm referring to Reference

21   Capital was also involved?

22         S9:  No, I have not.

23         S8:  Did you or Paladin have any involvement with the

24   debtors prior to that call on August nineteen?

25         S9:  No, I did not.

1       S8:  What were you asked to do initially prior to the

2  petition date?

3       S9:  Diligence on the situation.  What was the key?

4  Key drivers?  The primarily the liquidity condition of the

5  business.  My observation on how to work through it.

6       S8:  And what did you, in fact do between the time

7  that you were first contacted and the petition date on August

8  24th.

9       S9:  Looked at information on the size of the

10  organization, number of people in the organization, what it was

11  doing, how much cash it had, and a little bit about the

12  business.  Try to understand a liquidity projection because

13  that will allow me and my team to understand what the business

14  is doing.  Is it economically viable where the key critical

15  points are the pinch points, I'll call them.

16       S8:  Did you come to any assessments at that time just

17  prior to the petition date on August 24th?

18       S9:  Yes.  The company had no no liquidity.  It had

19  well knows understatement.  It had limited liquidity.  It was

20  not going likely actually likely.  It was unable to make

21  payroll that was going to be due on about 92495 payroll.  The

22  company pays its payroll in the fifth and 20th of every month,

23  and it was not going to be able to make that payroll.

24       S8:  How many employees did the company have at that

25  time?

1          S9:  I would say around 160 ish.  That's the

2     definition of employees, because there's a lot of folks that

3     were paid as 1099 employees, 1099 contractors, a lot of brokers

4     saying so as the pool's bigger than that.  But the employee

5     base is around 160 ish.

6          S8:  Were all those employees located in Arizona?

7          S9:  No, they were not.

8          S8:  How much cash did the company have approximately

9     at that time?  Just prior to the petition?

10         S9:  I think around $450,000, give or take 20,000.

11         S8:  Do you think that's enough money to sustain a

12     company that has over 150 employees?

13         S9:  The payroll that way, just payroll was about

14     570,000, including commission the following week.

15         S8:  Did the company also have significant overhead

16     and rent obligations at that time?

17         S9:  Yes, it did.

18         S8:  How would you characterize those.

19         S9:  Excessive.

20         S8:  Y?

21         S9:  So as the industry constricted after the rise in

22     rates in 2022, the volume cut to a third and then obviously it

23     had to restart its business in May and didn't have enough

24     volume to cover the overhead and it didn't have enough volume

25     to cover the overhead and July of twenty-two either.  So it

1    just had too much over it.

2         S8:  Was the company losing money at the time?

3         S9:  Yes, it was.

4         S6:  Your Honor, let me just like to interject it.

5    Objection.  At this point in time, we're not here for the tape

6    hearing and no one is contesting whether or not AFI had the

7    right to file for bankruptcy.  So I'm trying to figure out the

8    relevance of this background information regarding the

9    financial status of AFFI at the time of the filing.

10        S1:  Mr.

11        S8:  LITVACK Your Honor, this is in anticipation of

12   arguments and objections that will likely be made that were

13   made in the various objections that were filed.  That was a

14   focus on what was going on as of the petition date, who was

15   making the decisions and why were the decisions being made.  So

16   this is to provide context for all of that and background for

17   the Court.

18        S1:  Okay.  I'm going to overrule the objection.  I

19   think that's right.  And I'd also note that in.  For Bombay's

20   papers, they assert, although they don't really go on to argue

21   that the filing was in bad faith.  So I think that it is

22   appropriate for the debtors to pursue this line of questioning.

23        S8:  Thank you, Your Honor.  The assessment that you

24   just testified about that you reached as of the petition date,

25   was that your own personal conclusion about where things stood

1    with respect to the company, or was that something that RCP

2    told you?

3              S9:  No, that was my personal opinion.

4              S8:  Okay.  When were you hired as CRO.

5              S9:  On the 24th of August, excuse me, Of 24th of

6    August.

7              S8:  Who hired you at a mayor first?

8              S9:  I think Jeff Dane, the independent director,

9    signed my engagement letter.

10             S8:  Is there a board of directors at American?

11             S9:  Yes, there is.

12             S8:  Who are the members of the America First Board?

13             S9:  Jeff Dane.

14             S8:  David Sloan is one of them.  Independent?

15             S9:  Yes.  Jeff Dane.

16             S8:  Is Mr. Dane delegated certain authority separate

17   from Mr. Sloan?

18             S9:  Yes, he is.

19             S8:  Is Mr. Sloan affiliated with RCP?

20             S9:  Yes, he is.

21             S8:  What sort of authority is Mr. Dane delegated?

22   Separate from Mr. Sloan in his capacity as a director of

23   AmeriCares?

24             S9:  Anything to do that would appear to have a

25   conflict with RCP.

1          S8:  Does RCP dictate what you do as CRO in these

2     cases?

3          S9:  No, they don't.

4          S8:  Do you read your own independent assessments as a

5     restructuring professional?

6          S9:  Yes.

7          S8:  On August 24th, which is also the petition date.

8     Were you asked to make a presentation to the America First

9     board?

10         S9:  I made a verbal presentation.

11         S8:  What did you tell the board at that time?

12         S9:  I formed a board that is fiduciaries.  I do not

13    see how this business can continue as a going concern without

14    substantial new capital be invested in it to cover the

15    operating costs and the fiduciary obligations that we have

16    specifically around payroll and the payroll related taxes.

17         S8:  Did you make a recommendation with respect to a

18    bankruptcy filing?

19         S9:  Yes, I did.

20         S8:  What was the recommendation?

21         S9:  I didn't see any other course.  But to file

22    bankruptcy, to be able to have liquidity come in and meet these

23    obligations.

24         S8:  What kind of liquidity did you envision on a post

25    position basis?

1          S9:  At that time, I was not sure.

2          S8:  Did the board agree with you on your

3    recommendation with respect to a Chapter eleven filing?

4          S9:  Yes, they did.

5          S8:  What did they decide?

6          S9:  They decided to file that day.

7          S8:  And the debtor is filed in Delaware?  Correct.

8    Were you supportive of a filing in Delaware?

9          S9:  Yes, I was.

10         S8:  Why?

11         S9:  Well, the number one is the company was the 1040

12   LLC, Phoenix 1040 LLC.  It was incorporated in Delaware, a

13   company operated throughout the Country, which we knew at the

14   time.  The employees throughout the Country, creditors

15   throughout the Country, and originate loans throughout the

16   Country.  Many of the cases I filed have been in Delaware.

17   It's not unusual.  There's nothing surprising about this case

18   and filing in Delaware, in my opinion.

19         S8:  Did the debtors manufacture venue in Delaware?

20         S9:  No.

21         S8:  Why do you say that?

22         S9:  Because we looked at it originally.  RCP had its

23   fund incorporated in Delaware, Phoenix 1040 Holding.  It was

24   incorporated in Delaware.  Phoenix 1040 LLC was incorporated in

25   Delaware.  That was before the petition date.  It wasn't like

1    they were.  We were thinking about trying to manufacture

2    before.  It wasn't a venue shot in conversation.

3            S8:  Is it your understanding that prior to the

4    petition date, RCP exercised its rights under a stock pledge to

5    take control of the America First stock?

6            S9:  Yes.

7            S8:  Did you play any role in putting a mere first

8    stock into the Debtor Fenix 1040 entity?

9            S9:  No.

10           S8:  Did you play any role in our exercise of the

11   stock pledge?

12           S9:  No.

13           S8:  As crow after the petition date, what was your

14   focus during the first few weeks of the case?

15           S9:  First, let's break that down.  The first couple

16   of days it was really understanding the equity position.  We

17   knew we were going to have to get a different place

18   immediately.  We knew we had to get a payroll funded.  We knew

19   that courts only move so fast.  And that's no disrespect to the

20   Court, it's that we only had literally less than seven days

21   that we had to get something approved and funded.  And while

22   people think that moves real fast and easy, it never does.  And

23   that was our big that was our team's biggest concern.  And then

24   we shifted to the administrative responsibilities of the case.

25   But more importantly was can this business continue as a going

1    concern?  So that was the focus.  Can we continue to originate

2    loans and can we fund loans and sell loans?

3           S8:  And what was the outcome of your of that process?

4    What conclusion did you reach as to whether or not the debtors

5    could continue as a going concern?

6           S9:  We could not.

7           S8:  Why not?

8           S9:  We were not able to offer it the standard reps

9    and warrants.  So when you originate a loan, you usually have

10   like we do, a warehouse line that is a very short-term lending

11   facility.  We supposed to hold that loan for say, thirty days.

12   Those warehouse lenders require you able to wrap a warrant,

13   which says if the loan is bad, if it's underwritten or bad,

14   you're going to buy it back at par in the refund.  Secondly, as

15   it sits on the warehouse line.  You've already gone out to your

16   investors for them to purchase a loan.  There's not a lot of

17   time given to file the investor pool.  We called all the

18   investors that the company had been using and purchasing loans

19   we call the warehouse loans.  We ask you, we are not able in

20   Chapter eleven to offer wrap warrants.  I can't offer any rep

21   awards insurance on any of these.  As such, we're not able to

22   purchase loans.  Therefore, the warehouse lenders were saying

23   we're not going to fund.  Well, I got asked a lot of times, can

24   we find we can fund.  I said, sure, go ahead.  But the

25   warehouse lender is not going to fund.  They told me flat out.

1   Lastly, as the investors said, we will not buy loans at market

2   prices without revenue warrants insurance.  We call them half a

3   dozen or however we're dealing with.  We called.  The only way

4   they would buy them is as basically as classified industries

5   are scratching down, which is in the $0.85.  So in other words,

6   I had to go sell a loan.  I originally $100,000 mortgage.  I

7   would have to find $100,000, which I didn't have the cash to

8   fund.  And then be is I would only get back maybe $0.85 later

9   on.  So that's not a viable going concern business.

10          S8:  Is it then, based on that testimony, Mr. Avila,

11   that your conclusion was in the exercise of your business

12   judgment, that you simply could not make money, the debtors

13   could not make money on a post position basis if they were to

14   continue to operate as a going concern?

15          S9:  That's correct.

16          S8:  And as a result of that, did you make the

17   decision to then move to liquidating the debtor's assets?

18          S9:  We had a board meeting to discuss that, and that

19   was agreed at the board meeting that we needed to discontinue

20   going concern operations.

21          S8:  And let me ask you another question about that.

22   Did that RCP direct you to direct you to liquidate Emira first

23   assets?

24          S9:  No, they did not.

25          S8:  Where are Amara first?  Well, actually.  Excuse

1    me.  Let me ask you this preliminary question.  Are you

2    familiar with the debtor's assets, liabilities and operations

3    in your capacity as chief restructuring officer?

4         S9:  Based on the time frame, I've been there, I

5    believe we are.  Yes.

6         S8:  Well, how would you characterize the status of

7    the debtors accounting when you first arrived around the

8    petition date?

9         S9:  Poor.

10        S8:  How so?

11        S9:  The internal controls and processes and skill

12   sets in the People as well were significantly.  Lacking

13   compared to the size and complexity of the business.

14        S8:  In terms of the assets.  Mr. Avila, what are they

15   or what were they as of the petition date and where are they or

16   were they located?

17        S9:  A Classify these assets and a few categories that

18   make it easy.  We have what's called and it's been discussed in

19   this courtroom of cash and King homes.  At the petition date, I

20   believe we had for cash King Homes, these are homes that the

21   company had a program whereby they would purchase a an

22   individual home.  And then with the key, that's what they would

23   use as proceeds for a second home.  And they would the company

24   would own the home and then resell it.  And when the market was

25   going well, it probably did okay.  I don't know the economics.

1  We had four of those homes right at the petition date.  Two of

2  those homes have sold post-petition.  There's two more.  Two of

3  the homes were made.  Those two homes are located in the State

4  of Texas.  We have two other residential properties.  One, we

5  have a deed on.  It's Shawn Barbee, Eric's brother.  We have a

6  deed of trust on that home.  We don't own the home, but it's an

7  asset.  The second home is Eric.  Bobby's where Eric Bobby

8  lives.  It's owned by the company that's in the State of

9  Arizona.  We have Scratch and Dent loans of about thirteen,

10  which are spread in various states, some in Arizona, some

11  outside of Arizona, and there's thirteen of those.  We're in

12  the process of trying to monetize those.  We have some

13  miscellaneous assets in the retail loans that are on the entire

14  warehouse line.  We filed a motion to sell those loans as well

15  as kind of clean up some commercial loans classified as

16  commercial, which are really kind of construction type loans,

17  I'll call them.  And those are also located in many different

18  states.  And lastly, we have the what we call the MSR, which is

19  our right to service mortgage mortgages that we've originated.

20  We have a portfolio of about $850 million of those.  Those are

21  located again across many states.  And we're in the process

22  hopefully this coming week to file a motion to obviously sell

23  those assets as well.  And that does not include cause of

24  action.  So those are the physical assets we have today.

25          S8:  Out of those assets.  Which category would you

1    characterize as the the most valuable.

2            S9:  Thank you.  The the MSR, the servicing right

3    assets.

4            S8:  Why is that?

5            S9:  Because it has a value in the $8 million range

6    and the other values are maybe total well outside of scratch

7    and debt should be around three million and the other homes are

8    net net a couple of million dollars.

9            S8:  How close are you to filing a motion to sell

10   those valuable MSRs?

11           S9:  I was hoping this week, but I believe it'll be

12   next week with all that motion to sell the MSRs.

13           S8:  How far do you think we already are in this case

14   in terms of maximizing the value of the assets?  It's been

15   pending for almost two months.

16           S9:  Outside of the the the real estate assets and the

17   scratch and and the real estate assets are in process of being

18   market the ones in Texas.  We haven't commenced the ones in

19   Arizona or proceed on the deed.  We're fairly far down the

20   path.  I mean I think the majority of the assets will be in

21   front of this Court in the next thirty days.  That and when I

22   got into this matter, I expected this to be a very, very short

23   case.  It's not very large compared to other cases that are

24   heard in this courtroom, in this building.  So it should be it

25   should have been a quick case.  I have to say on that.

1          S8:  Thank you, Mr. Avila.  And then with respect to

2    the liability side of the balance sheet, where are America's

3    creditors located?

4          S9:  We looked at that approximately the last two

5    years, and the number in dollars is about 10,000 creditors,

6    excluding employees.  They thirty and it's between thirty-five

7    and thirty-nine percent are located in Arizona, and the rest

8    are spread across a variety of other every other state.  And

9    actually, when I looked at the other day, it was fifty-two

10   states and Guam and Australia.

11         S8:  That have creditors.

12         S9:  Correct, sir?

13         S8:  In terms of potential witnesses that may come to

14   this Court in here in Delaware, are you aware of anyone needing

15   to come from Arizona to testify except for Mr. Bowlby?

16         S9:  No, I don't see anyone coming from Arizona.

17         S8:  So I'm going to turn to the objecting parties for

18   a moment.  Did you prepare or did persons under your

19   supervision prepare the bankruptcy schedules for a matter first

20   that were filed in this case?

21         S9:  Yes, we did.

22         S8:  Is Eric Bowlby listed as a creditor of America

23   first?

24         S9:  No, he's not.

25         S8:  Did you or anyone under your supervision agree to

1    pay him for post-petition services?

2            S9:  No, we did not.

3            S8:  Are you aware of any valid indemnity claims that

4    may be asserted by Mr. Bowlby against the Mayor first?

5            S9:  I'm not aware of any.

6            S8:  Does the.

7            S5:  Estate.  Objection, Your Honor.  I don't really

8    see how this line of questioning relates to transfer of venue.

9    I understood the previous objection was a little different, but

10   this one seems far afield.

11           S1:  Mr.

12           S8:  LITVACK Your Honor, one of our arguments is that

13   Mr. Beauvais lacks standing to object.  He's not really a

14   creditor.

15           S1:  That is the argument.  I'm going to overrule the

16   objection.

17           S8:  Thank you, Your Honor.  Looking at it from the

18   other perspective, Mr. Avila, do you believe that the Emir of

19   First Estate may have potential claims against Mr. Bowlby?

20           S9:  Yes.

21           S8:  Are you still investigating what those claims may

22   be?

23           S9:  Yes, we are.

24           S8:  Now, I'm going to move to the committee.  Are you

25   aware that Mortgage Schott's is a member of the committee?  An

1    entity called Mortgage Shots?

2           S9:  Yes, I am.

3           S8:  Is mortgage shots a creditor of America First?

4    As far as you know.

5           S9:  We did not find any liabilities that the company

6    owes mortgage shots in its books and records.

7           S8:  So when you file the schedules, is mortgage shots

8    listed with any amount that's owed to them?

9           S9:  No.

10           S8:  Are you aware of that, Christine?  Ron is a

11    member of the committee.

12           S9:  Yes, I am.

13           S8:  Do you know how many members total there are on

14    the committee?

15           S9:  Three.

16           S8:  Is Ms. Ron a creditor?  As far as you know.

17           S9:  But you're not finding any liabilities on the

18    balance sheet or any liabilities in payable anywhere for Mr.

19    Mrs. Ron.

20           S8:  And is her claim reflected as anything other than

21    zero in the debtors schedules that were filed?

22           S9:  No, it's not.

23           S8:  Turning to the facility, very briefly, would

24    there be an event of default under the DIP facility if venue is

25    transferred?

1              S9:  Yes.  That would.

2              S8:  In your mind, does that put the debtor's

3   financing at risk?

4              S9:  Yes, it does.

5              S8:  What's the current maturity date of the debtors

6   dip facility?

7              S9:  December 31st, 2023.

8              S8:  That's a couple of months from today.  Roughly

9   correct.

10             S9:  Sixty, seventy days.

11             S8:  As Chief restructuring officer, Mr. Avila.  Do

12  you believe that it is in the interest of justice and

13  convenience of the parties to transfer these cases to Arizona?

14             S9:  No, I do not.

15             S8:  Why not?

16             S9:  This is not a large case.  It shouldn't last very

17  long.  This is supposed to be an efficient process.  And we

18  discussed this with your firm and others when this case

19  started.  What's the strategy?  What are we going to do?  And

20  it should be fast and efficient.  This isn't a $500 million of

21  assets.  $15 million maybe.  In other words, maybe gross

22  assets.  That's it.  Transferring venue here is just not

23  economically feasible.  The cost justify what you're going to

24  get out of it.  Just doesn't make economic sense.  It may make

25  legal sense, but that's not my opinion.  That's not what I'm

1   here to say.  Economically, it makes no sense.

2          S8:  Thank you, Mr. Avila, in Your Honor, that that

3   concludes the direct examination.  And if I may, at this point,

4   even though we didn't refer to the exhibits during Mr. Avila's

5   testimony, I would like to ask the Court to admit Exhibits one

6   through twenty-seven on the debtors exhibit list.

7          S1:  Is there any objection to admission of debtors

8   exhibits one through twenty-seven?

9          S3:  No, Your Honor.

10          S2:  No, Your Honor.

11          S1:  Okay.  Debtors exhibits one through twenty-seven

12   are admitted.

13          S8:  Thank you, Reynolds.

14          S1:  Okay.  Cross-examine, Ms. Rich and.

15          S6:  Have a brief recess so we can get.  We want to

16   make this as short and sweet as possible.  And if we could just

17   take five minutes.

18          S1:  Yes, You're welcome to take five minutes.  Let's.

19   Let's come back at ten to eleven.  Okay?  Okay.  We're in

20   recess.

21          S6:  Yeah.  I need my morning snack.

22          S1:  All right.  Thank you, sweetie.  Richard.

23          S6:  Thank you, Your Honor.  For the record, Linda

24   Rich and Barbara from the Office of the United States Trustee.

25   Good morning, Mr. Havel.

1          S9:  Good morning.

2          S6:  I have to ask you, because yesterday I heard

3    people using different pronunciations of your name.  Do I have

4    this right, Angela?

5          S9:  That's correct.

6          S6:  I thought that's what it was.  But then Mr. Dame

7    was using a different pronunciation.  And speaking of Mr. Dane,

8    have you been involved in cases before where he was serving as

9    an independent director?

10         S9:  Yes, I.

11         S6:  Have.  And approximately how many cases?  What

12   one?  In which case was that?

13         S9:  Apex Park's group.

14         S6:  Was that here in Delaware?

15         S9:  Yes, it.

16         S6:  Was.  Do you happen to remember if that was my

17   case?

18         S9:  I do.

19         S6:  I that's what I thought.  Okay.  When I heard

20   about Waterparks, I thought that was my case.  And how many

21   times have you been involved in cases where you were serving as

22   the crow for the debtor?  And the debtor was being represented

23   by someone from the Petoskey firm?

24         S9:  That's a good question.  I think I said yesterday

25   less than ten.  Ten.  I have to goes back quite a few years.

1   So when I served this, there was a couple of times I wasn't

2   Sierra, but there's less than ten.

3          S6:  And Apex Piotrowski was representing the debtor

4   in that case, correct?

5          S9:  Correct.

6          S6:  And how many cases have you served as a crow

7   where Kirkland and Ellis either represented the debtor or

8   previously represented the debtor until the time of the filing?

9          S9:  I don't recall an apex.  I think they represented

10  the funds there but wasn't involved with them.  So I don't

11  recall.  I don't think any.

12         S6:  Do you don't think any.

13         S9:  I don't I can't recall any.

14         S6:  And are you aware that Kirkland, Ellis and DB is

15  providing legal services to reference with respect to its loan

16  to apply prior to the bankruptcy case?

17         S9:  I know Kirkland Ellis was providing some counsel

18  to us.  I'm not sure which exactly what services they were

19  providing.  I didn't have I never had any interaction with

20  them.  So I don't know.

21         S6:  In fact, wasn't it a Kirkland and Ellis attorney

22  who reached out to Mr. Dane about serving as the independent

23  director in this case?

24         S9:  I have no idea about that.

25         S8:  I was going to object you on it, but you heard

1    the answer.

2          S9:  Have no idea.

3          S6:  So you never inquired of Mr. Dane about how it

4    was he came to be the independent director?

5          S9:  No, I never did.

6          S6:  Prior to August 24th, had you stepped foot on any

7    premises operating being operated by Affi?

8          S9:  No, I had not.

9          S6:  So the information that you were talking about,

10   the verbal presentation you gave to the board on August 24th,

11   that presentation was that before or after the bankruptcy was

12   filed before?  And what was that verbal presentation based on?

13         S9:  Based on information that I received from RCP.

14         S6:  And you stated that now on August 24th.  This is

15   what I was confused about.  Did you tell the board then that

16   you thought you weren't sure as to how AFI could continue as a

17   going concern?

18         S9:  I did not see a path forward for a going concern.

19         S6:  And did you tell the board that on August 24th?

20   Now, I believe you stated at the beginning that you are an

21   officer and you're also the CRO of Phoenix 1040 LLC.  Correct?

22         S9:  That was the intention.  I am and I am a managing

23   director.

24         S6:  Managing Director.  And are you aware that

25   Phoenix 1040 LLC was incorporated in Delaware in June of 2023?

1          S9:  I was not aware of the date.

2          S6:  And when did you become the managing director of

3    Phoenix?  1040.

4          S9:  There was a member consent.  I don't know exactly

5    the date of the member consent.  I know the conversation was

6    around the Monday, the 21st, Tuesday of 22nd.  Somewhere in

7    there there was a conversation.  That's what they were going to

8    do, and they intended to fulfill that obligation.

9          S6:  And at that point in time, that the Monday,

10   Tuesday 20th, 21st on two knowledge in Phoenix said forty have

11   any assets or liabilities.

12         S9:  At that time I did not know what their assets or

13   liabilities were.

14         S6:  And prior to the filing of the Phoenix 1040

15   bankruptcy petition, did you determine what their assets and

16   liabilities were?

17         S9:  Just prior I.  At some point, probably on

18   Tuesday, the 23rd, 22nd, they I was informed I believe and this

19   has been a foggy for me that it was a it was going to the

20   assets were going to be the stock in affi.

21         S6:  And the stock and a f I wasn't placed into

22   Phoenix 1040 into August 24th.  Correct.

23         S9:  Correct.

24         S6:  So the Phoenix 1040 bankruptcy petition lists the

25   same debts and number of creditors, I should say, amount of

1    liabilities and assets, et cetera a number of creditors, as

2    does RFI.  Is that correct?

3           S9:  Well, in preparing the schedule itself, as we

4    consolidate those up, that's something we've done in many other

5    cases.  So we operate that in the same way that they can, that

6    either the assets could be funded, it would be one in the same

7    a consolidated basis to make it consistent.  It's just a common

8    practice we've done.

9           S6:  But the schedules and statements that were

10   actually filed for Phoenix 1040 show no liabilities, don't

11   they?

12          S9:  That's correct.

13          S6:  Okay.  So I'm talking about the petition that was

14   filed that was signed by you that shows that I forget how many

15   hundreds of creditors it says that Phoenix 1040 had on the date

16   of the petition.  Did Phoenix 1040 have any creditors?

17          S9:  The creditors they had, we assume, were the same

18   creditors that Affi had.  And if there was any assets in 1040,

19   they could have a claim against those assets.

20          S6:  But were there any assets in 1040 on the date of

21   the filing other than the.

22          S9:  Stock, other than the potential claims from AFFI?

23   No, there was not.

24          S6:  What type of potential claims for me if I am not

25   following.

1          S9:  Any claims that a creditor, if I have made may

2     have on the parent.  1040.

3          S6:  And so that was the reason why when you signed

4     the petition, you thought that it was proper to use all the

5     information from the affi petition and put it on that.  And

6     prior to the filing of the petition, had you looked at any

7     actual documents at a f i.

8          S9:  What do you mean actual documents that.

9          S6:  Affi Well, you're telling, you told us that you

10    received information from Master P.

11         S9:  Correct.

12         S6:  And that's what you talked to the board about,

13    Correct.  So then I'm moving forward a step before you filed

14    the petitions, before you authorized or whoever authorized the

15    filing of the petitions, had anyone looked at information,

16    financial information that was present at an affi.

17         S9:  Location, Did we go to an RFI location?  Look at

18    information at an RFI location.  In other words, are you asking

19    me, Did we go to an RFI location and look at RFI documents and

20    if my location.

21         S6:  To prepare the petition?

22         S9:  No, we did not go to an RFI location and look at

23    RFI information.

24         S6:  Now, Mr. Abbott, let's move on to another aspect

25    of your experience here.  Have you ever been a crow before for

1    an entity that was in the mortgage industry?

2              S9:  I have not.

3              S6:  Do you have any prior experience with companies

4    in the mortgage industry?

5              S9:  My firm has.

6              S6:  Your firm has.  But have you personally?

7              S9:  No, I have not.

8              S6:  Okay.  And you mentioned about you learned that

9    you couldn't or that affi couldn't continue to originate loans

10   because it could no longer offer reps and warranties on the

11   loans.  When did you find that out?

12             S9:  I found that out that that we knew that was a

13   potential requirement.  But we're hoping that some investors

14   would still see the quality and the assets.  We continue to do

15   business with us.  I found that out subsequent to the filing.

16   Probably the following week we would start making a lot of

17   calls to telling the story, what we, you know, that we were

18   going and so we were trying to keep the business as a going

19   concern.  We're looking to we have funding.  There was a lot of

20   concern about funding by various parties.  We were able to try

21   to settle that down, that we have the backing we need to go

22   forward.  The first question was, do you have the warrant?  And

23   talking to counsel?  And my own thoughts was no.  So we tried

24   to get rep and warrant insurance.

25             S6:  So prior to you having those conversations, did

1   you know that reps and warranties were going to be needed?

2          S9:  I had a feeling of that.  Was it Did I think it

3   was going to be such a hard and fast?  Wasn't sure.

4          S6:  And these calls, when you learn that reps and

5   warranties were going to be needed, did they occur before Labor

6   Day?

7          S9:  I'm not sure.

8          S6:  Let me see if this refreshes your recollection.

9   The day after Labor Day was when over one hundred employees

10  were terminated.  Correct.

11         S9:  I have to go back and look at the exact date, but

12  I know that we immediately started trying to call these

13  purchases because that's how the business is going to continue.

14  We wanted to keep funding loans and twenty-four yes, it was the

15  following week, which would have been probably the day after

16  Labor Day.  Just look at think of the calendar in my own mind.

17  So it was between following the Thursday.  The following week

18  was pretty Labor Day.  That was the week we were doing all the

19  work.  So it was during that week we recall, and making all

20  those phone calls.

21         S6:  So I'm trying to remember the 24th I think was a

22  Thursday.

23         S9:  It was a Thursday.

24         S6:  So you file on the 24th and let me see if I have

25  this right then.  It was the next week that you started to make

1    the calls and then the following Tuesday, which was the first

2    business day after Labor Day, was when over one hundred

3    employees were terminated.

4            S9:  Correct.

5            S6:  Okay.  And were you present for the status

6    conference that we had with the Court?  That was a few days

7    after the filing?

8            S9:  Yes.

9            S6:  And at that point in time, did you already know

10   that the reps and warranties were going to be needed in order

11   to continue the loan origination business?

12           S9:  No, I did not.

13           S6:  And were you present trying to remember when the

14   first first day hearing was?  It would have been before Labor

15   Day because the Court allowed the payroll.

16           S9:  To go forward.  Right.

17           S6:  And so at the time of that hearing, were you

18   aware then that reps and warranties were needed?

19           S9:  We knew it was an issue.  We weren't trying to

20   understand the economic impact of that issue.

21           S6:  So prior to this case, have you ever been

22   involved before in the sale of MSRs?

23           S9:  No, I have not.

24           S6:  Have you ever been involved before in the sale of

25   Scratch and Dent loans?

1          S9:  No, I have not.

2          S6:  Have you ever been involved before in I guess

3     it's called sick loans?

4          S9:  I think those are just homes.

5          S6:  Those are just terms.  Okay.  Have you been

6     involved in a business before where you needed to sell homes

7     more than just a a residence, but multiple residences?

8          S9:  I believe so.  I'm trying to recall the access.

9     Prior to this assignment, I was the CFO did not file of a

10    brokerage, a real estate brokerage company with a title

11    business.  So experience the same economic issues this had as

12    far as the downturn in 2022.  So had a lot of same economic

13    industry issues.  I know we did not sell homes in that case

14    just because we were obviously in a home sale between our

15    assets weren't homes.  I'm trying to think of situations where

16    we've had residence to sell, had a lot of real estate, but

17    maybe one or two residents.  I think another case two years ago

18    in eastern Washington, we had some residential real estate, had

19    a lot of farmland, too.  But.

20         S6:  And you mentioned that I think you said that the

21    debtor.  When you say debtor, let me just make sure I

22    understand this.  It's affi right.  Affi has the MSRs to sell.

23         S9:  They have yes, they have the contractual rights.

24         S6:  And RFI is the one that has the scratch and debt

25    loads to sell.

1          S2:  Correct.

2          S6:  And RFI is the one that owns the houses that are

3     two of the boby correct individuals are living in.  Correct.

4     And those homes are in Arizona.

5          S9:  Right.  To be clear, one is just a deed.  The

6     Sean, Sean, Bobby.  That's just a deed on the house.  We don't

7     actually have physical title of the house.  The other house,

8     Mr. Eric's house.  We have title two.

9          S6:  And both of those are in Arizona, correct?

10    There's one more question.  Excuse me just a moment.  I can't

11    find it.  Another item that you mentioned that was an asset of

12    the estate was you said that there may be causes of action.

13    Correct.  And what types of causes of action were you referring

14    to?

15         S9:  There could be a cause of action against insiders

16    and other parties due to this to the circumstance.  In this

17    case, we haven't gone and started pursuing all the causes or

18    even investigating all the cause of action.  But like in any

19    Chapter eleven, there's always cause a potential cause of

20    action.

21         S6:  And the potential causes of action against

22    insiders.  Would that include members of the BOWLBY family?

23         S9:  It may.

24         S6:  And do you happen to know where Eric's father

25    lives?

1          S9:  I believe he lives in Arizona, in the Phoenix

2     area.

3          S6:  His name is Ken, right?

4          S9:  I believe so yes.  Senior to Junior.  So I think

5     it's a senior.

6          S6:  And they were the two shareholders who owned AFI

7     prior to the foreclosure and the pledge?  No, the pledge

8     interest rate.

9          S9:  That's my understanding.

10         S6:  That's all the questions I have.  Thank you, Your

11    Honor.

12         S1:  Thank you, Ms. Richard.

13         S4:  I'm good if you are, Your Honor.

14         S1:  Yep.  All set to go.  Thank you.

15         S4:  Are you good?

16         S9:  We're good.

17         S4:  For the record.  Robert Denny for the committee.

18    Morris Nichols.  Austin Tunnel.  In your direct, you are asked

19    to describe from the time you received the phone call about

20    this potential engagement.  What did you do from that time

21    through the filing date?  And you answered, you perform

22    diligence.  So I want to explore a little bit about the time

23    you received the first phone call to the filing date.  Just so

24    we're all following along.

25         S9:  Okay.  Sure.

1          S4:  Okay.  When you receive the phone call about the

2     potential engagement, did you obtain any information to prepare

3     for an interview?

4          S9:  I don't believe I even received the name of the

5     company.

6          S4:  Okay.  Did you have conversations?  With whom?

7     Did you have conversations about the engagement or the.  Let's

8     talk about the potential engagement.

9          S9:  Mrs. Jones called me and said, I may have

10    something I could use a hand on.

11         S8:  Your Honor, I apologize.  Objecting to my own

12    witness.  But I would ask if it's all right with the Court.  I

13    do not want the witness to disclose the substance of the

14    communications that he had with Ms. Jones.  Even though he was

15    not yet retained.  It was in anticipation of his retention by

16    the debtors, which actually happened.  So if I could make that

17    clarification or objection on the record, I'd like to do it

18    now.

19         S1:  Mr. Dennie.

20         S4:  I appreciate the clarification, but there is no

21    privilege that attaches.  I haven't heard that Petrovsky was

22    engaged at that time.  And by whom?  So one with whom is the

23    privilege?  Two When did it attach?  He was not engaged.  Right

24    now, I just asked a simple question.  You received a phone call

25    about a potential gig.  Who called you?  And then what happened

1   after?  I do not believe they can demonstrate a privilege from

2   that phone call until the time they were all hired.  So the

3   burden is on them to demonstrate the privilege.  We have a

4   chronological with documents showing that Mr. Avila could not

5   have been engaged until the filing date.  So that's my

6   response, Your Honor.  I don't believe they can claim privilege

7   for anything up until that point.

8       S8:  Mr. LITVACK Your Honor, I wholeheartedly

9   disagree, and I don't have a problem with him asking about who

10  he spoke to when he spoke to them, if it was Ms. Jones.  It's

11  the question about the substance of the discussion.  We,

12  Petrovsky, were in the process of getting retained.  Mr. Avila

13  was in the process of getting retained and the information that

14  was being shared between us and Mr. Avila.  We view as

15  privileged for that reason.

16      S1:  When does the privilege attach.

17      S8:  Your Honor?  That's a tough question, but I think

18  from the very beginning, from the very first conversations,

19  once confidential information is being exchanged amongst

20  parties who are going to be representing one or the other.  If

21  you have an interview with someone.

22      S9:  And confidential.

23      S8:  Information is being disclosed, I think that is

24  within the scope of the privilege.

25      S1:  Mr. Denny.

1              S4:  There's no privilege that attaches.  Are you are

2      you are you saying there was an attorney client privilege

3      between Petrovsky and Paladin?  And if so at what point in

4      time, because you were not engaged by any of the debtor

5      entities until the change of control that's within your

6      retention papers.  Otherwise you might have an adverse

7      interest.  So what is it that you believe?  When will you

8      engage?  So for example, Your Honor, the problem I have with

9      this is yesterday they cut off questioning of Mr. Avila only

10     from the time he received a phone call through the filing.  And

11     we know that the communications had moved in from RCP because

12     there were no communications with the company, the debtor.  And

13     we know from what he signed that they were not engaged until

14     two hours before the filing because it was the board supposedly

15     who hired Mr. Avila.  So I don't understand how there could be

16     any privilege attaching if they're arguing that they were

17     engaged by RCP to prepare for it through that holding company

18     that was created.  And I have questions about that in the

19     schedules and how money flowed.  That creates other issues.

20     But we were told there are no privileges.  So I believe I am

21     free to ask the witness questions.  What happened from the time

22     you were contacted through the petition date?  And again, he

23     was being hired as an officer.  So I don't see how there's a

24     privilege that attaches, Your Honor.

25              S1:  Mr.

1          S8:  LITVACK Your Honor, I think that Mr. Denny is

2     drawing a very hard and fast rule that doesn't exist, which is

3     that you have to be formally retained before the privilege

4     attaches.  And by the way, we're not talking about any

5     communications with RCP or any RCP lawyer or any RCP business

6     people.  This is just Mr. Avila and Ms. Jones.  It's an

7     anticipation of an engagement that's going to take place.  If

8     you go in, you're interviewed by a potential client and the

9     potential client asks you for your assessment of a case, your

10    legal assessment of it, and you give it to them and then they

11    hire you.  He's saying that conversation isn't privileged

12    because they hadn't hired you at that particular moment, which

13    I would submit, Your Honor, is ridiculous.  The privilege

14    attaches as soon as you're speaking to someone confidentially

15    in anticipation of an engagement, especially when that

16    engagement actually occurs.

17         S4:  So just a brief response, Your Honor.  I don't

18    believe I'm just going to go with the timing.  The only

19    information that anyone could have obtained was from RCP.

20    Isn't that correct?  You did not see any books.

21         S1:  Okay.  We're.  We're working on this.  Objection.

22         S4:  We are.  I'm sorry.  It's just.  I understand

23    they don't want the questioning, but the fact is, it's not

24    privilege.  Ms. Jones wasn't engaged by the debtors.  Mr. Abela

25    was not engaged by the debtors, and they represented to the

1    Court.  His engagement occurred when the change of control

2    occurred.  And that two hour period from the change of control

3    and the filing.  Right now, I'm only focused on up until that

4    point and I don't see how they can claim a privilege unless

5    there was something that confirmed.  And the only one who could

6    have done that is RCP.  Ms. Jones could not have hired him.

7    She could not have confirmed that he was hired.

8         S1:  At the time of these conversations, and I want to

9    spend time on this.  I think it's important.  Who who was your

10   law firm's client?

11        S8:  Your Honor, my understanding is to break it apart

12   between the two debtors, because I don't agree with Mr. Dennis

13   characterization of Mr. Avila's testimony on this.  On this

14   point, Phoenix was already under the control of RCP.  They

15   didn't need to exercise the stock pledge.  So that occurred.

16   That was whenever they set up that entity.  And then my

17   understanding is that we were hired prior to the petition date

18   by Phoenix on or about September twenty-one.

19        S1:  That's August.  August twenty-one.

20        S3:  August.

21        S1:  Sorry.

22        S8:  Thank you for the correction.  With respect to

23   America, first, because there was no control of that stock

24   until the exercise of the stock pledge, which didn't occur

25   until August 24th, The hiring did not occur.  Our hiring did

1    not occur.  Mr. AVALOS Formal hiring did not occur until August

2    twenty-four.  What I'm saying is that even prior to that, since

3    the very first conversation, there may have been confidential

4    information that was exchanged between Ms. Jones knowing that

5    we would we were or we would be retained by Phoenix very soon,

6    August twenty-one, and then by America first.  There was an

7    anticipation of that engagement, and it was also in the

8    anticipation that Mr. Mr. Avila would be brought in as hired as

9    an officer, first for Phoenix and then for a first if and when

10   that exercise of the stock pledge took place.  So I'm just

11   saying that every conversation leading up to that should be

12   privileged.  If there were no other parties involved in that

13   conversation.  If I wasn't involved, if Quinn Emanuel wasn't

14   involved.  That's our counsel.  We're entitled to assert

15   privilege for those.  The substance of those communications.

16        S1:  Okay.

17        S5:  Let me just just very briefly.  That's okay.

18        S1:  Yes, Mr. Kemp.

19        S5:  I would just add that I think the context matters

20   here.  If the if the phone call was from Ms. Laura Davis Jones

21   to Mr. Avila about hiring him, then we're not talking about

22   hiring an attorney.  So if that's the purpose of the phone

23   call, then that context matters.  We're talking about hiring

24   him for a different role.  I just wanted to add that Judge.

25        S1:  Okay.  I'm going to overrule the the objection.

1   I think it's I think it's a very, very close call, a very

2   difficult call.  But at that time, the firm was not

3   representing America first.  And these were in discussions

4   between an attorney and a client who is the prospect of

5   bringing in a different professional to work on the engagement.

6   So I'm going to permit the line of questioning.

7          S3:  Thank you.

8          S8:  Just to clarify your ruling, is it that counsel

9   can ask about the substance of communications prior to August

10  twenty-one with respect to Phoenix and then prior to August

11  24th?  The prospective mayor.

12         S1:  First.  Thank you for clarifying.  As I

13  understand that there are two different dates of engagement for

14  Phoenix.  The date of engagement was August twenty-one.  For

15  AFI, it was August 24th.  So for conversations regarding

16  Phoenix prior to August twenty-one, I think those are those are

17  in play.  And for conversations regarding AFI before August

18  24th, those are in play.

19         S4:  Your Honor, if I may ask, Mr. Avila was not

20  engaged by anyone until 824.  The Petrovsky.

21         S1:  Okay.  I've.  I've already ruled.

22         S8:  Thank you, Your Honor.

23         S4:  Mr. Ravel, you testified earlier that you were

24  asked to perform diligence on AFIS operations.  Do you recall

25  that?

1          S9:  Correct.

2          S4:  Who asked you to perform diligence on AFIS

3    operations?

4          S9:  But let's say it wasn't asked to do that

5    specifically.  Anyone?  I knew that if I was going to be

6    retained as a CRO, I needed to perform diligence.  It wasn't a

7    request to perform diligence.

8          S4:  So nobody asked you to perform diligence on the

9    operations of AFI?  That's what you're saying.

10          S9:  Nobody tells me how to do my job.

11          S4:  Okay.  Who did you.  Who did you?  From whom did

12    you obtain information to perform your diligence?

13          S9:  RCP.

14          S4:  And who would actually pick.

15          S9:  A variety of people, I think.  Theo Smits.

16    Gentleman.  I don't know his.  Remember his last name?  Ricky.

17    And a guy named Alex.

18          S4:  And did you obtain information from our

19    professionals?  They were part of.

20          S9:  That due diligence.  No, no, not that I'm aware

21    of.

22          S4:  So do you recall the type of information you

23    received from RCP about AF operating information.

24          S9:  Number of employees, leases, cash expenditures.

25    So my team was trying to put together an understanding of a

1   cash projections, things like that.

2         S4:  Did you diligence the source of the information

3   you were being provided?  How did you come to believe it was

4   reliable?

5         S9:  We asked a variety of questions around that and

6   there's a level of most lenders and doing this for so many, so

7   many years have asked the company prior to my arrival and they

8   provided information prior to my arrival.  And they usually

9   have a pretty good understanding of the credit they've invested

10  in.  I never walked, as I said to somebody one time, I never

11  walk in when you're not in default.  So clearly there had been

12  information calls, communication transfer of information and

13  knowledge based on not only the underwriting of the credit

14  prior to my arrival, but also the managing the credit.  So

15  there is some sense of they may not be one hundred percent

16  accurate, but you know what the company be.  So therefore,

17  that's how I took their information to go validate it with AF.

18  I know, but the reality is that information turned out to be

19  not accurate.  It was worse than accurate.  What do you mean?

20  The performance of the business was ways way farther south than

21  even RCP had managed, way farther degraded than RCP even

22  thought.

23        S4:  So what other diligence did you under?  I guess

24  let's go back.  You said there were a number of calls and

25  information back and forth.

1          S9:  I didn't say that.

2          S4:  All right.  Please then.

3          S9:  What's your question?

4          S4:  The diligence you performed, you said you

5    obtained all the information from RCP.

6          S9:  Correct.  That's what I said.  I didn't say there

7    was any calls.

8          S4:  How did you obtain the information from RCP?

9          S9:  We had a meeting and we had a robust

10   conversation.

11         S4:  So there was just one meeting in a.

12         S9:  Year long meeting over two days.

13         S4:  When was that?

14         S9:  On Tuesday, the 22nd and Wednesday the 23rd.

15         S4:  And other than that meeting that occurred over

16   those two days, did you perform any other diligence to

17   understand AFIS operations?

18         S9:  The information provided in those meetings that

19   lasted two days in Phoenix, but not at an AFI facility and

20   probably went on for twelve hours a day?  No, we did not

21   provide any to do any of this besides a twenty hour window.

22         S4:  And there were no documents involved in the

23   presentations to you and your team.

24         S9:  They provided us, as we talked in, whether it was

25   list of employees, list of leases, various information like

1    that.

2         S4:  I think you testified in response to the U.S.

3    trustee's questions.  You don't have any experience dealing

4    with securitizations and MSRs, correct?  Correct.  Okay.  What

5    did you do to diligence the status of the securitization and

6    MSR assets as of the 22nd and 23rd?

7         S9:  Nothing.  I didn't need to.

8         S4:  Okay.  You mention liquidity that you observe

9    that there is a need for liquidity.  Do you recall that?

10        S9:  I sure.

11        S7:  Do.

12        S4:  What did you do to understand the company's

13   liquidity?

14        S9:  My understanding was the company was not

15   understood how the company from the lender made payroll on the

16   5th of August.  Payrolls paid, as I said earlier today on the

17   fifth and the 20th of every month.  The company did not have

18   enough liquidity on the fifth to make payroll.  When asked how

19   payroll was made, because it wasn't generating enough cash from

20   operations and it wasn't paying any interest to RCP, that was a

21   big concern because I think I coined to RCP it's like a flesh

22   eating animal, just eating itself.  On August 20th, that

23   payroll was going to be made, which was, and it had to be

24   funded on Thursday, I believe today, the week before we saw the

25   17th, no one was aware how that payroll was funded.  That

1    information and and the information we had.  And it's not

2    perfect, but it's this information available was $400,000

3    roughly of cash.  And we weren't really sure the number because

4    no one knew the number.  So we knew that the payroll made on

5    the Fifth and any other obligations, health care, if things we

6    ask for in the first days was unlikely to be paid.  So there

7    was enough evidence there on my opinion that this company

8    couldn't live any longer.  And my personal opinion?  This

9    company should have filed bankruptcy in August of 2022, not

10   August of 2023.

11           S4:  When you arrived at the company and you're saying

12   that the company needed cash?  I'm sorry, actually, did you

13   just say there was a payroll paid and no one understood where

14   the money came from?

15           S9:  Correct.

16           S4:  So there was a payroll made.  And you're saying

17   that RCP communicated to you they did not understand the source

18   of the cash for the payment?

19           S9:  Correct.

20           S4:  Now, at the time, had I mean, they have locked

21   boxes, right?  They control the.

22           S9:  Cash.  No.

23           S4:  That's not that's your.

24           S9:  My understanding is they weren't controlling the

25   cash and how that cash got paid.  They might have put another

1   account.  No one knew at the time.

2       S4:  Well, that's that let's let's focus on that

3   because as the crow you're saying you arrived at the time and

4   you did your diligence, did you inquire how the cash management

5   system worked and who controlled disbursements?

6       S9:  We asked for a list of people and understand who

7   managed what.  Some of it they knew, some of it they thought.

8       S4:  So you had no more information about that on the

9   24th and what you're telling us now?  Right.

10      S9:  I had no more information on the 24th and I have

11  today.

12      S4:  No, on the 24th.  I just asked.  What information

13  did you obtain concerning cash management and who had the

14  ability to.

15      S9:  Approve them prior to the petition or after the.

16      S4:  Petition?  As of the 24th.

17      S9:  At the beginning of day, at the end of the day.

18      S4:  The commencement of these cases.

19      S9:  Okay.  At the beginning of the day, cases filed

20  about noon.  So the beginning of the day, I didn't have any

21  more information of who did what or where or how I had ideas of

22  who did it and how they managed it.  Based on conversation with

23  RCP and looking at a list of employees.  But I know for sure

24  who managed cash and how it was set up and what lockbox was

25  there and where Cash was.  No, it's not any different to any

1    other debtor.

2         S4:  Then how did you know that there was a liquidity

3    issue and they needed cash and they needed to file.

4         S9:  Because based on the information that was

5    provided and the fact that no one knew how the hell they made

6    payroll last to last payroll periods and come to find out it

7    was all true.  So whether I didn't make a guess that we didn't

8    have any fact, the fact is that was all accurate.

9         S4:  So you didn't inquire of RCP whether it swept $5

10   million at the end of May?

11        S9:  It was irrelevant.

12        S4:  Or 3.2 million at the at the beginning of July.

13   Right.  You didn't.

14        S9:  Inquire that.  I didn't inquire where the cash

15   was or where it was.  I focused on what were here and now.  I

16   didn't care what happened in the past and I didn't inquire

17   about.  Did you sleep?  Did you spend time sleeping?  It was

18   how much cash you have today, how you got here.  I have to

19   focus on what's here and now.  I don't have time to focus on

20   what happened in the past.

21        S4:  And on the 22nd of August, $600,000 was paid to

22   or CPA.  That's the amount of the payroll you're talking about,

23   right?

24        S9:  Say that again.

25        S4:  600,000 was swept by RCP on the 22nd of August.

1   Did you inquire about that?

2        S8:  Objection, Your Honor.  I don't really know where

3   counsel is getting that as a fact.

4        S9:  I never heard of that.

5        S8:  I don't see that in the record.

6        S1:  That's his answer.  He's not familiar with it.

7        S5:  Thank you.

8        S4:  I'll keep moving.  Your Honor.  So when you so in

9   the 19th you received a phone call, correct?

10        S9:  Correct.

11        S4:  And then on the 24th, RCP exercised remedies and

12   exercised on the pledge of stock and took the stock and put it

13   into the holding company.

14        S9:  Correct.  Correct.

15        S4:  And you had an understanding that those were the

16   steps that were going to happen before the 24th?  Correct.

17        S9:  I had an understanding at some point before the

18   24th that was that they were going to exercise a pledge, which

19   I've seen happened quite a few times.

20        S4:  Actually, I think that's the case that was

21   mentioned right Then another example where the lenders exercise

22   the pledge.

23        S9:  And I'm not in the case.

24        S4:  I guess I'm just trying to understand a little

25   bit about.  Well, withdraw in Your Honor.  So when do you

1   believe you were engaged by the debtors?

2          S9:  I was engaged, I believe.  And it was more of a

3   conversation and a consent that happened with 1040 on the

4   Tuesday.  I'll call it Tuesday the 22nd.

5          S4:  And what did you do to diligence with that entity

6   was or comprised that entity?

7          S9:  I didn't diligence 1040 LLC.

8          S4:  You didn't ask whether it had operations.

9          S9:  I was focused on the problem at hand.

10         S4:  So you didn't think there was a problem at hand

11  at that entity, so you didn't?

12         S9:  I thought I knew it was a holding entity for this

13  potential stock of AFFI.

14         S4:  So you weren't worried about that entity because

15  it had no assets or operations or employees to pay?  Correct.

16         S9:  I focus on what's the key issue at hand, not a

17  secondary issue.  My key issue hand was the cash and making

18  payroll that was due that following week.  So I wouldn't have

19  the time or wherewithal or resources to go diligence every

20  potential action here.

21         S4:  Why did you not have the time or the resources?

22         S9:  Because there was a lot to do in a limited time

23  with limited data.

24         S4:  And yet you concluded it was in the best interest

25  of the companies to file two hours after you were retained by

1    Affi Right.

2            S9:  I concluded that based on the information we had

3    done before, that that upon my retention, that that was the

4    best strategic alternative available to this company.  As I

5    just stated, they should have filed away prior to that.  Based

6    on the operating losses of the business since 2022 and the cash

7    losses it was in, that's what I just saw on my previous

8    assignment in the same affiliated industry.  Yeah, I'm pretty

9    accurate on that one.

10           S4:  So let me ask the Phoenix 1040 LLC.  You remember

11   signing that petition?

12           S9:  Yes.

13           S4:  And I think you've just testified you didn't do

14   anything to evaluate assets, liabilities, creditors.  You

15   didn't have the time or.

16           S9:  What day Prior to 1040, we asked about it and we

17   signed it because we knew it was its only asset was the asset

18   of the holdco asset.  I found that out prior to the filing.

19           S4:  And how'd you find that out?

20           S9:  Conversations where I think some RCP individuals.

21           S4:  Do you remember.

22           S9:  Who?  No, I don't.  Okay.

23           S4:  So Phoenix 1040 LLC the only thing that it holds

24   is the stock in Affi, correct?

25           S9:  Correct.

1          S4:  And that's an Arizona company, right?

2          S9:  Advising.  Arizona Company.  Correct.

3          S4:  Okay.  Sitting here today.  Phoenix, 1040, has no

4   creditors as far as you know.  Right.

5          S9:  Direct creditors.  That's correct.

6          S4:  And it has no assets other than the stock,

7   correct?

8          S9:  Correct.

9          S4:  And it shows in the sofas in Your Honor.  Now, at

10  the debtors Exhibit sixteen, you need to make sure we have the

11  right one.  You signed the schedules and so.  Correct?

12         S9:  Correct.

13         S4:  There's a reference to retainers paid to your

14  firm and Petrovsky.

15         S9:  Correct.

16         S1:  Can you please point to the page number?

17         S4:  Yes, Your Honor.  I'm sorry.  Well, actually,

18  before we do that, Your Honor, since I have the tabs, let me go

19  back.  Would you go to exhibit sixteen, Mr. Aguilar?

20         S9:  I don't have anything to go to.

21         S4:  It's in the debtors binder.

22         S1:  Yes, please do.

23         S4:  Thank you.

24         S9:  Tab sixteen.

25         S4:  Yes, please.  Okay.  I'd ask you to flip through

1   it quickly.  I just want to make sure you recognize the

2   document.

3           S9:  Yes, I recognize the document.

4           S4:  And how do you recognize the document?

5           S9:  We prepared it and preparing this stuff in the

6   schedules we file.

7           S4:  Okay.  Great.  Would you look at page seventeen?

8   828.

9           S9:  Yes.

10          S4:  Your name is listed there, isn't it.

11          S9:  A name listed here in twenty-eight?

12          S1:  Mr. Danny, I'm not clear where we are.  Can you

13  refer to the page numbers at the top of the page?

14          S4:  Yes, Your Honor.  I'm looking at this exhibit,

15  and on the top, I have the file date of ten, 1223.  And next to

16  that, it's page seventeen or eighteen.  Were you able to find

17  it?

18          S1:  Oh, I'm with you.

19          S4:  I'm sorry.  No, that's okay.  These documents are

20  not fine.  I just wanted to confirm.  28.2.  List you with a

21  mesa, Arizona address, correct?

22          S9:  Correct.  Okay.

23          S4:  And then if you flip back to next page, other

24  businesses in which the debtor has or had an interest.  25.1

25  American Financial.  That's Mesa, Arizona, correct?

1          S9:  Correct.  Okay.

2          S4:  So what is the what is the purpose of having this

3  case in bankruptcy today?

4          S9:  Excuse me.

5          S4:  Why did why did you recommend and authorize the

6  filing of this petition?  What was the purpose?

7          S9:  The petition for RFI.

8          S4:  Now Phoenix 1040.

9          S9:  LLC, because its only asset was bankrupt.

10          S4:  But it has no creditors, right?

11          S9:  It may have creditors.

12          S4:  Well, you filed the schedules and sofas.  You

13  didn't list anything, right?

14          S9:  Correct.  I said it may have creditors.

15          S4:  Okay.  Who owns Phoenix 1040 LLC?  Do you

16  remember that?

17          S9:  Ten for Phoenix.  1040 Holdings.

18          S4:  And who owns Phoenix?

19          S9:  1040 Holdings?  Our reference Capital Partners.

20  Or a fund thereof.

21          S4:  So on ten on 824, RCP has lender exercised its

22  remedies, Correct?

23          S9:  Correct.

24          S4:  And at that point, RCP was both the owner of the

25  company and the lender of the company, correct?

1          S9:  Correct.

2          S4:  What was the reason to file bankruptcy two hours

3     later?  Was there something that was going to happen that in

4     your business judgment, required the immediate filing of the

5     companies?

6          S9:  In many situations, not only this one, but others

7     I've been involved in, and I can list a few of those if you'd

8     like.

9          S4:  No, I just want to know about this one.

10         S9:  Okay.  Lenders will not provide capital to a

11    situation unless it's under the protection of a Chapter eleven.

12    It's just a fact.

13         S4:  Is that what they told you.

14         S9:  That it was?  They weren't willing to fund

15    outside of a Chapter eleven.

16         S4:  But they told you that, correct?

17         S9:  I asked.

18         S4:  And who did you ask?

19         S9:  I don't recall.  But it was never a conversation

20    about funding after twenty-four.  They were not going to fund

21    this outside of the Chapter eleven.

22         S4:  What was your understanding of why?

23         S9:  For the reasons that have the People that have to

24    do that to this, they said they wanted to protect the Chapter

25    eleven bankruptcy.  I wasn't their legal advisor, sir.

1           S4:  Well, I'm just trying to understand the

2     decisions.

3           S9:  I've been involved in, at least in the last

4     fifteen years.  And that was the case.

5           S4:  Between August nineteen and August twenty-four.

6     Did you have any communications directly with Affi?

7           S9:  No, I did not.

8           S4:  Were you aware?  Did you are you aware was there

9     anything prohibiting RCP as the owner and lender from simply

10    funding the payroll.

11          S9:  Prohibiting them?  I don't.  I'm not aware of

12    anything that was prohibiting them.

13          S4:  Was there?  Did you observe in the two hours you

14    were the CRO before the filing?  Did you observe an imminent

15    threat to the value of the assets that required the automatic

16    stay.

17          S9:  An imminent threat?  We knew that if payroll was

18    not funded, that the potential value of the MSRs would be

19    impaired.  Is that imminent?  It could have been.  And it was

20    it was a concern that was discussed.  It was discussed with

21    Jeff, Dana and I, the independent director.

22          S4:  And I think he was appointed maybe after you were

23    appointed, but we'll get to that.  So but I just want to

24    understand so that there was there was no imminent

25    precipitating factor.  It's not that someone was about to

1   exercise remedies as a lender because that happened already,

2   right?

3          S9:  Well, the lender had already exercised its

4   remedies.

5          S4:  Right.  So we didn't have to worry about the

6   lender exercise.

7          S9:  I didn't know about it.  I couldn't tell you what

8   somebody else was going to do.  I didn't have information to

9   tell you what the MSRs were going to do.  But it was it was a

10  very it was a concern that we needed the protection of the of

11  the Court to preserve the value of the assets.

12         S4:  And it was a concern expressed to you.

13         S9:  Or.

14         S4:  On your own with all that diligence you

15  performed.

16         S8:  Your Honor, I'm going to object at this point to

17  this line of questioning, because the issue before the Court

18  isn't whether the debtor should have filed for bankruptcy.

19  It's where they filed for bankruptcy.  That's the venue issue.

20  So I've tried to give Mr. Denny as much leeway.  I'll move on

21  at a certain point.

22         S1:  Okay.  Objection.  Sustained.

23         S4:  So when you file bankruptcy, when you authorize

24  the filing of the bankruptcy, I think you listed the assets as

25  there are two types of assets.  Right.  Causes of action and

1    assets related to the operating business of affi.  Correct?

2            S9:  Correct.

3            S4:  And and I think I just want to confirm.  So the

4    MSRs, I guess, explain to us what your understanding is of the

5    MSRs.

6            S9:  The MSRs.  It's a it's a a right.  We have to

7    provide mortgage servicing to those those underlying mortgages

8    that are held by various third parties, that are guaranteed by

9    various third parties who collect payments and what have you.

10   The actual activity of that, We've outsourced to a company

11   called Service Max.  So we have the right to and every month we

12   generate around $100,000 in revenue from that.  But that goes

13   as long as those assets are performing.  That's the the asset

14   it is.

15           S4:  And I think we we already covered people who've

16   covered.  You had no experience with MSR securitizations,

17   right?  I think you said that you made a verbal presentation to

18   the board.  Why bankruptcy was the best way to maximize value

19   of the assets.  Is that right?

20           S9:  That was the logical strategic alternative.

21           S4:  My question is, did you make a verbal

22   presentation to the board members as management?  Why there

23   should be a bankruptcy filing?

24           S9:  Correct.

25           S4:  And that was because you believed that was

1    preserving the assets?

2          S9:  Correct.  Preserving the assets and getting

3    liquidity into the business.

4          S4:  And but you had no understanding of the

5    consequences of filing on the MSRs.  Right.

6          S9:  We felt that the MSRs, if we could reach out to

7    Jenny Mae and the federal Jenny, Freddie and any others, that

8    they would would be barred from taking any action, that if the

9    company was not able to make payroll, that it could impair the

10   value and they could pull the servicing rights.  If they pull

11   the servicing rights, the value of that asset is destroyed.

12         S4:  But they can do that today even with the

13   bankruptcy.  Right.

14         S9:  I'm not sure that's easy.  And we now have a path

15   to monetize them that's clear.  And the support which we spent

16   a fair amount of time working on to get their support and

17   hopefully we still have it.  And hopefully when we file that,

18   they're aware we're going to be selling those assets.  They're

19   aware of the potential buyer and they're continuing to support.

20   I don't have any fires now that we need to put out as long as

21   we continue down the path we're going.  And if there's a

22   conversion, as an example, I'm not sure they're going to

23   continue to support.

24         S4:  But all of those discussions occurred after you

25   suggested you told the board it was best to file to maximize

1   the value, right?  Correct.  So none of those discussions

2   occurred between you and those counterparties before the

3   filing.

4          S9:  Correct.

5          S4:  And you had therefore no idea what was going to

6   happen to the MSRs or their value?  Correct.

7          S9:  I had an idea that based on previous experience

8   and other matters that most situations you get support through

9   the Chapter eleven process by third parties, at least for some

10  period of time.

11         S4:  So have you heard what our goals are as with the

12  bankruptcy filing?

13         S9:  We intend to file a plan.  I believe we filed it.

14         S4:  So there are the MSRs and I think you mentioned

15  that's going to they're going to generate roughly eight

16  million, I think you said.  Right.

17         S9:  We hope.

18         S4:  Okay.  And then there are the scratching debt

19  loans.  And I think you said that's going to be, say, three

20  million net.

21         S9:  Three, three and a half.

22         S4:  And the Cash king properties.  I think that's a

23  de minimis number, right?

24         S9:  A couple of hundred.

25         S4:  Okay.  So does it sound like those total roughly

1   nine and a half million?

2        S9:  I'm trying to list the other assets.  I know we

3   have a schedule and I thought it scheduled total around

4   fourteen.  So then you have scratch and debt.  Gets you to

5   about three and a half.  Eight, eleven.  I'd have to go back

6   and look.  And then the resident real estate.  So maybe a

7   couple of million there.

8        S4:  So let's assume that it's the fourteen million.

9   That's what you think it's going to total, right?  At some

10  point, roughly.  And you've already run the process to sell the

11  scratch and dance and the MSRs, right?

12       S9:  Well, we've run a process.  We haven't had them

13  approved.  We filed one of those.

14       S4:  But the MSRs sale is if you're going to file

15  this.  I hope so.  This week or next week, right?

16       S9:  I hope so.

17       S4:  And the buyer has been selected after bidding?

18  Correct?

19       S9:  Correct.

20       S4:  Okay.  So we know what those numbers are likely

21  to generate, correct?

22       S9:  Correct.

23       S4:  And that's the fourteen and a half.  Roughly.

24  Roughly.  Okay.  Now.  When the budget that was attached to the

25  debt shows it's another thirteen weeks out.  You're familiar

1   with the budget, right?

2           S9:  Yes.

3           S4:  And you're familiar with the budget because you

4   supervised the creation of it.

5           S9:  Correct.

6           S4:  And the the the disbursements.  Do you recall

7   what the total disbursements are going to be for the whole case

8   through the end of that thirteen week?

9           S9:  I don't recall.  Top of my head operating

10  disbursements are total disbursements total.  I don't I don't

11  recall top of my head.

12          S4:  Well, let's go operating.  You remember what I

13  don't recall.

14          S3:  You're on objective.

15          S8:  Basis that this is not relevant to the venue

16  dispute.

17          S4:  It is, Your Honor, because they said if you

18  transfer venue, it's going to blow up the debt.  They put at

19  issue whether there's going to be some harm to the estate.  If

20  the case is transferred and I'm walking them through the

21  numbers.

22          S8:  We cited a provision, that event of default that

23  said.

24          S4:  Your Honor, I have a few more questions and I'll

25  tie it together.  But the point is, the total asset recovery is

1   going to be fourteen million and change the expenses and the

2   debt is going to be twenty-two million with a seven and a half

3   delta negative.  There's no harm to the estate and creditors if

4   the case is transferred or if there's no debt.  This isn't the

5   dip hearing.  But when they suggested, oh my God, it's going to

6   happen.  The fact is, the only reason you would be concerned is

7   if you need if the estate needed the dip to monetize assets for

8   the benefit of the estate and the numbers add up that it

9   doesn't.  So from the committee's perspective, we're okay.  If

10  if RCP decides they don't want to lend and therefore don't get

11  a debt.  And more importantly, an adequate protection claim,

12  there's no involuntary imposition of the automatic stay here

13  that benefits the estate and creditors.  That's where I'm going

14  with this witness.  It's for that point I can move on and just

15  deal with it.  But this is the person who knows.  We just ran

16  through the assets and the liabilities and the outflow of cash

17  is what I was going to deal with.  And it's like two questions,

18  if I may.  Just two questions and then I'll move on.

19         S1:  I'll give you two questions.  Thank you.

20         S4:  In the schedules, in the AFI schedules you

21  identified which exhibit you had the the debt of RCP over

22  twenty million, but in the different dancing papers you had the

23  lower fifteen 798 zero eighty-seven.  Do you do you understand

24  what that represents, that difference?

25         S9:  It may be something I don't necessarily know what

1    the difference is sitting here today.

2         S4:  But in the debt financing motion and in your

3    first aid declaration, you represented that the secured debt as

4    of the petition date was fifteen seven 9887.  Does that sound.

5         S9:  Right?  Correct.

6         S4:  And the dip is five million, right?

7         S9:  The proposed dip is five million.

8         S4:  So that would be twenty almost $21 million,

9    correct?

10        S9:  Correct.

11        S4:  And and I believe I think that's with the

12   schedules and so this.  And I think we've covered dollars and

13   cents of the case.  So I have a handful more questions, please.

14   On August 24th when the change of control occurred.  Were you

15   physically in Los Angeles or Arizona?

16        S9:  Arizona.

17        S4:  Why?

18        S9:  We were meeting with Eric BOLLING.

19        S4:  That's where the company is located, right?

20        S9:  That's where Eric was.

21        S4:  Is that where the company is located?

22        S9:  His primary offices are there.

23        S4:  And you're down to twenty-two people, I think.

24   Is that right?  seventeen.  And where are they located?

25        S9:  Arizona.  Colorado.  Florida.

1          S4:  Your team.  You're based in Los Angeles, right?

2          S9:  I get that question a lot.  I don't know where

3   I'm based.  It's been half my time on the West and half the

4   time in the East.  John just asked me that question on the way

5   over.

6          S4:  So you reside in in L.A.?

7          S9:  No, I.

8          S4:  Don't.  Where do you reside?

9          S9:  Incline Village.

10          S4:  Where's that?

11          S9:  Lake Tahoe.

12          S4:  Mr. Lambeau.  He's on your team.  Is he based out

13   of the New York, New Jersey area?

14          S9:  Yes.

15          S4:  Then you have another individual, Stefan.  I

16   won't try to pronounce the last name.  That's Chicago, right?

17          S9:  Chicago.

18          S4:  And then you have a Christin.  That's Los

19   Angeles, right?

20          S9:  Central Valley.  But yes, close enough.

21          S4:  And why is Chicago?

22          S9:  Why is Chicago.

23          S4:  And West Gonzalez's L.A.?  Right.

24          S9:  This is.

25          S4:  L.A., Mr. White.  Back in California, too, isn't

1    he?

2              S9:  I think he is.

3              S4:  So from a professional perspective, if the case

4    is transferred to Arizona.  Everyone's pretty much on the West

5    Coast.  He's dealing with this on a day-to-day basis.  Right?

6              S9:  Well, we're not on site that much anymore, so

7    it's irrelevant where the case is.

8              S4:  Why aren't you on site that much anymore?

9              S9:  Because there's not as much activity to do.

10             S4:  Okay.  So one of the other I want to go back.  We

11   talked about the salable assets.  Now the assets as of the

12   filing date.  The cash is king.  Scratching that MSRs.  What

13   did you do to understand whether they were encumbered or

14   unencumbered?

15             S9:  Well, yeah, that's a legal conclusion.  What we

16   did is just talk to counsel and ask counsel.  That question is

17   how did it look?  But based on pretty good experience and you

18   don't see a lot of unencumbered assets anymore.  So there you

19   go.

20             S4:  Well, when you assess the company's liquidity,

21   did you inquire whether there were unencumbered assets?

22             S8:  Your Honor, objection to relevance.  And also, I

23   should have object to the last question.  It calls for a legal

24   conclusion.

25             S1:  Okay.  Well, he already answered the last

1    question, so that one's gone.  What's the relevance to the the

2    the venue of the case?

3         S4:  Your Honor, it really goes to the assets and sort

4    of where the assets are.  And.  And prejudice of of

5    transferring.  That's all.  So is it your understanding that.

6         S1:  Hold on a second.  Mr. Litvack, did you have any

7    response to that?

8         S8:  Nothing further, Your Honor.

9         S1:  Okay.  Okay.  Objection.  Overruled.

10        S4:  Is your understanding the RCP asserts a lien and

11   all of the assets we listed so that the the cash is king

12   scratches and and MSR?

13        S9:  That's my understanding.

14        S4:  Okay.  And do you.  They made their loan to Affi?

15   Correct.

16        S9:  They made their loan.  Say if I correct.  Okay.

17        S4:  Do you have an understanding of whether before

18   the bankruptcy and the debtor-in-possession financing, they had

19   a lean in any causes of action?

20        S9:  I have no idea.

21        S4:  Okay.  Did you investigate?

22        S9:  No, I did.

23        S4:  Did you look into whether there were claims

24   against RCP?

25        S9:  Not at that time.  Okay.

1          S4:  Who are the directors at the holding company?

2    Debtor.  Do you know?

3          S9:  Are you talking about Phoenix 1040 LLC?  I am.  I

4    believe that is David Sloan.

5          S4:  It's only Mr. Swan, correct?

6          S9:  That's my understanding.

7          S4:  Okay.  And affi I think you said there are two

8    individuals, correct?

9          S9:  Correct.

10          S4:  And I think it maybe it was your deposition

11   yesterday, but at that at that level, when was Mr. Dane brought

12   in?  Do you know?

13          S9:  Define brought in.

14          S4:  Well, why don't you explain to me your

15   understanding of when he became the independent director of

16   that entity?

17          S9:  He became the independent director of that entity

18   the morning of the Thursday morning of August 24th.

19          S4:  Okay.  And did you why do you refer to him?  What

20   lead you to state?  He is the independent director of RFI.

21          S9:  It's my understanding talking to Jeff, he had no

22   relationship with Reverends Capital Partners, RCP or any of

23   their funds prior to this, the involvement of his involvement

24   here at RFI.

25          S4:  What about the professionals?  Did he have any

1    connections with those?

2         S9:  I didn't.  I don't know about that.  Okay.

3         S4:  So at the time, there was no.

4         S1:  Please.  Silence.  Phones.

5         S4:  Are you aware?  Was there a resolution delegating

6    to Mr. Dame exclusive power and authority for conflict issues?

7         S9:  I don't know if there's a resolution.

8         S4:  Do you know whether Mr. Dan was allowed to hire

9    independent counsel if he so chose?

10        S9:  I don't know if he was aware or not aware.  I.

11        S4:  When did you learn that the MSRs could not be

12   sold with recs and warranties?

13        S9:  I never said they couldn't be sold out.  Reps and

14   warranties.

15        S4:  Can they be sold with reps and warranties?

16        S9:  We don't have reps and warranties today, but

17   we're selling those those MSRs.

18        S4:  But after the petition date, when did you learn

19   that there were you could not sell them for X and warranties?

20        S9:  I think that is a misunderstanding.  I never said

21   we couldn't sell MSRs.

22        S4:  I understand.  When did you learn you could not

23   sell MSRs with reps and warranties as was done in the normal

24   operating course?

25        S9:  Well, I learned that we weren't able to provide

1    reps and warranties, certainly after the bankruptcy, but.

2         S4:  You mentioned that.  Do you believe it's relevant

3    to where the case proceeds that a liquidating plan has been

4    filed?

5         S9:  Excuse me.

6         S4:  Of what relevance do you place on the filing of a

7    liquidating plan late last night.

8         S9:  That the case is moving along?  It's.  I see a

9    path to the end and the assets that we're going to monetize,

10   the need for leases and personnel.  I can see an end to that.

11   I can see an end that we want to make this a speedy and as

12   efficient as possible.  And the plan process helps us get

13   there.

14        S4:  Were there any discussions with the committee

15   about the plan?

16        S9:  I'm not aware of any.

17        S4:  There was a reference to committee members

18   mortgage shot, I think is a name.  I just want to make sure we

19   cover over this.  Well, actually, let's go back to the

20   schedules themselves for AFI show $14 million of unsecured

21   claims, correct?

22        S9:  Approximately, yes.  Okay.

23        S4:  Counsel suggested that maybe there's an issue

24   with the committee members.  Did you check with Omni to see if

25   mortgage shot filed the proof of claim?

1        S9:  Did not check if mortgage had filed a proof of

2   claim or anyone else.

3        S4:  Is it is it the debtors position that the

4   committee's the committee's views are irrelevant based on how

5   many members are on the committee?

6        S9:  I don't think we've ever discussed the relevance

7   of of a committee member or the irrelevance of a committee's

8   position by any level.

9        S4:  In the debtors.  Reply that Debtor suggested

10  there was no one with an economic interest supporting a

11  transfer of venue.  The committee voted to transfer venue.  Why

12  is the debtor not consenting?

13       S9:  As I said earlier, it doesn't make economic

14  sense.  This case you just went through the the pluses and

15  minus and assets and liabilities.  This is not a textbook case

16  which I've had in this building before.  This should be in and

17  out.  And I don't see the economic rationale.  Now, I'm not

18  going to get into the legal rationale that's above my pay

19  grade.  But I'll tell you, I don't see the economic rationale.

20       S4:  Your Honor, if I could just have one or two

21  minutes, I might be.

22       S1:  Sure you can.

23       S4:  Your Honor, if I can approach the witness, we're

24  getting another.  Another copy.  This is going to be one of the

25  emails.  Just a question about that.  So the dates number at

1    the bottom is our eve.  A bunch of zeros and then one, six,

2    seven.  So I'll just mark it as UCC.  I'll do it one A Since

3    the others have already been done.

4            S8:  On the objection, ask for a copy.

5            S3:  And may I as well Your Honor, for.  Thanks.

6            S8:  Can I take a look at this?  Just look at it.

7            S1:  Yes.

8            S3:  Your Honor, we object.

9            S8:  To using this document if it's not on the

10   committee's exhibit list.

11           S3:  I would join in that attack.  The first time so

12   prejudicial likely to.  Both of them are interested to not have

13   noticed that this really is your response.

14           S4:  I do.  Your Honor, of course, we have the ability

15   to use documents on rebuttal or for rebuttal, rebutting things

16   stated by witness.  The witness has testified to you the bona

17   fides of the filing and the timing, as well as the termination

18   of employees.  And this document is dated August twenty-one.

19   He is on it.  There are a bunch of people on it, Mr. Avila.

20   All the reference people, their counsel, and it is talking

21   about the imminent risk.  So it goes to rebut the direct

22   testimony that was elicited about the liquidity, the need, the

23   importance of paying the employees they already planned on

24   ripping them.  Was it in the first days or the declaration?

25   But it was already discussed in plan.  So that's why I'm

1   introducing it.

2        S8:  Your Honor, if you look at this email, it doesn't

3   it doesn't seem like proper impeachment, because just doesn't

4   relate to anything that Mr. Avila testified about in terms of

5   the timing of his engagement.  Plus, there's reference to an

6   attachment here, at least on one of these emails and then no

7   attachment.

8        S1:  Yeah, I can I have a copy.  I can't.  I'm sorry.

9   Nothing is stamped in my my attachments to the letter.

10       S8:  And you can use my.

11       UU:  Sure.  Thanks for.

12       S1:  And we're we're looking at the the top email or

13  are we looking at the entire chain?

14       S4:  Your Honor, I believe the whole document would

15  come in.  It goes to the preparation that was undertaken.  It

16  shows that it was at the time he was first contacted.  So there

17  was no engagement.  And then it goes to his testimony that they

18  needed to file two hours after being retained to to pay the

19  employees to maintain a going concern.  These documents impeach

20  All of that testimony are.

21       S1:  I'm not sure it does, but I'll allow it in.

22       UU:  Thank you, Your Honor.

23       S4:  Just one more one or two more questions, Your

24  Honor.  Mr. Avila, counsel said that the venue was transferred.

25  It would trigger a default.  Did you hear that?

1          S9:  I heard that.

2          S4:  Are you familiar with the debt?

3          S9:  I'm familiar with the debt.

4          S4:  Did you negotiate the terms?

5          S9:  Yes, many of the terms.  I didn't negotiate the

6     legal terms, but I negotiated the economic terms.

7          S4:  And you signed off on the stipulations and the

8     releases in that.

9          S9:  Order, correct?  I did.

10          S4:  Do you believe they're binding and effective

11     today?

12          S8:  Your Honor, Jack, that calls for a legal

13     conclusion and also completely irrelevant to the issue of venue

14     it.

15          S4:  All I'm asking is his understanding is the person

16     who said he just negotiated it.

17          S1:  Objection.  Sustained.  It calls for a legal

18     conclusion.

19          S4:  Do you?  I think that's all I have.  Your Honor.

20          S1:  Thank you, Mr. Denny.  Does anybody else wish to

21     question the witness?

22          S5:  Your Honor.  John Kim from PASHMAN Stein on

23     behalf of interested party.  Toby, I have some questions as

24     well, but if I could just ask, Your Honor for a five minute

25     recess.  You want to use the bathroom first?  Of course.

1          S4:  Before we break the Earth trust.  You reminded me

2    to move in all our exhibits, so I would ask to do that before

3    you breath.

4          S1:  Okay.  Are there any objections to the admission

5    of committee exhibits one through fifteen?

6          S3:  No objection.

7          S1:  Okay.  They are admitted.  Okay.  So we're going

8    to take a five minute break.  Let's come back at 1220.  We're

9    in recess.

10          UU:  But I will not tell you whether.

11          S7:  I live in.

12          S9:  A six.

13          S2:  Day old water.  I was thinking the same thing.

14    Sorry.  This.  This is going to go.

15          S1:  Go on.  All rise.  Please be seated.  Let's

16    begin.

17          S5:  Good afternoon, Your Honor.  Good afternoon, Mr.

18    Avila.

19          S9:  How are you?

20          S5:  Just want to start by thanking you for your time

21    here today, and I will endeavor to be as brief as I can.  Mr.

22    Avila, you you testified on direct that your first contact in

23    This matters was with Ms. Laura Davis Jones on or around August

24    19th, correct?

25          S9:  Correct.

1          S5:  And you testified that you had no prior

2     relationship with RCP before that time, correct?

3          S9:  Correct.

4          S5:  Okay.  And during your direct testimony, in some

5     in substance, you testified that the drivers for AFIS

6     bankruptcy were liquidity capital payroll issues.  Is that

7     right?  Some substance.

8          S9:  Summary?  Yes.

9          S5:  And you testified in some substance that it was

10    not because RCP told you to do it, right?

11         S9:  Correct.

12         S5:  You said it was a personal conclusion.  You came

13    to it, not because RCP told you.  Isn't that right?

14         S9:  Correct.

15         S5:  And I believe that you said during direct your

16    direct testimony that RCP does not dictate your decisions.

17    Isn't that right?

18         S9:  That's correct.

19         S5:  And you also testified that the board agreed with

20    your opinion on filing bankruptcy in Delaware?  Correct?

21         S9:  Correct.

22         S5:  And that also was not dictated by RCP.

23         S9:  Correct.  Correct.

24         S5:  Mr. Avila, who hired you to be the CRO of the

25    debtors?

1          S9:  Well, on RFI it was Mr. Dane, the independent

2     director, and on 1040 it was Mr. Sloan.

3          S5:  Mr. Sloan, who was acting on behalf of RCA at the

4     time.

5          S9:  Now he's acting as is his role as a member of

6     Phoenix 1040 LLC.

7          S5:  And Mr. Dean.  I mean.  Excuse me, Mr. Avila, I

8     just want to remind you of some of your testimony during your

9     first day testimony on August 30th.  During that testimony, you

10    were asked, who is the individual, Mr. Avila, who retained you

11    to serve as the chief restructuring officer?  And your

12    response?  It was it was Jeff Dane, the independent director.

13    Next question and just Mr. Dane.  Excuse me.  Just Mr. Dane.  I

14    believe so.  So when you gave that testimony, you were talking

15    about which entity?  RFI So as far as RFI goes, it was Mr. Dane

16    that hired you and definitely not RCP, Correct?

17         S9:  Yes.

18         S5:  Also on your direct examination in some

19    substance, you testified that you felt the need to file

20    bankruptcy right away on August 24th on behalf of AFI.  I think

21    you said within two hours or so because a payroll issue was

22    maybe imminent.  Do you recall that?

23         S9:  I didn't say maybe.

24         S5:  Okay.  Then in your own words, it was imminent.

25    Was that do you recall that testimony?

1          S9:  Yes, I do.

2          S5:  Okay.  But isn't it true that payroll is not due

3     until September 5th?

4          S9:  Actually, it funds That's set for September 5th,

5     the day after Labor Day.  If you recall, it actually funds on

6     Thursday before.

7          S5:  What I'd like to do now with you, Mr. Vila, is

8     show you a couple of documents.  Your Honor, if I might

9     approach the witness with our binder.

10         S1:  Yes, ma'am.

11         S9:  Thanks.

12         S5:  All right.  Mr. Vella.  The first document that I

13    would like you to look at has been marked for identification as

14    exhibit P in that binder.  Could you please go ahead and open

15    that.

16         S9:  Sir?

17         S5:  And if you'll just flip to the second page there.

18    Do you see that this is an email from Theodore Stamets to you

19    to yourself?  I do.  And Theodore Stamets.  Who is that?

20         S9:  He's a representative of RCP.

21         S5:  And this is dated August 22nd, 2023, right?

22         S9:  Correct.

23         S5:  This is two days before the takeover, two days

24    before you were installed as the crow.

25         S9:  Correct.  Correct.

1          S5:  And if you look at the attachment there, that's

2    dated August 20th, correct?

3          S9:  That is dated August 20th.

4          S5:  And you see the mark at the top right hand corner

5    of the document, top left.  If you're looking at vertically, it

6    says RCP Reverends, Capital Partners, right?

7          S9:  Correct.

8          S5:  And then it says Air Force Financial Link.

9    That's the title, correct?  Correct.  And if you flip to the

10   next page, it says scenario one and it says Chapter eleven

11   bankruptcy.  And then it has some boxes there, right?

12         S9:  Correct.  Okay.

13         S5:  So is it fair to say that as of the several days

14   before the takeover and before you were installed as as as the

15   crow, you were looking at scenarios for bankruptcy sent to you

16   from RCP?

17         S9:  I was looking at scenarios and I didn't spend any

18   time in this why it was sent to me.  I didn't really look at

19   it.

20         S5:  Oh, you got it.  But it didn't mean anything to

21   you.

22         S9:  It was their thoughts on what their thoughts of

23   strategic alternatives were.

24         S5:  Oh, I see.  Do you recall looking at this at the

25   time?

 1          S9:  I recall skimming it just to see what the general

 2     thoughts were.

 3          S5:  Go ahead and flip to what's been marked as

 4     Exhibit Q for identification.  And if you flipped, flipped to

 5     the second page of this document.  And when I say second page,

 6     I mean they're double sided.  So I mean, you know.

 7          S9:  So we're talking about.

 8          S5:  I'm talking about the email from David Sloan to

 9     yourself.  Do you see that at the top there?  Yes.  It's dated

10     August 23rd, 2023, correct?

11          S9:  Correct.

12          S5:  And David Sloan was a director.  He's a director

13     at Phoenix, correct?

14          S9:  Correct.

15          S5:  And he's also the director of finance at RCP.

16     Right.

17          S9:  I don't know what his title is.

18          S5:  RCP okay.  As far as you know, to your

19     understanding, is he employed by or CP as well?

20          S9:  It's my understanding.

21          S5:  I want to direct your attention to the first

22     email that appears there.  It's from Bennett Murphy of Quinn

23     Emanuel, and it's dated August 23rd.  Do you see that?

24     Correct.  And that's a day before the takeover and before you

25     were installed as CRO, right?

1          S9:  It was the he received it at 430 the evening of

2     the 23rd.

3          S5:  Yep.  And it says updating re status.  We

4     understand Geoffrey Dane will be the independent director and

5     we'll be reaching out to him to coordinate his designation in

6     Arizona.  Do you see that?

7          S9:  Yes, I see that.

8          S5:  And then it got two different bullet points.  But

9     the next black bullet point on the next page that says we

10    understand Scott Avila will be the chief restructuring officer

11    and hold the title of at least one of the mandatory positions

12    present.  You see that.

13         S9:  Correct?

14         S5:  And this was before Mr. Dane was hired, according

15    to your testimony, correct?

16         S9:  Correct.

17         S5:  So my question for you, Mr. Avila, is it looking

18    at this document, is it still your position that you were hired

19    by Mr. Dane and not by rep?

20         S9:  Yes, it's still my testimony that I was hired by

21    Mr. Dane because Jeff, Dane and I prior to that had

22    conversations like any directory he was getting delivered and

23    stuff on the situation.  We had conversations about liquidity,

24    status of business, what's going on, what we knew, what we

25    didn't know.

1          S5:  He said that that answered my question.  Thank

2    you.  So if you look at the next email from Bennett Murphy

3    that's dated August 22nd, you see that one?

4          S9:  I see that one again.

5          S5:  That's two days before the takeover and your

6    installation is zero, right?

7          S9:  That's before my tenure is zero.  If I correct.

8          S5:  And then it says all blows a summary of the legal

9    steps needed to take control and if necessary, authorize

10   Chapter eleven filings and the status of documentation for each

11   step.  Do you see that?

12         S9:  I see it.

13         S5:  And then the next sentence, it says, It's

14   important to note that this is a checklist of the legal steps

15   and not the sequence in which the documentation was signed.

16   You see that?

17         S3:  I see that.

18         S5:  I just want you to flip the page and I'm going to

19   direct your attention to step one.  This says Operating

20   agreements and resolutions for two new Delaware entities.  You

21   see that?

22         S9:  I see.

23         S5:  That.  And it says 1040 Fenix Holdings LLC

24   documents set up for Peter to sign on behalf of RCP lenders as

25   members.  Right.

1          S9:  Okay.

2          S5:  All right.  We can we can strip down step two.

3     It says notice of default and acceleration of debt to affi.

4     You see that?

5          S9:  I see that.

6          S8:  Your Honor.  I'm just going to object at this

7     point.  This is not these emails are not emails that were

8     written by Mr. Avila.  They were forwarded to Mr. Avila.  My

9     objection is, what does this have to do with the issue of venue

10    and with the testimony of this witness?  This is cross.  I'm

11    not sure what this has to do with this.

12         S5:  Mr. York.  This is cross-examination, and I'm

13    entitled to test the credibility of this witness.  This witness

14    has taken the position that he was an independent decision made

15    by him and af his board to try to file Chapter eleven

16    bankruptcy proceedings in Delaware.  Our theory of the case is

17    that that was dictated by RCP.  So this email, which was sent

18    to Mr. Avila and produced by his company, by the debtors, we

19    think is is absolutely relevant to that point.

20         S3:  I'm going to join with Mr. Wetback in objecting

21    to this now that its potential use has been put before the

22    Court.  As for impeachment, it does not impeach the witnesses

23    testimony at all.  There's no indication in his emails that RCP

24    is dictating or controlling any of the events described in the

25    email.  In fact, I'm up to is the first person I wrote because

1   I'm here on the email that we understand.  Jeffrey Dahn It's

2   not saying we have designated.  Jeffrey Dahn And then on the

3   next email it says We understand, it doesn't say we are causing

4   Scott.  And then in the next section respecting the summary of

5   the legal steps needed to take control and the words are, if

6   necessary, authorize Chapter eleven filing.  If anything that

7   shows the witness correctly testified that the Chapter eleven

8   filing, the need for it, was determined after this date, August

9   of this email.

10        S5:  And Your Honor, he's he's testifying about the

11   document, and I would appreciate it if he wouldn't testify

12   about the document.  All I'm trying to do here is this is a

13   document that Your Honor already ruled on, that they tried to

14   keep out as privileged.  And Your Honor said that that

15   privilege did not apply.  This is an email that was sent to

16   this witness.  It directly talks about the various steps to

17   form Delaware entities and declare bankruptcy.  I think it's

18   highly relevant and it's it's a ridiculous assertion to say

19   it's not.

20        S1:  I don't see how he can testify as to the contents

21   of that email when all that happened was it was forwarded to

22   him.  He wasn't a party to the email.  I'm going to sustain the

23   objection, Your Honor.

24        S5:  Just if I might say, I'm not asking him to

25   testify about the contents of it.  If you'll permit me to ask

1    my question about it, I think you'll see that I'm just it's not

2    going to go toward the contents of what the email is.

3         S1:  Well, that's what you've been asking.

4         S5:  Well, so far, all I've been doing is is repeating

5    what it is.  That's it.  And then I have a question for them.

6         S1:  Okay.  I've already ruled the objection.

7    Sustained.

8         S5:  I understood your.  Mr. Miller, may I ask him if

9    he's seen the email and if you recall, is it.  Yeah.  Yes.

10   Yeah.  Mr. Bartlett, do you recall seeing this email?

11        S9:  No.

12        S5:  You don't have no dispute that it was sent to

13   you, though, correct?

14        S9:  It says it was sent to me.

15        S5:  And you generally not read the emails that you

16   get.

17        S9:  This one didn't.  I probably scan.  It didn't

18   apply to anything I was doing at the time.

19        S5:  So when you saw this email, you thought, Oh, he

20   had steps for bankruptcy, I'm going to ignore it.  That's fair

21   to say.

22        S8:  Objection, Your Honor.  Mischaracterizes the

23   testimony, Jack.

24        S1:  Sustained.

25        S5:  I will be on, Judge.  Mr. Avila.  I'm going to

1    direct your attention to what's been marked by identification

2    as Exhibit R.  And you'll see here at the top.  Excuse me.

3    Yeah, you'll see her at the top.  You see Alex Chang?

4            S9:  I do.

5            S5:  And that's an associate, right?

6            S9:  He works for our CP.  I don't know his title.

7            S5:  Okay.  And under the CC line, you appear,

8    correct?

9            S9:  I do appear.

10           S5:  I mean, this is dated August 23rd, right?

11           S9:  Correct.

12           S5:  I want you to go ahead and flip to page for

13   accounting back title pages.  One, two.

14           S4:  Three, four.

15           S9:  Four to three.

16           S5:  Yeah.  If I could direct your attention, sir, to

17   the email that says August 23rd from Alex Chang.  It says, Hi,

18   Paul.  Do you see that?

19           S9:  I do.

20           S5:  It says, Please see the attached for piece

21   cookbook.  Do you understanding is SSG the the firm counsel of

22   the letters?

23           S9:  Yes, it is.

24           S5:  And it says the first three pages on this are

25   details we need for the Chapter eleven filing.  You see that?

 1          S9:  I do.

 2          S5:  And this is also before the takeover and before

 3  you were installed, correct?

 4          S9:  It was.

 5          S5:  Is it still your testimony here today that the

 6  decision to file bankruptcy in Delaware was the board's

 7  decision and not Rcb's decision they received?

 8          S9:  Yes, it was.

 9          S5:  I'm going to direct your attention next to what's

10  been marked by identification as Exhibit T as of tango.  Do you

11  see at the top of this that this is from Alex Chang from

12  Reverence Capital.  You see that, correct.  And it's sent to

13  you directly.  You see that, sir?

14          S9:  I see that.

15          S5:  And the date here is August 21st, right?

16          S9:  I see that.

17          S5:  And it says, Scott, please find the attached one,

18  the cookbook referenced by PSA that outlines the data when you

19  provide and you see that.

20          S9:  I do see.

21          S5:  That.  One question, Mr. Avila.  What is the term

22  the cookbook mean to you?

23          S9:  It means a information.  It's a variety of

24  schedules and information request.  In the in the event you may

25  need to file, you'll need to pull this type of information.

1          S5:  In the event that you need to file what.

2          S9:  Chapter eleven?  Excuse me.

3          S5:  And then point three on there.  It says, The

4     initial draft petitions prepared by J and to be filed jointly

5     in the Chapter eleven.  You see.

6          S9:  That?  I do see that.

7          S5:  And this is also we went over, but this is prior

8     to the takeover and prior to installation, right?

9          S9:  It is.

10         S5:  Is it still your position, sir, that you and the

11    board independently decided to declare Chapter eleven

12    bankruptcy and that wasn't directed by CP?  Yes.  I'd like you

13    to go ahead and go to page one.  Page five.  Okay.  If you look

14    here in the middle, you'll see there's an email from Theodore

15    Simons of Reverence Capital.  This is dated August 21st, and

16    it's sent to you.  Do you see that?

17         S9:  Yes.

18         S5:  And that email just says, adding David Sloan from

19    our team.  Right.

20         S9:  What do you know you're looking at?  sir, let me

21    look.  Let me come in.

22         S5:  I'm sorry.  I didn't hear you.

23         S9:  Okay.  I got the right page.

24         S5:  Okay.  Do you see them all talking about?

25         S9:  Yes.

1          S5:  Okay.  Below that, it says August 20th, 2023.

2   There's an email from you sent to that chain, and it says all

3   pursuant to our call.  Attached his presentation outlining

4   Parliament's qualifications for this situation.  You see that?

5          S9:  Yes, I do.

6          S5:  As I mentioned, the call, I have served as CEO in

7   approximately twenty-five different engagements and in many

8   acrimonious situations.  You see that.

9          S9:  That the right page.  Oh, yes.

10          S5:  Okay.  And and this is you writing for the

11   reference team, right?

12          S9:  It is.  Writing to the representative reference.

13          S5:  It's not sent to name, is it?

14          S9:  Dane's not on this list.

15          S5:  Is it still your position that you were hired by

16   Independent Director Dane and not by our RCMP document?

17          S9:  Yes, I was hired by Mr. Dane.

18          S5:  And RCP had nothing to do with it.

19          S9:  It's be like any other situation I'm involved in.

20   A lender wants to make sure that they're comfortable with who

21   the crew is going to be.  It's not abnormal in the twenty-five

22   engagements I referenced.

23          S5:  Now you've answered my question.

24          S9:  Thank you.  Okay.

25          S5:  I'm going to direct your attention next to

1   exhibit you as in uniform.  Okay.  Do you see at the top here?

2   Paula So Sam, if I apologize if I pronounce this wrong, So.  So

3   Simon.  Yes.  From Paladin, right?  That's so somebody that you

4   work with, right?

5          S9:  Correct.

6          S5:  And it's sent to Theodore Simons of RTP.  Right.

7   Yes.  And you're right on this email, correct?  Correct.  In

8   the dated August 24th, 2023.  Right.  The date of the takeover.

9   I didn't hear.

10         S9:  Response.  Yes, I said correct.

11         S5:  That's the date.  I just want to direct your

12  attention to page five.

13         S9:  Okay.

14         S5:  There's an email here dated August 23rd.  And

15  from Patti to Moscow.  You see that?

16         S9:  I didn't see that email from Quinn Emanuel.  I do

17  see that.

18         S5:  And she writes, Hi all.  Just a reminder that we

19  need to conduct a brief board meeting to discuss authorizing

20  the filing so that Jeff Dady can say that he made an informed

21  decision.  You see that?

22         S9:  I see.

23         S3:  That.

24         S5:  When you got this email, what did it mean to you?

25         S9:  That email was a chain.  I didn't even read far

1     that far down.

2           S5:  That's okay, sir.  Go ahead.  If you if you need

3     some context.

4           S9:  Go ahead and take.  No, I just said I didn't read

5     that part out when I got the email.

6           S5:  Oh, are you is your testimony that you did not

7     read that email?

8           S9:  I didn't read it.  I didn't care about the bottom

9     of the page.  I didn't read that far down the chain.

10          S5:  Is it your usual custom to ignore in an email

11    chain what's sent to you at the bottom?

12          S9:  If I'm focused on the top in a 2020 on a page,

13    I'm not reading the whole thing.

14          S5:  So is your usual rule that you just read?  It's

15    not a rule.  Okay.  Your usual customer practice is it, to just

16    read the top email?

17          S9:  It depends the situation.  I didn't care what the

18    bottom said.  I was focused on the time.

19          S5:  Do you have any recollection of whether or not

20    you excuse me?  You may.  You may answer this question.  Did

21    you say that you recall that you did not read this.

22          S9:  Or you're not?  I don't recall reading the bottom

23    of an email chain like this.

24          S5:  Just so I have your testimony.

25          S9:  Clear is copied on this from Paula.  And I wasn't

1   even it was a communication.  So it was more of a reference to

2   the top.  Power's not even mentioned on this in any shape or

3   form.  I'm not even sure I'd have to go back and read the whole

4   chain.  And she was probably just trying to find the email

5   address.  And it was sent, I believe, for a phone.

6          S5:  You're not disputing that you received the email,

7   though, correct, sir?

8          S9:  No, I'm not going to receive it.  But.

9          S5:  And your testimony here today is you have no

10  recollection one way or the other if you read this particular

11  email.

12         S9:  That's correct.

13         S5:  I want to see if it refreshes your recollection.

14  Looking at it now.

15         S9:  It doesn't reflect on anything.  No, no.

16         S5:  As you sit here today looking at that word, it

17  says so that Jeff Dahn can say that he made an informed

18  decision.  I have no.  What do you think?  What does that mean

19  to you as you sit here today?

20         S9:  It has no relevance to me.  I don't care what it

21  says.  I know the conversations Jeff and I were having on

22  Tuesday, Wednesday, multiple conversations.  So what this would

23  say about Jeff and informed decision, he did make an informed

24  decision.  I don't care what it says.

25         S5:  Or you don't care what it says.  Okay.  I

1    understand.  I'll move on.  I direct your attention to Exhibit

2    V?  As in Victor?

3         S3:  Yes, Your Honor.  I object to the use of Exhibit

4    V and the hearing.  Mr. Avila is not on the email chain in any

5    respect.  Has left foundation.  The subject matter is also not

6    relevant to the question of venue.

7         S5:  If I may respond, Your Honor.  Yes.  I'm not at

8    this time trying to emit this document into evidence.  So the

9    foundation is not the point I'm just using to cross-examine

10   him.  And what I'm trying to do is see if he has any

11   familiarity with some of the the content of it.

12        S3:  I appreciate the clarification, Your Honor.  It

13   does not go to any of the direct testimony, but this goes to

14   first.  I order other things that have to take place, do not

15   travel.

16        S5:  And if I make, I may make a proffer.  Your Honor,

17   this email chain, if you'll take a look.  It is highly relevant

18   to our theory of the case, which goes to the interest of

19   justice prong, that that venue was manufactured here.  It was

20   playing.  So all I want to do is ask this witness if he's

21   familiar with it, if he's familiar with the topic of it, if

22   he's having discussions about it, and if the answer is no, his

23   answer is no.

24        S1:  You can ask him if he's familiar with it.  Okay.

25        S5:  All right.  This email, it's from Patti to

1    Moscow, from Quinn Emanuel, Right, sir?

2         S9:  That's what it.

3         S5:  Says.  And just to clarify, you're not anywhere

4    on this, right?

5         S9:  That's correct.

6         S5:  Maxim Litvak.  He is counsel for your

7    organization.  Correct.

8         S3:  I believe the question is going to be, are you

9    familiar with it?

10        S5:  I haven't heard that question.  I'm just getting

11   there, Judge.  Well.

12        S1:  But you're continuing to ask other questions.

13        S5:  Oh, I was just trying to identify the document

14   for the record.

15        S1:  You're not seeking to admit.

16        S7:  It, though?  I'm not.

17        S1:  Then I don't think there's any need to identify

18   the record.  It's not part of the record, then.

19        S5:  Understood.  Understood From this?  Absolutely,

20   Judge.  So sir, I just want you to take a look at the first

21   email from Teddy to Moscow.  At the top there.

22        S9:  The top email and page one.

23        S1:  You're not seeking to admit this document.  Let's

24   move on from it.

25        S5:  Okay.  Judge.  Just because I don't think I have

1    it on the record.  May I ask the witness if he is familiar with

2    any of the contents of it?

3         S1:  I think you did ask that, but you can ask that

4    question.

5         S9:  What are the contents you want me to say?  If I'm

6    familiar with?

7         S5:  Take a look at the first email from Patrick to

8    Moscow.

9         S1:  Okay.  We're not we're not going there.  I've

10   already said we're moving off this document.  You're not

11   seeking to admit it?  It's not part of the record.

12        S5:  Understood, Judge.  I'll move on.  I'll direct

13   your attention next, sir, to what's been marked for

14   identification as Exhibit W, as in whiskey.  This one is from

15   David Sloan.  From reference to yourself, right?

16        S9:  Correct.

17        S5:  And it's dated August 23rd, a day before the

18   takeover and your installation as S.R.O., correct?

19        S9:  It's correct.

20        S8:  John, I'm going to object to any further

21   questions about this document for the same reason that the

22   Court sustain the objection that I made earlier.  This is a

23   forwarding of an email that has internal planning amongst our

24   people to which Mr. Abela is not party.  He was forwarded an

25   email between our CVP asked, quote, You sustain the objection

1  before.  So I'm making the same objection here with this

2  document.

3       S5:  You are actually overruled that objection.  This

4  is something that was sent to him.  I'm not going to ask him

5  questions on cross-examination, Judge.  What I'm seeking to do

6  is ask him questions for a document that was sent to him and

7  produced by him to see what his familiarity is with this

8  material and what what he understands it to me, if he even

9  recalls it, we haven't gotten there yet.

10      S1:  Okay.  I'm going to overrule the objection.

11      S5:  Please go ahead and turn to page nine.

12      S9:  Nine?

13      S5:  Yes, I know.  I'm sorry.  That's one.  One, two,

14 three, four.  All the way to nine.  Och och.  Just make sure

15 we're on the same page here, literally.  There's an email from

16 Brian Schwartz from Kirkland.  Do you see that?

17      S9:  I see that.

18      S5:  And it's dated August 17th, which is about a week

19 before the takeover in your installation, correct?

20      S3:  Correct.

21      S5:  And then says, I spoke to Patty.  Here's the game

22 plan, as I understand it.  Patty, please confirm or let

23 everyone know what I got wrong.  Reverence will form a new

24 Delaware LLC that will be the above, not below the current LLC

25 form by the two reference funds.  You see that?  I see that.

1   Do you understand?  Delaware LLC to me?

2          S9:  Phoenix 1040.  I have no idea what it means.

3          S8:  Sorry.  Go on.  This is two days before I even

4   had the first conversation.

5          S1:  In this case, I agree.  Sustained.

6          S5:  Okay.  So Mr. Avella, you were sent this email,

7   correct?

8          S9:  Yes, I.

9          S5:  Was.  You don't dispute that you were sent this

10  email, right?

11         S9:  I don't dispute that email came to me.

12         S5:  Okay.  Looking at the content of this email that

13  you received as you sit here today where it says the current

14  LLC and Arizona Corp will then file for chapter or CE eleven in

15  Delaware with reference seeking to provide a diff.  Does that

16  mean.

17         S9:  Anything to you?  No.

18         S8:  Here's what I'm objecting to.  The use of this

19  document.  Generally, every question going forward because it

20  predates Mr. Able is involved.

21         S1:  I just sustained the objection as to this August

22  17th email.  No more questions on it.

23         S5:  Understood, Judge.  Okay.  Mr. Avila, sorry, this

24  is a little a little cumbersome.  These were produced to us

25  without base numbers, so that would have made it a little

1    easier.  If you just go back to the beginning, it'll be easier

2    for me to give you which page number it's on.

3              S9:  Yeah.  What?

4              S5:  The beginning of this exhibit.

5              S9:  Oh, okay.  Okay.  The first page.

6              S5:  Yeah.  So if you go to the beginning, I'd like

7    you to turn to page seven.

8              S9:  Okay.  One says, Hi, I need an E and I.

9              S5:  Yes, that's the one.  I want to direct your

10   attention to the bottom of this.  There's an email dated August

11   18th from Sean Hill of Kirkland, right?

12             S9:  Correct.

13             S5:  Okay.  Take a look at this email.

14             S1:  Sustained.

15             UU:  Thank you.  Okay.

16             S5:  Sir, I'm going to direct your attention next to

17   an exhibit that's been marked for identification as x as an x

18   ray.

19             S9:  Yes, sir.  I have it up.

20             S5:  Actually, I don't have any questions about this

21   exhibit at this time.  Mr. Villa, I'm just going to go ahead

22   and direct your attention to what's been marked as Exhibit B B

23   for identification.

24             S9:  I have it open.

25             S4:  Okay.  Great.

1          S5:  I'm just going to direct your attention to the

2     second email on this in the first page.  It's an email from Ms.

3     Laura Davis Jones dated August 20th and includes you in the CC.

4     Do you see that, sir?

5          S3:  I sure do.

6          S5:  Okay.  And it says, Hi, Theo.  Following up on

7     our call, please meet by email.  Scott Avila of Paladin.  You

8     see that?

9          S9:  I see that.

10          S5:  Is this the first time that you were introduced

11     to this?

12          S9:  That is correct.

13          S5:  Okay.  You testified there was a phone call maybe

14     prior to this, but this is the first follow up email, correct?

15          S9:  That is correct.  That I'm aware of.  Okay.

16          S5:  I'm going to go ahead and direct your attention

17     to what's been marked by identification as Exhibit C.  And this

18     is an email from yourself to Theodore Simons at reference.  You

19     see that?  I see that it's dated August 21st, right?

20          S9:  Correct.

21          S5:  It's a steel protocol attached to the draft

22     engagement letter, right?

23          S9:  Correct.

24          S5:  And do you recall your earlier testimony, sir,

25     that Mr. Dein was hired as independent director of PHI on

1   August 24th?

2          S9:  Correct.

3          S5:  So knowing that testimony and then looking at

4   this exhibit and this email with you sending over your draft

5   engagement letter on August 21st, is it still your testimony

6   that you were hired by Mr. Dahn and not RCP?

7          S9:  Yes.  It's very common for a lender to look at my

8   engagement letter.  That's not out of the ordinary.

9          S5:  I'm going to go ahead and direct your attention

10  to exhibit marked G.  G.  All right.  For this exhibit, I just

11  want you to turn to page two.  And in the middle email, I think

12  you'll see your name, Scott, as.  Tell me if you see that.

13         S9:  Yes.

14         S5:  And it says, As far as I can tell, they plan to,

15  but haven't figured out who it's going to be.  Not finalized.

16  RCP directors.  Not sure we have officers either other than

17  SCOTUS zero.  You see that where I'm pointing out.  I see that.

18  And this is dated August 22nd, right?

19         S9:  That's the date.

20         S5:  And this is before Mr. Dane was hired on the 24th

21  per year prior testimony, right?

22         S9:  Correct.

23         S5:  It's still your testimony, sir, as you sit here

24  today looking at this document that you were hired by Mr. Dane

25  and not by RCP, and they had nothing to do with it.

1          S9:  Yes, this is I get hired all the time by

2     independent directors and people that get put in roles, and I'm

3     already in the role or talked about the role.  It's not that

4     there's nothing about this case petition that was out of the

5     ordinary for me.  It may be I don't know if others in this

6     room, but it's not out of ordinary for me.

7          S5:  Mr. Vela, considering all the exhibits, the

8     documents, the emails that we went over today, I just want to

9     confirm.  Is it still your testimony as you sit here today,

10    that it was the board and your independent decision to file

11    bankruptcy proceedings for the debtors in Delaware?  Not

12    directed by RCP?

13         S9:  Correct.

14         S5:  Not influenced by RCP.

15         S9:  Or influence because they had the one funding the

16    cash and we need the money.  So and I needed it fast.

17         S5:  So when you when you when you say influenced and

18    you agree that you were influenced, how strong was that

19    influence?

20         S9:  Not that strong.  The bottom line is so you keep

21    missing the fact here.  And I don't know why.  The fact of the

22    matter is company had no money.  You act like that just falls

23    out of the sky.  It just doesn't happen.

24         S5:  If you put influence.  On a scale of one to ten,

25    sir, where would you put that influence?

1          S9:  Probably three, because they're the closest way I

2     was going to get any funds.  What had happened before?  As you

3     well know, they had to sell assets and whatever they could, and

4     actually they had to actually give up about $900,000 of

5     collateral.

6          S5:  And is it your testimony here today that that

7     influence that you just admitted to, that you're talking about,

8     that it's just a coincidence?

9          S9:  Oh, it's small influence, because the influence

10    was they were the one that the only influence was they had the

11    cash.

12         S5:  And it's just a coincidence that it happened or

13    keep it influence you.

14         S3:  Objection.

15         S8:  Now, just legal argument, really.  It's just the

16    counsel is being argumentative with the witness.  He's not

17    asking him facts.

18         S5:  I withdraw my last question, Judge.  I have no

19    further questions for this witness.

20         S1:  Okay.  How much time do you think redirect will

21    take?

22         S8:  I really don't think it will take much time.  Ten

23    minutes.

24         S1:  Okay.  Okay.  Why don't you go ahead.  Yes.

25         S2:  Just.

1          S8:  Your Honor, given that we're anticipating that

2     there may be some further questions after redirect, perhaps we

3     can just take the break now.  Unless the Court just wants to

4     finish with this witness.

5          S1:  Now, I think you're right.  I'm sure there'll be

6     recross.  And it's it's time for lunch, so why don't we come

7     back at 2:00?  Perfect.  Thank you.  Okay.  We're in recess.

8     It.  Welcome back.

9          S8:  Thank you.  Max lit dark skies.  Thanks.  Elan

10    Jones.  On behalf of the debtors, Your Honor, I'll commence the

11    redirect, if that's acceptable.

12         S1:  Yeah, Please do.

13         S8:  Mr. Abel.  Good afternoon.

14         S9:  Good afternoon.

15         S8:  There were some questions on cross about your

16    prior experience in the mortgage industry.  Do you recall.

17         S9:  That?  I do recall that.

18         S8:  Are there people at the debtors or a paladin who

19    are helping you with this matter?  Who do have experience in

20    the mortgage industry?

21         S9:  That's correct.  There are many.

22         S8:  Can you describe who that is and what they're

23    doing?

24         S9:  Jeff Merwin He was involved in Fremont Capital

25    eight years ago, which is a very large mortgage syndication and

1    securitization company.  He's with Paladin at the company.

2    There is seventy people that have at the company with a lot of

3    experience in mortgage, probably in mortgage mortgage related

4    industry.  Pete Garcia, he's a senior person.  He's been there

5    over twenty years, I believe, fifteen years or something like

6    that.  He's been at the company, knows a lot of in and out of

7    the business.  Latisha has done compliance and they that's not

8    the People I'm speaking of.  These are just operating people.

9    And I'm I'm sure I'm missing many of them.  I don't have to

10   listen for them, but they've been in.  There's no one there

11   that hasn't been there for some period of time and know what

12   they're dealing with, the experience they have, whether it's

13   compliance around the assets that we have today.

14        S8:  And based on that experience that is surrounding

15   you in this matter, do you believe that you have the expertise

16   that you have that you need in order to consummate a sale of

17   the mortgage servicing rights?

18        S9:  Yes, we do.  We've also brought in a an

19   individual that we're trying to get retain, I believe, is the

20   applications filed who used to be involved with the Fannie Mae.

21   So we we believe we're covered pretty well there.

22        S8:  And who is that individual?

23        S9:  Eddie Monzo.

24        S8:  And what about with the Scratch and Dent loans?

25   Do you believe you have the experience.

1          S9:  The team, the team sold scratching down loans at

2    the company and scratching debt loans.  To be clear, you're

3    just getting information that was probably not obtained or

4    obtained incorrectly when you originated the mortgage.  So

5    they're just trying to find the, you know, get the

6    documentation, get it cleared up, try to find what the default

7    is.

8          S8:  There were also some questions on cross about the

9    information that you obtained from RCP and not from a member

10   first prior to the petition date.  Do you recall that?

11         S9:  Yes, I do.

12         S8:  When you were installed as the Crow of America

13   first, did you then get access to America first books and

14   records?

15         S9:  Yes, we did.

16         S8:  Did the information revealed in those books and

17   records change any of the conclusions that you had reached at

18   the time of the August 24th board meeting?

19         S9:  Not at all.

20         S8:  Why is that?

21         S9:  It was in line with the company's liquidity

22   position, historical financial performance, operational

23   activities.  There's nothing that changed it anything

24   materially.  We found more leases, more facilities than I was

25   told were there.  Some of the other costs, specifically the

1   cost around software cost, was much greater than anticipated.

2   It didn't change anything.  It just confirmed and confirmed

3   everything, to be honest with you.

4         S8:  Did you confirm what the cash balance

5   approximately was as of the petition date?

6         S9:  Yes, we did.

7         S8:  And what was that number again?

8         S9:  The petition that we didn't know.  After the

9   petition date, we found out it was right for $450,000 in that

10   range.

11         S8:  Currently.  What physical space do the debtors

12   have already?

13         S9:  Approximately three or four offices subletting it

14   on a month to month basis.  In Chandler, Arizona, it's about

15   1500 square feet.  1500 square feet?  Yes.  1500 square feet.

16         S8:  Does that fit seventeen employees?

17         S9:  Most of them don't come in every day.  They

18   didn't before.  So it fits the People we need to have in there.

19         S8:  And did you testify?  I'm just trying to

20   recollect.  Did you testify that not all the employees are

21   based in the State of Arizona?

22         S9:  Correct.

23         S8:  You were asked some questions on cross about some

24   emails from representatives of RCP regarding bankruptcy

25   preparations.  Do you recall.

1          S9:  That?  I do recall that.

2          S8:  Did that the fact that those emails come from RCP

3    impact your decision making in terms of whether or not the

4    company needed to file for bankruptcy?

5          S9:  No, it did not.

6          S8:  Did you reach your own conclusion about whether

7    or not the company needed to file for bankruptcy?

8          S9:  Yes, we did.

9          S8:  Thank you, Your Honor.  Nothing further on

10   redirect.

11         S9:  Okay.

12         S1:  Thank you, Mr. Litvak.

13         S6:  Your Honor, the U.S. Trustee has never joined.  I

14   mean, Red Cross.  I'm sorry.

15         S1:  Okay.  Thank you, Mr. Richard.

16         S4:  Good afternoon.  Robert Denny.  For the record, I

17   hate to ask this question because it's pretty obvious, but did

18   you speak with counsel during the break at all about this.

19         S9:  About this matter?  Yes.

20         S4:  So you spoke with counsel during the break about

21   this case.  Can you please explain what it is you discussed?

22         S9:  I spoke to none of the People at that table.  I

23   spoke to some of the patrol's representatives regarding motions

24   that we expect to file, what the status of those were.  A

25   couple of our employment motions we filed.  The US has had some

1    comments.  Want to see how that's going?  Potential other

2    motions we will be filing.  Just general things about other

3    parts of the case that have nothing to do with this hearing.

4          S4:  I think on your redirect, counsel asked about if

5    your experience was following up on the questions concerning

6    your experience, who was Mr. Irwin and when did he start at

7    Paladin?

8          S9:  Mr. Jeff An early sort of paladin.  Around nine,

9    nine, five, I think he started.

10         S4:  So that was after the filing of the cases, right?

11         S9:  Yeah.  Yes.  Well, he started with nine five.

12    That was his first day on site.  It's nine five.  They might

13    have started nine one, probably nine when he started.

14         S4:  Okay.  So he would not have been a resource to

15    you as you were evaluating the impact of bankruptcy on the MSRs

16    and the business generally, correct?

17         S9:  Correct.

18         S4:  And I think at that time of 824 after the company

19    change of control, that's when you became the CRO of AFFI, the

20    operating company, right?

21         S9:  Yes.

22         S4:  And you you do not have any expertise in

23    securitization or the MSRs.  I think we covered that, Right?

24         S9:  Correct.

25         S4:  During that two hour period, did you consult with

1    any counsel who has an expertise in securitization and MSRs.

2         S9:  In that two hour period?  No.

3         S4:  So you testified earlier that it was your choice

4    to file two hours after change of control?  Correct.

5         S9:  I testified that I presented to the new board the

6    facts of the matter, and I testified that a bankruptcy filing,

7    it would allow us to get cash in to fund payroll and to keep

8    the business operating.

9         S4:  At the time you became the CRO of AF during that

10   two hour period, did you have a set of first days that could

11   have been filed in Arizona?

12        S9:  I don't think we had any first days at all.  At

13   the time in that two hour window.  And any first days.

14        S4:  That you have available to you petitions to file

15   in Arizona at that time.

16        S9:  Could I could a petition has been changed of

17   venue to file in Arizona?  I could change the venue to file

18   anywhere.

19        S4:  I was asking different question.  When you

20   arrived there with the two hours, did you have a set of

21   petitions and resolutions ready to go for Arizona?  That's all

22   I'm asking.

23        S3:  Your Honor.

24        S8:  I didn't ask anything on redirect about this

25   issue.  And my objection was that it was beyond the scope of

1    redirect.

2          S4:  Today, response counsel did address that his

3    decision and the decision to file in Delaware on redirect.  And

4    this just goes to that.

5          S1:  I don't I don't recall that line of questioning.

6    I'm going to sustain the objection.

7          S4:  Okay.  On redirect you were asked about.  Cash

8    needs.  And you say that you confirm the cash balance after you

9    were at the company, right?

10          S9:  Correct.

11          S4:  And up until then, you you were aware of the cash

12    balances because of communications with our CPP.

13          S9:  There were some estimates around it, but nobody

14    was sure.  I testified that we weren't sure of the cash

15    balance.  It was unknown specifically what the total cash of

16    the business was.  We believed that there was insufficient

17    cash.  Based on the conversations that occurred between RCP and

18    the company.  Previous weeks of the limited cash.  So I did not

19    know at the petition date the exact cash that was there or even

20    close to the exact cash.  I had a feeling it was less than a

21    million and less than 500.  I didn't know if it was zero.

22          S4:  And I think we covered this.  But you mentioned

23    that payroll payroll would have needed to have been funded one

24    week after you filed.

25          S9:  Exactly.  Yes.  Correct.

1          S4:  Okay.  So the filing two hours after the change

2     of control.  That did not enable financing of a funding or

3     payroll that was due then, Correct?  You still had it.  You

4     could have waited a week and filed.

5          S9:  And how so?

6          S4:  Right.

7          S9:  How so?

8          S4:  Well, I'm asking you, did you ask the lenders

9     about funding outside of the case?

10         S9:  I inquired about it.

11         S4:  And the answer was.

12         S9:  They had no interest in funding outside of the

13    bankruptcy.

14         S4:  When you.  Who did you ask?

15         S9:  I don't recall.

16         S4:  Do you know when.  When you're talking with Mr.

17    Sloan, how do you keep track of which hat he's wearing?

18         S8:  Objection, Your Honor.  Also, same objection that

19    it's beyond the scope of the redirect.  It is being crossed.

20         S4:  It is fine.  I have nothing else.

21         S1:  Okay.  Thank you, Mr. Dennis.  Mr. Kim?

22         S5:  Yes.  Briefly, Your Honor.  Mr. Avila, you were

23    asked during your redirect about information that you received

24    from RCP about RFI before the change in control.  You recall

25    that?

1        S9:  Yes, I do.

2        S5:  And you were also asked about conclusions that

3   you reached at the board meeting.  You recall that?

4        S9:  I do recall that.

5        S5:  And in some of the substance, you said that from

6   your review of the data, the company, books and records and so

7   forth, that confirmed your opinion.  You recall that testimony?

8        S9:  Correct.

9        S5:  So you reviewed those records and they confirmed

10  your opinion that was given at the board meeting, correct?

11       S9:  Correct.

12       S5:  So you gave your opinion at that board meeting

13  before getting that confirmation from the review of books and

14  records, isn't that right?

15       S9:  Correct.

16       S5:  That's all.

17       S1:  Okay.  Thank you, Mr. Litvack.

18       S8:  I think we're done with Mr. Avila.

19       S1:  Your Honor.  Okay.  Mr. Avila, you are excused.

20  Thanks.

21       S8:  And Your Honor, the debtors have no further

22  witnesses to call in our in our case.

23       S1:  Okay.  Okay.  Thank you.  Does the committee wish

24  to call any witnesses regarding the venue motion?

25       S4:  No, Your Honor, we're going to rely on the live

1    testimony.  And all of the documents that have been made.

2         S1:  Ms. Richard, Any witnesses?

3         S6:  No, Your Honor.  The document that I had filed

4    with the Court had mentioned Mr. Dean, the independent

5    director.  I've been speaking with counsel, and I made a

6    decision that neither of us were going to call Mr. Dein.  And

7    so I also am relying on Mr. Analyst's testimony, and all of the

8    exhibits have been moved into all of the documents, moved into

9    evidence.  Thank you.

10        S1:  Okay.  Thank you for Mr. Ball.  Mr. Kim, do you

11   have any evidence that you wish to put on in support of your

12   position?

13        S5:  Your Honor, in lieu of calling our witness, Mr.

14   Bowlby, we wish to rely on the declaration of Eric Bowlby that

15   was submitted and located at docket number Dye 154, as well as

16   all its attached exhibits.

17        S1:  Does anybody object to the admission of Mr.

18   Bailey's declaration?

19        S8:  yes, Your Honor.  We object.  The debtors object

20   to the admission of all of it.  Because, Your Honor, it was

21   filed on September 22nd in connection with a supplemental

22   objection to the dip financing.  It does not relate to venue

23   issues, so we would object to it.  First of all, I believe Mr.

24   Beauvais is here.  So as a procedural matter, we would object

25   to the use of a declaration if they would like testimony from

1   Mr. Bowlby to be admitted into evidence here.  Then they should

2   call him live.  But secondly, Your Honor, this declaration does

3   not relate to the venue motion and therefore should not be

4   allowed into admitted into evidence.

5          S1:  Mr. KEMP.

6          S5:  Your Honor, if I might respond.  The declaration

7   does contain paragraphs that are relevant to the venue transfer

8   motion.  And to make it clear, we want to rely on that in lieu

9   of direct testimony to the extent that counsel wishes to cross.

10  Mr. BALL We're fine with that.

11         S8:  I This is a lengthy declaration, Your Honor.  It

12  has fifty-three paragraphs, and I don't think that the debtor

13  should be in the position of trying to decipher which

14  paragraphs relate to venue in which don't.  And again, so

15  procedurally, we would like to hear live testimony to the

16  extent that Mr. Bowlby has any live testimony, to the extent he

17  has any testimony to offer relevant to the venue motion.

18         S1:  Well, the proceeding by declaration is certainly

19  a where appropriate, a convenience to the Court and to the

20  parties, but nobody has an absolute right to proceed by

21  declaration.  So.  So given the objection, you'll have to

22  proceed to have Mr. Bowlby testify in person.

23         S9:  Here.  We have a recess to discuss on their

24  witness.

25         S1:  How much time do you need, Mr. Barcelona?

1          S5:  Just five minutes, Judge.

2          S1:  Okay.  We will come back on at 225.  We're in

3     recess.  If you.

4          S2:  I thought that was your name.

5          S3:  Sorry, sir.  Okay.

6          S7:  Yes, sir.

7          S9:  Look.

8          S2:  We can replace the chair.  Easier than your name.

9          UU:  Here's just one for you.  All right.

10         S1:  Please be seated.  Mr. Barcelona, good to have

11    you here this afternoon.

12         S7:  Good afternoon.  Your Honor, for the record, Joe

13    Barcelona from PASHMAN, Stein, Walder and Haden on behalf of

14    Mr. Bobby.  At this time, we would like to call Mr. Bobby to

15    the stand.

16         S1:  Okay.  Mr. Bobby, please approach.  And just

17    remain standing.

18         S2:  Please raise your right hand.  Do you affirm that

19    you are telling the truth, the whole truth, and nothing but

20    the.  Now, would you please state your full name and spell your

21    last name for the record?

22         S7:  Eric.  Michael Bowlby last year felt both life

23    and.  Good afternoon, Mr. Bové.

24         S9:  Good afternoon.

25         S7:  Where are you currently employed?

1          S9:  Currently at Gold Water Bank.

2          S7:  Prior to that, where were you employed?

3          S9:  I'm here first.  Financial.

4          S7:  At what point did you start working at America

5    First Financial?

6          S9:  June 3rd, 1998.

7          S7:  Did you form the company?  No.  Who formed the

8    company?

9          S9:  Ralph Larson.

10         S7:  Who's that?

11         S9:  The previous owner.  My original employer.  We

12   bought him out.  Me and my father and I.  January 1st, 2006.

13         S7:  Six.  And from 2006 to the petition date about

14   how many employees have gone through the halls of AFI.

15         S9:  Pretty close to 10,000.

16         S7:  Who is RCP.

17         S9:  Reverence Capital Partners.

18         S7:  When did you start transacting with RCP?

19         S9:  I don't remember the exact date when the loan

20   funded, but it was like maybe after the first quarter 2020,

21   March 2020, maybe May 2020.

22         S7:  And since that time, how was that relationship

23   been?

24         S9:  Up until, say, October of 2022?  It was fine.

25         S7:  What happened around October 2020 to.

1      S9:  That was we were getting close to a required

2   payment down.  The mortgage industry was starting to take a

3   little bit of a turn.  RCP did not want to be tied to the

4   mortgage industry any longer.  They had had a problem with a

5   other client by the name of Sprout that had gone default on

6   them.  In fact, a Mair first helped them out and fixing part of

7   the problems that they had with Sprout.  And I just don't think

8   they lost.  The People that originally were with RCP that were

9   from the mortgage industry had left.  And so we were left with

10  people who didn't really understand the mortgage industry.

11      S7:  And that was going to go to my next question Who

12  who were the primary people you would interact with?  RCP.

13      S9:  So towards the most the first part it was Geoff

14  or Chris Mueller.  When we were first doing the deal, it was

15  Geoff Fertilizer.  Geoff left two days before the loan actually

16  funded.  Then from there it was Chris, But attending the board

17  of Directors meeting, Peter Aber would be there, Theo would be

18  there.  Steve I forget Steve's last name.  They'd have three or

19  four people join the board meetings, but most of the day-to-day

20  was with Chris.  When Chris left the firm, it transferred more

21  over to Theo and Ricky.

22      S7:  And you said the relationship started to sour

23  around October 2022.

24      S9:  That was when they had made it known to us.  They

25  didn't really like the mortgage industry and recommended we

1  find a take out lender.

2          S7:  How did they make that known to you?

3          S9:  I had flown in to meet with them in their offices

4  in October.

5          S7:  Can you describe to the Court the circumstances

6  that arose between AFFI and RCP in and around December of 2022?

7          S8:  Objection, Your Honor, that this this is really

8  ancient history when it comes to the venue motion that's

9  pending might be relevant for another hearing in this case, but

10 not today.

11         S1:  Mr. Barcelona.

12         S7:  Your Honor, the interest of Justice standard is a

13 holistic standard.  You have to look at all the facts and

14 circumstances of everything that has been leading up to the

15 time period right now.  And this was within Mr. Bobby's

16 declaration, which is why we were trying to put it in there.

17 This is not ancient history because our position is RCP

18 breached the credit agreement of May 15th that reverted back to

19 all of the private previous acts being looked into.  So all of

20 that is relevant today.

21         S1:  The entire history of the relationship is not

22 relevant to the issue of whether to transfer a venue.  I think

23 you need to tailor this a little bit more closely to the issues

24 at hand.

25         S7:  Understood, Your Honor.  Thank you.  I'm going to

1    go in a different direction.  Mr. Bobi, for just a second.  If

2    you heard Mr. Avila's testimony earlier today about the assets

3    of the debtor, one of which was your personal residence, did

4    you hear that?

5          S9:  I did.

6          S7:  To your knowledge, is your home owned by the

7    company, sir?

8          S9:  It is.

9          S7:  How how did that come to be?

10         S9:  Well, we wanted to keep more assets in the

11   company at the time to make sure we stayed in compliance with

12   our agreement with our CPP.  So we.  We put it in there.

13         S7:  Okay.  And did you have any type of protections

14   for yourself while you were living in your house?  But the

15   company owned it?

16         S9:  Yeah.  We put together a lease purchase

17   agreement.

18         S7:  And has with the debtors have that lease purchase

19   agreement.

20         S9:  I probably not.  I don't know.  I don't believe

21   they ever requested it.  I don't believe we ever gave it to

22   them.

23         S7:  Would it be in the company's files if.

24         S9:  It was in my files?  That AFIS.

25         S3:  Okay.  Your Honor, I'm going to restate the

1   objection made by debtors counsel.  It's very hard to see.

2   This is tailored to the venue motion, as the Court requested.

3        S7:  Your Honor, they have challenged that my client

4   has an economic stake in this case.  His personal residence,

5   where his wife and children live, are at stake in this case.

6   And obviously, that house is in Arizona, where a lot of Arizona

7   real property law will be coming into.  And this is going to be

8   a very big issue in this case and goes directly to where the

9   venue of these cases are proceeding.

10        S4:  Yeah.  Just quickly on this.  If I'm hearing the

11   books and the records and Mr. Valda were in Arizona, the

12   debtors have already suggested there are going to be claims

13   against Mr. Holdings and his family affiliate.  So as we're

14   looking at locus of assets and where witnesses are going to

15   gauge.

16        S3:  Things that.

17        S5:  May be.

18        S4:  Relevant, but I'm listening real time with

19   everyone.

20        S8:  Else.  Your Honor, committee counsel should not

21   be arguing his position during Mr. Barcelona's direct

22   examination.  When asked, counsel counsel's making an

23   objection.  So just a procedural objection to that.

24        S1:  Thank you.  Mr. Litvack.

25        S3:  Nonetheless.

1        S1:  Yes.  I'd like to hear from you to your

2   objection.

3        S3:  Thank you.  We'll stipulate to houses in Arizona,

4   and I'm speaking for my friends.  I think I might do that.  And

5   that issues over its ownership or interests in the House would

6   be governed by our law.

7        S1:  Yeah, I think we all understand the testimony has

8   been that Mr. Barbie's home is is in Arizona.

9        S7:  We'll move on.  Thank you.  Now, Mr. Bobby, I'd

10   like to take you to the week of August 21st.  If I could.  On

11   May or excuse me, August 22nd.  To your knowledge, did AFFI

12   send correspondence to RCP related to that credit agreement

13   that we were just talking about?

14        S9:  We did.  We filed a notice of default.

15        S7:  To your knowledge, what does that mean?

16        S8:  Objection, Your Honor.  I apologize, but the

17   notice of default that was set on behalf of the debtors to RCP

18   also does not relate to the issue in hand.  Today may be an

19   issue for another hearing in this case, but again has nothing

20   to do with the choice of venue here.

21        S3:  I would echo that and also point out the letter

22   was written by counsel at State's legal positions and the

23   question calls for a legal conclusion.

24        S1:  Yeah, I think it calls for a legal conclusion.

25   I'm going to sustain the objection.

1        S7:  And let's turn to August 24th, which I think is

2    directly on issue for for today.  Sir, please take me through

3    your experience on August 24th.

4        S9:  So on August 24th, I received a phone call from

5    the receptionist at the corporate offices in Gilbert, Arizona,

6    letting me know that a package had been delivered to me and

7    asked if she should send it over and run her, which she did.

8    Upon opening, it was the notice of default from reference

9    against America first.  I immediately reached out to counsel

10   while I was on the call with counsel.  The Paladin group showed

11   up with armed guards at the Mesa office as well as at the

12   Gilbert office.  They came in to control talk to us.  They were

13   pleasant.  They were nice to talk to.  I didn't have any real

14   issues there.  They seem concerned about how do we, you know,

15   what do we need to get out to everybody immediately?  We

16   attempted to get stuff out immediately, but they had already

17   shut me out of the system.  Took a couple of hours to get us

18   set back out.  So while we were in the room, everybody was kind

19   of in panic mode.  What's going on?  We got people with armed

20   guards walking around the the company.  They're telling us

21   we're insolvent.  We're filing bankruptcy.  So it just kind of

22   went a little out of control.  We eventually wrote up.  When I

23   say we, Paladin and their attorneys helped draft the letter

24   that they wanted me to send out to everybody, our agency letter

25   email that we sent out to everybody.  I did let them know that

1    it wasn't going to sound like it was coming from me the way it

2    was written, which, funny enough, as soon as we sent it, we

3    started getting texts going, Okay, who wrote this letter?  We

4    know it's not from you.  And we sat.  We discussed the things

5    that would need to be done to help protect the company.  Scott

6    was actually good, and it was his understanding that they did

7    not want me in there anymore.  And Paladin group did feel that

8    it was in the best interest of the company to keep me around

9    and help out.  So I stayed and helped in any way that I could.

10        S8:  Your Honor, Objection.  And move to strike the

11   portion of that answer which consists of hearsay, which is the

12   witness testifying about what other parties were saying to him

13   or communicating to him either orally or in writing, via text

14   or.

15        S4:  Otherwise.

16        S7:  Statement against interest, Your Honor.

17        S8:  It's the he was I thought he was testifying about

18   employees.  Employee day-to-day employee, rank and file

19   employees.

20        S1:  Yeah.  I'm not really getting the statement

21   against interest position.  Can you explain that further,

22   please?

23        S7:  Sure, Your Honor.  With respect to that and I

24   apologize.  I thought that was with I thought he was moving to

25   strike Mr. Avila's statements about what RCP was telling him.

1   That's what.  So what are you actually moving The strike

2   questions?

3         S1:  We don't talk to each other directly.  I can ask

4   Mr. Litvack the question.  Can you clarify the testimony that

5   you're trying to strike?

6         S8:  Yeah.  I'm not talking about statements that the

7   witness heard from Mr. Avila, but anyone else, basically.

8   Debtors, employees, rank and file employees, that type of those

9   people you are.

10        S1:  Yeah.  And to that extent, I grant the motion to

11   strike.

12        S4:  Thank you all.

13        S7:  You said Mr. Abdullah was with you on August

14   24th, is that correct?  Correct.  Did Mr. Avila request to see

15   the books and records at that time of the company?

16        S9:  Not with me, I believe.  His partner, who was in

17   the Gilbert office, may have.  I don't know.  Okay.  But the

18   books and records are kept in the Gilbert office mainly, and a

19   few in my office.  But nothing was requested from my office.

20   Okay.

21        S7:  Do you recall how long you stayed in that office?

22   On August 24th?  Like when you went home?

23        S9:  Yeah, they.  They came in around eleven, 1130

24   that afternoon, and I was there till 730, 8:00 that night.

25        S7:  What were you doing till 730 at night?

1          S9:  Several hours.  We couldn't get right the wrong

2    word.  A couple hours.  We were waiting for my system to be

3    turned back on so we could even send out any correspondence to

4    anybody.  But it was just kind of talking about what the next

5    steps would be, how to preserve assets, who do we need to call,

6    how do we make get the word out to everybody that'll be

7    business as normal.  We're just talking about that kind of

8    stuff.

9          S7:  Was August 24th the last day you spent in the

10   offices of Occupy?  No.  What was the last day you spent?  And

11   you know.

12         S9:  I don't recall the exact day, but it would have

13   been two or three weeks later.

14         S7:  Two or three weeks later.  Yeah.  At the time of

15   August 24th, though, did you hold a position with Affi?

16         S9:  No.  As of August 24th, I was relieved of all

17   duties.

18         S7:  Okay.  So what were you doing between August 24th

19   and two weeks later?

20         S9:  From my initial meeting with with Scott, I

21   believe that that was a reorganization and that it was going to

22   be back to business as normal.  So I was trying to preserve

23   jobs.  I was trying to continue moving everything forward,

24   getting assets sold.  We had already had preliminary sold all

25   the scratch and Dent loans.  In fact, that money was supposed

1    to come on on August 31st.  It's probably the exact same people

2    that are getting ready to buy them now.  We had the MSRs up for

3    sale already.  We had the loans on the pipeline that we were

4    getting ready to sell, both the retail, BPL and retail loans.

5    So I was trying to make sure it flowed and we took care of all

6    of our vendors and and kept the company afloat.

7         S7:  Were you offered any compensation for your work,

8    sir?  No.  Did did you ask for any compensation.

9         S9:  For your work?  I complained about it a couple of

10   times.

11        S7:  Why did you continue to work for this company

12   after they'd kicked you out.

13        S9:  Again, trying to protect all the employees that

14   were there as well as the vendors?  I mean, we had just agreed

15   to relaunch the company the month before.  So when you look at

16   the records, yes, it looks like we were losing a ton of money

17   because we were in relaunch mode.  We had been shut down since

18   December 2nd.  So I had just asked everybody the previous month

19   to quit their jobs and come back and join us.  And now they

20   were losing their jobs again with nowhere else to go.  So I was

21   trying to take care of our people.

22        S7:  Okay.  And you heard the testimony of Mr. Avila

23   regarding the reps and warranties.  Can you, in your own words,

24   describe what these reps and warranties are?

25        S9:  Yeah.  So when you sell any loan on the secondary

1   market, they want to insure that somebody is going to stand

2   behind it in case any material defect was done.  You missed a

3   pay stub.  The underwriter missed a calculation on the debt to

4   income ratios.  There was something maturely wrong so that they

5   can come back later and say you failed to do your job, buy the

6   loan back.  So if you don't supply reps and warrants, it

7   devalues the the asset.  Same with the MSRs.  In December we

8   had our bid out to sell the MSRs for 9.3 million.  They filed

9   the notice of default.  In fact, we had actually already signed

10   the letter of intent to sell them for 9.3 million.  And then

11   when they filed the notice of default on December 2nd, they

12   went from 9.3 to six million drop a thirty percent.  So reps

13   and warrants are it ensures the person who's buying them, if

14   they're not going to get stuck with something that can't be

15   sold.

16         S7:  So it's if I want to put words in your mouth, but

17   for the layman here, don't know anything about the mortgage

18   industry.  That means that the company is guaranteeing.

19         S9:  We're saying that we're repping in warranty and

20   that the underwriting guidelines were followed and the approval

21   of that loan and that the securitization that it's being sold

22   into, that it matches the underwriting guidelines.  Okay.

23         S7:  Did you ever have a discussion with Mr. Avila

24   regarding reps and warranties?

25         S9:  Yes.

1        S7:  When was your first discussion about them?

2        S9:  I don't remember if it was the very first day,

3   but it would have been within the first week when we were

4   talking about business as normal or ongoing that you do have to

5   provide them to sell.

6        S7:  Okay.  So just to go back to what you just said,

7   so you told him you have to provide reps and warranties in

8   order to continue as a going concern?  Correct.  Do you

9   remember what his response to that was or.

10        S9:  The first day?  It was It.

11        S3:  Was I think his main.

12        S9:  Focus was on making sure that payroll and

13   everything else was made.  I don't know, as that was his

14   number.  One focus, same as providing those reps and warrants

15   for our warehouse line to allow us to fund loans.  So we went

16   on an entire week where we had people waiting for loans to fund

17   that we couldn't fund because they weren't ready to get to that

18   stage.  There were scenes and I don't understand bankruptcy, so

19   I don't want to put words in his mouth.  But things were more

20   important.  He was triaging the situation and he was doing what

21   he thought was most important at the time.  And at that time,

22   it wasn't the most important.

23        S7:  Since you've been running a marathon for so many

24   years, how important is the reps and warranties to the going

25   concern aspect of the business?

1          S9:  I'll tell you the same thing I told Scott.

2    Without reps and warrants are not a Chapter eleven or Chapter

3    seven.  Shut it down, sell everything and fire everybody.  You

4    can't survive without them.

5          S7:  And that conversation, when you first told him

6    about that was when.

7          S9:  Probably would have been when we were preparing

8    the the first day here in motion.

9          S7:  Can you explain that a bit?  What first day

10   hearing motion did you help prepare.

11         S9:  The one that was put in front of the Court?

12         S7:  Are you referring to the Cash's King scratch and

13   Dent motion?

14         S9:  No, it was the motion that they talked about for

15   payroll dip financing.  What does it mean?  What do you need in

16   order to keep the business going forward?

17         S7:  So they were consulting you for your knowledge

18   with respect to their first day pleadings?

19         S9:  Correct?

20         S8:  Leading question.

21         S1:  I agree.  Can you rephrase the question for us?

22         S7:  Absolutely.  So explain the work that you did

23   with Paladin with respect to the pleadings that were put before

24   the Court.

25         S9:  They had a previous case that they had been

1   involved with or that somebody they knew had been involved with

2   that sent them over.  It was about an eighty page document or

3   so and they had me go through it and say, What's valid, what

4   works with us, what doesn't, and help us put together the

5   things that are missing.

6         S7:  Okay.  So it sounds like they relied on on your

7   knowledge of the industry.

8         S3:  That was part of it.

9         S7:  I'll withdraw it.  You had spoken before about

10  reaching out to vendors shortly after the filing.  Is that

11  correct?  Correct.  Okay.  Did you ever reach out to vendors

12  with Mr. Avila present?

13        S3:  Objection, Your Honor.

14        S8:  I tried to give Mr. Barcelona some some leeway

15  here, but what does this have to do with the venue issue before

16  the Court today?

17        S7:  Your Honor, the business judgment of the debtors

18  to file and where to file is a key issue of the venue motion

19  and needs to be incorporated into the judge's determination of

20  whether or not this was proper.  We have evidence already that

21  Mr. Avila was not experienced at all.  How could he make a

22  proper business judgment to file anywhere if he knew nothing

23  about the business?

24        S1:  Well, nobody's nobody's challenged the filing

25  itself.  The challenge today is as to the the selection of

1    venue and whether we ought to be in Arizona rather than here.

2    That's a different issue.  Objection.  Sustained.

3            S8:  Thank you.

4            S7:  One moment.

5            S1:  Of course.  Yeah.

6            S7:  I believe we're done with direct honor.

7            S1:  Okay.

8            S4:  I'm going to have two or three questions.

9            S7:  We'll open it up to cross.

10           S1:  Okay.  Okay.  Mr. Denny, you go first.

11           S4:  It's going to be real quick.  So we're on the

12   24th.  Where were you located?

13           S9:  1550.  East McCallum's Road, Suite 117 in Mesa,

14   Arizona.  85203.

15           S4:  Why is that?

16           S9:  That's the office I've worked out of since 2001.

17           S4:  And what was your title at the time, CEO?  Did

18   you run the company from there?  I did.  Is that where the

19   books and records were?

20           S9:  Some majority was in Gilbert.

21           S4:  That's also in Arizona, correct?

22           S9:  Correct.

23           S4:  Okay.  When Mr. Avila showed up, he arrived at

24   the offices, Correct?

25           S9:  Mr. Avila was in my offices, Yes.

1          S4:  And that was to effect a transition of

2     management, correct?

3          S9:  That was my.

4          S4:  Understanding.  Okay.  And there was a

5     communication that was prepared to go out to employees to that

6     emanate from Arizona.

7          S9:  It did.  Well, the People that I was working with

8     were in Arizona, but they did send it to somebody else to

9     review counsel to review before we sent it out.

10         S4:  Okay.

11         S9:  And I don't know where they were located.

12         S4:  I have nothing, I'm sure.

13         S1:  Okay.  Thank you, Mr. Okay.  Mr. Litvak.

14         S8:  Not too much cause for Your Honor.  Mr. Bowlby.

15    Good afternoon.

16         S3:  Good afternoon.

17         S8:  There were some questions on direct about

18    services that you provided to the Paladin team and America

19    first.  Post-Petition post August 24th, 2023.  Do you recall.

20         S9:  That?  Yes.

21         S8:  And isn't it correct that no one on the Paladin

22    side agreed to pay you any compensation for the services that

23    you provided post August 24th?

24         S9:  Yeah.  There was actually no discussion when I

25    would bring it up, there was no answer.

1          S8:  But no one told you that?  Yes, we'll pay you X

2     amount.  Correct?

3          S9:  That is correct.

4          S8:  So you don't have a claim against the estate for

5     post-petition services, correct?

6          S9:  Incorrect.

7          S4:  Actually, that's a legal conclusion.  You may

8     have a referee being on Your Honor.  He's not a lawyer.

9          S8:  That's 503 thirty-nine.  He's providing services.

10          S1:  He can testify, as is his understanding.

11          S9:  So I had the previous payroll per se request.  I

12     was denied the ability to pay myself any salary.  So I would

13     disagree with you and say, yes, I am owed money.

14          S8:  No, but my specific question, Mr. Bowlby, is with

15     respect to post-petition services, you provide post position

16     services.  You don't have a claim against the estate, correct?

17     Correct.  When the company filed for bankruptcy on August 24th,

18     it was losing money on an operating basis.  Correct?

19          S3:  Correct.

20          S8:  How much money did the company have in terms of

21     unrestricted cash that's available to the company for its

22     operations?  On the petition date, August 24th.

23          S9:  On August 24th, it was down to 400.  RCP had

24     slept 600,000 on August, I believe, 17th.  So they were they

25     they would continue to sweep the dock account to ensure we

1    didn't have funding unless they agreed to waive rights and

2    claims against them.

3           S8:  But in actuality, as of the petition date, it was

4    less than half a million dollars, correct?

5           S9:  Yeah, because they had just drained it.

6           S8:  How did you.  Well, let me put it this way.  Was

7    there a payroll on August 20th?  Yep.  How many people?

8           S9:  130.  240.  Somewhere on there.

9           S8:  How much was that payroll?

10          S9:  About 600,000.

11          S8:  Did you take a mortgage on your residence, which

12   is owned by a mayor first, in order to obtain a loan to make

13   that payroll?

14          S9:  Yes.  A mortgage is a loan?  Yes.

15          S8:  How much of a loan did you take?

16          S9:  We did a total credit agreement of 1.5 million.

17          S8:  Who is that from?

18          S9:  Granite Mountain.

19          S8:  Who is the principal of Granite Granite Mountain?

20          S9:  John Jackson.

21          S8:  Is he a friend of yours?

22          S9:  Yes.

23          S8:  How long have you known him?

24          S5:  Your Honor, I just want to object to this line of

25   questioning.  Counsel made an objection saying that all of this

1   entire line was not relevant to the venue transfer motion,

2   which, Your Honor sustained.  Now he's asking questions about

3   it.  It's inherently.

4          S1:  Unfair.  Mr. Litvack.  Any response?

5          S8:  I'll withdraw the question.

6          S1:  Okay.

7          S8:  And that concludes the cross, Your Honor.

8          S1:  Okay.  Thank you.  Thank you, Mr. Murphy.

9          S3:  Yes.  Just a handful of things.  Good afternoon.

10  Good afternoon.  Good to see you.  You testified that in

11  October 2022, if I was getting close to a required payment.  Is

12  that right?  That is correct.  And that was the payment that

13  was required under the loan agreement with RCP.  That is

14  correct.  Did affi make that payment?

15         S9:  We had a three week delay in selling our MSRs by

16  our sub servicer, which would have paid them down to nine

17  million instead of three million.  So yes, we missed it on

18  December 1st, but they knew the money was coming in on December

19  21st.  That would have paid them triple of what the requirement

20  amount was.

21         S3:  What your testimony is now is that the payment

22  was not made when it was due on December.  That is correct.

23  You also testified as to a number of things that happened when

24  the Paladin team arrived at your offices.  And I think you were

25  speaking of perhaps both Mesa and Gilbert, but you described

1   them as friendly and cooperative.  Is that right?

2          S9:  Yeah.  I had no issues with with the Paladin

3   group.  I didn't care for the security that was armed, but

4   Scott and his team were were pleasant.

5          S3:  But you didn't feel intimidated or coerced by the

6   presence.

7          S9:  Once they got rid of the the armed guards and let

8   them step out and realize that I wasn't a threat, I didn't feel

9   anything but know armed guards certainly doesn't doesn't make

10  you feel good, especially when it's in front of all your

11  employees.

12         S3:  And you, in fact, worked with the Paladin team on

13  drafting a letter to employees together.

14         S9:  It started out with me and then it was completely

15  changed.  So I was technically in the room and I took what they

16  sent me and I copied it, pasted it and emailed it.

17         S3:  But you testified also that you worked with

18  Paladin team on first what we call here first day pleadings,

19  Correct?  And that was a cooperative effort.  Correct.  And you

20  also said it was your point of view after the filing that if I

21  should reorganize, would $450,000 in cash be sufficient to do

22  so?

23         S9:  No.  But if you go to what's in my filing on

24  August 31st, the Scratch and Dent loans were already sold, $3.8

25  million was coming in, would have been more than sufficient for

1   the relaunch of their first.

2       S3:  So you would not.  But that those proceeds and

3   I'm not asking for a legal conclusion, but you understand that

4   the company was not permitted to freely use the proceeds of

5   sale of assets without the lender's permission.  Correct.

6       S9:  But we would have been well within the

7   performance on the revised credit agreement that we had all

8   agreed to.  We would have been right on line.

9       S3:  Yes, but after the petition date, you would have

10  needed some dip financing in order to reorganize the company,

11  wouldn't you?

12      S9:  Not if they had accepted the sale on the scratch

13  and dent, $3.8 million would have been in a couple of days

14  later.

15      S3:  But you would have needed their permission to use

16  that money.

17      S9:  Well, I didn't own the company at that point, so

18  it was them making the decision themselves.

19      S3:  Okay.  But the point I'm trying to make is that

20  once the bankruptcy was filed, the cash on hand of the company

21  was not sufficient to reorganize the company and emerge as a

22  going concern business.  Isn't that correct, Ms. Richard?

23      S6:  Yes, I the moving here for the venue issue, I

24  first, I think that this cross-examination has nothing to do

25  with the issues of the venue motion.  And I think it's along

1    the same lines of what was objected to by Mr. Litvack and Your

2    Honor upheld those objections.  And I think that we are getting

3    far afield at this point in time.

4         S1:  Any response, Mr. MURPHY.

5         S3:  Yeah.  If we strike the testimony about how the

6    company was poised to reorganize, I wouldn't need to be asking

7    questions about the lack of any feasibility to do that without

8    financing.

9         S1:  Okay.  I'm going to sustain the objection.

10        S3:  I have nothing for you.

11        S1:  Okay.  Thank you, sir.

12        S5:  Before we move any further, something I wanted to

13   make sure we do.  I wanted to move into evidence, certain

14   exhibits that we had asked Mr. Avila about.  They would be

15   exhibits.

16        S1:  He said, Well, we're doing this in the middle of

17   testimony.

18        S5:  That's.  Oh, I'm sorry.  I thought.

19        S1:  Okay.  Sorry, Your Honor.  Just a.

20        S8:  Litigator.

21        S7:  Not a bankruptcy attorney.  Your Honor, at this

22   time, there's no redirect.

23        S1:  Okay.  Okay.  Mr. Baldi, you're excused.  Thank

24   you.  Okay.

25        S5:  Yeah, I thought we were there.  Sorry, Judge.

1          S1:  So what are we seeking to admit?

2          S5:  These were just the exhibits that we ask

3    questions to Mr. Avila about.  None of the ones.  These are not

4    the ones that Your Honor sustained.  Any objections?  And I did

5    not ask questions to.  Those would be exhibits p, q, r, t, u,

6    W, B.B., CC, and jg G.  I'll just note where I represented that

7    we're not moving something into evidence that is not on the

8    list.

9          S1:  Okay.  Mr. Litvak.

10         S8:  Your Honor, can we have can we move on to other

11   issues, maybe the closings?  And so to give us a chance to

12   review these exhibits and then tell the Court if we have some

13   objection or take a break, take a five minute.

14         S1:  Yeah, I think I think the problem is that if a

15   party wants to refer to an exhibit, we don't know whether it's

16   in evidence or not.

17         S4:  Fair enough.

18         S1:  How much time do you think you need for that?

19         S8:  five minutes.  Really?  Just.  And I just wanted

20   to confirm, Your Honor, that the ones that were just read into

21   the record are the ones that Bobbi's counsel is seeking to

22   admit into evidence.

23         S1:  Yes.  P.  Q.  R.  T.  U.  W.  Double b.  Double

24   C.  And double G.

25         S8:  Thank you.

1          S1:  Okay.  So come back at 305.  We're in recess.

2          S9:  Yes.

3          S1:  All right.  Please be seated.  Tell me the five

4    minutes was useful.

5          S8:  Very useful.  Your Honor.  We have no objection

6    on the debtor side to the admission of those designated

7    exhibits by BOWLBY Counsel.

8          S1:  Okay.

9          S3:  Nor does RCP.  Your Honor.

10         S1:  Thank you very much.  Okay.  So Bobby exhibits p

11   q r ht UW, double B, double C, double g r admitted.  Okay.  So

12   all the evidence is closed all around.

13         S8:  It's confirmed.

14         S1:  Okay.  We are.  We're running a lot longer than I

15   think everybody anticipated based on what we heard yesterday.

16   And we do need to finish by five today.  Can I jump ahead and

17   ask how long do you think the presentation on the application

18   to retain the Kasowitz firm is going to take?

19         S2:  Good afternoon, Your Honor.  Lord Davids, Jones

20   and Jones on behalf of the debtors.  Your Honor, I think our

21   presentation is approximately fifteen minutes, maybe a little

22   less.  My understanding, though, is the other side may be

23   calling a witness.

24         S1:  Mr. Stein.  Good afternoon, sir.

25         S2:  Good afternoon.  For the record, Matthew Stein, I

1    think it should be just a short.  I think the issues are

2    relatively straightforward and we can streamline it.  I will be

3    introducing Mr. Felicia's testimony by declaration.  So it all.

4         S9:  Depends on how long the is.

5         S1:  Okay.  Okay.  I think we can probably manage all

6    this by by five then if we're efficient with our our closing

7    arguments.  Ms. Rich and Director.

8         S6:  Good afternoon, Your Honor.  Linda Rich and Dr.

9    from the Office of the United States Trustee.  As Your Honor is

10   very well aware, the U.S. Trustee filed a motion to transfer

11   venue in the interest of justice.  This is extraordinary

12   relief.  I'll be the first to admit that my office is the first

13   to admit that.  But the circumstances here are not common ones.

14   And I heard Mr. Avila several times say, well, this is the way

15   we always do it.  Well.  Raises two questions.  One, is that

16   right?  But two, is that the way it should have been done here?

17   Maybe it was appropriate in other circumstances, but we had to

18   look at the circumstances of this case.  And this is not a case

19   where there's a formal corporate structure that had been in

20   existence for several years.  And in the middle of it, it's a

21   holding company that owns a percentage or one hundred percent

22   of something below it.  And usually that holding company is a

23   borrower along with the operating entity, or it's a guarantor

24   of the debt that has been taken on by the operating entity.

25   That's not the corporate structure we have here in any form or

1   fashion.  This is a case where the holding company is created

2   in June 2023 and venue does not come into existence until

3   sometime on August twenty-four.  I don't know when the exactly

4   the pledge agreement was foreclosed or whatever the appropriate

5   terminology there is, but it was sometime during business hours

6   in the Pacific Time Zone.  All I know is that two petitions

7   were filed at 2:03 p.m. on August 24th.  That's the date they

8   arrived in my office.  So it's some time.  On August 24th,

9   foreclosure occurs, stock goes into Phoenix 1040 LLC, and lo

10  and behold, we have a Delaware LLC that holds an asset, but it

11  holds no liabilities.  And the petition that was filed simply I

12  don't know any other way to put it, but it was incorrect.  It

13  references creditors and amount of liabilities and assets that

14  Phoenix 1040 didn't have because when one looks at the

15  schedules and statements that Mr. Avila had the opportunity to

16  do after he was actually boots on the ground at AMPHI and could

17  also sit down and consider what was up with Phoenix.  1040

18  those schedules and statements reflect, I think, a total of a

19  $19,000 asset, and it's a retainer that was paid to Mr. Avila's

20  company.  When everything about this case is about AFI, it's

21  about can AFI reorganize?  Is AFI going to have to convert?

22  What is going to go on with the assets of AFI?  How are the AFI

23  assets going to be sold?  What about the liabilities of AFI?

24  There's nothing in this case that concerns Phoenix 1040 LLC.

25  We heard from Mr. Litvak earlier on today and his direct

1   examination of Mr. Aviles, some information about the creditor

2   base.  Well, Your Honor, I focus on the top twenty, top thirty

3   creditors, whatever is provided to us, because those are the

4   largest creditors.  And on that list, eighteen of those

5   creditors were located in Arizona.  Nine were in California,

6   one was in Texas and one was in Utah.  It shows you the basis

7   of where the jurisdiction laid.  Just a little side note,

8   There's a little bit of trouble in getting the committee formed

9   because I was in a different time zone than the People that I

10  needed to interview who are on the West Coast.  So scheduling

11  things got to be a little difficult.  There are no just to

12  briefly go back to the schedules and statements of Phoenix,

13  because I finally found my note here.  It's a die 250 for the

14  purpose of the record and no secure creditors, no unsecured

15  creditors, no executory contracts and no co debtors because it

16  owes nothing, no owes something to no one under the little case

17  standard set down by the Third Circuit recently.  This is not

18  an entity that is in financial distress.

19       S1:  But its sole asset is the stock of a company

20  that's in bankruptcy.  I mean, surely that's that's distress.

21       S6:  Well, Your Honor, that's it has an asset whose

22  value has been decreased because of the bankruptcy filing, but

23  it has no liabilities, so it's not in financial distress.  I

24  would submit, Your Honor, because nobody's knocking on its door

25  asking for money.

1        S1:  Well, it sounds like you're making an argument

2    that you would be making if we were here on a motion to dismiss

3    the Phoenix 1040 case, and we're not here on that.  And you

4    didn't brief those issues for sure?

5        S6:  That's correct, Your Honor.  And but the reason

6    why I'm focusing on this is to show that this case is not about

7    Phoenix 1040 This case is about a f i affi an Arizona company.

8    In addition to the usual factors that courts consider for

9    transfer of venue motions, there is relevant case law from this

10   Court regarding what one is to look at when considering a

11   request that's based on the interest of justice, a request to

12   transfer venue.  And these were all contained within the

13   motion.  The Quartet case, the Northfield case, those are both

14   Delaware cases.  You look at judicial efficiency, fair trial

15   form of an interest and deciding the issues, enforceability of

16   any judgments.  In the Quartet case, the Court wrote What will

17   promote the efficient administration of the estate judicial

18   economy timelessness, timeliness excuse me, and fairness.  DBS

19   II, which was also a Delaware case, the form where the debtor

20   had its primary operations, is favored.  Phoenix had no

21   operations, AFI did.  Now that is, try to distinguish some of

22   the main cases that the U.S. Trustee relies on with Patriot

23   coal.  I think its main point was that no economic parties and

24   interest had moved to transfer the venue and that changed when

25   the committee decided that it was going to support the motion

1   to transfer venue.  The little case the judge in the case from

2   North Carolina talked about if the convenience of the parties

3   and the witnesses are served usually follows that justice will

4   also be served.  It's not a question of bad faith.  This was

5   very prevalent in the case that I personally was involved with.

6   It's not a question of whether or not there's been bad faith in

7   making the decision as to where to file.  The question is,

8   though, regardless of good faith, bad faith, no faith whether

9   or not in the interest of justice, the case should be

10  transferred.  I'm trying to find my note here, my copy of LTL.

11  Here it is.  Your Honor, this is from the the slip opinion from

12  LTL.  It is a star.  Note six.  I'm just going to read a

13  portion here.  The debtor is trying to manufacture venue and is

14  attempting to outsmart the purpose of the statute.  In response

15  to the argument, the debtor contends the claimants are forum

16  shopping themselves.  Debtor tested the claim long as to can

17  transfer this case do according to the debtors.  Belief of the

18  claimants perception of circa is the more friendly dismissal

19  standard any form of shopping by the parties ways against them

20  both and looking at the factors.  But in this case the debtor

21  is not just form shopping, the debtor is manufacturing form and

22  creating a venue to file bankruptcy.  Thus, the purposeful

23  creation of venue, although not dispositive by itself, must be

24  considered in the interest of justice analysis.  The more

25  dispositive factor, however, remains if there is a more

1   appropriate venue for the administration of the estate.  And

2   the judge there sent the case to New Jersey.  Principal place

3   of business of and Jay, which was the entity behind LTL.

4           S1:  And I think that it was wasn't it also a

5   significant factor in his ruling that there is the MDL

6   litigation going on in the District of New Jersey, which is

7   very sizable.

8           S6:  That was one of the factors that he took into

9   consideration.  Yes, Your Honor, that was one of those factors.

10  And I guess to jump ahead a little bit here, we've heard from

11  Mr. Avila that he thinks that one of the State assets may be

12  claims and four claims he's focusing on mentioned potential

13  claims against former insiders.  And that takes us back to Mr.

14  Bowlby, possibly his father.  And where are they located?  They

15  are located in Arizona, and it's the debtor's response.  It

16  raises a certain number of points.  One is it talks about how

17  Delaware has an interest in protecting its citizens, and it

18  points to Phoenix.  I think Arizona has just as much interest

19  in protecting its citizens and its one of its citizens was Fee,

20  a fully operating company that employed over 150 employees that

21  now is in bankruptcy.  The debtor focuses a great deal.  They

22  claim that this was filed belatedly.  Most of the cases that

23  are cited by the debtor to support this point are cases where

24  parties to an adversary proceeding or trying to change venue of

25  the adversary proceeding.  So in Vienna Park Properties.

1    Petitions filed November 22nd, 1989 Motion to Transfer is filed
2    January 10th, 1990.  Court doesn't rule until October 23rd,
3    1990.  That was not an adversary proceeding.  But in between
4    the filing of the motion and the Court ruling, there were some
5    very substantive rulings that were made by the Court.  The Man
6    Bell Cape Mansfield case Petitions filed August twenty-six,
7    1982.  It wasn't clear to me the more I read through the
8    opinion, I couldn't figure out exactly when the motion was
9    filed, but I do know it was denied in November of 1985.  So
10   that's three years later.  Hechinger You have a June eleven,
11   1999 filing.  You have June 6th, 2001, and avoidance action for
12   $25,000.  And in that case, the defendant filed a motion to
13   transfer venue.  And I believe that would have still been Judge
14   Walsh, who said on August twenty-seven, 2001.  Now, I've
15   already had Hechinger now for over two years, basically, and
16   handling a $25,000 avoidance action.  We're going to keep the
17   case here.  I can't do my own writing.  I think the last one
18   was and I'm going to have to look it up.  We had a filing on
19   January 23rd, 2009.  Again, it was to transfer an advisory
20   adversary action.  And the ruling on the transfer was on July
21   8th, 2010.  Again, it wasn't clear to me exactly when the
22   motion to transfer was filed here.  This case got off to a slow
23   start.  We've heard about some of that today from Mr. Obama was
24   filed on August 24th with no first day motions.  We had to have
25   a status conference with Your Honor because there were no first

1    name motions.  Your Honor called for a status conference.  We

2    learned at that point that first days were going to be coming.

3    We had first day motions that were filed on August 29th, August

4    31st, and September 6th.  We had court hearings that started

5    with one on, I believe it was August 31st, it may have been

6    August 30th, and we had interim and final orders going out the

7    door through, it appears, about September 8th at this point in

8    time that, Your Honor, we don't have a final management order

9    because there is still an issue with one of the bank accounts.

10   We also don't have a final DEP order.  The committee was formed

11   on Thursday, I'm sorry, Friday, September 15th, and the motion

12   to transfer was filed two business days later on Tuesday,

13   September 19th.  Your Honor, if I came running into this Court

14   one week after the petitions were filed, I would have been told

15   that you're jumping the gun.  You got to find out more about

16   this case and what's going on with it.  So we waited and we

17   waited for the first day motions to be fine.  We waited until

18   the committee could be put together and that the committee

19   could gain counsel so they could be in a position to make

20   decisions.  We have the schedules and statements, but they were

21   just filed on October twelve.  So while we had a preliminary

22   341 meeting, we have not had yet the second 341 meeting to go

23   through the schedules.  Mr. Dahn yesterday testified that they

24   were working on a sale plan, but it wasn't ready yet to file.

25   Well, something got filed last night before midnight.  Called

1    the plan.  I haven't had a chance to look at it yet.  I have no
2    idea how baked it is, how ready it is to go out the door.  One
3    of the most telling things to me that Your Honor is one of the
4    items up for next week is a Kirk motion, and it seeks to make
5    retention payments to employees.  And it has said states that
6    there will be a schedule and it needs the employees to stay
7    between nine weeks and twenty-two weeks.  Twenty-two weeks,
8    Your Honor, will take us into February.  I don't see that this
9    case is on the verge of being complete when they want Kirk
10   payments approved by this Court.  That will not be made until
11   February of 2024.  I know hope springs eternal.  Everybody
12   thinks this case is going to be materially completed.
13   Everybody thinks their own case is going to be materially
14   completed.  With all due respect, Your Honor, I don't think
15   this Court has yet been called upon to make any substantive
16   rulings.  There's been rulings on first day motions.  And then
17   at this point in time, we're standing here today on the venue
18   motion.  I don't know some of the court's decisions talk about,
19   you know, concern that a subsequent court might have to make
20   rulings, go back and look at rulings.  Well, like I said, to
21   date, it's pretty much been the administrative matters.  I know
22   there was something said about the cost.  Well, Your Honor,
23   debtor's counsel, very well known nationally.  And in fact, Mr.
24   Litvack himself is from the California office.  So not hard to
25   say if a case in Arizona committee counsel I know, also has the

1    ability to still continue to serve in its role and whoever is

2    out there in the US trustee's office.  I appreciate the doubt

3    of being concerned for them.  But these days we have learned to

4    get up to speed on cases extremely fast, and so I don't think

5    that would be a problem and I can definitely share information.

6    So I don't think there will be any dragging, you know, in terms

7    of lengthening the case.  And I don't see there being an

8    increase in cost either, Your Honor.  And so I guess at the end

9    of the day, the reason why we use the term manufacture venue is

10   that once that stock was put into a Delaware LLC on August

11   24th, that became the key event.  They filed first Phoenix 1045

12   first, and then Fee is filed as a follow on.  But this case is

13   only about IFR, and regardless of where the stock resides, this

14   case, again, is about whether or not AFI can be restructured or

15   whether it has to be liquidated.  It sounds like it's going to

16   be liquidated.  And if it's going to be liquidated, then it

17   should be liquidated in the form where it exists and where its

18   creditors are.  I went through the list of the top creditors,

19   and we have a nucleus of our creditors committee that is out

20   that way.  So I don't know if Your Honor has any questions for

21   me.

22        S1:  You know, one of the the issues that you do focus

23   on in your brief pretty extensively is, you know, the Patriot

24   coal issue.  And is it is it at all relevant to you that the

25   debtors do not form a Delaware entity?  You know, the the

1  Delaware LLC debtor ten Phoenix 1040 was formed by RCP or an

2  affiliate thereof, and it sort of makes sense that they would

3  that they would form a Delaware LLC.  So I guess what I'm

4  getting is from your argument, you're you're certainly not

5  moving on from the Patriot Cole type argument, but you're

6  pulling back from it.  You're focusing on other things.  What

7  am I to make of the fact that the debtors did not form this

8  LLC?  And therefore how how could the debtors have manufactured

9  venue, as was the the case in Patriot Cole And in Little North

10  Carolina.

11      S6:  The debtors made the decision to file in the

12  jurisdiction where the LLC was located as opposed to the

13  jurisdiction where the operating entity was located.  So you're

14  correct drug.  And I think that's why there was testimony that

15  various parties wanted to question Mr. Avila about regarding

16  who was behind all of this.  And when I look at LTL, it didn't

17  make a difference that or not in MTL, it was J and J at the top

18  of the corporate structure, pulling the strings and saying,

19  We're going to do this, we're going to do that, we're going to

20  do the Texas Two-Step, you're going to incorporate over there.

21  It wasn't the debtor lt'll was not the one, it was the ones

22  above it that were making the decision.  But we have the same

23  thing here, and that's one of the reasons why we have focused

24  on that narrow period of time between when Mr. Zavala comes on

25  the scene and when it's actually filed and who's making what

1    decisions.  You're right, Your Honor.  Forming Phoenix 1040 LLC

2    in Delaware, foreclosing on the stock and deciding to put it in

3    there, that's fine.  But it was the decision that was made by

4    the debtors to use that entity to make a filing here in

5    Delaware to manufacture and use that to come here as opposed to

6    staying where they should have been, which was in Arizona.

7    Okay.  I mean, in LTL, the Court did look into the entities

8    above stream that were pulling and were deciding where things

9    were going to lay out and how and when and where the debtor was

10   going to be filed.

11          S1:  Right.  And I think in LTL, the fact that it was

12   this divisive merger, which is a controversial play, I got the

13   feeling from reading the opinion that that that bothered the

14   judge a great deal.

15          S6:  I know for a fact and I will admit this is sort

16   of neither here nor there, but having been listening to what

17   was going on live as it was going on down there, Your Honor,

18   the judge was a little tired of having divisive merger cases

19   appear in front of him and concerning entities that in no way

20   were really related to North Carolina.  And here was yet

21   another one that didn't have a relationship to North Carolina.

22          S1:  Right.

23          S6:  This is a case that doesn't have a relationship

24   to Delaware.  This is a case that is related to Arizona.

25          S1:  Thank you, Mr. Richard Shaffer.  Mr. Denning,

1    Thank you.

2          S4:  Your Honor.  Robert Danny for the committee.  And

3    the debtor's reply.  They said no economic stakeholder had

4    weighed in asking for venue to be transferred.  Well, we did,

5    and there are a lot of reasons why.  And you've heard some of

6    them.  I'm going to cover what I believe is the indisputable

7    record.  I'm going to pick up on your last point, the creation

8    of the venue and whether it's okay or not.  And you asked about

9    distress.  Well, the record, Your Honor, is that RCP is the one

10   hundred percent owner and controller all the way up and down to

11   the debtors.  There's no question about that.  We know sitting

12   here today that Phoenix 1040 LLC is one hundred percent owned

13   by RCP, which is also the lender.  We know that that entity has

14   nobody in control or operating except Mr. Sloan, who is RCP.

15   There is no one independent.  It's down below.  So it is

16   controlled corporate wise and ownership wise all the way up.

17   They created the holdco with the Delaware venue.  That holdco

18   entity.  From a venue perspective, it's a Delaware entity for

19   sure.  But if you look at the petition, the petition says

20   whatever it has is in Arizona, the stock it owns is in an

21   Arizona company.  That's the extent of what it has.  There are

22   no creditors.  There are no other parties-in-interest.  That

23   entity had no distress.  It has no debt.  It's not even on the

24   debt.  It's not on the pre-petition secured documents.  But

25   that makes sense because the lender owns it.  The lender is the

1    equity, it is the board and it is the lender pre-petition and

2    then it comes in with a dip.  So when we talk about

3    manufactured venue, we do believe it was.  I don't think you

4    have to get to that though to grant the motion to transfer

5    venue because let's assume for the moment it wasn't

6    manufactured with a plan so that they had a Delaware hook.

7    Really, that's the only reason.  It's kind of ironic.  They

8    named it Phoenix 1040 LLC and they say Delaware has an interest

9    in it.  If you look at that Delaware Hook entity, judge, again,

10   there's nothing else that suggests it was in distress that it

11   needed to file.  It wasn't that the lender was going to

12   exercise rights and remedies and foreclose on itself when there

13   is no debt in any way connected to that entity.  So it didn't

14   need an automatic state.  It didn't need court relief.  There's

15   no 363 benefit.  There's no 360 to benefit that entity.  You

16   said that the U.S. Trustee hasn't moved to dismiss the case.

17   We don't want the case dismissed.  We're going to ask to

18   convert.  And we'll be back next week in front of you for that,

19   because we want the independent fiduciary to make the decisions

20   going forward.  That's what that will do.  So we're not going

21   to suggest dismiss it.  We're going to say convert it, not at

22   today issue.  But I want you to understand the facts and

23   circumstances that are undisputed so far.  So venue, when you

24   start talking about venue.  Well, you mentioned was that entity

25   in distress?  I don't think it was in distress.  There's no

1   record of it being in distressed, nor could there be.  Affi was

2   affi in distress.  Well, it was affi in distress.  And was it a

3   self created distress by virtue of the lender can can a lender.

4   It's one thing if you're a lender and you have a borrower and

5   you don't have control, you can't control the actions and

6   operations.  But they eliminated that when they exercised the

7   pledge.  Unlike most instances, most lenders will exercise a

8   proxy and put an independent board in but never take control

9   and ownership here.  RCP did all of that.  They are one in the

10  same one could even sub on it for sport if there was enough

11  money and interest, but that's the effect of what they did.  So

12  they can't manufacture distress and I don't believe legally

13  they can come in to you and say, Gee, we had to do this because

14  but I don't think that matters for venue.  The record is

15  already clear.  Just looking at the debtors binder.  All right.

16  So their petition, if we go to their petitions, every box they

17  checked Arizona, there's nothing about their their papers that

18  suggest Delaware.  They note on the cover sheet.  Principal

19  place of business Arizona location of principal assets if

20  different from principal place of business.  No.  Arizona.

21  That's what they have.  So that's exhibit thirteen.  That's

22  1040 OLS, Your Honor.  Exhibit thirteen of the Debtors Papers.

23  Their petition shows the principal place of business of LLC as

24  Mesa, Arizona.  And they acknowledged that's the principal

25  place of their business and their assets.  That right there, I

1   think there's no there's no prejudice to the debtor

2   transferring that case.  They can't argue it.  They can't say,

3   gee, that's detrimental to the lawyers or any economic

4   stakeholders.  So that's the petition of that entity.  When you

5   go to the actual operating entity, same thing, right?  You've

6   got Arizona principal place of business, principal place of

7   assets.  You had Mr. Bob, who is your only fact witness,

8   really.  I mean, Mr. Avila confirmed that upon the change of

9   control, he and his team were in Arizona to effect the

10  transfer.  The nerve center is Arizona.  The books and records,

11  Arizona.  The business was run from Arizona.  The test is where

12  was it at the time of the case?  RCP loan money to an entity in

13  Arizona.  They sent their teams in to Arizona.  Was in

14  Delaware.  Nothing here in Delaware.  No remedies exercised

15  here in Delaware.  No connection to Delaware.  So that's just

16  going by their petitions and the undisputed facts of what

17  existed at the time they filed two hours after the change of

18  control.  Let's go to their schedules.  And again, these are

19  all the debtors information and this is what you look at for

20  venue.  If you had a properly filed case.  Right.  You look I

21  remember going, Ernest, one hundred years ago.  Where is

22  everyone?  Where's the business?  We don't even have that here

23  because it was all Arizona.  If I look at their schedules and

24  we covered this on the direct, there is nothing in the 1040 LLC

25  inconsistent with what's on the petition.  No assets, no ideas.

1    Same thing when you get to the operating company, Your Honor,

2    there's nothing to suggest a basis to be here in Delaware or

3    more importantly, a reason to keep it.  So there is.  Are you

4    here and why?  And then there's why not transfer it?  You can

5    keep it.  Clearly.  You could keep it.  We could skip over the

6    manufacturer venue.  We could skip over debtor, say, well,

7    debtors always entitled to deference for its decision.  But.

8    But what if it wasn't the debtors decision?  Was it AFI's

9    decision?  AFI was put in two hours after a board was created.

10   Everything was already set up and it's an Arizona company.  It

11   never could have been here.  So it wasn't that entity's

12   decision.  All it was was the entity above.  And that's RCP is

13   that's the RCP controlled entity with the RCP director.  There

14   is no an independent who made that decision.  So I don't think

15   the deference works for them.  And then the Court would say,

16   All right.  Well, Mr. Denny, even if whether there's deference

17   or not, what are the reasons to transfer it?  And the

18   overwhelming reasons, the transfer, that's where everything is.

19   That's just it's, it's indisputable fact wise.  So we don't

20   believe there.  We do believe it was manufactured.  I'm not

21   going to go through all of the emails and documents and

22   exhibits.  You've already read them.  They're in the record.  I

23   don't think there's I can't think of a fact pattern.  Better to

24   find that deference should not be rewarded here and venue was

25   established.  It's just not credible to suggest otherwise based

1   on all the documents and the evidence so far.  And as I said,

2   the hook itself, there's no basis to to allow that Delaware

3   entity hook to stay.  It's not a guarantor.  It's not on any

4   debt.  There's no rehabilitative purpose, not a dismissal

5   motion, but it should be factored into whether it transfers

6   convenience of the parties and creditors.  Your Honor, you

7   know, Exhibit Number one with the committee members,

8   California, Arizona, Chicago.  I think the debtor said know

9   predominant number of creditors are not or west of the

10  Mississippi.  I know the U.S. Trustee went into numbers of the

11  top twenty.  One thing I do want to hit, Your Honor.  So the

12  filing itself and the costs and efficiency, because that was

13  one of the things that was raised in the papers.  I would come

14  running in to convert much faster.  But we were trying to get

15  the information to understand why we're here.  So Your Honor,

16  the debtor's budget.  So I'm not using anything new or

17  different.  The debtors budget shows projected professional

18  fees of seven and a half million dollars.  Operating expenses,

19  2.6.  And that's if more people are not laid off.  That's

20  running on an eighteen week period.  You heard that the debt is

21  well over twenty million and that the asset sale proceeds are

22  going to be half.  I mean, there's a huge difference why the

23  case filed and what the benefit is.  We're going to get to that

24  at some point, whether it's here or in Arizona or a Trustee

25  will do it.  Never made sense to be in Chapter eleven because

1  you wouldn't normally spend a $5 million debt on top of your

2  $16 million to yield eight or $10 million.  So there's

3  something more to it.  We'll get to it.  But I don't want, Your

4  Honor, to think that the committee's decision is not eyes wide

5  open about what happens if they don't fund.  If you convert, if

6  you transfer and they call a default, what happens?  Well,

7  everything they're doing is solely for their benefit.  We never

8  have a problem in our jurisdiction about as long as the lenders

9  paying the freight here.  It's so obvious.  It makes no sense.

10 The whole idea here is to get liens claims, and then they're

11 adequate protection claims to soak up the value of the other

12 assets.  We know it's not.  They're their securitization assets

13 because Mr. Avila already testified they're done.  Here's the

14 number.  Here's their debt.  None of it's disputed.  And for

15 that, they want to burn through this amount of money and it's

16 secured by causes of action.  Mr. Avila didn't look into causes

17 of action stipulated in the debt that they tendered to you, but

18 they didn't look at it.  And then they try to eliminate it in

19 the last turn of the order from the committee perspective.  If

20 they wanted to liquidate their collateral, they could have

21 stood up.  As I said, there was no distress.  Payroll was a

22 week later.  They're on all sides of the transaction.

23 Everything they did to preserve value redounds to their

24 benefit.  They never said they thought this was the best thing

25 to maximize value for employees or creditors.  So it's all in

1     their control.  If they if they want to fund, they can fund or

2     not transfer.  A venue should not be determined by what the

3     lender may or may not do when the record is so clear.

4     Everything has been done by the lender for the lender, and that

5     is just the record.  That's not me and rhetoric.  All we have

6     to do is look at the top lenders, lenders, professionals,

7     lender process.  There were no interviews.  There is no

8     independence.  There's no absolute delegation of authority.

9     There was no time for a board to make a decision.  There was no

10    option to do anything.  But they had a week before a payroll

11    was due and the lack of liquidity we heard it's not disputed

12    that the bank was sweeping all the money.  So they're sleeping

13    money to themselves for their own benefit and their the equity.

14    So from our perspective, when you look at those facts and

15    thinking about, look, it's Delaware, right?  We have to be

16    mindful of the deference and the importance of the ability to

17    file and choice.  But on specific facts, we also have to think

18    about the process and transparency.  And none of that was here.

19    None of that was introduced.  They're still not as much as we

20    expect or will be.  But we do know the numbers now, Your Honor,

21    should have a good sense of the numbers, and it lends itself to

22    ask why.  And then you look at the conduct you could have filed

23    in Arizona.  There was a choice planned not to be in Arizona,

24    so you should go to Arizona.  That's where the operating

25    company is.  You've heard already for Mr. Avila that from an

1   operating perspective, there's nothing really left.  Anyway,

2   they referred everybody, and that may be a cause of action.

3   Just filing without knowing the impact of filing on the MSRs

4   different issue.  But again, in Disher that it was not a well

5   thought out, well reasoned decision by a board because it was

6   already decided.  But but we.  Look at it now.  All the

7   operating assets are pretty much done.  They're sold.  The

8   People are gone.  What's going to be for the estate?  What is

9   the material prejudice to the estate if it transfers and

10  finishes liquidating?  Because remember, the only thing that's

11  left, according to Mr. Abela, are causes of action.  Causes of

12  action against maybe, Mr. Bowlby.  If they're under secured,

13  the schedule will show they received three and a half million

14  dollars within ninety days.  They were stockholders, by the

15  way, preferred stockholder.  So they were preferred stockholder

16  and the lender and you heard they were at the board.  It could

17  be all kinds of causes of action against them.  There's a law

18  firm ready to pursue it.  That's sort of the next motion.  But

19  but if you think about what's left in this case, we appreciate

20  the speed with which they moved.  All could have been done out

21  of court.  All could have been done in Arizona.  If you look at

22  the talking about timing and payment, they had payments going

23  out into the spring of next year.  It's not like the bankruptcy

24  court here in Delaware is turning you know, turning these

25  assets into gold in sixty days.  It's not the case.  There was

1    really no reason to be here.  Maybe one, maybe it releases

2    maybe the ability to get third-party releases in this District

3    and not in the ninth Circuit could be the speed with which

4    they've moved in, hoping that things could be done quickly.

5    It's going to be looked at no matter whether it's here or in

6    Arizona, Your Honor, to be clear.  But the numbers don't lie.

7    None of it makes sense.  There is no prejudice to transfer.

8    The professionals can't say there's prejudice.  Mr. Abalos

9    team, they're not here.  He said.  They're not even going to

10   the office.  I'm not even sure why we're operating at that

11   point.  Mr. Noland, who just started after the fact, the only

12   one with securitization experience.  He's based in California,

13   so it's not going to hurt.  They're professionals, it's not

14   going to add cost might be cheaper in Arizona.  It's a lot

15   cheaper to get Phillies tickets there than it is here.  So so

16   that's where we are in terms of transfer, Your Honor, we just

17   don't see any good reason for it to be here.  At deposition

18   yesterday when Mr. Avila was asked, why aren't you consenting?

19   And he said, well, we've pretty much wrapped it all up.  They

20   filed a plan last night.  No one consulted with the committee.

21   We haven't had a discussion with them.  No one has reached out

22   their plan that they filed last night.  I flipped it this

23   morning.  Third-party releases presumes they're released by the

24   estate.  Premature when we think.  But that's what they filed

25   last night.  Does it need to be filed?  There is no exclusivity

1   issue.  There is no urgency.  So on balance, Your Honor, it

2   just none of it adds up.  And certainly it's not an operating

3   eleven, and there's no risk that the lender is going to pull

4   the plug because the lender is the only one who's going to get

5   the proceeds from the MSRs.  And this isn't just a play of

6   checking of, you know, I'm looking for a couple of shekels.

7   They set it up this way.  They've dictated the terms and the

8   tempo and the numbers are fixed.  So we should preserve our

9   paramount focus is going to be preserving the unencumbered

10  litigation claims the estate has against everyone.  No one's

11  getting a free pass in this case, not for the pre-petition, not

12  for the ex post-petition that we think may not have been as

13  informed as you might have liked.  But we're ready to transfer

14  the case out there last day cost.  And who's going to represent

15  parties?  We have no idea whether we're going to be engaged or

16  not to stay out there.  We know that we have a former associate

17  who moved that they're much smarter decision.  We spoke with

18  them and we spoke to that law firm.  And we have a sense of,

19  sure, there are judges.  Yes, they have time.  They know what

20  they're doing.  We know what their rates are.  So there's not

21  going to be disruption or lack of continuity between

22  professionals.  I think as Rich and Dorf said, everyone's going

23  to be fine.  Professionals will stay in place.  It's not going

24  to be materially different.  So for all those reasons, Your

25  Honor, we would ask that you transfer the case.  I'll keep

1   that.  I'll stop babbling and I'll ask you have any questions

2   of me.

3           S1:  I don't have any questions.  Thank you, Robert.

4   Thank you, Mr. Denny.  Mr. Barcelona.

5           S7:  Good afternoon, Your Honor.  For the record, your

6   Barcelona PASHMAN signed Walter and Hayden on behalf of Mr.

7   Dolby.  Your Honor, we're here on a motion under 1412 one

8   sentence statute with a disjunct.  Of choice for the Court.

9   Either one wins interest of justice or convenience of the

10  parties.  There's been a lot of discussion in evidence about

11  Arizona convenience, et cetera.  I don't want to belabor the

12  point.  I think that is pretty clear by the record that Arizona

13  is where this business has always been and always will be.  I

14  will say to that point, Your Honor, there's a there are in

15  restaurants, in restaurants, Acquisition one, LLC, a case by

16  Judge GROSS, he cites to proposition that the location of

17  assets becomes more important in a liquidation rather than a

18  rehabilitation.  So perhaps if this had been a rehabilitation,

19  it would be more proper to be in a more national scale in

20  Delaware.  That's not happening here.  But for convenience of

21  parties, I want to put that aside.  We're here on the interest

22  of justice.  This is a court of equity.  You've heard some

23  incredible facts throughout this case.  And I want to read also

24  Judge Chapman's quote from Patriot Coal and what the Court has

25  to determine when they're looking at the interest of justice

1   analysis.  It's a broad and flexible standard which must be

2   applied on a case by case basis.  It contemplates a

3   consideration of whether transferring venue would promote the

4   efficient administration of the bankruptcy estate, judicial

5   economy, timeliness and fairness.  So interests of justice.

6   Your Honor.  Pretty weighty term.  I'm not being dramatic.

7   That's what's in the writing.  And there's a lot of meaning

8   built into that term that this Court has to look at on a case

9   by case basis.  Concepts of fairness, concepts of equity,

10  concepts of integrity of our bankruptcy system.  That's the

11  reason why Judge Chapman in Patriot Coal and Judge Whitley and

12  Lttle focused on the interests of justice, because they're like

13  here, even though the letter of the law of 1408 was satisfied,

14  the circumstances they're like, here are so inequitable, so

15  unfair that the interest of justice required their transfer.

16  Now, you asked the question before of Mr. Rich and Duffer

17  regarding the creation of the entity by the lenders.  How does

18  that play into this?  Well, I think that should be the prime

19  focus of Your Honor's ruling.  The whole deference of the

20  debtor IDEA concept is out the window.  The debtors in

21  paragraph twenty-five to thirty of their objection, keep

22  saying, Hey, we didn't make the choice.  It was RCP.  Don't

23  blame us.  So the business judgment to choose where to file was

24  made by the secured lender that in the papers in front of Your

25  Honor show, we want to file in Delaware to get a dip and get a

1    release.  The plan that was filed last night just supplements

2    that confirms it.  We're going to be here on release ISSUES.

3    Your Honor.  Another quote I would like to put in the record,

4    not the record.  Now it's just arguments with respect to

5    Patriot.  And I think it it has been in the forefront of my

6    mind throughout this entire case.  And it's once again focused

7    on the secured lenders choice.  We have a secured lender that

8    could have foreclose on its assets.  It has remedies out of

9    court.  It arguably exercise those remedies legally.  But they

10   took that extra step.  They took that extra step to say, you

11   know what, let's try to get something extra in a Chapter

12   eleven.  Let's bring in independents.  We'll make the phone

13   calls a week in advance.  We'll put everything in place, line

14   everybody up so that once we get into bankruptcy, we can

15   cleanse it, get an arm's length dip, release all the claims

16   that you heard from my my client, they've been asking for a

17   release from him for many months.  They couldn't get it from

18   him.  Can they get it from a Delaware bankruptcy court?

19   Remember, we're talking about Arizona versus Delaware.

20   Arizona's in the Ninth Circuit.  Can't get leases out there.

21   So you run.  I do want to leave with the Patriot statement, and

22   I'm going to put in the secured lenders choice here.  So.

23   Would condoning the secured lenders choice of venue here, would

24   it, quote, elevate form over substance in a way that would be

25   an affront to the purpose of the bankruptcy venue statute and

1   the integrity of the bankruptcy system.  I want to have another

2   quote.  It's from Lttle on Judge Whitley, Setting up a company

3   with the sole intent of filing bankruptcy in a certain district

4   cannot be, quote unquote, the thing which the venue statute

5   intended, citing patriot even without any evidence of bad

6   faith.  Courts are not required to condone every strategy

7   devised by clever lawyers to outsmart statutory purpose.

8   Clever lawyers at the lenders chose Delaware as a venue for a

9   purpose.  Like Mr. Denny said, we don't know definitively what

10  that purpose is, but we have a good idea for that.  Your Honor.

11  We believe that in the interest of justice, this case should be

12  transferred to Arizona.

13         S1:  Thank you, Mr. Castle.  Mr. Litvack.

14         S8:  Good afternoon, Your Honor.  We just heard a lot,

15  and I'm going to try and get to some of it.  I don't think I'm

16  going to get to all of it, but there was a lot there were a lot

17  of statements, a lot of arguments that I felt almost like

18  counsel on the other side did not listen to the testimony, did

19  not hear the evidence that came in.  It seemed to me that a lot

20  of the arguments were inconsistent with the undisputed record

21  that we have in front of the Court.  In terms of timing, Your

22  Honor, I'd just point out in in our reply, we did say that no

23  economic stakeholder, no legitimate economic stakeholder has

24  joined in the motion of transfer venue.  After we filed the

25  reply, the committee did file a joinder.  We believe that that

1    filing was late because they didn't file it until October 17th.

2    And under the scheduling order, responses with respect to the

3    motion of transfer venue were due on October thirteen.  Replies

4    were due on October seventeen, not joiners, and I'm not sure

5    why it took the committee over a month to join, but they did

6    join ultimately, as you heard from Ms. Rich and therefore the

7    committee was appointed on September 15th.  So they didn't file

8    the rejoinder until October 17th.  And we'll come back around

9    to that a little bit in a moment.  The first point I want to

10   make, Your Honor, from a legal perspective is that no one is

11   challenging.  The venue is proper here in this Court.  Under

12   twenty-eight U.S.C. Section 1408, Phoenix is in fact organized

13   as a Delaware.

14           S9:  Entity.

15           S8:  And America First is a wholly owned subsidiary of

16   Phoenix.  1040 It is an affiliate and therefore is also

17   properly valued here.  The sole issue is whether this Court

18   wants to exercise, chooses to exercise its discretion to

19   transfer venue in the interest of justice or for the

20   convenience of the parties.  And we've cited plenty of case law

21   from this District that the editor's choice of form is entitled

22   to great weight, substantial deference.  I heard the U.S.

23   Trustee admit that it is unusual for a court to transfer venue.

24   And in fact, the movement here, the U.S. Trustee, bears the

25   burden of proof to convince you that you should exercise your

1    discretion and make that extraordinary determination.  That
2    venue should be transferred.  Contrary to the US trustee's
3    position, the committee's position in Mr. Colby's position, and
4    consistent, I think, with some of the questioning of the Court
5    earlier, the debtors themselves did not manufacture venue here.
6    And the critical distinction that I don't think anyone has
7    addressed, at least not in closing argument with the other
8    cases that have been cited like Patriot Coal and and LTL, is
9    that this was not the sole purpose the creation of a Delaware
10   entity.  Fenix 1040 was not the sole purpose.  The sole purpose
11   was not to create venue in Delaware.  Whereas in those other
12   cases, I think in one of those cases maybe it was patriot.
13   Cole the debtor actually stipulated that it was the sole
14   purpose.  Here there is a very legitimate alternative purpose.
15   The alternative purpose is that RCP, as the pre-petition
16   lenders who by the way themselves are organized in Delaware,
17   decided as they were, they were able to do because there were a
18   multitude of events of default, they decided to exercise
19   remedies.  One of the remedies that they had available to them,
20   Your Honor, is a stock pledge.  The stock pledge is in
21   evidence, and it's a stock pledge that is signed by Mr. Bowlby.
22   He knew what he was doing at the time this was back.  It's not
23   long ago.  The stock pledge was signed in mid-May 2023.  He
24   agreed as part of an overall amendment of the credit documents
25   for various consideration going both ways, all the parties

1    negotiating in good faith.  After extensive arms length and

2    good faith discussions, he agreed to give the RCP a stock

3    pledge.  He knew if there would be an event of default and RCP

4    is entitled to exercise remedies, that they could exercise

5    remedies by taking away his company.  And that's in fact what

6    happened.  There were events in.  Default.  I don't think

7    anyone, not even Mr. Bowlby, is challenging that.  There were

8    events of default come late August or mid-August 2023, and so

9    the lenders did just that.  They made that decision to exercise

10   their contractual rights.  It wasn't the debtors decision to do

11   that.  It was the lenders decision.  And the lenders have

12   created the Senate in Phoenix a couple of months before as a

13   Delaware entity.  They needed to put the stock somewhere on or

14   we say this in our papers.  It makes perfect sense to put it

15   into a Delaware entity.  They themselves are Delaware entities,

16   and so they decided to drop the stock of a mirror first into

17   Phoenix.  1040.  They didn't do that solely for the purpose of

18   creating venue.  They did it because they needed to put the

19   stock somewhere.  And of course they're going to have a holding

20   company there.  It happens to be another Delaware entity,

21   Phoenix 1040 Holdings LLC, and then they control that entity.

22   None of that is unusual.  That's what happens when lenders

23   exercise remedies.  They're not going to give away their

24   collateral.  They're going to keep control of it.  And that's

25   what happened here.  Why did Phoenix Spot?  You heard a lot

1    about this.  I think Mr. Denny went to great lengths to argue

2    that there was really no reason for Phoenix to have filed in

3    the first place.  Your Honor challenged that in questioning.  I

4    totally agree that the issue here is not so much about the the

5    liabilities on the Phoenix balance sheet.  It's the risk of

6    having the equity in America first, which is the debtor that

7    owns the material assets here, whether they're litigation

8    assets or nonlitigation assets or mortgage related assets.  By

9    not filing Phoenix, the equity would be open to litigation.

10   This case, as everyone knows, has been hotly litigated on

11   almost every issue in the case and to leave the equity out so

12   that then someone like Mr. Bowlby could then rush into Arizona

13   State Court and say and take issue with the execution of the

14   pledge would create even more uncertainty in this case.  And

15   frankly, Your Honor, if there was any progress in any such

16   litigation, our independent management.

17          S7:  Of America first.

18          S8:  Could be removed.  And that and that would be

19   really a devastating consequence.  Jeffrey Dame, the

20   independent director, could then be removed.  Scott Avila The

21   CRO could then be removed.  We needed control of the debt, the

22   America first debtor to be before you as well.  We needed you

23   to have jurisdiction over the equity.  And so that's not

24   unusual.  You know, that happens in so many cases where you

25   have holding companies that don't themselves.  They're not

1    obligors on the secured debt that's below them.  But you want

2    to file the the ultimate parent as well because you want to

3    make sure that where all the assets are, that that's protected

4    has the benefit of the automatic stay.  So it makes perfect

5    sense here to take advantage of the fact that Phoenix was in

6    Delaware.  We from the debtors perspective, have to take the

7    debtors as they came to us.  And in this case, Mr. Abell is the

8    CHRO at Phoenix.  He's also the CRO.  At first he did his

9    diligence as much as he could under the circumstances.  But

10   frankly, Your Honor, wasn't that complicated.  As you heard

11   from his testimony, this was not even close.  The there are 150

12   plus employees as of the petition date, the company has less

13   than 500,000.  The payroll is due the next week.  I think it

14   was after Labor Day, but it has to be funded within a matter of

15   days.  This was a very, very urgent situation.  And obviously

16   from Mr. Abel's perspective, he doesn't want to come into a

17   situation where he's appointed officer and he has all these

18   people coming to work and then sorry, he can't pay them.  That

19   doesn't make sense.  He made it crystal clear over and over on

20   the stand that there was no funding available.  There was no

21   outside funding source that was going to put in some sort of a

22   white knife that was going to put in money pre-petition or

23   outside of bankruptcy.  The only way that he was going to

24   ensure that the employees were going to come to work, we're

25   going to have money to do the work.  He couldn't rely on

1    scratching that loan sales.  That may or may not happen in the

2    future.  He needs to know that he has the money in the door

3    before he was comfortable taking on the engagement, becoming an

4    officer.  And I'm sure, Jeffrey, Mr. Dane was in the same

5    position from a director standpoint, independent director

6    standpoint, you want to know that you can pay for the

7    obligations that are being incurred, particularly to the

8    employees where there's personal liability potentially to the

9    officers.  So from the debtors perspective, they really this

10   was not a close call.  It was really a no brainer that.  The

11   company was out of its options.  Mr. Bowlby admitted that he

12   had to mortgage his house, his residence.  It's actually a

13   house owned by America first, but he had to.

14         S9:  Put a mortgage.

15         S8:  On it just to make the last payroll.  That's how

16   dire the situation was.  So this was not this was not a close

17   call, nor was there anything nefarious going on about a

18   Delaware filing when presented with a Phoenix entity that holds

19   the American stock.  This was on August 24th and America First,

20   which is an Arizona company, but which is held through Phoenix

21   LLC.  The decision was made for one reason or another to take

22   advantage of the Delaware forum.  There is nothing, nothing

23   wrong with that, Your Honor.  Happens every day in so many

24   cases before this Court.

25         S1:  There's nothing wrong with it.  But the you know

1    what I think your opponents would say is, well, you had a

2    choice of two venues and you've got I think I'm sort of

3    paraphrasing what Mr. Denny was saying, but you've got the

4    little holding company as sort of the tail wagging the dog when

5    really the the the operating company is in large respects in

6    Arizona, a company with Arizona connections.  And you could

7    have as well achieved all of these goals by bringing them into

8    bankruptcy in Arizona and bringing in Phoenix 1040 along with

9    the operating company.

10           S8:  That's a fair point, Your Honor.  It's it's one,

11   frankly, that can be made in many, many cases.  A lot of times

12   debtors have the opportunity to file in the venue of the

13   principal place of business, or they can take advantage of

14   where an entity may be organized.  In this case, it made sense

15   given the national scope of America's operations.  This was

16   reflected, I think, back in the first day declaration that Mr.

17   Avila filed there.  Were they the debtors operated in forty-

18   four states, and I'll get to the factors.  But basically, as

19   you heard the testimony, the creditor body is all over the

20   place.  RCP itself, which is actually the largest creditor

21   there, owed fifteen to $20 million.  They're not located in

22   Arizona.  They are organized in Delaware.  They have offices in

23   New York, they have offices in Miami.  But the point is that

24   this is not a mom and pop business in Arizona where you're

25   prejudicing Arizona creditors or for that matter, potential

1    Arizona witnesses.  The only one that you heard testimony on

2    this was the only one who we can foresee.  Even coming from

3    Arizona to this Court is Mr. Bowlby himself.  So this is a this

4    was a business that was national in scope.  There was a holding

5    company that was organized in Delaware.  And ultimately the

6    decision was made by the board and by Mr. Avila to file here,

7    take advantage of the of the venue here.  And we we would urge

8    the Court, given that the cases have been pending for as long

9    as they have, and we've had so many hearings in front of you

10   already.  Your Honor, I'm not I'm not sure if it was half a

11   dozen or six, seven or eight.  But clearly, you've heard a lot

12   of testimonial testimony today, putting aside all of the other

13   hearings.  I was a little surprised to hear Mr. Denny say that

14   they basically given up on this debtor as a Chapter eleven

15   debtor and that they're ready to convert the case.  It's almost

16   like speaking out of both sides of your mouth, Your Honor, to

17   say that, oh, it's no big deal.  If you transfer this case to

18   Arizona, it's not going to cost anything.  There's not going to

19   be any dislocation.  Oh, by the way, we're just going to have

20   the new judge come into this and we're going to file a motion

21   to convert the case on the first day.  And that'll be the first

22   thing that the new judge has to consider.  That, to me is just

23   a bit mind boggling and a bit unfair and certainly does not go

24   to the interests of justice here.  Your Honor, the U.S. Trustee

25   is the only movement with respect to the transfer of venue.

1    And it took that office about one month to file it from the

2    petition date.  And I did hear that Ms. Christopher said that,

3    well, the first days weren't filed at the same time as the

4    petition.  That's true.  They were filed a few days later.  The

5    vast majority of them have now been approved on either an

6    interim or a final basis.  But the point is that nothing in

7    terms of venue facts changed.  All of the venue facts were as

8    they stood on August 24th, the same issues that opposing

9    counsel's raising.  Today existed on that day.  They're saying

10   that venue was manufactured, so there was nothing that

11   prevented the U.S. Trustee or for that matter, any other party,

12   including Mr. Bola.  But Bobby, from filing the motion, a

13   transfer venue in a timely fashion.  But they didn't, Your

14   Honor.  And now we're almost two months into this case.  The

15   current debt maturity date is December thirty-one, and it is

16   true that we have a curt motion pending where some of the

17   outside dates are tied to.  For some of the employees, it's

18   only ten employees who are covered, rank and file only

19   noninsiders.  But the current dip maturity date is is short of

20   that, short of some of the bonus, the bonuses that are

21   potentially payable there.  But obviously if people are let go

22   earlier because they're done with the work or we have to pay

23   off the loan and so forth, then they would be entitled to that

24   bonus.  But the point is that under the dip is contemplated, we

25   are already halfway through and in fact halfway through with

1    the case.  And in fact, a lot has happened in this case.  There

2    are over 250 docket entries.  Sales are in process.  We have a

3    motion to sell retail loans and to exit our warehouse

4    facilities, warehouse loan facilities that's been on file.

5    It's set for hearing next week.  We as you heard the testimony

6    today, the MSR sale, there is a buyer that's lined up that just

7    needs to be finalized.  Hopefully we'll be filed next week

8    scratching debt loans.  Your Honor, you authorize the debtors

9    to continue to make those sales in the ordinary course through

10   one of the earlier first day orders.  That's in process.  So

11   what really is left in Arizona and what you heard is, yes, this

12   was a a big enterprise for a while, but the mortgage industry

13   is hurting, Your Honor, and it's been hurting since 2022

14   because of interest rates.  And this company had very high

15   overhead and adjustments were not made to that overhead to take

16   into account that revenues were no longer being generated the

17   way they were before for mortgage originations.  So what's left

18   now, Your Honor, is that it's not a very complicated case.  We

19   have some financial instruments, mortgage loans.  There were a

20   couple of houses in Texas, not Arizona, a couple of houses in

21   Texas, a couple of houses in Arizona, including Mr. Bobby's

22   house.  The mortgage service REITs are intangible assets, Your

23   Honor.  There is nothing that necessarily ties those assets to

24   Arizona.  I'm not even sure where they are physically located.

25   But the bottom line is that we we've progressed a lot.  We have

1    filed a Chapter eleven liquidating plan, and the debtors would

2    submit that there is really no basis to transfer venue given

3    all that has already transpired in the case, given that venue

4    is proper, given that the really there is no evidence in the

5    record that justice or fairness will be served by moving these

6    cases, that in fact, the only evidence, the undisputed evidence

7    in the record is that and this is from Mr. Ottaway, in his

8    view, that there would be no cost savings from transferring

9    venue.  Quite the opposite.  There would be additional costs,

10   there would be no value enhancement to creditors, and it really

11   makes no sense.  So what we're left with, Your Honor, is we

12   have the U.S. Trustee moving.  They are the movement.  They're

13   not an economic party.  This was mentioned by in one of the

14   decisions that was cited, Mr. Bowlby, we question his standing

15   as a creditor.  His counsel had previously said at one of the

16   hearings that he worked post-petition and didn't get paid for

17   it.  Today, he admitted that, in fact, he never no one ever

18   agreed to pay him and he doesn't have a claim for post-petition

19   services.  Mr. Avila.  Question whether Mr. Bowlby has a claim

20   for pre-petition services.  You question whether he has a claim

21   for an indemnity or will ever have a legitimate claim for an

22   indemnity.  So we we've said this before, Your Honor, and with

23   stand by it that we question Mr. Bobbie's standing.  He's

24   really a disgruntled former officer, CEO, removed and majority

25   shareholder.  That's really in what capacity is coming at this.

1   He's upset.  And understandably so that he was removed.  But

2   again, it was something that the lender had the right to do in

3   Your Honor.  On winding it.

4        S1:  Up.  Now you're fine.  I want to hear what you

5   have to say.

6        S8:  I appreciate that, Your Honor.  The committee,

7   Your Honor, as I mentioned, I think they joined late.  I think

8   they they joined so late.  It was just a couple of days ago,

9   three days ago, October 17th, that it was not consistent with

10  this court's scheduling order with respect to the venue motion.

11  And further, Your Honor, the the only evidence that we have is

12  that two of the claimants on the committee, it's a three member

13  committee.  And I should mention, Your Honor, that two of the

14  members on the committee, if you look at the notice of

15  appointment, which is also in evidence, they don't have Arizona

16  addresses.  One has a California address and one has an

17  Illinois address.  I just find that curious.  But mortgage

18  shots is not in the schedules.  We did check neither mortgage

19  shots nor Kristen.  Ron has filed a claim yet and they don't

20  appear in the books, in books and records.  So we question

21  whether they have claims.  Not really sure why they got on the

22  committee.  It may have been that the U.S. Trustee needed to

23  appoint somebody because, as she mentioned, there was some

24  trouble in getting sufficient people onto the committee.  But

25  the ultimate point here, Your Honor, is that we question

1    whether those two creditors have an economic stake here.  And I

2    note that no other creditors have joined their you know, a lot

3    of times when you have a venue transfer motion, you get

4    rejoinders that are filed by various creditors.  No one's no

5    one's done that here.  Mr. Bobby, Your Honor, took a lot made a

6    lot of effort in their papers and also at the hearing today to

7    attack the debtors independence, to basically say that you're

8    taking direction from our CP.  And they tried to do that with

9    documents, which a lot of the documents, as you heard Mr. Avila

10   say, he didn't even look at them, didn't scroll down far

11   enough.  He had so many other fires that needed to be addressed

12   that he wasn't looking at all the details of emails that may

13   have been sent to him by RCP.  And ultimately the undisputed

14   evidence, Your Honor, is that he made his own independent

15   assessment Communications from RCP.  Yes, he got information

16   from RCP.  That's what he really wanted is to get information

17   about the facts surrounding America first.  What was its cash

18   balance?  What was its liquidity?  He didn't care so much of

19   what happened weeks ago or months ago.  He wanted to know going

20   forward, which makes sense because he was being brought in into

21   a position of responsibility with respect to the employees and

22   payroll and so forth.  So he made his own independent

23   assessment.  He has, I think he testified thirty some odd years

24   of restructuring experience, Your Honor.  So clearly, Mr. Avila

25   knows what he's doing.  There were questions about his

1    experience in the mortgage industry, which I think we've

2    addressed by him, clarifying that there are a lot of other

3    people at the debtors and also outside professionals and also

4    professionals at Paladin who know MSRs, who know Scratch and

5    Dent Loans, who know the mortgage business and provide the

6    expertise that he needs to reach the conclusions and make the

7    decisions that he makes in this case.  And at the end of the

8    day, Your Honor, we're left with an entity here that is managed

9    by an independent manager, Mr. Dang Jeff Dahn, and he has

10   delegated exclusive responsibility over certain conflict

11   matters.  If if it's a matter involving RCP, then ultimately

12   the decision maker at first is Mr. Dahn and Mr. Avila provides

13   recommendations and he implements the overall direction of the

14   independent director.  If I said an independent manager, I'm

15   sorry, he's the independent director.  Mr. Dahn is the

16   independent director.  Mr. Avalos, the CRO, they both have they

17   both have experience in the restructuring field and ultimately

18   the strategy here, which is not controversial.  Your Honor, the

19   debtor was in a very difficult spot.  Both Ameriquest was in a

20   very difficult spot.  On August 24th, Mr. Avila did as much as

21   he could to get up to speed as quickly as possible.  He reached

22   certain conclusions about the situation, which he then

23   confirmed once he actually gained access to America first books

24   and records and personnel, he confirmed that they had very

25   little cash.  He confirmed that there was a liquid.  And later,

1   as things went on, he started to make decisions about the

2   company, the fact that it could not continue to operate as a

3   going concern, and he needed to commence liquidating a

4   liquidation effort, which is all that he's trying to do.

5   That's that's all that we're trying to accomplish here is to

6   maximize value of the estate, the estate assets.  It's it's not

7   a complicated result.  This case, frankly, has generated a lot

8   more litigation than we would have expected.  And finally, Your

9   Honor, we really just want to preserve access to our facility

10  and also access to cash collateral so that we can continue to

11  pay the seventeen employees who are there to continue the

12  effort to maximize and liquidate the assets that are there.

13  And a venue transfer would trigger a default under the dip

14  financing.  I know that's something that our wanted for this

15  very reason, but from our perspective, from the debtors

16  perspective, if you transfer venue, then they don't have to

17  lend and that's an out.  And we don't want to we don't want to

18  put put the financing at risk.  We don't want to give the

19  lender the opportunity to to walk.  There is no reason to do

20  that.  They've committed to the financing on the terms that

21  we're going to be talking about next week.  And we would like

22  to we would like to have access to that financing.

23       S1:  Mr. Litvak, There's, I think, a tension in some

24  of the cases that we have in this District where you talk about

25  the importance of deference to the debtors decision about

1    venue.  And you know, I think the most the most recent or

2    loudest iteration of that principle was in the Caesars decision

3    that Judge GROSS rendered.  But we also have case law that says

4    when there's going to be a liquidation of the assets, that

5    perhaps that has a little less force.  And I'm wondering how

6    how you would reconcile those those two competing concepts.

7            S8:  I'm actually struggling with it because I'm not

8    sure I I understand the rationale.  I mean, from our

9    perspective in this case, if we were just to strip away all the

10   gloss and just look at where we stand and you heard the what I

11   think is uncontroverted testimony of Mr. Avila, he's the one

12   that's doing the the liquidating.  And he thinks that it would

13   just cause delay, it would just cause additional cost.  It

14   would just cause additional risk in order to transfer venue.

15   So that's what I would go back to is just the record here.  The

16   record here is that the CRO, who's a professional in doing just

17   what he's doing here, is his strong recommendation here is that

18   you keep the case, Your Honor, because transferring it will

19   just it'll just delay things.  There's no sense.  And yes, it's

20   a liquidation as opposed to reorganization, but to me, a

21   reorganization, then you have a real business going in some

22   other location.  So shouldn't it be in that location?  That's

23   why I'm struggling with the rationale of why a liquidation

24   should go back to somewhere where to some venue where it's not

25   really relevant anymore.  There's so little that's left in

1    Arizona other than two houses owned by a family of of former

2    insiders that it just doesn't it doesn't make sense to us.  It

3    doesn't make practical sense to us.  Mr. Avila testified to it,

4    Your Honor.  And the debtors would urge the Court to support

5    his judgment.

6         S1:  Okay.  Thank you.  Mr. LITVACK.  Thank you, Mr.

7    Murphy.

8         S3:  Thank you, Your Honor.  It's never an enviable

9    position to be coming up last on a late on an afternoon, but

10   here I am.  I'll try to.  I'll try to be brief.  Let's back to

11   basics.  The burden is on the U.S. Trustee to demonstrate that

12   the interests of justice would be served by a transfer of venue

13   at this stage of the case to a court in Arizona.  We don't

14   think that burden has been carried.  I won't reiterate my

15   colleague's remarks, but I do want to start with the

16   authorities that are in the trustees papers and comment a bit

17   on those at the outset.  There are very few cases in which a

18   movement has successfully overcome the presumption that the

19   debtor's choice of forum should be respected.  A number of the

20   cases cited are not about the main case that is the transfer

21   venue of the Chapter eleven case, but rather of adversary

22   proceedings brought within a case that's Judge Walton's

23   decision.  That's also BHP Holdings.  And it it makes sense

24   that you would see cases that movements might succeed more

25   often where defendant.  Says, I'm not sure I want to be brought

1   in to the fore in case of a Chapter eleven debtor or

2   representative who's suing.  Where there are other cases, and I

3   think they're cited as well, where there's an either one that I

4   don't think is cited in the papers, but I was involved with

5   where there is a competing involuntary and a competing

6   voluntary case.  In those cases, tend to say that the debtor

7   gets to choose not uniformly, but that's, I think, a different

8   context from where we are today.  Today's context and I think

9   the cases that are left, there's there's an effort to say that

10  the cases like Patriot Coal or Winn-Dixie cited by Judge

11  Chapman, Judge Strain's decision, our precedent here, good

12  precedent.  And I think, Your Honor, in questioning counsel to

13  the U.S. Trustee, saw something about those cases that really

14  do distinguish them.  In each of those cases, it is the debtor

15  or an affiliate of the debtor making a decision to manufacture

16  through the creation of an entity, manufacture the jurisdiction

17  in in a particular bankruptcy court.  That's not here, that's

18  not present here, as as Mr. Litvack pointed out.  By the time

19  the secured creditor had completed its exercise of remedies,

20  there was a Delaware entity, the Phoenix 1040 Holding Company,

21  and there was venue appropriate because of that entities

22  organization and the State of Delaware and also for its for its

23  subsidiary.  That's very unlike a case where a debtor in

24  financial distress and patriot coal for example West Virginia

25  coal company said I don't want to be in West Virginia.  My

1    unions are there, my electric utility customers are there.   I

2    don't want to be in Court X, I want to be in court.   Why?   What

3    can I do to get the Court?   Why?   And in Patriot, even little

4    also, it was stipulated that the entity created and in form why

5    or why was created specifically by the debtor to achieve the

6    business goal of having its case go someplace else than what

7    otherwise go?   What we see here today, in all the evidence

8    that's been put forth about the creation of 1040 Phoenix back

9    in June, about how it got the stock of MFI, those are not

10   actions that were taken by a debtor, the secured creditor, and

11   correctly I said a moment ago, obtained from Mr. Bowlby

12   voluntarily a pledge of the stock of a five.   This is not

13   unusual.   It is from a secured lender standpoint.   That's what

14   I'm where I'm coming from.   Today.   Having a UCC lien on all of

15   the debtors assets is a good thing.   It's duly perfected, but

16   there comes a time when to liquidate one's collateral.   The

17   secured creditor needs to control the company.   And here in

18   May, based on an agreement that was actually reached months

19   prior, Mr. Bolden has the other shareholder, his father, agreed

20   that if there was a default, the stock would be transferred at

21   the order of of the RCP lenders, and that was through not only

22   the pledge agreement but an executed stock power that so

23   provided RCP then exercised its rights, it had created an

24   entity, a Delaware entity owned by Delaware lenders that would

25   hold the stock once it exercised remedies.   The debtors didn't

1   do these things.  Relying on actions of a secured creditor to

2   establish a change of venue would be a remarkable extension of

3   the case law.  There is no logical basis to find that the

4   actions of a lender establish a manufacturing by default.  Now,

5   the U.S. Trustee has not even established that that when RCP

6   created Phoenix 1040, it was created for the purpose of having

7   venue in Delaware because the Delaware entities had the right,

8   the Delaware lenders to put the stock wherever they wanted it

9   to go.  They have the they have the right to put it right into

10  the into the Delaware entity they created for that purpose some

11  months ago.  There has been, I would submit it an inordinate

12  attention to the minutia of how the change of control took

13  place.  I think that the drama that is expressed about it may

14  have something to do with the fact it was all done in a very

15  compressed period of time.  But these are bread and butter

16  things a secured lender does to realize upon its collateral,

17  not only in placing it into an entity it created, but then

18  using the rights under the pledge agreement and as a holder of

19  the stock to achieve what the stock pledge is for to take

20  control of the borrower.  Taking control means there will be

21  no.  The old officers and directors are no longer in office.

22  They are replaced.  I found out in working through this process

23  that in Arizona, that's not self-executing.  You have to file

24  something with the Arizona Corporations Commission and they

25  need to approve it.  So that was done here, too.  There were

1    resolutions prepared to invest the authority of AFI as a

2    corporation in a new officer, Mr. Avila, and in the directors,

3    Mr. Dein and Mr. Sloan.

4          S8:  There's nothing illegitimate with this.

5          S3:  This is what secured lenders did.  They can

6    accelerate their debt.  They can take control of a company, and

7    then they can do what they need to do to liquidate the assets

8    of the borrower.  But RCP also determined after it exercised

9    its remedies, and I submit this was not something they were

10   legally required to do.  They determined to step back from the

11   management of FFI once they took control and own the company.

12   And that is why Mr. Bain was invested and this is in the record

13   with exclusive control as an independent director over matters

14   related to bankruptcy, over matters related to the pre-

15   condition loan over any matter where there might be a conflict

16   with RCP.  This is good government and good governance.  And

17   you saw the the power of that governance exercised in a wholly

18   appropriate manner through the testimony of Mr. Avila.  Now,

19   the I guess we're to believe that all of this and this, I

20   suppose, is the argument of the movements of the movement and

21   and its allies, that that was all a ruse, that, in fact, Mr.

22   Avila was not acting independently.  Now, for example, we've

23   seen plenty of emails put forward about the manner in which he

24   was selected.  What his testimony shows is that he was selected

25   based on his reputation.  He had worked in more than two dozen

1    important cases where he had served as chief restructuring

2    officer.  His expertise and his ability to make independent

3    decisions were critical to his selection as a CRO.  The

4    currency of his work as a professional is for his independence

5    to be known to anyone who wishes to hire him.  The same is true

6    of Mr. Dein.  He came into this knowing that he would have

7    exclusive decision making power at AFFI over anything related

8    to RCP.

9         S1:  Well, we don't have anything in the record on the

10   resolution.

11        S3:  His appointment is is among the is among the

12   exhibits.  Do we have.  Do we have that?

13        S1:  Well, I think my my point is that you were saying

14   when Mr. Dein thought and I don't I don't know what he thought.

15        S3:  Fair enough.  Fair enough.  But I will say that

16   he came in with knowledge of what his role was to be, and he

17   had the responsibility to act independently in discharging his

18   powers, that he was given decision making powers here.  And my

19   this is in the the area.  That's all ruse we're supposed to

20   believe.  Mr. Dame accepted that those responsibilities with

21   some some form of reservation in his mind, but he would not

22   exercise them independently.  We don't know.  We don't know

23   that.  And it is the burden, I think, of the U.S. Trustee to

24   say that these professionals should not be believed.  And when

25   they went, when their role was to act as an independent entity.

1    And I think the it's all a ruse.  You shouldn't believe in the

2    independence of the professionals applies to the attorneys at

3    the Chelsea firm as well.  The argument, apparently, is that

4    their legal advice was not given for their client, but was

5    given under the control and influence of a of a secured lender.

6    The record doesn't show that.  And I don't I don't think our

7    sort of our understanding of how these these professionals work

8    is consistent with that point of view.  Mr. Avila testified

9    that when he first encountered the situation at AFFI and the

10   possibility of a bankruptcy case in his professional

11   assessment, it would it was I think the words he used were not

12   large and short, meaning the bankruptcy case.  So why are we

13   here today?  Two months into the case, and this goes to the

14   question of what would be the impact, what would be the impact

15   of this venue was transferred to Arizona.  Well, firstly.  A

16   lot's been done in terms of liquidation of assets, and that's

17   on the record with the filing of the plan of liquidation by the

18   debtor last night.  I would submit that we are more than we're

19   past half time and the ability and the timeline for this case

20   to emerge from Chapter eleven and for it to emerge before the

21   maturity of the DIP loan at the end of December, RCP supports

22   that plan.  It includes, and I guess in the skimming through it

23   may not have been apparent, but it includes a fund which RCP

24   will provide to unsecured creditors for meaningful distribution

25   in the case, it provides for litigation claims to be assigned

1   to a liquidating trust for the benefit of unsecured creditors

2   for RCP to fund that trust.  This is this is how a case like

3   this leads Chapter eleven through a plan, and we hope it is a

4   consensual one to to complete the liquidation as much as

5   possible in Chapter eleven and then set up the appropriate and

6   common structure of a liquidating trust to provide for

7   liquidation of assets for the benefit of unsecured creditors

8   and for other assets to be liquidated if they haven't been yet

9   that are collateral and paid for seeking.  Now RCP as a pre-

10  petition lender took the steps I described.  RCP is of course

11  also the dip lender in these cases, and Mr. Abela testified

12  that in his professional judgment when he arrived at the scene

13  at AFFI, it could not make the next payroll.  It had no source

14  of liquidity to do so.  It could not sustain operations without

15  a dip loan.  Dip a dip loan.  As with any other extension of

16  credit, it's a voluntary act.  To my knowledge, I do believe

17  that he did.  I think it's in a declaration from an earlier

18  submission look at other alternative sources.  But as a as a

19  dip lender, RCP made the choice that the case should be filed

20  here, and we're not going to be shy about that.  A dip lender

21  has good reason to want its borrower to be in proceedings

22  before this Court.  No slight intended to other courts, but the

23  the rules are very well known here.  The local rules spell out

24  how the financing is done.  It is a process that lender can be

25  familiar with and it is a process that is smooth and swift.  I

1    say that even though the final hearing is next week, but it is

2    from the point of view of a dip lender at the outset of the

3    case.  It is a legitimate choice and proper choice to say that

4    as a dip lender, the borrowers proceedings need to be in

5    Delaware and that needs to continue to be the case.

6         S1:  Mr. Murphy, I hate to do this to you.  Yeah, I we

7    do need to stop at five and I need to offer an opportunity for

8    rebuttal argument.  So if if you could sum up, I'd be awfully

9    grateful.

10        S3:  I'm going to I'm going to sum up by saying I'm

11   going to sum up by saying that the interests of justice will be

12   served in this case, stays here.  And I didn't have a chance to

13   comment on the the dramatic loss of value that would be

14   occasioned by this by a transfer.  There is no question that it

15   would really put the case in in risk of liquidation.  I don't

16   see how that would be, how there would be another option and

17   what hope that the Court would keep the case here where it

18   belongs.

19        S1:  Okay.  And again, I apologize for truncating your

20   arguments or.  Mr. Durban.

21        S6:  Good afternoon, Your Honor.  Almost Good evening.

22   I will be fast.  I've never been accused of speaking slowly.

23   Number one, I have been misquoted many times, but I've never

24   been misquoted in the way that Mr. Litvack misquoted me.  He

25   said that the U.S. Trustee said that she had trouble getting

1   members for the committee.  No way.  I said I had trouble

2   arranging times for there to be meetings and phone calls

3   because of the time difference, but I never said I had trouble.

4   I had other potential members of the committee too.  If the

5   debtor has a problem with the committee, there are ways under

6   the Code to deal with it, not to sit up here and cast

7   aspersions.  At the last minute, with no forewarning, there's

8   been no bar date.  Their time has not yet run.  And it's my

9   understanding that one of the two creditors that he's

10  questioning has already filed his proof of claim.  But there's

11  plenty of time left for everyone to file their proofs of claim.

12  Number two, Your Honor, I don't have to prove that something

13  occurred here that was illegitimate or nefarious or all the

14  other words that I just heard lenders counsel used that I'm

15  supposed to bear the burden to prove.  Your Honor, I'm freely

16  in many most of what Mr. Litvak said and what we just heard

17  from lenders counsel, the Trustee is admitting there were two

18  places where this case could have been filed.  That's the whole

19  idea of manufactured venue.  If venue and here was improper.

20  Totally different motion.  There are two places where this case

21  could have been filed, and I heard lender's counsel say that

22  that he didn't believe this was a case for the debtor and or an

23  affiliate of the debtor manufactured venue, because I wrote

24  that one down as he was saying it.  Well, I don't know how much

25  more of an affiliate you can become than what we have here.  We

1    have RCP is the ultimate owner of the debtor.  It is the owner

2    of Phoenix 1040 Holdings.  Phoenix 1040 Holdings owns Phoenix

3    1040.  Phoenix 1040 owns RFI.  David Sloan, whose names are all

4    over the corporate records for Holdings and also for Phoenix,

5    1040, is an employee of our CPA.  Again, I just don't know how

6    much more of an affiliate you can become.  Also to go back

7    briefly to the issue of the who is or isn't a creditor.  Mr.

8    Avila himself testified about the State of The affairs of the

9    of the records once he got into the company.  So I don't take

10   that as gospel that just because he can't locate the name

11   doesn't mean that that person is not a creditor.  And again, my

12   office takes appointment of an unsecured creditors committee

13   very seriously.  If they've got an issue, there's a way to deal

14   with it.  And we haven't had a bar date yet and their only

15   burden that's placed on me is regarding manufactured venue.

16   And I think that burden has been met.  And in the closing

17   remarks of Lender's counsel, I heard him talk about the

18   control, the exercise, why they wanted the case here.  I don't

19   know what more we need.  I'll end with that, Your Honor.

20         S1:  Thank you, Mr. Denning.  I'll give you the last

21   word.

22         S9:  Be very quick.

23         S4:  I was going to say on that last point, I think

24   Mr. Murphy made everyone's case.  He talked about control.

25   They want to control.  They have control.  They're an insider.

1   They're an affiliate.  None of that's disputed.  In fact, it
2   was all admitted.  And he said it was their decision, not the
3   debtor's decision.  So there goes deference right out the door.
4   Next, people said they're surprised that we would stand up and
5   talk about values and conversion.  And it's taken a while to
6   get information, Your Honor, but it's just the undisputed facts
7   like it.  And the debtor gave up the right to even move to
8   convert.  So if the debtor believed in the numbers and saw that
9   it's going to lose another $10 million operating from now until
10  the end of the budget, the debtor can't even say to you, We
11  think in the standard exercise of our business judgment, it's
12  in the best interest of our estate.  But that's because it was
13  the lender as the owner, as the equity all over the place who
14  wants this process for a reason.  But it's not maximizing value
15  of the estate.  So that's why today is when we're hearing about
16  it and I'm happy to share the numbers, but these came from
17  them.  So it is.  But we did hear in their papers, everyone
18  talked about, oh, my God, what if it transfers?  You know, what
19  if it transfers, the lender who has all the control can decide
20  how they want to proceed, but having adequate protection, liens
21  and claims, even if they don't have liens and avoidance
22  actions, they would have to agree that the estate has no
23  diminution, no impact to the estate from the petition date
24  through now, because they knew with their budgets there was
25  never going to be any value.  They were funding a negative for

1   their own benefit.  So that's all, Your Honor.  I don't think

2   it's laying anything at anyone's doorstep.  I don't think that

3   it's going to be a problem for a judge in Arizona, if that's

4   where it ends up.  I don't think it's going to be a problem for

5   a panel Trustee.  Those are just the numbers and the debtors

6   and the lenders have set this up.  But for venue purposes,

7   they've already eliminated deference.  They've explained

8   control.  And I guess the last thing I would say, Your Honor,

9   yeah, the lenders have admitted they want control.  They had

10  control going back to the spring.  They've had the access to

11  the cash.  They had preferred stock that control that they

12  unabashedly tout here in court.  That's the cause of action

13  That's going to be an asset for the estate.  It's actually the

14  cause of action that the cash was firm was ready to bring.  So

15  it wasn't that the committee was going the hard way trying to

16  retain caseloads.  There were the ones up, up and running and

17  ready to go.  So not this issue, but just to be clear,

18  everything they said, that's why the committee picked Kasowitz.

19  That's why there was a case and actually counsel Mr. Litvack

20  actually said we filed because we were concerned that there

21  might be an action in state court by the equity.  That's not an

22  emergency filing that dealt with financial distress.  That's

23  all.

24        S1:  Okay.  And I apologize.  I should have let Mr.

25  Barcelona have the last word.

     1          S7:  Very quickly, Your Honor.  And I want to touch on

     2     the one question you asked of Mr. Litvack, which is how do you

     3     measure the debtors deference versus the liquidation cases, the

     4     importance of debtors deference and why that is usually giving

     5     great weight is because there are fiduciary for the estate.  It

     6     is now uncontested, in fact, boasted by the lender that they

     7     made the choice.  That's why deference doesn't matter here.  No

     8     fiduciary was making this choice.  The lender wanted Delaware

     9     for a reason.  And with respect to liquidation, you're honor

    10     also, this is a lender that's looking to liquidate its

    11     collateral.  It could have ended exercise its state court

    12     remedies.  There is no such thing as an involuntary petition by

    13     a secured lender.  That's illegal.  You can't run a Chapter

    14     eleven case or a Chapter seven case for the benefit of a

    15     secured lender.  That's illegal.  That's what they tried to do

    16     here.  That's why they had the quick timing and that's why

    17     venue should be transferred.  Thank you, Rob.

    18          S1:  Thank you.  Okay.  I'm going to take this matter

    19     under advisement.  And my plan is to rule by no later than

    20     Thursday's hearing that we have scheduled in this case.  So

    21     the.  And let me just double check and make sure that is

    22     Thursday that we're talking about.  It is I may rule in writing

    23     before then, but if not, I'm going to deliver an oral ruling.

    24     Frankly, I'm considering whether we ought to move the hearing

    25     to an earlier part of the day in case we need to have further

1   proceedings.  Can we move it to 10:00 without inconvenience any

2   of the parties?

3          S2:  That's fine with the debtor, Your Honor.

4          S1:  Okay.

5          S6:  That's fine, Your Honor, if I was going to ask

6   you about that, because I did not foresee how we could possibly

7   get through everything the afternoon time.

8          S1:  I appreciate that.  And the committee.

9          S4:  We'll figure it out, Your Honor.

10          S1:  Mr. Bobby.

11          S7:  It's in Your Honor.

12          S1:  Okay.  Okay.  Very good.  We're moving that to to

13   10:00 on Thursday, October twenty-six, and we'll have the

14   ruling by no later than that time.  So I wish everyone a good

15   weekend.  And I appreciate the really outstanding briefing and

16   argument and presentations.  They're extremely helpful.  So

17   I'll look forward to seeing you all again on Thursday.  We are

18   objective.  Your Honor.

19

20

21

22

23

24

25

## Exhibit 2

**Redacted**

**Dane Deposition**

**Exhibit 1 - Redacted**

**Dane Deposition**

**Exhibit 2 - Redacted**

**Dane Deposition**

**Exhibit 3 – Redacted**

**Dane Deposition**

**Exhibit 4 – Redacted**

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(if known)* _____   Chapter __11__

☐ Check if this an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy   06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **AmeriFirst Financial, Inc.** |
| 2. | **All other names debtor used in the last 8 years** <br> Include any assumed names, trade names and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **86-0634557** |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **1550 McKelleps Road** <br> **Suite 117** <br> **Mesa, AZ 85203** <br> Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| **Maricopa** <br> County | **Location of principal assets, if different from principal place of business** <br><br> Number, Street, City, State & ZIP Code |

5. **Debtor's website** (URL)   **https://amerifirstloan.com/**

6. **Type of debtor**

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____


EXHIBIT
Dane-5

Debtor  **AmeriFirst Financial, Inc.** _____  Case number (*if known*) _____
        Name

**7.** **Describe debtor's business**  A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
   http://www.uscourts.gov/four-digit-national-association-naics-codes.

   **6163**

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check **all** that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

☑ No.

☐ Yes.

| District | When | Case number |
|----------|------|-------------|
| District _____ | When _____ | Case number _____ |
| District _____ | When _____ | Case number _____ |

Debtor    **AmeriFirst Financial, Inc.**           Case number *(if known)* _____
      Name

**10.** **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No
■ Yes.

List all cases. If more than 1, attach a separate list

| | | |
|---|---|---|
| Debtor   **See Schedule 1** | | Relationship _____ |
| District _____ | When _____ | Case number, if known _____ |

**11.** **Why is the case filed in *this district*?**

*Check all that apply:*

☐   Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

■   A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12.** **Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No
☐ Yes.

Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

    What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
                       Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No
☐ Yes.   Insurance agency _____
          Contact name _____
          Phone _____

---

### █   Statistical and administrative information

**13.** **Debtor's estimation of available funds**

*Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14.** **Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ■ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15.** **Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ■ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

---

| Debtor | **AmeriFirst Financial, Inc.** | Case number (*if known*) |
|---|---|---|
| | Name | |

**16. Estimated liabilities**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
■ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

| Debtor | **AmeriFirst Financial, Inc.** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

---

**Request for Relief, Declaration, and Signatures**

---

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **August 24, 2023**
           MM / DD / YYYY

**X** **/s/ T. Scott Avila**          **T. Scott Avila**
       Signature of authorized representative of debtor      Printed name

Title    **Chief Restructuring Officer**

---

**18. Signature of attorney**

**X** **/s/ Laura Davis Jones**      Date   **August 24, 2023**
       Signature of attorney for debtor             MM / DD / YYYY

**Laura Davis Jones**
Printed name

**Pachulski Stang Ziehl & Jones LLP**
Firm name

**919 North Market Street**
**17th Floor**
**Wilmington, DE 19801**
Number, Street, City, State & ZIP Code

Contact phone   **302-652-4100**      Email address   **ljones@pszjlaw.com**

**2436 DE**
Bar number and State

**SCHEDULE 1**

**Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor**

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware. The Debtors have moved for joint administration of these cases for procedural purposes only under the case number assigned to the chapter 11 case of AmeriFirst Financial, Inc.

1. Phoenix 1040 LLC
2. AmeriFirst Financial, Inc.

**UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS
OF AMERIFIRST FINANCIAL, INC.**

Effective as of August 24, 2023

The undersigned, being all of the members of the Board of Directors (the "**Board**") of **AMERIFIRST FINANCIAL, INC.** (the "**Company**"), pursuant to the laws of the State of Arizona and the applicable governing documents of the Company, do hereby waive notice of meeting and consent to the adoption of the resolutions below to the same extent and with the same force and effect as if such resolutions were adopted at a special meeting of the Board duly called and held for the purpose of adopting such recitals and resolutions, and directs that this Unanimous Written Consent be filed in the records of the Company.

WHEREAS, the Board has reviewed the historical performance of the Company, the market for the Company's products and services, and the current and long-term liabilities of the Company;

WHEREAS, the Board has reviewed the materials presented by the management of and the advisors to the Company regarding the possible need to restructure the Company, and has analyzed each of the strategic alternatives available to it, and the impact of the foregoing on the Company's business and its stakeholders;

NOW, THEREFORE, BE IT RESOLVED, that in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors, employees, stockholders and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

RESOLVED, that T. Scott Avila of Paladin Management Group, Chief Restructuring Officer of the Company (the "**Authorized Officer**"), is authorized on behalf of the Company to execute, verify and file all petitions, schedules, lists, and other papers or documents, and to take and perform any and all further actions and steps that the Authorized Officer deems necessary, desirable and proper in connection with the Company's chapter 11 case, with a view to the successful prosecution of such case;

RESOLVED, that the Authorized Officer, on behalf of the Company, is authorized, empowered and directed to retain the law firm of Pachulski Stang Ziehl & Jones LLP ("**PSZ&J**") as bankruptcy counsel to represent and assist the Company in carrying out its duties under chapter 11 of the Bankruptcy Code, and to take any and all actions to advance the Company's rights in connection therewith, and the Authorized Officer is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the bankruptcy, and to cause to be filed an appropriate application for authority to retain the services of PSZ&J;

RESOLVED, that the Authorized Officer of the Company is authorized and directed to employ any other professionals necessary to assist the Company in carrying out its duties under the Bankruptcy Code; and in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate retention agreements, pay appropriate

retainers prior to or immediately upon the filing of the chapter 11 case and cause to be filed appropriate applications with the bankruptcy court for authority to retain the services of any other professionals, as necessary, and on such terms as are deemed necessary, desirable and proper;

RESOLVED, that the Authorized Officer of the Company is authorized and empowered to obtain post-petition financing according to terms which may be negotiated by the management of the Company, including under debtor-in-possession credit facilities or the use of cash collateral; and to enter into any guaranties and to pledge and grant liens on its assets as may be contemplated by or required under the terms of such post-petition financing or cash collateral agreement; and in connection therewith, the Authorized Officer of the Company is hereby authorized and directed to execute appropriate loan agreements, cash collateral agreements and related ancillary documents;

RESOLVED, that in the judgment of the Board of Directors it is desirable and in the best interests of the Company that the Company conduct an orderly liquidation of substantially all of its assets and, therefore, the Company is hereby authorized to enter into one or more asset purchase agreements and/or take other appropriate actions to effectuate such orderly liquidation on such terms that management determines will maximize value, and the Company is further authorized to file one or more motions to approve any such sales and for any related relief, or to approve sales of assets to a higher and better bidder, and to close such sale(s) or transactions, subject to Bankruptcy Court approval in the Company's chapter 11 proceeding;

RESOLVED, that the Authorized Officer is authorized on behalf of the Company to take any and all actions, to execute, deliver, certify, file and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities or certificates and to take any and all actions and steps deemed by the Authorized Officer to be necessary or desirable to carry out the purpose and intent of each of the foregoing resolutions and to effectuate a successful chapter 11 case, including, but not limited to the development, filing and prosecution to confirmation of a chapter 11 plan and related disclosure statement; and

RESOLVED, that any and all actions heretofore taken by the Authorized Officer or the directors of the Company in the name and on behalf of the Company in furtherance of the purpose and intent of any or all of the foregoing resolutions be, and hereby are, ratified, confirmed, and approved in all respects;

RESOLVED, that in connection with the commencement of the chapter 11 case by the Company, the Authorized Officer is authorized and empowered on behalf of, and in the name of, the Company, to negotiate, execute and deliver a cash collateral arrangement and/or debtor-in-possession loan facility and the related guarantees thereto (including, in connection therewith, such notes, security agreements and other agreements or instruments as such officers consider appropriate) on the terms and conditions such officer executing the same may consider necessary, proper or desirable, such determination to be conclusively evidenced by such execution or the taking of such action, and to consummate the transactions contemplated by such agreements or instruments on behalf of the Company and any affiliates.

**AMERIFIRST FINANCIAL, INC.**

DIRECTORS


_/s/ David Sloane_____
David Sloane


_/s/ Jeffrey Dane_____
Jeffrey Dane

**Fill in this information to identify the case:**

Debtor name    AmeriFirst Financial, Inc., *et al.*

United States Bankruptcy Court for the District of

                        (State)

Case number (If known): _____

☐ Check if this is an amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (on a Consolidated Basis)    12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1. RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P. 590 MADISON AVE. FLOOR 29 NEW YORK, NY 10022 | Peter Aberg Peter.aberg@reverencesapital.com | Bond Debt (Partially Secured) | U | | | $17,900,893 |
| 2. RCP Customized Credit Fund (Fund IV-A), L.P. 590 MADISON AVE. FLOOR 29 NEW YORK, NY 10022 | Peter Aberg Peter.aberg@reverencesapital.com | Bond Debt (Partially Secured) | U | | | 5,966,964 |
| 3. WELLS FARGO BANK, N.A. 420 MONTGOMERY ST. SAN FRANCISCO, CA 94104 | | Trade Debt | U | | | 1,086,315 |
| 4. US BANK PO BOX 1950 ST. PAUL, MN 55101 | | Trade Debt | U | | | 463,165 |
| 5. LAKEVIEW LOAN SERVICING, LLC 4425 PONCE DE LEON MS 5-251 CORAL GABLES, FL 33146 | | Trade Debt | U | | | 431,045 |
| 6. FARHANG AND MEDCOFF 4201 N 24TH ST. PHOENIX, AZ 85016 | | Professional Services | | | | 425,166 |
| 7. TRUIST BANK 214 N TRYON ST. SUITE 3 CHARLOTTE, NC 28202 | | Trade Debt | U | | | 417,538 |

| Debtor | AmeriFirst Financial, *et al.* | | Case number *(if known)* | | | |

| | Name | | | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8. PARAGON MICRO INC 1711 W GREENTREE DR. TEMPE, AZ 85284 | | Trade Debt | | | | 369,975 |
| 9. JPMCB 270 PARK AVE. NEW YORK, NY 10017 | | Trade Debt | | | | 339,942 |
| 10 KASOWITZ BENSON TORRES LLP 1633 BROADWAY NEW YORK, NY 10019 | | Professional Services | | | | 187,386 |
| 11 CIT 75 N FAIR OAKS AVE. SUITE C PASADENA, CA 91103 | | Equipment Lease | D | | | 167,689 |
| 12 TOTAL EXPERT 1600 UTICA AVE. S MINNEAPOLIS, MN 55416 | | Trade Debt | D | | | 166,264 |
| 13 QUARLES & BRADY LLP 2 N CENTRAL AVE. #3 PHOENIX, AZ 85004 | | Professional Services | | | | 142,077 |
| 14 UNITED HEALTHCARE 9700 HEALTH CARE LN. MINNETONKA, MN 55343 | | Employee Benefits | | | | 103,454 |
| 15 TRACY KEARNS [ADDRESS REDACTED] | | Profit Sharing | | | | 102,365 |
| 16 PHOENIX ARENA DEVELOPMENT, LP 201 E JEFFERESON ST. PHOENIX, AZ 85004 | | Trade Debt | | | | 95,608 |
| 17 EL CAMINO REAL BUILDING | | Real Property Lease | D | | | 93,000 |
| 18 THE LAW OFFICE OF JEFF A. GEORGE, APC 14071 PEYTON DR. #2710 CHINO HILLS, CA 91709 | | Professional Services | | | | 85,463 |
| 19 DB TRUST CO. AMERICAS 1761 E ST ANDREW PLACE SANTA ANA, CA 92705 | | Trade Debt | | | | 76,530 |

| Debtor | AmeriFirst Financial, _et al._ | | Case number _(if known)_ | | | |
|---|---|---|---|---|---|---|

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 20 | OPTIMAL BLUE, LLC 5340 LEGACY DR. BLDG 2 2ND FLOOR PLANO, TX 75024 | | Trade Debt | | | | 71,896 |
| 21 | ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES 333 E OSBORN RD. SUITE 100, 270, AND 300 PHOENIX, AZ 85012 | | Trade Debt | | | | 66,367 |
| 22 | ASSIMILATE SOLUTIONS TOWER 49 12 E 49TH ST. 34TH FLOOR NEW YORK, NY 10017 | | Trade Debt | | | | 62,432 |
| 23 | ARIVS 1930 N ARBOLEDA RD MESA, AZ 85213 | | Trade Debt | | | | 44,150 |
| 24 | EXPERIAN | | Trade Debt | | | | 40,677 |
| 25 | MOURIER LAND INVESTMENT CORPORATION 1430 BLUE OAKS BLVD. SUITE 190 ROSEVILLE, CA 95747 | | Real Property Lease | D | | | 40,000 |
| 26 | CLEARCOMPANY HRM 200 CLARENDON ST. 49TH FLOOR BOSTON, MA 02116 | | Trade Debt | D | | | 37,290 |
| 27 | COUSINS FUND II PHOENIX III, LLC 3800 N CENTRAL AVE. SUITE 460 PHOENIX, AZ 85012 | | Real Property Lease | | | | 33,347 |
| 28 | MORTGAGE COACH PO BOX 112 CORONA, CA 92878 | | Trade Debt | D | | | 30,625 |
| 29 | FLOIFY 1630A 30TH ST. SUITE 120 BOULDER, CO 80301 | | Trade Debt | D | | | 30,601 |

Official Form 204    **Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims (on a consolidated basis)**    page 4

DOCS_DE:244340.3

Debtor  AmeriFirst Financial, *et al.*
_____
Name

Case number *(if known)* _____

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 30 | LANE POWELL 1420 5TH AVE. SUITE 4200 SEATTLE, WA 98101 | | Professional Services | | | | 30,047 |

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., | Case No. __-_____ (___) |
| Debtor. | |

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned authorized officer of the above-captioned Debtor, certifies that the following is a corporation other than the Debtor, or a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under FRBP 7007.1.

☐ None [*check if applicable*]

|  |  |
|---|---|
| Name: | Phoenix 1040 LLC |
| Address: | 275 E. Rivulon Blvd. |
| | Suite 300 |
| | Gilbert, Arizona 85297 |

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., | Case No. __-_____ (___) |
| Debtor. | |

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case:

### COMMON

| Equity Holder | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|
| Phoenix 1040 LLC | 275 E. Rivulon Blvd. Suite 300 Gilbert, Arizona 85297 | 100% |

### PREFERRED

| Equity Holder | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|
| RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. | 590 Madison Ave. 29th Floor New York, NY 10022 | 100% |

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., | Case No. __-_____ (___) |
| Debtor. | |

## CERTIFICATION OF CREDITOR MATRIX

Pursuant to Rule 1007-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the above captioned debtor and its affiliated debtors in possession (collectively, the "Debtors")[1] hereby certify that the *Creditor Matrix* submitted herewith contains the names and addresses of the Debtors' creditors. To the best of the Debtors' knowledge, the *Creditor Matrix* is complete, correct, and consistent with the Debtors' books and records.

The information contained herein is based upon a review of the Debtors' books and records as of the petition date. However, no comprehensive legal and/or factual investigations with regard to possible defenses to any claims set forth in the *Creditor Matrix* have been completed. Therefore, the listing does not, and should not, be deemed to constitute: (1) a waiver of any defense to any listed claims; (2) an acknowledgement of the allowability of any listed claims; and/or (3) a waiver of any other right or legal position of the Debtors.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 1550 McKelleps Road, Suite 117, Mesa, AZ 85203.

DOCS_DE:244340.3

| Consolidated Creditor Matrix | |
|---|---|
| **Name** | **Address** |
| 4G BUSINESS SOLUTIONS, INC | |
| ACADEMY MORTGAGE CORPORATION | |
| ADVANTAGE PLUS CREDIT REPORTING, INC. | |
| ADVANTAGE SYSTEMS, INC. | |
| ALTISOURCE HOLDINGS, LLC | |
| ALTURAS STANFORD | |
| AMERICAN PACIFIC MORTGAGE | |
| AMERIHOME MORTGAGE COMPANY, LLC | |
| ANNUAL REGISTRATION MANAGEMENT SERVICES, LLC | |
| ARIVS | |
| ARIZONA ACADEMY OF REAL ESTATE INC | |
| ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES | |
| ASSIMILATE SOLUTIONS | |
| BENSON SYSTEMS | |
| BLACK KNIGHT TECHNOLOGIES, LLC | |
| BUCHALTER | |
| CAPITAL INSURANCE SERVICES | |
| CENTURYLINK | |
| CISCO CREDIT INFORMATION SERVICES COMPANY | |
| CIT | |
| CITY OF MESA CUSTOMER SERVICE | |
| CLEARCAPITAL.COM INC | |
| CLEARCOMPANY HRM | |
| CLIX MARKETING GROUP INC | |
| COMCAST. | |
| CORELOGIC CREDCO LLC | |
| CORELOGIC SOLUTIONS, LLC | |
| COSOL PROPERTY MANAGEMENT | |
| COUSINS FUND II PHOENIX III, LLC | |
| COX COMMUNICATIONS | |
| DAMONTEK | |
| DATAVERIFY | |
| DB TRUST CO. AMERICAS | |
| DIGITECH OFFICE EQUIPMENT | |
| EL CAMINO REAL BUILDING | |
| EXPERIAN | |
| FARHANG AND MEDCOFF | |
| FEDEX | |
| FIRST AMERICAN DATA TREE, LLC | |
| FIRST AMERICAN MORTGAGE SOLUTIONS, LLC | |
| FLOIFY | |
| FREEDOM MORTGAGE CORP | |
| GERACI LEGAL CORPORATION | |
| GOS PRODUCTS FOR BUSINESS | |
| GOTO TECHNOLOGIES USA, INC. | |
| HARRIS PARK PROFESSIONAL PLAZA | |
| HULL BARRETT, PC | |
| JPMCB | |
| KASOWITZ BENSON TORRES LLP | |
| LAKEVIEW LOAN SERVICING, LLC | |
| LANE POWELL | |
| LEGALSHIELD | |
| LES EXTENSION, LLC | |
| LESLIE BROOKS GRIFFITH PLLC | |
| MANSPERGER PATTERSON & MCMULLIN PLC | |
| MASS MUTUAL | |
| MERSCORP HOLDINGS, INC | |
| MORTGAGE COACH | |
| MORTGAGE COLLABORATIVE COOPERATIVE | |
| MORTGAGE REFERENCES INC. | |
| MOURIER LAND INVESTMENT CORPORATION | |
| NAVESINK MORTGAGE SERVICES LLC | |
| NEWREZ, LLC | |
| NORTH CAROLINA DEPARTMENT OF REVENUE | |
| NORTH SCOTTSDALE GATEWAY, LLC | |

OCL FINANCIAL SERVICES LLC
ONSITE BUSINESS SERVICE, LLC
OPTIMAL BLUE
OPTIMAL BLUE, LLC
PACIFIC OFFICE AUTOMATION
PARAGON MICRO INC
PARKS COFFEE
PENNYMAC CORP.
PG&E
PHOENIX ARENA DEVELOPMENT, LP
PROSHRED SECURITY
QC ALLY, LLC
QUADIENT FINANCE USA, INC
QUARLES & BRADY LLP
REVERSEVISION, INC
RICHEY MAY & CO
ROBINSON GROUP REALTY
SILVERWORK SOLUTIONS LLC
SYNERGI PARTNERS INC
TALISMAN MARKETING CONSULTING, LLC
TALX CORPORATION
THE HARTFORD
THE LAW OFFICE OF JEFF A. GEORGE, APC
TIDE POOL ENTERPRISES INC
TIEMPO DEVELOPMENT LLC
TOTAL EXPERT
TRACY KEARNS
TRUIST BANK
U.S. BANK THIRD PARTY LENDING
UKG INC.
ULINE
UNIQUE SECURITY, INC.
UNITED HEALTHCARE
UNIVOIP INC
US BANK
VAR TECHNOLOGY FINANCE
VERI-TAX
WELLS FARGO BANK, N.A.
WELLS FARGO FINANCIAL LEASING
WRIGHT, FINLAY & ZAK, LLP
WSFS BANK
XACTUS

Eric Bowlby
Kenneth Bowlby
Erik Lutz
Fred Kron
Andrew Platt
Robin Kasitz
Peter Maniccia
Kelly Powers
Brittney Stratton
Jamieson Breuker
Benjamin Jones
Kristine Pelatt
Caroline Kelly
Alexandria Orth
Christina Castrellon
Edward Consalvi
Manuel Padro
Jennifer Kennedy
Kenneth Wigley
Sharicka McHenry
Leslie Robles
Patricia D'Pulos
Brittney Iannacone
Cameron Odle
Patricia Luna
Tasha Christenson

Linda Welsch
Randall Kocinski
Cheryl Printz
LaVonne Giacomini
Samantha Kimbrell
Sara Olmedo
Sead Bahor
Kelly Littrell
Ted Wilkinson
Delora Bearden
Lindsey Warren
Shelley Wilson
Emily Norton
Madonna Radeff
Mary Johnson
Ruth Alcorn
Steven Larsen
Luis Tiscareno
Brianne Taylor
Ivan Tiscareno
Larissa Lewis
Rogelio Sanchez
Letisha Merritt
Shair Riebli-Hull
Renee Zabel
Colby Barnes
Kenneth Staker
Craig Willis
Heber Schnebly
Tessa Carter
Judith Gould

| | |
|---|---|
| TEXAS CAPITAL BANK | |
| Origin Bank | |
| Alliance Bank of Arizona | 2701 E Camelback Rd., Suite 110, Phoenix, AZ 85016 |
| Flagstar Bank | 301 W Michigan Ave, Jackson MI 49201 |
| Veritex Community Bank | |
| JVB Financial | |

| | |
|---|---|
| Alliance Bank of Arizona | 2701 E Camelback Rd., Suite 110, Phoenix, AZ 85016 |
| BMO Harris Bank N.A. | P.O. Box 94033 Palatine, IL 60094-4033 |
| Chase Bank | 2509 S Power Rd, Suite 103, Mesa AZ 85209 |
| Flagstar Bank | 301 W Michigan Ave, Jackson MI 49201 |
| Wells Fargo | P.O. Box 6995 Portland, OR 97228-6995 |

| | |
|---|---|
| FHLMC | |
| FNMA | |
| GNMA | |

| | |
|---|---|
| Mourier Land Investment Corporation | |
| El Camino Real Building | |
| Alturas Stanford - Was BRI 1871 Stanford, LLC | |
| Cousins Fund II Phoenix III, LLC - was Cousins Realty Servies, LLC | |
| HARRIS PARK | |
| Regus | |
| Premier Business Centers | |
| 275 Rivulon Blvd., LLC | |
| Academy Mortgage | |
| CoSol Property Management, Inc | |
| Robinson Group Realty | |
| United Insurance Company of America | |

| | |
|---|---|
| RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P. | 590 Madison Ave., Fl. 29, New York, NY 10022 |
| RCP Customized Credit Fund (Fund IV-A), L.P. | 590 Madison Ave., Fl. 29, New York, NY 10022 |

**Fill in this information to identify the case:**

Debtor name    **AmeriFirst Financial, Inc.**

United States Bankruptcy Court for the:    DISTRICT OF DELAWARE

Case number (if known) _____

☐ Check if this is an amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐   *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐   *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐   *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐   *Schedule H: Codebtors* (Official Form 206H)
☐   *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐   Amended *Schedule*
☑   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
☑   Other document that requires a declaration   **Corporate Ownership Statement; List of Equity Security Holders; and Certification of Creditor Matrix**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   **August 24, 2023**    X **/s/ T. Scott Avila**
                                  Signature of individual signing on behalf of debtor

                                  **T. Scott Avila**
                                  Printed name

                                  **Chief Restructuring Officer**
                                  Position or relationship to debtor

**Dane Deposition**

**Exhibit 6 – Redacted**

**Dane Deposition**

**Exhibit 7 – Redacted**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | ) | Case No. 23-11240 (TMH) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

### MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

AmeriFirst Financial, Inc. ("AmeriFirst") and Phoenix 1040, LLC ("Phoenix"), as debtors and debtors in possession (collectively, the "Debtors"), in these chapter 11 cases (the "Chapter 11 Cases"), hereby file this postpetition financing motion (this "Motion") requesting entry of an interim order (this "Interim Order") and a final order (the "Final Order") as set forth below pursuant to sections 105(a), 363, and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (as amended, the "Local Bankruptcy Rules"). In support of this Motion, the Debtors submit the *Declaration of T. Scott Avila in Support of First Day Motions* (the "First Day Declaration"),[2] filed concurrently herewith and incorporated herein by reference. In further support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 1550 McKelleps Road, Suite 117, Mesa, AZ 85203.

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the First Day Declaration.



EXHIBIT
Dane-8

## I.  SUMMARY OF RELIEF REQUESTED

1.      The Debtors seek entry of the Interim Order, substantially in the form attached hereto as **Exhibit 1**, and the Final Order to be submitted at a later date (respectively, the "Interim Order" and "Final Order" and collectively, the "DIP Orders"):

(1)      authorizing AmeriFirst to obtain postpetition financing from RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. ("DIP Lenders"), consisting of a senior secured, superpriority term loan facility in the principal amount of up to **$5,000,000** (the "DIP Loans") to be used for general liquidity purposes, including the payment of administrative expenses and estate professional fees, as described herein and in that certain *Binding DIP Term Sheet*, dated August 28, , 2023, by and among the DIP Lenders, as lenders, RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., as agent (the "DIP Agent"), and AmeriFirst, as borrower (substantially in the form attached hereto as **Exhibit A**, as any time amended, the "DIP Term Sheet"), of which amount **$2,775,000** will be available on an interim basis (the "Interim Amount Limit") during the Interim Period (as defined below), on the terms and conditions set forth in the DIP Term Sheet and this Interim Order;

(2)      authorizing AmeriFirst to execute and enter into the DIP Term Sheet and to perform all such other and further acts as may be required in connection with the DIP Term Sheet;

(3)      authorizing AmeriFirst  to use proceeds of the DIP Loans solely as expressly permitted in the DIP Term Sheet and in accordance with this Interim Order;

(4)      pursuant to Bankruptcy Code section 364, granting the DIP Agent for the benefit of the DIP Lenders security interests and liens as set forth in the DIP Term Sheet and this Interim Order and allowed superpriority administrative expense claims against AmeriFirst for the amounts advanced under the DIP Loans;

(5)      authorizing AmeriFirst to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Term Sheet as such amounts become due and payable;

(6)      granting adequate protection to the Prepetition Lenders (as defined below) as set forth in the DIP Term Sheet and this Interim Order;

(7)      scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the Motion; and

(8)      granting the Debtors such other and further relief as is just and proper.

## II.  JURISDICTION AND VENUE

2.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013–1(f) of the Local Bankruptcy Rules, the Debtors consent to the entry of a Final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter Final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory basis for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 507 and 552 of Title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9013, and Local Bankruptcy Rules 4001-2, 9006-1, and 9013.

## III. BACKGROUND

### A.     General Background

5.     On August 24, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this Motion, no official committee, trustee or examiner has been appointed in these chapter 11 cases (the "Chapter 11 Cases").

6.     Background information regarding the Debtors' business, organizational structure, and description of the events precipitating the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

### B.     Prepetition Secured Debt

7.     Pursuant to, *inter alia*, (i) that certain *Amended and Restated Credit and Security Agreement*, dated as of May 15, 2023 the "Prepetition Credit Agreement"), among AmeriFirst , as borrower, and RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IVA), L.P. (each, a "Prepetition Lender" and collectively, the "Prepetition Lenders"), and RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. as administrative agent (the "Prepetition Agent", and with the Prepetition Lenders, the "Prepetition Secured Parties"), and (ii) the certain *Limited Waiver and Second Amendment to Credit and Security Agreement*, dated as of May 15, 2023 (the "Second Amendment"), the Prepetition Secured Parties provided certain prepetition term loans and other financial accommodations to AmeriFirst.

8.     Pursuant to the that certain Settlement Agreement, dated as of May 15, 2023 (the "Settlement Agreement"), in consideration for the execution of the Prepetition Credit Agreement, the Second Amendment, and a restatement of the "bad boy" guaranty of Eric Bowlby

(the "<u>Guarantor</u>"), AmeriFirst's former Chief Executive Officer and then majority shareholder, in favor of the Prepetition Secured Parties, the Prepetition Secured Parties, AmeriFirst, and Guarantor entered into certain mutual releases, including the release of all Existing Defaults (as defined in the Settlement Agreement), subject to the terms and conditions set forth therein.

9. As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Credit Agreement is at least $15,798,087 (*plus* accrued and unpaid interest, additional fees, costs, expenses, and other obligations as provided under the Prepetition Credit Agreement) (the "<u>Prepetition Obligations</u>").

10. In connection with the Prepetition Credit Agreement, the shareholders of AmeriFirst, Eric Bowlby and Kenneth Bowlby, entered into that certain *Pledge Agreement*, dated as of May 15, 2023 (the "<u>Pledge Agreement</u>") with the Prepetition Secured Parties, which granted liens on and security interests in the 100% of the common equity stock of AmeriFirst (the "<u>Pledged Shares</u>") in favor of the Prepetition Agent, AmeriFirst entered into that certain *Security Agreement*, dated as of May 15, 2023, with the Prepetition Secured Parties (the "<u>Security Agreement</u>"), which granted a first priority lien on and security interest in substantially all of the personal property of AmeriFirst to the Prepetition Agent, subject to certain permitted liens, together with mortgages on certain real property of AmeriFirst scheduled pursuant to the Prepetition Credit Agreement. Pursuant to the Prepetition Credit Agreement and the Security Agreement, the Prepetition Secured Parties assert that the Prepetition Obligations are secured by valid, binding, perfected first priority security interests and liens (the "<u>Prepetition Liens</u>") in and on the "Collateral," as defined in the Prepetition Credit Agreement and Security Agreements (the "<u>Prepetition Collateral</u>").

11. Pursuant to the Second Amendment, AmeriFirst agreed to issue 40,000 shares of preferred shares, with an aggregate liquidation value of $4 million, to the Prepetition Lenders, at the closing of the Prepetition Credit Agreement.

12. On August 24, 2023, following various events of default under the Prepetition Credit Agreement and prior to the commencement of these Chapter 11 Cases, the Prepetition Agent gave a Notice of Events of Default under the Prepetition Credit Agreement and declared that the Obligations of AmeriFirst under the Prepetition Credit Agreement were immediately due and payable. The Prepetition Agent thereafter exercised its rights under the Pledge Agreement, including transferring the Pledged Stock and assigning the Prepetition Agent's rights under the Pledge Agreement to Phoenix. Pursuant to the Pledge Agreement, the certificates for the Pledged Shares were then canceled and a new stock certificate issued to Phoenix. Phoenix as the sole shareholder of AmeriFirst, then executed a Unanimous Written Consent as the sole shareholder of AmeriFirst (the "Phoenix Consent"). The Phoenix Consent (a) removed the former directors of AmeriFirst; and (b) elected two new directors (including an independent director) to AmeriFirst's board of directors. Finally, also on August 24, 2023, the new reconstituted board of AmeriFirst executed a separate unanimous consent removing all former officers of AmeriFirst and electing new officers.

13. The Prepetition Lenders assert that all of the Debtors' cash, including but not limited to the amounts on deposit or maintained in any account or accounts by the Debtors or any amounts generated postpetition, constitutes the Prepetition Lenders' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

6

## IV.   PROPOSED DIP TERM SHEET

14.      Subject to Court approval, the DIP Lenders have agreed to provide DIP Loans to the Debtors in an amount up to $5 million (subject to any limitations on borrowing under the DIP Term Sheet), of which $2.775 million will be available upon entry of the Interim Order. The Debtors require an immediate infusion of new money in order to maintain operations, pay employees, and satisfy accruing administrative expenses, including estate professional fees. The Debtors do not have adequate funding based on access to Cash Collateral alone. Without the proposed DIP Loans, the Debtors would suffer immediate and irreparable harm and would be forced to terminate operations, layoff all employees, and convert these cases to Chapter 7.

15.      As set forth in the First Day Declaration, the Debtors' only source of funding for these Chapter 11 Cases are the existing Prepetition Lenders. The proposed DIP Loans and authorization to use Cash Collateral, as offered by the DIP Lenders and the Prepetition Lenders, are the best and only financing options currently available to these estates. Fully unsecured postpetition financing was not available to the Debtors. Other potential sources of debtor in possession financing for the Debtors, including but not limited to funding on a junior secured basis, are also nonexistent.

### A.      Summary of Essential Terms of DIP Term Sheet

16.      In accordance with Bankruptcy Rule 4001(b) and Local Bankruptcy Rule 4001-2(a)(i)-(iii), the chart below reflects the essential terms of the proposed financing and use of cash collateral as set forth in the DIP Term Sheet and incorporated in the proposed DIP Orders. The DIP Term Sheet is copied essentially verbatim below:

7

| Borrowers: | AmeriFirst Financial, Inc. as debtor-in-possession (the "Debtor") |
|---|---|
| **DIP Credit Facility:** | Maximum available on entry of the Interim Order: $2,775,000 <br> Maximum available upon entry of the Final Order: $5,000,000 <br><br> The DIP Credit Facility is a senior secured, superpriority term loan facility. <br><br> Amounts repaid under the DIP Credit Facility may be reborrowed consistent with the Approved Budget. |
| **DIP Lenders:** | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., RCP Customized Credit Fund (Fund IV-A), L.P. ("DIP Lenders") |
| **Agent:** | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. ("DIP Agent") |
| **Interest Rate:** | Non-default:  SOFR plus 2.0%, which shall be accrued and payable upon maturity of the DIP Loans <br> Default:  SOFR plus 4.5% payable in cash monthly in arrears. |
| **Fees** | 50 bps on total facility size and 50 bps on unused committed amounts, both of which shall be accrued and payable upon maturity of the DIP Loans. |
| **Maturity and Repayment:** | The DIP Loans shall mature on the earliest of (unless extended in writing by the DIP Agent):  (i) November 30, 2023; (ii) the effective date or the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court; (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of the Debtor or the chapter 11 case of Phoenix 1040, LLC to a liquidation under Chapter 7 of the Bankruptcy Code; (iv) the date of consummation of a sale or other disposition of all or substantially all of the assets of the Debtor under section 363 of the Bankruptcy Code or otherwise; (v) the date the Bankruptcy Court orders the dismissal of the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC; (vi) the date of acceleration of the DIP Loans, including as a result of the occurrence and continuance of an Event of Default; and (vii) the date that is 35 calendar days after the Petition Date if the Final Order shall not have been entered by such date. <br><br> Upon the maturity of the DIP Loans, the Debtor shall repay to the DIP Agent for the ratable account of the DIP Lenders the aggregate principal amount of all DIP Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount of the DIP Loans (to be paid to but excluding the date of such payment) and all fees and expenses and other obligations payable under the DIP Facility (together, the "DIP Obligations"). |

8

| Use of Proceeds: | The proceeds of the DIP Loans shall be applied strictly in accordance with the Approved Budget (subject to the Permitted Variance), including, without limitation, to the extent authorized by the Bankruptcy Court, to pay the prepetition accrued wages specified in the Initial Budget (subject to the Permitted Variance).

No part of the proceeds of any DIP Loan, the Cash Collateral, or any other of the Collateral will be used:

(i) for any purpose that is prohibited under the Bankruptcy Code or the Interim or the Final Order; or
(ii) to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Agent and the DIP Lenders, including to commence or prosecute or join in any action against the DIP Agent or the DIP Lenders with respect to or related to:
(A) the claims, liens or security interest of the DIP Agent and the DIP Lenders, or their respective rights and remedies under the Interim Order or the Final Order, as the case may be, including to commence or prosecute or join in any action against the DIP Agent or the DIP Lenders seeking (x) to avoid, subordinate or recharacterize the DIP Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Agent or the DIP Lenders or (z) to prevent or restrict the exercise by the DIP Agent or the DIP Lenders of any of their respective rights or remedies under the Interim Order or the Final Order,
(B) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the releases set forth in the Interim Order and the Final Order,
(C) the stipulations to be made by the Debtor and approved by the Final Order; or
(D) any other action which with the giving of notice or passing of time would result in an Event of Default as described below; or
(iii) to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the Prepetition Agent or the Prepetition  Lenders, including to commence or prosecute or join in any action against the Prepetition Agent or the Prepetition Lenders with respect to or related to the claims, liens or security interest of the Prepetition Agent and the Prepetition Lenders, or their respective rights and remedies under the Interim Order or the Final Order, as the case may be, or the Prepetition Loan Documents, including to commence or prosecute or join in any action against the Prepetition Agent or the Prepetition Lenders seeking (x) to avoid, subordinate or recharacterize the Prepetition Obligations, (y) any monetary, injunctive or other affirmative relief against the Prepetition Agent or the Prepetition Lenders or (z) to prevent or restrict the exercise by the Prepetition Agent or the Prepetition Lenders of any of their respective rights or remedies under the Interim Order or the Final Order, as the case may be, or, to the extent authorized by the Interim Order or the Final Order, under the Prepetition Loan Documents ; provided, however, that up to $50,000 in the aggregate of the proceeds of any DIP Loan or cash collateral may be used solely by any statutory committee appointed in the Chapter 11 Case to investigate, but not to commence, prosecute or finance litigation, with respect to the foregoing. |
|---|---|

9

| | |
|---|---|
| **Budget** | Following delivery of the Initial Budget, not later than the last Business Day of the last full calendar week of each month (or earlier with respect to the budget to be attached to the Final Order) (the "Updated Budget Deadline"), the Debtor shall provide the DIP Agent with an updated budget (each such update which is approved in accordance with the terms hereof, an "Updated Budget"), prepared by management of the Debtor in consultation with the DIP Agent covering a 13-week period that commences with the Updated Budget Deadline, consistent with the form and level of detail set forth in the Initial Budget.  Each Updated Budget shall be, in each case, subject to the written approval of the DIP Agent (in its sole discretion).  As used herein, the "Approved Budget" shall mean (i) initially, the Initial Budget and (ii) thereafter, upon (and subject to) the approval of any Updated Budget by the DIP Agent, such Updated Budget. |
| **Budget Variance** | Commencing on Friday, September 8, 2023, and on each Friday thereafter, the Debtor shall provide a weekly variance report to the DIP Agent showing actual receipts (if any) and actual disbursements compared against the projected receipts (if any) and projected disbursements in the Approved Budget through the last Business Day of the prior week (each, a "Budget Variance Test Date").  The Debtor shall not permit:

(a) the sum of the actual aggregate operating disbursements of the Debtor for the four weeks (or lesser period if applicable) ending immediately prior to such Budget Variance Test Date (the "Budget Variance Test Period") to be greater than 110% of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Operating Disbursements" for such Budget Variance Test Period (the "Permitted Variance"); or

(b) the sum of the actual disbursements of fees incurred by professionals of any unsecured creditors committee in the Chapter 11 Case and of the Debtor ending immediately prior to such Budget Variance Test Date to be greater than the amount set forth for the line item in the Approved Budget under "Non-Operating Disbursements" for such Budget Variance Test Period.

To the extent that any Budget Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the described above. |

10

| Conditions of Borrowing | The following shall each be true as the date of any Credit Extension: |
|---|---|
| | (a) (i) All Chapter 11 Orders filed or to be filed with, and submitted to, the Bankruptcy Court shall be in form and substance reasonably acceptable to the DIP Agent. (ii) Each Chapter 11 Order that has been entered as of such date shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the DIP Agent. (iii) The Debtor shall be in compliance in all material respects with the Interim Order and the Final Order, as applicable, and each other Chapter 11 Order. (b) The DIP Agent shall have received a Request for Credit Extension in accordance with the requirements hereof. (c) All engagement letters or other agreements providing for the payment of the fees and expenses of the Debtor's proposed professional advisors shall be in form and substance reasonably satisfactory to the DIP Agent. |

The effectiveness of the DIP Credit Facility and the obligation of the DIP Lenders to fund the Initial Loans shall be subject to the satisfaction or waiver of the following conditions precedent:

(a) The Interim Order (i) shall have been entered by the Bankruptcy Court and (ii) shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, or vacated, absent prior written consent of Agent.
(b) All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent.
(c)(i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtor or its business, properties or assets, and (ii) no order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or any other relief authorizing any third party to exercise control over the bankruptcy estate of the Debtor or any Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions.
(d) The DIP Agent shall have received the Initial Budget and such other information (financial or otherwise) regarding the Initial Budget as the DIP Lenders or the DIP Agent may reasonably request.
(e) Subject to Bankruptcy Court approval, the Debtor shall have the corporate power and authority to make, deliver and perform their obligations under the Interim Order.

The obligation of the DIP Lenders to fund loans subsequent to the Initial Loans shall be subject to the satisfaction or waiver of the following conditions precedent:

(a) The Final Order (i) shall be in form and substance satisfactory to the Agent, (ii) shall have been entered by the Bankruptcy Court within a date which is 35 days following the Petition Date, and (iii) shall be in full force and effect and shall not have been modified or amended absent prior written consent of the DIP Agent or reversed, modified, amended, stayed, or vacated, absent the prior written consent of the DIP Agent.
(b) The Debtor shall be in compliance with each order entered in the Chapter 11 Case, including the Interim Order, and following entry of the Final Order, the Final Order.
(c) The Debtor shall be in compliance with the Approved Budget (subject to the Permitted Variance).
(d) All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent.
(e)(i) No trustee, examiner or receiver shall have been appointed or designated with

11

| | respect to the Debtor or its business, properties or assets, and (ii) no order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or any other relief authorizing any third party to exercise control over the bankruptcy estate of the Debtor or any Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions, and no motion or application shall have been filed with respect to the foregoing other than a motion that is being contested by the Debtor in good faith.<br>(f) The DIP Agent shall have received the Initial Budget and such other information (financial or otherwise) regarding the Initial Budget as the DIP Lenders or the DIP Agent may reasonably request. |
|---|---|
| **Roll-up** | Subject to entry of the Final Order, an amount of the loans under the prepetition credit facility (the "<u>Prepetition Loans</u>") provided to the Debtor by the Prepetition Lenders (which entities are also the DIP Lenders) shall be rolled up, and converted into DIP Obligations secured by the DIP Liens ratably with the DIP Loans in an amount equal to the sum of (x) the amounts advanced to Phoenix 1040, LLC immediately prior to the Petition Date to fund the retention of professionals and premiums for director and officer liability insurance (the "<u>Prepetition Protective Advances</u>"); and (y) 100% of the aggregate amount of Cash Collateral used by the Debtor and DIP Loans advanced pursuant to the Interim Order and the Final Order. |
| **Perfection and Enforceability of Prepetition Obligations and Liens** | Subject to entry of the Final Order, the Debtor stipulates that the Prepetition Loans and other obligations of the Debtor (the "<u>Prepetition Obligations</u>") under that certain *Amended and Restated Credit and Security Agreement*, dated as of May 15, 2023, and the Loan Documents (as defined therein) (the "<u>Prepetition Loan Documents</u>"), constitute legal, valid, binding, and non-avoidable obligations of the Debtor in accordance with the respective terms of the relevant Prepetition Loan Documents, and no portion of the Prepetition Obligations or any payment made to the Prepetition Lenders or applied to or paid on account thereof prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law. The Prepetition Protective Advances shall be deemed "Protective Advances" under the Prepetition Loan Documents.<br><br>Subject to entry of the Final Order, the Debtor stipulates that, as of the Petition Date, pursuant to the Prepetition Loan Documents, the Debtor granted for the benefit of the Prepetition Lenders, a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on (the "<u>Prepetition Liens</u>") substantially all of their assets and property as set forth in the Prepetition Loan Documents (the "<u>Prepetition Collateral</u>"), subject only to any liens permitted by the Prepetition Loan Documents to be senior to the Prepetition Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "<u>Prepetition Permitted Senior Liens</u>"). |

| | |
|---|---|
| **Challenge Period** | The Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon the Debtor in all circumstances and for all purposes. The Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes unless: (a) (x) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than the later of (x) 21 calendar days after entry of the Final Order and (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 21 calendar days after entry of the Final Order, or (B) the date that is 30 calendar days after their appointment; or any such later date as has been agreed to in writing by the Prepetition Lenders or has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (x)-(z) the "<u>Challenge Period</u>"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or (B) asserting or prosecuting any avoidance action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "<u>Challenges</u>") against the Prepetition Lenders in connection with or related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; provided, however, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred. If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) the Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding on all parties in interest; (2) the obligations of the Debtor under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in this case and any Successor Case; (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party in interest acting or seeking to act on behalf of the Debtor's estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 case or any other party acting or seeking to act on behalf of the Debtor's estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of Prepetition Lenders shall be deemed forever waived, released and barred. If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the Final Order shall |

DOCS_SF:109424.3 70786/001

| | nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in the Final Order will vest or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Loans or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in the Chapter 11 Case. |
|---|---|
| **Waiver/Modification of the Automatic Stay** | The Interim Order and the Final Order shall include a customary waiver/modification of the automatic stay to permit the DIP Agent and the DIP Lenders to take all actions as are necessary or appropriate to implement the terms of the Interim Order and the Final Order. The automatic stay shall be modified to the extent necessary to permit the DIP Agent on behalf of the DIP Lenders to take any action necessary or appropriate to perfect the liens of the DIP Lenders on the DIP Collateral and the Collateral. |
| **Adequate Protection** | Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral for the aggregate diminution in value of such interests (including from the amount of any Cash Collateral used by the Debtor) (the "Diminution in Value") (if any) and as an inducement to the Prepetition Lenders to consent to the use of their Cash Collateral, the Prepetition Lenders are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"), subject to and junior in all respects to the DIP Obligations and the Carve-Out:<br><br>(i)  The Prepetition Lenders, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition Lenders' Diminution in Value (if any) upon all of the DIP Collateral, subject to and junior in all respects to the DIP Liens (as defined below) and the Carve-Out; and<br><br>(ii)  The Prepetition Lenders shall be granted allowed superpriority administrative expense claims against the Debtor (without the need to file any proof of claim) on account of the Prepetition Lenders' Diminution in Value (if any) under section 507(b) of the Bankruptcy Code (the "Prepetition Lender 507(b) Claims"), which Prepetition Lender 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding avoidance actions, but including upon entry of the Final Order, without limitation, proceeds of avoidance actions). Except as otherwise provided in the Interim Order or the Final Order and subject to and junior in all respects to the DIP Superiority Claims (as defined below) and the Carve-Out, the Prepetition Lender 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtor now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |

14

| Collateral: | As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Lenders, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "DIP Liens") will be granted to the DIP Agent for the benefit of the DIP Lenders (all property identified below being collectively referred to as the "DIP Collateral," and, together with the Prepetition Collateral, the "Collateral"), subject to and junior in all respects to the Carve-Out: |
|---|---|
| | *Liens on Unencumbered Property* |
| | Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the Debtor whether existing on the Petition Date or thereafter acquired, including, without limitation, the Debtor's mortgage servicing rights (to the extent such rights are unencumbered property) and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than avoidance actions and the Carve-Out (and any amounts held therein), but including, upon and subject to entry of the Interim Order, proceeds of avoidance actions (collectively, the "Unencumbered Property"). |
| | *Liens Junior to Certain Other Liens on Encumbered Property* |
| | Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtor that, on or as of the Petition Date, is subject to and junior in all respects to the Prepetition Liens and the liens or security interests permitted under the Prepetition Loan Documents (i.e., the Prepetition Permitted Senior Liens), which Collateral (the "Encumbered Property") shall be subject to such Prepetition Liens and Prepetition Permitted Senior Liens. |
| | For the avoidance of doubt, the valid and enforceable interests of providers of warehouse credit facilities in mortgage loans and related documents existing as of the Petition Date (the "Prepetition Warehoused Mortgage Loans Collateral") shall be deemed Prepetition Permitted Senior Liens and the Prepetition Warehoused Mortgage Loans Collateral shall be deemed Encumbered Property. |
| **DIP Superpriority Claims** | The DIP Obligations shall be superpriority administrative expense claims against the Debtors (without the need to file any proof of claim) under section 507(b) of the Bankruptcy Code entitled to superpriority status senior to the Prepetition Lender 507(b) Claims, as set forth in the Interim Order and the Final Order (the "DIP Superpriority Claims"). |
| **Carve-Out:** | As to be provided in the Interim Order and Final Order |

| Events of Default: | (b)   Failure to pay or prepay principal or interest within three (3) business days after the same becomes due. |
|---|---|
| | (c)   Failure to perform or observe any other term, covenant or agreement described herein and such failure continue for fifteen (15) days after receipt by the Debtor of written notice thereof. |
| | (d)   Any final judgment or order is entered against the Debtor for the payment of money in excess of $100,000 and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal for a period of (60) days. |
| | (e)   The Interim Order or the Final Order shall for any reason cease to create, or shall be asserted by the Debtor not to create, a valid and perfected lien on and security interest in the Collateral with the priority required herein. |
| | (f)   Any Change in Control. |
| | (g)   The Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 35 days following the Petition Date, which Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated. |
| | (h)   The Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC shall be dismissed or the Bankruptcy Court shall have made a ruling requiring the dismissal of the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC , suspended or converted it to a case under chapter 7 of the Bankruptcy Code, or the Debtor shall file any pleading requesting any such relief; or a motion shall be filed by the Debtor for the approval of, or there shall arise, (x) any other claim having priority senior to or *pari passu* with the claims of the DIP Agent and the DIP Lenders or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out)or (y) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted in the Interim Order or the Final Order, except as expressly provided herein and in the Interim Order or the Final Order, as applicable. |
| | (i)   The Debtor shall file a motion in the Chapter 11 Case to obtain additional or replacement financing from a party other than DIP Lenders under Section 364(d) of the Bankruptcy Code or to use Cash Collateral of a DIP Lender under Section 363(c) of the Bankruptcy Code, except to the extent any such financing shall provide for the payment in full in cash of the DIP Obligations and the obligations under the Prepetition Loan Documents. |
| | (j)   The Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (A) approving payment of any prepetition claim other than (x) as provided for in (i) the First Day Orders or Second Day Orders or (ii) the Approved Budget or (y) otherwise consented to by the DIP Agent on behalf of  the DIP Lenders in writing, (B) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets with a fair market value in excess of $100,000; or (C) approving any settlement or other stipulation not approved by the DIP Agent on behalf of  the DIP Lenders in writing with any secured creditor providing for payments as adequate protection or otherwise to such secured creditor. |
| | (k)   An order shall be entered by the Bankruptcy Court without the express prior written consent of the DIP Agent on behalf of  the DIP Lenders (i) to revoke, reverse, stay, modify, supplement, vacate or amend the Interim Order or the Final Order in a manner inconsistent with this term sheet in a manner adverse to the DIP Lenders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the DIP Loans (other than the Carve-Out); or (iii) to grant or permit the grant of a Lien on the Collateral. |
| | (l)   An application for any of the orders described in clauses (h), (i), (j), (k), (n) and (r) shall be made by a Person other than the Debtor, and such application is not contested by the Debtor in good faith or any Person obtains a non-appealable final |

|  | order charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Lenders or obtains a final order adverse to the DIP Lenders. <br> (m)    The Debtor shall fail to comply with the terms and conditions of the Interim Order or the Final Order in any material respect, and such failure is not cured within two (2) Business Days of knowledge or notice thereof. <br> (n)    The Bankruptcy Court shall enter order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC or the Debtor shall file, or support, any pleading seeking such relief. <br> (o)    The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Debtor to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent on behalf of the DIP Lenders. <br> (p)    The Debtor shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor) any other Person's opposition of any motion made in the Bankruptcy Court by or on behalf of the DIP Lenders seeking confirmation of the amount of the DIP Lenders' claim or the validity and enforceability of the Liens in favor of the DIP Agent. <br> (q)    (A) The Debtor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor any other person's motion to, disallow in whole or in part the DIP Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the DIP Agent or contest any material provision of any Loan Document, (B) the Debtor shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the DIP Agent or the DIP Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, (C) any Liens on the Collateral and/or super-priority claims shall otherwise, for any reason, cease to be valid, perfected and enforceable in all respects, (D) any action is commenced by the Debtor  that contests the validity, perfection or enforceability of any of the Liens and security interests of the DIP Agent or the DIP Lenders created by the Interim Order or the Final Order, or (E) any material provision of the Interim Order or the Final Order shall cease to be effective. <br> (r)    Any judgments which are in the aggregate in excess of $100,000 as to any postpetition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed. <br> (s)    An order shall be entered by the Bankruptcy Court transferring venue of the Chapter 11 Case to any other court. |
|---|---|
| **Milestones:** | To be included in the Final Order. |

**B.**     **Additional Required Disclosures**

17.     Pursuant to Local Bankruptcy Rule 4001-2(a)(i), a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion of certain such provisions.  Set forth below are the disclosures required in accordance Local Bankruptcy Rule 4001-2(a)(i)(A)-(X) (many of which are also disclosed in Paragraph 16 of this Motion as set forth above):

(i)     Local Bankruptcy Rule 4001-2(a)(i)(A) requires a Debtors to disclose the amount of cash collateral the Debtors seeks permission to use or the amount of credit the Debtors seeks to obtain under the proposed loan agreement, including the committed amount of the proposed loan agreement and the amount of new funding that will actually be available for borrowing by the Debtors.

**Cash Collateral in the amount of approximately $483,000 would be used by the Debtors in accordance with the Budget.**

**New money DIP Loans total $ 5 million, of which $2.775 million would be available under the Interim Order, as set forth in the Recitals to the proposed Interim Order.**

(ii)     Local Bankruptcy Rule 4001-2(a)(i)(B) require the disclosure of pricing and economic terms, including letter of credit fees, commitment fees, and any other fees, provided that when any such terms are sought to be filed under seal, they shall not be disclosed in the Financing Motion itself, but shall be set forth in a separate document filed pursuant to the procedures set forth in Local Bankruptcy Rule 9018-1(d), the filing of which shall be disclosed in the Financing Motion.

**The economic terms of the DIP Loans are disclosed in the DIP Term Sheet. There are no terms sought to be filed under seal.**

(iii)     Local Bankruptcy Rule 4001-2(a)(i)(C) requires the disclosure of provisions that specifically limit the Court's power or discretion to enter future orders in the case.

**None.**

(iv)     Local Bankruptcy Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for the funding of non-Debtors affiliates with cash collateral or proceeds of the loan, as applicable, and the approximate amount of such funding.

**None.**

18

(v)      Local Bankruptcy Rule 4001-2(a)(i)(E) requires disclosure of material conditions to closing and borrowing, including budget provisions.

**The material conditions to borrowing are disclosed in DIP Term Sheet.**

(vi)      Local Bankruptcy Rule 4001-2(a)(i)(F) requires disclosure of any carve-outs from liens or superpriority claims, including the material terms of any professional fee carve-out.

**The provisions of the Carve-Out are disclosed in paragraph 16 of the proposed Interim Order.**

(vii)      Local Bankruptcy Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for postpetition liens on unencumbered assets, including the identification of such assets.

**The DIP Liens cover Unencumbered Property to the extent set forth in the DIP Term Sheet and paragraph 9 of the proposed Interim Order.**

(viii)      Local Bankruptcy Rule 4001-2(a)(i)(H) requires disclosure of provisions that establish any sale or plan milestones.

**Milestones are contemplated, but have not been agreed as yet and will be set forth in the proposed Final Order.**

(ix)      Local Bankruptcy Rule 4001-2(a)(i)(I) requires disclosure of provisions that provide for a prepayment penalty or other provisions that affect the Debtor's right or ability to repay the financing in full during the course of the chapter 11 case.

**None.**

(x)      Local Bankruptcy Rule 4001-2(a)(i)(J) requires disclosure of provisions, in jointly administered cases, that govern joint liability of the Debtors, including any provisions that would cause one jointly administered Debtors to become liable for the prepetition debt of another jointly administered Debtors for which it was not previously subject to.

**None for purposes of the proposed Interim Order.  To be determined as to the proposed Final Order.**

(xi)      Local Bankruptcy Rule 4001-2(a)(i)(K) requires disclosure of provisions that require the Debtors to pay an agent's or lender's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review by the Office of the United States Trustee, the committee appointed under section 1102 of the Bankruptcy Code (if formed) or, upon objection by either of the foregoing parties, the Court.

19

None.

(xii)     Local Bankruptcy Rule 4001-2(a)(i)(L) requires disclosure of provisions that prohibit the use of estate funds to investigate the liens and claims of the prepetition lender.

**None for purposes of the proposed Interim Order.  To be determined as to the proposed Final Order.**

(xiii)     Local Bankruptcy Rule 4001-2(a)(i)(M) requires disclosure of any termination or default provisions concerning the use of cash collateral or the availability of credit.

**The default and termination provisions are disclosed in paragraphs 17 and 20 of the proposed Interim Order.**

(xiv)     Local Bankruptcy Rule 4001-2(a)(i)(N) requires disclosure of any provisions that grant cross-collateralization protection or elevate prepetition debt to administrative expense (or higher) status or that secure prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

**There is a partial roll-up of the Prepetition Obligations contemplated in the proposed Final Order.**

(xv)     Local Bankruptcy Rule 4001-2(a)(i)(O) requires disclosure of any provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise have the effect of converting (or "rolling up") prepetition debt to postpetition debt.

**There is a partial roll-up of the Prepetition Obligations contemplated in the proposed Final Order.**

(xvi)     Local Bankruptcy Rule 4001-2(a)(i)(P) requires disclosure of any provisions that immediately prime valid, perfected and non-avoidable liens existing immediately prior to the petition date or that are perfected subsequent to the petition date as permitted by section 546(b) of the Bankruptcy Code, in each case that are senior to the lender's prepetition liens under applicable law, without the consent of the affected secured creditors, and the proposed notice to be provided to such affected secured creditors.

**The proposed DIP Orders do not provide for the priming of any pre-existing secured liens.**

(xvii)     Local Bankruptcy Rule 4001-2(a)(i)(Q) requires disclosure of any provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75)

20

days from the entry of the initial interim order to investigate such matters or (ii) limit the Court's ability to grant relief in the event of a successful challenge.

**None in the proposed Interim Order.   There are certain stipulations contemplated in favor of the Prepetition Secured Parties, subject to challenge, in the proposed Final Order, as set forth in the DIP Term Sheet.**

(xviii)     Local Bankruptcy Rule 4001-2(a)(i)(R) requires disclosure of any provisions that immediately approve all terms and conditions of the underlying loan agreement (provided that provisions in the order that provide that the Debtors is authorized to enter into and be bound by the terms and conditions of such loan agreement do not need to be summarized).

**The DIP Term Sheet and the authority of the Debtors to enter into the DIP Loans are approved upon entry of the Interim Order.**

(xix)     Local Bankruptcy Rule 4001-2(a)(i)(S) requires disclosure of any provisions that modify or terminate the automatic stay or permit the lender to enforce remedies following an event of default that do not require at least five (5) days' written notice to the trustee or Debtors in possession, the Office of the United States Trustee and each committee appointed under sections 1102 and 1114 of the Bankruptcy Code (the "Remedies Notice Period"), prior to such modification or termination of the automatic stay or the enforcement of the lender's remedies.

**None.   This requirement is met in the proposed Interim Order, as set forth in paragraphs 17 and 20 thereof.**

(xx)     Local Bankruptcy Rule 4001-2(a)(i)(T) requires disclosure of any provisions that seek to limit what parties in interest (other than the Debtors) may raise at any emergency hearing scheduled during the Remedies Notice Period.

**None.**

(xxi)     Local Bankruptcy Rule 4001-2(a)(i)(U) requires disclosure of any provisions that immediately grant to the prepetition secured creditor liens on the Debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code or, in each case, the proceeds thereof.

**Liens on the proceeds of avoidance actions are effective only upon entry of the proposed Final Order.**

(xxii)     Local Bankruptcy Rule 4001-2(a)(i)(V) requires disclosure of any provisions that immediately waive the Debtor's rights under section 506(c) of the Bankruptcy Code.

**None.   These provisions are subject to entry of the proposed Final Order.**

(xxiii) Local Bankruptcy Rule 4001-2(a)(i)(W) requires disclosure of any provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code.

**None. These provisions are subject to entry of the proposed Final Order.**

(xxiv) Local Bankruptcy Rule 4001-2(a)(i)(X) requires disclosure of any provisions that immediately shield the lender from the equitable doctrine of "marshalling" or any similar doctrine.

**None.** These provisions are subject to entry of the proposed Final Order.

## C. Need for Financing and Use of Cash Collateral

18. As noted above and in the First Day Declaration, AmeriFirst has an immediate and critical need to obtain the DIP Loans and use Cash Collateral (solely to the extent consistent with the Budget) to, among other things, (a) continue business operations; (b) make payroll; and (c) fund expenses of the Chapter 11 Cases. AmeriFirst does not have sufficient sources of working capital and financing to maximize value throughout the Chapter 11 Cases without access to the DIP Loans and authorized use of Cash Collateral. In the absence of the DIP Term Sheet and the use of Cash Collateral, AmeriFirst's business and estate would suffer immediate and irreparable harm. Without access to the DIP Loans and Cash Collateral, AmeriFirst would run out of money and its ability to maintain going concern value would evaporate.

19. As set out in the First Day Declaration, AmeriFirst is unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Term Sheet and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. AmeriFirst is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting the DIP Liens and the DIP Superpriority Claims (each as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in the Interim Order and the DIP Term Sheet.

22

## V.   BASIS FOR RELIEF

### A.   AmeriFirst Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code

20.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

21.     In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a.     unencumbered credit or alternative financing without superpriority status is available to the Debtors;

b.     the credit transactions are necessary to preserve assets of the estate;

c.     the terms of the credit agreement are fair, reasonable, and adequate;

d.     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the Debtors' estate and its creditors; and

e.     the proposed financing agreement adequately protects the DIP Lender.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

22.     To satisfy the standards of section 364 of the Bankruptcy Code, a debtor is not required to seek credit from every possible source: "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). Rather, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c). *Id.*; *see also In re Ames*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

23

Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

23.     There are no prohibitions in the Bankruptcy Code for an insider or an affiliate of an insider to make a debtor-in-possession loan. *See In re 495 Central Park Avenue Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (allowing priming debtor-in-possession loan from shareholders of the debtor); *Bland v. Farmworker Creditors* (*In re Bland*), 308 B.R. 109 (S.D. Ga. 2003) (recognizing that courts can approve post-petition loans from insiders).

24.     For the reasons discussed below and in the First Day Declaration, AmeriFirst satisfies the standards required to obtain postpetition financing in the Chapter 11 Cases on senior secured superpriority basis as to the DIP Collateral under sections 364(c)(1) and (2)of the Bankruptcy Code.

## B.     AmeriFirst is Unable to Obtain Financing on More Favorable Terms

25.     As discussed above and in the First Day Declaration, under the facts of these Chapter 11 Cases, AmeriFirst is unable to obtain postpetition financing from any other parties other than the Prepetition Lenders.  The DIP Term Sheet provides AmeriFirst with the only postpetition financing option available for the orderly maintenance of the its assets and should be approved by this Court.

26.     AmeriFirst respectfully submits that its efforts to obtain postpetition financing under the facts of these Chapter 11 Cases satisfy the standard required under section 364(c) of the Bankruptcy Code.  *See, e.g., In re Sky Valley, Inc.,* 100 at 113 (where few lenders can or will extend the necessary credit to a Debtors, "it would be unrealistic and unnecessary to require [the Debtors] to conduct such an exhaustive search for financing").

24

C.      **The Proposed DIP Loans are Necessary to Maximize the Value of the Estates**

27.     AmeriFirst seeks to use the DIP Loans to fund ordinary business expenses such as payroll, and bankruptcy-related costs and expenses, in accordance with the Budget, to maximize the value of these estates.  The DIP Term Sheet represents the best economic alternative for a new debtor in possession lending arrangement.

28.     As set forth in the First Day Declaration, AmeriFirst needs to continue to operate in the ordinary course, including satisfying payroll obligations, so as to maximize the value of its assets.  Failure to access the DIP Loans would irreparably damage AmeriFirst's efforts to effectuate an orderly Chapter 11 process for the benefit of all constituents.  Accordingly, the Debtors urge the Court to authorize the DIP Term Sheet and the DIP Loans on the terms contemplated herein.

D.      **The Terms of the Proposed DIP Term Sheet are Fair and Appropriate**

29.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

30.     The terms of the DIP Term Sheet were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets.  The Debtors submit that the proposed terms of the DIP Loans are fair, reasonable, and appropriate under the circumstances.  *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every

possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the Debtors' assets). Further, the Prepetition Lenders consent to the DIP Loans on the terms set forth in the DIP Term Sheet.

## E.     The Carve-Out is Appropriate

31.     The DIP Liens and adequate protection are subject and subordinate to the Carve-Out in all respects.

32.     The Carve-Out contains similar terms to others that this Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their advisors and other critical expenses. Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated are restricted. *See In re Ames Dep't Stores, Inc*., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of the U.S. Trustee fees and professional fees, among other expenses, notwithstanding the grant of superpriority claims and liens under the DIP Orders. Accordingly, the Carve-Out is appropriate and should be approved.

## F.     The DIP Lenders Should Be Deemed Good Faith Lenders

33.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

26

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

34.     Here, the Debtors believe the DIP Term Sheet embodies the most favorable terms on which AmeriFirst could obtain postpetition financing. As described in the First Day Declaration, negotiations of the terms of the DIP Facility with the DIP Lenders were conducted in good faith and at arms' length.  The terms and conditions of the DIP Term Sheet are fair and reasonable, and the proceeds of the DIP Loans will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the DIP Orders and the DIP Term Sheet, including the Budget.  Any consideration being provided to any of the DIP Lenders is described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**G.      The Proposed DIP Term Sheet Reflects AmeriFirst's Sound Business Judgment**

35.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

36.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  *See, e.g., Group of Inst. Investors v.*

27

*Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the Debtors); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."). Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

37.    Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Associates*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the Debtors). Generally courts will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

38.    For the reasons set forth above and in the First Day Declaration, AmeriFirst's sound business judgment clearly supports approval of the DIP Term Sheet. Access to the DIP Loans will allow AmeriFirst to continue to operate, thus maximizing value for all of their constituents.

**H.    Section 363 of the Bankruptcy Code Authorizes AmeriFirst's Use of Cash Collateral**

39.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or (B) the court approves the use of cash collateral after notice and a

28

hearing. *See* 11 U.S.C. § 363(c). Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtors in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

40.     Here, AmeriFirst seeks authority to use the Cash Collateral pursuant to the Budget and have sought approval of various forms of adequate protection in favor of the Prepetition Lenders, including adequate protection liens and superpriority claims on the DIP Collateral to the extent of any diminution. Importantly, the DIP Lenders and the Prepetition Lenders consent to the use of Cash Collateral on the terms set forth in the Interim Order and Final Order.

41.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a Final hearing." Bankruptcy Rule 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Simasko Production Co.*, 47 B.R. at 449; *see also In re Ames Dep't Stores Inc.,* 115 B.R. at 38. After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

42.     As previously noted, in order to continue operating and satisfying accruing administrative expenses, the Debtors require access to the DIP Loans and the use of Cash Collateral. Such use will provide AmeriFirst with the necessary funds to remain administratively solvent.

43.    Absent access to Cash Collateral, AmeriFirst would face immediate and irreparable harm.  AmeriFirst would be forced to cease operations and convert these Chapter 11 Cases to Chapter 7.  Jobs would be lost and substantial value destroyed.  Thus, immediate access to Cash Collateral is essential to the Debtors' ability to maximize value for the benefit of all constituents.

## I.    Interim Order and Final Hearing

44.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a Final Hearing within approximately thirty-five (35) calendar days of the commencement of the Chapter 11 Cases to consider approval of this Motion on a final basis.

45.    The urgent need to avoid immediate and irreparable harm to AmeriFirst's estates makes it imperative that AmeriFirst be authorized to access the DIP Loans and use Cash Collateral pending the Final Hearing, in order to allow the Debtors to operate and administer these Chapter 11 Cases on a postpetition basis.  Without the ability to make draws under the DIP Facility and use Cash Collateral, AmeriFirst would be unable to satisfy accruing postpetition obligations, including payroll, and would not be able to conduct a value-maximizing Chapter 11 process, thus causing irreparable harm to the AmeriFirst and its estates.  Accordingly, the Debtors respectfully request that, pending the Final Hearing, the Interim Order be approved and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## J.    Waiver of Bankruptcy Rule 6004(a) and 6004(h)

46.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a)

30

and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## VI.   NOTICE

47.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee, (b) the consolidated 30 largest unsecured creditors of the Debtors, (c) the Internal Revenue Service, (d) all parties who have filed requests prior to the date of service for notices under Rule 2002 of the Bankruptcy Rules, and (e) all parties known by a Debtor to hold or assert a lien on any asset of a Debtor.  As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered in respect to this Motion as required by Local Bankruptcy Rule 9013-1(m).

## VII.  NO PRIOR REQUEST

48.     The Debtors have not made any prior request for the relief sought herein to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, after Final Hearing, the Final Order, granting the relief requested herein and such other relief as is just and proper.

31

Dated: August 29, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        tcairns@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

DOCS_SF:109424.3 70786/001

**EXHIBIT 1**

**Proposed Interim Order**

Ex. A: DIP Term Sheet
Ex. B: Initial Budget

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | Case No. 23-11240 (TMH) |
| Debtors. | (Joint Administration Requested) |

### INTERIM ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

This matter is before the Court on the motion (the "Motion") of AmeriFirst Financial, Inc.

("AmeriFirst") and Phoenix 1040, LLC, as debtors and debtors in possession (collectively, the

"Debtors"), in these chapter 11 cases (the "Chapter 11 Cases"), requesting entry of an interim order

(this "Interim Order") and a final order (the "Final Order") pursuant to sections 105(a), 363, and

364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy

Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States

Bankruptcy Court for the District of Delaware (as amended, the "Local Bankruptcy Rules"):

(1) authorizing AmeriFirst to obtain postpetition financing from RCP Credit Opportunities

Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. ("DIP

Lenders"), consisting of a senior secured, superpriority term loan facility in the principal amount

of up to **$5,000,000** (the "DIP Loans") to be used for general liquidity purposes, including the

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers include:  Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557).  The Debtors' service address is 1550 McKellips Road, Suite 117, Mesa, AZ 85203.

payment of administrative expenses and estate professional fees, as described herein and in that certain *Binding DIP Term Sheet*, dated August 28, 2023, by and among the DIP Lenders, as lenders, RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., as agent (the "DIP Agent"), and AmeriFirst, as borrower (substantially in the form attached hereto as **Exhibit A**, as any time amended, the "DIP Term Sheet"), of which amount **$2,775,000** will be available on an interim basis (the "Interim Amount Limit") during the Interim Period (as defined below), on the terms and conditions set forth in the DIP Term Sheet and this Interim Order;

(2)     authorizing AmeriFirst to execute and enter into the DIP Term Sheet and to perform all such other and further acts as may be required in connection with the DIP Term Sheet;

(3)     authorizing AmeriFirst to use proceeds of the DIP Loans solely as expressly permitted in the DIP Term Sheet and in accordance with this Interim Order;

(4)     pursuant to Bankruptcy Code section 364, granting the DIP Agent for the benefit of the DIP Lenders security interests and liens as set forth in the DIP Term Sheet and this Interim Order and allowed superpriority administrative expense claims against AmeriFirst for the amounts advanced under the DIP Loans;

(6)     authorizing AmeriFirst to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Term Sheet as such amounts become due and payable;

(7)     granting adequate protection to the Prepetition Lenders (as defined below) as set forth in the DIP Term Sheet and this Interim Order;

(8)     scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the Motion; and

(9)     granting the Debtors such other and further relief as is just and proper.

Based upon the Court's review of the Motion, the exhibits attached thereto, the *Declaration of T. Scott Avila in Support of First Day Motions* (the "First Day Declaration") and all matters brought to the Court's attention at the interim hearing, which was held on August [___], 2023, pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) (the "Interim Hearing"), and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, AND ADJUDGED,** that:[2]

1.  Disposition.   The Motion is hereby GRANTED, as and to the extent provided herein.  Any and all objections to the relief requested in the Motion, to the extent not otherwise withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

2.  Jurisdiction; Core Proceeding.     This Court has jurisdiction over the Chapter 11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C.  § 1334.  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.  Service of Motion and Notice of Interim Hearing.    The Debtors have caused to be served a notice of the Motion and the Interim Hearing, including a copy of the proposed Interim Order and Budget (as defined below), by electronic mail, telecopy transmission, hand delivery, overnight courier, or first class United States mail upon the Office of the United States Trustee (the "U.S. Trustee"), the consolidated 30 largest unsecured creditors of the Debtors, the Internal Revenue Service, all parties who have filed requests prior to the date of service for notices under Rule 2002 of the Bankruptcy Rules, and all parties known by a Debtor to hold or assert a lien on any asset of a Debtor.  The foregoing notice of the Motion, as it relates to this Interim Order and

---

[2]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

the Interim Hearing, is appropriate, due, and sufficient under the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b), (c) and (d), and that no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.     <u>Petition Date</u>.  On August 24, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed with the Court its respective voluntary petition for relief under chapter 11 of the Bankruptcy Code, and each is continuing to manage its properties and to operate its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed for any Debtor herein.

5.     <u>AmeriFirst's Stipulations</u>.  Without prejudice to the rights of any other party, AmeriFirst admits, stipulates, acknowledges, and agrees as follows:

a.     <u>Need for Financing</u>.  An immediate and ongoing need exists for AmeriFirst to obtain the DIP Loans in order to permit, among other things, the orderly operation of its business and the satisfaction of administrative expense claims.  AmeriFirst does not have sufficient available resources of working capital to maintain its assets without postpetition financing.  AmeriFirst's ability to maintain going concern value is essential to its preservation of the value of its assets for the benefit of all stakeholders.

b.     <u>Prepetition Credit Facility</u>. Pursuant to that certain *Amended and Restated Credit and Security Agreement*, dated as of May 15, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "<u>Prepetition Credit Agreement</u>", collectively with all other agreements, documents, and instruments executed or delivered in connection therewith, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and fee letters, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date the "<u>Prepetition Loan Documents</u>", and the credit facilities evidenced thereby, collectively, the "<u>Prepetition Credit Facility</u>") among (a) AmeriFirst Financial, Inc., as borrower (the "<u>Prepetition Borrower</u>"), (b) RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., as agent (the "<u>Prepetition Agent</u>"), (c) RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P.

as lenders (the "<u>Prepetition Lenders</u>" and together with the Prepetition Agent, the "<u>Prepetition Secured Parties</u>"), the Prepetition Borrower incurred "Obligations" (as defined in the Prepetition Credit Agreement, the "<u>Prepetition Loans</u>" and with other obligations, the "<u>Prepetition Secured Obligations</u>") and the Prepetition Borrower is indebted to the Prepetition Secured Parties as set forth in the Prepetition Credit Facility.

c.   <u>Prepetition Secured Obligations</u>.  As of the Petition Date, the Prepetition Borrower was validly, justly and lawfully indebted and liable to the Prepetition Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for (x) not less than $15,798,087 in outstanding principal amount of Loans (as defined in the Prepetition Credit Agreement) plus accrued and unpaid interest thereon, and (y) any fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, financial advisors' fees, and fees of other consultants and professionals), costs, charges, indemnities, and other Prepetition Secured Obligations in each case incurred under (or reimbursable pursuant to) or secured by the Prepetition Loan Documents.

d.   <u>Validity of Prepetition Secured Obligations</u>.  Subject to entry of the Final Order, AmeriFirst stipulates that the Prepetition Obligations under Prepetition Loan Documents constitute legal, valid, binding, and non-avoidable obligations of AmeriFirst in accordance with the respective terms of the relevant Prepetition Loan Documents, and no portion of the Prepetition Obligations or any payment made to the Prepetition Lenders or applied to or paid on account thereof prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action  including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law.   The Prepetition Protective Advances (as defined in the DIP Term Sheet) shall be deemed "Protective Advances" under the Prepetition Loan Documents.

e.   <u>Validity, Perfection and Priority of Prepetition Liens</u>.  Subject to entry of the Final Order, AmeriFirst stipulates that, as of the Petition Date, pursuant to the Prepetition Loan Documents, AmeriFirst granted for the benefit of the Prepetition Lenders, a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on (the "<u>Prepetition Liens</u>") substantially all of its assets and property as set forth in the Prepetition Loan Documents (the "<u>Prepetition Collateral</u>"), subject

only to any liens permitted by the Prepetition Loan Documents to be senior to the Prepetition Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition Permitted Senior Liens").

f.   Waiver of Challenge and Challenge Period.   AmeriFirst's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon it in all circumstances and for all purposes.   AmeriFirst's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of AmeriFirst's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for AmeriFirst, in all circumstances and for all purposes unless: (a) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than the later of (x) 21 calendar days after entry of the Final Order and (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 21 calendar days after entry of a Final Order, or (B) the date that is 30 calendar days after their appointment; or any such later date as has been agreed to in writing by the Prepetition Lenders or has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (x)-(y) the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or (B) asserting or prosecuting any avoidance action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Prepetition Lenders in connection with or related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; provided, however, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.   If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of

the plaintiff in any such Challenge, then: (1) AmeriFirst's stipulations, admissions, agreements and releases contained in the Final Order shall be binding on all parties in interest; (2) the obligations of AmeriFirst under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in this case and any Successor Case; (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party in interest acting or seeking to act on behalf of AmeriFirst's estate, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 case or any other party acting or seeking to act on behalf of AmeriFirst's estate, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of Prepetition Lenders shall be deemed forever waived, released and barred. If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in the Final Order will vest or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to AmeriFirst or its estate, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Loans or Prepetition Liens, and any ruling on standing,

if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in the Chapter 11 Case.

g. <u>No Control</u>.  None of the Prepetition Secured Parties or the DIP Secured Parties control (or have in the past controlled) AmeriFirst or its respective properties or operations, have authority to determine the manner in which AmeriFirst's operations are conducted or are control persons or insiders of AmeriFirst by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Loan Documents;

h. <u>No Claims or Causes of Action</u>.  No claims or causes of action held by AmeriFirst or its estate exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined below), in each case, in their capacity as such, under or relating to any agreements by and among AmeriFirst and any Prepetition Secured Party that is in existence as of the Petition Date.

6. <u>Findings Regarding the DIP Loan</u>.

a. <u>Good Cause</u>.  Good cause has been shown for the entry of this Interim Order and authorization for AmeriFirst to incur DIP Obligations (as defined below) pursuant to the DIP Term Sheet as hereinafter provided up to the Interim Amount Limit during the Interim Period. AmeriFirst's need for financing of the type afforded by the DIP Term Sheet is immediate and critical.  Entry of this Interim Order will preserve the assets of AmeriFirst's estate and its value for the benefit of all stakeholders and is in the best interests of AmeriFirst, its creditors, and its estate.  The terms of the proposed financing are fair and reasonable, reflect AmeriFirst's exercise of business judgment, and are supported by reasonably equivalent value and fair consideration.

b. <u>Proposed DIP Loan</u>. AmeriFirst has requested that the DIP Lenders fund the DIP Loans from time to time (collectively with all other debts, obligations, liabilities, and indemnities of AmeriFirst under the DIP Term Sheet, the "<u>DIP Obligations</u>"), all in accordance with and subject to the terms of the DIP Term Sheet.  The DIP Lenders are willing to advance the DIP Loans upon the terms and conditions set forth herein and in the DIP Term Sheet.

c. <u>No Credit Available on More Favorable Terms</u>.    The terms of the DIP Term Sheet are favorable and it is unlikely that better terms could otherwise be obtained.  AmeriFirst is also unable to obtain unsecured credit allowable under Section 364(c)(1) of the Bankruptcy Code without granting liens and superpriority claims in

favor of the DIP Lenders under the terms and conditions set forth in this Interim Order and in the DIP Term Sheet.

d.   <u>Budget/Reporting</u>.   AmeriFirst has prepared and annexed to this Interim Order as **<u>Exhibit B</u>** hereto a budget (as at any time amended or supplemented with the written consent of the DIP Agent, the "<u>Budget</u>"), which sets forth, among other things, the projected disbursements for the period covered thereby and which AmeriFirst believes in good faith to be realistic and achievable.  The DIP Agent and the DIP Lenders are relying upon the Budget in entering into the DIP Term Sheet.  As set forth in the DIP Sheet, AmeriFirst is required to deliver certain ongoing reports to the DIP Agent and the DIP Lenders showing actual disbursements compared to the Budget, subject to certain Permitted Variance (as defined in the DIP Term Sheet).

e.   <u>Certain Conditions to DIP Loan</u>.   The DIP Lenders' willingness to make DIP Loans pursuant to the DIP Term Sheet is conditioned upon, among other things, (i) AmeriFirst obtaining Court approval of the DIP Term Sheet and all DIP Obligations of AmeriFirst and all rights and remedies of the DIP Agent and the DIP Lenders thereunder; and (ii) the DIP Agent and the DIP Lenders receiving, as a benefit for the prompt payment of all DIP Obligations, certain liens and superiority claims as set forth herein.

f.   <u>Interim Hearing</u>.   Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Bankruptcy Rule 4001-2, the Court has held the Interim Hearing and hereby authorizes AmeriFirst to obtain DIP Loans during the period from the date of entry of this Order through the date on which the final hearing on the Motion pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) scheduled pursuant to this Interim Order is concluded (the "<u>Interim Period</u>"), for purposes specified in the initial Budget.

g.   <u>Finding of Good Faith</u>.   Based upon the record presented at the Interim Hearing, the DIP Term Sheet was negotiated in good faith and at arm's-length between AmeriFirst , the DIP Agent, and the DIP Lenders.  All of the DIP Obligations including, without limitation, the DIP Loans made pursuant to the DIP Term Sheet and all other liabilities and obligations of AmeriFirst under this Interim Order owing to the DIP Agent and the DIP Lenders shall be deemed to have been extended by the DIP Lenders in "good faith," as such term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code.  The DIP Agent and the DIP Lenders shall be entitled to the full protection of Section 364(e) of the Bankruptcy

Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

h.  <u>Immediate Entry</u>.      AmeriFirst has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the interim relief sought by the Motion, AmeriFirst's estate will be immediately and irreparably harmed pending the Final Hearing.  AmeriFirst's consummation of the DIP Loans in accordance with the terms of this Interim Order and the DIP Term Sheet is in the best interest of AmeriFirst's estate and is consistent with AmeriFirst's exercise of its fiduciary duties.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules.  No further notice of the relief sought at the Interim Hearing is necessary or required.

7.  <u>Authorization of Interim Financing; Use of Proceeds</u>.

a.  The Court hereby authorizes and approves AmeriFirst's execution and delivery of the DIP Term Sheet in substantially the form annexed hereto (with such changes, if any, as were made prior to or as a result of the Interim Hearing or are otherwise authorized to be made as amendments to the DIP Term Sheet in accordance with this Interim Order).

b.  AmeriFirst is hereby authorized to borrow money pursuant to the DIP Term Sheet, on the terms and subject to the conditions, set forth in any DIP Loan Document and this Interim Order, up to an aggregate outstanding principal amount at any time not exceeding the sum of **$2,775,000**, plus applicable interest, expenses, fees and other charges payable in connection with such DIP Loans, and to incur any and all liabilities and obligations under the DIP Term Sheet and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Term Sheet.

c.  The DIP Agent and the DIP Lenders shall not have any obligation or responsibility to monitor AmeriFirst's use of the DIP Loans, and the DIP Agent and the DIP Lenders may rely upon AmeriFirst's representations that the amount of DIP Loans requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the DIP Term Sheet, and Bankruptcy Rule 4001(c)(2).

d.  Proceeds of any DIP Loans shall be used in accordance with the DIP Term Sheet.

8. <u>Execution, Delivery and Performance of DIP Term Sheet</u>. The DIP Term Sheet may be executed and delivered on behalf of AmeriFirst by any officer, director, or agent of such Debtor, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute the DIP Term Sheet for and on behalf of such Debtor. The DIP Agent and the DIP Lenders shall be authorized to rely upon any such person's execution and delivery of the DIP Term Sheet as having been done with all requisite power and authority to do so, and the execution and delivery of any of the DIP Term Sheet or amendments thereto by any such person on behalf of AmeriFirst shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company, or other entity action (as applicable) of such Debtor. Upon execution and delivery thereof, the DIP Term Sheet shall constitute a valid and binding obligation of AmeriFirst, enforceable against such Debtor in accordance with their terms for all purposes during its Chapter 11 Case, and any subsequently converted case of such Debtor under Chapter 7 of the Bankruptcy Code (each, a "<u>Successor Case</u>"). No obligation, payment, or transfer under the DIP Term Sheet or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under Sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim. AmeriFirst is authorized to do and perform all acts: to make, execute and deliver all instruments and documents (including, without limitation, amendments, waivers, consents, and other modifications) and to pay all reasonable fees, costs and expenses in each case as may be necessary or, in the reasonable opinion of the DIP Agent and the DIP Lenders, desirable to give effect to any of the terms and conditions of the DIP Term Sheet, to validate the perfection of the

DIP Liens (as defined below), or as may otherwise be required or contemplated by the DIP Term Sheet.

9.      <u>DIP Liens</u>.   As security for the DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any collateral, without any further action by the DIP Lenders, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "<u>DIP Liens</u>") will be granted to the DIP Agent for the benefit of the DIP Lenders (all property identified below being collectively referred to as the "<u>DIP Collateral</u>," and, together with the Prepetition Collateral (as defined below), the "<u>Collateral</u>"), subject to and junior in all respects to the Carve-Out:

(a)     *Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of AmeriFirst whether existing on the Petition Date or thereafter acquired, including, without limitation, AmeriFirst's mortgage servicing rights (to the extent such rights are unencumbered property) and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than avoidance actions and the Carve-Out, but including, upon and subject to entry of the Interim Order, proceeds of avoidance actions (collectively, the "<u>Unencumbered Property</u>").

(b)      *Liens Junior to Certain Other Liens on Encumbered Property.*  Pursuant to section

364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully

perfected security interest in and lien upon all tangible and intangible prepetition

and postpetition property of AmeriFirst that, on or as of the Petition Date, is subject

to and junior in all respects to the Prepetition Liens and the liens or security interests

permitted under the Prepetition Loan Documents (as defined below) (the

"Prepetition Permitted Senior Liens"), which Collateral (the "Encumbered

Property") shall be subject to such Prepetition Liens and Prepetition Permitted

Senior Liens.  For the avoidance of doubt, the valid and enforceable interests of

providers of warehouse credit facilities in mortgage loans and related documents

existing as of the Petition Date (the "Prepetition Warehoused Mortgage Loans

Collateral") shall be deemed Prepetition Permitted Senior Liens and the Prepetition

Warehoused Mortgage Loans Collateral shall be deemed Encumbered Property.

10.      DIP Superpriority Claims.      All DIP Obligations shall constitute joint and

several allowed superpriority administrative claims (the "DIP Superpriority Claims") AmeriFirst

for all DIP Obligations under the DIP Term Sheet (without the need to file any proof of claim)

pursuant to Section 364(c)(1) of the Bankruptcy Code having priority in right of payment over all

other obligations, liabilities, and indebtedness of AmeriFirst, whether now in existence or hereafter

incurred by such Debtor, and over any and all administrative expenses of the kind specified in

sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses

or other claims arising under Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to

entry of the Final Order approving the grant), 507, 546(c), 552(b) 726, 1113 or 1114 of the

Bankruptcy Code.  Such DIP Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of

the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the

Bankruptcy Code and shall be payable from and have recourse to all prepetition and postpetition

property of AmeriFirst and all proceeds thereof; *provided*, *however*, that the DIP Superpriority

Claims shall be subject to the Carve-Out (as defined below) and shall not be payable from the

proceeds of avoidance actions pending entry of the Final Order.

11.     <u>Adequate Protection</u>.    The Prepetition Loans provided to AmeriFirst by the

Prepetition Lenders are entitled to adequate protection.  The Prepetition Obligations arise under

the Prepetition Loan Documents.  The Prepetition Lenders assert that, as of the Petition Date,

pursuant to the Prepetition Loan Documents, AmeriFirst granted for the benefit of the Prepetition

Lenders, valid, binding, properly perfected, enforceable, non-avoidable first priority Prepetition

Liens on the Prepetition Collateral, subject only to any liens permitted by the Prepetition Loan

Documents to be senior to the Prepetition Liens.  Pursuant to sections 361, 362, 363(e), 364(d)(1)

and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the

Prepetition Collateral (including Cash Collateral) for the aggregate diminution in value of such

interests (including from the amount of any Cash Collateral used by AmeriFirst) (the "<u>Diminution</u>

<u>in Value</u>") (if any) and as an inducement to the Prepetition Lenders to consent to the use of their

Cash Collateral, the Prepetition Lenders are granted the following Adequate Protection

(collectively, the "<u>Adequate Protection Obligations</u>"), subject to and junior in all respects to the

DIP Obligations and the Carve-Out:

     (a)     The Prepetition Lenders, effective and perfected upon the date of this Interim Order

and without the necessity of the execution of any mortgages, security agreements,

pledge agreements, financing statements or other agreements, a valid, perfected

replacement security interest in and lien on account of the Prepetition Lenders'

Diminution in Value (if any) upon all of the DIP Collateral, subject to and junior in all respects to the DIP Liens and the Carve-Out; and

(b)    The Prepetition Lenders shall be granted allowed superpriority administrative expense claims against AmeriFirst (without the need to file any proof of claim) on account of the Prepetition Lenders' Diminution in Value (if any) under section 507(b) of the Bankruptcy Code (the "Prepetition Lender 507(b) Claims"), which Prepetition Lender 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding avoidance actions, but including upon entry of the Final Order, without limitation, proceeds of avoidance actions). Except as otherwise provided in the Interim Order or the Final Order and subject to and junior in all respects to the DIP Superpriority Claims (as defined below) and the Carve-Out, the Prepetition Lender 507(b) Claims shall have priority over any and all administrative expenses and all other claims against AmeriFirst now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

12.    Repayment.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Term Sheet and as provided herein, without offset or counterclaim. Without limiting the generality of the foregoing, in no event shall AmeriFirst be authorized to offset or recoup any amounts owed, or allegedly owed, by the DIP Agent or the DIP Lenders to AmeriFirst against any of the DIP Obligations without the prior written consent of the DIP Agent

or the DIP Lenders that would be affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders.

13.     <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to the DIP Agent or the DIP Lenders shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order approving the grant) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

14.     <u>Fees and Expenses of Estate Professionals; Professional Fee Reserve</u>.  Subject to the terms of the DIP Term Sheet and the Budget, for so long as no Event of Default has occurred, AmeriFirst is authorized to use the DIP Loans or Cash Collateral to fund, on a weekly basis as set forth in the Budget, the trust account of the Debtors' general bankruptcy counsel (the "<u>Professional Fee Reserve</u>") for the purpose of reserving sufficient funds to pay the compensation and expense reimbursement (collectively, "<u>Professional Fees</u>") of estate professional persons (including attorneys, financial advisors, accountants, investment bankers, claims and/or noticing agents, appraisers, and consultants) retained by any Debtor with Court approval or as an ordinary course professional (the "<u>Debtors Professionals</u>") or any official committee appointed in the Chapter 11 Cases (the "<u>Committee</u>") with Court approval (the "<u>Committee Professionals</u>," collectively with the Debtors Professionals, the "<u>Professionals</u>"), up to the amounts set forth for each Professional in the Budget; *provided*, *however*, that, notwithstanding anything herein or in any other order of this Court to the contrary, no proceeds of the DIP Loans or Cash Collateral shall be used to pay Professional Fees incurred for any Prohibited Purpose (as defined below).  The funds in the Professional Fee Reserve shall remain subject to the liens and claims of the DIP Agent and the

DIP Lenders.  Any excess funds in the Professional Fee Reserve after payment of Professional

Fees shall be returned to AmeriFirst, subject to the liens and claims of the DIP Agent and the DIP

Lenders.

15.     <u>Section 506(c) Claims</u>.  Effective upon entry of the Final Order, no costs or

expenses of administration shall be imposed upon the DIP Agent or the DIP Lenders pursuant to

Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP

Agent or the DIP Lenders from the payments or proceeds remitted to the DIP Agent or the DIP

Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the

DIP Agent or the DIP Lenders, provided that the Carve-Out is fully funded by AmeriFirst.

16.     <u>Carve-Out</u>.  Notwithstanding anything in this Interim Order, the DIP Term Sheet,

or any other order of this Court to the contrary, the DIP Obligations and the DIP Superpriority

Claims in favor of the DIP Agent and the DIP Lenders and the Prepetition Liens and Adequate

Protection Obligations in favor of the Prepetition Lenders shall be subject and subordinate in all

respects to the payment of the following Carve-Out.  As used in this Interim Order, the "<u>Carve-

Out</u>" means, collectively, the aggregate amount needed to satisfy (i) accrued but unpaid fees, costs,

and expenses of the professionals of the Debtors and the Committee incurred at any time prior to

the DIP Agent's or DIP Lenders' delivery of a Carve-Out Trigger Notice (as defined below), up

to the aggregate amounts set forth for each Professional in the Budget for such time period and

only to the extent allowed by the Bankruptcy Court, (ii) professional fees, costs and expenses of

the Debtors and the Committee incurred after delivery of a Carve-Out Trigger Notice not to exceed

$250,000 with respect to the Professionals, to the extent allowed by the Bankruptcy Court, (iii) the

fees and expenses payable pursuant to 28 U.S.C. § 1930, (iv) any fees, costs, and expenses of a

Chapter 7 trustee or their professionals up to $50,000 in the aggregate if either of the Chapter 11

Cases is converted to Chapter 7, and (iv) accrued but unpaid obligations to AmeriFirst's employees, including payroll, commissions, and benefits, due and owing under the Budget through the date of the Carve-Out Trigger Notice; *provided*, that nothing in this Interim Order shall be construed to impair the ability of any party to object to the fees, expenses, reimbursements or compensation of any Professional, whether or not in excess of the coverage provided by the Carve-Out. The Carve-Out shall not act as a cap on the Professional Fees that may be incurred by Professionals in the Chapter 11 Cases. In no event shall the Carve-Out, or the funding of the DIP Loans or the use of Cash Collateral to satisfy the Carve-Out, result in any reduction in the amount of the DIP Obligations. "Carve-Out Trigger Notice" means written notice by the DIP Agent or the DIP Lenders to the Debtors, any Committee, and the Office of the U.S. Trustee invoking the Carve-Out, which notice may be delivered at any time after the occurrence, and during the continuation, of an Event of Default.

17. <u>Excluded Professional Fees</u>. Notwithstanding anything to the contrary in this Interim Order, neither the Carve-Out, nor the proceeds of the DIP Loans or the Cash Collateral in any respect, shall be used to pay any Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following (each a "Prohibited Purpose"): (a) objecting to or contesting the validity or enforceability of this Interim Order or any DIP Loan; (b) asserting or prosecuting any claim or cause of action against the DIP Agent or the DIP Lenders, other than to enforce the terms of the DIP Term Sheet or this Interim Order; (c) seeking to modify any of the rights granted under this Interim Order to the DIP Agent or the DIP Lenders; or (d) objecting to, contesting, delaying, preventing or interfering in any way with the exercise of rights and remedies by the DIP Agent or the DIP Lenders after the occurrence and during the continuance of an Event of Default, *provided*, that the DIP Agent and the DIP Lenders may not seek to exercise

remedies, and the Debtors may seek appropriate relief from this Court, during the period of five

(5) business days following the delivery of a Carve-Out Trigger Notice.

18. <u>Preservation of Rights Granted Under This Interim Order</u>.

a. <u>Protection from Subsequent Financing Order</u>. There shall not be entered in any of the Chapter 11 Cases or in any Successor Case any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that is entitled to a security interest in any of the Debtors' assets or priority administrative status that is equal or senior to the DIP Liens and DIP Superpriority Claims granted to the DIP Agent and the DIP Lenders herein; *provided*, *however*, that nothing herein shall prevent the entry of an order that specifically provides for the full payment of all of the DIP Obligations, in the manner required by the DIP Term Sheet, from the proceeds of such credit or indebtedness, and the termination of any funding commitments under the DIP Term Sheet.

b. <u>Rights Upon Dismissal, Conversion or Consolidation</u>. If any of the Chapter 11 Cases are dismissed, converted or substantively consolidated with another case, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of any of the Chapter 11 Cases shall affect the rights or remedies of the DIP Agent or the DIP Lenders under the DIP Term Sheet or the rights or remedies of the DIP Agent or the DIP Lenders under this Interim Order, and all of the respective rights and remedies hereunder and thereunder of the DIP Agent and the DIP Lenders shall remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, or substantively consolidated. Unless and until full payment of all DIP Obligations has occurred, it shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 Cases. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Liens and DIP Superpriority Claims shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until full payment of all DIP Obligations, (ii) such DIP Liens and DIP Superpriority Claims shall, notwithstanding such dismissal, remain binding on all parties in interest, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph and otherwise in this Interim Order.

c. <u>Survival of Interim Order</u>. The provisions of this Interim Order, and any actions taken pursuant hereto, shall survive the entry of and shall

govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases or any Successor Case.

d.      No Discharge.  None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, AmeriFirst has waived such discharge.

e.      No Requirement to File Claim for DIP Obligations. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar date order establishing a deadline for the filing of proofs of claim entitled to administrative expense treatment under Section 503(b) of the Bankruptcy Code, the DIP Agent and the DIP Lenders shall not be required to file any proof of claim with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Term Sheet without the necessity of filing any such proof of claim; and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Term Sheet or prejudice or otherwise adversely affect any rights, remedies, powers or privileges of the DIP Agent and the DIP Lenders under any of the DIP Term Sheet or under this Interim Order.

19.      Amendments to DIP Term Sheet.  AmeriFirst, the DIP Agent, and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Term Sheet and without further order of the Court, any amendments to and modifications of any of such DIP Term Sheet on the following conditions: (a) the amendment or modification must not constitute a Material Change (as defined below) to the terms of such DIP Term Sheet and (b) copies of the amendment or modification must be served upon counsel for the Committee, the U.S. Trustee, and other interested parties specifically requesting such notice.  Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court.  For purposes hereof, a "Material Change" shall mean a change that operates to reduce the DIP Loans or the maturity of the DIP Obligations, to increase the aggregate amount of the commitments of the DIP Lenders under the DIP Term Sheet, to increase the rate of interest other than as currently provided in or

contemplated by the DIP Term Sheet, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the DIP Agent or the DIP Lenders following the occurrence of an Event of Default.  Without limiting the generality of the foregoing, any amendment of the DIP Term Sheet to postpone or extend any date or deadline therein (including, without limitation, the expiration of the term of the DIP Loans) shall not constitute a Material Change and may be effectuated by AmeriFirst and the DIP Agent or the DIP Lenders without the need for further approval of the Court.

20.     <u>Maturity and Repayment</u>.  The DIP Loans shall mature and be repaid as set forth in the DIP Term Sheet.

21.     <u>Events of Default; Remedies</u>.

a.      <u>Events of Default</u>.     The occurrence of any "Event of Default" under (and as defined in) the DIP Term Sheet shall constitute an Event of Default under this Interim Order.  The term "Change of Control" as used in the DIP Term Sheet shall mean that Phoenix 1040 LLC ceases to be sole owner of the equity interests in AmeriFirst Financial, Inc.

b.      <u>Default Remedies</u>.     Upon the occurrence and during the continuance of any Event of Default, the DIP Agent and the DIP Lenders may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court) by written notice to the Debtors, any Committee, and the Office of the U.S. Trustee (a) send the Carve-Out Trigger Notice and (b) declare (i) the unpaid principal amount of and accrued interest on the DIP Loans and (ii) all other DIP Obligations, immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by AmeriFirst, and the same shall forthwith become immediately due and payable, and the obligation of the DIP Lenders to make any DIP Loans shall thereupon terminate.  Upon the occurrence and during the continuance of any Event of Default and following the delivery of a Carve-Out Trigger Notice, the DIP Agent and the DIP Lenders shall be required to obtain the authority of this Court to exercise any rights and remedies of the DIP Agent and the DIP Lenders set forth in the DIP Term Sheet or in this Interim Order.

      c.    <u>Rights Cumulative</u>.    The rights, remedies, powers, and privileges conferred upon the DIP Agent and the DIP Lenders pursuant to this Interim Order shall be in addition to and cumulative with those contained in the DIP Term Sheet.

22.    <u>Effect of Stipulations on Third Parties; Deadline for Challenges</u>.  AmeriFirst's admissions, stipulations, agreements, and releases contained in this Interim Order shall be binding upon such Debtor and any successor thereto (including, without limitation any Chapter 7 trustee or Chapter 11 trustee or examiner appointed or elected for such Debtor) under all circumstances and for all purposes.

23.    <u>Service of Interim Order</u>.  Promptly after the entry of this Interim Order, the Debtors shall mail, by first class mail, a copy of this Interim Order, the Motion (and all exhibits attached to the Motion), and a notice of the Final Hearing, to (without duplication) counsel for the DIP Agent and the DIP Lenders, the U.S. Trustee, the Debtors' consolidated thirty largest unsecured creditors, the Internal Revenue Service, all parties who have filed requests for notices under Rule 2002 of the Bankruptcy Rules prior to the time of such service, and all parties known by a Debtor to hold or assert a lien on any assets of a Debtor, and shall file a certificate of service regarding same with the Clerk of the Court.  Such service shall constitute good and sufficient notice of the Final Hearing and the relief sought by the Debtors pursuant to the proposed Final Order.

24.    <u>No Deemed Control</u>.  In determining to make the DIP Loans, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the Final Order, or the DIP Term Sheet, the DIP Agent and the DIP Lenders shall not be deemed to be in control of any Debtor or its operations.

25.    <u>Exculpation</u>.  Nothing in this Interim Order, the DIP Term Sheet, or any other document related to the DIP Loans shall in any way be construed or interpreted to impose or allow

the imposition upon the DIP Agent or the DIP Lenders any liability for any claims arising from the prepetition or postpetition activities of any Debtor in the operation of its business or in connection with its restructuring efforts.

26.     <u>Binding Effect; Successors and Assigns</u>.  The provisions of the DIP Term Sheet and this Interim Order, including all findings, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Debtors, the Committee, and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed for the estate of any Debtor, any Chapter 7 trustee appointed or elected in a Successor Case, any examiner appointed pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any Debtor or with respect to the property of the estate of any Debtor), and shall inure to the benefit of DIP Agent and the DIP Lenders and their respective successors and assigns.

27.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order shall be held [at __:00 o'clock __.m., prevailing Eastern time on September ____, 2023, at Courtroom__], United States Bankruptcy Court, 824 Market Street North, Wilmington, Delaware 19801.  The Final Hearing may be adjourned or postponed without further notice except as may be announced in open Court or posted on the Court's docket.  If any or all of the provisions of this Interim Order are modified, vacated, or stayed as the result of any Objection (as defined below) timely filed and asserted at the Final Hearing, then any DIP Obligations incurred prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent and the DIP Lenders shall be entitled to the protections afforded under Section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and

benefits, including, without limitation, the DIP Liens and DIP Superpriority Claims granted herein and pursuant to the DIP Term Sheet with respect to all such DIP Obligations.

28.    <u>Objection Deadline</u>.  If any party in interest shall have an objection to any of the provisions of this Interim Order, any provisions of the DIP Term Sheet, or any provisions of the proposed Final Order (collectively, an "<u>Objection</u>"), such party may assert such Objection at the Final Hearing, if a written statement setting forth the basis for such Objection is filed with the Court and concurrently served so as to be received on or before ___:00 _.m., prevailing Eastern time on _____, 2023, by the following: (a) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (b) counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, Attn.: Laura Davis Jones, 919 North Market Street, 17th Floor, Wilmington, DE 19801, email: ljones@pszjlaw.com; and (c) counsel for the DIP Agent and the DIP Lenders, Quinn Emanuel Urquhart & Sullivan, LLP, Attn.: Patricia B. Tomasco, 711 Louisiana Street, Suite 500, Houston, TX 77002 and Quinn Emanuel Urquhart & Sullivan, LLP, Attn.: Bennett Murphy, 51 Madison Avenue, 22nd Floor, New York, New York 10010; email: pattytomasco@quinnemanuel.com, bennettmurphy@quinnemanuel.com. If an objecting party shall fail to appear at the Final Hearing and assert the basis for such Objection before the Court, such Objection shall be deemed to have been waived and abandoned by such objecting party.

29.    <u>Effectiveness; Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim

Order; and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

30.     <u>Retention of Jurisdiction</u>.    This Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for AmeriFirst notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

31.     <u>Inconsistencies</u>.    To the extent of any inconsistencies or conflicts between this Interim Order and the DIP Term Sheet, this Interim Order shall govern.

Dated:          _____, 2023
                Wilmington, Delaware



                              _____
                              UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## DIP Term Sheet

# AMERIFIRST FINANCIAL, INC.
## BINDING DIP TERM SHEET DATED AUGUST 28, 2023[1]

| | |
|---|---|
| **Borrowers:** | AmeriFirst Financial, Inc. as debtor-in-possession (the "<u>Debtor</u>") |
| **DIP Credit Facility:** | Maximum available on entry of the Interim Order: $2,775,000<br>Maximum available upon entry of the Final Order: $5,000,000<br><br>The DIP Credit Facility is a senior secured, superpriority term loan facility.<br><br>Amounts repaid under the DIP Credit Facility may be reborrowed consistent with the Approved Budget. |
| **DIP Lenders:** | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., RCP Customized Credit Fund (Fund IV-A), L.P. ("<u>DIP Lenders</u>") |
| **Agent:** | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. ("<u>DIP Agent</u>") |
| **Interest Rate:** | Non-default: SOFR plus 2.0%, which shall be accrued and payable upon maturity of the DIP Loans<br>Default: SOFR plus 4.5% payable in cash monthly in arrears. |
| **Fees** | 50 bps on total facility size and 50 bps on unused committed amounts, both of which shall be accrued and payable upon maturity of the DIP Loans. |
| **Maturity and Repayment:** | The DIP Loans shall mature on the earliest of (unless extended in writing by the DIP Agent): (i) November 30, 2023; (ii) the effective date or the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court; (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of the Debtor or the chapter 11 case of Phoenix 1040, LLC to a liquidation under Chapter 7 of the Bankruptcy Code; (iv) the date of consummation of a sale or other disposition of all or substantially all of the assets of the Debtor under section 363 of the Bankruptcy Code or otherwise; (v) the date the Bankruptcy Court orders the dismissal of the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC; (vi) the date of acceleration of the DIP Loans, including as a result of the occurrence and continuance of an Event of Default; and (vii) the date that is 35 calendar days after the Petition Date if the Final Order shall not have been entered by such date.<br><br>Upon the maturity of the DIP Loans, the Debtor shall repay to the DIP Agent for the ratable account of the DIP Lenders the aggregate principal amount of all DIP Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount of the DIP Loans (to be paid to but excluding the date of such payment) and all fees and expenses and other obligations payable under the DIP Facility (together, the "<u>DIP Obligations</u>"). |

---

[1]  Capitalized terms not defined herein have the meaning set forth in the proposed Interim Order.

| | |
|---|---|
| **Use of Proceeds:** | The proceeds of the DIP Loans shall be applied strictly in accordance with the Approved Budget (subject to the Permitted Variance), including, without limitation, to the extent authorized by the Bankruptcy Court, to pay the prepetition accrued wages specified in the Initial Budget (subject to the Permitted Variance).<br><br>No part of the proceeds of any DIP Loan, the Cash Collateral, or any other of the Collateral will be used:<br><br>(i) for any purpose that is prohibited under the Bankruptcy Code or the Interim or the Final Order; or<br>(ii) to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Agent and the DIP Lenders, including to commence or prosecute or join in any action against the DIP Agent or the DIP Lenders with respect to or related to:<br>(A) the claims, liens or security interest of the DIP Agent and the DIP Lenders, or their respective rights and remedies under the Interim Order or the Final Order, as the case may be, including to commence or prosecute or join in any action against the DIP Agent or the DIP Lenders seeking (x) to avoid, subordinate or recharacterize the DIP Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Agent or the DIP Lenders or (z) to prevent or restrict the exercise by the DIP Agent or the DIP Lenders of any of their respective rights or remedies under the Interim Order or the Final Order,<br>(B) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the releases set forth in the Interim Order and the Final Order,<br>(C) the stipulations to be made by the Debtor and approved by the Final Order; or<br>(D) any other action which with the giving of notice or passing of time would result in an Event of Default as described below; or<br>(iii) to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the Prepetition Agent or the Prepetition  Lenders, including to commence or prosecute or join in any action against the Prepetition Agent or the Prepetition Lenders with respect to or related to the claims, liens or security interest of the Prepetition Agent and the Prepetition Lenders, or their respective rights and remedies under the Interim Order or the Final Order, as the case may be, or the Prepetition Loan Documents, including to commence or prosecute or join in any action against the Prepetition Agent or the Prepetition Lenders seeking (x) to avoid, subordinate or recharacterize the Prepetition Obligations, (y) any monetary, injunctive or other affirmative relief against the Prepetition Agent or the Prepetition Lenders or (z) to prevent or restrict the exercise by the Prepetition Agent or the Prepetition Lenders of any of their respective rights or remedies under the Interim Order or the Final Order, as the case may be, or, to the extent authorized by the Interim Order or the Final Order, under the Prepetition Loan Documents ; <u>provided, however</u>, that up to $50,000 in the aggregate of the proceeds of any DIP Loan or cash collateral may be used solely by any statutory committee appointed in the Chapter 11 Case to investigate, but not to commence, prosecute or finance litigation, with respect to the foregoing. |

2

| | |
|---|---|
| **Budget** | Following delivery of the Initial Budget, not later than the last Business Day of the last full calendar week of each month (or earlier with respect to the budget to be attached to the Final Order) (the "Updated Budget Deadline"), the Debtor shall provide the DIP Agent with an updated budget (each such update which is approved in accordance with the terms hereof, an "Updated Budget"), prepared by management of the Debtor in consultation with the DIP Agent covering a 13-week period that commences with the Updated Budget Deadline, consistent with the form and level of detail set forth in the Initial Budget.  Each Updated Budget shall be, in each case, subject to the written approval of the DIP Agent (in its sole discretion).  As used herein, the "Approved Budget" shall mean (i) initially, the Initial Budget and (ii) thereafter, upon (and subject to) the approval of any Updated Budget by the DIP Agent, such Updated Budget. |
| **Budget Variance** | Commencing on Friday, September 8, 2023, and on each Friday thereafter, the Debtor shall provide a weekly variance report to the DIP Agent showing actual receipts (if any) and actual disbursements compared against the projected receipts (if any) and projected disbursements in the Approved Budget through the last Business Day of the prior week (each, a "Budget Variance Test Date").  The Debtor shall not permit:

(a) the sum of the actual aggregate operating disbursements of the Debtor for the four weeks (or lesser period if applicable) ending immediately prior to such Budget Variance Test Date (the "Budget Variance Test Period") to be greater than 110% of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Operating Disbursements" for such Budget Variance Test Period (the "Permitted Variance"); or

(b) the sum of the actual disbursements of fees incurred by professionals of any unsecured creditors committee in the Chapter 11 Case and of the Debtor ending immediately prior to such Budget Variance Test Date to be greater than the amount set forth for the line item in the Approved Budget under "Non-Operating Disbursements" for such Budget Variance Test Period.

To the extent that any Budget Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the described above. |

| **Conditions of Borrowing** | The following shall each be true as the date of any Credit Extension: |
| --- | --- |
| | (a) (i) All Chapter 11 Orders filed or to be filed with, and submitted to, the Bankruptcy Court shall be in form and substance reasonably acceptable to the DIP Agent. (ii) Each Chapter 11 Order that has been entered as of such date shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the DIP Agent. (iii) The Debtor shall be in compliance in all material respects with the Interim Order and the Final Order, as applicable, and each other Chapter 11 Order. (b) The DIP Agent shall have received a Request for Credit Extension in accordance with the requirements hereof. (c) All engagement letters or other agreements providing for the payment of the fees and expenses of the Debtor's proposed professional advisors shall be in form and substance reasonably satisfactory to the DIP Agent. |
| | The effectiveness of the DIP Credit Facility and the obligation of the DIP Lenders to fund the Initial Loans shall be subject to the satisfaction or waiver of the following conditions precedent: |
| | (a) The Interim Order (i) shall have been entered by the Bankruptcy Court and (ii) shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, or vacated, absent prior written consent of Agent. (b) All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent. (c)(i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtor or its business, properties or assets, and (ii) no order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or any other relief authorizing any third party to exercise control over the bankruptcy estate of the Debtor or any Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions. (d) The DIP Agent shall have received the Initial Budget and such other information (financial or otherwise) regarding the Initial Budget as the DIP Lenders or the DIP Agent may reasonably request. (e) Subject to Bankruptcy Court approval, the Debtor shall have the corporate power and authority to make, deliver and perform their obligations under the Interim Order. |
| | The obligation of the DIP Lenders to fund loans subsequent to the Initial Loans shall be subject to the satisfaction or waiver of the following conditions precedent: |
| | (a) The Final Order (i) shall be in form and substance satisfactory to the Agent, (ii) shall have been entered by the Bankruptcy Court within a date which is 35 days following the Petition Date, and (iii) shall be in full force and effect and shall not have been modified or amended absent prior written consent of the DIP Agent or reversed, modified, amended, stayed, or vacated, absent the prior written consent of the DIP Agent. (b) The Debtor shall be in compliance with each order entered in the Chapter 11 Case, including the Interim Order, and following entry of the Final Order, the Final Order. (c) The Debtor shall be in compliance with the Approved Budget (subject to the Permitted Variance). (d) All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent. |

4

| | (e)(i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtor or its business, properties or assets, and (ii) no order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or any other relief authorizing any third party to exercise control over the bankruptcy estate of the Debtor or any Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions, and no motion or application shall have been filed with respect to the foregoing other than a motion that is being contested by the Debtor in good faith.<br>(f) The DIP Agent shall have received the Initial Budget and such other information (financial or otherwise) regarding the Initial Budget as the DIP Lenders or the DIP Agent may reasonably request. |
|---|---|
| **Roll-up** | Subject to entry of the Final Order, an amount of the loans under the prepetition credit facility (the "<u>Prepetition Loans</u>") provided to the Debtor by the Prepetition Lenders (which entities are also the DIP Lenders)  shall be rolled up, and converted into DIP Obligations secured by the DIP Liens ratably with the DIP Loans in an amount equal to the sum of (x) the amounts advanced to Phoenix 1040, LLC immediately prior to the Petition Date to fund the retention of professionals and premiums for director and officer liability insurance (the "<u>Prepetition Protective Advances</u>"); and (y) 100% of the aggregate amount of Cash Collateral used by the Debtor and DIP Loans advanced pursuant to the Interim Order and the Final Order. |
| **Perfection and Enforceability of Prepetition Obligations and Liens** | Subject to entry of the Final Order, the Debtor stipulates that the Prepetition Loans and other obligations of the Debtor (the "<u>Prepetition Obligations</u>") under that certain *Amended and Restated Credit and Security Agreement*, dated as of May 15, 2023, and the Loan Documents (as defined therein) (the "<u>Prepetition Loan Documents</u>"), constitute legal, valid, binding, and non-avoidable obligations of the Debtor in accordance with the respective terms of the relevant Prepetition Loan Documents, and no portion of the Prepetition Obligations or any payment made to the Prepetition Lenders or applied to or paid on account thereof prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action  including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law.  The Prepetition Protective Advances shall be deemed "Protective Advances" under the Prepetition Loan Documents.<br><br>Subject to entry of the Final Order, the Debtor stipulates that, as of the Petition Date, pursuant to the Prepetition Loan Documents, the Debtor granted for the benefit of the Prepetition Lenders, a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on (the "<u>Prepetition Liens</u>") substantially all of their assets and property as set forth in the Prepetition Loan Documents (the "<u>Prepetition Collateral</u>"), subject only to any liens permitted by the Prepetition Loan Documents to be senior to the Prepetition Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "<u>Prepetition Permitted Senior Liens</u>"). |

| Challenge Period | The Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon the Debtor in all circumstances and for all purposes.  The Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes unless: (a) (x) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than the later of (x) 21 calendar days after entry of the Final Order and (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 21 calendar days after entry of the Final Order, or (B) the date that is 30 calendar days after their appointment; or any such later date as has been agreed to in writing by the Prepetition Lenders or has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (x)-(z) the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or (B) asserting or prosecuting any avoidance action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Prepetition Lenders in connection with or related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; provided, however, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.  If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) the Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding on all parties in interest; (2) the obligations of the Debtor under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in this case and any Successor Case; (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party in interest acting or seeking to act on behalf of the Debtor's estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 case or any other party acting or seeking to act on behalf of the Debtor's estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of Prepetition Lenders shall be deemed forever waived, released and barred. If any Challenge is timely filed during the Challenge Period, the |
|---|---|

| | |
|---|---|
| | stipulations, admissions, agreements and releases contained in the Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in the Final Order will vest or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Loans or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in the Chapter 11 Case. |
| **Waiver/Modification of the Automatic Stay** | The Interim Order and the Final Order shall include a customary waiver/modification of the automatic stay to permit the DIP Agent and the DIP Lenders to take all actions as are necessary or appropriate to implement the terms of the Interim Order and the Final Order. The automatic stay shall be modified to the extent necessary to permit the DIP Agent on behalf of the DIP Lenders to take any action necessary or appropriate to perfect the liens of the DIP Lenders on the DIP Collateral and the Collateral. |
| **Adequate Protection** | Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral for the aggregate diminution in value of such interests (including from the amount of any Cash Collateral used by the Debtor) (the "Diminution in Value") (if any) and as an inducement to the Prepetition Lenders to consent to the use of their Cash Collateral, the Prepetition Lenders are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"), subject to and junior in all respects to the DIP Obligations and the Carve-Out:

(i)   The Prepetition Lenders, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition Lenders' Diminution in Value (if any) upon all of the DIP Collateral, subject to and junior in all respects to the DIP Liens (as defined below) and the Carve-Out; and

(ii)   The Prepetition Lenders shall be granted allowed superpriority administrative expense claims against the Debtor (without the need to file any proof of claim) on account of the Prepetition Lenders' Diminution in Value (if any) under section 507(b) of the Bankruptcy Code (the "Prepetition Lender 507(b) Claims"), which Prepetition Lender 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding avoidance actions, but including upon entry of the Final Order, without limitation, proceeds of avoidance actions). Except as otherwise provided in the Interim Order or the Final Order and subject to and junior in all respects to the DIP Superpriority Claims (as defined below) and the Carve-Out, the Prepetition Lender 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtor now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |

| Collateral: | As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Lenders, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "<u>DIP Liens</u>") will be granted to the DIP Agent for the benefit of the DIP Lenders (all property identified below being collectively referred to as the "<u>DIP Collateral</u>," and, together with the Prepetition Collateral, the "<u>Collateral</u>"), subject to and junior in all respects to the Carve-Out:

*Liens on Unencumbered Property*

Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the Debtor whether existing on the Petition Date or thereafter acquired, including, without limitation, the Debtor's mortgage servicing rights (to the extent such rights are unencumbered property) and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than avoidance actions and the Carve-Out (and any amounts held therein), but including, upon and subject to entry of the Interim Order, proceeds of avoidance actions (collectively, the "<u>Unencumbered Property</u>").

*Liens Junior to Certain Other Liens on Encumbered Property*

Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtor that, on or as of the Petition Date, is subject to and junior in all respects to the Prepetition Liens and the liens or security interests permitted under the Prepetition Loan Documents (i.e., the Prepetition Permitted Senior Liens), which Collateral (the "<u>Encumbered Property</u>") shall be subject to such Prepetition Liens and Prepetition Permitted Senior Liens.

For the avoidance of doubt, the valid and enforceable interests of providers of warehouse credit facilities in mortgage loans and related documents existing as of the Petition Date (the "<u>Prepetition Warehoused Mortgage Loans Collateral</u>") shall be deemed Prepetition Permitted Senior Liens and the Prepetition Warehoused Mortgage Loans Collateral shall be deemed Encumbered Property. |
| **DIP Superpriority Claims** | The DIP Obligations shall be superpriority administrative expense claims against the Debtors (without the need to file any proof of claim) under section 507(b) of the Bankruptcy Code entitled to superpriority status senior to the Prepetition Lender 507(b) Claims, as set forth in the Interim Order and the Final Order (the "<u>DIP Superpriority Claims</u>"). |
| **Carve-Out:** | As to be provided in the Interim Order and Final Order |

| Events of Default: | (b)   Failure to pay or prepay principal or interest within three (3) business days after the same becomes due. |
|---|---|
| | (c)   Failure to perform or observe any other term, covenant or agreement described herein and such failure continue for fifteen (15) days after receipt by the Debtor of written notice thereof. |
| | (d)   Any final judgment or order is entered against the Debtor for the payment of money in excess of $100,000 and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal for a period of (60) days. |
| | (e)   The Interim Order or the Final Order shall for any reason cease to create, or shall be asserted by the Debtor not to create, a valid and perfected lien on and security interest in the Collateral with the priority required herein. |
| | (f)   Any Change in Control. |
| | (g)   The Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 35 days following the Petition Date, which Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated. |
| | (h)   The Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC shall be dismissed or the Bankruptcy Court shall have made a ruling requiring the dismissal of the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC , suspended or converted it to a case under chapter 7 of the Bankruptcy Code, or the Debtor shall file any pleading requesting any such relief; or a motion shall be filed by the Debtor for the approval of, or there shall arise, (x) any other claim having priority senior to or *pari passu* with the claims of the DIP Agent and the DIP Lenders or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out)or (y) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted in the Interim Order or the Final Order, except as expressly provided herein and in the Interim Order or the Final Order, as applicable. |
| | (i)   The Debtor shall file a motion in the Chapter 11 Case to obtain additional or replacement financing from a party other than DIP Lenders under Section 364(d) of the Bankruptcy Code or to use Cash Collateral of a DIP Lender under Section 363(c) of the Bankruptcy Code, except to the extent any such financing shall provide for the payment in full in cash of the DIP Obligations and the obligations under the Prepetition Loan Documents. |
| | (j)   The Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (A) approving payment of any prepetition claim other than (x) as provided for in (i) the First Day Orders or Second Day Orders or (ii) the Approved Budget or (y) otherwise consented to by the DIP Agent on behalf of  the DIP Lenders in writing, (B) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets with a fair market value in excess of $100,000; or (C) approving any settlement or other stipulation not approved by the DIP Agent on behalf of  the DIP Lenders in writing with any secured creditor providing for payments as adequate protection or otherwise to such secured creditor. |
| | (k)   An order shall be entered by the Bankruptcy Court without the express prior written consent of the DIP Agent on behalf of  the DIP Lenders (i) to revoke, reverse, stay, modify, supplement, vacate or amend the Interim Order or the Final Order in a manner inconsistent with this term sheet in a manner adverse to the DIP Lenders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the DIP Loans (other than the Carve-Out); or (iii) to grant or permit the grant of a Lien on the Collateral. |
| | (l)   An application for any of the orders described in clauses (h), (i), (j), (k), (n) and (r) shall be made by a Person other than the Debtor, and such application is not |

| | contested by the Debtor in good faith or any Person obtains a non-appealable final order charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Lenders or obtains a final order adverse to the DIP Lenders. |
| --- | --- |
| | (m)    The Debtor shall fail to comply with the terms and conditions of the Interim Order or the Final Order in any material respect, and such failure is not cured within two (2) Business Days of knowledge or notice thereof. |
| | (n)    The Bankruptcy Court shall enter order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC or the Debtor shall file, or support, any pleading seeking such relief. |
| | (o)    The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Debtor to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent on behalf of the DIP Lenders. |
| | (p)    The Debtor shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor) any other Person's opposition of any motion made in the Bankruptcy Court by or on behalf of the DIP Lenders seeking confirmation of the amount of the DIP Lenders' claim or the validity and enforceability of the Liens in favor of the DIP Agent. |
| | (q)    (A) The Debtor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor any other person's motion to, disallow in whole or in part the DIP Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the DIP Agent or contest any material provision of any Loan Document, (B) the Debtor shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the DIP Agent or the DIP Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, (C) any Liens on the Collateral and/or super-priority claims shall otherwise, for any reason, cease to be valid, perfected and enforceable in all respects, (D) any action is commenced by the Debtor  that contests the validity, perfection or enforceability of any of the Liens and security interests of the DIP Agent or the DIP Lenders created by the Interim Order or the Final Order, or (E) any material provision of the Interim Order or the Final Order shall cease to be effective. |
| | (r)    Any judgments which are in the aggregate in excess of $100,000 as to any postpetition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed. |
| | (s)    An order shall be entered by the Bankruptcy Court transferring venue of the Chapter 11 Case to any other court. |
| **Milestones:** | To be included in the Final Order. |

10

| | |
|---|---|
| **Waivers:** | Subject to entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. Further, effective upon entry of the Final Order, the Debtors shall waive and the Final Order shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory, and in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Lenders. |

11

**AGREED AS OF THE DATE FIRST WRITTEN ABOVE:**

**BORROWER:**

**AMERIFIRST FINANCIAL, INC.**

By: _____T. Scott Avila_____

Title: Chief Restructuring Officer

**DIP AGENT AND DIP LENDER:**

**RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P.**

_____

By: _____

Title: _____

**DIP LENDER**:

**RCP CUSTOMIZED CREDIT FUND LOAN SPV (FUND IV-A), L.P.**

_____

By: _____

Title: _____

**AGREED AS OF THE DATE FIRST WRITTEN ABOVE:**

**BORROWERS:**

**AMERIFIRST FINANCIAL, INC.**

By: _____
Name: _____
Title: _____

**DIP AGENT AND DIP LENDER:**

**RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P.**

By:    Reverence Capital Partners Credit (Fund III)
       GP, LLC, its General Partner
By: _____
Name: Peter C. Aberg
Title:  Member

**DIP LENDER:**

**RCP CUSTOMIZED CREDIT FUND LOAN SPV (FUND IV-A), L.P.**

By:    RCP CUSTOMIZED CREDIT FUND (FUND IV)
       GP, LLC, its General Partner
By: _____
Name: Peter C. Aberg
Title:  Member

**<u>EXHIBIT B</u>**

**Initial Budget**

*Amerifirst Financial, LLC*
*Three Week Cash Flow Budget*
*8/28/2023*
*($ 000's)*

| Week Ending | Week 1 9/1 | Week 2 9/8 | Week 3 9/15 | 3-Week Total |
|---|---|---|---|---|
| *Cash Receipts* | | | | |
| MSR | $ - | $ - | 100 | $ 100 |
| **Net Cash Receipts** | **-** | **-** | **100** | **100** |
| *Operating Disbursements* | | | | |
| Payroll & Payroll Taxes | 544 | - | 536 | 1,080 |
| Commissions | 208 | - | 95 | 304 |
| IT Expense | 5 | 128 | 85 | 217 |
| Benefits | 111 | 112 | - | 223 |
| Rent and Lease Expense | - | - | 90 | 90 |
| Insurance | 1 | 66 | - | 67 |
| CIK Expense | - | - | 13 | 13 |
| Other | 10 | 10 | 10 | 30 |
| **Total Operating Disbursements** | 879 | 316 | 829 | 2,024 |
| **Operating Cash Flow** | (879) | (316) | (729) | (1,924) |
| **Cumulative Operating Cash Flow** | (879) | (1,195) | (1,924) | |
| *Non-Operating Disbursements / (Receipts)* | | | | |
| Restructuring Fees | 426 | 406 | 449 | 1,281 |
| **Total Non-Operating Disbursements / (Receipts)** | 426 | 406 | 449 | 1,281 |
| **Beginning Cash** | 483 | 50 | 50 | 483 |
| (+/-) Net Cash Flow | (1,305) | (722) | (1,178) | (3,205) |
| (+) DIP | 872 | 722 | 1,178 | 2,773 |
| **Ending Cash** | $ 50 | $ 50 | $ 50 | $ 50 |
| **Minimum Cash** | $ 50 | $ 50 | $ 50 | $ 50 |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., *et al.*, | Case No. 23-11240 (TMH) |
| Debtors.[1] | (Jointly Administered)<br>**Ref. Docket No. 21, 61, 67** |

**Hearing Date: September 18, 2023 at 2:00 p.m. (ET)**

### NOTICE OF FILING OF PROPOSED FINAL ORDER
### (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING
### AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE
### PROTECTION TO PREPETITION LENDERS, (III) MODIFYING
### THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on August 29, 2023, the above-captioned debtors

and debtors in possession (collectively, the "Debtors") filed the *Motion of the Debtors for Interim*

*and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize*

*Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the*

*Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 21]

(the "DIP Motion").

**PLEASE TAKE FURTHER NOTICE** that on August 31, 2023, the Bankruptcy

Court granted interim relief on the DIP Motion and entered the *Interim Order (I) Authorizing*

*Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting*

*Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling*

---

[1]     The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are:
Phoenix 1040 LLC (2550); and AmeriFirst Financial, Inc. (4557).  The location of Debtor AmeriFirst Financial,
Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 1550 McKellips
Road, Suite 117, Mesa, Arizona 85203.



EXHIBIT
Dane-9

*a Final Hearing, and (V) Granting Related Relief* [Docket No. 61] (the "Interim DIP Order"). Attached to the Interim DIP Order as Exhibits A is the *Binding DIP Term Sheet*.

      **PLEASE TAKE FURTHER NOTICE** that on September 1, 2023, the Debtors filed and served the *Notice of Entry of Interim Order and Final Hearing Regarding Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 67] (the "Notice"). Pursuant to the Notice, a final hearing on the DIP Motion is scheduled for **September 18, 2023 at 2:00 p.m. (prevailing Eastern Time)** (the "Final Hearing") before the Honorable Thomas M. Horan at the United States Bankruptcy Court for the District of Delaware (the "Court"), located at 824 North Market Street, 3rd Floor, Courtroom No. 7, Wilmington, Delaware 19801.

      **PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is a proposed *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "Proposed Final DIP Order"). Attached to the Proposed Final DIP Order as Exhibits A is the *Amended and Restated Binding DIP Term Sheet*. The Debtors intend to present the Proposed Final DIP Order and the *Amended and Restated Binding DIP Term Sheet* at the Final Hearing.

      **PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit B** is a blacklined copy of the Proposed Final DIP Order, including the *Amended and Restated Binding DIP Term Sheet*, showing changes made from the Interim DIP Order and the *Binding DIP Term Sheet*.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify, if necessary, the Proposed Final DIP Order and the *Amended and Restated Binding DIP Term Sheet* before or at the Final Hearing.

Dated: September 7, 2023     **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: ljones@pszjlaw.com
      dbertenthal@pszjlaw.com
      tcairns@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

3

## EXHIBIT A

**Proposed Final DIP Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | ) | Case No. 23-11240 (TMH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

This matter is before the Court on the motion (the "Motion") of AmeriFirst Financial, Inc.

("AmeriFirst") and Phoenix 1040, LLC, as debtors and debtors in possession (collectively, the

"Debtors"), in these chapter 11 cases (the "Chapter 11 Cases"), requesting entry of a final  order

(this "Final Order") pursuant to sections 105(a), 363, and 364 of chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rule 4001 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of

Delaware (as amended, the "Local Bankruptcy Rules"):

(1)     authorizing AmeriFirst to obtain postpetition financing from RCP Credit

Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A),

L.P. ("DIP Lenders"), consisting of a senior secured, superpriority term loan facility in the

principal amount of up to **$5,000,000** (the "DIP Loans") to be used for general liquidity purposes,

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers include:  Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557).  The Debtors' service address is 1550 McKelleps Road, Suite 117, Mesa, AZ 85203.

including the payment of administrative expenses and estate professional fees, as described herein and in that certain *Amended and Restated Binding DIP Term Sheet*, dated September 7, 2023, by and among the DIP Lenders, as lenders, RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., as agent (the "DIP Agent"), and AmeriFirst, as borrower (substantially in the form attached hereto as **Exhibit A**, as any time amended, the "DIP Term Sheet"), of which amount **$2,775,000** was approved on an interim basis (the "Interim Amount Limit") during the Interim Period (as defined below), on the terms and conditions set forth in the DIP Term Sheet and this Interim Order;

(2)    authorizing AmeriFirst to execute and enter into the DIP Term Sheet and to perform all such other and further acts as may be required in connection with the DIP Term Sheet;

(3)    authorizing AmeriFirst to use proceeds of the DIP Loans solely as expressly permitted in the DIP Term Sheet and in accordance with this Interim Order;

(4)    pursuant to Bankruptcy Code section 364, granting the DIP Agent for the benefit of the DIP Lenders security interests and liens as set forth in the DIP Term Sheet and this Interim Order and allowed superpriority administrative expense claims against AmeriFirst for the amounts advanced under the DIP Loans;

(6)    authorizing AmeriFirst to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Term Sheet as such amounts become due and payable;

(7)    granting adequate protection to the Prepetition Lenders (as defined below) as set forth in the DIP Term Sheet and this Interim Order; and

(8)    granting the Debtors such other and further relief as is just and proper.

Based upon the Court's review of the Motion, the exhibits attached thereto, the *Declaration of T. Scott Avila in Support of First Day Motions* (the "First Day Declaration") and all matters brought to the Court's attention at the interim hearing, which was held on August 30, 2023,

pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) (the "Interim Hearing"), and all matters

brought to the Court's attention at the final hearing, which was held on September 18, 2023 (the

"Final Hearing"), and after due deliberation and consideration, and good and sufficient cause

appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, AND ADJUDGED,** that:[2]

1.      Disposition.    The Motion is hereby GRANTED on a final basis to the extent

provided herein.  Any and all objections to the relief requested in the Motion, to the extent not

otherwise withdrawn, waived, or resolved by consent at or before the Interim Hearing and the Final

Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

2.      Jurisdiction; Core Proceeding.      This Court has jurisdiction over the Chapter

11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C.  § 1334.

This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      Service of Motion and Notice of Interim Hearing.     The Debtors have caused to be

served a notice of the Motion, the Interim Hearing, and the Final Hearing, including a copy of the

proposed Interim Order, entered Interim Order, proposed Final Order, and Budget (as defined

below), by electronic mail, telecopy transmission, hand delivery, overnight courier, or first class

United States mail upon the Office of the United States Trustee (the "U.S. Trustee"), the

consolidated 30 largest unsecured creditors of the Debtors, the Internal Revenue Service, all parties

who have filed requests prior to the date of service for notices under Rule 2002 of the Bankruptcy

Rules, and all parties known by a Debtor to hold or assert a lien on any asset of a Debtor.  The

foregoing notice of the Motion, as it relates to this Interim Order and the Interim Hearing, is

---

[2]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

appropriate, due, and sufficient under the Bankruptcy Code, the Bankruptcy Rules, and the Local

Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code

and Bankruptcy Rule 4001(b), (c) and (d), and that no further notice of the relief sought at the

Interim Hearing and the relief granted herein is necessary or required.

4.     Petition Date.  On August 24, 2023 (the "Petition Date"), each of the Debtors filed

with the Court its respective voluntary petition for relief under chapter 11 of the Bankruptcy Code,

and each is continuing to manage its properties and to operate its business as a debtor in possession

pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee

has been appointed for any Debtor herein.

5.     AmeriFirst's Stipulations.  Without prejudice to the rights of any other party,

AmeriFirst admits, stipulates, acknowledges, and agrees as follows:

a.     Need for Financing.  An immediate and ongoing need exists for
AmeriFirst to obtain the DIP Loans in order to permit, among other
things, the orderly operation of its business and the satisfaction of
administrative expense claims.  AmeriFirst does not have sufficient
available resources of working capital to maintain its assets without
postpetition financing.  AmeriFirst's ability to maintain going
concern value is essential to its preservation of the value of its assets
for the benefit of all stakeholders.

b.     Prepetition Credit Facility. Pursuant to that certain *Amended and
Restated Credit and Security Agreement*, dated as of May 15, 2023
(as amended, supplemented, restated or otherwise modified prior to
the Petition Date, the "Prepetition Credit Agreement", collectively
with all other agreements, documents, and instruments executed or
delivered in connection therewith, including, without limitation, all
security agreements, notes, guarantees, mortgages, Uniform
Commercial Code financing statements, and fee letters, each as may
be amended, restated, amended and restated, supplemented, waived,
or otherwise modified prior to the Petition Date the "Prepetition
Loan Documents", and the credit facilities evidenced thereby,
collectively, the "Prepetition Credit Facility") among (a) AmeriFirst
Financial, Inc., as borrower (the "Prepetition Borrower"), (b) RCP
Credit Opportunities Fund Loan SPV (Fund III), L.P., as agent (the
"Prepetition Agent"), (c) RCP Credit Opportunities Fund Loan SPV
(Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P.

as lenders (the "Prepetition Lenders" and together with the Prepetition Agent, the "Prepetition Secured Parties"), the Prepetition Borrower incurred "Obligations" (as defined in the Prepetition Credit Agreement, the "Prepetition Loans" and with other obligations, the "Prepetition Secured Obligations"), the Prepetition Borrower is indebted to the Prepetition Secured Parties as set forth in the Prepetition Credit Facility.

c.   Prepetition Secured Obligations.   As of the Petition Date, the Prepetition Borrower was validly, justly and lawfully indebted and liable to the Prepetition Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for (x) not less than $15,798,087 in outstanding principal amount of Loans (as defined in the Prepetition Credit Agreement) plus accrued and unpaid interest thereon, and (y) any fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, financial advisors' fees, and fees of other consultants and professionals), costs, charges, indemnities, and other Prepetition Secured Obligations in each case incurred under (or reimbursable pursuant to) or secured by the Prepetition Loan Documents.

d.   Validity of Prepetition Secured Obligations.   AmeriFirst stipulates that the Prepetition Obligations under Prepetition Loan Documents constitute legal, valid, binding, and non-avoidable obligations of AmeriFirst in accordance with the respective terms of the relevant Prepetition Loan Documents, and no portion of the Prepetition Obligations or any payment made to the Prepetition Lenders or applied to or paid on account thereof prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action  including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law.   The Prepetition Protective Advances (as defined in the DIP Term Sheet) shall be deemed "Protective Advances" under the Prepetition Loan Documents.

e.   Validity, Perfection and Priority of Prepetition Liens.   AmeriFirst stipulates that, as of the Petition Date, pursuant to the Prepetition Loan Documents, AmeriFirst granted for the benefit of the Prepetition Lenders, a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on (the "Prepetition Liens") substantially all of its assets and property as set forth in the Prepetition Loan Documents (the "Prepetition Collateral"), subject only to any liens permitted by

the Prepetition Loan Documents to be senior to the Prepetition Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition Permitted Senior Liens").

f.    Waiver of Challenge and Challenge Period.    AmeriFirst's stipulations, admissions, agreements and releases contained in this Final Order shall be binding upon it in all circumstances and for all purposes.    AmeriFirst's stipulations, admissions, agreements and releases contained in this Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of AmeriFirst's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for AmeriFirst, in all circumstances and for all purposes unless: (a) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than the later of (x) 75 calendar days after entry of the Interim Order and (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 75 calendar days after entry of the Interim Order, or (B) the date that is 30 calendar days after their appointment; or any such later date as has been agreed to in writing by the Prepetition Lenders or has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (x)-(y) the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or (B) asserting or prosecuting any avoidance action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Prepetition Lenders in connection with or related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; provided, however, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.    If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) AmeriFirst's

stipulations, admissions, agreements and releases contained in this Final Order shall be binding on all parties in interest; (2) the obligations of AmeriFirst under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in this case and any Successor Case; (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party in interest acting or seeking to act on behalf of AmeriFirst's estate, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 case or any other party acting or seeking to act on behalf of AmeriFirst's estate, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of Prepetition Lenders shall be deemed forever waived, released and barred. If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Final Order will vest or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to AmeriFirst or its estate, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Loans or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in the Chapter 11 Case.

g.    No Control.    AmeriFirst's board of directors includes an independent director who has been delegated authority over all matters in the Bankruptcy Cases, including entry into the DIP Loans, where there is an actual or potential conflict of interest with any of AmeriFirst's equity holders or other stakeholders, including the Prepetition Secured Parties and the DIP Secured Parties (and the authority to determine whether such a conflict exists).  None of the Prepetition Secured Parties or the DIP Secured Parties control (or have in the past controlled) AmeriFirst or its respective properties or operations, have authority to determine the manner in which AmeriFirst's operations are conducted or are control persons or insiders of AmeriFirst by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Loan Documents;

h.    No Claims or Causes of Action.  No claims or causes of action held by AmeriFirst or its estate exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined below), in each case, in their capacity as such, under or relating to any agreements by and among AmeriFirst and any Prepetition Secured Party that is in existence as of the Petition Date.

6.    Findings Regarding the DIP Loan.

a.    Good Cause.    Good cause has been shown for the entry of this Final Order and authorization for AmeriFirst to incur DIP Obligations (as defined below) pursuant to the DIP Term Sheet.  AmeriFirst's need for financing of the type afforded by the DIP Term Sheet is immediate and critical.  AmeriFirst cannot rely on receipts from assets sales because such receipts are uncertain as to amount and timing, and are cash collateral.  Entry of this Final Order will preserve the assets of AmeriFirst's estate and its value for the benefit of all stakeholders and is in the best interests of AmeriFirst, its creditors, and its estate.  The terms of the proposed financing are fair and reasonable, reflect AmeriFirst's exercise of business judgment, and are supported by reasonably equivalent value and fair consideration.

b.    Proposed DIP Loan.  AmeriFirst has requested that the DIP Lenders fund the DIP Loans from time to time (collectively with all other debts, obligations, liabilities, and indemnities of AmeriFirst under the DIP Term Sheet, the "DIP Obligations"), all in accordance with and subject to the terms of the DIP Term Sheet.  The DIP Lenders are willing to advance the DIP Loans upon the terms and conditions set forth herein and in the DIP Term Sheet.

c.      <u>No Credit Available on More Favorable Terms</u>.     The terms of the DIP Term Sheet are favorable and it is unlikely that better terms could otherwise be obtained. AmeriFirst contacted several possible alternative lenders and none were willing to make a proposal. AmeriFirst is also unable to obtain unsecured credit allowable under Section 364(c)(1) of the Bankruptcy Code without granting liens and superpriority claims in favor of the DIP Lenders under the terms and conditions set forth in this Final Order and in the DIP Term Sheet.

d.      <u>Budget/Reporting</u>.     AmeriFirst has prepared and annexed to this Final Order as **Exhibit B** hereto a budget (as at any time amended or supplemented with the written consent of the DIP Agent, the "<u>Budget</u>"), which sets forth, among other things, the projected disbursements for the period covered thereby and which AmeriFirst believes in good faith to be realistic and achievable. The DIP Agent and the DIP Lenders are relying upon the Budget in entering into the DIP Term Sheet. As set forth in the DIP Sheet, AmeriFirst is required to deliver certain ongoing reports to the DIP Agent and the DIP Lenders showing actual disbursements compared to the Budget, subject to certain Permitted Variance (as defined in the DIP Term Sheet).

e.      <u>Certain Conditions to DIP Loan</u>.     The DIP Lenders' willingness to make DIP Loans pursuant to the DIP Term Sheet is conditioned upon, among other things, (i) AmeriFirst obtaining Court authorization to enter into the DIP Term Sheet addressing all DIP Obligations of AmeriFirst and all rights and remedies of the DIP Agent and the DIP Lenders thereunder; and (ii) the DIP Agent and the DIP Lenders receiving, as a benefit for the prompt payment of all DIP Obligations, certain liens and superpriority claims as set forth herein.

f.      <u>Finding of Good Faith</u>.     Based upon the record presented at the Interim Hearing and the Final Hearing, the DIP Term Sheet was negotiated in good faith and at arm's-length between AmeriFirst , the DIP Agent, and the DIP Lenders. All of the DIP Obligations including, without limitation, the DIP Loans made pursuant to the DIP Term Sheet and all other liabilities and obligations of AmeriFirst under this Final Order owing to the DIP Agent and the DIP Lenders shall be deemed to have been extended by the DIP Lenders in "good faith," as such term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code. The DIP Agent and the DIP Lenders shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Final Order or

any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

7.   <u>Authorization of Financing; Use of Proceeds</u>.

   a.   The Court hereby authorizes AmeriFirst's execution and delivery of the DIP Term Sheet in substantially the form annexed hereto (with such changes, if any, as were made prior to or as a result of the Final Hearing or are otherwise authorized to be made as amendments to the DIP Term Sheet in accordance with this Final Order).

   b.   AmeriFirst is hereby authorized to borrow money pursuant to the DIP Term Sheet, on the terms and subject to the conditions, set forth in any DIP Loan Document and this Final Order, up to an aggregate outstanding principal amount at any time not exceeding the sum of **$5,000,000**, plus applicable interest, expenses, fees and other charges payable in connection with such DIP Loans, and to incur any and all liabilities and obligations under the DIP Term Sheet and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Term Sheet.

   c.   The DIP Agent and the DIP Lenders shall not have any obligation or responsibility to monitor AmeriFirst's use of the DIP Loans, and the DIP Agent and the DIP Lenders may rely upon AmeriFirst's representations that the amount of DIP Loans requested at any time, and the use thereof, are in accordance with the requirements of this Final Order and the DIP Term Sheet.

   d.   Proceeds of any DIP Loans shall be used in accordance with the DIP Term Sheet.

8.   <u>Execution, Delivery and Performance of DIP Term Sheet</u>.  The DIP Term Sheet may be executed and delivered on behalf of AmeriFirst by any officer, director, or agent of such Debtor, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute the DIP Term Sheet for and on behalf of such Debtor.  The DIP Agent and the DIP Lenders shall be authorized to rely upon any such person's execution and delivery of the DIP Term Sheet as having been done with all requisite power and authority to do so, and the execution and delivery of any of the DIP Term Sheet or amendments thereto by any such person on behalf of AmeriFirst shall be conclusively presumed to have been duly authorized by all

necessary corporate, limited liability company, or other entity action (as applicable) of such Debtor. Upon execution and delivery thereof, the DIP Term Sheet shall constitute a valid and binding obligation of AmeriFirst, enforceable against such Debtor in accordance with their terms for all purposes during its Chapter 11 Case, and any subsequently converted case of such Debtor under Chapter 7 of the Bankruptcy Code (each, a "Successor Case"). No obligation, payment, or transfer under the DIP Term Sheet or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under Sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim. AmeriFirst is authorized to do and perform all acts: to make, execute and deliver all instruments and documents (including, without limitation, amendments, waivers, consents, and other modifications) and to pay all reasonable fees, costs and expenses in each case as may be necessary or, in the reasonable opinion of the DIP Agent and the DIP Lenders, desirable to give effect to any of the terms and conditions of the DIP Term Sheet, to validate the perfection of the DIP Liens (as defined below), or as may otherwise be required or contemplated by the DIP Term Sheet.

9. Roll Up. The Prepetition Loans provided to AmeriFirst by the Prepetition Lenders (which entities are also the DIP Lenders) shall be rolled up, and converted into DIP Obligations secured by the DIP Liens ratably with the DIP Loans in an amount equal to the sum of (x) the aggregate amount of $676,400, representing the sum of $325,000 advanced to Phoenix 1040, LLC immediately prior to the Petition Date to fund the retention of Paladin Management Group and Pachulski Stang Ziehl & Jones and $351,400 advanced to Phoenix 1040, LLC to pay the premium

for a director and officer liability insurance policy for the Debtors (the "Prepetition Protective Advances"); and (y) 100% of the aggregate amount of Cash Collateral used by AmeriFirst from and after the Petition Date and the principal amount of all DIP Loans advanced pursuant to the Interim Order and this Final Order.

10.     DIP Liens.   As security for the DIP Obligations, effective and automatically properly perfected on the date this Final Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any collateral, without any further action by the DIP Lenders, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "DIP Liens") will be granted to the DIP Agent for the benefit of the DIP Lenders (all property identified below being collectively referred to as the "DIP Collateral," and, together with the Prepetition Collateral (as defined below), the "Collateral"), subject to and junior in all respects to the Carve-Out:

(a)     *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of AmeriFirst whether existing on the Petition Date or thereafter acquired, including, without limitation, AmeriFirst's mortgage servicing rights (to the extent such rights are unencumbered property) and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than avoidance actions and the Carve-Out, but

including proceeds of avoidance actions (collectively, the "Unencumbered Property").

(b)     *Liens Junior to Certain Other Liens on Encumbered Property*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of AmeriFirst that, on or as of the Petition Date, is subject to and junior in all respects to the Prepetition Liens and the liens or security interests permitted under the Prepetition Loan Documents (as defined below) (the "Prepetition Permitted Senior Liens"), which Collateral (the "Encumbered Property") shall be subject to such Prepetition Liens and Prepetition Permitted Senior Liens.  For the avoidance of doubt, the valid and enforceable interests of providers of warehouse credit facilities in mortgage loans and related documents existing as of the Petition Date (the "Prepetition Warehoused Mortgage Loans Collateral") shall be deemed Prepetition Permitted Senior Liens and the Prepetition Warehoused Mortgage Loans Collateral shall be deemed Encumbered Property.

11.     DIP Superpriority Claims.     All DIP Obligations shall constitute joint and several allowed superpriority administrative claims (the "DIP Superpriority Claims") against AmeriFirst for all DIP Obligations under the DIP Term Sheet (without the need to file any proof of claim) pursuant to Section 364(c)(1) of the Bankruptcy Code having priority in right of payment over all other obligations, liabilities, and indebtedness of AmeriFirst, whether now in existence or hereafter incurred by such Debtor, and over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(a),

503(b), 506(c), 507, 546(c), 552(b) 726, 1113 or 1114 of the Bankruptcy Code.  Such DIP

Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be

considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and

shall be payable from and have recourse to all prepetition and postpetition property of AmeriFirst

and all proceeds thereof; *provided*, *however*, that the DIP Superpriority Claims shall be subject to

the Carve-Out (as defined below).

      12.    <u>Adequate Protection</u>.  The Prepetition Loans provided to AmeriFirst by the

Prepetition Lenders are entitled to adequate protection.  The Prepetition Obligations arise under

the Prepetition Loan Documents.  The Prepetition Lenders assert that, as of the Petition Date,

pursuant to the Prepetition Loan Documents, AmeriFirst granted for the benefit of the Prepetition

Lenders, valid, binding, properly perfected, enforceable, non-avoidable first priority Prepetition

Liens on the Prepetition Collateral, subject only to any liens permitted by the Prepetition Loan

Documents to be senior to the Prepetition Liens.  Pursuant to sections 361, 362, 363(e), 364(d)(1)

and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the

Prepetition Collateral (including Cash Collateral) for the aggregate diminution in value of such

interests (including from the amount of any Cash Collateral used by AmeriFirst) (the "<u>Diminution

in Value</u>") (if any) and as an inducement to the Prepetition Lenders to consent to the use of their

Cash Collateral, the Prepetition Lenders are granted the following Adequate Protection

(collectively, the "<u>Adequate Protection Obligations</u>"), subject to and junior in all respects to the

DIP Obligations and the Carve-Out:

      (a)    The Prepetition Lenders, effective and perfected upon the date of this Final Order

             and without the necessity of the execution of any mortgages, security agreements,

             pledge agreements, financing statements or other agreements, a valid, perfected

replacement security interest in and lien on account of the Prepetition Lenders' Diminution in Value (if any) upon all of the DIP Collateral, subject to and junior in all respects to the DIP Liens and the Carve-Out; and

(b)     The Prepetition Lenders shall be granted allowed superpriority administrative expense claims against AmeriFirst (without the need to file any proof of claim) on account of the Prepetition Lenders' Diminution in Value (if any) under section 507(b) of the Bankruptcy Code (the "Prepetition Lender 507(b) Claims"), which Prepetition Lender 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding avoidance actions, but including, without limitation, proceeds of avoidance actions). Except as otherwise provided in this Final Order and subject to and junior in all respects to the DIP Superpriority Claims (as defined below) and the Carve-Out, the Prepetition Lender 507(b) Claims shall have priority over any and all administrative expenses and all other claims against AmeriFirst now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

13.     Repayment.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Term Sheet and as provided herein, without offset or counterclaim. Without limiting the generality of the foregoing, in no event shall AmeriFirst be authorized to offset or recoup any amounts owed, or allegedly owed, by the DIP Agent or the DIP Lenders to AmeriFirst against any of the DIP Obligations without the prior written consent of the DIP Agent

or the DIP Lenders that would be affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders.

14.    <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to the DIP Agent or the DIP Lenders shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code.

15.    <u>Fees and Expenses of Estate Professionals; Professional Fee Reserve</u>.  Subject to the terms of the DIP Term Sheet and the Budget, for so long as no Event of Default has occurred, AmeriFirst is authorized to use the DIP Loans or Cash Collateral to fund, on a weekly basis as set forth in the Budget, the trust account of the Debtors' general bankruptcy counsel (the "<u>Professional Fee Reserve</u>") for the purpose of reserving sufficient funds to pay the compensation and expense reimbursement (collectively, "<u>Professional Fees</u>") of estate professional persons (including attorneys, financial advisors, accountants, investment bankers, claims and/or noticing agents, appraisers, and consultants) retained by any Debtor with Court approval or as an ordinary course professional (the "<u>Debtors Professionals</u>") or any official committee appointed in the Chapter 11 Cases (the "<u>Committee</u>") with Court approval (the "<u>Committee Professionals</u>," collectively with the Debtors Professionals, the "<u>Professionals</u>"), up to the amounts set forth for each Professional in the Budget; *provided*, *however*, that, notwithstanding anything herein or in any other order of this Court to the contrary, no proceeds of the DIP Loans or Cash Collateral shall be used to pay Professional Fees incurred for any Prohibited Purpose (as defined below).  The funds in the Professional Fee Reserve shall remain subject to the liens and claims of the DIP Agent and the DIP Lenders.  Any excess funds in the Professional Fee Reserve after payment of Professional

Fees shall be returned to AmeriFirst, subject to the liens and claims of the DIP Agent and the DIP Lenders.

16.    <u>Section 506(c) Claims</u>.  No costs or expenses of administration shall be imposed upon the DIP Agent or the DIP Lenders pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Agent or the DIP Lenders from the payments or proceeds remitted to the DIP Agent or the DIP Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders, provided that the Carve-Out is fully funded by AmeriFirst.

17.    <u>Carve-Out</u>.  Notwithstanding anything in this Final Order, the DIP Term Sheet, or any other order of this Court to the contrary, the DIP Obligations and the DIP Superpriority Claims in favor of the DIP Agent and the DIP Lenders and the Prepetition Liens and Adequate Protection Obligations in favor of the Prepetition Lenders shall be subject and subordinate in all respects to the payment of the following Carve-Out.  As used in this Final Order, the "<u>Carve-Out</u>" means, collectively, the aggregate amount needed to satisfy (i) accrued but unpaid fees, costs, and expenses of the professionals of the Debtors and any Committee incurred at any time prior to the DIP Agent's or DIP Lenders' delivery of a Carve-Out Trigger Notice (as defined below), up to the aggregate amounts set forth for each Professional in the Budget for such time period and only to the extent allowed by the Bankruptcy Court, (ii) professional fees, costs and expenses of the Debtors and any Committee incurred after delivery of a Carve-Out Trigger Notice not to exceed $250,000 with respect to the Professionals, to the extent allowed by the Bankruptcy Court, (iii) the fees and expenses payable pursuant to 28 U.S.C. § 1930, (iv) any fees, costs, and expenses of a Chapter 7 trustee or their professionals up to $50,000 in the aggregate if either of the Chapter 11 Cases is converted to Chapter 7, and (iv) accrued but unpaid obligations to AmeriFirst's

employees, including payroll, commissions, and benefits, due and owing under the Budget through the date of the Carve-Out Trigger Notice; *provided*, that nothing in this Final Order shall be construed to impair the ability of any party to object to the fees, expenses, reimbursements or compensation of any Professional, whether or not in excess of the coverage provided by the Carve-Out. The Carve-Out shall not act as a cap on the Professional Fees that may be incurred by Professionals in the Chapter 11 Cases. In no event shall the Carve-Out, or the funding of the DIP Loans or the use of Cash Collateral to satisfy the Carve-Out, result in any reduction in the amount of the DIP Obligations. "Carve-Out Trigger Notice" means written notice by the DIP Agent or the DIP Lenders to the Debtors, any Committee, and the Office of the U.S. Trustee invoking the Carve-Out, which notice may be delivered at any time after the occurrence, and during the continuation, of an Event of Default.

18.     Excluded Professional Fees. Notwithstanding anything to the contrary in this Final Order, neither the Carve-Out, nor the proceeds of the DIP Loans or the Cash Collateral in any respect, shall be used to pay any Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following (each a "Prohibited Purpose"): (a) objecting to or contesting the validity or enforceability of this Final Order or any DIP Loan; (b) asserting or prosecuting any claim or cause of action against the DIP Agent or the DIP Lenders, other than to enforce the terms of the DIP Term Sheet or this Final Order; (c) seeking to modify any of the rights granted under this Final Order to the DIP Agent or the DIP Lenders; or (d) objecting to, contesting, delaying, preventing or interfering in any way with the exercise of rights and remedies by the DIP Agent or the DIP Lenders after the occurrence and during the continuance of an Event of Default, *provided*, that the DIP Agent and the DIP Lenders may not seek to exercise remedies, and the

Debtors may seek appropriate relief from this Court, during the period of five (5) business days following the delivery of a Carve-Out Trigger Notice.

19. <u>Preservation of Rights Granted Under This Final Order</u>.

a. <u>Protection from Subsequent Financing Order</u>. There shall not be entered in any of the Chapter 11 Cases or in any Successor Case any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that is entitled to a security interest in any of the Debtors' assets or priority administrative status that is equal or senior to the DIP Liens and DIP Superpriority Claims granted to the DIP Agent and the DIP Lenders herein; *provided*, *however*, that nothing herein shall prevent the entry of an order that specifically provides for the full payment of all of the DIP Obligations, in the manner required by the DIP Term Sheet, from the proceeds of such credit or indebtedness, and the termination of any funding commitments under the DIP Term Sheet.

b. <u>Rights Upon Dismissal, Conversion or Consolidation</u>. If any of the Chapter 11 Cases are dismissed, converted or substantively consolidated with another case, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of any of the Chapter 11 Cases shall affect the rights or remedies of the DIP Agent or the DIP Lenders under the DIP Term Sheet or the rights or remedies of the DIP Agent or the DIP Lenders under this Final Order, and all of the respective rights and remedies hereunder and thereunder of the DIP Agent and the DIP Lenders shall remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, or substantively consolidated. Unless and until full payment of all DIP Obligations has occurred, it shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 Cases. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Liens and DIP Superpriority Claims shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until full payment of all DIP Obligations, (ii) such DIP Liens and DIP Superpriority Claims shall, notwithstanding such dismissal, remain binding on all parties in interest, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph and otherwise in this Final Order.

c. <u>Survival of Final Order</u>. The provisions of this Final Order, and any actions taken pursuant hereto, shall survive the entry of and shall

govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases or any Successor Case.

d.  <u>No Discharge</u>. None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, AmeriFirst has waived such discharge.

e.  <u>No Requirement to File Claim for DIP Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar date order establishing a deadline for the filing of proofs of claim entitled to administrative expense treatment under Section 503(b) of the Bankruptcy Code, the DIP Agent and the DIP Lenders shall not be required to file any proof of claim with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Term Sheet without the necessity of filing any such proof of claim; and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Term Sheet or prejudice or otherwise adversely affect any rights, remedies, powers or privileges of the DIP Agent and the DIP Lenders under any of the DIP Term Sheet or under this Final Order.

20.  <u>Amendments to DIP Term Sheet</u>. The amendments to the original DIP Term Sheet are hereby approved as necessary and in the interests of the Debtors' estates. AmeriFirst, the DIP Agent, and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Term Sheet and without further order of the Court, any amendments to and modifications of any of such DIP Term Sheet on the following conditions: (a) the amendment or modification must not constitute a Material Change (as defined below) to the terms of such DIP Term Sheet and (b) copies of the amendment or modification must be served upon counsel for any Committee, the U.S. Trustee, and other interested parties specifically requesting such notice. Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court. For purposes hereof, a "<u>Material Change</u>" shall mean a change that operates to reduce the DIP Loans or the maturity of the DIP Obligations, to increase the aggregate amount of the commitments

of the DIP Lenders under the DIP Term Sheet, to increase the rate of interest other than as currently provided in or contemplated by the DIP Term Sheet, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the DIP Agent or the DIP Lenders following the occurrence of an Event of Default.   Without limiting the generality of the foregoing, any amendment of the DIP Term Sheet to postpone or extend any date or deadline therein (including, without limitation, the expiration of the term of the DIP Loans) shall not constitute a Material Change and may be effectuated by AmeriFirst and the DIP Agent or the DIP Lenders without the need for further approval of the Court.

21.      Maturity and Repayment.   The DIP Loans shall mature and be repaid as set forth in the DIP Term Sheet.

22.      Events of Default; Remedies.

a.      Events of Default.      The occurrence of any "Event of Default" under (and as defined in) the DIP Term Sheet shall constitute an Event of Default under this Final Order.   The term "Change of Control" as used in the DIP Term Sheet shall mean that Phoenix 1040 LLC ceases to be sole owner of the equity interests in AmeriFirst Financial, Inc.

b.      Default Remedies.      Upon the occurrence and during the continuance of any Event of Default, the DIP Agent and the DIP Lenders may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court) by written notice to the Debtors, any Committee, and the Office of the U.S. Trustee (a) send the Carve-Out Trigger Notice and (b) declare (i) the unpaid principal amount of and accrued interest on the DIP Loans and (ii) all other DIP Obligations, immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by AmeriFirst, and the same shall forthwith become immediately due and payable, and the obligation of the DIP Lenders to make any DIP Loans shall thereupon terminate.   Upon the occurrence and during the continuance of any Event of Default and following the delivery of a Carve-Out Trigger Notice, the DIP Agent and the DIP Lenders shall be required to obtain the authority of this Court to exercise any rights and remedies

of the DIP Agent and the DIP Lenders set forth in the DIP Term
Sheet or in this Final Order.

    c.    <u>Rights Cumulative</u>.    The rights, remedies, powers, and privileges
conferred upon the DIP Agent and the DIP Lenders pursuant to this
Final Order shall be in addition to and cumulative with those
contained in the DIP Term Sheet.

23.    <u>Effect of Stipulations on Third Parties; Deadline for Challenges</u>.  AmeriFirst's

admissions, stipulations, agreements, and releases contained in this Final Order shall be binding

upon such Debtor and any successor thereto (including, without limitation any Chapter 7 trustee

or Chapter 11 trustee or examiner appointed or elected for such Debtor) under all circumstances

and for all purposes.

24.    <u>Service of Final Order</u>.  Promptly after the entry of this Final Order, the Debtors

shall mail, by first class mail, a copy of this Final Order to (without duplication) counsel for the

DIP Agent and the DIP Lenders, the U.S. Trustee, the Debtors' consolidated thirty largest

unsecured creditors, the Internal Revenue Service, all parties who have filed requests for notices

under Rule 2002 of the Bankruptcy Rules prior to the time of such service, and all parties known

by a Debtor to hold or assert a lien on any assets of a Debtor, and shall file a certificate of service

regarding same with the Clerk of the Court.  Such service shall constitute good and sufficient

notice of this Final Order.

25.    <u>No Deemed Control</u>.  In determining to make the DIP Loans, or in exercising any

rights or remedies as and when permitted pursuant to the Interim Order, this Final Order, or the

DIP Term Sheet, the DIP Agent and the DIP Lenders shall not be deemed to be in control of any

Debtor or its operations.

26.    <u>Exculpation</u>.  Nothing in this Final Order, the DIP Term Sheet, or any other

document related to the DIP Loans shall in any way be construed or interpreted to impose or allow

the imposition upon the DIP Agent or the DIP Lenders any liability for any claims arising from

the prepetition or postpetition activities of any Debtor in the operation of its business or in connection with its restructuring efforts.

27.     Binding Effect; Successors and Assigns.  The provisions of the DIP Term Sheet and this Interim Order, including all findings, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Debtors, any Committee, and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed for the estate of any Debtor, any Chapter 7 trustee appointed or elected in a Successor Case, any examiner appointed pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any Debtor or with respect to the property of the estate of any Debtor), and shall inure to the benefit of DIP Agent and the DIP Lenders and their respective successors and assigns.

28.     Government Sponsored Enterprises and Governmental Units.

(a)     Fannie Mae Rights.

(i)     Notwithstanding anything to the contrary contained in the DIP Term Sheet or this Final Order, (a) no lien or security interest granted pursuant to the DIP Term Sheet or this Final Order (including, without limitation, the DIP Liens, the Adequate Protection Obligations, or any other lien that may be approved pursuant to the terms of this Final Order) shall attach to, modify, include, encumber, impair or otherwise affect, and (b) no administrative expense claim (of a superpriority nature or otherwise) shall prime, encumber, impair or limit, in any way: (1) any mortgage loans presently owned by, subsequently transferred to, or otherwise acquired by, the Federal National Mortgage Association (together with any successor thereto, "Fannie Mae"; and such mortgage loans, the "Fannie Mae Loans"), (2) the Fannie Mae Lender Contract (as defined below) or any of Fannie Mae's rights with respect to the sale and delivery of mortgage loans to, or

any servicing rights with respect to the Fannie Mae Loans (the "Fannie Mae Servicing Rights"), or any obligations of AmeriFirst, or obligations of Fannie Mae, under the Fannie Mae Lender Contract, or (3) any cash, accounts, or other collateral (or any proceeds of the foregoing) that have been pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between AmeriFirst and Fannie Mae. Nothing in the DIP Term Sheet or this Final Order shall discharge, release or otherwise preclude any valid right of setoff or recoupment of Fannie Mae.

(ii)     Furthermore, and without limiting the foregoing, none of the principal, interest, and funds for the payment of property taxes and insurance premiums, mortgage premiums, condominium fees, or any other amounts collected by AmeriFirst or any subservicer in connection with its performance of its servicing obligations under the Fannie Mae Lender Contract are property of AmeriFirst's estate under section 541 of the Bankruptcy Code. Fannie Mae reserves all rights in and under the Fannie Mae Lender Contract. None of the DIP Lenders, Prepetition Lenders, or any other lender subject to this Final Order has a claim against Fannie Mae arising by virtue of this Final Order. No secured claim or administrative expense granted pursuant to, or lien approved by, this Final Order, trumps, or negatively impacts, in any way, Fannie Mae's rights and AmeriFirst's obligations under the Fannie Mae Lender Contract (including, without limitation, with respect to the Fannie Mae Loans and the Fannie Mae Servicing Rights).

(iii)     If, notwithstanding the foregoing, any lender or other party hereafter asserts that the DIP Liens or any Adequate Protection Obligations and related adequate protection collateral, or any other lien in any other collateral that may be approved or granted pursuant to the terms of this Final Order, include: (a) any Fannie Mae Servicing Rights, (b) the Fannie Mae Lender Contract and/or (c) any other rights of AmeriFirst, or obligations of Fannie Mae under the Fannie

Mae Lender Contract, any and all security interests therein shall be subject and subordinate to all rights of Fannie Mae under the Mortgage Selling and Servicing Contract, the Fannie Mae Selling Guide, the Fannie Mae Servicing Guide and all supplemental servicing instructions or directives provided by Fannie Mae, all applicable master agreements, recourse agreements, repurchase agreements, indemnification agreements, loss-sharing agreements, and any other agreements between Fannie Mae and AmeriFirst, and all as amended, restated or supplemented from time to time (collectively, the "Fannie Mae Lender Contract"), which rights include, among other rights, the right of Fannie Mae to: (1) terminate, at any time, all or any portion of servicing or the Fannie Mae Lender Contract with or without cause and (2) sell, or have transferred, the Fannie Mae Servicing Rights, with any such sale or transfer being subject to Fannie Mae's consent.

(iv)    Fannie Mae reserves all of its rights under the Fannie Mae Lender Contract, including all of its rights under the Fannie Mae Servicing Guide.  If there is any conflict between the terms of the Fannie Mae Lender Contract and those of the DIP Term Sheet, the terms of the Fannie Mae Lender Contract will control.

(b)    Freddie Mac Rights.

(i)    Notwithstanding anything to the contrary in the DIP Term Sheet or this Final Order -- (a) no lien or security interest granted pursuant to the DIP Term Sheet or this Final Order (including, without limitation, the DIP Liens, the Adequate Protection Obligations, or any other lien that may be approved pursuant to the terms of this Interim Order) shall attach to, modify, include, encumber, impair or otherwise affect and (b) no administrative expense claim (of a superpriority nature or otherwise) shall prime, encumber, impair or limit, in any way: (1) any mortgage loans presently owned by, subsequently transferred to, or otherwise acquired by, the Federal Home Loan Mortgage Corporation ("Freddie Mac"; and all such mortgage loans shall be

referred to as the "<u>Freddie Mac Loans</u>"); (2) the Freddie Mac Agreements (defined below) or any of Freddie Mac's rights with respect to the servicing of Freddie Mac Loans for Freddie Mac under the Freddie Mac Single-Family Seller/Servicer Guide ("<u>Freddie Mac Guide</u>"), the Freddie Mac Single-Family/Servicer Guide Plus Additional Provisions, certain applicable Master Agreements (as defined in the Freddie Mac Guide), Purchase Contracts (as defined in the Freddie Mac Guide), Pricing Identifier Terms (as defined in the Freddie Mac Guide) supplements, addendums, Bulletins (as defined in the Freddie Mac Guide), terms of business and any other agreements between AmeriFirst and Freddie Mac, as amended, restated or supplemented from time to time (collectively, the "<u>Freddie Mac Agreements</u>"), or AmeriFirst's obligations with respect thereto; and/or (3) any cash, accounts, or other collateral (or any proceeds of the foregoing) that has been pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between AmeriFirst and Freddie Mac.  Nothing in the DIP Term Sheet or this Final Order shall discharge, release or otherwise preclude any valid right of setoff or recoupment of Freddie Mac.

(ii)    Furthermore, and without limiting the foregoing, none of the principal, interest, and funds for the payment of property taxes and insurance premiums, mortgage premiums, condominium fees, or any other amounts collected by AmeriFirst (or any sub-servicer) in connection with AmeriFirst's performance of its servicing obligations under the Freddie Mac Agreements are property of AmeriFirst's estate under section 541 of the Bankruptcy Code. Freddie Mac reserve all rights in, and under, the Freddie Mac Agreements.  None of the DIP Lenders, Prepetition Lenders, or any other lender subject to this Final Order has a claim against Freddie Mac arising by virtue of this Interim Order.  No secured claim or administrative expense granted pursuant to, or lien approved by, this Final Order, trumps, or negatively impacts, in any way, Freddie Mac's rights and AmeriFirst's obligations under the Freddie Mac Agreements

(including, without limitation, with respect to the Freddie Mac Loans and the Freddie Mac Servicing Contract Rights (as defined in the Freddie Mac Agreements)).

(iii)     If, notwithstanding the foregoing, any lender or other party hereafter asserts that the DIP Liens or Adequate Protection Obligations and related adequate protection collateral, or any other lien in any other collateral that may be approved or granted pursuant to the terms of this Final Order, include: (i) any Servicing Contract Rights (as defined in the Freddie Mac Agreements) relating to Freddie Mac Loans; (ii) any Freddie Mac Agreement; and/or (iii) any other rights of Freddie Mac, or the obligations of AmeriFirst, under any Freddie Mac Agreement, any and all security interests therein shall be subject and subordinate to all rights of Freddie Mac under the Freddie Mac Agreements, which rights include, among other rights, the right to, among other things: (i) terminate, at any time, all, or any portion of, Servicing (as defined by the Freddie Mac Agreements) by AmeriFirst, and/or to suspend or disqualify AmeriFirst as Seller or Servicer (as defined in the Freddie Mac Agreements), with or without cause, and (ii) sell, or have transferred, the Freddie Mac Servicing Contract Rights (as defined in the Freddie Mac Agreements) associated with Freddie Mac Loans, with any such sale or transfer being subject to Freddie Mac and its conservator, Federal Housing Finance Agency's, consent.

(iv)     Freddie Mac reserves all of its rights under all Freddie Mac Agreements.  If there is any conflict between the terms of any Freddie Mac Agreements and those of the DIP Term Sheet or in this Final Order, the Freddie Mac Agreements shall explicitly supersede and control.

(c)     GNMA Rights.

(i)     The Government National Mortgage Association ("GNMA") is a wholly-owned Government Corporation within the U.S. Department of Housing and Urban Development ("HUD").  Pursuant to 12 U.S.C. § 1716, *et seq.* and 24 C.F.R. Part 300 (collectively, the "National

Housing Act"), GNMA is a federal agency that guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS") backed by federally insured or guaranteed mortgage loans (e.g., mortgage loans insured by the Federal Housing Administration ("FHA"), guaranteed by the U.S. Department of Veterans Administration ("VA"), or guaranteed by the U.S. Department of Agriculture's Rural Housing Service ("RHS" ). Notwithstanding anything to the contrary contained in the DIP Term Sheet or this Final Order, (A) no lien or security interest granted pursuant to the DIP Term Sheet or this Final Order (including, without limitation, the DIP Liens, the Adequate Protection Obligations, or any other lien that may be approved pursuant to the terms of this Final Order) shall attach to, modify, include, encumber, impair or otherwise affect, and (B) no administrative expense claim (of a superpriority nature or otherwise) shall prime, encumber, impair or limit, in any way: (1) any mortgage loans that presently, subsequently, or are otherwise acquired by, AmeriFirst and serve as collateral for the GNMA MBS (and such mortgage loans, the "GNMA Loans"), (2) the GNMA Agreements (as defined below) or any of GNMA's rights with respect to the assignment or transfer any servicing rights with respect to the GNMA Loans (the "GNMA Servicing Rights"), or any obligations of AmeriFirst under the GNMA Agreements, or (3) any cash, accounts, or other collateral (or any proceeds of the foregoing) that have been pledged to GNMA pursuant to any collateral pledge agreement or other security agreement between AmeriFirst and GNMA.

(ii)     Without limiting the foregoing, none of the principal, interest, and funds for the payment of property taxes and insurance premiums, mortgage premiums, condominium fees, or any other amounts collected by AmeriFirst or any subservicer in connection with its performance of its servicing obligations under the GNMA Agreements are property of AmeriFirst's estate under section 541 of the Bankruptcy Code.  Further, nothing in this Final Order

or the DIP Term Sheet shall (a) preclude or limit GNMA' rights pursuant to the National Housing Act or the GNMA Agreements; (b) be construed to limit the right of the United States to take any action not subject to the automatic stay; or (c) releases or waives AmeriFirst's obligations and liabilities pursuant to any and all statutes, regulations, rules, policies and procedures of GNMA, FHA, RHS, and VA, including, without limitation, (1) the National Housing Act and GNMA Agreements; (2) 42 U.S.C. §§ 1471 et seq. and 7 C.F.R. part 3555; and (3) 38 U.S.C. §§ 3701 et seq., 38 C.F.R. part 36, and all administrative materials issued under such statutes or regulations thereunder, nor shall anything discharge, release or otherwise preclude any valid right of setoff or recoupment of the United States.  None of the DIP Lenders, Prepetition Lenders, or any other lender subject to this Final Order has a claim against GNMA arising by virtue of this Final Order. No secured claim or administrative expense granted pursuant to, or lien approved by, this Final Order, trumps, or negatively impacts, in any way, GNMA's rights and AmeriFirst's obligations under the GNMA Agreements (including, without limitation, with respect to the GNMA Loans and the GNMA Servicing Rights).

(iii)    If, notwithstanding the foregoing, any lender or other party hereafter asserts that the DIP Liens or any Adequate Protection Obligations and related adequate protection collateral, or any other lien in any other collateral that may be approved or granted pursuant to the terms of this Final Order, include: (a) any GNMA Servicing Rights, (b) the GNMA Agreements and/or (c) any other rights of GNMA or obligations of AmeriFirst under the GNMA Agreements, any and all security interests therein shall be subject and subordinate to all rights of GNMA under the National Housing Act, the GNMA Guide, all guaranty agreements, MBS prospectus documents, escrow agreements, unilateral notification, notices of violation, supplements, addendums, amendments, and related agreements (collectively, the "GNMA Agreements"), which

rights include, among other rights, the right of GNMA to: (1) extinguish, at any time, all or any rights and interests of AmeriFirst under the GNMA Agreements with or without cause, or (2) review and consent to any proposed assignment or transfer the GNMA Servicing Rights.

(iv)   GNMA reserves all of its rights under the GNMA Agreements, including all of its rights under the National Housing Act and GNMA Guide.  If there is any conflict between the terms of the GNMA Agreements and those of the DIP Term Sheet or this Final Order, the terms of the GNMA Agreements will control.

29.   <u>Effectiveness; Enforceability</u>.  This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  This Final Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Final Order; and any stay of the effectiveness of this Final Order that might otherwise apply is hereby waived for cause shown.

30.   <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for AmeriFirst notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

31.   <u>Inconsistencies</u>.  To the extent of any inconsistencies or conflicts between this Final Order and the DIP Term Sheet, this Final Order shall govern.

## EXHIBIT A

### Amended DIP Term Sheet

# AMERIFIRST FINANCIAL, INC.
## AMENDED AND RESTATED
## BINDING DIP TERM SHEET DATED SEPTEMBER 7, 2023[1]

| | |
|---|---|
| **Borrowers:** | AmeriFirst Financial, Inc. as debtor-in-possession (the "Debtor") |
| **DIP Credit Facility:** | Maximum available on entry of the Interim Order: $2,775,000<br>Maximum available upon entry of the Final Order: $5,000,000<br><br>The DIP Credit Facility is a senior secured, superpriority term loan facility.<br><br>Amounts repaid under the DIP Credit Facility may be reborrowed consistent with the Approved Budget. |
| **DIP Lenders:** | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., RCP Customized Credit Fund (Fund IV-A), L.P. ("DIP Lenders") |
| **Agent:** | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. ("DIP Agent") |
| **Interest Rate:** | Non-default: SOFR plus 2.0%, which shall be accrued and payable upon maturity of the DIP Loans<br>Default: SOFR plus 4.5% payable in cash monthly in arrears. |
| **Fees** | 50 bps on total facility size and 50 bps on unused committed amounts, both of which shall be accrued and payable upon maturity of the DIP Loans. |
| **Maturity and Repayment:** | The DIP Loans shall mature on the earliest of (unless extended in writing by the DIP Agent): (i) November 30, 2023; (ii) the effective date or the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court; (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of the Debtor or the chapter 11 case of Phoenix 1040, LLC to a liquidation under Chapter 7 of the Bankruptcy Code; (iv) the date of consummation of a sale or other disposition of all or substantially all of the assets of the Debtor under section 363 of the Bankruptcy Code or otherwise; (v) the date the Bankruptcy Court orders the dismissal of the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC; (vi) the date of acceleration of the DIP Loans, including as a result of the occurrence and continuance of an Event of Default; and (vii) the date that is 35 calendar days after the Petition Date if the Final Order shall not have been entered by such date.<br><br>Upon the maturity of the DIP Loans, the Debtor shall repay to the DIP Agent for the ratable account of the DIP Lenders the aggregate principal amount of all DIP Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount of the DIP Loans (to be paid to but excluding the date of such payment) and all fees and expenses and other obligations payable under the DIP Facility (together, the "DIP Obligations"). |

---

[1] Capitalized terms not defined herein have the meaning set forth in the proposed Interim Order.

| Use of Proceeds: | The proceeds of the DIP Loans shall be applied strictly in accordance with the Approved Budget (subject to the Permitted Variance), including, without limitation, to the extent authorized by the Bankruptcy Court, to pay the prepetition accrued wages specified in the Initial Budget (subject to the Permitted Variance).<br><br>No part of the proceeds of any DIP Loan, the Cash Collateral, or any other of the Collateral will be used:<br><br>(i) for any purpose that is prohibited under the Bankruptcy Code or the Interim or the Final Order; or<br>(ii) to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Agent and the DIP Lenders, including to commence or prosecute or join in any action against the DIP Agent or the DIP Lenders with respect to or related to:<br>(A) the claims, liens or security interest of the DIP Agent and the DIP Lenders, or their respective rights and remedies under the Interim Order or the Final Order, as the case may be, including to commence or prosecute or join in any action against the DIP Agent or the DIP Lenders seeking (x) to avoid, subordinate or recharacterize the DIP Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Agent or the DIP Lenders or (z) to prevent or restrict the exercise by the DIP Agent or the DIP Lenders of any of their respective rights or remedies under the Interim Order or the Final Order,<br>(B) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the releases set forth in the Interim Order and the Final Order,<br>(C) the stipulations to be made by the Debtor and approved by the Final Order; or<br>(D) any other action which with the giving of notice or passing of time would result in an Event of Default as described below; or<br>(iii) to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the Prepetition Agent or the Prepetition Lenders, including to commence or prosecute or join in any action against the Prepetition Agent or the Prepetition Lenders with respect to or related to the claims, liens or security interest of the Prepetition Agent and the Prepetition Lenders, or their respective rights and remedies under the Interim Order or the Final Order, as the case may be, or the Prepetition Loan Documents, including to commence or prosecute or join in any action against the Prepetition Agent or the Prepetition Lenders seeking (x) to avoid, subordinate or recharacterize the Prepetition Obligations, (y) any monetary, injunctive or other affirmative relief against the Prepetition Agent or the Prepetition Lenders or (z) to prevent or restrict the exercise by the Prepetition Agent or the Prepetition Lenders of any of their respective rights or remedies under the Interim Order or the Final Order, as the case may be, or, to the extent authorized by the Interim Order or the Final Order, under the Prepetition Loan Documents ; provided, however, that up to $50,000 in the aggregate of the proceeds of any DIP Loan or cash collateral may be used solely by any statutory committee appointed in the Chapter 11 Case to investigate, but not to commence, prosecute or finance litigation, with respect to the foregoing. |
|---|---|

2

| | |
|---|---|
| **Budget** | Following delivery of the Initial Budget, not later than the last Business Day of the last full calendar week of each month (or earlier with respect to the budget to be attached to the Final Order) (the "Updated Budget Deadline"), the Debtor shall provide the DIP Agent with an updated budget (each such update which is approved in accordance with the terms hereof, an "Updated Budget"), prepared by management of the Debtor in consultation with the DIP Agent covering up to a 13-week period that commences with the Updated Budget Deadline, consistent with the form and level of detail set forth in the Initial Budget. Each Updated Budget shall be, in each case, subject to the written approval of the DIP Agent (in its sole discretion). As used herein, the "Approved Budget" shall mean (i) initially, the Initial Budget and (ii) thereafter, upon (and subject to) the approval of any Updated Budget by the DIP Agent, such Updated Budget. |
| **Budget Variance** | Commencing on Friday, September 8, 2023, and on each Friday thereafter, the Debtor shall provide a weekly variance report to the DIP Agent showing actual receipts (if any) and actual disbursements compared against the projected receipts (if any) and projected disbursements in the Approved Budget through the last Business Day of the prior week (each, a "Budget Variance Test Date"). The Debtor shall not permit:<br><br>(a) the sum of the actual aggregate operating disbursements of the Debtor for the four weeks (or lesser period if applicable) ending immediately prior to such Budget Variance Test Date (the "Budget Variance Test Period") to be greater than 110% of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Operating Disbursements" for such Budget Variance Test Period (the "Permitted Variance"); or<br><br>(b) the sum of the actual disbursements of fees incurred by professionals of any unsecured creditors committee in the Chapter 11 Case and of the Debtor ending immediately prior to such Budget Variance Test Date to be greater than the amount set forth for the line item in the Approved Budget under "Non-Operating Disbursements" for such Budget Variance Test Period.<br><br>To the extent that any Budget Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the described above. |

3

| **Conditions of Borrowing** | The following shall each be true as the date of any Credit Extension: |
|---|---|
| | (a) (i) All Chapter 11 Orders filed or to be filed with, and submitted to, the Bankruptcy Court shall be in form and substance reasonably acceptable to the DIP Agent. (ii) Each Chapter 11 Order that has been entered as of such date shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the DIP Agent. (iii) The Debtor shall be in compliance in all material respects with the Interim Order and the Final Order, as applicable, and each other Chapter 11 Order. (b) The DIP Agent shall have received a Request for Credit Extension in accordance with the requirements hereof. (c) All engagement letters or other agreements providing for the payment of the fees and expenses of the Debtor's proposed professional advisors shall be in form and substance reasonably satisfactory to the DIP Agent. |
| | The effectiveness of the DIP Credit Facility and the obligation of the DIP Lenders to fund the Initial Loans shall be subject to the satisfaction or waiver of the following conditions precedent: |
| | (a) The Interim Order (i) shall have been entered by the Bankruptcy Court and (ii) shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, or vacated, absent prior written consent of Agent. (b) All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent. (c)(i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtor or its business, properties or assets, and (ii) no order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or any other relief authorizing any third party to exercise control over the bankruptcy estate of the Debtor or any Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions. (d) The DIP Agent shall have received the Initial Budget and such other information (financial or otherwise) regarding the Initial Budget as the DIP Lenders or the DIP Agent may reasonably request. (e) Subject to Bankruptcy Court approval, the Debtor shall have the corporate power and authority to make, deliver and perform their obligations under the Interim Order. |
| | The obligation of the DIP Lenders to fund loans subsequent to the Initial Loans shall be subject to the satisfaction or waiver of the following conditions precedent: |
| | (a) The Final Order (i) shall be in form and substance satisfactory to the Agent, (ii) shall have been entered by the Bankruptcy Court within a date which is 35 days following the Petition Date, and (iii) shall be in full force and effect and shall not have been modified or amended absent prior written consent of the DIP Agent or reversed, modified, amended, stayed, or vacated, absent the prior written consent of the DIP Agent. (b) The Debtor shall be in compliance with each order entered in the Chapter 11 Case, including the Interim Order, and following entry of the Final Order, the Final Order. (c) The Debtor shall be in compliance with the Approved Budget (subject to the Permitted Variance). (d) All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent. |

| | |
|---|---|
| | (e)(i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtor or its business, properties or assets, and (ii) no order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or any other relief authorizing any third party to exercise control over the bankruptcy estate of the Debtor or any Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions, and no motion or application shall have been filed with respect to the foregoing other than a motion that is being contested by the Debtor in good faith. <br><br> (f) The DIP Agent shall have received the Initial Budget and such other information (financial or otherwise) regarding the Initial Budget as the DIP Lenders or the DIP Agent may reasonably request. |
| **Roll-up** | The Prepetition Loans provided to the Debtor by the Prepetition Lenders (which entities are also the DIP Lenders) shall be rolled up, and converted into DIP Obligations secured by the DIP Liens ratably with the DIP Loans in an amount equal to the sum of (x) the aggregate amount of $676,400, representing the sum of $325,000 advanced to Phoenix 1040, LLC immediately prior to the Petition Date to fund the retention of Paladin Management Group and Pachulski Stang Ziehl & Jones and $351,400 advanced to Phoenix 1040, LLC to pay the premium for a director and officer liability insurance policy for the Debtors (the "Prepetition Protective Advances"); and (y) 100% of the aggregate amount of Cash Collateral used by the Debtor from and after the Petition Date and the principal amount of all DIP Loans advanced pursuant to the Interim Order and the Final Order. |
| **Perfection and Enforceability of Prepetition Obligations and Liens** | Subject to entry of the Final Order, the Debtor stipulates that the Prepetition Loans and other obligations of the Debtor (the "Prepetition Obligations") under that certain *Amended and Restated Credit and Security Agreement*, dated as of May 15, 2023, and the Loan Documents (as defined therein) (the "Prepetition Loan Documents"), constitute legal, valid, binding, and non-avoidable obligations of the Debtor in accordance with the respective terms of the relevant Prepetition Loan Documents, and no portion of the Prepetition Obligations or any payment made to the Prepetition Lenders or applied to or paid on account thereof prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law. The Prepetition Protective Advances shall be deemed "Protective Advances" under the Prepetition Loan Documents. <br><br> Subject to entry of the Final Order, the Debtor stipulates that, as of the Petition Date, pursuant to the Prepetition Loan Documents, the Debtor granted for the benefit of the Prepetition Lenders, a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on (the "Prepetition Liens") substantially all of their assets and property as set forth in the Prepetition Loan Documents (the "Prepetition Collateral"), subject only to any liens permitted by the Prepetition Loan Documents to be senior to the Prepetition Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition Permitted Senior Liens"). |

| Challenge Period | The Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon the Debtor in all circumstances and for all purposes.  The Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes unless: (a) (x) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than the later of (x) 75 calendar days after entry of the Interim Order and (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 75 calendar days after entry of the Interim Order, or (B) the date that is 30 calendar days after their appointment; or any such later date as has been agreed to in writing by the Prepetition Lenders or has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (x)-(z) the "<u>Challenge Period</u>"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or (B) asserting or prosecuting any avoidance action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "<u>Challenges</u>") against the Prepetition Lenders in connection with or related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; <u>provided</u>, <u>however</u>, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.  If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) the Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding on all parties in interest; (2) the obligations of the Debtor under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in this case and any Successor Case; (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party in interest acting or seeking to act on behalf of the Debtor's estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 case or any other party acting or seeking to act on behalf of the Debtor's estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of Prepetition Lenders shall be deemed forever waived, released and barred. If any Challenge is timely filed during the Challenge Period, the |
|---|---|

| | |
|---|---|
| | stipulations, admissions, agreements and releases contained in the Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in the Final Order will vest or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Loans or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in the Chapter 11 Case. |
| **Waiver/Modification of the Automatic Stay** | The Interim Order and the Final Order shall include a customary waiver/modification of the automatic stay to permit the DIP Agent and the DIP Lenders to take all actions as are necessary or appropriate to implement the terms of the Interim Order and the Final Order. The automatic stay shall be modified to the extent necessary to permit the DIP Agent on behalf of the DIP Lenders to take any action necessary or appropriate to perfect the liens of the DIP Lenders on the DIP Collateral and the Collateral. |
| **Adequate Protection** | Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral for the aggregate diminution in value of such interests (including from the amount of any Cash Collateral used by the Debtor) (the "Diminution in Value") (if any) and as an inducement to the Prepetition Lenders to consent to the use of their Cash Collateral, the Prepetition Lenders are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"), subject to and junior in all respects to the DIP Obligations and the Carve-Out: <br><br> (i)   The Prepetition Lenders, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition Lenders' Diminution in Value (if any) upon all of the DIP Collateral, subject to and junior in all respects to the DIP Liens (as defined below) and the Carve-Out; and <br><br> (ii)   The Prepetition Lenders shall be granted allowed superpriority administrative expense claims against the Debtor (without the need to file any proof of claim) on account of the Prepetition Lenders' Diminution in Value (if any) under section 507(b) of the Bankruptcy Code (the "Prepetition Lender 507(b) Claims"), which Prepetition Lender 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding avoidance actions, but including upon entry of the Final Order, without limitation, proceeds of avoidance actions). Except as otherwise provided in the Interim Order or the Final Order and subject to and junior in all respects to the DIP Superpriority Claims (as defined below) and the Carve-Out, the Prepetition Lender 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtor now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |

7

| | |
|---|---|
| **Collateral:** | As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Lenders, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "<u>DIP Liens</u>") will be granted to the DIP Agent for the benefit of the DIP Lenders (all property identified below being collectively referred to as the "<u>DIP Collateral</u>," and, together with the Prepetition Collateral, the "<u>Collateral</u>"), subject to and junior in all respects to the Carve-Out: <br><br> *Liens on Unencumbered Property* <br><br> Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the Debtor whether existing on the Petition Date or thereafter acquired, including, without limitation, the Debtor's mortgage servicing rights (to the extent such rights are unencumbered property) and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than avoidance actions and the Carve-Out (and any amounts held therein), but including, upon and subject to entry of the Interim Order, proceeds of avoidance actions (collectively, the "<u>Unencumbered Property</u>"). <br><br> *Liens Junior to Certain Other Liens on Encumbered Property* <br><br> Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtor that, on or as of the Petition Date, is subject to and junior in all respects to the Prepetition Liens and the liens or security interests permitted under the Prepetition Loan Documents (i.e., the Prepetition Permitted Senior Liens), which Collateral (the "<u>Encumbered Property</u>") shall be subject to such Prepetition Liens and Prepetition Permitted Senior Liens. <br><br> For the avoidance of doubt, the valid and enforceable interests of providers of warehouse credit facilities in mortgage loans and related documents existing as of the Petition Date (the "<u>Prepetition Warehoused Mortgage Loans Collateral</u>") shall be deemed Prepetition Permitted Senior Liens and the Prepetition Warehoused Mortgage Loans Collateral shall be deemed Encumbered Property. |
| **DIP Superpriority Claims** | The DIP Obligations shall be superpriority administrative expense claims against the Debtors (without the need to file any proof of claim) under section 507(b) of the Bankruptcy Code entitled to superpriority status senior to the Prepetition Lender 507(b) Claims, as set forth in the Interim Order and the Final Order (the "<u>DIP Superpriority Claims</u>"). |
| **Carve-Out:** | As provided in the Interim Order and Final Order |

8

| | |
|---|---|
| **Events of Default:** | (a)    [Reserved] |
| | (b)    Failure to pay or prepay principal or interest within three (3) business days after the same becomes due. |
| | (c)    Failure to perform or observe any other term, covenant or agreement described herein and such failure continue for fifteen (15) days after receipt by the Debtor of written notice thereof. |
| | (d)    Any final judgment or order is entered against the Debtor for the payment of money in excess of $100,000 and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal for a period of (60) days. |
| | (e)    The Interim Order or the Final Order shall for any reason cease to create, or shall be asserted by the Debtor not to create, a valid and perfected lien on and security interest in the Collateral with the priority required herein. |
| | (f)    Any Change in Control. |
| | (g)    The Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 35 days following the Petition Date, which Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated. |
| | (h)    The Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC shall be dismissed or the Bankruptcy Court shall have made a ruling requiring the dismissal of the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC , suspended or converted it to a case under chapter 7 of the Bankruptcy Code, or the Debtor shall file any pleading requesting any such relief; or a motion shall be filed by the Debtor for the approval of, or there shall arise, (x) any other claim having priority senior to or *pari passu* with the claims of the DIP Agent and the DIP Lenders or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out)or (y) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted in the Interim Order or the Final Order, except as expressly provided herein and in the Interim Order or the Final Order, as applicable. |
| | (i)    The Debtor shall file a motion in the Chapter 11 Case to obtain additional or replacement financing from a party other than DIP Lenders under Section 364(d) of the Bankruptcy Code or to use Cash Collateral of a DIP Lender under Section 363(c) of the Bankruptcy Code, except to the extent any such financing shall provide for the payment in full in cash of the DIP Obligations and the obligations under the Prepetition Loan Documents. |
| | (j)    The Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (A) approving payment of any prepetition claim other than (x) as provided for in (i) the First Day Orders or Second Day Orders or (ii) the Approved Budget or (y) otherwise consented to by the DIP Agent on behalf of  the DIP Lenders in writing, (B) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets with a fair market value in excess of $100,000; or (C) approving any settlement or other stipulation not approved by the DIP Agent on behalf of  the DIP Lenders in writing with any secured creditor providing for payments as adequate protection or otherwise to such secured creditor. |
| | (k)    An order shall be entered by the Bankruptcy Court without the express prior written consent of the DIP Agent on behalf of  the DIP Lenders (i) to revoke, reverse, stay, modify, supplement, vacate or amend the Interim Order or the Final Order in a manner inconsistent with this term sheet in a manner adverse to the DIP Lenders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the DIP Loans (other than the Carve-Out); or (iii) to grant or permit the grant of a Lien on the Collateral. |

9

| | |
|---|---|
| | (l)　An application for any of the orders described in clauses (h), (i), (j), (k), (n) and (r) shall be made by a Person other than the Debtor, and such application is not contested by the Debtor in good faith or any Person obtains a non-appealable final order charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Lenders or obtains a final order adverse to the DIP Lenders. |
| | (m)　The Debtor shall fail to comply with the terms and conditions of the Interim Order or the Final Order in any material respect, and such failure is not cured within two (2) Business Days of knowledge or notice thereof. |
| | (n)　The Bankruptcy Court shall enter order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC or the Debtor shall file, or support, any pleading seeking such relief. |
| | (o)　The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Debtor to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent on behalf of the DIP Lenders. |
| | (p)　The Debtor shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor) any other Person's opposition of any motion made in the Bankruptcy Court by or on behalf of the DIP Lenders seeking confirmation of the amount of the DIP Lenders' claim or the validity and enforceability of the Liens in favor of the DIP Agent. |
| | (q)　(A) The Debtor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor any other person's motion to, disallow in whole or in part the DIP Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the DIP Agent or contest any material provision of any Loan Document, (B) the Debtor shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the DIP Agent or the DIP Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, (C) any Liens on the Collateral and/or super-priority claims shall otherwise, for any reason, cease to be valid, perfected and enforceable in all respects, (D) any action is commenced by the Debtor that contests the validity, perfection or enforceability of any of the Liens and security interests of the DIP Agent or the DIP Lenders created by the Interim Order or the Final Order, or (E) any material provision of the Interim Order or the Final Order shall cease to be effective. |
| | (r)　Any judgments which are in the aggregate in excess of $100,000 as to any postpetition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed. |
| | (s)　An order shall be entered by the Bankruptcy Court transferring venue of the Chapter 11 Case to any other court. |
| **Milestones:** | None, aside from maturity of the DIP Loans as set forth herein. |

| Waivers: | Subject to entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. Further, effective upon entry of the Final Order, the Debtors shall waive and the Final Order shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory, and in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Lenders. |
|---|---|

11

**AGREED AS OF THE DATE FIRST WRITTEN ABOVE:**

**BORROWER:**

**AMERIFIRST FINANCIAL, INC.**

By: _____

T. Scott Avila

Title: Chief Restructuring Officer

**DIP AGENT AND DIP LENDER:**

**RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P.**

_____

By: _____

Title: _____

**DIP LENDER**:

**RCP CUSTOMIZED CREDIT FUND LOAN SPV (FUND IV-A), L.P.**

_____

By: _____

Title: _____

**AGREED AS OF THE DATE FIRST WRITTEN ABOVE:**

**BORROWERS:**

**AMERIFIRST FINANCIAL, INC.**

By: _____
Name: _____
Title: _____

**DIP AGENT AND DIP LENDER:**

**RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P.**

By:    Reverence Capital Partners Credit (Fund III)
       GP, LLC, its General Partner

By: _____
Name: Peter C. Aberg
Title:  Member

**DIP LENDER**:

**RCP CUSTOMIZED CREDIT FUND LOAN SPV (FUND IV-A), L.P.**

By:    RCP CUSTOMIZED CREDIT FUND (FUND IV)
       GP, LLC, its General Partner

By: _____
Name: Peter C. Aberg
Title:  Member

**EXHIBIT B**

**DIP Budget**

[TO BE FILED]

**EXHIBIT B**

**Blackline Comparing Proposed Final DIP Order to Interim DIP Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | ) | Case No. 23-11240 (TMH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ~~INTERIM~~FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, ~~(IV) SCHEDULING A FINAL HEARING,~~ AND ~~(V)~~(IV) GRANTING RELATED RELIEF

This matter is before the Court on the motion (the "Motion") of AmeriFirst Financial,

Inc. ("AmeriFirst") and Phoenix 1040, LLC, as debtors and debtors in possession (collectively,

the "Debtors"), in these chapter 11 cases (the "Chapter 11 Cases"), requesting entry of ~~an interim~~

a final order (this ~~"Interim Order") and a final order (the~~ "Final Order") pursuant to sections

105(a), 363, and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

(the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure

for the United States Bankruptcy Court for the District of Delaware (as amended, the "Local

Bankruptcy Rules"):

(1) authorizing AmeriFirst to obtain postpetition financing from RCP Credit

Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A),

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 1550 McKellips Road, Suite 117, Mesa, AZ 85203.

L.P. ("DIP Lenders"), consisting of a senior secured, superpriority term loan facility in the principal amount of up to **$5,000,000** (the "DIP Loans") to be used for general liquidity purposes, including the payment of administrative expenses and estate professional fees, as described herein and in that certain *Amended and Restated Binding DIP Term Sheet*, dated August 28September 7, 2023, by and among the DIP Lenders, as lenders, RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., as agent (the "DIP Agent"), and AmeriFirst, as borrower (substantially in the form attached hereto as **Exhibit A**, as any time amended, the "DIP Term Sheet"), of which amount **$2,775,000** will be availablewas approved on an interim basis (the "Interim Amount Limit") during the Interim Period (as defined below), on the terms and conditions set forth in the DIP Term Sheet and this Interim Order;

(2)     authorizing AmeriFirst to execute and enter into the DIP Term Sheet and to perform all such other and further acts as may be required in connection with the DIP Term Sheet;

(3)     authorizing AmeriFirst to use proceeds of the DIP Loans solely as expressly permitted in the DIP Term Sheet and in accordance with this Interim Order;

(4)     pursuant to Bankruptcy Code section 364, granting the DIP Agent for the benefit of the DIP Lenders security interests and liens as set forth in the DIP Term Sheet and this Interim Order and allowed superpriority administrative expense claims against AmeriFirst for the amounts advanced under the DIP Loans;

(6)     authorizing AmeriFirst to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Term Sheet as such amounts become due and payable;

(7)     granting adequate protection to the Prepetition Lenders (as defined below) as set forth in the DIP Term Sheet and this Interim Order; and

(8)     scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the Motion; and

(9

(8)     granting the Debtors such other and further relief as is just and proper.

Based upon the Court's review of the Motion, the exhibits attached thereto, the *Declaration of T. Scott Avila in Support of First Day Motions* (the "First Day Declaration") and all matters brought to the Court's attention at the interim hearing, which was held on August 30, 2023, pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) (the "Interim Hearing"), and all matters brought to the Court's attention at the final hearing, which was held on September 18, 2023 (the "Final Hearing"), and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, AND ADJUDGED,** that:[2]

1.      Disposition.    The Motion is hereby GRANTED on ~~an interim~~a final basis~~, as and~~ to the extent provided herein. Any and all objections to the relief requested in the Motion, to the extent not otherwise withdrawn, waived, or resolved by consent at or before the Interim Hearing and the Final Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

---

[2]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

2.    <u>Jurisdiction; Core Proceeding</u>.    This Court has jurisdiction over the Chapter 11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    <u>Service of Motion and Notice of Interim Hearing</u>.  The Debtors have caused to be served a notice of the Motion, the Interim Hearing, and the ~~Interim~~Final Hearing, including a copy of the proposed Interim Order, entered Interim Order, proposed Final Order, and Budget (as defined below), by electronic mail, telecopy transmission, hand delivery, overnight courier, or first class United States mail upon the Office of the United States Trustee (the "<u>U.S. Trustee</u>"), the consolidated 30 largest unsecured creditors of the Debtors, the Internal Revenue Service, all parties who have filed requests prior to the date of service for notices under Rule 2002 of the Bankruptcy Rules, and all parties known by a Debtor to hold or assert a lien on any asset of a Debtor.  The foregoing notice of the Motion, as it relates to this Interim Order and the Interim Hearing, is appropriate, due, and sufficient under the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b), (c) and (d), and that no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.    <u>Petition Date</u>. On August 24, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed with the Court its respective voluntary petition for relief under chapter 11 of the Bankruptcy Code, and each is continuing to manage its properties and to operate its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed for any Debtor herein.

5.    <u>AmeriFirst's Stipulations</u>.  Without prejudice to the rights of any other party, AmeriFirst admits, stipulates, acknowledges, and agrees as follows:

a.    <u>Need for Financing</u>.  An immediate and ongoing need exists for AmeriFirst to obtain the DIP Loans in order to permit, among other things, the orderly operation of its business and the satisfaction of administrative expense claims.  AmeriFirst does not have sufficient available resources of working capital to maintain its assets without postpetition financing.  AmeriFirst's ability to maintain going concern value is essential to its preservation of the value of its assets for the benefit of all stakeholders.

b.    <u>Prepetition Credit Facility</u>. Pursuant to that certain *Amended and Restated Credit and Security Agreement*, dated as of May 15, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "<u>Prepetition Credit Agreement</u>", collectively with all other agreements, documents, and instruments executed or delivered in connection therewith, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and fee letters, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date the "<u>Prepetition Loan Documents</u>", and the credit facilities evidenced thereby, collectively, the "<u>Prepetition Credit Facility</u>") among (a) AmeriFirst Financial, Inc., as borrower the ("<u>Prepetition Borrower</u>"), (b) RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., as agent (the "<u>Prepetition Agent</u>"), (c) RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. as lenders (the "<u>Prepetition Lenders</u>" and together with the Prepetition Agent, the "<u>Prepetition Secured Parties</u>"), the Prepetition Borrower incurred "Obligations" (as defined in the Prepetition Credit Agreement, the "<u>Prepetition Loans</u>" and with other obligations, the "<u>Prepetition Secured Obligations</u>") and, the Prepetition Borrower is indebted to the Prepetition Secured Parties as set forth in the Prepetition Credit Facility.

c.    <u>Prepetition Secured Obligations</u>.  As of the Petition Date, the Prepetition Borrower was validly, justly and lawfully indebted and liable to the Prepetition Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for (x) not less than $15,798,087 in outstanding principal amount of Loans (as defined in the Prepetition Credit Agreement) plus accrued and unpaid interest thereon, and (y) any fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, financial advisors' fees, and fees of

other consultants and professionals), costs, charges, indemnities, and other Prepetition Secured Obligations in each case incurred under (or reimbursable pursuant to) or secured by the Prepetition Loan Documents.

d.    *Validity of Prepetition Secured Obligations*.  ~~Subject to entry of the Final Order,~~ AmeriFirst stipulates that the Prepetition Obligations under Prepetition Loan Documents constitute legal, valid, binding, and non-avoidable obligations of AmeriFirst in accordance with the respective terms of the relevant Prepetition Loan Documents, and no portion of the Prepetition Obligations or any payment made to the Prepetition Lenders or applied to or paid on account thereof prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action  including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law.  The Prepetition Protective Advances (as defined in the DIP Term Sheet) shall be deemed "Protective Advances" under the Prepetition Loan Documents.

e.    *Validity, Perfection and Priority of Prepetition Liens*.  ~~Subject to entry of the Final Order,~~ AmeriFirst stipulates that, as of the Petition Date, pursuant to the Prepetition Loan Documents, AmeriFirst granted for the benefit of the Prepetition Lenders, a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on (the "<u>Prepetition Liens</u>") substantially all of its assets and property as set forth in the Prepetition Loan Documents (the "<u>Prepetition Collateral</u>"), subject only to any liens permitted by the Prepetition Loan Documents to be senior to the Prepetition Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "<u>Prepetition Permitted Senior Liens</u>").

f.    *Waiver of Challenge and Challenge Period*.    AmeriFirst's stipulations, admissions, agreements and releases contained in ~~the~~this Final Order shall be binding upon it in all circumstances and for all purposes.    AmeriFirst's stipulations, admissions, agreements and releases contained in ~~the~~this Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity

acting or seeking to act on behalf of AmeriFirst's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for AmeriFirst, in all circumstances and for all purposes unless: (a) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than the later of (x) 75 calendar days after entry of ~~this~~the Interim Order and (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 75 calendar days after entry of ~~this~~the Interim Order, or (B) the date that is 30 calendar days after their appointment; or any such later date as has been agreed to in writing by the Prepetition Lenders or has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (x)-(y) the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or (B) asserting or prosecuting any avoidance action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Prepetition Lenders in connection with or related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; provided, however, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.  If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) AmeriFirst's stipulations, admissions, agreements and releases contained in ~~the~~this Final Order shall be binding on all parties in interest; (2) the obligations of AmeriFirst under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in this case and any Successor Case; (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable,

contractual or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party in interest acting or seeking to act on behalf of AmeriFirst's estate, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 case or any other party acting or seeking to act on behalf of AmeriFirst's estate, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of Prepetition Lenders shall be deemed forever waived, released and barred.  If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in ~~the~~this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in ~~the~~this Final Order will vest or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to AmeriFirst or its estate, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Loans or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in the Chapter 11 Case.

g.  No Control.  AmeriFirst's board of directors includes an independent director who has been delegated authority over all matters in the Bankruptcy Cases, including entry into the DIP Loans, where there is an actual or potential conflict of interest with any of AmeriFirst's equity holders or other stakeholders, including the Prepetition Secured Parties and the DIP Secured Parties (and the authority to determine whether such a conflict exists).  None of the Prepetition Secured Parties or the DIP Secured Parties control (or have in the past controlled) AmeriFirst or its respective properties or operations, have authority to determine the manner in which AmeriFirst's operations are conducted or are control

persons or insiders of AmeriFirst by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Loan Documents;

h.      <u>No Claims or Causes of Action</u>.  No claims or causes of action held by AmeriFirst or its estate exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined below), in each case, in their capacity as such, under or relating to any agreements by and among AmeriFirst and any Prepetition Secured Party that is in existence as of the Petition Date.

6.      <u>Findings Regarding the DIP Loan</u>.

a.      <u>Good Cause</u>.  Good cause has been shown for the entry of this ~~Interim~~<u>Final</u> Order and authorization for AmeriFirst to incur DIP Obligations (as defined below) pursuant to the DIP Term Sheet ~~as hereinafter provided up to the Interim Amount Limit during the Interim Period~~.  AmeriFirst's need for financing of the type afforded by the DIP Term Sheet is immediate and critical.  <u>AmeriFirst cannot rely on receipts from assets sales because such receipts are uncertain as to amount and timing, and are cash collateral.</u>  Entry of this ~~Interim~~<u>Final</u> Order will preserve the assets of AmeriFirst's estate and its value for the benefit of all stakeholders and is in the best interests of AmeriFirst, its creditors, and its estate.  The terms of the proposed financing are fair and reasonable, reflect AmeriFirst's exercise of business judgment, and are supported by reasonably equivalent value and fair consideration.

b.      <u>Proposed DIP Loan</u>.  AmeriFirst has requested that the DIP Lenders fund the DIP Loans from time to time (collectively with all other debts, obligations, liabilities, and indemnities of AmeriFirst under the DIP Term Sheet, the "<u>DIP Obligations</u>"), all in accordance with and subject to the terms of the DIP Term Sheet. The DIP Lenders are willing to advance the DIP Loans upon the terms and conditions set forth herein and in the DIP Term Sheet.

c.      <u>No Credit Available on More Favorable Terms</u>.   The terms of the DIP Term Sheet are favorable and it is unlikely that better terms could otherwise be obtained.<u> AmeriFirst contacted several possible alternative lenders and none were willing to make a proposal</u>.  AmeriFirst is also unable to obtain unsecured credit allowable under Section 364(c)(1) of the Bankruptcy Code without granting liens and superpriority claims in favor of the DIP Lenders

under the terms and conditions set forth in this ~~Interim~~Final Order and in the DIP Term Sheet.

d.     <u>Budget/Reporting</u>.     AmeriFirst has prepared and annexed to this ~~Interim~~Final Order as **Exhibit B** hereto a budget (as at any time amended or supplemented with the written consent of the DIP Agent, the "<u>Budget</u>"), which sets forth, among other things, the projected disbursements for the period covered thereby and which AmeriFirst believes in good faith to be realistic and achievable. The DIP Agent and the DIP Lenders are relying upon the Budget in entering into the DIP Term Sheet. As set forth in the DIP Sheet, AmeriFirst is required to deliver certain ongoing reports to the DIP Agent and the DIP Lenders showing actual disbursements compared to the Budget, subject to certain Permitted Variance (as defined in the DIP Term Sheet).

e.     <u>Certain Conditions to DIP Loan</u>.     The DIP Lenders' willingness to make DIP Loans pursuant to the DIP Term Sheet is conditioned upon, among other things, (i) AmeriFirst obtaining Court authorization to enter into the DIP Term Sheet addressing all DIP Obligations of AmeriFirst and all rights and remedies of the DIP Agent and the DIP Lenders thereunder; and (ii) the DIP Agent and the DIP Lenders receiving, as a benefit for the prompt payment of all DIP Obligations, certain liens and superpriority claims as set forth herein.

f.     ~~Interim Hearing. Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Bankruptcy Rule 4001-2, the Court has held the Interim Hearing and hereby authorizes AmeriFirst to obtain DIP Loans during the period from the date of entry of this Order through the date on which the final hearing on the Motion pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) scheduled pursuant to this Interim Order is concluded (the "Interim Period"), for purposes specified in the initial Budget.~~

<u>f.</u>     ~~g.~~<u>Finding of Good Faith</u>.     Based upon the record presented at the Interim <u>Hearing and the Final</u> Hearing, the DIP Term Sheet was negotiated in good faith and at arm's-length between AmeriFirst , the DIP Agent, and the DIP Lenders. All of the DIP Obligations including, without limitation, the DIP Loans made pursuant to the DIP Term Sheet and all other liabilities and obligations of AmeriFirst under this ~~Interim~~Final Order owing to the DIP Agent and the DIP Lenders shall be deemed to have been extended by the DIP Lenders in "good faith," as such term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code. The DIP Agent and the DIP Lenders shall be entitled to the

full protection of Section 364(e) of the Bankruptcy Code in the event that this ~~Interim~~Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

h.      ~~Immediate Entry.      AmeriFirst has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the interim relief sought by the Motion, AmeriFirst's estate will be immediately and irreparably harmed pending the Final Hearing. AmeriFirst's consummation of the DIP Loans in accordance with the terms of this Interim Order and the DIP Term Sheet is in the best interest of AmeriFirst's estate and is consistent with AmeriFirst's exercise of its fiduciary duties.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules.  No further notice of the relief sought at the Interim Hearing is necessary or required.~~

7.      <u>Authorization of ~~Interim~~ Financing; Use of Proceeds.</u>

a.      The Court hereby authorizes AmeriFirst's execution and delivery of the DIP Term Sheet in substantially the form annexed hereto (with such changes, if any, as were made prior to or as a result of the ~~Interim~~Final Hearing or are otherwise authorized to be made as amendments to the DIP Term Sheet in accordance with this ~~Interim~~Final Order).

b.      AmeriFirst is hereby authorized to borrow money pursuant to the DIP Term Sheet, on the terms and subject to the conditions, set forth in any DIP Loan Document and this ~~Interim~~Final Order, up to an aggregate outstanding principal amount at any time not exceeding the sum of $~~2,775,000~~5,000,000, plus applicable interest, expenses, fees and other charges payable in connection with such DIP Loans, and to incur any and all liabilities and obligations under the DIP Term Sheet and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Term Sheet.

c.      The DIP Agent and the DIP Lenders shall not have any obligation or responsibility to monitor AmeriFirst's use of the DIP Loans, and the DIP Agent and the DIP Lenders may rely upon AmeriFirst's representations that the amount of DIP Loans requested at any time, and the use thereof, are in accordance with the requirements of this ~~Interim~~Final Order<u>, and</u> the DIP Term Sheet~~, and Bankruptcy Rule 4001(c)(2)~~.

d.      Proceeds of any DIP Loans shall be used in accordance with the DIP Term Sheet.

8.      <u>Execution, Delivery and Performance of DIP Term Sheet</u>.  The DIP Term Sheet may be executed and delivered on behalf of AmeriFirst by any officer, director, or agent of such Debtor, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute the DIP Term Sheet for and on behalf of such Debtor.  The DIP Agent and the DIP Lenders shall be authorized to rely upon any such person's execution and delivery of the DIP Term Sheet as having been done with all requisite power and authority to do so, and the execution and delivery of any of the DIP Term Sheet or amendments thereto by any such person on behalf of AmeriFirst shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company, or other entity action (as applicable) of such Debtor.  Upon execution and delivery thereof, the DIP Term Sheet shall constitute a valid and binding obligation of AmeriFirst, enforceable against such Debtor in accordance with their terms for all purposes during its Chapter 11 Case, and any subsequently converted case of such Debtor under Chapter 7 of the Bankruptcy Code (each, a "<u>Successor Case</u>").  No obligation, payment, or transfer under the DIP Term Sheet or this ~~Interim~~Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under Sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.  AmeriFirst is authorized to do and perform all acts:  to make, execute and deliver all instruments and documents (including, without limitation, amendments, waivers, consents, and other modifications) and to pay all reasonable fees, costs and expenses in each case as may be necessary or, in the reasonable opinion of the DIP Agent

and the DIP Lenders, desirable to give effect to any of the terms and conditions of the DIP Term Sheet, to validate the perfection of the DIP Liens (as defined below), or as may otherwise be required or contemplated by the DIP Term Sheet.

9.      Roll Up.   The Prepetition Loans provided to AmeriFirst by the Prepetition Lenders (which entities are also the DIP Lenders) shall be rolled up, and converted into DIP Obligations secured by the DIP Liens ratably with the DIP Loans in an amount equal to the sum of (x) the aggregate amount of $676,400, representing the sum of $325,000 advanced to Phoenix 1040, LLC immediately prior to the Petition Date to fund the retention of Paladin Management Group and Pachulski Stang Ziehl & Jones and $351,400 advanced to Phoenix 1040, LLC to pay the premium for a director and officer liability insurance policy for the Debtors (the "Prepetition Protective Advances"); and (y) 100% of the aggregate amount of Cash Collateral used by AmeriFirst from and after the Petition Date and the principal amount of all DIP Loans advanced pursuant to the Interim Order and this Final Order.

10.     9.  DIP Liens.  As security for the DIP Obligations, effective and automatically properly perfected on the date this ~~Interim~~Final Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any collateral, without any further action by the DIP Lenders, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "DIP Liens") will be granted to the DIP Agent for the benefit of the DIP Lenders (all property identified below being collectively referred to as the "DIP Collateral," and, together with the Prepetition Collateral (as defined below), the "Collateral"), subject to and junior in all respects to the Carve-Out:

(a)    *Liens on Unencumbered Property*.   Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of AmeriFirst whether existing on the Petition Date or thereafter acquired, including, without limitation, AmeriFirst's mortgage servicing rights (to the extent such rights are unencumbered property) and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than avoidance actions and the Carve-Out, but including, ~~upon and subject to entry of the Interim Order,~~ proceeds of avoidance actions (collectively, the "Unencumbered Property").

(b)    *Liens Junior to Certain Other Liens on Encumbered Property*.   Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of AmeriFirst that, on or as of the Petition Date, is subject to and junior in all respects to the Prepetition Liens and the liens or security interests permitted under the Prepetition Loan Documents (as defined below) (the "Prepetition Permitted Senior Liens"), which Collateral (the "Encumbered Property") shall be subject to such Prepetition Liens and Prepetition Permitted Senior Liens.   For the avoidance of doubt, the valid and enforceable interests of providers of warehouse credit facilities in mortgage loans and related documents existing as of the Petition Date (the "Prepetition Warehoused

Mortgage Loans Collateral") shall be deemed Prepetition Permitted Senior Liens and the Prepetition Warehoused Mortgage Loans Collateral shall be deemed Encumbered Property.

11. ~~10.~~ DIP Superpriority Claims.  All DIP Obligations shall constitute joint and several allowed superpriority administrative claims (the "DIP Superpriority Claims") against AmeriFirst for all DIP Obligations under the DIP Term Sheet (without the need to file any proof of claim) pursuant to Section 364(c)(1) of the Bankruptcy Code having priority in right of payment over all other obligations, liabilities, and indebtedness of AmeriFirst, whether now in existence or hereafter incurred by such Debtor, and over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c ~~(subject to entry of the Final Order approving the grant~~), 507, 546(c), 552(b) 726, 1113 or 1114 of the Bankruptcy Code.  Such DIP Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all prepetition and postpetition property of AmeriFirst and all proceeds thereof; *provided*, *however*, that the DIP Superpriority Claims shall be subject to the Carve-Out (as defined below) ~~and shall not be payable from the proceeds of avoidance actions pending entry of the Final Order~~.

12. ~~11.~~ Adequate Protection.  The Prepetition Loans provided to AmeriFirst by the Prepetition Lenders are entitled to adequate protection.  The Prepetition Obligations arise under the Prepetition Loan Documents.  The Prepetition Lenders assert that, as of the Petition Date, pursuant to the Prepetition Loan Documents, AmeriFirst granted for the benefit of the Prepetition Lenders, valid, binding, properly perfected, enforceable, non-avoidable first priority Prepetition

Liens on the Prepetition Collateral, subject only to any liens permitted by the Prepetition Loan Documents to be senior to the Prepetition Liens.  Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) for the aggregate diminution in value of such interests (including from the amount of any Cash Collateral used by AmeriFirst) (the "Diminution in Value") (if any) and as an inducement to the Prepetition Lenders to consent to the use of their Cash Collateral, the Prepetition Lenders are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"), subject to and junior in all respects to the DIP Obligations and the Carve-Out:

(a)     The Prepetition Lenders, effective and perfected upon the date of this ~~Interim~~Final Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition Lenders' Diminution in Value (if any) upon all of the DIP Collateral, subject to and junior in all respects to the DIP Liens and the Carve-Out; and

(b)     The Prepetition Lenders shall be granted allowed superpriority administrative expense claims against AmeriFirst (without the need to file any proof of claim) on account of the Prepetition Lenders' Diminution in Value (if any) under section 507(b) of the Bankruptcy Code (the "Prepetition Lender 507(b) Claims"), which Prepetition Lender 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding avoidance actions, but including ~~upon entry of the Final Order~~, without limitation, proceeds of avoidance actions). Except as otherwise provided in ~~the Interim Order or the~~this Final Order

and subject to and junior in all respects to the DIP Superpriority Claims (as defined below) and the Carve-Out, the Prepetition Lender 507(b) Claims shall have priority over any and all administrative expenses and all other claims against AmeriFirst now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

13.    12. Repayment.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Term Sheet and as provided herein, without offset or counterclaim.  Without limiting the generality of the foregoing, in no event shall AmeriFirst be authorized to offset or recoup any amounts owed, or allegedly owed, by the DIP Agent or the DIP Lenders to AmeriFirst against any of the DIP Obligations without the prior written consent of the DIP Agent or the DIP Lenders that would be affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders.

14.    13. Payments Free and Clear.  Any and all payments or proceeds remitted to the DIP Agent or the DIP Lenders shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order approving the grant) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

15.   ~~14.~~ Fees and Expenses of Estate Professionals; Professional Fee Reserve. Subject to the terms of the DIP Term Sheet and the Budget, for so long as no Event of Default has occurred, AmeriFirst is authorized to use the DIP Loans or Cash Collateral to fund, on a weekly basis as set forth in the Budget, the trust account of the Debtors' general bankruptcy counsel (the "Professional Fee Reserve") for the purpose of reserving sufficient funds to pay the compensation and expense reimbursement (collectively, "Professional Fees") of estate professional persons (including attorneys, financial advisors, accountants, investment bankers, claims and/or noticing agents, appraisers, and consultants) retained by any Debtor with Court approval or as an ordinary course professional (the "Debtors Professionals") or any official committee appointed in the Chapter 11 Cases (the "Committee") with Court approval (the "Committee Professionals," collectively with the Debtors Professionals, the "Professionals"), up to the amounts set forth for each Professional in the Budget; *provided*, *however*, that, notwithstanding anything herein or in any other order of this Court to the contrary, no proceeds of the DIP Loans or Cash Collateral shall be used to pay Professional Fees incurred for any Prohibited Purpose (as defined below). The funds in the Professional Fee Reserve shall remain subject to the liens and claims of the DIP Agent and the DIP Lenders. Any excess funds in the Professional Fee Reserve after payment of Professional Fees shall be returned to AmeriFirst, subject to the liens and claims of the DIP Agent and the DIP Lenders.

16.   ~~15.~~ Section 506(c) Claims. ~~Effective upon entry of the Final Order, no~~No costs or expenses of administration shall be imposed upon the DIP Agent or the DIP Lenders pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Agent or the DIP Lenders from the payments or proceeds remitted to the DIP Agent or the DIP

Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders, provided that the Carve-Out is fully funded by AmeriFirst.

17.   16.  Carve-Out.  Notwithstanding anything in this ~~Interim~~Final Order, the DIP Term Sheet, or any other order of this Court to the contrary, the DIP Obligations and the DIP Superpriority Claims in favor of the DIP Agent and the DIP Lenders and the Prepetition Liens and Adequate Protection Obligations in favor of the Prepetition Lenders shall be subject and subordinate in all respects to the payment of the following Carve-Out.  As used in this ~~Interim~~Final Order, the "Carve-Out" means, collectively, the aggregate amount needed to satisfy (i) accrued but unpaid fees, costs, and expenses of the professionals of the Debtors and ~~the~~any Committee incurred at any time prior to the DIP Agent's or DIP Lenders' delivery of a Carve-Out Trigger Notice (as defined below), up to the aggregate amounts set forth for each Professional in the Budget for such time period and only to the extent allowed by the Bankruptcy Court, (ii) professional fees, costs and expenses of the Debtors and ~~the~~any Committee incurred after delivery of a Carve-Out Trigger Notice not to exceed $250,000 with respect to the Professionals, to the extent allowed by the Bankruptcy Court, (iii) the fees and expenses payable pursuant to 28 U.S.C. § 1930, (iv) any fees, costs, and expenses of a Chapter 7 trustee or their professionals up to $50,000 in the aggregate if either of the Chapter 11 Cases is converted to Chapter 7, and (iv) accrued but unpaid obligations to AmeriFirst's employees, including payroll, commissions, and benefits, due and owing under the Budget through the date of the Carve-Out Trigger Notice; *provided*, that nothing in this ~~Interim~~Final Order shall be construed to impair the ability of any party to object to the fees, expenses, reimbursements or compensation of any Professional, whether or not in excess of the coverage provided by the Carve-Out.  The Carve-Out shall not act as a cap on the Professional Fees that may be incurred by Professionals

in the Chapter 11 Cases.  In no event shall the Carve-Out, or the funding of the DIP Loans or the use of Cash Collateral to satisfy the Carve-Out, result in any reduction in the amount of the DIP Obligations.  "Carve-Out Trigger Notice" means written notice by the DIP Agent or the DIP Lenders to the Debtors, any Committee, and the Office of the U.S. Trustee invoking the Carve-Out, which notice may be delivered at any time after the occurrence, and during the continuation, of an Event of Default.

18.    ~~17.~~ Excluded Professional Fees.  Notwithstanding anything to the contrary in this ~~Interim~~Final Order, neither the Carve-Out, nor the proceeds of the DIP Loans or the Cash Collateral in any respect, shall be used to pay any Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following (each a "Prohibited Purpose"): (a) objecting to or contesting the validity or enforceability of this ~~Interim~~Final Order or any DIP Loan; (b) asserting or prosecuting any claim or cause of action against the DIP Agent or the DIP Lenders, other than to enforce the terms of the DIP Term Sheet or this ~~Interim~~Final Order; (c) seeking to modify any of the rights granted under this ~~Interim~~Final Order to the DIP Agent or the DIP Lenders; or (d) objecting to, contesting, delaying, preventing or interfering in any way with the exercise of rights and remedies by the DIP Agent or the DIP Lenders after the occurrence and during the continuance of an Event of Default, *provided*, that the DIP Agent and the DIP Lenders may not seek to exercise remedies, and the Debtors may seek appropriate relief from this Court, during the period of five (5) business days following the delivery of a Carve-Out Trigger Notice.

19.    ~~18.~~ Preservation of Rights Granted Under This ~~Interim~~Final Order.

    a.    Protection from Subsequent Financing Order.  There shall not be entered in any of the Chapter 11 Cases or in any Successor Case any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that is

entitled to a security interest in any of the Debtors' assets or priority administrative status that is equal or senior to the DIP Liens and DIP Superpriority Claims granted to the DIP Agent and the DIP Lenders herein; *provided*, *however*, that nothing herein shall prevent the entry of an order that specifically provides for the full payment of all of the DIP Obligations, in the manner required by the DIP Term Sheet, from the proceeds of such credit or indebtedness, and the termination of any funding commitments under the DIP Term Sheet.

b. <u>Rights Upon Dismissal, Conversion or Consolidation</u>. If any of the Chapter 11 Cases are dismissed, converted or substantively consolidated with another case, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of any of the Chapter 11 Cases shall affect the rights or remedies of the DIP Agent or the DIP Lenders under the DIP Term Sheet or the rights or remedies of the DIP Agent or the DIP Lenders under this ~~Interim~~Final Order, and all of the respective rights and remedies hereunder and thereunder of the DIP Agent and the DIP Lenders shall remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, or substantively consolidated. Unless and until full payment of all DIP Obligations has occurred, it shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 Cases. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Liens and DIP Superpriority Claims shall continue in full force and effect and shall maintain their priorities as provided in this ~~Interim~~Final Order until full payment of all DIP Obligations, (ii) such DIP Liens and DIP Superpriority Claims shall, notwithstanding such dismissal, remain binding on all parties in interest, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph and otherwise in this ~~Interim~~Final Order.

c. <u>Survival of ~~Interim~~Final Order</u>. The provisions of this ~~Interim~~Final Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases or any Successor Case.

d. <u>No Discharge</u>. None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases and, pursuant to Section

1141(d)(4) of the Bankruptcy Code, AmeriFirst has waived such discharge.

e.   <u>No Requirement to File Claim for DIP Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar date order establishing a deadline for the filing of proofs of claim entitled to administrative expense treatment under Section 503(b) of the Bankruptcy Code, the DIP Agent and the DIP Lenders shall not be required to file any proof of claim with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Term Sheet without the necessity of filing any such proof of claim; and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Term Sheet or prejudice or otherwise adversely affect any rights, remedies, powers or privileges of the DIP Agent and the DIP Lenders under any of the DIP Term Sheet or under this ~~Interim~~<u>Final</u> Order.

20.   ~~19.~~ Amendments to DIP Term Sheet.  <u>The amendments to the original DIP Term Sheet are hereby approved as necessary and in the interests of the Debtors' estates.</u>  AmeriFirst, the DIP Agent, and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Term Sheet and without further order of the Court, any amendments to and modifications of any of such DIP Term Sheet on the following conditions: (a) the amendment or modification must not constitute a Material Change (as defined below) to the terms of such DIP Term Sheet and (b) copies of the amendment or modification must be served upon counsel for ~~the~~<u>any</u> Committee, the U.S. Trustee, and other interested parties specifically requesting such notice.  Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court.  For purposes hereof, a "<u>Material Change</u>" shall mean a change that operates to reduce the DIP Loans or the maturity of the DIP Obligations, to increase the aggregate amount of the commitments of the DIP Lenders under the DIP Term Sheet, to increase the rate of interest other than as currently provided in or contemplated by the DIP Term Sheet, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the

DIP Agent or the DIP Lenders following the occurrence of an Event of Default.  Without

limiting the generality of the foregoing, any amendment of the DIP Term Sheet to postpone or

extend any date or deadline therein (including, without limitation, the expiration of the term of

the DIP Loans) shall not constitute a Material Change and may be effectuated by AmeriFirst and

the DIP Agent or the DIP Lenders without the need for further approval of the Court.

21.    20. Maturity and Repayment.  The DIP Loans shall mature and be repaid as set

forth in the DIP Term Sheet.

22.    21. Events of Default; Remedies.

    a.    Events of Default.    The occurrence of any "Event of Default"
under (and as defined in) the DIP Term Sheet shall constitute an
Event of Default under this Interim Final Order.  The term "Change
of Control" as used in the DIP Term Sheet shall mean that Phoenix
1040 LLC ceases to be sole owner of the equity interests in
AmeriFirst Financial, Inc.

    b.    Default Remedies.    Upon the occurrence and during the
continuance of any Event of Default, the DIP Agent and the DIP
Lenders may (notwithstanding the provisions of Section 362 of the
Bankruptcy Code and without application or motion to, or order
from, the Bankruptcy Court) by written notice to the Debtors, any
Committee, and the Office of the U.S. Trustee (a) send the
Carve-Out Trigger Notice and (b) declare (i) the unpaid principal
amount of and accrued interest on the DIP Loans and (ii) all other
DIP Obligations, immediately due and payable, without
presentment, demand, protest or other requirements of any kind, all
of which are hereby expressly waived by AmeriFirst, and the same
shall forthwith become immediately due and payable, and the
obligation of the DIP Lenders to make any DIP Loans shall
thereupon terminate.    Upon the occurrence and during the
continuance of any Event of Default and following the delivery of
a Carve-Out Trigger Notice, the DIP Agent and the DIP Lenders
shall be required to obtain the authority of this Court to exercise
any rights and remedies of the DIP Agent and the DIP Lenders set
forth in the DIP Term Sheet or in this Interim Final Order.

    c.    Rights Cumulative.    The rights, remedies, powers, and privileges
conferred upon the DIP Agent and the DIP Lenders pursuant to this

~~Interim~~Final Order shall be in addition to and cumulative with those contained in the DIP Term Sheet.

23.    ~~22.~~ Effect of Stipulations on Third Parties; Deadline for Challenges.  AmeriFirst's admissions, stipulations, agreements, and releases contained in this ~~Interim~~Final Order shall be binding upon such Debtor and any successor thereto (including, without limitation any Chapter 7 trustee or Chapter 11 trustee or examiner appointed or elected for such Debtor) under all circumstances and for all purposes.

24.    ~~23.~~ Service of ~~Interim~~Final Order.  Promptly after the entry of this ~~Interim~~Final Order, the Debtors shall mail, by first class mail, a copy of this ~~Interim~~Final Order~~, the Motion (and all exhibits attached to the Motion), and a notice of the Final Hearing,~~ to (without duplication) counsel for the DIP Agent and the DIP Lenders, the U.S. Trustee, the Debtors' consolidated thirty largest unsecured creditors, the Internal Revenue Service, all parties who have filed requests for notices under Rule 2002 of the Bankruptcy Rules prior to the time of such service, and all parties known by a Debtor to hold or assert a lien on any assets of a Debtor, and shall file a certificate of service regarding same with the Clerk of the Court.  Such service shall constitute good and sufficient notice of ~~the Final Hearing and the relief sought by the Debtors pursuant to the proposed~~this Final Order.

25.    ~~24.~~ No Deemed Control.  In determining to make the DIP Loans, or in exercising any rights or remedies as and when permitted pursuant to ~~this~~the Interim Order, ~~the~~this Final Order, or the DIP Term Sheet, the DIP Agent and the DIP Lenders shall not be deemed to be in control of any Debtor or its operations.

26.    ~~25.~~ Exculpation.  Nothing in this ~~Interim~~Final Order, the DIP Term Sheet, or any other document related to the DIP Loans shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the DIP Lenders any liability for any claims

arising from the prepetition or postpetition activities of any Debtor in the operation of its business or in connection with its restructuring efforts.

27.    ~~26.~~ Binding Effect; Successors and Assigns.  The provisions of the DIP Term Sheet and this Interim Order, including all findings, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Debtors, ~~the~~any Committee, and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed for the estate of any Debtor, any Chapter 7 trustee appointed or elected in a Successor Case, any examiner appointed pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any Debtor or with respect to the property of the estate of any Debtor), and shall inure to the benefit of DIP Agent and the DIP Lenders and their respective successors and assigns.

28.    ~~27.~~ Government Sponsored Enterprises and Governmental Units.

(a)    Fannie Mae Rights.

(i)      Notwithstanding anything to the contrary contained in the DIP Term Sheet or this ~~Interim~~Final Order, (a) no lien or security interest granted pursuant to the DIP Term Sheet or this ~~Interim~~Final Order (including, without limitation, the DIP Liens, the Adequate Protection Obligations, or any other lien that may be approved pursuant to the terms of this ~~Interim~~Final Order) shall attach to, modify, include, encumber, impair or otherwise affect, and (b) no administrative expense claim (of a superpriority nature or otherwise) shall prime, encumber, impair or limit, in any way: (1) any mortgage loans presently owned by, subsequently transferred to, or otherwise acquired by, the Federal National Mortgage Association (together with any successor thereto, "Fannie Mae"; and such mortgage loans, the "Fannie Mae Loans"), (2) the Fannie Mae Lender Contract (as defined below) or any of Fannie Mae's rights with respect to the sale and delivery of mortgage loans to, or any servicing rights with respect to the Fannie Mae Loans (the "Fannie Mae Servicing Rights"), or any obligations of AmeriFirst, or obligations of Fannie Mae, under the Fannie Mae Lender Contract, or (3) any cash, accounts, or other collateral (or any proceeds of the foregoing) that have been pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between AmeriFirst and Fannie Mae. Nothing in the DIP Term Sheet or this ~~Interim~~Final Order shall discharge, release or otherwise preclude any valid right of setoff or recoupment of Fannie Mae.

(ii)    Furthermore, and without limiting the foregoing, none of the principal, interest, and funds for the payment of property taxes and insurance premiums, mortgage premiums, condominium fees, or any other amounts collected by AmeriFirst or any subservicer in connection with its performance of its servicing obligations under the Fannie Mae Lender Contract are property of AmeriFirst's estate under section 541 of the Bankruptcy Code.  Fannie Mae reserves all rights in and under the Fannie Mae Lender Contract.  None of the DIP Lenders, Prepetition Lenders, or any other lender subject to this ~~Interim~~Final Order has a claim against Fannie Mae arising by virtue of this ~~Interim~~Final Order.  No secured claim or administrative expense granted pursuant to, or lien approved by, this ~~Interim~~Final Order, trumps, or negatively impacts, in any way, Fannie Mae's rights and AmeriFirst's obligations under the Fannie Mae Lender Contract (including, without limitation, with respect to the Fannie Mae Loans and the Fannie Mae Servicing Rights).

(iii)    If, notwithstanding the foregoing, any lender or other party hereafter asserts that the DIP Liens or any Adequate Protection Obligations and related adequate protection collateral, or any other lien in any other collateral that may be approved or granted pursuant to the terms of this ~~Interim~~Final Order, include: (a) any Fannie Mae Servicing Rights, (b) the Fannie Mae Lender Contract and/or (c) any other rights of AmeriFirst, or obligations of Fannie Mae under the Fannie Mae Lender Contract, any and all security interests therein shall be subject and subordinate to all rights of Fannie Mae under the Mortgage Selling and Servicing Contract, the Fannie Mae Selling Guide, the Fannie Mae Servicing Guide and all supplemental servicing instructions or directives provided by Fannie Mae, all applicable master agreements, recourse agreements, repurchase agreements, indemnification agreements, loss-sharing agreements, and any other agreements between Fannie Mae and AmeriFirst, and all as amended, restated or supplemented from time to time (collectively, the "Fannie Mae Lender Contract"), which rights include, among other rights, the right of Fannie Mae to: (1) terminate, at any time, all or any portion of servicing or the Fannie Mae Lender Contract with or without cause and (2) sell, or have transferred, the Fannie Mae Servicing Rights, with any such sale or transfer being subject to Fannie Mae's consent.

(iv)    Fannie Mae reserves all of its rights under the Fannie Mae Lender Contract, including all of its rights under the Fannie Mae Servicing Guide.  If there is any conflict between the terms of the Fannie Mae Lender Contract and those of the DIP Term Sheet, the terms of the Fannie Mae Lender Contract will control.

(b)    Freddie Mac Rights.

(i)    Notwithstanding anything to the contrary in the DIP Term Sheet or this ~~Interim~~Final Order -- (a) no lien or security interest granted pursuant to the DIP Term Sheet or this ~~Interim~~Final Order (including, without limitation, the DIP Liens, the Adequate Protection Obligations, or any other lien that may be approved pursuant to the terms of this Interim Order) shall attach to, modify, include, encumber, impair or otherwise affect and (b) no administrative expense claim (of a superpriority nature or otherwise) shall prime, encumber, impair or limit, in any way: (1) any mortgage loans presently owned by, subsequently transferred to, or otherwise acquired by, the Federal Home Loan Mortgage Corporation ("Freddie Mac"; and all such mortgage loans shall be referred to as the "Freddie Mac Loans"); (2) the Freddie Mac Agreements (defined below) or any of Freddie Mac's rights with respect to the servicing of Freddie Mac Loans for Freddie Mac under the Freddie Mac Single-Family Seller/Servicer Guide ("Freddie Mac Guide"), the Freddie Mac Single-Family/Servicer Guide Plus Additional Provisions, certain applicable Master Agreements (as defined in the Freddie Mac Guide), Purchase Contracts (as defined in the Freddie Mac Guide), Pricing Identifier Terms (as defined in the Freddie Mac Guide) supplements, addendums, Bulletins (as defined in the Freddie Mac Guide), terms of business and any other agreements between AmeriFirst and Freddie Mac, as amended, restated or supplemented from time to time (collectively, the "Freddie Mac Agreements"), or AmeriFirst's obligations with respect thereto; and/or (3) any cash, accounts, or other collateral (or any proceeds of the foregoing) that has been pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between AmeriFirst and Freddie Mac.  Nothing in the DIP Term Sheet or this ~~Interim~~Final Order shall discharge, release or otherwise preclude any valid right of setoff or recoupment of Freddie Mac.

(ii)     Furthermore, and without limiting the foregoing, none of the principal, interest, and funds for the payment of property taxes and insurance premiums, mortgage premiums, condominium fees, or any other amounts collected by AmeriFirst (or any sub-servicer) in connection with AmeriFirst's performance of its servicing obligations under the Freddie Mac Agreements are property of AmeriFirst's estate under section 541 of the Bankruptcy Code.   Freddie Mac reserve all rights in, and under, the Freddie Mac Agreements. None of the DIP Lenders, Prepetition Lenders, or any other lender subject to this ~~Interim~~Final Order has a claim against Freddie Mac arising by virtue of this Interim Order.  No secured claim or administrative expense granted pursuant to, or lien approved by, this ~~Interim~~Final Order, trumps, or negatively impacts, in any way, Freddie Mac's rights and AmeriFirst's obligations under the Freddie Mac Agreements (including, without limitation, with respect to the Freddie Mac Loans and the Freddie Mac Servicing Contract Rights (as defined in the Freddie Mac Agreements)).

(iii)    If, notwithstanding the foregoing, any lender or other party hereafter asserts that the DIP Liens or Adequate Protection Obligations and related adequate protection collateral, or any other lien in any other collateral that may be approved or granted pursuant to the terms of this ~~Interim~~Final Order, include: (i) any Servicing Contract Rights (as defined in the Freddie Mac Agreements) relating to Freddie Mac Loans; (ii) any Freddie Mac Agreement; and/or (iii) any other rights of Freddie Mac, or the obligations of AmeriFirst, under any Freddie Mac Agreement, any and all security interests therein shall be subject and subordinate to all rights of Freddie Mac under the Freddie Mac Agreements, which rights include, among other rights, the right to, among other things: (i) terminate, at any time, all, or any portion of, Servicing (as defined by the Freddie Mac Agreements) by AmeriFirst, and/or to suspend or disqualify AmeriFirst as Seller or Servicer (as defined in the Freddie Mac Agreements), with or without cause, and (ii) sell, or have transferred, the Freddie Mac Servicing Contract Rights (as defined in the Freddie Mac Agreements) associated with Freddie Mac Loans, with any such sale or transfer being subject to Freddie Mac and its conservator, Federal Housing Finance Agency's, consent.

(iv)    Freddie Mac reserves all of its rights under all Freddie Mac Agreements. If there is any conflict between the terms of any Freddie Mac Agreements and those of the DIP Term Sheet or in this ~~Interim~~Final Order, the Freddie Mac Agreements shall explicitly supersede and control.

(c)    GNMA Rights.

(i)    The Government National Mortgage Association ("GNMA") is a wholly-owned Government Corporation within the U.S. Department of Housing and Urban Development ("HUD").   Pursuant to 12 U.S.C. § 1716, *et seq.* and 24 C.F.R. Part 300 (collectively, the "National Housing Act"), GNMA is a federal agency that guarantees investors the timely payment of principal and interest on mortgage-backed securities ("MBS") backed by federally insured or guaranteed mortgage loans (e.g., mortgage loans insured by the Federal Housing Administration ("FHA"), guaranteed by the U.S. Department of Veterans Administration ("VA"), or guaranteed by the U.S. Department of Agriculture's Rural Housing Service ("RHS" ). Notwithstanding anything to the contrary contained in the DIP Term Sheet or this ~~Interim~~Final Order, (A) no lien or security interest granted pursuant to the DIP Term Sheet or this ~~Interim~~Final Order (including, without limitation, the DIP Liens, the Adequate Protection Obligations, or any other lien that may be approved pursuant to the terms of this ~~Interim~~Final Order) shall attach to, modify, include, encumber, impair or otherwise affect, and (B) no administrative expense claim (of a superpriority nature or otherwise) shall prime, encumber, impair or limit, in any way: (1) any mortgage loans that presently, subsequently, or are otherwise acquired by, AmeriFirst and serve as collateral for the GNMA MBS (and such mortgage loans, the "GNMA Loans"), (2) the GNMA Agreements (as defined below) or any of GNMA's rights with respect to the assignment or transfer any servicing rights with respect to the GNMA Loans (the "GNMA Servicing Rights"), or any obligations of AmeriFirst under the GNMA Agreements, or (3) any cash, accounts, or other collateral (or any proceeds of the foregoing) that have been pledged to GNMA pursuant to any collateral pledge agreement or other security agreement between AmeriFirst and GNMA.

(ii)     Without limiting the foregoing, none of the principal, interest, and funds for the payment of property taxes and insurance premiums, mortgage premiums, condominium fees, or any other amounts collected by AmeriFirst or any subservicer in connection with its performance of its servicing obligations under the GNMA Agreements are property of AmeriFirst's estate under section 541 of the Bankruptcy Code.  Further, nothing in this ~~Interim~~Final Order or the DIP Term Sheet shall (a) preclude or limit GNMA' rights pursuant to the National Housing Act or the GNMA Agreements; (b) be construed to limit the right of the United States to take any action not subject to the automatic stay; or (c) releases or waives AmeriFirst's obligations and liabilities pursuant to any and all statutes, regulations, rules, policies and procedures of GNMA, FHA, RHS, and VA, including, without limitation, (1) the National Housing Act and GNMA Agreements; (2) 42 U.S.C. §§ 1471 et seq. and 7 C.F.R. part 3555; and (3) 38 U.S.C. §§ 3701 et seq., 38 C.F.R. part 36, and all administrative materials issued under such statutes or regulations thereunder, nor shall anything discharge, release or otherwise preclude any valid right of setoff or recoupment of the United States.  None of the DIP Lenders, Prepetition Lenders, or any other lender subject to this ~~Interim~~Final Order has a claim against GNMA arising by virtue of this ~~Interim~~Final Order.  No secured claim or administrative expense granted pursuant to, or lien approved by, this ~~Interim~~Final Order, trumps, or negatively impacts, in any way, GNMA's rights and AmeriFirst's obligations under the GNMA Agreements (including, without limitation, with respect to the GNMA Loans and the GNMA Servicing Rights).

(iii)     If, notwithstanding the foregoing, any lender or other party hereafter asserts that the DIP Liens or any Adequate Protection Obligations and related adequate protection collateral, or any other lien in any other collateral that may be approved or granted pursuant to the terms of this ~~Interim~~Final Order, include: (a) any GNMA Servicing Rights, (b) the GNMA Agreements and/or (c) any other rights of GNMA or obligations of AmeriFirst under the GNMA Agreements, any and all security interests therein shall be subject and subordinate to all rights of GNMA under the National Housing Act, the GNMA Guide, all guaranty agreements, MBS prospectus documents, escrow agreements, unilateral notification, notices of violation, supplements, addendums, amendments, and related agreements (collectively, the "<u>GNMA Agreements</u>"), which rights include, among other rights, the right of GNMA to: (1) extinguish, at any time, all or any rights and interests of AmeriFirst under the GNMA Agreements with or without cause, or (2) review and consent to any proposed assignment or transfer the GNMA Servicing Rights.

(iv)     GNMA reserves all of its rights under the GNMA Agreements, including all of its rights under the National Housing Act and GNMA Guide.  If there is any conflict between the terms of the GNMA Agreements and those of the DIP Term Sheet <u>or this Final Order</u>, the terms of the GNMA Agreements will control.

~~28.     Final Hearing.  The Final Hearing to consider entry of the Final Order shall be held at **2:00 p.m., prevailing Eastern time, on September 18, 2023**, United States Bankruptcy Court, 824 North Market Street, 3rd floor, Wilmington, Delaware 19801.  The Final Hearing may be adjourned or postponed without further notice except as may be announced in open Court or posted on the Court's docket.  If any or all of the provisions of this Interim Order are modified, vacated, or stayed as the result of any Objection (as defined below) timely filed and asserted at~~

the Final Hearing, then any DIP Obligations incurred prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent and the DIP Lenders shall be entitled to the protections afforded under Section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, without limitation, the DIP Liens and DIP Superpriority Claims granted herein and pursuant to the DIP Term Sheet with respect to all such DIP Obligations.

29.    Objection Deadline.  If any party in interest shall have an objection to any of the provisions of this Interim Order, any provisions of the DIP Term Sheet, or any provisions of the proposed Final Order (collectively, an "Objection"), such party may assert such Objection at the Final Hearing, if a written statement setting forth the basis for such Objection is filed with the Court and concurrently served so as to be received on or before **5:00 p.m., prevailing Eastern time, on September 13, 2023**, by the following: (a) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (b) counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, Attn.:  Laura Davis Jones, 919 North Market Street, 17th Floor, Wilmington, DE 19801, email:  ljones@pszjlaw.com; and (c) counsel for the DIP Agent and the DIP Lenders, Quinn Emanuel Urquhart & Sullivan, LLP, Attn.: Patricia B. Tomasco, 711 Louisiana Street, Suite 500, Houston, TX 77002 and Quinn Emanuel Urquhart & Sullivan, LLP, Attn.:  Bennett Murphy, 51 Madison Avenue, 22nd Floor, New York, New York 10010; email: pattytomasco@quinnemanuel.com, bennettmurphy@quinnemanuel.com.  If an objecting party shall fail to appear at the Final Hearing and assert the basis for such Objection before the Court, such Objection shall be deemed to have been waived and abandoned by such objecting party. The Debtors shall file any final DIP Term Sheet, proposed Final Order, or any other definitive documentation relating thereto on or before **11:59 p.m., prevailing Eastern time, on**

~~**September 7, 2023**.  The Debtors and any other party supporting the Motion and the Final Order may file a reply in support thereof on or before **11:59 p.m., prevailing Eastern time, on September 14, 2023**.~~

29.    ~~30.~~ Effectiveness; Enforceability.    This ~~Interim~~Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  ~~Notwithstanding Bankruptcy Rules 4001(a)(3), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim~~This Final Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this ~~Interim~~Final Order; and any stay of the effectiveness of this ~~Interim~~Final Order that might otherwise apply is hereby waived for cause shown.

30.    ~~31.~~ Retention of Jurisdiction.  This Court shall retain jurisdiction to enforce the provisions of this ~~Interim~~Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for AmeriFirst notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

~~32.    No Roll-Up.  Notwithstanding anything to the contrary herein or in the DIP Term Sheet, no roll-up of Prepetition Loans is approved by this Interim Order and all rights are reserved as to any such roll-up pending entry of the Final Order.~~

31.    ~~33.~~ Inconsistencies.  To the extent of any inconsistencies or conflicts between this ~~Interim~~Final Order and the DIP Term Sheet, this ~~Interim~~Final Order shall govern.

_____,

# EXHIBIT A

## Amended DIP Term Sheet

**AMERIFIRST FINANCIAL, INC.**
AMENDED AND RESTATED
**BINDING DIP TERM SHEET DATED ~~AUGUST 28~~SEPTEMBER 7, 2023**[1]

| | |
|---|---|
| **Borrowers:** | AmeriFirst Financial, Inc. as debtor-in-possession (the "Debtor") |
| **DIP Credit Facility:** | Maximum available on entry of the Interim Order: $2,775,000<br>Maximum available upon entry of the Final Order: $5,000,000<br><br>The DIP Credit Facility is a senior secured, superpriority term loan facility.<br><br>Amounts repaid under the DIP Credit Facility may be reborrowed consistent with the Approved Budget. |
| **DIP Lenders:** | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., RCP Customized Credit Fund (Fund IV-A), L.P. ("DIP Lenders") |
| **Agent:** | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. ("DIP Agent") |
| **Interest Rate:** | Non-default:  SOFR plus 2.0%, which shall be accrued and payable upon maturity of the DIP Loans<br>Default:  SOFR plus 4.5% payable in cash monthly in arrears. |
| **Fees** | 50 bps on total facility size and 50 bps on unused committed amounts, both of which shall be accrued and payable upon maturity of the DIP Loans. |
| **Maturity and Repayment:** | The DIP Loans shall mature on the earliest of (unless extended in writing by the DIP Agent):  (i) November 30, 2023; (ii) the effective date or the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court; (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of the Debtor or the chapter 11 case of Phoenix 1040, LLC to a liquidation under Chapter 7 of the Bankruptcy Code; (iv) the date of consummation of a sale or other disposition of all or substantially all of the assets of the Debtor under section 363 of the Bankruptcy Code or otherwise; (v) the date the Bankruptcy Court orders the dismissal of the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC; (vi) the date of acceleration of the DIP Loans, including as a result of the occurrence and continuance of an Event of Default; and (vii) the date that is 35 calendar days after the Petition Date if the Final Order shall not have been entered by such date.<br><br>Upon the maturity of the DIP Loans, the Debtor shall repay to the DIP Agent for the ratable account of the DIP Lenders the aggregate principal amount of all DIP Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount of the DIP Loans (to be paid to but excluding the date of such payment) and all fees and expenses and other obligations payable under the DIP Facility (together, the "DIP Obligations"). |
| **Use of Proceeds:** | The proceeds of the DIP Loans shall be applied strictly in accordance with the Approved Budget (subject to the Permitted Variance), including, without limitation, to the extent authorized by the Bankruptcy Court, to pay the prepetition accrued wages specified in the Initial Budget (subject to the Permitted Variance).<br><br>No part of the proceeds of any DIP Loan, the Cash Collateral, or any other of the Collateral will be used:<br><br>(i) for any purpose that is prohibited under the Bankruptcy Code or the Interim or the Final Order; or<br>(ii) to investigate, commence, prosecute, or finance in any way (or reimburse for |

---

[1]  Capitalized terms not defined herein have the meaning set forth in the proposed Interim Order.

| | |
|---|---|
| | expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Agent and the DIP Lenders, including to commence or prosecute or join in any action against the DIP Agent or the DIP Lenders with respect to or related to: <br><br> (A) the claims, liens or security interest of the DIP Agent and the DIP Lenders, or their respective rights and remedies under the Interim Order or the Final Order, as the case may be, including to commence or prosecute or join in any action against the DIP Agent or the DIP Lenders seeking (x) to avoid, subordinate or recharacterize the DIP Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Agent or the DIP Lenders or (z) to prevent or restrict the exercise by the DIP Agent or the DIP Lenders of any of their respective rights or remedies under the Interim Order or the Final Order, <br><br> (B) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the releases set forth in the Interim Order and the Final Order, <br><br> (C) the stipulations to be made by the Debtor and approved by the Final Order; or <br><br> (D) any other action which with the giving of notice or passing of time would result in an Event of Default as described below; or <br><br> (iii) to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the Prepetition Agent or the Prepetition Lenders, including to commence or prosecute or join in any action against the Prepetition Agent or the Prepetition Lenders with respect to or related to the claims, liens or security interest of the Prepetition Agent and the Prepetition Lenders, or their respective rights and remedies under the Interim Order or the Final Order, as the case may be, or the Prepetition Loan Documents, including to commence or prosecute or join in any action against the Prepetition Agent or the Prepetition Lenders seeking (x) to avoid, subordinate or recharacterize the Prepetition Obligations, (y) any monetary, injunctive or other affirmative relief against the Prepetition Agent or the Prepetition Lenders or (z) to prevent or restrict the exercise by the Prepetition Agent or the Prepetition Lenders of any of their respective rights or remedies under the Interim Order or the Final Order, as the case may be, or, to the extent authorized by the Interim Order or the Final Order, under the Prepetition Loan Documents ; <u>provided, however</u>, that up to $50,000 in the aggregate of the proceeds of any DIP Loan or cash collateral may be used solely by any statutory committee appointed in the Chapter 11 Case to investigate, but not to commence, prosecute or finance litigation, with respect to the foregoing. |
| **Budget** | Following delivery of the Initial Budget, not later than the last Business Day of the last full calendar week of each month (or earlier with respect to the budget to be attached to the Final Order) (the "<u>Updated Budget Deadline</u>"), the Debtor shall provide the DIP Agent with an updated budget (each such update which is approved in accordance with the terms hereof, an "<u>Updated Budget</u>"), prepared by management of the Debtor in consultation with the DIP Agent covering up to a 13-week period that commences with the Updated Budget Deadline, consistent with the form and level of detail set forth in the Initial Budget. Each Updated Budget shall be, in each case, subject to the written approval of the DIP Agent (in its sole discretion). As used herein, the "<u>Approved Budget</u>" shall mean (i) initially, the Initial Budget and (ii) thereafter, upon (and subject to) the approval of any Updated Budget by the DIP Agent, such Updated Budget. |
| **Budget Variance** | Commencing on Friday, September 8, 2023, and on each Friday thereafter, the Debtor shall provide a weekly variance report to the DIP Agent showing actual receipts (if any) and actual disbursements compared against the projected receipts (if any) and projected disbursements in the Approved Budget through the last Business Day of the prior week (each, a "<u>Budget Variance Test Date</u>"). The Debtor shall not permit: |

2

| | |
|---|---|
| | (a) the sum of the actual aggregate operating disbursements of the Debtor for the four weeks (or lesser period if applicable) ending immediately prior to such Budget Variance Test Date (the "Budget Variance Test Period") to be greater than 110% of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Operating Disbursements" for such Budget Variance Test Period (the "Permitted Variance"); or |
| | (b) the sum of the actual disbursements of fees incurred by professionals of any unsecured creditors committee in the Chapter 11 Case and of the Debtor ending immediately prior to such Budget Variance Test Date to be greater than the amount set forth for the line item in the Approved Budget under "Non-Operating Disbursements" for such Budget Variance Test Period. |
| | To the extent that any Budget Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the described above. |
| **Conditions of Borrowing** | The following shall each be true as the date of any Credit Extension: |
| | (a) (i) All Chapter 11 Orders filed or to be filed with, and submitted to, the Bankruptcy Court shall be in form and substance reasonably acceptable to the DIP Agent. (ii) Each Chapter 11 Order that has been entered as of such date shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the DIP Agent. (iii) The Debtor shall be in compliance in all material respects with the Interim Order and the Final Order, as applicable, and each other Chapter 11 Order. (b) The DIP Agent shall have received a Request for Credit Extension in accordance with the requirements hereof. (c) All engagement letters or other agreements providing for the payment of the fees and expenses of the Debtor's proposed professional advisors shall be in form and substance reasonably satisfactory to the DIP Agent. |
| | The effectiveness of the DIP Credit Facility and the obligation of the DIP Lenders to fund the Initial Loans shall be subject to the satisfaction or waiver of the following conditions precedent: |
| | (a) The Interim Order (i) shall have been entered by the Bankruptcy Court and (ii) shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, or vacated, absent prior written consent of Agent. (b) All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent. (c)(i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtor or its business, properties or assets, and (ii) no order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or any other relief authorizing any third party to exercise control over the bankruptcy estate of the Debtor or any Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions. (d) The DIP Agent shall have received the Initial Budget and such other information (financial or otherwise) regarding the Initial Budget as the DIP Lenders or the DIP Agent may reasonably request. (e) Subject to Bankruptcy Court approval, the Debtor shall have the corporate power and authority to make, deliver and perform their obligations under the Interim Order. |
| | The obligation of the DIP Lenders to fund loans subsequent to the Initial Loans shall |

| | be subject to the satisfaction or waiver of the following conditions precedent: |
|---|---|
| | (a) The Final Order (i) shall be in form and substance satisfactory to the Agent, (ii) shall have been entered by the Bankruptcy Court within a date which is 35 days following the Petition Date, and (iii) shall be in full force and effect and shall not have been modified or amended absent prior written consent of the DIP Agent or reversed, modified, amended, stayed, or vacated, absent the prior written consent of the DIP Agent. |
| | (b) The Debtor shall be in compliance with each order entered in the Chapter 11 Case, including the Interim Order, and following entry of the Final Order, the Final Order. |
| | (c) The Debtor shall be in compliance with the Approved Budget (subject to the Permitted Variance). |
| | (d) All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Agent. |
| | (e)(i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtor or its business, properties or assets, and (ii) no order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or any other relief authorizing any third party to exercise control over the bankruptcy estate of the Debtor or any Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions, and no motion or application shall have been filed with respect to the foregoing other than a motion that is being contested by the Debtor in good faith. |
| | (f) The DIP Agent shall have received the Initial Budget and such other information (financial or otherwise) regarding the Initial Budget as the DIP Lenders or the DIP Agent may reasonably request. |
| **Roll-up** | ~~Subject to entry of the Final Order, an amount of the loans under the prepetition credit facility (the "~~The Prepetition Loans~~")~~ provided to the Debtor by the Prepetition Lenders (which entities are also the DIP Lenders) shall be rolled up, and converted into DIP Obligations secured by the DIP Liens ratably with the DIP Loans in an amount equal to the sum of (x) the ~~amounts~~aggregate amount of $676,400, representing the sum of $325,000 advanced to Phoenix 1040, LLC immediately prior to the Petition Date to fund the retention of ~~professionals and premiums~~Paladin Management Group and Pachulski Stang Ziehl & Jones and $351,400 advanced to Phoenix 1040, LLC to pay the premium for a director and officer liability insurance policy for the Debtors (the "Prepetition Protective Advances"); and (y) 100% of the aggregate amount of Cash Collateral used by the Debtor ~~and~~from and after the Petition Date and the principal amount of all DIP Loans advanced pursuant to the Interim Order and the Final Order. |
| **Perfection and Enforceability of Prepetition Obligations and Liens** | Subject to entry of the Final Order, the Debtor stipulates that the Prepetition Loans and other obligations of the Debtor (the "Prepetition Obligations") under that certain *Amended and Restated Credit and Security Agreement*, dated as of May 15, 2023, and the Loan Documents (as defined therein) (the "Prepetition Loan Documents"), constitute legal, valid, binding, and non-avoidable obligations of the Debtor in accordance with the respective terms of the relevant Prepetition Loan Documents, and no portion of the Prepetition Obligations or any payment made to the Prepetition Lenders or applied to or paid on account thereof prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law. The Prepetition Protective Advances shall be deemed "Protective Advances" under the Prepetition Loan |

4

|  | Documents. |
|--|--|
|  | Subject to entry of the Final Order, the Debtor stipulates that, as of the Petition Date, pursuant to the Prepetition Loan Documents, the Debtor granted for the benefit of the Prepetition Lenders, a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on (the "Prepetition Liens") substantially all of their assets and property as set forth in the Prepetition Loan Documents (the "Prepetition Collateral"), subject only to any liens permitted by the Prepetition Loan Documents to be senior to the Prepetition Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition Permitted Senior Liens"). |
| **Challenge Period** | The Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon the Debtor in all circumstances and for all purposes. The Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes unless: (a) (x) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than the later of (x) ~~21~~75 calendar days after entry of the ~~Final~~Interim Order and (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) ~~21~~75 calendar days after entry of the ~~Final~~Interim Order, or (B) the date that is 30 calendar days after their appointment; or any such later date as has been agreed to in writing by the Prepetition Lenders or has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (x)-(z) the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or (B) asserting or prosecuting any avoidance action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Prepetition Lenders in connection with or related to the Prepetition Loan Documents, the Prepetition Loans, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; provided, however, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred. If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) the Debtor's stipulations, admissions, agreements and releases contained in the Final Order shall be binding on all parties in interest; (2) the obligations of the Debtor under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in this case and any Successor Case; (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any |

| | |
|---|---|
| | applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case or any other party in interest acting or seeking to act on behalf of the Debtor's estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 case or any other party acting or seeking to act on behalf of the Debtor's estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of Prepetition Lenders shall be deemed forever waived, released and barred. If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in the Final Order will vest or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Loans or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in the Chapter 11 Case. |
| **Waiver/Modification of the Automatic Stay** | The Interim Order and the Final Order shall include a customary waiver/modification of the automatic stay to permit the DIP Agent and the DIP Lenders to take all actions as are necessary or appropriate to implement the terms of the Interim Order and the Final Order. The automatic stay shall be modified to the extent necessary to permit the DIP Agent on behalf of the DIP Lenders to take any action necessary or appropriate to perfect the liens of the DIP Lenders on the DIP Collateral and the Collateral. |
| **Adequate Protection** | Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral for the aggregate diminution in value of such interests (including from the amount of any Cash Collateral used by the Debtor) (the "Diminution in Value") (if any) and as an inducement to the Prepetition Lenders to consent to the use of their Cash Collateral, the Prepetition Lenders are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"), subject to and junior in all respects to the DIP Obligations and the Carve-Out:

(i)   The Prepetition Lenders, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition Lenders' Diminution in Value (if any) upon all of the DIP Collateral, subject to and junior in all respects to the DIP Liens (as defined below) and the Carve-Out; and

(ii)   The Prepetition Lenders shall be granted allowed superpriority administrative expense claims against the Debtor (without the need to file any proof of claim) on account of the Prepetition Lenders' Diminution in Value (if any) under section 507(b) of the Bankruptcy Code (the "Prepetition Lender 507(b) Claims"), which Prepetition Lender 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding avoidance actions, but including upon entry of the Final Order, without limitation, proceeds of avoidance actions). Except as otherwise |

| | |
|---|---|
| | provided in the Interim Order or the Final Order and subject to and junior in all respects to the DIP Superpriority Claims (as defined below) and the Carve-Out, the Prepetition Lender 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtor now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |
| **Collateral:** | As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Lenders, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "DIP Liens") will be granted to the DIP Agent for the benefit of the DIP Lenders (all property identified below being collectively referred to as the "DIP Collateral," and, together with the Prepetition Collateral, the "Collateral"), subject to and junior in all respects to the Carve-Out: *Liens on Unencumbered Property* Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the Debtor whether existing on the Petition Date or thereafter acquired, including, without limitation, the Debtor's mortgage servicing rights (to the extent such rights are unencumbered property) and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than avoidance actions and the Carve-Out (and any amounts held therein), but including, upon and subject to entry of the Interim Order, proceeds of avoidance actions (collectively, the "Unencumbered Property"). *Liens Junior to Certain Other Liens on Encumbered Property* Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtor that, on or as of the Petition Date, is subject to and junior in all respects to the Prepetition Liens and the liens or security interests permitted under the Prepetition Loan Documents (i.e., the Prepetition Permitted Senior Liens), which Collateral (the "Encumbered Property") shall be subject to such Prepetition Liens and Prepetition Permitted Senior Liens. For the avoidance of doubt, the valid and enforceable interests of providers of warehouse credit facilities in mortgage loans and related documents existing as of the Petition Date (the "Prepetition Warehoused Mortgage Loans Collateral") shall be deemed Prepetition Permitted Senior Liens and the Prepetition Warehoused Mortgage Loans Collateral shall be deemed Encumbered Property. |
| **DIP Superpriority Claims** | The DIP Obligations shall be superpriority administrative expense claims against the Debtors (without the need to file any proof of claim) under section 507(b) of the Bankruptcy Code entitled to superpriority status senior to the Prepetition Lender 507(b) Claims, as set forth in the Interim Order and the Final Order (the "DIP Superpriority Claims"). |

| Carve-Out: | As ~~to be~~ provided in the Interim Order and Final Order |
|---|---|
| **Events of Default:** | (a)     [Reserved] |
| | (b)     Failure to pay or prepay principal or interest within three (3) business days after the same becomes due. |
| | (c)     Failure to perform or observe any other term, covenant or agreement described herein and such failure continue for fifteen (15) days after receipt by the Debtor of written notice thereof. |
| | (d)     Any final judgment or order is entered against the Debtor for the payment of money in excess of $100,000 and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal for a period of (60) days. |
| | (e)     The Interim Order or the Final Order shall for any reason cease to create, or shall be asserted by the Debtor not to create, a valid and perfected lien on and security interest in the Collateral with the priority required herein. |
| | (f)     Any Change in Control. |
| | (g)     The Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 35 days following the Petition Date, which Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated. |
| | (h)     The Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC shall be dismissed or the Bankruptcy Court shall have made a ruling requiring the dismissal of the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC , suspended or converted it to a case under chapter 7 of the Bankruptcy Code, or the Debtor shall file any pleading requesting any such relief; or a motion shall be filed by the Debtor for the approval of, or there shall arise, (x) any other claim having priority senior to or *pari passu* with the claims of the DIP Agent and the DIP Lenders or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out)or (y) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted in the Interim Order or the Final Order, except as expressly provided herein and in the Interim Order or the Final Order, as applicable. |
| | (i)     The Debtor shall file a motion in the Chapter 11 Case to obtain additional or replacement financing from a party other than DIP Lenders under Section 364(d) of the Bankruptcy Code or to use Cash Collateral of a DIP Lender under Section 363(c) of the Bankruptcy Code, except to the extent any such financing shall provide for the payment in full in cash of the DIP Obligations and the obligations under the Prepetition Loan Documents. |
| | (j)     The Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (A) approving payment of any prepetition claim other than (x) as provided for in (i) the First Day Orders or Second Day Orders or (ii) the Approved Budget or (y) otherwise consented to by the DIP Agent on behalf of  the DIP Lenders in writing, (B) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets with a fair market value in excess of $100,000; or (C) approving any settlement or other stipulation not approved by the DIP Agent on behalf of  the DIP Lenders in writing with any secured creditor providing for payments as adequate protection or otherwise to such secured creditor. |
| | (k)     An order shall be entered by the Bankruptcy Court without the express prior written consent of the DIP Agent on behalf of  the DIP Lenders (i) to revoke, reverse, stay, modify, supplement, vacate or amend the Interim Order or the Final Order in a manner inconsistent with this term sheet in a manner adverse to the DIP Lenders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the DIP Loans (other than the Carve-Out); or (iii) to grant or permit the grant of a Lien on the Collateral. |
| | (l)     An application for any of the orders described in clauses (h), (i), (j), (k), (n) and |

8

| | |
|---|---|
| | (r) shall be made by a Person other than the Debtor, and such application is not contested by the Debtor in good faith or any Person obtains a non-appealable final order charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Lenders or obtains a final order adverse to the DIP Lenders.<br><br>(m)   The Debtor shall fail to comply with the terms and conditions of the Interim Order or the Final Order in any material respect, and such failure is not cured within two (2) Business Days of knowledge or notice thereof.<br><br>(n)   The Bankruptcy Court shall enter order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Case or the chapter 11 case of Phoenix 1040, LLC or the Debtor shall file, or support, any pleading seeking such relief.<br><br>(o)   The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Debtor to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent on behalf of the DIP Lenders.<br><br>(p)   The Debtor shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor) any other Person's opposition of any motion made in the Bankruptcy Court by or on behalf of the DIP Lenders seeking confirmation of the amount of the DIP Lenders' claim or the validity and enforceability of the Liens in favor of the DIP Agent.<br><br>(q)   (A) The Debtor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtor any other person's motion to, disallow in whole or in part the DIP Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the DIP Agent or contest any material provision of any Loan Document, (B) the Debtor shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the DIP Agent or the DIP Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, (C) any Liens on the Collateral and/or super-priority claims shall otherwise, for any reason, cease to be valid, perfected and enforceable in all respects, (D) any action is commenced by the Debtor  that contests the validity, perfection or enforceability of any of the Liens and security interests of the DIP Agent or the DIP Lenders created by the Interim Order or the Final Order, or (E) any material provision of the Interim Order or the Final Order shall cease to be effective.<br><br>(r)   Any judgments which are in the aggregate in excess of $100,000 as to any postpetition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed.<br><br>(s)   An order shall be entered by the Bankruptcy Court transferring venue of the Chapter 11 Case to any other court. |
| **Milestones:** | ~~To be included in the Final Order.~~None, aside from maturity of the DIP Loans as set forth herein. |
| **Waivers:** | Subject to entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. Further, effective upon entry of the Final Order, the |

9

| | Debtors shall waive and the Final Order shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory, and in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Lenders. |
|---|---|

10

**AGREED AS OF THE DATE FIRST WRITTEN ABOVE:**

**BORROWER:**

**AMERIFIRST FINANCIAL, INC.**

By:    T. Scott Avila
Title:  Chief Restructuring Officer

**DIP AGENT AND DIP LENDER:**

**RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P.**

_____
By: _____
Title: _____

**DIP LENDER**:

**RCP CUSTOMIZED CREDIT FUND LOAN SPV (FUND IV-A), L.P.**

_____
By: _____
Title: _____

**AGREED AS OF THE DATE FIRST WRITTEN ABOVE:**

**BORROWERS:**

**AMERIFIRST FINANCIAL, INC.**

By: _____
Name: _____
Title: _____

**DIP AGENT AND DIP LENDER:**

**RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P.**

By:   Reverence Capital Partners Credit (Fund III)
      GP, LLC, its General Partner

By: _____
Name: Peter C. Aberg
Title:  Member

**DIP LENDER**:

**RCP CUSTOMIZED CREDIT FUND LOAN SPV (FUND IV-A), L.P.**

By:   RCP CUSTOMIZED CREDIT FUND (FUND IV)
      GP, LLC, its General Partner

By: _____
Name: Peter C. Aberg
Title:  Member

**<u>EXHIBIT B</u>**

~~Initial~~<u>DIP</u> **Budget**

[TO BE FILED]

**Dane Deposition**

**Exhibit 10 – Redacted**

# KASOWITZ BENSON TORRES LLP

EDWARD E. FILUSCH
DIRECT DIAL: (212) 506-3315
DIRECT FAX: (212) 835-5010
EFilusch@kasowitz.com

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

August 22, 2023

**VIA EMAIL**

Reverence Capital Partners
590 Madison Ave., 29th Floor
New York, New York 10022
Email: RCPCredit@ReverenceCapital.com

### RE: Notice of Default

To Whom it May Concern:

As you know, we represent AmeriFirst Financial, Inc. ("AFI"). Reference is made to that certain Amended and Restated Credit and Security Agreement dated as of May 15, 2023, by and between AmeriFirst Financial, Inc., RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., and the several lenders from time to time party thereto (the "A&R Credit Agreement").[1]  I am writing to formally notify you of the violation of the A&R Credit Agreement committed by Reverence Capital Partners (together with its agents or subsidiaries, including RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., "RCP"), and RCP's default under the A&R Credit Agreement.  This default is the latest in an escalating series of breaches and violations since almost the moment the A&R Credit Agreement was signed, which has culminated in RCP's refusal to release funds from the Collection Account sufficient to enable AFI to satisfy its payroll obligations, in willful and flagrant violation of the A&R Credit Agreement.

As you know, Section 5.01(e) of the A&R Credit Agreement governs the adoption of Approved Budgets.  Because of numerous delays—each resulting from RCP's action, not those of AFI—AFI has been forced at RCP's insistence to revise the budgets presented to RCP on multiple occasions.  The current Approved Budget reflected a number of necessary payments that had to be made this month, including licensing fees to Paragon Software to keep certain aspects of AFI's computer infrastructure running; payments to Deutsche Bank National Trust Company for custodial-related services; payments due on various company credit cards; rent obligations; and

---

[1] Terms capitalized but not defined herein shall have the definitions ascribed to them in the A&R Credit Agreement.



# Kasowitz Benson Torres llp

Reverence Capital Partners
August 22, 2023
Page 2

payroll obligations.  None of these obligations could be characterized as discretionary expenses; each is undeniably a necessary payment to continue operation of the business.

Nonetheless, rather than release funds sufficient to cover these necessary expenses, RCP elected instead to sweep the Collection Account, withdrawing (i) $5,000,000.00 on May 25, 2023, and (ii) $3,258,313.00 on June 29, 2023, despite AFI's explicit warnings that such a sweep would leave AFI undercapitalized, in danger of violating net worth covenants with the Federal National Mortgage Association ("Fannie Mae"), and unable to pay the above-detailed bills on time.  As of the date of this notice, the Collection Account has been left with a balance of $594,054.00, which is insufficient to pay each of the obligations above and satisfy ongoing financial covenants with Fannie Mae.  Moreover, when AFI sought approval to meet its most crucial and pressing obligation—payroll—RCP inexplicably refused approval.  RCP was aware of all of the foregoing when it chose to withdraw amounts from the Collection Account, and RCP is aware, of course, that AFI's failure to make payroll would spell its end as a going concern.

RCP's refusal to approve payment of AFI's payroll obligations and other necessary obligations constitutes a breach of Section 10.05(b) of the A&R Credit Agreement and is yet another default by RCP thereunder.  Like so many of RCP's actions since the execution of the A&R Credit Agreement, RCP's refusal to approve payment of these necessary obligations is flatly commercially unreasonable, and demonstrates RCP's calculated and willful bad faith.  RCP is *also* in breach of the parties' May 15, 2023 Side Letter, which provides that RCP "shall . . . execute any and all amendments or waivers, as applicable, to the terms of the Credit Agreement or other Loan Documents which are required to be amended or waived to ensure that the Borrower . . . remains compliant with all Agency requirements applicable to Borrower."  Finally, RCP's behavior also constitutes a violation of its fiduciary duties as an equity holder.  In light of RCP's breaches, AFI has begun to, and continues to, take all necessary and appropriate precautionary measures to protect all stakeholders.

Should RCP fail to cure its blatant default, it will face a host of meritorious claims against it in court, including claims for breach of contract, breach of its fiduciary duties, and breach of the duty of good faith and fair dealing.  While we are confident AFI would prevail in such a suit, the costs would be high on both sides—certainly far in excess of the amounts at issue today—and there is no rational reason to engage in protracted, expensive litigation of this matter.  We therefore urge RCP to cure, and are happy to discuss resolution of this matter.  Nonetheless, AFI is prepared litigate this matter.

Accordingly, given the significant likelihood of litigation against RCP, notice is hereby given that RCP (including its members, officers, directors, employees, representatives, advisors, attorneys, and other agents) has a legal obligation to take all steps necessary to ensure preservation of all relevant information, including documents, emails, records, text messages, voicemails, and other paper or electronic files and data that relate in any way to the parties' actions under the A&R

K A S O W I T Z  B E N S O N  T O R R E S  LLP

Reverence Capital Partners
August 22, 2023
Page 3


Credit Agreement, RCP's decisions to sweep the Collection Account, and the relationship of RCP to AmeriFirst.

My client reserves all rights and waives none.

Regards,

Edward E. Filusch



cc:    Quinn Emanuel Urquhart & Sullivan LLP
       51 Madison Avenue, 22nd Floor
       New York, New York 10010
       Attention: Manisha Sheth
       Email: ManishaSheth@QuinnEmanuel.com

**Dane Deposition**

**Exhibit 12 – Redacted**

# Exhibit 3

**Redacted**

**Avila Deposition**

**Exhibit 1 – Redacted**

**Avila Deposition**

**Exhibit 2 - Redacted**

**Avila Deposition**

**Exhibit 3 – Redacted**

**Avila Deposition**

**Exhibit 4 – Redacted**

**Avila Deposition**

**Exhibit 5 – Redacted**

**Avila Deposition**

**Exhibit 6 – Redacted**

**Avila Deposition**

**Exhibit 7 – Redacted**

**Avila Deposition**

**Exhibit 8 – Redacted**

**Avila Deposition**

**Exhibit 9 – Redacted**

**Avila Deposition**

**Exhibit 10 – Redacted**

**Avila Deposition**

**Exhibit 11 – Redacted**

**Avila Deposition**

**Exhibit 12 – Redacted**

**Avila Deposition**

**Exhibit 13 – Redacted**

**Avila Deposition**

**Exhibit 14 – Redacted**

**Avila Deposition**

**Exhibit 15 – Redacted**

**Avila Deposition**

**Exhibit 16 – Redacted**

**Avila Deposition**

**Exhibit 17 – Redacted**

**Avila Deposition**

**Exhibit 18 – Redacted**

**Avila Deposition**

**Exhibit 19 – Redacted**

**Avila Deposition**

**Exhibit 20 – Redacted**

**Avila Deposition**

**Exhibit 21 – Redacted**

**Avila Deposition**

**Exhibit 22 – Redacted**

<table>
<tr><td colspan="2" style="background:black;color:white"><strong>Fill in this information to identify your case:</strong></td></tr>
</table>

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(if known)* _____  Chapter  __11__

☐ Check if this an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy   06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| **1.** | **Debtor's name** | Phoenix 1040 LLC |
| **2.** | **All other names debtor used in the last 8 years** Include any assumed names, trade names and *doing business as* names | |
| **3.** | **Debtor's federal Employer Identification Number (EIN)** | 93-3032550 |

**4.  Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **1550 McKelleps Road Suite 117 Mesa, AZ 85203** Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| **Maricopa** County | **Location of principal assets, if different from principal place of business** Number, Street, City, State & ZIP Code |

**5.  Debtor's website (URL)**   https://amerifirstloan.com/

**6.  Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____



EXHIBIT

Exhibit Avila-23

Debtor    **Phoenix 1040 LLC**
_____    Case number *(if known)* _____
Name

**7.  Describe debtor's business**    A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes.

      6163

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check **all** that apply*:

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

☒ No.
☐ Yes.

District _____  When _____  Case number _____
District _____  When _____  Case number _____

Debtor **Phoenix 1040 LLC**
Name

Case number (*if known*)

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No
■ Yes.

List all cases. If more than 1, attach a separate list

Debtor **See Schedule 1**     Relationship

District     When     Case number, if known

**11. Why is the case filed in *this district*?**

*Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No
☐ Yes.    Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard?

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other

**Where is the property?**

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No
☐ Yes.    Insurance agency

Contact name

Phone

---

**■ Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ■ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 – $10 million | ☐ $500,000,001 – $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 – $50 million | ☐ $1,000,000,001 – $10 billion |
| ☐ $100,001 - $500,000 | ■ $50,000,001 – $100 million | ☐ $10,000,000,001 – $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 – $500 million | ☐ More than $50 billion |

---

| Debtor | Phoenix 1040 LLC | Case number (*if known*) |
|--------|------------------|--------------------------|
|        | Name             |                          |

**16. Estimated liabilities**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
■ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

| Debtor | Phoenix 1040 LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**Request for Relief, Declaration, and Signatures**

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **August 24, 2023**
MM / DD / YYYY

**X** /s/ T. Scott Avila
Signature of authorized representative of debtor

**T. Scott Avila**
Printed name

Title **Chief Restructuring Officer**

**18. Signature of attorney**

**X** /s/ Laura Davis Jones
Signature of attorney for debtor

Date **August 24, 2023**
MM / DD / YYYY

**Laura Davis Jones**
Printed name

**Pachulski Stang Ziehl & Jones LLP**
Firm name

**919 North Market Street
17th Floor
Wilmington, DE 19801**
Number, Street, City, State & ZIP Code

Contact phone **302-652-4100**      Email address **ljones@pszjlaw.com**

**2436 DE**
Bar number and State

**SCHEDULE 1**

**Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor**

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors have moved for joint administration of these cases for procedural purposes only under the case number assigned to the chapter 11 case of AmeriFirst Financial, Inc.

1. Phoenix 1040 LLC
2. AmeriFirst Financial, Inc.

## <u>WRITTEN CONSENT OF THE SOLE MEMBER OF PHOENIX 1040 LLC</u>

Effective as of August 24, 2023

The undersigned, being the sole member (the "**Sole Member**") of **PHOENIX 1040 LLC**, a Delaware limited liability company (the "**Company**"), pursuant to laws of the state of Delaware, does hereby consent to the adoption of the resolutions set forth below with the same force and effect as though adopted at a meeting duly called and held for the purpose of acting upon proposals to adopt such resolutions, and directs that this Written Consent of Sole Member be filed in the records of the Company.

WHEREAS, the Sole Member has reviewed the materials presented by the management of and the advisors to the Company regarding the possible need to restructure the Company, and has analyzed each of the strategic alternatives available to it, and the impact of the foregoing on the Company's business and its stakeholders;

NOW, THEREFORE, BE IT RESOLVED, that in the judgment of the Sole Member, it is desirable and in the best interests of the Company, its creditors, stockholders and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

RESOLVED, that the officers of the Company (each, an "**Authorized Officer**") be, and each of them hereby is, authorized on behalf of the Company to execute, verify and file all petitions, schedules, lists, and other papers or documents, and to take and perform any and all further actions and steps that any such Authorized Officer deems necessary, desirable and proper in connection with the Company's chapter 11 case, with a view to the successful prosecution of such case;

RESOLVED, that the Authorized Officers, on behalf of the Company, are authorized, empowered and directed to retain the law firm of Pachulski Stang Ziehl & Jones LLP ("**PSZ&J**") as bankruptcy counsel to represent and assist the Company in carrying out its duties under chapter 11 of the Bankruptcy Code, and to take any and all actions to advance the Company's rights in connection therewith, and the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the bankruptcy, and to cause to be filed an appropriate application for authority to retain the services of PSZ&J;

RESOLVED, that the Authorized Officers of the Company be, and hereby are, authorized and directed to employ any other professionals necessary to assist the Company in carrying out its duties under the Bankruptcy Code; and in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to or immediately upon the filing of the chapter 11 case and cause to be filed appropriate applications with the bankruptcy court for authority to retain the services of any other professionals, as necessary, and on such terms as are deemed necessary, desirable and proper;

RESOLVED, that the Authorized Officers of the Company be, and each of them hereby is, authorized and empowered to obtain post-petition financing according to terms which may be negotiated by the management of the Company, including under debtor-in-possession credit facilities or the use of cash collateral; and to enter into any guaranties and to pledge and grant liens on its assets as may be contemplated by or required under the terms of such post-petition financing or cash collateral agreement; and in connection therewith, the Authorized Officers of the Company are hereby authorized and directed to execute appropriate loan agreements, cash collateral agreements and related ancillary documents;

RESOLVED, that in the judgment of the Sole Member it is desirable and in the best interests of the Company that the Company conduct an orderly liquidation of substantially all of its assets and, therefore, the Company is hereby authorized to enter into one or more asset purchase agreements and/or take other appropriate actions to effectuate such orderly liquidation on such terms that management determines will maximize value, and the Company is further authorized to file one or more motions to approve any such sales and for any related relief, or to approve sales of assets to a higher and better bidder, and to close such sale(s) or transactions, subject to Bankruptcy Court approval in the Company's chapter 11 proceeding;

RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized on behalf of the Company to take any and all actions, to execute, deliver, certify, file and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities or certificates and to take any and all actions and steps deemed by any such Authorized Officer to be necessary or desirable to carry out the purpose and intent of each of the foregoing resolutions and to effectuate a successful chapter 11 case, including, but not limited to the development, filing and prosecution to confirmation of a chapter 11 plan and related disclosure statement; and

RESOLVED, that any and all actions heretofore taken by any Authorized Officer or the directors of the Company in the name and on behalf of the Company in furtherance of the purpose and intent of any or all of the foregoing resolutions be, and hereby are, ratified, confirmed, and approved in all respects;

RESOLVED, that in connection with the commencement of the chapter 11 case by the Company, the Authorized Officers be and hereby are, authorized and empowered on behalf of, and in the name of, the Company, to negotiate, execute and deliver a cash collateral arrangement and/or debtor-in-possession loan facility and the related guarantees thereto (including, in connection therewith, such notes, security agreements and other agreements or instruments as such officers consider appropriate) on the terms and conditions such officer or officers executing the same may consider necessary, proper or desirable, such determination to be conclusively evidenced by such execution or the taking of such action, and to consummate the transactions contemplated by such agreements or instruments on behalf of the Company and any affiliates.

**SOLE MEMBER:**

PHOENIX 1040 HOLDINGS LLC


By:      /s/ David Sloane
         Name: David Sloane
         Title:   Managing Director

**Fill in this information to identify the case:**

Debtor name: _AmeriFirst Financial, Inc., et al._

United States Bankruptcy Court for the District of

_____ (State)

Case number (If known): _____

☐ Check if this is an amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (on a Consolidated Basis)          12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. **Do** not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). **Also,** do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1. RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P. 590 MADISON AVE. FLOOR 29 NEW YORK, NY 10022 | Peter Aberg Peter.aberg@reverencesapital.com | Bond Debt (Partially Secured) | U | | | $17,900,893 |
| 2. RCP Customized Credit Fund (Fund IV-A), L.P. 590 MADISON AVE. FLOOR 29 NEW YORK, NY 10022 | Peter Aberg Peter.aberg@reverencesapital.com | Bond Debt (Partially Secured) | U | | | 5,966,964 |
| 3. WELLS FARGO BANK, N.A. 420 MONTGOMERY ST. SAN FRANCISCO, CA 94104 | | Trade Debt | U | | | 1,086,315 |
| 4. US BANK PO BOX 1950 ST. PAUL, MN 55101 | | Trade Debt | U | | | 463,165 |
| 5. LAKEVIEW LOAN SERVICING, LLC 4425 PONCE DE LEON MS 5-251 CORAL GABLES, FL 33146 | | Trade Debt | U | | | 431,045 |
| 6. FARHANG AND MEDCOFF 4201 N 24TH ST. PHOENIX, AZ 85016 | | Professional Services | | | | 425,166 |
| 7. TRUIST BANK 214 N TRYON ST. SUITE 3 CHARLOTTE, NC 28202 | | Trade Debt | U | | | 417,538 |

| Debtor | AmeriFirst Financial, *et al.* | | | Case number *(if known)* | | | |
|---|---|---|---|---|---|---|---|
| | Name | | | | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8. PARAGON MICRO INC 1711 W GREENTREE DR. TEMPE, AZ 85284 | | Trade Debt | | | | 369,975 |
| 9. JPMCB 270 PARK AVE. NEW YORK, NY 10017 | | Trade Debt | | | | 339,942 |
| 10. KASOWITZ BENSON TORRES LLP 1633 BROADWAY NEW YORK, NY 10019 | | Professional Services | | | | 187,386 |
| 11. CIT 75 N FAIR OAKS AVE. SUITE C PASADENA, CA 91103 | | Equipment Lease | D | | | 167,689 |
| 12. TOTAL EXPERT 1600 UTICA AVE. S MINNEAPOLIS, MN 55416 | | Trade Debt | D | | | 166,264 |
| 13. QUARLES & BRADY LLP 2 N CENTRAL AVE. #3 PHOENIX, AZ 85004 | | Professional Services | | | | 142,077 |
| 14. UNITED HEALTHCARE 9700 HEALTH CARE LN. MINNETONKA, MN 55343 | | Employee Benefits | | | | 103,454 |
| 15. TRACY KEARNS [ADDRESS REDACTED] | | Profit Sharing | | | | 102,365 |
| 16. PHOENIX ARENA DEVELOPMENT, LP 201 E JEFFERESON ST. PHOENIX, AZ 85004 | | Trade Debt | | | | 95,608 |
| 17. EL CAMINO REAL BUILDING | | Real Property Lease | D | | | 93,000 |
| 18. THE LAW OFFICE OF JEFF A. GEORGE, APC 14071 PEYTON DR. #2710 CHINO HILLS, CA 91709 | | Professional Services | | | | 85,463 |
| 19. DB TRUST CO. AMERICAS 1761 E ST ANDREW PLACE SANTA ANA, CA 92705 | | Trade Debt | | | | 76,530 |

Debtor AmeriFirst Financial, *et al.*
Name

Case number (*if known*)

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 20 | OPTIMAL BLUE, LLC 5340 LEGACY DR. BLDG 2 2ND FLOOR PLANO, TX 75024 | | Trade Debt | | | | 71,896 |
| 21 | ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES 333 E OSBORN RD. SUITE 100, 270, AND 300 PHOENIX, AZ 85012 | | Trade Debt | | | | 66,367 |
| 22 | ASSIMILATE SOLUTIONS TOWER 49 12 E 49TH ST. 34TH FLOOR NEW YORK, NY 10017 | | Trade Debt | | | | 62,432 |
| 23 | ARIVS 1930 N ARBOLEDA RD MESA, AZ 85213 | | Trade Debt | | | | 44,150 |
| 24 | EXPERIAN | | Trade Debt | | | | 40,677 |
| 25 | MOURIER LAND INVESTMENT CORPORATION 1430 BLUE OAKS BLVD. SUITE 190 ROSEVILLE, CA 95747 | | Real Property Lease | D | | | 40,000 |
| 26 | CLEARCOMPANY HRM 200 CLARENDON ST. 49TH FLOOR BOSTON, MA 02116 | | Trade Debt | D | | | 37,290 |
| 27 | COUSINS FUND II PHOENIX III, LLC 3800 N CENTRAL AVE. SUITE 460 PHOENIX, AZ 85012 | | Real Property Lease | | | | 33,347 |
| 28 | MORTGAGE COACH PO BOX 112 CORONA, CA 92878 | | Trade Debt | D | | | 30,625 |
| 29 | FLOIFY 1630A 30TH ST. SUITE 120 BOULDER, CO 80301 | | Trade Debt | D | | | 30,601 |

Debtor   AmeriFirst Financial, *et al.*
_____     Case number *(if known)*_____
         Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 30 | LANE POWELL<br>1420 5TH AVE.<br>SUITE 4200<br>SEATTLE, WA 98101 | | Professional Services | | | | 30,047 |

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PHOENIX 1040 LLC, | Case No. __-_____ (___) |
| Debtor. | |

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned authorized officer of the above-captioned Debtor, certifies that the following is a corporation other than the Debtor, or a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under FRBP 7007.1.

☐ None [*check if applicable*]

|  |  |
|---|---|
| Name: | RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. |
| Address: | 590 Madison Ave. |
| | 29th Floor |
| | New York, NY 10022 |

DOCS_DE:244339.3

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PHOENIX 1040 LLC, | Case No. __-_____ (___) |
| Debtor. | |

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case:

| Equity Holder | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|
| RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. | 590 Madison Ave. 29th Floor New York, NY 10022 | 100% |

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PHOENIX 1040 LLC, | Case No. __-_____ (___) |
| Debtor. | |

## CERTIFICATION OF CREDITOR MATRIX

Pursuant to Rule 1007-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the above captioned debtor and its affiliated debtors in possession (collectively, the "Debtors")[1] hereby certify that the *Creditor Matrix* submitted herewith contains the names and addresses of the Debtors' creditors. To the best of the Debtors' knowledge, the *Creditor Matrix* is complete, correct, and consistent with the Debtors' books and records.

The information contained herein is based upon a review of the Debtors' books and records as of the petition date. However, no comprehensive legal and/or factual investigations with regard to possible defenses to any claims set forth in the *Creditor Matrix* have been completed. Therefore, the listing does not, and should not, be deemed to constitute: (1) a waiver of any defense to any listed claims; (2) an acknowledgement of the allowability of any listed claims; and/or (3) a waiver of any other right or legal position of the Debtors.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 1550 McKelleps Road, Suite 117, Mesa, AZ 85203.

DOCS_DE:244339.3

| Consolidated Creditor Matrix | |
|---|---|
| **Name** | **Address** |
| 4G BUSINESS SOLUTIONS, INC | |
| ACADEMY MORTGAGE CORPORATION | |
| ADVANTAGE PLUS CREDIT REPORTING, INC. | |
| ADVANTAGE SYSTEMS, INC. | |
| ALTISOURCE HOLDINGS, LLC | |
| ALTURAS STANFORD | |
| AMERICAN PACIFIC MORTGAGE | |
| AMERIHOME MORTGAGE COMPANY, LLC | |
| ANNUAL REGISTRATION MANAGEMENT SERVICES, LLC | |
| ARIVS | |
| ARIZONA ACADEMY OF REAL ESTATE INC | |
| ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES | |
| ASSIMILATE SOLUTIONS | |
| BENSON SYSTEMS | |
| BLACK KNIGHT TECHNOLOGIES, LLC | |
| BUCHALTER | |
| CAPITAL INSURANCE SERVICES | |
| CENTURYLINK | |
| CISCO CREDIT INFORMATION SERVICES COMPANY | |
| CIT | |
| CITY OF MESA CUSTOMER SERVICE | |
| CLEARCAPITAL.COM INC | |
| CLEARCOMPANY HRM | |
| CLIX MARKETING GROUP INC | |
| COMCAST. | |
| CORELOGIC CREDCO LLC | |
| CORELOGIC SOLUTIONS, LLC | |
| COSOL PROPERTY MANAGEMENT | |
| COUSINS FUND II PHOENIX III, LLC | |
| COX COMMUNICATIONS | |
| DAMONTEK | |
| DATAVERIFY | |
| DB TRUST CO. AMERICAS | |
| DIGITECH OFFICE EQUIPMENT | |
| EL CAMINO REAL BUILDING | |
| EXPERIAN | |
| FARHANG AND MEDCOFF | |
| FEDEX | |
| FIRST AMERICAN DATA TREE, LLC | |
| FIRST AMERICAN MORTGAGE SOLUTIONS, LLC | |
| FLOIFY | |
| FREEDOM MORTGAGE CORP | |
| GERACI LEGAL CORPORATION | |
| GOS PRODUCTS FOR BUSINESS | |
| GOTO TECHNOLOGIES USA, INC. | |
| HARRIS PARK PROFESSIONAL PLAZA | |
| HULL BARRETT, PC | |
| JPMCB | |
| KASOWITZ BENSON TORRES LLP | |
| LAKEVIEW LOAN SERVICING, LLC | |
| LANE POWELL | |
| LEGALSHIELD | |
| LES EXTENSION, LLC | |
| LESLIE BROOKS GRIFFITH PLLC | |
| MANSPERGER PATTERSON & MCMULLIN PLC | |
| MASS MUTUAL | |
| MERSCORP HOLDINGS, INC | |
| MORTGAGE COACH | |
| MORTGAGE COLLABORATIVE COOPERATIVE | |
| MORTGAGE REFERENCES INC. | |
| MOURIER LAND INVESTMENT CORPORATION | |
| NAVESINK MORTGAGE SERVICES LLC | |
| NEWREZ, LLC | |
| NORTH CAROLINA DEPARTMENT OF REVENUE | |
| NORTH SCOTTSDALE GATEWAY, LLC | |

OCL FINANCIAL SERVICES LLC
ONSITE BUSINESS SERVICE, LLC
OPTIMAL BLUE
OPTIMAL BLUE, LLC
PACIFIC OFFICE AUTOMATION
PARAGON MICRO INC
PARKS COFFEE
PENNYMAC CORP.
PG&E
PHOENIX ARENA DEVELOPMENT, LP
PROSHRED SECURITY
QC ALLY, LLC
QUADIENT FINANCE USA, INC
QUARLES & BRADY LLP
REVERSEVISION, INC
RICHEY MAY & CO
ROBINSON GROUP REALTY
SILVERWORK SOLUTIONS LLC
SYNERGI PARTNERS INC
TALISMAN MARKETING CONSULTING, LLC
TALX CORPORATION
THE HARTFORD
THE LAW OFFICE OF JEFF A. GEORGE, APC
TIDE POOL ENTERPRISES INC
TIEMPO DEVELOPMENT LLC
TOTAL EXPERT
TRACY KEARNS
TRUIST BANK
U.S. BANK THIRD PARTY LENDING
UKG INC.
ULINE
UNIQUE SECURITY, INC.
UNITED HEALTHCARE
UNIVOIP INC
US BANK
VAR TECHNOLOGY FINANCE
VERI-TAX
WELLS FARGO BANK, N.A.
WELLS FARGO FINANCIAL LEASING
WRIGHT, FINLAY & ZAK, LLP
WSFS BANK
XACTUS

---

Eric Bowlby
Kenneth Bowlby
Erik Lutz
Fred Kron
Andrew Platt
Robin Kasitz
Peter Maniccia
Kelly Powers
Brittney Stratton
Jamieson Breuker
Benjamin Jones
Kristine Pelatt
Caroline Kelly
Alexandria Orth
Christina Castrellon
Edward Consalvi
Manuel Padro
Jennifer Kennedy
Kenneth Wigley
Sharicka McHenry
Leslie Robles
Patricia D'Pulos
Brittney Iannacone
Cameron Odle
Patricia Luna
Tasha Christenson

| | |
|---|---|
| Linda Welsch | |
| Randall Kocinski | |
| Cheryl Printz | |
| LaVonne Giacomini | |
| Samantha Kimbrell | |
| Sara Olmedo | |
| Sead Bahor | |
| Kelly Littrell | |
| Ted Wilkinson | |
| Delora Bearden | |
| Lindsey Warren | |
| Shelley Wilson | |
| Emily Norton | |
| Madonna Radeff | |
| Mary Johnson | |
| Ruth Alcorn | |
| Steven Larsen | |
| Luis Tiscareno | |
| Brianne Taylor | |
| Ivan Tiscareno | |
| Larissa Lewis | |
| Rogelio Sanchez | |
| Letisha Merritt | |
| Shair Riebli-Hull | |
| Renee Zabel | |
| Colby Barnes | |
| Kenneth Staker | |
| Craig Willis | |
| Heber Schnebly | |
| Tessa Carter | |
| Judith Gould | |
| TEXAS CAPITAL BANK | |
| Origin Bank | |
| Alliance Bank of Arizona | 2701 E Camelback Rd., Suite 110, Phoenix, AZ 85016 |
| Flagstar Bank | 301 W Michigan Ave, Jackson MI 49201 |
| Veritex Community Bank | |
| JVB Financial | |
| Alliance Bank of Arizona | 2701 E Camelback Rd., Suite 110, Phoenix, AZ 85016 |
| BMO Harris Bank N.A. | P.O. Box 94033 Palatine, IL 60094-4033 |
| Chase Bank | 2509 S Power Rd, Suite 103, Mesa AZ 85209 |
| Flagstar Bank | 301 W Michigan Ave, Jackson MI 49201 |
| Wells Fargo | P.O. Box 6995 Portland, OR 97228-6995 |
| FHLMC | |
| FNMA | |
| GNMA | |
| Mourier Land Investment Corporation | |
| El Camino Real Building | |
| Alturas Stanford - Was BRI 1871 Stanford, LLC | |
| Cousins Fund II Phoenix III, LLC - was Cousins Realty Servies, LLC | |
| HARRIS PARK | |
| Regus | |
| Premier Business Centers | |
| 275 Rivulon Blvd., LLC | |
| Academy Mortgage | |
| CoSol Property Management, Inc | |
| Robinson Group Realty | |
| United Insurance Company of America | |
| RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P. | 590 Madison Ave., Fl. 29, New York, NY 10022 |
| RCP Customized Credit Fund (Fund IV-A), L.P. | 590 Madison Ave., Fl. 29, New York, NY 10022 |

**Fill in this information to identify the case:**

Debtor name    **Phoenix 1040 LLC**

United States Bankruptcy Court for the:    DISTRICT OF DELAWARE

Case number (if known)

☐ Check if this is an
amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**Declaration and signature**

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐ *Schedule H: Codebtors* (Official Form 206H)
☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐ Amended *Schedule*
■ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
■ Other document that requires a declaration   **Corporate Ownership Statement; List of Equity Security Holders; and Certification of Creditor Matrix**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **August 24, 2023**          X /s/ T. Scott Avila
                                            Signature of individual signing on behalf of debtor

                                            **T. Scott Avila**
                                            Printed name

                                            **Chief Restructuring Officer**
                                            Position or relationship to debtor

Official Form 202          Declaration Under Penalty of Perjury for Non-Individual Debtors

---

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(if known)* _____ Chapter __11__

☐ Check if this an amended filing

---

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy
06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **AmeriFirst Financial, Inc.** |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names and *doing business as* names | |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number (EIN)** | **86-0634557** |

| | | | |
|---|---|---|---|
| 4. | **Debtor's address** | **Principal place of business** | **Mailing address, if different from principal place of business** |
| | | **1550 McKelleps Road**<br>**Suite 117**<br>**Mesa, AZ 85203**<br>Number, Street, City, State & ZIP Code | <br><br>P.O. Box, Number, Street, City, State & ZIP Code |
| | | **Maricopa**<br>County | **Location of principal assets, if different from principal place of business**<br><br>Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | **https://amerifirstloan.com/** |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☐ Other. Specify: _____ |



**EXHIBIT**

Exhibit Avila-24

| Debtor | AmeriFirst Financial, Inc. | Case number (if known) |
|---|---|---|
| | Name | |

**7.** **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

    **6163**

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check all that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No.

☐ Yes.

| | District _____ | When _____ | Case number _____ |
|---|---|---|---|
| | District _____ | When _____ | Case number _____ |

Debtor  **AmeriFirst Financial, Inc.**
Name

Case number (if known) _____

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No
■ Yes.

List all cases. If more than 1, attach a separate list

Debtor  **See Schedule 1**  Relationship _____

District _____  When _____  Case number, if known _____

**11. Why is the case filed in this district?**  Check all that apply:

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

■ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No
☐ Yes.  Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (Check all that apply.)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
   What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other

**Where is the property?** _____
   Number, Street, City, State & ZIP Code

**Is the property insured?**
☐ No
☐ Yes.  Insurance agency _____
         Contact name _____
         Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**  .  Check one:

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

☐ 1-49
☐ 50-99
■ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than100,000

**15. Estimated Assets**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
■ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

---

| Debtor | **AmeriFirst Financial, Inc.** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**16. Estimated liabilities**

- ☐ $0 – $50,000
- ☐ $50,001 – $100,000
- ☐ $100,001 – $500,000
- ☐ $500,001 – $1 million

- ☐ $1,000,001 – $10 million
- ☐ $10,000,001 – $50 million
- ☒ $50,000,001 – $100 million
- ☐ $100,000,001 – $500 million

- ☐ $500,000,001 – $1 billion
- ☐ $1,000,000,001 – $10 billion
- ☐ $10,000,000,001 – $50 billion
- ☐ More than $50 billion

| Debtor | **AmeriFirst Financial, Inc.** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**Request for Relief, Declaration, and Signatures**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **August 24, 2023**
                MM / DD / YYYY

**X** **/s/ T. Scott Avila**                       **T. Scott Avila**
     Signature of authorized representative of debtor            Printed name

Title    **Chief Restructuring Officer**

**18. Signature of attorney**

**X** **/s/ Laura Davis Jones**           Date   **August 24, 2023**
     Signature of attorney for debtor                      MM / DD / YYYY

**Laura Davis Jones**
Printed name

**Pachulski Stang Ziehl & Jones LLP**
Firm name

**919 North Market Street**
**17th Floor**
**Wilmington, DE 19801**
Number, Street, City, State & ZIP Code

Contact phone   **302-652-4100**      Email address   **ljones@pszjlaw.com**

**2436 DE**
Bar number and State

**SCHEDULE 1**

**Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor**

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors have moved for joint administration of these cases for procedural purposes only under the case number assigned to the chapter 11 case of AmeriFirst Financial, Inc.

1. Phoenix 1040 LLC
2. AmeriFirst Financial, Inc.

### UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS
### OF AMERIFIRST FINANCIAL, INC.

Effective as of August 24, 2023

The undersigned, being all of the members of the Board of Directors (the "**Board**") of **AMERIFIRST FINANCIAL, INC.** (the "**Company**"), pursuant to the laws of the State of Arizona and the applicable governing documents of the Company, do hereby waive notice of meeting and consent to the adoption of the resolutions below to the same extent and with the same force and effect as if such resolutions were adopted at a special meeting of the Board duly called and held for the purpose of adopting such recitals and resolutions, and directs that this Unanimous Written Consent be filed in the records of the Company.

WHEREAS, the Board has reviewed the historical performance of the Company, the market for the Company's products and services, and the current and long-term liabilities of the Company;

WHEREAS, the Board has reviewed the materials presented by the management of and the advisors to the Company regarding the possible need to restructure the Company, and has analyzed each of the strategic alternatives available to it, and the impact of the foregoing on the Company's business and its stakeholders;

NOW, THEREFORE, BE IT RESOLVED, that in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors, employees, stockholders and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

RESOLVED, that T. Scott Avila of Paladin Management Group, Chief Restructuring Officer of the Company (the "**Authorized Officer**"), is authorized on behalf of the Company to execute, verify and file all petitions, schedules, lists, and other papers or documents, and to take and perform any and all further actions and steps that the Authorized Officer deems necessary, desirable and proper in connection with the Company's chapter 11 case, with a view to the successful prosecution of such case;

RESOLVED, that the Authorized Officer, on behalf of the Company, is authorized, empowered and directed to retain the law firm of Pachulski Stang Ziehl & Jones LLP ("**PSZ&J**") as bankruptcy counsel to represent and assist the Company in carrying out its duties under chapter 11 of the Bankruptcy Code, and to take any and all actions to advance the Company's rights in connection therewith, and the Authorized Officer is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the bankruptcy, and to cause to be filed an appropriate application for authority to retain the services of PSZ&J;

RESOLVED, that the Authorized Officer of the Company is authorized and directed to employ any other professionals necessary to assist the Company in carrying out its duties under the Bankruptcy Code; and in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate retention agreements, pay appropriate

retainers prior to or immediately upon the filing of the chapter 11 case and cause to be filed appropriate applications with the bankruptcy court for authority to retain the services of any other professionals, as necessary, and on such terms as are deemed necessary, desirable and proper;

RESOLVED, that the Authorized Officer of the Company is authorized and empowered to obtain post-petition financing according to terms which may be negotiated by the management of the Company, including under debtor-in-possession credit facilities or the use of cash collateral; and to enter into any guaranties and to pledge and grant liens on its assets as may be contemplated by or required under the terms of such post-petition financing or cash collateral agreement; and in connection therewith, the Authorized Officer of the Company is hereby authorized and directed to execute appropriate loan agreements, cash collateral agreements and related ancillary documents;

RESOLVED, that in the judgment of the Board of Directors it is desirable and in the best interests of the Company that the Company conduct an orderly liquidation of substantially all of its assets and, therefore, the Company is hereby authorized to enter into one or more asset purchase agreements and/or take other appropriate actions to effectuate such orderly liquidation on such terms that management determines will maximize value, and the Company is further authorized to file one or more motions to approve any such sales and for any related relief, or to approve sales of assets to a higher and better bidder, and to close such sale(s) or transactions, subject to Bankruptcy Court approval in the Company's chapter 11 proceeding;

RESOLVED, that the Authorized Officer is authorized on behalf of the Company to take any and all actions, to execute, deliver, certify, file and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities or certificates and to take any and all actions and steps deemed by the Authorized Officer to be necessary or desirable to carry out the purpose and intent of each of the foregoing resolutions and to effectuate a successful chapter 11 case, including, but not limited to the development, filing and prosecution to confirmation of a chapter 11 plan and related disclosure statement; and

RESOLVED, that any and all actions heretofore taken by the Authorized Officer or the directors of the Company in the name and on behalf of the Company in furtherance of the purpose and intent of any or all of the foregoing resolutions be, and hereby are, ratified, confirmed, and approved in all respects;

RESOLVED, that in connection with the commencement of the chapter 11 case by the Company, the Authorized Officer is authorized and empowered on behalf of, and in the name of, the Company, to negotiate, execute and deliver a cash collateral arrangement and/or debtor-in-possession loan facility and the related guarantees thereto (including, in connection therewith, such notes, security agreements and other agreements or instruments as such officers consider appropriate) on the terms and conditions such officer executing the same may consider necessary, proper or desirable, such determination to be conclusively evidenced by such execution or the taking of such action, and to consummate the transactions contemplated by such agreements or instruments on behalf of the Company and any affiliates.

**AMERIFIRST FINANCIAL, INC.**

DIRECTORS


 /s/ David Sloane_____
David Sloane


 /s/ Jeffrey Dane_____
Jeffrey Dane

| Fill in this information to identify the case: |
| --- |

Debtor name    *AmeriFirst Financial, Inc., et al.*

United States Bankruptcy Court for the District of

                (State)

Case number (If known): _____

☐ Check if this is an
amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (on a Consolidated Basis)    12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. **Do not include claims by any person or entity who is an** *insider,* **as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1. RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P. 590 MADISON AVE. FLOOR 29 NEW YORK, NY 10022 | Peter Aberg Peter.aberg@reverencesapital.com | Bond Debt (Partially Secured) | U | | | $17,900,893 |
| 2. RCP Customized Credit Fund (Fund IV-A), L.P. 590 MADISON AVE. FLOOR 29 NEW YORK, NY 10022 | Peter Aberg Peter.aberg@reverencesapital.com | Bond Debt (Partially Secured) | U | | | 5,966,964 |
| 3. WELLS FARGO BANK, N.A. 420 MONTGOMERY ST. SAN FRANCISCO, CA 94104 | | Trade Debt | U | | | 1,086,315 |
| 4. US BANK PO BOX 1950 ST. PAUL, MN 55101 | | Trade Debt | U | | | 463,165 |
| 5. LAKEVIEW LOAN SERVICING, LLC 4425 PONCE DE LEON MS 5-251 CORAL GABLES, FL 33146 | | Trade Debt | U | | | 431,045 |
| 6. FARHANG AND MEDCOFF 4201 N 24TH ST. PHOENIX, AZ 85016 | | Professional Services | | | | 425,166 |
| 7. TRUIST BANK 214 N TRYON ST. SUITE 3 CHARLOTTE, NC 28202 | | Trade Debt | U | | | 417,538 |

Debtor  AmeriFirst Financial, *et al.*
_____  Case number *(if known)*_____
      Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8. PARAGON MICRO INC 1711 W GREENTREE DR. TEMPE, AZ 85284 | | Trade Debt | | | | 369,975 |
| 9. JPMCB 270 PARK AVE. NEW YORK, NY 10017 | | Trade Debt | | | | 339,942 |
| 10. KASOWITZ BENSON TORRES LLP 1633 BROADWAY NEW YORK, NY 10019 | | Professional Services | | | | 187,386 |
| 11. CIT 75 N FAIR OAKS AVE. SUITE C PASADENA, CA 91103 | | Equipment Lease | D | | | 167,689 |
| 12. TOTAL EXPERT 1600 UTICA AVE. S MINNEAPOLIS, MN 55416 | | Trade Debt | D | | | 166,264 |
| 13. QUARLES & BRADY LLP 2 N CENTRAL AVE. #3 PHOENIX, AZ 85004 | | Professional Services | | | | 142,077 |
| 14. UNITED HEALTHCARE 9700 HEALTH CARE LN. MINNETONKA, MN 55343 | | Employee Benefits | | | | 103,454 |
| 15. TRACY KEARNS [ADDRESS REDACTED] | | Profit Sharing | | | | 102,365 |
| 16. PHOENIX ARENA DEVELOPMENT, LP 201 E JEFFERESON ST. PHOENIX, AZ 85004 | | Trade Debt | | | | 95,608 |
| 17. EL CAMINO REAL BUILDING | | Real Property Lease | D | | | 93,000 |
| 18. THE LAW OFFICE OF JEFF A. GEORGE, APC 14071 PEYTON DR. #2710 CHINO HILLS, CA 91709 | | Professional Services | | | | 85,463 |
| 19. DB TRUST CO. AMERICAS 1761 E ST ANDREW PLACE SANTA ANA, CA 92705 | | Trade Debt | | | | 76,530 |

Debtor AmeriFirst Financial, *et al.*
Name

Case number (*if known*)_____

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 20 | OPTIMAL BLUE, LLC 5340 LEGACY DR. BLDG 2 2ND FLOOR PLANO, TX 75024 | | Trade Debt | | | | 71,896 |
| 21 | ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES 333 E OSBORN RD. SUITE 100, 270, AND 300 PHOENIX, AZ 85012 | | Trade Debt | | | | 66,367 |
| 22 | ASSIMILATE SOLUTIONS TOWER 49 12 E 49TH ST. 34TH FLOOR NEW YORK, NY 10017 | | Trade Debt | | | | 62,432 |
| 23 | ARIVS 1930 N ARBOLEDA RD MESA, AZ 85213 | | Trade Debt | | | | 44,150 |
| 24 | EXPERIAN | | Trade Debt | | | | 40,677 |
| 25 | MOURIER LAND INVESTMENT CORPORATION 1430 BLUE OAKS BLVD. SUITE 190 ROSEVILLE, CA 95747 | | Real Property Lease | D | | | 40,000 |
| 26 | CLEARCOMPANY HRM 200 CLARENDON ST. 49TH FLOOR BOSTON, MA 02116 | | Trade Debt | D | | | 37,290 |
| 27 | COUSINS FUND II PHOENIX III, LLC 3800 N CENTRAL AVE. SUITE 460 PHOENIX, AZ 85012 | | Real Property Lease | | | | 33,347 |
| 28 | MORTGAGE COACH PO BOX 112 CORONA, CA 92878 | | Trade Debt | D | | | 30,625 |
| 29 | FLOIFY 1630A 30TH ST. SUITE 120 BOULDER, CO 80301 | | Trade Debt | D | | | 30,601 |

Debtor   AmeriFirst Financial, *et al.*   Case number *(if known)*_____
            Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 30 | LANE POWELL 1420 5TH AVE. SUITE 4200 SEATTLE, WA 98101 | | Professional Services | | | | 30,047 |

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., | Case No. __-_____ (___) |
| Debtor. | |

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

      Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned authorized officer of the above-captioned Debtor, certifies that the following is a corporation other than the Debtor, or a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under FRBP 7007.1.

☐ None [*check if applicable*]

      Name:        Phoenix 1040 LLC
      Address:     275 E. Rivulon Blvd.
                       Suite 300
                       Gilbert, Arizona 85297

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., | Case No. __-_____ (___) |
| Debtor. | |

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case:

## COMMON

| Equity Holder | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|
| Phoenix 1040 LLC | 275 E. Rivulon Blvd. Suite 300 Gilbert, Arizona 85297 | 100% |

## PREFERRED

| Equity Holder | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|
| RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. | 590 Madison Ave. 29th Floor New York, NY 10022 | 100% |

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., | Case No. __-_____ (___) |
| Debtor. | |

## CERTIFICATION OF CREDITOR MATRIX

Pursuant to Rule 1007-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the above captioned debtor and its affiliated debtors in possession (collectively, the "Debtors")[1] hereby certify that the *Creditor Matrix* submitted herewith contains the names and addresses of the Debtors' creditors. To the best of the Debtors' knowledge, the *Creditor Matrix* is complete, correct, and consistent with the Debtors' books and records.

The information contained herein is based upon a review of the Debtors' books and records as of the petition date. However, no comprehensive legal and/or factual investigations with regard to possible defenses to any claims set forth in the *Creditor Matrix* have been completed. Therefore, the listing does not, and should not, be deemed to constitute: (1) a waiver of any defense to any listed claims; (2) an acknowledgement of the allowability of any listed claims; and/or (3) a waiver of any other right or legal position of the Debtors.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 1550 McKelleps Road, Suite 117, Mesa, AZ 85203.

| Consolidated Creditor Matrix | |
|---|---|
| **Name** | **Address** |
| 4G BUSINESS SOLUTIONS, INC | |
| ACADEMY MORTGAGE CORPORATION | |
| ADVANTAGE PLUS CREDIT REPORTING, INC. | |
| ADVANTAGE SYSTEMS, INC. | |
| ALTISOURCE HOLDINGS, LLC | |
| ALTURAS STANFORD | |
| AMERICAN PACIFIC MORTGAGE | |
| AMERIHOME MORTGAGE COMPANY, LLC | |
| ANNUAL REGISTRATION MANAGEMENT SERVICES, LLC | |
| ARIVS | |
| ARIZONA ACADEMY OF REAL ESTATE INC | |
| ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES | |
| ASSIMILATE SOLUTIONS | |
| BENSON SYSTEMS | |
| BLACK KNIGHT TECHNOLOGIES, LLC | |
| BUCHALTER | |
| CAPITAL INSURANCE SERVICES | |
| CENTURYLINK | |
| CISCO CREDIT INFORMATION SERVICES COMPANY | |
| CIT | |
| CITY OF MESA CUSTOMER SERVICE | |
| CLEARCAPITAL.COM INC | |
| CLEARCOMPANY HRM | |
| CLIX MARKETING GROUP INC | |
| COMCAST. | |
| CORELOGIC CREDCO LLC | |
| CORELOGIC SOLUTIONS, LLC | |
| COSOL PROPERTY MANAGEMENT | |
| COUSINS FUND II PHOENIX III, LLC | |
| COX COMMUNICATIONS | |
| DAMONTEK | |
| DATAVERIFY | |
| DB TRUST CO. AMERICAS | |
| DIGITECH OFFICE EQUIPMENT | |
| EL CAMINO REAL BUILDING | |
| EXPERIAN | |
| FARHANG AND MEDCOFF | |
| FEDEX | |
| FIRST AMERICAN DATA TREE, LLC | |
| FIRST AMERICAN MORTGAGE SOLUTIONS, LLC | |
| FLOIFY | |
| FREEDOM MORTGAGE CORP | |
| GERACI LEGAL CORPORATION | |
| GOS PRODUCTS FOR BUSINESS | |
| GOTO TECHNOLOGIES USA, INC. | |
| HARRIS PARK PROFESSIONAL PLAZA | |
| HULL BARRETT, PC | |
| JPMCB | |
| KASOWITZ BENSON TORRES LLP | |
| LAKEVIEW LOAN SERVICING, LLC | |
| LANE POWELL | |
| LEGALSHIELD | |
| LES EXTENSION, LLC | |
| LESLIE BROOKS GRIFFITH PLLC | |
| MANSPERGER PATTERSON & MCMULLIN PLC | |
| MASS MUTUAL | |
| MERSCORP HOLDINGS, INC | |
| MORTGAGE COACH | |
| MORTGAGE COLLABORATIVE COOPERATIVE | |
| MORTGAGE REFERENCES INC. | |
| MOURIER LAND INVESTMENT CORPORATION | |
| NAVESINK MORTGAGE SERVICES LLC | |
| NEWREZ, LLC | |
| NORTH CAROLINA DEPARTMENT OF REVENUE | |
| NORTH SCOTTSDALE GATEWAY, LLC | |

OCL FINANCIAL SERVICES LLC
ONSITE BUSINESS SERVICE, LLC
OPTIMAL BLUE
OPTIMAL BLUE, LLC
PACIFIC OFFICE AUTOMATION
PARAGON MICRO INC
PARKS COFFEE
PENNYMAC CORP.
PG&E
PHOENIX ARENA DEVELOPMENT, LP
PROSHRED SECURITY
QC ALLY, LLC
QUADIENT FINANCE USA, INC
QUARLES & BRADY LLP
REVERSEVISION, INC
RICHEY MAY & CO
ROBINSON GROUP REALTY
SILVERWORK SOLUTIONS LLC
SYNERGI PARTNERS INC
TALISMAN MARKETING CONSULTING, LLC
TALX CORPORATION
THE HARTFORD
THE LAW OFFICE OF JEFF A. GEORGE, APC
TIDE POOL ENTERPRISES INC
TIEMPO DEVELOPMENT LLC
TOTAL EXPERT
TRACY KEARNS
TRUIST BANK
U.S. BANK THIRD PARTY LENDING
UKG INC.
ULINE
UNIQUE SECURITY, INC.
UNITED HEALTHCARE
UNIVOIP INC
US BANK
VAR TECHNOLOGY FINANCE
VERI-TAX
WELLS FARGO BANK, N.A.
WELLS FARGO FINANCIAL LEASING
WRIGHT, FINLAY & ZAK, LLP
WSFS BANK
XACTUS

Eric Bowlby
Kenneth Bowlby
Erik Lutz
Fred Kron
Andrew Platt
Robin Kasitz
Peter Maniccia
Kelly Powers
Brittney Stratton
Jamieson Breuker
Benjamin Jones
Kristine Pelatt
Caroline Kelly
Alexandria Orth
Christina Castrellon
Edward Consalvi
Manuel Padro
Jennifer Kennedy
Kenneth Wigley
Sharicka McHenry
Leslie Robles
Patricia D'Pulos
Brittney Iannacone
Cameron Odle
Patricia Luna
Tasha Christenson

Linda Welsch
Randall Kocinski
Cheryl Printz
LaVonne Giacomini
Samantha Kimbrell
Sara Olmedo
Sead Bahor
Kelly Littrell
Ted Wilkinson
Delora Bearden
Lindsey Warren
Shelley Wilson
Emily Norton
Madonna Radeff
Mary Johnson
Ruth Alcorn
Steven Larsen
Luis Tiscareno
Brianne Taylor
Ivan Tiscareno
Larissa Lewis
Rogelio Sanchez
Letisha Merritt
Shair Riebli-Hull
Renee Zabel
Colby Barnes
Kenneth Staker
Craig Willis
Heber Schnebly
Tessa Carter
Judith Gould

| | |
|---|---|
| TEXAS CAPITAL BANK | |
| Origin Bank | |
| Alliance Bank of Arizona | 2701 E Camelback Rd., Suite 110, Phoenix, AZ 85016 |
| Flagstar Bank | 301 W Michigan Ave, Jackson MI 49201 |
| Veritex Community Bank | |
| JVB Financial | |

| | |
|---|---|
| Alliance Bank of Arizona | 2701 E Camelback Rd., Suite 110, Phoenix, AZ 85016 |
| BMO Harris Bank N.A. | P.O. Box 94033 Palatine, IL 60094-4033 |
| Chase Bank | 2509 S Power Rd, Suite 103, Mesa AZ 85209 |
| Flagstar Bank | 301 W Michigan Ave, Jackson MI 49201 |
| Wells Fargo | P.O. Box 6995 Portland, OR, 97228-6995 |

| | |
|---|---|
| FHLMC | |
| FNMA | |
| GNMA | |

| | |
|---|---|
| Mourier Land Investment Corporation | |
| El Camino Real Building | |
| Alturas Stanford - Was BRI 1871 Stanford, LLC | |
| Cousins Fund II Phoenix III, LLC - was Cousins Realty Servies, LLC | |
| HARRIS PARK | |
| Regus | |
| Premier Business Centers | |
| 275 Rivulon Blvd., LLC | |
| Academy Mortgage | |
| CoSol Property Management, Inc | |
| Robinson Group Realty | |
| United Insurance Company of America | |

| | |
|---|---|
| RCP CREDIT OPPORTUNITIES FUND LOAN SPV (FUND III), L.P. | 590 Madison Ave., Fl. 29, New York, NY 10022 |
| RCP Customized Credit Fund (Fund IV-A), L.P. | 590 Madison Ave., Fl. 29, New York, NY 10022 |

**Fill in this information to identify the case:**

Debtor name    **AmeriFirst Financial, Inc.**

United States Bankruptcy Court for the:    DISTRICT OF DELAWARE

Case number (if known)    _____

☐ Check if this is an amended filing

## Official Form 202
# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐ *Schedule H: Codebtors* (Official Form 206H)
☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐ Amended *Schedule*
■ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
■ Other document that requires a declaration    **Corporate Ownership Statement; List of Equity Security Holders; and Certification of Creditor Matrix**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **August 24, 2023**     X **/s/ T. Scott Avila**
                                                   Signature of individual signing on behalf of debtor

                                                **T. Scott Avila**
                                                Printed name

                                                **Chief Restructuring Officer**
                                                Position or relationship to debtor

**Avila Deposition**

**Exhibit 25 – Redacted**

**Exhibit 4**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | Case No. 23-11240 (TMH) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MATTHEW DUNDON IN SUPPORT OF THE AMENDED AND
RESTATED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B)
TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV)
SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, Matthew Dundon, being duly sworn, declare under penalty of perjury:

1.    I am a Principal with IslandDundon LLC ("IslandDundon"), a specialist in the restructuring of real estate related companies, which is the proposed financial advisor to the Official Committee of Unsecured Creditors' (the "Committee").  In my time working with the Committee, I have become familiar with the above-captioned debtors (the "Debtors") and the financial documents of Reverence Capital Partner and its affiliates ("RCP") that were shared with the Committee in the course of discovery and that were shared with IslandDundon by Paladin Management Group, LLC, the Debtors' financial advisors.

2.    I am over the age of 18 and authorized to submit this declaration (this "Declaration").  If called to testify, I could and would competently testify to the facts and opinions as set forth in this Declaration.

---

[1]    The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Phoenix 1040 LLC (2550); and AmeriFirst Financial, Inc. (4557). The location of Debtor AmeriFirst Financial, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 1550 McKelleps Road, Suite 117, Mesa, Arizona 85203.

3.      I submit this declaration in support of the *Amended and Restated Objection of the Official Committee of Unsecured Creditors to Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Amended Objection").

4.      This declaration is intended to provide factual support for the Committee's arguments that the Debtors' proposed DIP financing is unnecessary and unduly expensive for the Debtors in these chapter 11 bankruptcy cases.

## BACKGROUND AND CREDENTIALS

5.      I have more than 20 years of experience in global credit, litigation and distressed investment and restructuring, over 17 of which have been in leadership roles.  I practiced law for five years prior to commencing work in investment and restructuring.  I have extensive experience in real estate and securitization matters over the length of my 25-year career.  Numerous IslandDundon personnel have specialized in real estate and securitization for all or a substantial part of their careers.

6.      I am a co-founder and principal of the joint venture, of which IslandDundon is a vehicle, of Dundon Advisers LLC ("Dundon") and Island Capital Group ("Island") established in 2021 to pursue certain debt investment and real estate-related restructuring opportunities.  This Island and Dundon joint venture, including through IslandDundon, has advised parties in numerous in-court and out-of-court real-estate-related restructurings since its establishment. Dundon, of which I am the founder and a principal, is a diversified restructuring asset management

2

and restructuring firm established in 2016. Dundon has advised in a restructuring or investment advisory capacity in many hundreds of restructurings across numerous industries.

7.      The Committee proposes to retain IslandDundon as its financial advisor in these chapter 11 cases.

## DIP FINANCING

8.      The Debtors propose a $5 million DIP loan to fund the operating expenses of these chapter 11 cases, associated DIP fees, and professionals' fees (the "Dip Loan") as well as a $325,000 roll-up of the Debtors' professionals' fee retainers (the "Roll-Up" and, together with the DIP Loan, the "DIP Financing"). The Debtors claim as of August 24, 2023 (the "Petition Date"), to owe $15,798,087 under a prepetition credit agreement to Reverence Capital Partners and its affiliates (collectively, "RCP"). *See Declaration of T. Scott Avila in Support of First Day Motion*, ¶ 9 (D.I. 20) (the "First Day Declaration"). As reported on the Debtors' Schedules of Assets and Liabilities (D.I. 251) (the "Schedules") on October 12, 2023, RCP affiliates RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IVA), L.P. have prepetition secured claims in the amount of $23,867,857. *See* Schedules, Schedule D, 2.14 & 2.16.

9.      The Debtors have represented to the Committee that their cash on hand as of October 6, 2023, was approximately $436,000.[2]

10.     Based upon the Debtors' representations to the Committee, and on limited inquiries IslandDundon has performed, the net proceeds of the sales which (in the aggregate) will

---

[2] Per Paladin's weekly memorandum to RCP dated 10/13/23, which included, amongst other items, a liquidity / cash flow update and asset sale update.

dispose of substantially all the assets of the Debtors other than causes action appears to be approximately $14,500,00.[3]

11.     The Debtors' budget proposal for activities from October 6, 2023, through December 15, 2023, which we believe to be an outside date for closing of the sale of the MSRs (before which a Chapter 7 conversion or dismissal could be suboptimal) is approximately $6,948,000.[4]

I declare under penalty of perjury that the foregoing is correct to the extent of my knowledge thereof.

October 22, 2023                                          /s/ Matthew Dundon

---

[3] Id.
[4] Per the Proposed Revised DIP Order filed on October 6, 2023.

# ATTACHMENT

| Sources & Uses to Paydown Secured Debt (S-1 & S-2) | 18-Weeks 12/29/23 (per Budget) (A) | 9-Weeks 03/01/24 (Estimated) (B) | 27-Weeks 03/01/24 Total (C) [(A) + (B)] |
|---|---|---|---|
| **SCENARIO 1** | | | |
| SOURCES: Estimated Proceeds from Asset Sales *(as of 10/13/23)* | | | |
| Cash-is-King ("CIK") Properties | $ 124,205 | $ 259,000 | $ 383,205 |
| Scratch & Dent ("S&D") Loans | 2,922,920 | 773,080 | 3,696,000 |
| MSR Portfolio | 5,400,000 | 2,623,000 | 8,023,000 |
| Cash Collateral / Funds Held by Centier | 1,200,000 | 200,000 | 1,400,000 |
| Other Assets (Bowlby Properties) | - | 1,018,000 | 1,018,000 |
| **Total Estimated Proceeds from Asset Sales:** | $ 9,647,125 | $ 4,873,080 | $ 14,520,205 |
| | | | |
| USES: Prepetition Secured Debt & DIP, including roll-up | | | |
| Prepetition Secured Debt Balance *(per Declaration)* | $ 15,798,087 | | $ 15,798,087 |
| + Prepetition Debt - unpaid interest, fees, costs, and expenses | *TBD* | | *TBD* |
| + DIP Loan to fund Operating Exp., DIP Fees & Prof. Fees | 5,000,000 | | 5,000,000 |
| + DIP Lenders' Professional Fees | *TBD* | | *TBD* |
| + Roll-up of Debtors' Professional Fee Retainers | 325,000 | | 325,000 |
| + Additional Ch. 11 Professional Fees | - | 1,000,000 | 1,000,000 |
| + Other | - | - | - |
| **Total Prepetition Secured Debt & DIP, including roll-up:** | $ 21,123,087 | $ 1,000,000 | $ 22,123,087 |
| **Net Positive (Negative) to the Estate:** | $ (11,475,962) | $ 3,873,080 | $ (7,602,882) |
| **SCENARIO 2** | | | |
| **SOURCES: Estimated Proceeds from Asset Sales *(as of 10/13/23)*** | $ 9,647,125 | $ 4,873,080 | $ 14,520,205 |
| | | | |
| USES: Prepetition Secured Debt & DIP, including roll-up | | | |
| Prepetition Secured Debt *(per Schedule D filed on 10/12/23)* | | | |
| RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. | $ 17,900,893 | | $ 17,900,893 |
| RCP Customized Credit Fund (Fund IVA), L.P. | 5,966,964 | | 5,966,964 |
| **Total Prepetition Secured Debt:** | $ 23,867,857 | | $ 23,867,857 |
| + Prepetition Debt - unpaid interest, fees, costs, and expenses | *TBD* | | *TBD* |
| + DIP Loan to fund Operating Exp., DIP Fees & Prof. Fees | 5,000,000 | | 5,000,000 |
| + DIP Lenders' Professional Fees | *TBD* | | *TBD* |
| + Roll-up of Debtors' Professional Fee Retainers | 325,000 | | 325,000 |
| + Additional Ch. 11 Professional Fees | - | 1,000,000 | 1,000,000 |
| + Other | - | - | - |
| **Total Prepetition Secured Debt & DIP, including roll-up:** | $ 29,192,857 | $ 1,000,000 | $ 30,192,857 |
| **Net Positive (Negative) to the Estate:** | $ (19,545,732) | $ 3,873,080 | $ (15,672,652) |

| Forecast ($ in 000's) | 10/6 | 10/13 | 10/20 | 10/27 | 11/3 | 11/10 | 11/17 | 11/24 | 12/1 | 12/8 | 12/15 | 12/22 | 12/29 | 13-Week Total | 18-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 13 Weeks Ending December 29th | | | | | | | | | |
| Total Proceeds from Asset Sales: | $ - | $ - | $ 2,843 | $ 80 | $ - | $ - | $ 1,200 | $ - | $ 5,400 | $ - | $ - | $ - | $ - | $ 9,523 | $ 9,647 |
| Operating Cash Flow (+/-) | (166) | (453) | (239) | (125) | (187) | (18) | (169) | (16) | (118) | (17) | (91) | (22) | (15) | (1,637) | (2,650) |
| DIP Loan Interest & Fees | - | - | - | - | - | - | - | - | (83) | - | - | - | - | (83) | (83) |
| Restructuring Fees | (302) | - | (2,642) | (443) | (350) | (303) | (318) | (303) | (303) | (278) | (293) | (278) | (258) | (6,068) | (7,368) |
| NCF before Consideration of Asset Sale Proceeds | $ (468) | $ (453) | $ (2,881) | $ (568) | $ (537) | $ (320) | $ (487) | $ (318) | $ (504) | $ (294) | $ (384) | $ (299) | $ (273) | $ (7,788) | $ (10,101) |
| NCF after Consideration of Asset Sale Proceeds | $ (468) | $ (453) | $ (39) | $ (488) | $ (537) | $ (320) | $ 713 | $ (318) | $ 4,896 | $ (294) | $ (384) | $ (299) | $ (273) | $ 1,735 | $ (454) |
| Estimated, Available Beginning Cash | 49 | 581 | 128 | 89 | 100 | 100 | 100 | 813 | 495 | 1,260 | 965 | 581 | 282 | 49 | 462 |
| (+/-) Net Cash Flow | (468) | (453) | (39) | (488) | (537) | (320) | 713 | (318) | 4,896 | (294) | (384) | (299) | (273) | 1,735 | (454) |
| (+) DIP Draw / (Paydown) | 1,000 | - | - | 499 | 537 | 320 | - | - | (4,131) | - | - | - | - | (1,775) | - |
| Estimated, Available Ending Cash | $ 581 | $ 128 | $ 89 | $ 100 | $ 100 | $ 100 | $ 813 | $ 495 | $ 1,260 | $ 965 | $ 581 | $ 282 | $ 9 | $ 9 | $ 9 |
| DIP Balance | $2,775 | $2,775 | $2,775 | $3,274 | $3,811 | $4,131 | $4,131 | $4,131 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

## Exhibit 5

**Redacted**

## Exhibit 6

**Redacted**

## Exhibit 7

**Redacted**

## Exhibit 8

**Redacted**

## Exhibit 9

**Redacted**

# Exhibit 10

**Redacted**

**Exhibit 11**

## Re: AmeriFirst - Final DIP Order

**From:** Patty Tomasco <pattytomasco@quinnemanuel.com>
**To:** Maxim Litvak <mlitvak@pszjlaw.com>
**Cc:** Bennett Murphy <bennettmurphy@quinnemanuel.com>; Brittany Nelson <brittanynelson@quinnemanuel.com>; Manisha Sheth <manishasheth@quinnemanuel.com>; Laura Davis Jones <ljones@pszjlaw.com>; David Bertenthal <dbertenthal@pszjlaw.com>; Razmig Izakelian <razmigizakelian@quinnemanuel.com>
**Date:** Sat, 30 Sep 2023 21:52:44 -0400

Completely unprecedented for debtor's prepetition counsel to represent the committee. We will go on the charm offensive in the meantime but the choice for them needs to be binary.

**Patty Tomasco**
Partner
**Quinn Emanuel Urquhart & Sullivan, LLP**

711 Louisiana Street, Suite 500 | Houston, TX 77002
T +1 713 221 7227 | F +1 713 221 7100 | M +1 512 695 2684

51 Madison Avenue, 22nd Floor | New York, NY 10010
T +1 212 849 7000 | F +1 212 849 7100

> On Sep 30, 2023, at 8:48 PM, Maxim Litvak <mlitvak@pszjlaw.com> wrote:

---

**[EXTERNAL EMAIL from mlitvak@pszjlaw.com]**

---

Completely unprecedented to strip all challenge provisions by other parties in interest, but we've already discussed that.

---

**From:** Patty Tomasco [mailto:pattytomasco@quinnemanuel.com]
**Sent:** Saturday, September 30, 2023 5:42 PM
**To:** Maxim Litvak <mlitvak@pszjlaw.com>
**Cc:** Bennett Murphy <bennettmurphy@quinnemanuel.com>; Brittany Nelson <brittanynelson@quinnemanuel.com>; Manisha Sheth <manishasheth@quinnemanuel.com>; Laura Davis Jones <ljones@pszjlaw.com>; David Bertenthal <dbertenthal@pszjlaw.com>; Razmig Izakelian <razmigizakelian@quinnemanuel.com>
**Subject:** RE: AmeriFirst - Final DIP Order

RCP has not signed off on this yet, but I'm sending so you can see that the changes are relatively simple. When Theo gets back online hopefully overnight, we can get you the final word.

Patty Tomasco
Partner
**Quinn Emanuel Urquhart & Sullivan, LLP**

711 Louisiana Street, Suite 500 | Houston, TX 77002
T +1 713 221 7227 | F +1 713 221 7100 | M +1 512 695 2684

51 Madison Avenue, 22nd Floor | New York, NY 10010
T +1 212 849 7000 | F +1 212 849 7100

REV0008483

**From:** Maxim Litvak <mlitvak@pszjlaw.com>
**Sent:** Saturday, September 30, 2023 6:48 PM
**To:** Patty Tomasco <pattytomasco@quinnemanuel.com>
**Cc:** Bennett Murphy <bennettmurphy@quinnemanuel.com>; Brittany Nelson <brittanynelson@quinnemanuel.com>; Manisha Sheth <manishasheth@quinnemanuel.com>; Laura Davis Jones <ljones@pszjlaw.com>; David Bertenthal <dbertenthal@pszjlaw.com>
**Subject:** RE: AmeriFirst - Final DIP Order

[EXTERNAL EMAIL from mlitvak@pszjlaw.com]

Depends how long it takes other parties to respond.  I would hope that we can file by end of the day Monday.

**From:** Patty Tomasco [mailto:pattytomasco@quinnemanuel.com]
**Sent:** Saturday, September 30, 2023 4:13 PM
**To:** Maxim Litvak <mlitvak@pszjlaw.com>
**Cc:** Bennett Murphy <bennettmurphy@quinnemanuel.com>; Brittany Nelson <brittanynelson@quinnemanuel.com>; Manisha Sheth <manishasheth@quinnemanuel.com>; Laura Davis Jones <ljones@pszjlaw.com>; David Bertenthal <dbertenthal@pszjlaw.com>
**Subject:** Re: AmeriFirst - Final DIP Order

Max, when will the revised order be filed?

**Patty Tomasco**
Partner
**Quinn Emanuel Urquhart & Sullivan, LLP**
711 Louisiana Street, Suite 500 | Houston, TX 77002
T +1 713 221 7227  F +1 713 221 7100  M +1 512 695 2684

On Sep 30, 2023, at 4:35 PM, Maxim Litvak <mlitvak@pszjlaw.com> wrote:

[EXTERNAL EMAIL from mlitvak@pszjlaw.com]

Adding Brittany and Manisha here.  Please let us know if there are going to be any revisions to the attached proposed final DIP order that we previously filed.  Thanks.

**From:** Maxim Litvak
**Sent:** Thursday, September 28, 2023 10:19 AM
**To:** Patty Tomasco <pattytomasco@quinnemanuel.com>; 'Bennett Murphy' <bennettmurphy@quinnemanuel.com>
**Cc:** Laura Davis Jones <ljones@pszjlaw.com>; David Bertenthal (dbertenthal@pszjlaw.com) <dbertenthal@pszjlaw.com>
**Subject:** AmeriFirst - Final DIP Order

REV0008483

Patty/Ben:

Here is the latest Word version of the final DIP order that we submitted to the Court, updated with some minor language changes from Freddie Mac and one landlord.

Would you please revise this order as you see fit today so that we know what we can tell the Judge at the status conference tomorrow about what type of revised final DIP order we will be seeking at the final DIP hearing, whenever it is ultimately set?

In the meantime, we are working on a scheduling order as discussed.  Thank you, Max.

**Maxim Litvak**
Pachulski Stang Ziehl & Jones LLP
Tel: 415.263.7000 | Fax: 415.263.7010
mlitvak@pszjlaw.com
vCard | Bio | LinkedIn

<image001.jpg>

<image002.png>

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

<DOCS_SF-#109472-v4-AmeriFirst_-_Final_DIP_Order.docx>

REV0008483

## Exhibit 12

**Redacted**

## Exhibit 13

**Redacted**

## Exhibit 14

**Redacted**