**<u>EXHIBIT 1</u>**

**Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | ) | Case No. 23- 11240 (TMH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Ref. Docket No. __** |

**ORDER (I) AUTHORIZING (A) PRIVATE SALE AND (B) TRANSFER OF CERTAIN MORTGAGE SERVICING RIGHTS AND OBLIGATIONS TO THE MONEY SOURCE INC. FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) APPROVING THE TERMS OF THE LOAN SERVICING RIGHTS PURCHASE AND SALE AGREEMENT; AND (III) GRANTING RELATED RELIEF**

Upon the motion dated October 31, 2023 (the "Sale Motion")[2] of the Debtors for an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, 9013, and 9014, (i) authorizing the private sale and transfer of certain of the Debtors' mortgage servicing rights; (ii) approving the terms of that certain *Loan Servicing Rights Purchase and Sale Agreement* by and between Debtor AmeriFirst Financial, Inc. and The Money Source Inc.; and (iii) granting further relief; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference of the United States Court for the District of Delaware,* dated February 29, 2012; and consideration of the Sale Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Phoenix 1040 LLC (255) and AmeriFirst Financial, Inc. (4557).  The Debtors' service address is 575 W. Chandler Boulevard, Suite 225, Unit 236, Chandler, AZ 85225.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Sale Motion.

and 1409; and due and sufficient notice of the Sale Motion having been given under the circumstances; and it appearing that no other or further notice need be provided; and the Court having reviewed the Sale Motion; and the Court having held a hearing to consider the relief requested in the Sale Motion on November 21, 2023 (the "Sale Hearing"); and upon the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Sale Motion establish just cause for the relief granted herein; and it appearing that the relief requested is in the best interests of the Debtors, their estates, and all parties in interest; and after due deliberation; and good and sufficient cause appearing therefor;

**THE BANKRUPTCY COURT HEREBY FINDS, ORDERS, ADJUDGES, AND DECREES that**[3]**:**

1.      The Sale Motion is GRANTED as set forth herein.

2.      The Sale Agreement annexed hereto as **Exhibit A** and the sale of the Assets are hereby approved as being in the best interest of the Debtors' estates and their stakeholders.  The Debtors are hereby authorized and empowered to enter into, consummate, implement and perform their obligations under the Sale Agreement, and to execute, deliver, and perform such agreements, instruments, and documents and take any other actions that may be reasonably necessary and desirable to implement and effectuate the terms of the Sale Agreement, this Sale Order, and the Sale, without any further corporate action or orders of the Court.

3.      At the closing of the sale, the Debtors shall be, and hereby are, authorized and empowered by sections 105 and 363(b) and (f) of the Bankruptcy Code to sell and effectuate the

---

[3] All findings of fact and conclusions of law set forth in this Sale Order or announced by the Court at the hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.

transfer of the Assets to Buyer.  The sale of the Assets by the Debtors to Buyer shall constitute a legal, valid and effective transfer of the Assets, notwithstanding any requirement for approval or consent by any person, and vest Buyer with all rights, title, and interests of the Debtors in the Assets, subject to the terms of the Sale Agreement.

4.    The Buyer is hereby granted and is entitled to all the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.  Neither the Debtors nor the Buyer, nor any of their equity owners, officers, directors, employees, professionals or other agents have engaged in any action or inaction that would (a) cause the entry into the Sale Agreement, or consummation of the transactions contemplated thereby, to be avoided, or (b) result in costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  Entry into the Sale Agreement is undertaken by the parties thereto without collusion, and in good faith, as that term is used in 363(m) of the Bankruptcy Code.  All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed.  The Buyer is not an "insider" of any Debtor (as defined under section 101(31) of the Bankruptcy Code).  The reversal or modification on appeal of the authorization provided herein to enter into the Sale Agreement and consummate the transactions contemplated thereby shall not affect the validity of such transactions (including the Sale Agreement), unless such authorization is duly stayed pending such appeal.

5.    The sale is hereby approved pursuant to section 363(f) of the Bankruptcy Code. The Assets sold pursuant to the Sale Agreement shall be transferred free and clear of all liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code; *provided that* with such liens, claims, encumbrances and interests to attach to the sale proceeds of the Assets.

3

Neither the Sale Agreement nor the Assets under the Sale Agreement shall be subject to any avoidance claim or cause of action arising under section 363(n) or chapter 5 of the Bankruptcy Code. The Buyer would not have entered into the Sale Agreement and would not consummate the transactions contemplated thereby if the sale of the Assets to the Buyer was not free and clear of all liens, claims, encumbrances, and other interests, or if the Buyer would, or in the future could, be liable for any such liens, claims, encumbrances, or other interests. The holders of any liens, claims, encumbrances, or other interests against the Debtors, their estates, or any of the Assets who did not object, who withdrew their objections, or whose objections were overruled, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. To the extent any person or entity that has filed statements or other documents or agreements evidencing liens, claims, encumbrances, or other interests in all or any portion of the Assets, and such person or entity has not filed and executed the appropriate termination statements, instruments of satisfaction, releases of liens and easements, or any other documents necessary to document the release of such liens, claims, encumbrances, or other interests, the Debtors are hereby authorized, and the Buyer is hereby authorized on the Debtors' behalf, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets. For the avoidance of doubt, the Debtors and the Buyer are each authorized to file a copy of this Sale Order, which, upon filing, shall be conclusive evidence of the release and termination of such liens, claims, encumbrances, or other interests.

6.      Nothing contained in the Sale Motion or this Sale Order, nor any payment made pursuant to the authority granted by this Sale Order, shall constitute or be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

7.      Notwithstanding Bankruptcy Rule 6004(h), this Sale Order shall be effective and enforceable immediately upon entry.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and obtaining a stay prior to the closing of the sale or risk its appeal being foreclosed as moot.

8.      The Debtors and the Buyer are authorized to take all action necessary to effectuate the relief granted in this Sale Order in accordance with the terms of the Sale Agreement.

9.      The Sale Agreement and any related agreements, documents, or other instruments may be waived, modified, amended, or supplemented by the parties thereto, and in accordance with the terms thereof, without further order of this Court; *provided that* any such waiver, modification, amendment or supplement does not have a material adverse effect on the Buyer or the Debtors' estates.

10.      This Sale Order shall inure to the benefit of the Buyer and the Debtors, and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee that may be appointed in these chapter 11 cases, and shall be binding upon any trustee, party, entity, or fiduciary that may be appointed in connection with these chapter 11 cases or any other or further cases involving the Debtors, whether under chapter 7 or chapter 11 of the Bankruptcy Code.

5

11.     To the extent any provision of this Sale Order conflicts with the terms and conditions of the Sale Agreement, this Sale Order shall govern and control.

12.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Sale Order.

DOCS_DE:245469.5 70786/001

**<u>EXHIBIT A</u>**

**Sale Agreement**

**LOAN SERVICING RIGHTS PURCHASE AND SALE AGREEMENT**

This Loan Servicing Rights Purchase and Sale Agreement is made and entered into as of October 25, 2023, by and between The Money Source Inc. ("Buyer"), a New York corporation having a corporate office at 3138 East Elwood Street, Phoenix, AZ 85034, and AmeriFirst Financial, Inc. ("Seller"), a Delaware corporation, having a corporate office at 575 W. Chandler Blvd., Ste. 225 Unit 236, Chandler, AZ 85225.

**RECITALS:**

A.    Buyer desires to buy and Seller desires to sell the Servicing Rights described herein.

B.    Seller is servicing the Mortgage Loans underlying the Servicing Rights which are the subject of this Agreement.

C.    Buyer and Seller have agreed upon the terms set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

ARTICLE I

Definitions

All words or phrases defined in this Article I shall have the respective meanings specified in this Article.

Accepted Servicing Practices: With respect to each Mortgage Loan, the mortgage servicing practices that are in compliance with (i) all Applicable Laws, (ii) the terms of the related Mortgage and Mortgage Note, (iii) the applicable Servicing Agreement, including the related Investor Requirements, and (iv) to the extent not in conflict with the preceding clauses (i), (ii) and (iii), the accepted mortgage servicing practices of prudent mortgage lending institutions that service mortgage loans of the same type as such Mortgage Loan in the jurisdiction in which the related Mortgaged Property is located.

Advances:  With respect to any Mortgage Loan, P&I, Tax and Insurance, Charges, foreclosure fees and costs, bankruptcy fees, inspection, preservation and maintenance fees and expenses, including attorneys' fees and disbursements, and similar charges advanced in accordance with the related Investor Requirements on behalf of the related Mortgagor and recoverable by the servicer from the Mortgagor, the PMI company, if any, another third party, or the Investor in conformity with the Investor Requirements.

<u>Agency</u>:  FHA, USDA, and VA.

<u>Agreement</u>:  This Loan Servicing Purchase and Sale Agreement as the same may be amended in accordance with the terms hereof.

<u>Ancillary Income</u>:  All fees and income derived from and related to the Mortgage Loans, excluding Servicing Fees attributable to the Mortgage Loans, but including and not limited to late charges, fees received with respect to checks or bank drafts returned by the related bank for non-sufficient funds, assumption fees, optional insurance administrative fees, income on Escrow Accounts and Custodial Accounts or other receipts on or with respect to such Mortgage Loans, and all other incidental fees, income and charges collected from or assessed against the Mortgagor, other than those charges payable to the applicable Investor under the terms of the applicable Servicing Agreement or as otherwise agreed by the parties.

<u>Applicable Law</u>:  All of the following: (i) all federal, state and local laws, rules and regulations and any other applicable requirements and guidelines of any government or agency or instrumentality thereof, including, without limitation, the applicable Investor Requirements, the CFPB, and any applicable insurance companies; and (ii) all other applicable judicial and administrative judgments, orders, stipulations, directives, consent decrees, awards, writs and injunctions that are made or given at any time by any court or regulator to which Seller is a party or any of its affiliates is subject or is otherwise applicable to the servicing of the Mortgage Loans.

<u>Business Day</u>:  Any day other than Saturday, Sunday or a day on which banks in the State of New York are authorized or obligated by law to be closed.

<u>CFPB</u>:  The Consumer Financial Protection Bureau.

<u>Charges</u>:    All taxes, applicable insurance premiums, ground rents, government assessments, hazard and mortgage insurance premiums, water, sewer, municipal charges and common charges of condominiums or planned unit developments and similar charges relating to the Mortgage Loans and required to be timely paid under the applicable Investor Requirements.

<u>Closing Tape</u>:  A computer readable tape, diskette or other mutually agreed electronic format containing the following loan level data produced by Seller with respect to the Mortgage Loans:

| | |
|---|---|
| Current UPB | Original UPB |
| Note Rate | Origination Channel |
| Loan-level Guaranty Fee | Pass-through Rate |
| Net Service Fee | Loan Type |
| Investor Type | Remittance Type |
| Amortization Type | Original Term |
| Remaining Term or Age | Property State |

| | |
|---|---|
| P&I and T&I Constants | Origination Date |
| ARM Index & Margin, if app. | Property Type |
| LTV and CLTV | Occupancy Type |
| Pool #/Pool Type/ Pool Mo. | Due Date |
| Credit Scores (i.e. FICO), if | Mortgage Insurance Information |
| available | Foreclosure flag |
| Bankruptcy flag | Litigation flag |
| Modification flag | Closed/Active Renovation Flag |
| First Payment Date | (i.e. 203K / Homestyle) |
| Loan Purpose | Documentation Type |

<u>Custodial Account</u>:    An account maintained by Seller in accordance with the applicable Investor Requirements for the deposit of P&I payments received in respect of one or more Mortgage Loans.

<u>Custodial Documents</u>:  As to any Mortgage Loan, the following documents:

1.    Executed original Mortgage Note, rider and note addendum with any endorsements or an executed lost note affidavit or transferable lost note bond if permitted by and in form acceptable to the Investor;

2.  Original recorded Mortgage or a copy of the original recorded Mortgage or if the related Mortgage is in the process of being recorded, a photocopy of the related unrecorded Mortgage.  If an unrecorded copy was provided prior to the Transfer Date, the original recorded Mortgage or a copy of the original recorded Mortgage will be delivered upon receipt pursuant to the terms of the Agreement;

3.  All assignments required by the Investor or a copy thereof if permitted by the applicable Investor Requirements;

4.  Executed original modification agreement with evidence of recording thereon, if applicable;

5. Original final title policy or a copy of the related policy to the extent acceptable under Investor Requirements or a copy of the title commitment indicative of title insurance.  If the title commitment was provided prior to the Transfer Date, the original (which may be in electronic format) or a copy of the original final title policy will be delivered upon receipt pursuant to the terms of the Agreement;

6. Any FHA or VA or PMI insuring certificates or a copy thereof if permitted by the applicable Investor Requirements; and

7. Any other documents required to be retained by a Custodian in accordance with the Investor Requirements.

<u>Custodian</u>:  With respect to any Mortgage Loan and Servicing Agreement, each applicable document custodian holding the related Custodial Documents for Seller or the Investor, as applicable.

<u>Cut-Off Date</u>:  The date in each month established by the Investor on which a reconciliation is performed of all funds received on behalf of the Investor during the preceding month.

<u>Damaged Loan</u>:  Any Mortgage Loan, the real property improvements of which (i) are in a disaster area declared by the President of the United States as of the date of the this Agreement or at any time thereafter up to and including the Sale Date and (ii) as of the Sale Date have been adversely affected in any manner or suffered any damage or loss including, without limitation, unrepaired damage or uncompensated loss whether or not covered in whole or in part by insurance arising out of fire, explosion, accident, hurricane, earthquake, windstorm, flood, mold, tornado, lightning, toxic waste, hazardous waste, vandalism, strike, riot, war, or act of God or the public enemy.

<u>Delinquent Loan</u>:  A Mortgage Loan which, as of the month end prior to the Sale Date, is thirty (30) or more days delinquent on the MBA method. A list of such loans shall be provided in Exhibit I.

<u>eMortgage Loan</u>:  A mortgage loan for which the Mortgage Note and possibly other primary credit documents such as the Mortgage are created and stored electronically rather than by using traditional paper documentation that has a pen and ink signature.

<u>Escrow Accounts</u>:  All escrow and impound accounts, other than a Custodial Account, maintained pursuant to the Servicing Agreement or otherwise relating to the Mortgage Loans including, without limitation, all accounts established for purposes of receiving funds for the payment of Charges, suspense, buydown funds, unapplied balances, replacement reserve balances, loss draft balances (including interest accrued thereon for the benefit of the Mortgagors under the Mortgage Loans if required by law or the applicable Mortgage Documents), completion escrow monies and any other miscellaneous cash balances held with respect to the Mortgage Loans.

<u>Escrows</u>: As of any date of determination, amounts on deposit in an Escrow Account.

<u>Exceptions List</u>:  A list prepared by Buyer and delivered to Seller setting forth for each Mortgage Loan any Holdback Documents that have not been received by Buyer.

<u>FDIC</u>:  The Federal Deposit Insurance Corporation.

<u>FHA</u>:  The Federal Housing Administration.

<u>FHA Loan</u>:  Any Mortgage Loan insured by the FHA.

<u>FHLMC or Freddie Mac</u>:  The Federal Home Loan Mortgage Corporation and any successor thereto.

<u>Flood Certification Fee</u>:  As applicable: (i) ten dollars ($10.00) per Mortgage Loan without a flood certification contract, (ii) ten dollars ($10.00) per Mortgage Loan with a fully paid, life of loan, fully transferrable flood certification contract that is not from CoreLogic, and (iii) any beneficiary change fees required by CoreLogic for the transfer.

<u>FNMA or Fannie Mae</u>:  The Federal National Mortgage Association and any successor thereto.

<u>FNMA HomeStyle Loan</u>:  A Mortgage Loan offered through FNMA that enables a Mortgagor to make renovations, repairs, or improvements in a purchase or re-finance transaction of an existing home.

<u>GNMA or Ginnie Mae</u>:  The Government National Mortgage Association and any successor thereto.

<u>Guarantee Fees</u>:  Any such (guarantee) fees payable to an Investor in accordance with applicable Investor Requirements.

<u>Holdback Amount</u>:  An amount equal to 10 percent (10%) of the Purchase Price.

<u>Holdback Documents</u>:  As to any Mortgage Loan, the documents listed on Exhibit F.

<u>Imaging Fee</u>: The amount stated in the Transfer Procedures for each Loan File that is not comprised solely of imaged documents that have been indexed and formatted as provided in Exhibit E.

<u>Interim Servicing Costs</u>: In the event the Transfer Date is subsequent to the Sale Date, Seller will interim service the Loans in accordance with the respective Agency servicing guidelines and requirements and the terms of the Agreement. Buyer will pay Seller seven dollars ($7.00) per month, per loan serviced. The Interim Servicing Fee will be prorated for periods of less than a month. Seller will be entitled to and shall retain all interest float benefits of escrow and custodial accounts during the interim servicing period. Seller will retain all ancillary income during the interim servicing period and remit to Buyer all servicing fees collected net of the Interim Servicing Costs, with respect to the Mortgage Loans.

<u>Interim Servicing Period</u>: The period of time between the Sale Date and the Transfer Date, when the Seller shall subservice (or cause to be subserviced) the Mortgage Loans on behalf of the Buyer.

<u>Interim Servicing Income</u>:   The Revenue generated by the Servicing Rights between the Sale Date and the Transfer Date, net of any Interim Servicing Costs.

<u>Investor</u>:  Each of FNMA and FHLMC, or Ginnie Mae (as security guarantor), as appropriate to the identity of the investor of a particular Mortgage Loan in the Portfolio.

Investor Guides: Any of the (a) Fannie Mae Selling or Servicing Guides  (b) Freddie Mac Single-Family Seller/Servicer Guide (c) Ginnie Mae Servicing Guides, (d) FHA, VA, HUD, USDA, or private mortgage insurer guidelines, as applicable, subject to such waivers, variances and modifications as have been and may be agreed to between applicable Investor and Seller.

Investor Requirements:  The Servicing Agreement and any requirement or guide of the applicable Investor, including without limitation, all applicable rules, regulations, directives, guidelines, and instructions established by the Investor Guides.

Loan File:  With respect to each Mortgage Loan, all credit and servicing documents (including servicing histories) required by Applicable Law or Investor Requirements and those documents necessary to service, including those set forth in Exhibit C, to the extent such documents are in the possession or control of Seller.

Lock File:  A list identifying applications to refinance a Mortgage Loan the Servicing Rights of which are part of the sale to Buyer and which has a rate lock commitment in Seller's current mortgage loan pipeline as of the Sale Date. Such file shall detail the loan number of  the existing Mortgage Loan which is the subject of such refinance application and the new mortgage loan application together with all information gathered to date on such new mortgage loan, including, but not limited to, the new UPB, lock date, locked note rate, locked product type, and locked loan term.

MERS:  The Mortgage Electronic Registration Systems, Inc., a Delaware corporation and any successor thereto.

Mortgage:  A mortgage, deed of trust or other instrument creating a first lien on real property as security for payment of a Mortgage Note.

Mortgage Documents:   As to any Mortgage Loan, the documents specified in Exhibit C for such Mortgage Loan, which may be in the form of a copy.

Mortgage Loan:  An individual loan secured by a Mortgage on a Mortgaged Property the Servicing Rights to which are sold and transferred by Seller to Buyer under this Agreement.

Mortgage Loan Schedule:  The schedule of Mortgage Loans agreed to by Buyer and Seller, such schedule attached hereto as Exhibit B and setting forth the information with respect to each Mortgage Loan and the related Servicing Rights set forth on Exhibit G hereto.

Mortgage Note:   A promissory note evidencing the indebtedness under a Mortgage Loan secured by a Mortgage.

Mortgaged Property:   A fee simple interest in a single parcel of real property improved by a one- to four-family residential dwelling, a condominium unit or a unit in a planned unit development, securing the indebtedness of the Mortgagor under the related Mortgage Note.

<u>Mortgagor</u>:   The obligor on a Mortgage Note.

<u>P & I</u>:   Principal and interest due on a Mortgage Loan.

<u>Person</u>:   An individual corporation, limited liability company, joint venture, partnership, trust, unincorporated association, government or any department or agency thereof, or any other entity.

<u>PMI</u>:   Private mortgage insurance.

<u>Pool</u>:   A group of Mortgage Loans that collateralize a mortgage-backed security issue.

<u>Portfolio</u>:   The Servicing Rights to be sold and purchased under this Agreement.

<u>Purchase Price</u>:   An amount equal to (i) the product of (x) the Purchase Price Percentage and (y) the aggregate UPB of the Mortgage Loans as of the Sale Date, minus (ii) applicable Flood Certification Fees, Tax Contract Fees, and Imaging Fees as may be adjusted pursuant to Section 2.03.

<u>Purchase Price Percentage</u>: One hundred basis points (1.00%) expressed as a percentage of the UPB of the Mortgage Loans (other than the Delinquent Loans) as of the Sale Date.

<u>Records</u>:   Any and all of the Loan Files, insurance files, tax records, collection records, Mortgage Documents, ledgers, and other records, data or information relating to the Mortgage Loans, the Custodial Accounts, the Escrow Accounts or the Pools, or otherwise necessary or proper to transfer the Servicing Rights to Buyer.

<u>Remittance Date:</u> The scheduled date of the month in which an Investor receives P&I or interest payments, if applicable.

<u>REO</u>:   Real property acquired through foreclosure, trustee sale or other liquidation of a Mortgage Loan prior to the Sale Date.

<u>Sale Date:</u> November 30, 2023, or such other date agreed upon by the Parties in writing, on which date the economic risks and benefits of the Servicing Rights are conveyed to Buyer, subject to entry of the Sale Order described in section 5.01(b) of this Agreement.

<u>Servicing Agreement</u>:  Each agreement between Seller and the Investor pursuant to which a Mortgage Loan is serviced.

<u>Servicing Agreement Consent:</u> The duly executed, written acknowledgement provided by an Investor to Seller and Buyer, as specifically required by the related Investor Requirements, approving the purchase, sale and transfer of the applicable Servicing Rights pursuant to this Agreement.

Servicing Rights:  With respect to the Mortgage Loans, all of Seller's or Buyer's, as respective owner of the Servicing Rights (i) obligations to service the Mortgage Loans in accordance with the Investor Requirements, (ii) right to receive the servicing fee income and any and all ancillary or other income including, without limitation, late charge income, and (iii) right to hold and administer the related Escrows and the Records arising from or connected to any of the Mortgage Loans including but not limited to tax and insurance collections, (iv) rights to all accounts and other rights to payment related to any of the property described in this paragraph, (v) rights under all agreements or documents creating, defining or evidencing any such Servicing Rights, (vi) possession and use of any and all Loan Files pertaining to the past, present or prospective servicing of the Mortgage Loans and (vii) rights, powers and privileges incident to any of the foregoing.

Servicing Tape:  A computer readable tape with loan level data and servicing information in form and content sufficient to allow Buyer to service the Mortgage Loans in accordance with the applicable Investor Requirements.

Tax Contract Fee:  For each Mortgage Loan without a fully paid, life of loan, fully transferable tax contract, fifty dollars ($50).

Transfer Date:  February 1, 2024, or such other date as Seller and Buyer may mutually agree, and as the applicable Investor may allow, on which date Buyer shall assume the obligation to service the applicable Mortgage Loans.

Transfer Procedures:  The procedures for transferring the Servicing Rights substantially in the form set forth in Exhibit D.

UPB:  As to any Mortgage Loan and any date of determination, the unpaid principal balance of such Mortgage Loan as of such date.

USDA Loans: Mortgage Loans insured by the United States Department of Agriculture.

VA:  The Department of Veterans' Affairs.

VA Loan:  Any Mortgage Loan partially guaranteed by the VA.


ARTICLE II

Purchase and Sale

Section 2.01.   Purchase and Sale

On the terms and subject to the conditions set forth herein, Seller does hereby sell, transfer, assign, set over and convey to Buyer, effective on the Sale Date, all right, title and interest of Seller in, to and under the Servicing Rights.  Buyer covenants and agrees to assume, pay, perform and discharge, on and after the Transfer Date, each and every

obligation to service the Mortgage Loans in accordance with the Servicing Agreement, the Investor Requirements, the Custodial Documents and Applicable Law.

Section 2.02.   {Reserved}

Section 2.03.   Purchase Price and Adjustments.

(a)  The Purchase Price shall be adjusted downward for all Mortgage Loans which the applicable Investor disallows the servicing transfer, before the Sale Date.  Upon receipt of evidence of notice of disallowance from the Investor, at Buyer's option, the Purchase Price shall be reduced or Seller shall remit to Buyer an amount determined by multiplying the UPB of the applicable Mortgage Loan as of the Sale Date, as applicable, by the Purchase Price Percentage.

(b)  In the event the transaction contemplated herein fails to be consummated for any reason, including for failure to satisfy the conditions set forth in Sections 5.02 and 5.03 of this Agreement, Seller shall promptly refund any monies related to the Purchase Price paid by Buyer, and Buyer will return any custodial funds, escrow funds or other monies sent to Buyer, but rightfully belonging to Seller, related to the transaction.

Section 2.04.   Terms of Payment.

Seller shall deliver to Buyer a preliminary Closing Tape no later than the Sale Date, showing the UPB of each Mortgage Loan as of mid-month of the month of the Sale Date. The parties shall calculate the Purchase Price based on the Mortgage Loans listed on such preliminary Closing Tape; provided that a second final Mortgage Loan Schedule shall be produced and delivered prior to the Second Payment described below showing information as of the close of business on the Sale Date and the Purchase Price shall be adjusted accordingly, if necessary.

The Purchase Price shall be paid as follows:

(a)  First Payment:  After: (i) Written approval from GNMA, FNMA, or FHLMC, as applicable, has been requested by Seller and provided to Buyer; (ii) the Sale Date tape information is delivered to Buyer; (iii) execution of this Agreement; and (iv) satisfaction of the conditions set forth in Section 5.02, an amount equal to 70 percent (70%) of the Purchase Price shall be paid on the Sale Date.

(b)  Second Payment: An amount equal to 20 percent (20%) of the Purchase Price for GNMA, FNMA, and FHLMC Mortgage Loans will be paid within three (3) Business Days after the respective FNMA, FHLMC, and GNMA Transfer Dates and upon receipt of all respective Loan Files and Buyer's receipt of all net funds from the respective Escrow Accounts and Custodial Accounts.

(c)  Holdback Payment: An amount equal to 10 percent (10%) of the Purchase Price (the "Holdback Amount") will be released monthly (starting on the first month following

the Transfer Date), on a pro-rata loan-level basis, as missing Holdback Documents are received by Buyer and validated by Buyer's Custodian, it being agreed that Buyer shall take commercially reasonable steps to assist in expediting the validation of the Holdback Documents by the Buyer's Custodian. Buyer shall deliver or cause to be delivered to Seller the first Exceptions List identifying any missing Holdback Documents as soon as possible, but in no event later than sixty (60) days, following the Transfer Date. Buyer shall update the Exceptions List each month thereafter to remove from (but not add to) the Exceptions List those Mortgage Loans that no longer have any missing Holdback Documents. Buyer shall release portions of the Holdback Amount on a loan level, pro rata basis within seven to ten (7-10) days following each month end (beginning in the month in which the first such Exceptions List is required to be provided) with respect to Mortgage Loans with no missing Holdback Documents, or as to which all missing Holdback Documents identified in the initial Exceptions List have been provided or corrected, and Mortgage Loans that have paid off or otherwise been liquidated. Pro rata releases shall be calculated by multiplying the initial Holdback Amount by a percentage equal to (1) (x) for the first month, the number of related Mortgage Loans that do not appear on the initial Exceptions List as having any missing Holdback Documents, and for each subsequent month the number of such Mortgage Loans that are removed from the Exceptions List during such month due to no longer having any missing Holdback Documents, plus (y) the number of such Mortgage Loans that have paid off or otherwise liquidated during the applicable month, divided by (2) the number of Mortgage Loans. In no event will the Holdback Amount be less than $5,000 until all Holdback Documents are received by the Buyer. Following the expiration of a twelve (12) month period after the Transfer Date, Buyer shall, following notice to Seller, use the remaining Holdback Amount to cure the outstanding missing Holdback Documents on reasonable terms at competitive market rates. In the event that the remaining Holdback Amount is greater than the cost to cure, Buyer shall release the positive difference to Seller.

Section 2.05.  Other Payments and Transfers.

(a)  Provided Seller has delivered all notices required by this Agreement as necessary to effectuate the transfer of the Servicing Rights and is in material compliance with the Transfer Procedures, subsequent to the latest occurring Transfer Date and within three (3) Business Days after (x) Buyer's receipt and reconciliation (which Buyer will accomplish with all due haste following receipt of the information necessary to perform such reconciliation) of all funds in the Custodial Accounts and Escrow Accounts and (y) Buyer's receipt of a completed Mortgage Loan Schedule, then Buyer shall reimburse Seller for recoverable Advances on the following terms. Except as described in the following sentence, transfer of custodial and escrow funds shall be net of recoverable advances made in accordance with the applicable Agency and Investor requirements. Default related corporate advances shall be reimbursable at 100% of such advances that have been made in accordance with all applicable Agency and Investor requirements and are deemed by Buyer, in its reasonable discretion, to be recoverable and such amount shall be paid to the Seller on or before the date that is fifteen (15) days following the Transfer Date. Seller shall provide Buyer detail satisfactory to support the advances including supporting documentation for all such advances as may be required by any applicable Agency, CFPB,

or Investor.  Buyer will not reimburse Seller for any corporate advances on any current Mortgage Loans. Seller shall be responsible for remitting, up to the respective Transfer Date, payment of any interest on escrow amounts for the Loans, to the extent required by law. Seller is also responsible to remit to the Investor any interest shortfall between the amount of interest required to be remitted to the Investor and the funds collected from the Mortgagor(s), including without limitation, compensating interest payable on pay-offs and curtailments, where applicable.  As of the Transfer Date, Buyer shall be responsible for delinquent principal and interest advances that have been paid out of the custodial account and be responsible to fund such amounts into Seller's custodial account, provided the custodial account does not have sufficient cash to cover principal and interest advances for those amounts due to the Investor for the period immediately following the Transfer Date.

(b)  Each of Buyer and Seller agrees to remit to the other party any funds that the other party is due, including but not limited to any Guarantee Fees or scheduled P&I payments that the Investor may draw against the Seller after the applicable Transfer Date.

Section 2.06.   Transfer Date

The Transfer Date is the date on which Buyer assumes the actual responsibility for the servicing of the Mortgage Loans in accordance with the applicable Investor Requirements. The servicing responsibilities with respect to the applicable Mortgage Loans shall be transferred to Buyer as of the related Transfer Date.   Prior to the applicable Transfer Date, Seller shall continue to service, or shall cause its subservicer to service, the related Mortgage Loans in accordance with the Investor Requirements and Applicable Law.

Section 2.07.   Correction of Errors

If, prior to or subsequent to the payment of any amounts due under this Article II to Seller, the UPB of any Mortgage Loan or any applicable Advance is found to be in error, or if for any reason the Purchase Price or such other amounts is found to be in error, the parties shall mutually agree to an appropriate adjustment (and an associated reconciliation statement or other such documentation with respect to such adjustment), and the party benefiting from the error shall pay to the other party an amount sufficient to correct and reconcile the Purchase Price or such other amounts, as mutually agreed by the parties. Such amounts shall be paid by the applicable party within three (3) Business Days from receipt of satisfactory written verification of amounts due or mutual agreement between the parties as to amounts due.


ARTICLE III

Miscellaneous Provision

Section 3.01.   The Seller is making no representations or warranties with regard to the Seller, the Mortgage Loans or the Servicing Rights.

<u>Section 3.02.</u>  In the event that Ginnie Mae requires the Seller to buy one or more Mortgage Loans out of a Pool from and after the Sale Date, the Buyer shall advance all funds necessary to effect such buy out and all right, title and interest in and to such Mortgage Loans (and the related Servicing Rights) shall belong to the Buyer.  If needed, the Seller shall execute all such documents as is reasonable in order to effect such transfer to the Buyer.

ARTICLE IV

Document and Account Transfers

Notwithstanding anything in this Article IV to the contrary, Seller shall use commercially reasonable efforts to perform its obligations under this Article IV; provided, however, that if Seller does not, or is unable to, perform as required under this Article IV, Seller shall not be deemed to be in breach of this Agreement.

<u>Section 4.01.</u>   <u>Assignments and Endorsement of Notes</u>

(a)   As of the Transfer Date, each Mortgage Note shall be properly endorsed to Buyer or the Investor, as required by the applicable Investor Requirements, and each Mortgage shall be assigned in the manner required or allowed by Applicable Law and the Investor, subject, if applicable, only to recording of assignments to Buyer or MERS.  Seller shall prepare and record, at Seller's expense, all assignments required to complete the chain of title for each Mortgage Loan to Buyer, the Investor or MERS, as required by the Investor. Seller shall promptly deliver all such assignments to Buyer, at Seller's expense, when returned from the applicable recorder's office. Seller will promptly deliver to Buyer, or Buyer's custodian, upon Buyer's reasonable request on an "as needed basis" after the Transfer Date, a copy or duplicate original of any such assignment by Seller to Buyer or MERS that was sent for recording but not yet returned from the applicable recorder's office.

(b)   If required by the Investor, for any Mortgage Loans with respect to which the assignments are recorded in the name of Buyer, Seller shall prepare, or cause to be prepared for Buyer, at Seller's expense, assignments from Buyer to the Investor. Such assignments will be delivered within five (5) Business Days after the Transfer Date to Buyer but will not be recorded.

(c)   All assignments sent for recording and all other Mortgage Documents sent to Buyer on or after the Transfer Date shall contain Seller's loan number; provided however, that imaged documents will be sent in a loan folder with the Mortgagor's name and Seller's loan number but individual documents within the folder may not contain loan numbers. After the Transfer Date, Seller shall use its commercially reasonable efforts to place loan numbers on checks sent to Buyer.

Section 4.02    Loan Histories

Seller shall provide Buyer with all loan histories in its possession or control, including servicing notes, for the Mortgage Loans in the Loan Files (on Seller's system and if reasonably available to Seller, acquired from previous servicers) and a copy of each ARM change letter, where applicable, in accordance with the Transfer Procedures.

Section 4.03    Transfer of Escrow Accounts and P&I Funds

(a)   Seller shall transfer to Buyer within three (3) Business Days after the Transfer Date by wire transfer pursuant to Buyer's instruction all related Escrow Account balances (net as provided in Section 2.05(a)) and interest accrued on such funds for the benefit of the Mortgagors under the terms of the Mortgage Loans or Applicable Law.

(b)   Within five (5) Business Days after the Transfer Date, Buyer and Seller shall transfer funds representing settlement of the Custodial Accounts related to the applicable Mortgage Loans (with reasonable supporting documentation to reconcile funds transferred).

(c)   Seller shall remit funds to the Investor following each applicable Transfer Date for the final Investor reporting period in accordance with the applicable Investor Requirements; it being understood that although Seller shall have the obligation to make such remittance to the Investor, the funds necessary to allow Seller to make such remittance shall be provided to Seller by Buyer.

Section 4.04.    Transfer of Records

(a)   No later than the Transfer Date, Seller shall deliver in accordance with the Transfer Procedures and this Agreement, and at Seller's expense, all Loan Files in its possession or control in the image format set forth in Exhibit E.

(b)   All Custodial Documents held by the Custodian shall be delivered to the office of Buyer's custodian, or as otherwise directed by the Buyer, within five (5) Business Days after the Transfer Date.  Seller shall bear the risk of loss during transit until such Custodial Documents are received by Buyer's custodian.  Notwithstanding the foregoing, the parties acknowledge that (i) Deutsche Bank and Bank of New York are the Seller's Custodians and also will serve as the Buyer's Custodians and (ii) all documents held by Deutsche Bank and Bank of New York shall be transferred pursuant to a "shelf transfer" and shall remain in the custody of Deutsche Bank and Bank of New York, as Custodians.

(c)   Seller and Buyer acknowledge that, during the sixty (60) day period after the Transfer Date, all correspondence and funds received by Seller in connection with the Mortgage Loans, including, but not limited to, tax, insurance, principal, interest, mortgage guaranty or mortgage insurance payments, insurance loss drafts, tax refunds and all other types of payments, are to be promptly paid over to Buyer without offset or deduction of any kind or nature. Buyer shall be entitled to the servicing fees collected after the Sale Date and other servicing related income collected after the Sale Date, net of all Interim Servicing

Costs, all fees and income collected prior to the Sale Date, and all Ancillary Income (other than late fees which shall be paid to Buyer) related to Mortgage Loans earned by Seller. During such sixty (60) day period, any correspondence and funds relating to the Mortgage Loans shall be identified by Seller by Seller's and Buyer's loan numbers and shall be promptly delivered to Buyer at Seller's expense (by overnight courier for the next Business Day delivery for the first thirty (30) days, and thereafter by first-class mail), at the address for notice to Buyer contained herein.

Section 4.05.   Service Bureau Cooperation

Seller and Buyer shall cause their respective service bureaus and/or electronic data processing departments to cooperate with each other in the transfer of the Servicing Rights.

Section 4.06.   Investor Approval and Costs

(a)   No later than the Transfer Date, Seller shall have delivered to Buyer, proof of consent to transfer the servicing of the Mortgage Loans from each applicable Investor, including GNMA, FNMA, and FHLMC ("Servicing Agreement Consent").   When the Servicing Agreement Consent is received, it will not contain unusual conditions. "Unusual conditions" would include, by way of example, but are not limited to: (i) the imposition of conditions not customarily imposed by the Investor, (ii) the requirement for the payment of money by Buyer to the Investor, or (iii) the requirement that Buyer suspend or otherwise alter its normal origination or servicing activity.  In the event Servicing Agreement Consent is not received, or is received but with unusual conditions, Seller will promptly return all moneys paid, and this Agreement will be terminated.

(b)   Each of Buyer and Seller, as applicable, shall timely deliver to the applicable Investor all documents required by such Investor to obtain the Investor's approval in accordance with the applicable Investor Requirements so that Seller may comply with the requirement in Section 4.09(a). Buyer shall reasonably cooperate with Seller in the preparation of all documents and information necessary to support Seller's request for the Servicing Agreement Consents. Seller shall be responsible for all Seller's costs and expenses arising out of or relating to the transfer of the Servicing Rights to Buyer, including consent fees.

(c)   Prior to the Transfer Date, Seller shall use its best efforts to ensure that the chain of title for each Mortgage Loan is complete to the Investor or Seller, as appropriate. If subsequent to the Transfer Date, it is determined that the chain of title of any Mortgage Loan is not complete to the Investor, Seller or Buyer, Seller shall, upon notice from Buyer, take whatever commercially reasonable action is necessary to clear such title defect at Seller's expense.

Section 4.07.   Year-End Reporting

Seller shall be responsible for all government, and regulatory reporting pertaining to servicing activities relating to the Mortgage Loans prior to the Transfer Date including,

but not limited to, all year-end statements (for the period serviced by Seller only) to the Mortgagors and to government agencies (such as Form 1099's, 1098's, K-1's, and HMDA reporting). Buyer shall be responsible for all government, and regulatory reporting pertaining to servicing activities relating to the Mortgage Loans from and after the Transfer Date including, but not limited to, all year-end statements (for the period serviced by Buyer only) to the Mortgagors and to government agencies (such as Form 1099's, 1098's, K-1's, and HMDA reporting).

Section 4.08.    Interest and Escrow

Seller shall be responsible up to the Transfer Date for accurately posting all interest accrued up to such Transfer Date on the related Escrow Accounts to each account history, where applicable. Seller shall be responsible for reporting to the Internal Revenue Service all interest paid by Seller for the account of Mortgagors with respect to Mortgage Loans up to the Transfer Date. Buyer will not reimburse Seller for the Seller's interest on Escrows paid during the Interim Servicing Period, if any.

Section 4.09.    Notification to Mortgagors

No later than fifteen (15) days prior to the Transfer Date, Seller shall mail to all Mortgagors at Seller's cost and expense, a notice advising them of the occurrence of the sale contemplated hereby and including directions as to when and where to make payments on and after the Transfer Date and such other disclosures as may be required by the Investor or Applicable Law. Such letter shall comply with the applicable Investor Requirements and Applicable Law and be in form and substance reasonably acceptable to Buyer prior to Seller mailing it to Mortgagors. Buyer shall be responsible, at Buyer's cost and expense, for the preparation and delivery of all "hello" notices to be provided after the Transfer Date.

Section 4.10.    Notification to Insurance Carriers

At least five (5) days prior to the Transfer Date (or at such other time as may be necessary to comply with the applicable Investor Requirements, the requirements of the applicable insurance companies and Applicable Law), Seller shall mail a notice to all applicable hazard insurance companies and PMI companies, with respect to each applicable Mortgage Loan, of the sale and transfer of the related Servicing Rights as contemplated hereby and request that such companies revise their records to reflect Buyer (or its agent if so indicated by Buyer) as the servicer of the Mortgage Loans. If so requested by Buyer, Seller shall furnish Buyer with reasonable evidence of Seller's compliance with this section.

Section 4.11.    Payment of Property Insurance and Mortgage Insurance Premiums

Prior to the Transfer Date, Seller shall pay, or cause to be paid from the applicable Escrow Account all applicable property and mortgage insurance premiums due (x) prior to and including the Transfer Date and (y) within thirty (30) days after the Transfer Date except where a bill or invoice was required for payment and had not been issued or become

otherwise available prior to the Transfer Date. Promptly following the Transfer Date, Seller shall provide Buyer with a list, as of the Transfer Date, of all Mortgage Loans which reflect a property or mortgage insurance premium due but for which Seller has not received an invoice. During the period of ninety (90) days after the Transfer Date, Seller agrees to forward to Buyer, on a weekly basis, all insurance bills related to the Mortgage Loans received by Seller. During the ninety (90) day period after the Transfer Date, such bills shall be forwarded by overnight mail. Thereafter such bills may be forwarded by regular mail.

Section 4.12.   Payment of Property Taxes

(a)     Each Mortgage Loan shall have a fully paid, transferrable, life-of-loan tax contract in place.  Buyer shall set off against any portion of the Purchase Price then held by Buyer, the applicable Tax Contract Fee(s) in the event any Mortgage Loan does not have such tax contract in place.

(b)   Seller shall pay or cause to be paid, from the applicable Escrow Account, all real estate taxes on the Mortgaged Properties (and all interest, late payments and penalties in connection therewith) (x) for which  either (i) a tax bill has been received, (ii) a tax bill was issued on or prior to the Transfer Date, or (iii) a tax service contract is in effect and should have been paid by the tax service, if applicable, and (y) that have due dates or discount dates, whichever is earlier, prior to or within thirty (30) days after such Transfer Date except where a bill or invoice was required for payment and had not been issued or become otherwise available prior to the Transfer Date. In the event all such tax bills are not paid as set forth above, Seller shall reimburse Buyer, within five (5) days of Seller's receipt of an invoice with commercially reasonable supporting documentation for any penalties and out-of-pocket expenses incurred and related to the actual delay in payment by Seller.

(c)   During the period of ninety (90) days after the Transfer Date, Seller agrees to forward to Buyer, on a weekly basis, all real estate tax bills related to the Mortgage Loans received by Seller by overnight mail. Thereafter such bills may be forwarded by regular mail.

(d)   Prior to the Transfer Date, Seller shall provide Buyer with the taxing authority identification number referenced by the respective counties for each Mortgage Loan in order to allow the automated transfer of such data to Buyer.

(e)   An open items report will be furnished by Seller to Buyer five (5) days prior to the Transfer Date and again on the Transfer Date to identify the total number of Mortgage Loans for which tax bills due are within sixty (60) days after the Transfer Date.

Section 4.13.   Sale Treatment

The transfer of the Servicing Rights shall be treated as a sale on the books and records of Seller, and Seller has determined that, and will treat, the disposition of the Servicing Rights pursuant to this Agreement for tax and accounting purposes as a sale.

Seller shall maintain a complete set of books and records with respect to the sale of the Servicing Rights which shall be clearly marked to reflect the ownership of the Servicing Rights by the Buyer as of the Sale Date and the transfer of the servicing as of the Transfer Date and the entitlement of Buyer to the servicing fees and Ancillary Income (subject to Sellers' rights to certain Ancillary Income, if applicable) commencing on the Sale Date.

In addition, Seller agrees to provide, prior to the Sale Date, the Lock File.

Section 4.14.    No Solicitation

From and after the date of this Agreement, Seller agrees not to solicit, either directly or indirectly, by mail or otherwise, the borrowers under the Mortgage Loans for the purpose of seeking to refinance, modify (except for modifications that are performed on behalf of Seller by its subservicer and that are permitted or required under Applicable Law) or prepay their Mortgage Loans.  It is understood and agreed that promotions undertaken by Seller or any affiliates of Seller which are directed to the public and general public at large, or designated segments thereof, including, without limitation, mass mailings based on commercially acquired mailing lists, newspaper, internet or other social media channels, radio and television advertisements and unsolicited calls made by customers to Seller or any affiliate thereof, or notifications to borrowers with maturing balloon loans or seeking payoff quotes, shall not constitute solicitation under this Section.

Section 4.15.    Powers of Attorney

Upon the request of Buyer, whether before or after the Transfer Date, Seller shall deliver to Buyer a special irrevocable limited power of attorney for a limited time, coupled with an interest, in form and substance reasonably satisfactory to Buyer and in such quantities as Buyer may reasonably require, empowering Buyer, with respect to the Mortgage Loans, to endorse in the name of Seller, payment or loss draft checks relating to all Mortgage Loans, and similar items, and to undertake such further servicing obligations, including endorsing Mortgage Notes and allonges, executing satisfactions, partial releases, modifications, and assignments. In addition, Seller agrees to deliver to Buyer fifty (50) executed copies of such limited power of attorney on or before the Transfer Date.

Section 4.16.    Escrow Analysis

If   an escrow analysis is required by the applicable Investor Requirements or Applicable Law to be performed prior to the transfer of the Servicing Rights, Seller shall have completed an escrow analysis for each Mortgage Loan in accordance with the applicable Investor Requirements and Applicable Law such that all Servicing Rights transferred to Buyer as contemplated herein shall be transferred with each Mortgage Loan's current payment having been adjusted as a result of the aforementioned escrow analysis so that the amount due for the estimated related Charges can be paid from such accounts.

Section 4.17.    Certification of Pools

a)        With respect to each Mortgage Loan delivered to the Investor, it is Seller's responsibility to obtain all required Mortgage Loan documents necessary to obtain the Investor certification and/or recertification, as applicable, for each Mortgage Loan. Seller is responsible for any out-of-pocket costs that may be incurred by Buyer as a result of Seller's failure to obtain Mortgage Loan documents required for the Investor certification and/or recertification, as applicable, before the deadlines imposed pursuant to applicable Investor Requirements, unless such failure arises from, relates to or is caused by Buyer or Buyer's document custodian.  Buyer may offset the amount due against any portion of the Purchase Price then held by Buyer.

Section 4.18.    Transfer Procedures

Seller shall comply in all material respects with the Transfer Procedures described in Exhibit D prior to, on and subsequent to, as applicable, the Transfer Date. In the event of any inconsistency, if identified, between the requirements of the Transfer Procedures and the requirements of this Agreement, the requirements of this Agreement shall control.

Section 4.19.    Costs

In addition to the costs to be borne by Seller as provided elsewhere in this Agreement, Seller agrees to pay, as applicable: (i) any Seller - engaged broker fees; (ii) reasonable fees due to the Investor or Seller's sub-servicers, if any, relating to such transfer approval; (iii) all MERS registration and/or transfer fees and the costs of correcting or completing MERS records; (iv) the cost of Seller's notification to mortgagors, hazard insurance companies, taxing authorities, and the like; (v) Tax Contract Fees and/or Flood Certification Fees  for all applicable Mortgage Loans; (vi) all cost associated with preparing and recording assignments of mortgages, including preparation of assignment to the applicable Investor, as required by the Investor if MERS is not used; (vii) the cost of loan record transfer and shipping (including transfer of custodial files to Buyer's custodian); and (viii) Seller's custodial fees through the Transfer Date.  Seller also agrees to pay its own costs for any legal fees and computer conversion costs it incurs.

Section 4.20.    Supplementary Information

From time to time after the Sale Date, Seller shall furnish Buyer such incidental information, which is reasonably available to Seller and not otherwise reasonably available to Buyer, supplementary to the information contained in the documents, exhibits and schedules delivered pursuant hereto as Buyer may reasonably request.

Section 4.21.    Documentation Deliveries

As promptly as possible, and within two (2) Business Days of Seller's receipt thereof from Seller's Custodian, Seller shall deliver to Buyer a copy of a report from Seller's Custodian with regard to the inventory of documents on-hand with such Custodian.

Section 4.22.   Servicing Duties During the Interim Servicing Period

(a)      In the event the Transfer Date is subsequent to the Sale Date, Seller shall interim service the related Mortgage Loans in accordance with the terms of the applicable Investor Requirements during the Interim Servicing Period, and Buyer shall pay to Seller the applicable Interim Servicing Costs. Buyer shall continue to make Advances during the Interim Servicing Period.

(b)    Within five (5) Business Days after the Transfer Date, Seller shall deliver to Buyer, a trial balance for the Mortgage Loans as of the Transfer Date or a substitute reasonably acceptable to Buyer.

(c)      Seller shall remit all funds due to the Investor on the Remittance Date associated with the first Cut-off Date following the Transfer Date for the final Investor reporting period of the Interim Servicing Period; it being understood that although Seller shall have the obligation to make such remittance to the Investor, the funds necessary to allow Seller to make such remittance shall be provided to Seller by Buyer.

(d)      Seller's possession of any portion of the Loan Files related to the Mortgage Loans after the Sale Date shall be at the will of Buyer for the sole purpose of facilitating interim servicing of the Mortgage Loans during the Interim Servicing Period. Any such retention and possession by Seller is in a custodial and subservicing capacity only, with no ownership rights whatsoever. During the Interim Servicing Period, Seller shall, at Buyer's request, deliver to Buyer on a monthly basis not later than the tenth (10th) Business Day after the Investor's Cut-Off Date for each month all reports and data furnished to the Investor on such Cut-Off Date, reflecting Seller's interim servicing activity since the last Investor Cut-Off Date. At the time of delivery of such reports and data, Seller shall also furnish the following records related to the Mortgage Loans interim serviced by Seller for Buyer:

(1)      Trial balance in the form of a tape similar to that of the Closing Tape, including principal balance, Escrow balances, due date, P& I, interest rates, and service fees for the applicable month and as of the month end of such month.

(2)      System generated collection/delinquency reports, all open escrow items and other reports reasonably requested by Buyer. Seller will also provide Buyer with delinquency reports for the Portfolio during the Interim Servicing Period.

(3)      As reasonably requested by Buyer, copy of all P&I and T&I bank reconcilements (supporting documentation to such reconcilements shall be made available to Buyer at Seller's offices) within thirty (30) days after the applicable Investor Cut-Off Date, or such alternate report(s) that are approved by Buyer, such approval not to be unreasonably withheld.

(4)     Reasonable monthly remittance statements supporting the Interim Servicing Income

(5)     Customary document inventory/tracking status/delivery reports as reasonably requested by Buyer.

(6)     Other customary documents, records, and reports directly related to the interim servicing of the Mortgage Loans as may be reasonably requested by Buyer.

(e)  The Interim Servicing Period may be terminated by Buyer, with the consent of the applicable Investor, at an earlier time for cause if one or more of the following events shall occur and be continuing:

i.      failure by Seller to remit to the respective Investor and/or Buyer any payment required to be made by Seller during the Interim Servicing Period, which continues un-remedied for a period of two (2) Business Days after the earlier of: (i) discovery by the Seller of such non-payment; or (ii) the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to Seller by Buyer or the Investor; or

ii.     receipt of written notice by Seller from the respective Investor that Seller is no longer eligible to service mortgage loans for the Investor.

Upon such termination, Seller and Buyer shall promptly prepare, execute and deliver any and all documents and other instruments, and do or accomplish all other acts or things, in accordance with the Transfer Instructions as set forth in the Agreement or as otherwise provided by Buyer, and the Accepted Servicing Practices, and as necessary or appropriate to effect the termination of servicing by Seller hereunder and the transfer of such servicing by Seller to Buyer.  In the event this Interim Servicing Period is terminated by Buyer as provided in this section, then Seller shall reimburse Buyer for any out-of-pocket losses, damages and reasonable out-of-pocket expenses incurred by Buyer as a result of termination prior to the Transfer Date.

<u>Section 4.23</u>.   <u>Flood Insurance</u>

For each Mortgage Loan that is not covered by a fully paid, life of loan, fully transferable flood certification from Corelogic at the Sale Date, Seller shall pay Buyer, or at Buyer's option, Buyer may set off against any portion of the Purchase Price then held by Buyer, the applicable Flood Certification Fee.

<u>Section 4.24</u>.   <u>Assumptions</u>

Simultaneously with the delivery of the Mortgage Documents after the Transfer Date, Seller shall deliver to Buyer a list of Mortgage Loans for which Seller has received written notice of pending assumptions. Such list shall include the assuming Mortgagor's name and social security number, if available, Seller's Mortgage Loan number and the

name and social security numbers of co-borrowers, if any. Additionally, Seller shall provide to Buyer copies of any assumption instructions Seller has issued.

Section 4.25.  Inspection of Damaged Loans.

On or before the Sale Date, if required by the applicable Investor, Seller, at its expense, shall provide Buyer with a property inspection report, in form and substance reasonably acceptable to Buyer, for each and every Damaged Loan.  All Damaged Loans shall be listed on Exhibit H hereto.

ARTICLE V

Conditions to Closing

Section 5.01   Conditions to the Obligations of Buyer and Seller

(a) The respective obligations of Buyer and Seller to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by Buyer and Seller at or prior to the Sale Date of the following conditions:  (i) Except as set forth in this Section 5.01, no Applicable Law that restrains, enjoins or otherwise prohibits the transactions contemplated by this Agreement shall have been enacted, adopted or promulgated and be in effect, (ii) no order of a court of competent jurisdiction or other governmental authority which materially impairs, restrains, enjoins or otherwise prohibits the transactions contemplated by this Agreement shall have been issued, entered or enforced and be in effect and (iii) no claim, litigation or similar action by a governmental authority seeking such an order shall be pending.

(b) The Parties acknowledge that Seller has filed a petition for bankruptcy pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which proceeding is currently pending in the U.S. Bankruptcy Court for the U.S. District Court for the District of Delaware, Case No. 23-11240 (TMH) (the "Bankruptcy Case").  As such, the effectiveness of this Agreement as to the Seller and the consummation of the transactions set forth in this Agreement shall be subject to the following additional requirements:

i.   The Bankruptcy Court shall have entered the order approving this Agreement and authorizing the sale of the Servicing Rights to the Buyer in form and substance reasonably satisfactory to each of the Parties (the "Sale Order") and the Sale Order shall not have been stayed, vacated or revoked.

<u>Section 5.02.</u>   <u>Conditions to Buyer's Obligation to Purchase</u>

The obligation of Buyer hereunder to purchase the Servicing Rights on the Sale Date, shall be subject to the following conditions having been satisfied or waived by Buyer on or prior to the Sale Date:

(a)     Seller shall have performed or complied in all material respects with its obligations hereunder that are required to be performed or complied with on or before the Sale Date.

(b)     Except for the bankruptcy proceeding described in Section 5.01 of this Agreement, as of the Sale Date, there shall be no lawsuits or legal, administrative or regulatory proceedings pending or, to Seller's knowledge, threatened against Seller which could reasonably be expected to have a material adverse effect on the Servicing Agreements, the Mortgage Loans, the Servicing Rights or the transactions contemplated hereby.

(c)     Buyer shall have received a mid-month Closing Tape from Seller no later than five (5) Business Days prior to the Sale Date.

(d)     Buyer shall have received the Lock File.

<u>Section 5.03.</u>   <u>Conditions to Seller's Obligation to Sell</u>

The obligation of Seller hereunder to sell the Servicing Rights on the Sale Date shall be subject to the following conditions having been satisfied or waived by Seller on or prior to the Sale Date:

(a)     Buyer shall have performed or complied in all material respects with its obligations required to be performed or complied with on or prior to the Sale Date.

ARTICLE VI

Indemnification, Repurchase and Offset

Section 6.01.   <u>As-Is Purchase</u>.  Buyer agrees that, there are no representations or warranties whatsoever, express or implied, made by, or on behalf of, Seller in connection with this Agreement or as to any matters concerning the Mortgage Loans or the Servicing Rights, including, without limitation, the implied warranties of merchantability and fitness for a particular purpose, both of which implied warranties Seller hereby expressly disclaims.  The Servicing Rights will be transferred and sold by Seller and purchased by Buyer "AS IS AND WITH ALL FAULTS" and without representation by Seller, and no patent or latent condition or defect affecting the Servicing Rights in any way, whether known or unknown, discoverable or hereafter discovered, shall affect any of Seller's or Buyer's obligations contained in this Agreement or give rise to any right of damages,

repurchase, liability, claim, rescission or otherwise against Seller, except as otherwise expressly provided herein.  Buyer is an experienced and knowledgeable mortgage originator and servicer and will be relying solely upon Buyer's own inspections, investigations and analysis of the Servicing Rights and Mortgage Loans in purchasing and acquiring the Servicing Rights, and is not relying in any way upon any representations, statements, agreements, warranties, studies, reports, descriptions, guidelines or other information or material furnished by Seller or its representatives, whether oral or written, express or implied, of any nature whatsoever.  Buyer specifically acknowledges and agrees that Seller is selling and Buyer is purchasing the Servicing Rights on an "AS IS, WITH ALL FAULTS" basis and that Buyer is not relying on any representations or warranties of any kind whatsoever, express or implied, from Seller, its agents or brokers as to any matters concerning the Servicing Rights.

ARTICLE VII

Miscellaneous Provisions

Section 7.01.    Cooperation

Seller and Buyer shall cooperate fully and reasonably with each other and their respective counsel and other representatives and advisors in connection with the steps required to be taken as part of their respective obligations under this Agreement, including without limitation, securing the Servicing Agreement Consent and the approval and acceptance by Buyer and Seller of any and all documentation relating to the purchase of the Servicing Rights which may be required to effectuate the transfer of the Servicing Rights to Buyer.

Section 7.02.    Confidentiality

Each party understands that information which it has been furnished and will be furnished in connection with this transaction is deemed by the furnishing party to be confidential and proprietary, and the receiving party agrees that it will maintain the confidentiality of such information and will not disclose it to others or use it except in connection with the transaction contemplated by this Agreement, without the written consent of the party furnishing such information except as such disclosures may be required to be made to regulators, auditors, attorneys, investors, or others as required by Applicable Law. Information that is a matter of public record or that is generally known in the industry concerning a party shall not be deemed confidential or proprietary information for these purposes. Each party shall ensure that each Person to which it intends to disclose such information shall, prior to any such disclosure of information, agree to (i) keep confidential any such information and (ii) use or disclose such information only to the extent necessary to carry out its express obligations under or with respect to this Agreement.  If the transaction contemplated hereunder is not consummated, each party agrees to promptly return to the other all confidential materials, and all copies thereof, which have been furnished to it in connection with the transaction contemplated hereby, and to maintain the

confidentiality of all confidential and proprietary information furnished to such party under this Agreement for a period of one (1) year thereafter.  This Section 7.02 shall not bind the parties to the extent necessary for the parties to obtain a Sale Order from the Bankruptcy Court.

In addition, both parties will have access to non-public personal information relating to the Mortgage Loan borrowers, such information being protected by the Graham Leach Bliley Act of 1999 ("GLB").  Both parties agree to keep GLB information confidential and to indemnify each other as to breaches of this confidentiality as follows:

Section 7.03.    Integration

This Agreement constitutes a final and complete integration of the agreement of the parties respecting the subject matter hereof, thereby superseding all previous or contemporaneous oral and written agreements. There are no contemporaneous oral agreements relating to the subject matter of this Agreement.

Section 7.04.    Severability

If any portion of this Agreement is declared by a court of competent jurisdiction to be invalid or unenforceable, such declaration shall not affect the validity of the remaining provisions.

Section 7.05.    Governing Law

The validity, interpretation and enforcement of this Agreement shall be governed by the laws of the State of New York (without giving effect to the conflict of law principles thereof other than Section 5-1401 of the New York General Obligation Law), except to the extent that the laws of such State are superseded by the Bankruptcy Code.

Section 7.06.    Jurisdiction and Waiver

Notwithstanding anything to the contrary in this Agreement, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all legal proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 7.16; provided, however, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code or if the Bankruptcy Court declines such jurisdiction, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the State of New York, Suffolk County and any state appellate court therefrom within the State of New York (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action in the United States District Court for the Eastern District of New York) and any appellate court from any thereof, for

the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable legal requirements, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable legal requirements.

EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS.

Section 7.07.   Arbitration

(a)    Upon the request of both parties, any disputes hereunder shall be resolved by binding arbitration. Such election may be made before or after the institution of any legal proceeding, but prior to the rendering of any judgment in such proceeding. The arbitration shall be conducted in accordance with the United States Arbitration Act (Title 9, U. S. Code), notwithstanding any choice of law provision in this Agreement, and under the Commercial Rules of the American Arbitration Association before a panel of three (3) arbitrators.  Seller and Buyer shall each appoint one (1) arbitrator, and such two (2) arbitrators shall appoint a third neutral arbitrator. The arbitrator(s) shall give effect to statutes of limitation in determining any claim. Any controversy concerning whether an issue is subject to arbitration shall be determined by the arbitrators. The award rendered by the arbitrators shall set forth findings of the facts and conclusions of law and shall be final, and the judgment may be entered in any court having jurisdiction thereof. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if all parties consent to such action for judicial relief.

(b)    In any arbitration proceeding, the arbitrators are authorized to apportion costs and expenses, including investigation, legal and other expenses, which will include, if applicable, a reasonable estimate of allocated costs and expenses to be awarded only after the conclusion of the arbitration and will not be advanced during the course of arbitration.

Section 7.08.   Limitation on Damages

In no event shall either party, or their respective officers, directors or employees, be liable for consequential, indirect, punitive or exemplary damages, whether arising out of contract, tort or otherwise.

Section 7.09.   Attorney Fees, Costs, etc.

If any action at law or in equity, including an action for declaratory relief, or arbitration, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees from the other party. Such fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose or by an arbitrator. Such fees shall be in addition to any other relief that may be awarded.

Section 7.10.   Captions / Joint Drafting

Paragraph captions in this Agreement are for ease or reference only and shall be given no substantive or restrictive meaning or significance whatsoever.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.11.   Third Party Beneficiaries

This Agreement is intended for the benefit of the parties hereto only and the Buyer Indemnitees and Seller Indemnitees.  There shall be no third-party beneficiaries hereof.

Section 7.12.   Amendment and Modification

This Agreement may be amended only by an agreement in writing signed by both parties. No course of dealing between the parties shall constitute a modification to the terms hereof. The failure to exercise a remedy or right shall not constitute the waiver thereof. Any waiver of strict compliance with the provisions hereof shall be in writing signed by the party granting such waiver, and the waiver of a provision on one or more occasions shall not constitute the future waiver of the provision except to the extent set forth in the written waiver.

Section 7.13.   Assignment of Agreement

This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and permitted assigns. This Agreement and all rights, privileges, duties and obligations hereunder may not be assigned or delegated by either party without the prior written consent of the other party. Notwithstanding the foregoing, nothing, in this Section 7.13 or in this Agreement otherwise shall prevent or limit Buyer from transferring, selling or assigning after the Transfer Date to any Person the Servicing Rights purchased hereunder or require Buyer to obtain the consent of Seller or any other Person (other than the applicable Investor) for such transfer, sale or assignment after the Transfer Date.

Section 7.14.   Counterparts

This Agreement may be executed in multiple counterparts, each of which shall be an original. For the purpose of executing this Agreement, facsimile or pdf signatures shall be binding. Regardless of the number of counterparts, they shall constitute only one Agreement.

Section 7.15.   Exhibits to the Agreement

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 7.16.   Notices

Any notices to be given by either party to this Agreement shall be given in writing and shall be made by email transmission, or via the United States Postal Service, certified or registered mail, return receipt requested, postage prepaid, or sent by any nationally recognized air courier providing proof of delivery and addressed as follows:

**BUYER:** The Money Source Inc.
3138 East Elwood Street
Phoenix, AZ 85034
Attention: Frank Giglio, Esq. – Managing Counsel

**SELLER:** T. Scott Avila
575 W. Chandler Blvd.
Ste 225 Unit 236
Chandler, AZ 85225

With a copy to:
Pachulski Stang Ziehl & Jones
919 North Market Street
17th Floor
Wilmington, DE  19801
c/o Laura Davis Jones

Any notice, if mailed and properly addressed with postage prepaid and sent by registered or certified mail, shall be deemed given when received or when delivery is refused and any notice, if given to a reputable overnight courier and properly addressed, shall be deemed given two (2) Business Days after the date on which it was sent, unless it is actually received sooner by the named addressee.

Article VIII

Bankruptcy Court Matters

8.01   Buyer Acknowledgement

Buyer hereby acknowledges and agrees that Seller will be selling the Servicing Rights to the Buyer pursuant to a process in the Bankruptcy Case and effectiveness of this Agreement as to Seller the sale of the Servicing Rights is subject to approval by the Bankruptcy Court.

8.02.   Submission for Bankruptcy Court Approval.

As promptly as reasonably practicable after the execution of this Agreement, the Seller will seek entry of the Sale Order by the Bankruptcy Court, including the approval of this Agreement and the sale of the Servicing Rights to Buyer on the terms and conditions hereof.

{Signature Lines Appear on the Following Page}

IN WITNESS WHEREOF, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed by its duly authorized officers as of the date first above written.

**BUYER:  The Money Source Inc.**

By: _____

Name: Stavros Papastavrou
Title:   Chairman of The Money Source Inc.

**SELLER:**

By: _____

Name: Scott Avila
Title: Chief
Restructuring Officer

29

**EXHIBIT A**

BID INFORMATION AND LOI

One hundred basis points (1.00%)

**EXHIBIT B**

**LIST OF MORTGAGE LOANS**

[provided electronically]

## EXHIBIT C

## <u>MORTGAGE DOCUMENTS</u>

- ❑ Executed Original Note, Rider and Note Addendum with/ all intervening endorsements

- ❑ Original Recorded Security Instrument, Deed of Trust (Recorded)

- ❑ All Assignments

- ❑ Mortgage Insurance Certificate_LGC, MIC or LNG (as applicable)

- ❑ Original Final Title Policy

- ❑ 1003/92900/1802 - Loan Application (Final)

- ❑ 1008 (Transmittal Summary)

- ❑ Appraisal

- ❑ Sales Contract, if applicable

- ❑ Closing Instructions

- ❑ Credit Report

- ❑ Flood Certification (Life of Loan)

- ❑ Good Faith Estimate (Initial) or Loan Estimate (as applicable)

- ❑ HUD-1 Statement (Final) or Closing Disclosure (as applicable)

- ❑ Hazard Insurance Policy

- ❑ Mortgage Insurance Disclosure

- ❑ Payment Letter to Borrower

- ❑ Truth in Lending (Final) or Closing Disclosure (as applicable)

- ❑ AUS Findings as dictated by program

- ❑ Underwriting Compliance Checklist

- ❑ Verification of Deposit

- ❑ Verification of Employment

- ❑ Goodbye Letter

- ❑ Last Escrow/Impound Analysis showing breakdown of Escrow Payments

❑ Initial Escrow Account Disclosure Statement

❑ All Collections and Customer Service Notes created by Servicing Personnel - 2years

❑ All open and closed QWRs

❑ All Litigation Documents if applicable

❑ Copies of any information or documents provide to and from a borrower

❑ Payment History - Life of Loan

❑ Mailed notice to insurance carrier of mortgagee clause change (as applicable)

❑ Mailed PMI transfer notice – if applicable

❑ Notice to life of loan flood determination company of change of servicer (as applicable)

❑ Power of Attorney if applicable

❑ Net Tangible benefit if applicable

❑ 3555-18 Conditional Commitment (as applicable)

❑ Executed original modification, if applicable

❑ Evidence of ATR/QM status, where applicable

❑ TX 50(a)6 Lender Compliance Certificate (as applicable)

❑ TX 50(a)6 Owner Compliance Affidavit (as applicable)

❑ TX 50(a)6 Owner Acknowledgement Affidavit (as applicable)

❑ All Renovation related documents ( eg., permits, inspections., draw requests, etc.,) as applicable

❑ Evidence of ATR/QM status, where applicable

❑ Wisconsin Tax Option Letter, as applicable

**EXHIBIT D**

## **TRANSFER PROCEDURES**

[supplied separately]

**EXHIBIT E**

**<u>IMAGE FILE TRANSFER REQUIREMENTS</u>**

See Transfer Procedures (Exhibit D)

**EXHIBIT F**

**<u>HOLDBACK DOCUMENTS</u>**

The Custodial Documents (as defined herein)

**EXHIBIT G**

**<u>MORTGAGE LOAN SCHEDULE</u>**

[Provided separately]

**EXHIBIT H**

**<u>DAMAGED LOANS</u>**

Provided electronically

**Exhibit I**
**Delinquent Loans as of Sale Date**