**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | ) Case No. 23-11240 (TMH) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

Ref. Dkt. No. 470

**DEBTORS' OPPOSITION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF AMERIFIRST FINANCIAL, INC., ET AL. FOR AN ORDER GRANTING (I) LEAVE, STANDING, AND AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES AND (II) EXCLUSIVE SETTLEMENT AUTHORITY IN RESPECT OF SUCH CLAIMS**

AmeriFirst Financial, Inc. ("AmeriFirst") and Phoenix 1040, LLC ("Phoenix"), as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), file this opposition (the "Opposition") to the motion of the Official Committee of Unsecured Creditors (the "Committee") for leave, standing and authority to commence, prosecute, compromise and settle certain alleged claims on behalf of the estates [Dkt. No. 470] (the "Standing Motion") against RCP Credit Opportunities Fund Loan SPV (Fund III), L.P and RCP Customized Credit Fund (Fund IV-A), L.P. (collectively, "RCP"), as identified in the Proposed Complaint attached as Exhibit B to the Standing Motion (the "Alleged Claims").

**PRELIMINARY STATEMENT**

1.      The Committee does not remotely satisfy its burden to prove that it is entitled to derivative standing to prosecute the Alleged Claims. The Debtors concluded after an independent investigation that the Alleged Claims are not viable and, further, that the value of

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers include:  Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557).  The Debtors' service address is 575 W. Chandler Boulevard, Suite 225, Unit 236, Chandler, AZ 85225.

any viable claims would not exceed the amount needed to benefit the estate. The relevant facts and conclusions are detailed in the Debtors' Omnibus Reply [Dkt. No. 338] (the "Omnibus Reply") to the objections to their motion for approval of their postpetition financing [Dkt. No. 21] (the "DIP Motion"), and are strongly buttressed by RCP's comprehensive objection to the Standing Motion [Dkt. No. 509] (the "RCP Objection"). Based on these conclusions, the Debtors settled the Alleged Claims by releasing them in partial consideration of the postpetition financing, as was reasonably required by RCP. The Debtors believe that this disposition of the Alleged Claims is an exercise of sound business judgment and clearly in the interests of the estates.

2.      Even if the Alleged Claims were "colorable" (which they are not), the Committee utterly fails to meet its burden to prove that the Debtors have unjustifiably refused to grant permission to prosecute them. The Committee acknowledges that a cost-benefit analysis is required, yet its entire "analysis" consists of asserting it will prevail in full on over $100 million of claims against RCP and subordinate RCP's claims, paired with an assertion that costs will be minimal because unidentified counsel will take the matter on contingency. It does not address, for example, the probable loss of needed financing and likely conversion of these cases, or payment of attorneys' fees that the Committee blithely asserts but fails to prove could even be paid.

3.      Nothing in the Standing Motion brings the Debtors' conclusions concerning the Alleged Claims into question. Essentially, the Committee parrots the written advocacy of the Debtors' former litigation counsel, which was formulated in an unsuccessful attempt to extract concessions from RCP, and asks the Court to accord it greater weight than the objective analysis and conclusions concerning the merits of the Alleged Claims reached by the

Debtors' independent director.  That analysis was formulated in the context applicable here: determining what disposition of the Alleged Claims is in the best interests of the estate as a whole.  The Committee eschews objectivity for the transparent reason that it must swing for the fences.  But, ironically, as set forth in the RCP Objection, deposition testimony confirmed that the very counsel whose fierce advocacy the Committee relies upon, Kasowitz, is the counsel that recommended the Debtors enter into the May 2023 settlement that, as discussed below, categorically bars the largest of the Alleged Claims.

4.      Parsing the rhetoric, the allegations underlying the Alleged Claims are mostly the same as those addressed at length in the Debtors' Omnibus Reply (and even more comprehensively in the RCP Objection).   At bottom, the Committee alleges that RCP, AmeriFirst's junior lender, committed the original sin of issuing a December 2, 2022 Default Notice to Senior Lender (the "December 2022 NOD") informing warehouse lenders of a covenant default, and that this December 2022 NOD, and not the plummeting fortunes of the mortgage industry, caused AmeriFirst's demise.  It alleges based purely on speculation that this destruction was intentional and wrongful, giving rise to claims against RCP worth tens of millions of dollars, notwithstanding the fact that RCP, as Prepetition Agent (the "Prepetition Agent"), was contractually required to issue the December 2022 NOD by agreements to which AmeriFirst was party.  Completely reliant on that untenable basis is the Committee's next allegation: that a heavily negotiated Settlement Agreement and Amended Credit Agreement, executed as of May 15, 2023 together with related agreements (the "Amended Credit Agreement" and "Settlement Agreement" and, collectively, the "May 2023 Agreements"), were so grossly one-sided as to be both intentionally and constructively fraudulent, and so the release of the allegedly massive damage claims against RCP may be invalidated.  The Committee next

alleges several post-settlement violations of the Amended Credit Agreement for refusing to meet various funding needs, (all of which claims suffer the same infirmity that RCP very clearly had no contractual obligation to do so), or for fraudulent inducement based on vaguely alleged promises to be helpful (which patently fail federal pleading requirements). There are tort claims based on the foregoing untenable claims. Finally, there are avoidance claims that largely involve payments to RCP from its own collateral, as addressed herein.

5.      Against the Committee's strongly worded but factually and legally unmeritorious allegations, the Debtors' independent analysis remains applicable and sound:

- ***Alleged Claims Arising From Pre-Settlement Conduct Lack Merit***. The Committee alleges that the December 2022 NOD delivered by the Prepetition Agent to the Senior Lender unnecessarily and improperly killed AmeriFirst's mortgage origination business.

  ***Conclusion***: Such claims lack merit because (1) all claims arising prior to May 15, 2023, were released by AmeriFirst and Mr. Bowlby under the Settlement Agreement, (2) the Prepetition Agent was contractually required to deliver the Default Notice to Senior Lender under the Subordination Agreement, and (3) AmeriFirst was already hemorrhaging money by mid-2022 as a result of the precipitous rise in mortgage rates and had few prospects given the state of the mortgage industry at the time, hence there is no evidence of damage.

- ***Alleged Claims Concerning the Settlement Agreement:*** The Committee alleges that the Settlement Agreement, Amended Credit Agreement and related agreements, which were arduously negotiated between sophisticated parties and professionals may be invalidated because they were so one-sided as to constitute a constructively fraudulent transfer, or because they were fraudulently induced, thereby freeing the Committee to litigate pre-settlement claims.

  ***Conclusion:*** Such claims lack merit because, unsurprisingly, the heavily negotiated Settlement Agreement would not be found one-sided, much less so one-sided as to be constructively fraudulent or suggest fraudulent intent. The construct under which they are one-sided presupposes that AmeriFirst agreed to forego claims worth tens of millions of dollars arising from the December 2022 NOD, which claims in fact had no such value.

- ***Alleged Claims Concerning Post-Settlement Cash Sweeps:*** The Committee alleges that the Prepetition Agent violated the Amended Credit Agreement by

sweeping funds that were necessary for the operation of AmeriFirst's business.

*Conclusion*: Such claims lack merit because Section 10.05(b) of the Amended Credit Agreement provides that the Prepetition Agent is not required to release funds in excess of the Reserved Cash and was permitted to sweep cash constituting the proceeds of non-core assets and any other available cash at the end of each month less certain Reserved Cash. AmeriFirst failed to obtain an infusion of up to $8 million of subordinated debt which had been anticipated in order to re-start its mortgage origination business, and RCP was not required to fund budget shortfalls. In fact, the Prepetition Lenders allowed AmeriFirst to (1) retain over $600,000 of cash in excess of the Reserved Cash contemplated by the Amended Credit Agreement and (2) use another $1 million of cash to fund the required deposit with Centier Bank to support the new warehouse loan facility.

- *Alleged Claims Concerning Failure to Approve a Warehouse Facility*: The Committee alleges that following consummation of the Amended Credit Agreement, RCP unreasonably withheld its consent to a new warehouse facility from Customers that damaged AmeriFirst.

  *Conclusion*: Such claims lack merit because the proposal from Customers required the Prepetition Agent to an indefinite standstill with respect to the exercise of remedies and Customers refused to agree to any marshaling away from any liens on mortgage servicing rights. In any case, a warehouse facility from Centier Bank on substantially better terms was obtained within a matter of days and, even with such facility in place, AmeriFirst failed to generate enough loans to generate a profit or sustain the business.

- *Alleged Claims Concerning Failure to Fund Expenses in Approved Budget*: The Committee alleges that following consummation of the Amended Credit Agreement, the Prepetition Lenders failed to fund expenses set forth in the approved budget.

  *Conclusion*: Such claims lack merit because, as noted above, the Prepetition Lenders were entitled to payment of excess funds at the end of each month and had no affirmative obligation to advance funds to AmeriFirst if there was insufficient cash to make payroll or fund other expenses.

- *Alleged Claims Concerning Refusal to Release Funds to Allow AmeriFirst to Satisfy Covenants*: The Committee alleges that following consummation of the Amended Credit Agreement, the Prepetition Lenders violated the Amended Credit Agreement by refusing to release funds from a controlled account and violated the Side Letter by failing to allow AmeriFirst to satisfy net worth covenants in order to meet regulatory requirements.

> ***Conclusion*:**  Section 10.05(b) of the Amended Credit Agreement provides that the Prepetition Agent is not required to release funds in excess of the Reserved Cash.  The Prepetition Lenders also were not obligated to fund AmeriFirst to ensure that net worth covenants would be met.

- ***Alleged Preference and Lien Perfection Avoidance Claims***: The Committee alleges claims that certain transfers were preferential and that liens on certain deposit accounts were not perfected.

> ***Conclusion***:  As addressed herein and in the RCP Objection, most such claims are specious, and those that may have merit are nonetheless nowhere near large enough to warrant reconsideration of the Debtors' conclusions.

6.       On the basis of their independent investigation and these conclusions, the Debtors exercised sound business judgment in entering into the agreement with RCP to provide DIP financing, with its release of the Alleged Claims, and so justifiably refused to grant standing to the Committee to prosecute them.

## <u>RELEVANT FACTS</u>

7.       The Debtors' independent investigation was conducted by Jeffrey Dane, an independent director who is an experienced financial and restructuring professional and who is charged with express authority over conflict matters (*i.e.*, matters involving the Prepetition Lenders / DIP Lenders).  He has actively exercised such independent authority.  The Debtors also have an independent chief restructuring officer, T. Scott Avila.

8.       Mr. Dane commenced a formal investigation of potential estate claims against the Prepetition Lenders in late September 2023.  Mr. Dane's investigation was conducted with the assistance of Debtors' counsel.  He and Debtors' counsel have reviewed copious amounts of documents, including the relevant credit and security documents, and hundreds of communications between and among the Debtors and the Prepetition Lenders.  Mr. Dane also conducted lengthy interviews of Mr. Bowlby, attorneys at Kasowitz, and representatives of the Prepetition Lenders.

9.     Based on his investigation, Mr. Dane has concluded—based in considerable part on the unambiguous terms of the heavily negotiated May 2023 Agreements— that the Debtors' estates do not have any actionable claims to pursue against RCP.  Further, any affirmative claims against RCP would have to exceed the outstanding claims against AmeriFirst asserted by RCP for loans advanced.

10.     **The following factual narrative is set forth in the Omnibus Reply, and reproduced below; all exhibit references are to exhibits to the Omnibus Reply**.

B.     **Original Credit Agreement and Defaults**

11.     Amerifirst, as borrower, RCP Credit Opportunities Fund Loan SPV (Fund III), L.P., as administrative agent (the "Prepetition Agent"), and RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. (the "Prepetition Lenders") entered into a Credit and Security Agreement, dated as of April 21, 2021 (the "Original Credit Agreement").  **Exhibit A** (Original Credit Agreement).  Pursuant to the terms of the Original Credit Agreement, AmeriFirst borrowed $50 million from the Prepetition Lenders. The stated maturity date was February 28, 2025.  AmeriFirst granted a security interest in a collection account and related cash and financial assets to the Prepetition Agent to secure AmeriFirst's obligations under the Original Credit Agreement.  The Prepetition Agent filed a UCC-1 financing statement in Arizona to perfect its security interest under the Original Credit Agreement on January 9, 2023, prior to the ninety (90) days before the Petition Date.  **Exhibit B** (Original UCC Financing Statement).

12.     Eric Bowlby used $6 million of the loan proceeds from the Original Credit Agreement to purchase a majority stake in AmeriFirst from his father, Kenneth Bowlby.

13.     As part of the execution of the Original Credit Agreement, AmeriFirst, the Prepetition Agent, the Prepetition Lenders, as junior lenders, and Flagstar Bank, FSB, as senior lender (the "Senior Lender"), entered into a Subordination Agreement, dated as of April 21, 2021 (the "Subordination Agreement").  **Exhibit C** (Subordination Agreement).  Pursuant to the Subordination Agreement, the Prepetition Lenders agreed to subordinate their liens and claims to the Senior Lender's liens and claims against AmeriFirst arising under a warehouse revolving loan facility.  The Subordination Agreement required the Prepetition Agent or the Prepetition Lenders to notify the Senior Lender within one (1) business day of an event that gives the Prepetition Agent or the Prepetition Lenders the right to accelerate their loan or exercise remedies. *See* Subordination Agreement at §2.

14.     AmeriFirst was profitable in 2021 and repaid $22 million of the obligations under the Original Credit Agreement.

15.     The mortgage industry began to suffer in 2022 as interest rates increased substantially.  AmeriFirst was no exception.  AmeriFirst's financial performance deteriorated rapidly throughout 2022 and continuing into 2023, generating approximately $17 million in losses from January 2022 through December 2022 and $28 million of losses from January 2022 through August 2023. **Exhibit D** (Monthly Income Statements).

16.     One major problem was that AmeriFirst's overhead costs, including payroll and rent obligations, did not align with the reduced level of mortgage origination activity in a high interest rate environment.  AmeriFirst failed to cut costs to take into account the new mortgage environment and continued to incur substantial losses month after month.

17.     By August 1, 2022, AmeriFirst triggered a financial covenant tied to a minimum net worth to loan ratio under the Original Credit Agreement.  *See* Original Credit

Agreement at §6.11(d).  Pursuant to the Original Credit Agreement, AmeriFirst had ninety (90) days to pay down the outstanding loan in order to become compliant with the required covenant. The required pay-down as of August 2022 was $9 million, but ongoing losses in subsequent months, increased the required pay-down amount by another $2.4 million.

18.     Mr. Bowlby, who controlled AmeriFirst throughout the relevant time period until just prior to the Petition Date, attempted to sell AmeriFirst's mortgage servicing rights and other non-core assets, such as scratch & dent loans and real estate, in order to realize sufficient proceeds to pay down the loan.  No such sales were consummated, and no pay-down was made, by the December 1, 2022, deadline, triggering an event of default under the Original Credit Agreement.

19.     Accordingly, as of December 1, 2022, the Prepetition Lenders were entitled to accelerate the loan and exercise remedies.  On December 2, 2022, as required under the Subordination Agreement, the Prepetition Agent delivered a notice to the Senior Lender identifying the covenant default (the "Default Notice to Senior Lender"), but also noting that the Prepetition Agents had agreed to forbear from exercising remedies through December 9, 2022 and potentially longer.  **Exhibit E** (Default Notice to Senior Lender).  On information and belief, similar letters were sent to AmeriFirst's other warehouse lenders with subordination agreements.

20.     Mr. Bowlby contends that the delivery of the Default Notice to Senior Lender and the other warehouse lenders impaired AmeriFirst's ability to access the warehouse facilities provided by the Senior Lender and other lenders to originate loans and adversely impacted AmeriFirst's ability to sell its mortgage servicing rights.  Regardless of whether Mr. Bowlby's contention is correct, AmeriFirst had agreed to the provisions of the Original Credit Agreement and the Subordination Agreement and the Prepetition Lenders had the contractual

right to exercise remedies as they saw fit and deliver the Default Notice to Senior Lender. **Moreover, as addressed below, any claims AmeriFirst and the Prepetition Lenders may have had against each other arising prior to May 15, 2023, were waived through a global settlement agreement and mutual release.**

21.     After the Prepetition Lenders delivered the Default Notice to Senior Lender, Mr. Bowlby caused AmeriFirst to retain Kasowitz Benson & Torres LLP ("Kasowitz") as litigation counsel.  On December 27, 2022, Kasowitz delivered a demand letter to the Prepetition Lenders asserting that the Default Notice to Senior Lender had caused the Senior Lender and other warehouse lenders to immediately terminate their advances to AmeriFirst and had caused a substantial decrease in the value of the mortgage servicing rights and scratch & dent loans that AmeriFirst was in the process of marketing.  **Exhibit F** (Kasowitz Demand Letter).  Kasowitz also threatened legal action and asserted $50 million in potential claims, unless the Prepetition Lenders immediately advanced $15 million in new money to AmeriFirst in consideration of an equity stake in AmeriFirst and accepted $10 million in full and final satisfaction of the $28 million in outstanding obligations under the Original Credit Agreement.

22.     On January 4, 2023, counsel to the Prepetition Lenders, Quinn Emanuel, sent a letter to Kasowitz responding to the demand letter and rejecting any assertion of wrongdoing on the part of the Prepetition Lenders.  **Exhibit G** (Quinn Response Letter).

23.     On January 11, 2023, the Prepetition Agent delivered a notice of default to AmerFirst asserting a failure to pay interest due on January 3, 2023, and various additional covenant breaches (the "Default Notice to AmeriFirst").  **Exhibit H** (Default Notice to AmeriFirst).  Through the Default Notice to AmeriFirst, the Prepetition Agent accelerated the

obligations under the Original Credit Agreement and demanded the delivery of all collateral to the Prepetition Agent.

**C.**      **Amended Credit Agreement, Settlement Agreement, and Mutual Releases**

24.      In the weeks following the delivery of the Default Notice to AmeriFirst, the parties engaged in extensive discussions regarding, among other things, a sale of AmeriFirst's non-core assets, a pay-down schedule for the loan, possible waiver or equitization of portions of the loan, and additional collateral that may be granted to the Prepetition Agent. Ultimately, after robust negotiations and numerous calls and meetings between Mr. Bowlby and his team at AmeriFirst, attorneys from Kasowitz, and AmeriFirst's outside transactional counsel, Jeffrey George, on the one hand, and the Prepetition Lenders and their representatives, including attorneys from Quinn Emanuel, on the other, the parties reached agreement on a binding term sheet dated as of March 31, 2023 (the "Term Sheet").  **Exhibit I** (Term Sheet).

25.      Six weeks of intense negotiations followed in an effort to reach agreement on definitive documentation consistent with the Term Sheet.  Ultimately, in order to implement the provisions of the Term Sheet, AmeriFirst, as borrower, the Prepetition Agent, and the Prepetition Lenders entered into: (i) an Amended and Restated Credit and Security Agreement, dated as of May 15, 2023 (the "Amended Credit Agreement"), (ii) a Limited Waiver and Second Amendment to Credit and Security Agreement, dated as of May 15, 2023 (the "Second Amendment"), and (iii) a Settlement Agreement, dated as of May 15, 2023 (the "Settlement Agreement").  *See* **Exhibit J** (Amended Credit Agreement), **Exhibit K** (Second Amendment), and **Exhibit L** (Settlement Agreement), respectively.  There is no evidence that the foregoing agreements were the result of anything other than extensive good faith and arms' length

negotiations between sophisticated parties who were each represented by experienced and qualified counsel.

26.     Pursuant to the Amended Credit Agreement, AmeriFirst agreed and acknowledged that the principal amount then due and owing to the Prepetition Lenders was $28 million.  *See* Amended Credit Agreement at §2.01.   AmeriFirst agreed to pay-down the obligations under the Amended Credit Agreement by $20 million on or before September 16, 2023 (subject to extension under certain circumstances to October 16, 2023), and to sell certain non-core assets in order to realize sufficient proceeds to pay-down the Prepetition Lenders subject to certain milestones.  *See* Amended Credit Agreement at Art. VII(a), Exhibit B (Milestones).  Importantly, the Amended Credit Agreement required AmeriFirst to keep all of its cash in accounts subject to control agreements in favor of the Prepetition Agent and permitted the Prepetition Agent to sweep cash from such accounts constituting the proceeds of non-core assets and any other available cash at the end of each month less certain "Reserved Cash" (as defined in the Amended Credit Agreement).  *See* Amended Credit Agreement at §2.07(b)-(c), §10.02.  The definition of Reserved Cash took into account that AmeriFirst had projected operating losses under an agreed budget for the months of May, June, and July 2023.  It was intended that AmeriFirst would obtain an infusion of up to $8 million of subordinated debt in order to re-start its mortgage origination business and obtain a new warehouse loan facility on reasonable terms.  *See* Amended Credit Agreement at §6.04, Exhibit B (Milestones).

27.     Pursuant to the Settlement Agreement, in consideration for the execution of the Amended Credit Agreement, the Second Amendment, and a restatement of the "bad boy" guaranty agreement of Eric Bowlby, AmeriFirst's then majority shareholder, in favor of the Prepetition Secured Parties, the Prepetition Lenders, AmeriFirst, and Mr. Bowlby entered into

certain mutual releases, including the release of all Existing Defaults (as defined in the Settlement Agreement), subject to the terms and conditions set forth therein. **These global releases, which went into effect over 90 days prior to the Petition Date, had the effect of eliminating any purported claims that the Debtors may have had with respect to any conduct that pre-dated the Settlement Agreement on May 15, 2023, including the various allegations of wrongdoing made by Mr. Bowlby against the Prepetition Lenders dating back to the original Default Notice to Senior Lender delivered on December 2, 2022.**

28.    In connection with the Amended Credit Agreement, the shareholders of AmeriFirst, Eric Bowlby and Kenneth Bowlby, entered into a Pledge Agreement, dated as of May 15, 2023, with the Prepetition Agent (the "Pledge Agreement"), which granted liens and security interests in 100% of the common equity stock of AmeriFirst (the "Pledged Shares") in favor of the Prepetition Agent. *See* **Exhibit M** (Pledge Agreement).

29.    AmeriFirst also entered into a Security Agreement, dated as of May 15, 2023, with the Prepetition Agent (the "Security Agreement"), which granted a first priority lien on and security interest in substantially all of AmeriFirst's assets to the Prepetition Agent, subject to certain permitted liens. *See* **Exhibit N** (Security Agreement). Pursuant to the Amended Credit Agreement and the Security Agreement, AmeriFirst's obligations to the Prepetition Lenders are secured by valid, binding, perfected first priority security interests and liens (the "Prepetition Liens") in and on the "Collateral," as defined in the Amended Credit Agreement and Security Agreement (the "Prepetition Collateral"). The Prepetition Agent filed a UCC-3 amended financing statement in Arizona to perfect its security interest under the Amended Credit Agreement and Security Agreement on May 17, 2023, prior to the ninety (90) days before the Petition Date. **Exhibit O** (Amended UCC Financing Statement)

30.     The Prepetition Lenders also made certain concessions.  For example, they agreed to convert a portion of the outstanding loan to equity.  Specifically, as of May 15, 2023, the Prepetition Lenders agreed to reduce the principal balance of their loan from $28 million to $24 million in consideration for the issuance of 40,000 shares of preferred stock in AmeriFirst, with an aggregate liquidation value of $4 million.  Further, if AmeriFirst met its obligation to pay down $20 million of the outstanding loan, the Prepetition Lenders agreed to adjust the remaining $4 million balance by converting (a) $2 million of the outstanding obligation to preferred stock, with an aggregate liquidation value of $2 million, and (b) the remaining $2 million to two new "Hope Notes."  *See* Amended Credit Agreement at §2.19.  The Prepetition Lenders also agreed to waive any other claims that they may otherwise have had under the Original Credit Agreement for prepayment fees and accrued interest.

31.     Pursuant to the Amended Credit Agreement, AmeriFirst could not incur any indebtedness or grant liens on its assets except for certain permitted liens and warehouse facilities.  *See* Amended Credit Agreement at §6.04, §6.15.  In connection with any warehouse facility, AmeriFirst was required to deliver a subordination agreement acceptable to the Prepetition Agent.  *Id*. at §6.04.

32.     Finally, AmeriFirst, Mr. Bowlby, the Prepetition Agent, and the Prepetition Lenders executed a side letter dated May 15, 2023, requiring the parties to execute such other amendments or waivers as may be necessary for AmeriFirst to remain compliant with regulatory requirements and able to enter into customary warehouse arrangements, subject to limitations on any amendments or waivers that could cause a material adverse effect.  *See* **Exhibit P** (Side Letter).

**D.**     **Defaults Under Amended Credit Agreement and Exercise of Stock Pledge**

33.     On May 25, 2023, in accordance with section 2.07(b) of the Amended Credit Agreement and with Mr. Bowlby's advance knowledge, the Prepetition Agent swept $5 million from a controlled account of AmeriFirst and applied such amount against AmeriFirst's outstanding loan obligations.

34.     Beginning on May 31, 2023, AmeriFirst began to miss milestones under the Amended Credit Agreement.

35.     Pursuant to the Second Amendment, the Prepetition Lenders agreed that AmeriFirst could pledge its mortgage servicing rights in favor of one warehouse lender, Customers Bancorp, Inc. ("Customers"), along with any loans funded through such warehouse facility, provided that the terms of any such facility, including the form of an intercreditor agreement, were commercially reasonable and reasonably acceptable to the Prepetition Agent, and Customers agreed to marshal its recoveries away from the mortgage servicing rights, until its funded loans were liquidated. *See* Second Amendment at §9.

36.     After May 15, 2023, there were delays in effectuating a warehouse facility with Customers. The Prepetition Lenders assert that they were not presented with a written proposal for a warehouse facility from Customers until June 14, 2023. On June 23, 2023, counsel for Customers sent an email to the Prepetition Lenders and AmeriFirst insisting that the Prepetition Lenders waive all rights to exercise remedies, presumably until the Customers' facility has been paid in full and refusing to agree to marshal away from any of Customers' contemplated collateral or to allow the Prepetition Lenders to have any junior liens on such collateral. *See* **Exhibit Q** (Email from Customers). Customers' proposed terms conflicted with

the agreed-upon warehouse terms under the Second Amendment and the Prepetition Lenders refused to agree to Customers' demands.

37.     Mr. Bowlby contends that Customers' proposed terms were customary and that the Prepetition Lenders' failure to approve the Customers' warehouse facility damaged AmeriFirst by delaying its ability to re-start operations and meet the projections under an agreed budget.

38.     However, on June 28, 2023, less than one week after Customers sent the email described above, AmeriFirst obtained a superior warehouse facility from Centier Bank that (a) did not require any liens on mortgage servicing rights, (b) reduced by $1 million the required deposit, and (c) increased by $30 million the total facility to be provided.  The Prepetition Lenders approved the Centier Bank facility and allowed AmeriFirst to use otherwise available cash to fund the deposit.

39.     On June 29, 2023, in accordance with section 2.07(c) of the Amended Credit Agreement and with Mr. Bowlby's advance knowledge, the Prepetition Agent swept approximately $3.3 million from a controlled account of AmeriFirst and applied such amount against the outstanding loan obligations.  The Prepetition Agent did not sweep any cash at the end of July 2023 because there was insufficient cash on hand to do so.

40.     During July and August 2023, the new warehouse facility with Centier Bank did little to improve AmeriFirst's financial prospects.  The mortgage industry continued to struggle as high interest rates impeded new loan originations, and AmeriFirst continued to lose money.

41.     By early August 2023, AmeriFirst was operating on fumes and did not have sufficient cash to even make payroll.  Mr. Bowlby approached the Prepetition Lenders with

a request to advance new money in order make payroll – not something contemplated under the Amended Credit Agreement.  On August 3, 2023, the Prepetition Lenders proposed to make such advance for the sole purpose of funding payroll provided that AmeriFirst and Mr. Bowlby agree to hire a broker to immediately sell the mortgage servicing rights, indemnify the Prepetition Lenders in connection with any such sale, and terminate all compensation to Mr. Bowlby until AmeriFirst generated positive net income in a quarter.  *See* **Exhibit R** (Payroll Funding Offer from Prepetition Lenders).  Mr. Bowlby rejected this offer and apparently obtained the required funds elsewhere.

42.     Later in August 2023, AmeriFirst again could not make payroll and Mr. Bowlby again approached the Prepetition Lenders.  Those discussions did not lead to any agreement.  Mr. Bowlby claims that he obtained a loan from a friend (Jon Jackson) to make payroll.  Mr. Bowlby apparently mortgaged his residence as collateral for such loan—even though AmeriFirst owns the residence, not Mr. Bowlby.  On August 17, 2023, the Prepetition Agent swept approximately $593,000 from a controlled account of AmeriFirst and applied such amount against the outstanding loan obligations.

43.     On August 22, 2023, AmeriFirst, through Kasowitz, took the unorthodox step of delivering a notice of default to the Prepetition Lenders.  *See* **Exhibit S** (AmeriFirst Default Notice).  Referencing section 5.01(e) of the Amended Credit Agreement, which sets forth the requirement that the Prepetition Agent reasonably approve amended budgets, Kasowitz asserted that the Prepetition Lenders breached the Amended Credit Agreement by refusing to fund expenses set forth in the approved budget and improperly swept funds.  As noted above, the Prepetition Lenders were entitled to payment of excess funds at the end of each month and had no affirmative obligation to advance funds to AmeriFirst if there was insufficient cash to make

payroll or fund other expenses. Kasowitz also claimed that the Prepetition Lenders violated section 10.05(b) of the Amended Credit Agreement by refusing to release funds from a controlled account and violated the Side Letter by failing to allow AmeriFirst to satisfy net worth covenants in order to meet regulatory requirements. But Section 10.05(b) provides that the Prepetition Agent is not required to release funds in excess of the Reserved Cash. The Prepetition Lenders also were not obligated to fund AmeriFirst to ensure that net worth covenants would be met.

44.     The Prepetition Lenders submit that they allowed AmeriFirst to retain over $600,000 of cash in excess of the Reserved Cash contemplated by the Amended Credit Agreement. Further, the Prepetition Lenders allowed AmeriFirst to use another $1 million of cash to fund the required deposit with Centier Bank to support the new warehouse loan facility.

45.     On August 24, 2023, following various events of default under the Amended Credit Agreement, including failures to meet milestones and pay-down the loan, the Prepetition Agent gave a Notice of Events of Default under the Amended Credit Agreement and declared that the obligations of AmeriFirst under the Amended Credit Agreement were immediately due and payable. *See* **Exhibit T** (Prepetition Agent Default Notice). The Prepetition Agent thereafter exercised its rights under the Pledge Agreement, including transferring the Pledged Stock and assigning the Prepetition Agent's rights under the Pledge Agreement to Phoenix. Pursuant to the Pledge Agreement, the certificates for the Pledged Shares were then canceled and a new stock certificate issued to Phoenix. As the sole shareholder of AmeriFirst, Phoenix executed a Unanimous Written Consent as the sole shareholder of AmeriFirst (the "Phoenix Consent"). The Phoenix Consent (a) removed the former directors of AmeriFirst, including Eric Bowlby; and (b) elected two new directors (including Jeffrey Dane as

18

independent director) to AmeriFirst's board of directors.  Jeffrey Dane was delegated exclusive authority with respect to any conflict matters involving any affiliates of the Debtors.  The reconstituted board of AmeriFirst executed a unanimous consent removing all former officers of AmeriFirst, including Eric Bowlby, and electing new officers (the "<u>AmeriFirst Consent</u>", together with the Phoenix Consent, the "<u>Change in Control</u>").  The AmeriFirst Consent was filed with and accepted by the Arizona Corporation Commission.

46.    Following the Change of Control, also on August 24, 2023, Phoenix and AmeriFirst commenced these bankruptcy cases.  AmeriFirst needed to file for bankruptcy immediately because it had no available funding sources, aside from the possibility of debtor-in-possession financing, and there was concern that the regulatory agencies would take action to suspend AmeriFirst's mortgage servicing rights.  As of the Petition Date, the aggregate principal amount outstanding under the Amended Credit Agreement is at least $15,798,087 (plus accrued and unpaid interest, additional fees, costs, expenses, and other obligations as provided under the Amended Credit Agreement).[2]

## **ARGUMENT**

**A.    The Committee Has the Burden to Show That it is Entitled to Derivative Standing**

47.    The moving party has the burden of proving that it has satisfied the prerequisites for derivative standing.  *In re DeCurtis Holdings LLC*, No. 23-10548 (JKS), 2023 Bankr. LEXIS 2006, at *8 (Bankr. D. Del. Aug. 14, 2023) (citing *In re G-I Holdings, Inc*., 313 .R. 612, 628  (Bankr. D.N.J. 2004)); *In re Diocese of Camden*, No. 20-21257 (JNP), 2022 Bankr. LEXIS 814, at *13 (Bankr. D.N.J. Mar. 24, 2022) (same).

48.    To do so, the moving party must prove that: (a) the debtor in possession has unjustifiably refused to pursue the claim or refused to consent to the moving party's pursuit

---

[2]    This amount does not appear to take into account the $593,000 sweep on August 17, 2023.

of the claim on behalf of the debtor in possession; (b) the moving party has alleged a colorable claim or cause of action; and (c) the moving party has received leave to sue from the bankruptcy court.  *In re DeCurtis Holdings LLC*, supra, 2023 Bankr. LEXIS 2006, at *8-9 (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003)).  *See also Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC)*, 595 B.R. 631, 664 (Bankr. D. Del. 2018) (same).

## B.    The Committee Cannot Satisfy its Burden of Proving That the Debtors Have Unjustifiably Refused to Pursue the Alleged Claims or Consent to its Pursuit of the Alleged Claims

49.    The creditor seeking derivative standing bears "the initial burden to allege facts showing that the refusal to file suit is unjustified."  *In re Caesars Entm't Operating Co.*, 561 B.R. 457, 468 (Bankr. N.D. Ill. 2016) (citation omitted).  "For that challenge to succeed, the creditor must demonstrate that in refusing to pursue the claim, the debtor in possession is shirking its responsibilities to the estate [citations omitted]."  *Id.*

> Whether the refusal is unjustified is gauged in light of a debtor in possession's statutory obligations and fiduciary duties. [citation omitted]  One of those duties is to "wisely manage the estate's legal claims." *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005). But wise management does not mean the debtor in possession must always pursue a claim. Sometimes the better course is to settle. *Id.* (citing *In re Energy Coop., Inc.*, 886 F.2d 921, 927 (7th Cir. 1989))….

*Id.*

50.    Here, as in *Caesars*, the Debtors have determined, consistent with their fiduciary obligations, that a settlement of the Alleged Claims, in partial consideration of obtaining needed postpetition financing, is in the best interests of the estates.  *Camden* denied derivative standing in a similar circumstance:

> DOCT proposes to provide a loan of up to $50 million and the Parishes are providing $10 million to help fund the plan. DOCT

20

> and the Parishes will also waive any claims against Debtor. They
> will not fund a plan if the Committee obtains derivative standing to
> bring its proposed claims — counsel for the Parishes stated as
> much at the hearing — because that would effectively result in
> DOCT and the Parishes funding litigation against themselves. The
> Committee did not explain how this issue could be resolved, or if
> DOCT and Parishes do not fund a trust, how a trust with little or no
> liquid assets would be able to fund what would likely be
> protracted, expensive litigation.

*In re Diocese of Camden*, 2022 Bankr. LEXIS 814, at *34. Indeed, *Camden* takes the position

that a committee's remedy when a debtor seeks to settle a claim that the committee believes

should be prosecuted is not to seek derivative standing, but simply to object to the settlement:

> In addition, the plan is effectively a settlement between Debtor and
> DOCT and the Parishes. The Committee cannot obtain derivative
> standing simply because it does not believe the terms of those
> settlements are not favorable. *See In re Manley Toys Ltd*., 2020
> Bankr. LEXIS 902, 2020 WL 1580244, *8 (Bankr. D.N.J. Mar. 31,
> 2020) (citing *In re Caesars Entm't Operating Co., Inc*., 561 B.R.
> 457, 468 (Bank". N.D. Ill. 2016); *In re Milazzo*, 450 B.R. 363, 371
> (Bankr. D. Conn. 2011)). In each of these cases, when discussing
> whether derivative standing was appropriate, the court held that a
> trustee pursuing settlement of a potential claim was sufficient to
> deem the trustee had not unjustifiably refused to pursue it.

*Id*. at *32. *See also In re Manley Toys Ltd*., No. 16-15374 (JNP), 2020 Bankr. LEXIS 902, at

*25 (Bankr. D.N.J. Mar. 31, 2020) ("Engaging in settlement discussions with opposing parties is

evidence that the Liquidators are in fact pursuing the Claims.")

51.    At minimum, a court must undertake a cost-benefit analysis in order to

determine whether a debtor has unjustifiably refused to pursue claims.

> To determine whether a debtor in possession is justified in
> deciding not to pursue claims, courts typically conduct a cost-
> benefit analysis. In re Archdiocese of Milwaukee, 483 B.R. 855,
> 869 (Bankr. E.D. Wis. 2012). Among the factors courts consider in
> conducting this analysis are "(1) the probabilities of legal success
> and financial recovery in event of success; (2) the creditor's
> proposed fee arrangement; and (3) the anticipated delay and
> expense to the bankruptcy estate that the initiation and

continuation of litigation will likely produce.'" Id. (quoting In re
Racing Servs., Inc., 540 F.3d 892, 901 (8th Cir. 2008).

*Caesars,* 561 B.R. at 468-69.  *See also Eckbold v. Miller (In re Redden)*, 2013 WL 543638, at *3 (Bankr. D. Del. Sept. 30, 2013) ("Without an argument that granting standing would benefit the bankruptcy estate, derivative standing is necessarily improper"); *In re MIG, Inc*., 2009 WL 8662897, at *1 (Bankr. D. Del. Dec. 18, 2009) ("[A] court is required to take the analysis for standing beyond the motion to dismiss pleading requirements …. [I]t should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce") (citing *In re STN Enters*., 779 F.2d 901 (2d Cir. 1985)); *In re Sabine Oil & Gas Corp*., 547 B.R. 503, 519 (Bankr. S.D.N.Y. 2016) ("Conscious of its role as gatekeeper, the Court must weigh the probability of success, the potential financial recovery, and the costs to the estates of the proposed litigation in examining whether the proposed litigation is likely to benefit the estates and will not impair the Debtors' reorganization.").

52. The Committee does not and cannot meet its burden of demonstrating that a cost-benefit analysis supports prosecution of the Alleged Claims over their settlement in the DIP Motion.  Indeed, it barely touches the subject.  Its perfunctory cost-benefit analysis begins (and effectively ends) with the conclusory assertion that "By voluntarily waiving the right to contest the Unperfected Liens and pursue the causes of action identified by the Committee, ***the Debtors gave up potentially hundreds of millions of dollars' worth of value*** that rightfully belong to the Estates."  Standing Motion at 38 (emphasis added).  The "analysis" consists of assuming it will prevail on all claims, *id*. at 39, while postulating that "the Committee does not anticipate that the costs of pursuing the Proposed Claims to be material and could be pursued (in part or in whole) based upon a contingency fee structure."  *Id*. at 40.  It does not identify any

counsel who have agreed to do so.  Nor does it address the effect of losing the postpetition financing and the likely conversion of the cases, and the resulting funding issues.

53.    As set forth below and in the RCP Objection, there is little or no probability of success and financial recovery.  The Alleged Claims are largely not colorable and, to the limited extent they may be, have little probability of success or of achieving any recovery that would enhance the estates.  In comparison, the costs of prosecuting the Alleged Claims are steep.  As set forth in the DIP Motion and briefing thereon, the postpetition financing is critical if there is to be any outcome other than conversion to chapter 7 in these cases, and is being provided by RCP on better than market terms.  Further, the Committee does not explain how the litigation would be funded, other than naked speculation that contingency counsel can be found.

**C.    The Committee Also Fails to Meet is Burden of Proving the Alleged Claims Are Colorable, Or Are Likely to Succeed**

54.    The Debtors' independent investigation and conclusions set forth in the Omnibus Reply and above are now supplemented by RCP's comprehensive analysis of the Alleged Claims in the RCP Objection, which validates the Debtors' conclusion that most of the Alleged Claims are not colorable, much less likely to succeed and generate a financial recovery.

55.    The Proposed Complaint asserts eleven claims for relief.  Many of the claims rest on certain common allegations that, as set forth above, the Debtors have concluded— based in considerable part on the unambiguous terms of the heavily negotiated May 2023 Agreements—lack merit:

- *Allegation #1*:  The Default Notice to Senior Lender that was delivered by the Prepetition Agent to the Senior Lender on December 2, 2023, effectively killed AmeriFirst's mortgage origination business.

  *Conclusion*:  Claims based on this allegation lack merit because (1) all claims arising prior to May 15, 2023, were waived by AmeriFirst and Mr. Bowlby under the Settlement Agreement, (2) the Prepetition Agent was contractually required to deliver the Default Notice to Senior Lender under the

Subordination Agreement, and (3) AmeriFirst was already hemorrhaging money by mid-2022 as a result of the precipitous rise in mortgage rates and had few prospects given the state of the mortgage industry at the time, hence there is no evidence of damage.

- *Allegation #2*: Following consummation of the Amended Credit Agreement, the Prepetition Agent swept funds that were necessary for the operation of AmeriFirst's business.

   *Conclusion*: Claims based on the allegation that such sweeps were improper lack merit because the Amended Credit Agreement authorized the Prepetition Agent to sweep cash constituting the proceeds of non-core assets and any other available cash at the end of each month less certain Reserved Cash. The Prepetition Lenders also allowed AmeriFirst to (1) retain over $600,000 of cash in excess of the Reserved Cash contemplated by the Amended Credit Agreement and (2) use another $1 million of cash to fund the required deposit with Centier Bank to support the new warehouse loan facility. AmeriFirst also failed to obtain an infusion of up to $8 million of subordinated debt which had been anticipated in order to re-start its mortgage origination business.

- *Allegation #3*: Following consummation of the Amended Credit Agreement, the Prepetition Agent unreasonably withheld its consent to a new warehouse facility from Customers that damaged AmeriFirst.

   *Conclusion*: Claims based on this allegation lack merit because the proposal from Customers required the Prepetition Agent to an indefinite standstill with respect to the exercise of remedies and Customers refused to agree to any marshaling away from any liens on mortgage servicing rights. In any case, a warehouse facility from Centier Bank on substantially better terms was obtained within a matter of days and, even with such facility in place, AmeriFirst failed to generate enough loans to generate a profit or sustain the business.

- *Allegation #4*: Following consummation of the Amended Credit Agreement, the Prepetition Lenders failed to fund expenses set forth in the approved budget.

   *Conclusion*: Claims based on this allegation lack merit because, as noted above, the Prepetition Lenders were entitled to payment of excess funds at the end of each month and had no affirmative obligation to advance funds to AmeriFirst if there was insufficient cash to make payroll or fund other expenses.

- *Allegation #5*: Following consummation of the Amended Credit Agreement, the Prepetition Lenders violated the Amended Credit Agreement by refusing to release funds from a controlled account and violated the Side Letter by

24

failing to allow AmeriFirst to satisfy net worth covenants in order to meet regulatory requirements.

*Conclusion*: Claims based on this allegation lack merit because Section 10.05(b) of the Amended Credit Agreement provides that the Prepetition Agent is not required to release funds in excess of the Reserved Cash. The Prepetition Lenders also were not obligated to fund AmeriFirst to ensure that net worth covenants would be met.

56.     The eleven counts of the Proposed Complaint are addressed *seriatim* as follows:

57.     **Count One** of the Proposed Complaint seeks to avoid the May 2023 Settlement Agreement, Amended Credit Agreement related agreements, and three post-May 2023 cash distributions to RCP, on the grounds of actual fraud or fraudulent inducement. The Debtors concur with the legal and factual analysis in the RCP Objection (at 21-24) that these claims, and all others in the Proposed Complaint that are premised upon actual fraud, are facially defective for their conspicuous failure to plead the alleged fraudulent statements with particularity under Rule 9(b) of the Federal Rules of Civil Procedure.

58.     **Count One** also alleges constructively fraudulent transfers consisting of $10.3 million paid out of the Veritex Account, as well as grants of collateral and releases in the May 2023 Agreements. The argument that the May 2023 Agreements were constructively fraudulent is premised on the validity of claims based upon the allegedly improper December 2022 NOD, which the Debtors have concluded was not improper and does not give rise to viable claims. Accordingly, the Debtors disagree that the May 2023 Agreements would be found constructively fraudulent. The Debtors believe that reasonably equivalent value was transferred, and concur with the factual and legal analysis in the RCP Objection (at 24-25) on this issue.

59.     **Count Two** asserts preference claims based on two 90-day payments ($3,258,313 and $593,000), and **Count Three** asserts that $10,301,067 may be recovered as

"Insider Preferences" based on payments made within one year prior to the Petition Date to a non-statutory insider.  The Debtors concur with the factual and legal analysis in the RCP Objection (at 25-30) that: (1) payments from the Veritex account (which the Committee concedes was subject to a DACA) were made from RCP's own collateral and so not preferential; (2) it is highly unlikely that RCP would be considered a non-statutory insider, based on the facts set forth above and the authority in the RCP Objection; (3) certain of the Committee's claims, though not labeled as such, are classic "lender liability" claims almost certain to fail under applicable law; (4) certain transfers have not been specified; and (5) insider status cannot be predicated on voting rights inasmuch as the Preferred Shares received by RCP in the May 2023 Agreements did not carry such rights.

60.     **Count Four** seeks the recovery of avoidable transfers, and so fails unless there are avoidable transfers to recover.

61.     **Count Five** is for fraud and fraudulent inducement.  As set forth above in relation to Count One, allegations that "RCP claimed that it would work with AFI toward a reasonable path forward with the warehouse loans and business generally; that RCP would forbear from taking any more actions that would negatively impact AFI's business; and that RCP would be reasonable in its budget approvals" (Proposed Complaint at 31) are patently inadequate under Fed.R.Civ.P. 9(b).

62.     **Count Six** is for breach of the implied covenant of good faith and fair dealing under New York law.  The Debtors believe it is clear under New York law that no obligation will be imposed on RCP to act contrary to express contract provisions, and concur with the analysis of the law on this issue set forth in the RCP Objection (at 34).

63.     **Count Seven** asserts that RCP's claims are subject to equitable subordination.  Based on the facts set forth above and the Debtors' conclusions concerning the lack of actionable conduct, the Debtors do not believe the Committee has a viable claim for equitable subordination, and concur with the analysis and conclusions on this issue in the RCP Objection (at 30-31).

64.     **Counts Eight and Nine** assert perfection challenges based on the alleged lack of DACAs for certain specified deposit accounts (not including the Veritex account).  The Committee does not allege the amount held in non-Veritex accounts, which the Debtors believe to have been relatively nominal in comparison to how much must be recovered to achieve a net gain from RCP.  In other words, even if such claims are viable, they would not return any value to the estate, as they do not remotely approach the size of the RCP claims.

65.     **Count Ten** asserts a claim for tortious interference with contractual relationships, and **Count Eleven** asserts a claim for tortious interference with business relationships.  Both are based on asserted obligations of RCP to fund expenses or release cash to fund AmeriFirst's expenses and obligations.  Based on the facts and conclusions reached by the Debtors set forth above, including in particular the absence of any contractual obligation requiring RCP to fund more expenses than agreed, the Debtors do not believe such claims are viable, and concur with the legal analysis of the RCP Objection (at 32-33).

66.     Based on the foregoing, the Debtors submit that the Committee fails entirely to carry its burden  of proving that it has colorable claims to prosecute, much less claims that are likely to succeed and to result in a financial recovery by the estates.

WHEREFORE, the Debtors urge the Court to deny the Standing Motion, and grant such other and further relief as may be appropriate.

Dated: December 7, 2023                          **PACHULSKI STANG ZIEHL & JONES LLP**

                                                 */s/ Laura Davis Jones*
                                                 Laura Davis Jones (DE Bar No. 2436)
                                                 David M. Bertenthal (CA Bar No. 167624)
                                                 Timothy P. Cairns (DE Bar No. 4228)
                                                 919 North Market Street, 17th Floor
                                                 P.O. Box 8705
                                                 Wilmington, Delaware 19899-8705 (Courier 19801)
                                                 Telephone:  302-652-4100
                                                 Facsimile:   302-652-4400
                                                 Email: ljones@pszjlaw.com
                                                        dbertenthal@pszjlaw.com
                                                        tcairns@pszjlaw.com

                                                 *Counsel to the Debtors and Debtors in Possession*