**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | Case No. 23-11240 (TMH) |
| Debtors. | (Jointly Administered) |
| | Re: Dkt. Nos. 470, 509, 514 |

**OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF AMERIFIRST FINANCIAL, INC., *ET AL.*
IN SUPPORT OF ITS MOTION FOR AN ORDER GRANTING (I) LEAVE,
STANDING, AND AUTHORITY TO COMMENCE AND PROSECUTE
CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES AND
(II) EXCLUSIVE SETTLEMENT AUTHORITY IN RESPECT OF SUCH CLAIMS**

The Official Committee of Unsecured Creditors (the "Committee") of AmeriFirst Financial, Inc., *et al.* (collectively, the "Debtors"), in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully submits this omnibus reply (the "Reply") in support of its motion for entry of an order granting the Committee standing and authority to commence, prosecute and, if appropriate, settle certain claims and causes of action on behalf of the Debtors' estates [Dkt. No. 470] (the "Motion"),[2] and in response to objections to the Motion filed by RCP [Dkt. No. 509] (the "RCP Objection") and the Debtors [Dkt. No. 514] (the "Debtors Objection" and, together with the RCP Objection, the "Objections" and, RCP and the Debtors, together, the "Objectors"). In support of this Reply, the Committee respectfully states as follows:

---

1    The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: Phoenix 1040 LLC (2550); and AmeriFirst Financial, Inc. (4557). The Debtors' service address is 575 W. Chandler Boulevard, Suite 225, Unit 236, Chandler, AZ 85225.

2    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**PRELIMINARY STATEMENT**[3]

1.      The Objections raise few new issues in this dispute.  The Debtors' objection is largely a "cut-and-paste" of their prior DIP-related filings that simply adds a three-page summary response to 11 counts of the Proposed Complaint.  The Debtors (like RCP) again argue that RCP did nothing more than validly exercise contractual rights and that the Debtors were justified in providing RCP blanket releases.

2.      The Debtors now also suggest that granting such release was an exercise of "sound business judgment" and that the Committee should be limited to objecting to the Debtors' "settlement" of RCP claims.  Debtors Obj. ¶¶ 1, 50.  However, there is no Rule 9019 motion pending to approve an RCP settlement.  The relevant motion pending is the Committee's motion seeking standing to prosecute and settle claims against RCP, which is not subject to the deferential business judgment of the debtor, but rather to the simple requirements of colorability, cost-benefit and the Debtors' unjustified refusal to bring the claims.  The Committee has made this basic showing.

3.      Notably, the Debtors do not contest that RCP was an insider as alleged in the Complaint.  Nor do the Debtors contest any specific factual allegations in the Proposed Complaint.  Instead, they assert that, on those facts, RCP simply exercised contract rights and cannot incur any liability.

4.      The Committee disagrees.  The Proposed Complaint alleges numerous causes of action predicated on the abuse of RCP's contracts to extract concessions from and control over

---

[3]      Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them *infra*.

AFI.  Given that RCP controls the Debtors as their sole equity owner and lender, it is not surprising that the Debtors and RCP believe that their business judgment should not be second guessed.

5.      But it was the Debtors and RCP who commenced these Chapter 11 Cases and then attempted to hurry their insider DIP financing deal through the Court, thereby subjecting it to the independent review of the Committee under well-settled law and practice.  The Committee is the only impartial fiduciary who can properly evaluate RCP's conduct, and it has determined that RCP violated its contract obligations and exploited its position for the sole purpose of advantaging itself over all of its fellow unsecured creditors in these Chapter 11 Cases.  It should be held to account.

6.      The Objectors' absence-of-colorability argument hinges entirely upon their assertion that, because AFI was represented by counsel, the negotiation of the May 2023 Agreements was an "arms'-length transaction" that cannot be avoided as a matter of law.  This transaction granted RCP dominion over AFI's cash, extracted a release for RCP's prior misconduct and bestowed the formal control that, among other exercises, RCP used a few months later to commence these cases.  Worse still, by taking purported first-priority liens on nearly all of the Debtors' assets, RCP has extracted a projected recovery of over 82% for itself, while general unsecured creditors will recover (at best) less than 2% on account of their claims.  Absent these improperly granted liens, and all else being equal, all general unsecured creditors would have recovered approximately 64%.  In return for this massive transfer of value and control, AFI received no new value: no financing, and only an illusory opportunity to restart its operations subject to RCP's "reasonable good faith judgment" to accept or reject a new warehouse line and to allow AFI to adopt measures necessary to comply with regulatory requirements.  But, as Eric Bowlby has testified, RCP used its veto powers in bad faith to doom the reboot before it had a chance to begin.  *See* Bowlby Dep. Tr. at 119-121 (Oct. 24, 2023) (confirming that "had RCP not

swept when it did, at least [a] portion of the money that it swept would have been used to fund operations" and "the company would have been fine" and adding that "RCP is good at creating the fire and claim they're the ones putting it out.").

7.      Objectors also assert that the Committee has not shown that the cost-benefit to the estate analysis favors pursuing the Proposed Complaint.   The analysis in this case is straightforward.  RCP has used its control of the Debtors to commence a Chapter 11 liquidation that solely benefits RCP.  There is no benefit to other creditors, unsecured or otherwise.  The claims in the Proposed Complaint are literally the only assets in this case that could be used to generate any meaningful recovery for unsecured creditors, and the Committee – the fiduciary of those creditors – wants to pursue them.  Accordingly, if the claims are colorable (which they are), then their pursuit will benefit the estate and the only associated cost will be the cost of prosecution.  The Committee has received indications of interest to support the cost of prosecution from major litigation finance firms and from qualified contingency fee counsel, and therefore believes that the costs of prosecution will be supportable.

8.      The Objectors point to the "likely" conversion of these cases as the principal "cost" in this analysis.   However, conversion only means that a Chapter 7 trustee, rather than the Committee, will have the opportunity to pursue the Proposed Complaint for the estate's benefit. The Committee believes that any Delaware Chapter 7 trustee would reach the same conclusions the Committee has reached looking at the same facts and law.  Accordingly, the Committee will gladly accept a Chapter 7 conversion as the preferable outcome to abandoning the claims.  The "cost" of conversion is little more than an empty tantrum-like threat by RCP that it will hurt itself by conversion rather than reasonably negotiate a resolution with the Committee in these Chapter 11 Cases that RCP chose to commence.

9.     RCP makes much of its security interest in the Veritex account and that its security interest cannot be recovered, but that misses the point.  The contracts that enabled RCP to have this cash collateral and its cash sweep rights – the May 2023 Agreements – are themselves avoidable as fraudulent conveyances and preferences, and their avoidance would return millions of dollars to the estate for a more equitable distribution.

10.     Finally, the Objectors suggest that Federal Rule 9 requires more details of RCP's wrongdoing than provided in the Proposed Complaint.  As explained herein, there is ample detail in the Proposed Complaint to justify granting standing.  The Objectors claim that the record "tells a compelling story of cooperation and restraint by Reverence for over a year—not a 48-hour foreclosure as the Committee would have it."  RCP Obj. ¶ 19.  The Proposed Complaint tells a very different story of insider misconduct and its allegations are the ones that the Court must consider in determining whether to grant standing.

## REPLY

11.     Derivative standing requires (i) a colorable claim, (ii) that the debtor unjustifiably refused to pursue the claim, and (iii) permission of the bankruptcy court to initiate the action.  *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (citing *Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 580 (3d Cir. 2003)).  The Committee meets each of these requirements and, accordingly, its request to pursue the Proposed Claims should be granted.

## I.     The Committee Asserts Colorable Claims.

12.     The colorable claim showing is a "relatively easy one to make."  *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005).  A creditor's committee is not required to present its proof, and therefore courts

generally undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim.  *See In re Centaur, LLC*, 2010 WL 4624910, at *4; *Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*, 527 B.R. 169 (D. Del. 2015) ("The first element of that test—whether a party has asserted a colorable claim—requires 'the court [to] undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim.'").  Thus, when considering a standing motion, the court accepts as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts.  *See Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1400 (3d Cir. 1991).

13.    Central to the Proposed Claims is the fact that RCP is an insider of AFI that manufactured massive leverage through a curable financial covenant default, which it then used to extract new legal rights and exert complete control over AFI to elevate its claims above all other creditors during the preference period preceding the Petition Date.  Compl. ¶¶ 15, 74-78.  Notably, the Debtors do not contest that RCP is an insider as alleged in the Proposed Complaint, other than the conclusory statement that it is "unlikely" that RCP is a non-statutory insider.  Debtors Obj. ¶ 59.  RCP half-heartedly contests its insider status solely by relying on the *Parker* decision, where the court concluded the complaint there did not sufficiently allege a close relationship between the debtor and defendant.  *In re Parker School Uniforms, LLC*, No. 18-10085 (CSS), 2021 WL 4553016, at *6 (Bankr. D. Del. Oct. 5, 2021).  But the *Parker* plaintiff merely alleged that the defendant "was a designated [board] observer" that attended almost all board meetings and alleged no further facts to question the arm's-length nature of the transactions.  *Id.* at *5-6.  Here, by contrast, RCP had enormous control and influence over AFI's business and has effectively held AFI's business hostage since issuing the December 2022 NOD.  At that point, the future of AFI's entire business (and treatment of all of its creditors) was entirely dependent upon whether RCP

would agree to any arrangement to resolve the default and restart the business.  Compl. ¶¶ 36-41,

45-53.  AFI's only card at that point was the threat of a $50 to $100 million litigation against RCP

for destroying the business.  In order to remove that final card from AFI's deck, RCP abused its

leverage to extract a release (which it now uses as its primary defense in these cases) and solidify

its control over the debtor to elevate is interests above all other stakeholders in an insolvency.

Compl. ¶ 59.  AFI's only hope for continued viability was to agree to RCP's demands – under these

lopsided circumstances there could be no arm's-length fair bargain regardless of how skilled AFI's

counsel may have been.

14.     The Proposed Complaint includes ample allegations exemplifying RCP's control

making it a non-statutory insider.  The Proposed Complaint asserts that, by issuing the December

2022 NOD and forcing AFI's senior warehouse lenders to accelerate their loans, RCP had AFI's

back against the wall and positioned itself to elevate its priority at the expense of all of AFI's other

stakeholders by obtaining a first-priority lien on $24 million in assets, and a release of substantial

litigation claims against it.  Compl. ¶ 59.  It then kept AFI on life support (sweeping available cash,

and agreeing to fund only *some* of AFI's operating expenses) for little over 90 days before taking

complete control of AFI and filing these Chapter 11 Cases to seek new releases from the Court and

propose a plan of liquidation to provide general unsecured creditors with a $250,000 GUC Fund.

*See Combined Disclosure Statement and Plan of Liquidation of AmeriFirst Financial Inc. and its*

*Affiliated Debtor Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 300] (the "Plan") § 3.60.

But for the May 2023 Agreements, RCP would have been *pari passu* with other general unsecured

creditors and would have been entitled to approximately 64% in relative recoveries from the GUC

Fund.  As a result of its first-priority liens obtained through the May 2023 Agreements, however,

RCP would now be entitled to relative recoveries exceeding 82%, while the majority of general unsecured creditors would be left with relative recoveries of less than 2%.

15.    The Proposed Complaint more than sufficiently alleges facts to state the Proposed Claims, with a total estimated value in the tens of millions of dollars.  The Committee should be permitted to pursue these valuable claims to maximize the assets available to satisfy the Debtors' non-insider creditor claims.  The Objectors' self-serving arguments regarding delay and cost of the litigation of the Proposed Claims are tone deaf and legally irrelevant.  The Committee, the only independent fiduciary in these Chapter 11 Cases, has already begun a thorough investigation to date and is well positioned to litigate the Proposed Claims using the knowledge it has already gained.  The Proposed Claims are literally the only assets in this case that could be used to generate any meaningful recovery for unsecured creditors.  Accordingly, if they are colorable (which the Committee submits they are) then their pursuit will benefit the estate and the only associated cost will be the cost of prosecution.  The additional litigation costs associated with prosecution of the Proposed Claims will be minimal through the use of contingency counsel and litigation funding.

16.    Indeed, the Committee is already in contact with parties interested in providing litigation financing and there are also contingency fee arrangements by the Committee's professionals in the works, pending the outcome of the Motion.  The Debtors contend that the Committee has not identified counsel who has agreed to litigate the Proposed Claims on contingency and that the Committee asserts "naked speculation that contingency counsel can be found." Debtors Obj. ¶ 53.  To be clear, the Committee's proposed special litigation counsel, Glenn Agre Bergman & Fuentes LLP ("Glenn Agre") is ready and willing to prosecute the Proposed Claims on contingency, subject to the Court's approval of the Motion.  Moreover, the "likely conversion of these cases" has no bearing on the cost of pursuing the Proposed Claims.  Debtors

Obj. ¶ 2.  Conversion would not cost the estate more money – it would simply mean that a Chapter 7 trustee would step in the place of the Committee in pursuit of these claims for the estate's benefit. Conversion may be required in any case, given that the Debtors cannot confirm a Chapter 11 plan without the approval of unsecured creditors, which is highly unlikely at the present juncture.

17.    The Objectors' other arguments attacking the Proposed Claims similarly lack merit.

18.    ***Collateral Arguments Regarding Avoidance Claims***.  RCP states repeatedly – 24 times, to be exact – that its liens on the Veritex account bar estate recovery therefrom, but that assertion ignores the crux of the Proposed Complaint: if the May 2023 Agreements are avoided, RCP has no collateral and no preference defense.  RCP's liens on the Veritex account do not insulate it from recovery.  Moreover, RCP argues that it is "well-accepted" that a debtor cannot avoid transfers of assets that are subject to liens.  That is incorrect under the plain language of Sections 547 and 548 of the Bankruptcy Code, which expressly apply to any "transfer of an interest of the debtor in property," whether or not that property is encumbered.  *See In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558, 566-67 (3d Cir. 2005) ("collateral posted to secure a Letter of Credit is property of the estate.").  RCP does not, and cannot, dispute that the Debtors had an interest in the cash that was transferred to RCP, *even if* that cash were subject to RCP's lien.  *See Am. Cigar Co. v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 85 B.R. 965, 971 (Bankr. E.D. Pa. 1988) ("the estate does have an interest in proceeds of property of the estate, *whether or not they are fully encumbered*.") (emphasis added).  Furthermore, taken to its logical conclusion, RCP's argument would render meaningless Section 362(a)(4) of the Bankruptcy Code, which prohibits any act to "enforce any lien against property of the estate."  If, as RCP claims, encumbered property is not property of the estate, then why are lienholders precluded from foreclosing on such property?  RCP does not explain.  RCP is also incorrect that the purported existence of a lien insulates the transfer

from avoidance under state law.   Thus, RCP argues that the definition of "Asset" excludes encumbered property, but ignores the fact that both UFTA and UVTA provide for the avoidance of "*transfers*," which are defined to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset *or an interest in an asset*."   UFTA § 1(12) (emphasis added); UVTA § 1(16) (emphasis added).   As explained, the Debtors indisputably had an "interest" in the transferred cash.

19.   ***Actual Fraudulent Transfer, Fraud and Fraudulent Inducement Claims: Particularity***.   While the Objectors may be correct that, typically, claims for fraud, fraudulent inducement and actual fraudulent transfer must plead facts with sufficient particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>"), courts have overwhelmingly recognized that averments based upon information and belief are sufficient for matters that are peculiarly within the opposing party's knowledge or where the specific fraudulent actions are inaccessible to the pleader.   *See, e.g.*, *Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 285 (D. Del. 1993) (there is an exception to the prohibition against "information and belief" pleading for situations in which the factual information is peculiarly within the knowledge or control of the defendant); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (courts have relaxed the Rule 9(b) particularity requirement when factual information is peculiarly within the defendant's knowledge or control); *In re NJ Affordable Homes Corp.*, 2013 WL 6048836, at *11 (Bankr. D.N.J. Nov. 8, 2013) ("pleading fraud on information and belief alone is acceptable if the specific fraudulent actions are inaccessible to the pleader.").

20.   The Committee has met this standard and, even if the heightened pleading standard were to apply to the Committee's claims for fraud, fraudulent inducement and actual fraudulent transfer, the Committee has pleaded the Proposed Claims with sufficient particularity.   By the

Motion and the Proposed Complaint, and as reiterated herein, the Committee has stated a sufficient factual basis for its contentions, including that (i) RCP knew it rendered AFI insolvent upon issuing the December 2022 NOD, (ii) RCP induced AFI to enter into the May 2023 Agreements with illusory promises it never intended to keep in exchange for obligations it knew AFI could never satisfy, and (iii) AFI did not receive anywhere close to reasonably equivalent value in exchange for what RCP extracted through the May 2023 Agreements: first-priority liens ahead of all of AFI's other creditors, sweeping releases and unchecked control over AFI.

21.    ***Reasonably Equivalent Value***.  RCP contends that its "concessions conferred" in the May 2023 Agreements "constitute reasonably equivalent value as a matter of law."  RCP Obj. ¶ 55.  Conveniently, none of the cases RCP cites for this proposition involves a sweeping release of any and all liability; rather, each case holds that forbearance constitutes reasonably equivalent value exchanged for the grant of collateral.  *See, e.g.*, *In re Pfeifer*, 2013 WL 3828509, at *5 (Bankr. S.D.N.Y. July 23, 2013) (extension of maturity in exchange for additional collateral); *In re Silverman Laces, Inc.*, 2002 U.S. Dist. LEXIS 20288, at *15 (S.D.N.Y. Oct. 23, 2003) (same); *In re Pembroke Dev. Corp.*, 124 B.R. 398, 400-01 (Bankr. S.D. Fla. 1991) (extension of maturity and deferred interest payments in exchange for payments on loan and extension fee).  RCP, however, did not just receive collateral.  RCP received broad releases, first-priority liens on AFI's previously unencumbered assets, strict control and consent rights, and impossible accelerated paydown terms. Compl. ¶ 59.  RCP's "concession" was a forbearance lasting just long enough (91 days) to avoid the 90-day preference period.  RCP notes that its concessions include waived interest payments and the conversion of some of its debt into preferred equity interests in AFI, but these "concessions" were conditioned upon AFI making unrealistic paydown payments from which RCP knew AFI could never recover, on debt strategically accelerated by a curable default.

22.    ***Contract Rights Arguments***.  Objectors' primary defense is that RCP was simply a lender exercising contract rights and there is nothing to consider here other than the terms of the contracts.  In essence, the Objectors seek to establish a new exception to bankruptcy avoidance powers that would swallow the rules.  Avoidance powers reflect a Congressional policy that creditor/debtor behavior during the prepetition insolvency period must be closely scrutinized to avoid inequitable results for other creditors and damage to the estate.  Preference power requires a creditor to return assets to the estate if it gained priority over other creditors by receiving more from the insolvent debtor than they could have received in bankruptcy.  Fraudulent transfer law provides a remedy to return to the estate assets/rights that were improperly removed to hinder or delay other creditors.  It is not unusual, in fact it is typical, that the transactions subject to avoidance involve the exercise of contract rights by creditors and the creation of new contract rights in the voidable transaction.  There is no "just followed the contract terms" defense to avoidance challenges.  When contract rights are exercised in a manner that is designed to improve the priority/treatment of a creditor over similarly situated creditors, the resulting transactions are subject to challenge in the ensuing bankruptcy.  And such transactions are subject to heightened scrutiny when, as here, they involve insiders with inordinate influence over the vulnerable debtor.

23.    Moreover, equitable subordination is specifically designed to address/remedy inequitable conduct (even involving the exercise of contract rights) by insiders that damages the interests of other creditors, which is precisely what has happened here.

24.    ***Hypothetical Chapter 7 Liquidation:  547(b)(5)***.  RCP asserts that Count Two of the Proposed Complaint fails the hypothetical Chapter 7 liquidation Section 547(b)(5) of the Bankruptcy Code because of RCP's purported lien on the Veritex account.  RCP again misses the point.  While payment in satisfaction of a lien ordinarily "will not have a preferential effect under

section 547(b)(5)," where the lien "is avoided or voidable under section [] 548, . . . or when it is subordinated under section 510(c)(2), . . . the payment in satisfaction of the lien may create a preferential transfer."  5 Collier on Bankruptcy ¶ 547.04[6] (16th 2023).  As described herein, in the Motion and in the Proposed Complaint, RCP's lien is avoidable under Section 548 of the Bankruptcy Code.  *Even if* RCP had a lien that was not avoidable as a preference or fraudulent conveyance, the Section 547(b)(5) analysis must take into account a Chapter 7 trustee's hypothetical equitable subordination of RCP's claims.  *See, e.g.*, *In re Emergency Monitoring Techs., Inc.*, 366 B.R. 476, 505-511 (Bankr. W.D. Pa. 2007) (finding Section 547(b)(5) satisfied where hypothetical equitable subordination of creditor's claims established that challenged transfers "had preferential effect").  The Committee has demonstrated a strong basis for equitable subordination of RCP's claims, which must be considered in a hypothetical Chapter 7 analysis.

## II.    <u>The Debtors Have Unjustifiably Refused to Bring the Proposed Claims</u>.

25.    Central to the Objections is the purported "investigation" undertaken by AFI's independent director Jeffrey Dane and counsel to the Debtors (the "<u>Investigation</u>") to determine whether to release AFI's claims against RCP—claims the Debtors had already sought to release pursuant to the Interim DIP Order.  The primary thrust of the Objections is that—following this so-called comprehensive Investigation based solely upon RCP's assertion that it was merely exercising contractual rights for which it cannot be held liable—Mr. Dane determined there were no colorable claims against RCP and the most optimal path forward was to settle the claims via the DIP Motion by releasing them for nothing more than the promise to finance the case of its choosing.  The Objectors ask the Court to accept the adequacy of the Investigation and swiftly approve an insider deal, in an effort to clean their hands of undeniably fraudulent conduct and thwart inquiry by the only independent fiduciary in this case—the Committee.

26.    This comes as no surprise.  The Objecting Parties have pursued these Chapter 11 Cases with one unwavering objective:    obtaining releases for RCP through any available mechanism.  RCP cannot accomplish this goal through a plan of liquidation in which releases would be inappropriate and, more importantly, because RCP cannot control confirmation of the Plan due to its insider status.  Pursuant to Section 1129(a)(10) of the Bankruptcy Code, RCP's vote does not count, and the Plan can only be confirmed if a non-insider class votes to accept it.  The only such class would be unsecured creditors, who will not vote to accept a plan to receive little or no recovery and give RCP broad releases for its destructive conduct.

27.    Since RCP cannot obtain releases via the Plan, RCP has had to proceed more strategically.  Specifically, RCP pursued its releases by (i) causing the filing of these Chapter 11 Cases to provide DIP financing to a company with no underlying business to finance, (ii) infusing minimal unnecessary funds in exchange for a full and final release of any liability, (iii) hand-picking the company's new "independent" director to handle investigation into RCP's own conduct, and (iv) relying on Mr. Dane's purported investigation to avoid the investigatory role of official committees in a Chapter 11 case—particularly critical where, as here, there are claims against insiders.

28.    This conduct by RCP, with the help of the Debtors, has not gone unnoticed, as was made clear at the last hearing to consider final approval of the DIP Motion on November 21.  The Court addressed the elephant in the courtroom, remarking that "this is the first time that I've seen a debtor come to me with a final DIP order that is in no way reflective of committee comments. It's an unusual situation to be in, in any event.  I'm not even sure I encountered it in practice." Nov. 21, 2023 Hr'g Tr. at 21:15-19.

29.     The Court has witnessed the Objectors' pattern of behavior in these Chapter 11 Cases.

30.     Unable to obtain releases through the Plan and faced with the uncertainty of its potential releases through the DIP Motion, RCP's desperation for releases has risen to the level of threatening to convert the Chapter 11 Cases because they will not fund the DIP loans without obtaining releases, effectively holding a gun to the heads of the Court and parties in interest, for no one's benefit.  RCP's threat carries little weight;  the Debtors have substantially completed their asset sales and have no operations to fund.  The Debtors do not need the DIP financing at this junction.  RCP itself manufactured the need for any DIP financing through its cash sweeps before the filing.  All RCP has done is relend a small portion of those funds to create the illusion of a DIP in order to extract its expedited releases ahead of any plan process.  The main need for the DIP was to fund the efforts by the Debtor/RCP professionals to obtain releases through aggressive litigation tactics.  If RCP had commenced these cases in Chapter 7 rather than Chapter 11 none of this waste would have occurred.  But, of course, Chapter 7 was unattractive because a trustee would automatically inherit standing to investigate RCP without the opportunity to avoid such investigation through the untoward compromise at the heart of the DIP.

## RESERVATION OF RIGHTS

31.     In consideration of ongoing discovery, including the Committee's deposition of Mr. Dane on December 15, 2023, and discussions with counsel for the Debtors and RCP, the Committee reserves the right to supplement this Reply in advance of the December 18, 2023 hearing on the Motion.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court overrule the Objections and enter the Proposed Order granting the Committee (i) leave, standing and authority to commence and prosecute the Proposed Claims set forth in the Proposed Complaint, (ii) exclusive authority to compromise and settle the Proposed Claims on behalf of the Estates, subject to this Court's continuing jurisdiction to review any proposed compromise or settlement pursuant to Bankruptcy Rule 9019 and (iii) any additional relief as the Court may deem just and proper.

Dated: December 14, 2023          **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Wilmington, Delaware

*/s/ Donna L. Culver*
Donna L. Culver (No. 2983)
Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dculver@morrisnichols.com
        rdehney@morrisnichols.com
        eschwartz@morrisnichols.com
        dbutz@morrisnichols.com
        ehammer@morrisnichols.com

**COUNSEL FOR OFFICIAL COMMITTEE OF
UNSECURED CREDITORS**

- and -

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (*pro hac vice* pending)
Kurt A. Mayr (*pro hac vice* pending)
Malak S. Doss (*pro hac vice* pending)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
        kmayr@glennagre.com
        mdoss@glennagre.com

**PROPOSED SPECIAL LITIGATION COUNSEL
FOR OFFICIAL COMMITTEE OF UNSECURED
CREDITORS**