## **<u>EXHIBIT A</u>**

Highlighted Transcript of December 15, 2023 Deposition of Jeffrey Dane

Exhibit A is highlighted to reflect both the Debtors' and the Committee's designations.  The Committee's designations are highlighted in yellow, while the Debtors' designations are highlighted in blue.  Green highlights are areas designated by both the Debtors and the Committee.

12/15/2023                     In re AmeriFirst Financial, Inc., et al                     Jeffrey Dane

---

Page 1

```
              IN THE UNITED STATES BANKRUPTCY COURT

                  FOR THE DISTRICT OF DELAWARE

     _____
     In re                          )
                                    )Chapter 11
     AMERIFIRST FINANCIAL, INC.,    )Case No. 23-11240(TMH)
     et al.,                        )
                  Debtor.           )
     _____)


            VIDEOTAPED DEPOSITION OF JEFFREY DANE

                     APPEARING REMOTELY

                      December 15, 2023

                        10:06 a.m.


     Reported by: Eileen Mulvenna, CSR/RMR/CRR



           _____

                   DIGITAL EVIDENCE GROUP

                 1730 M Street, NW, Suite 812

                   Washington, D.C. 20036

                     (202) 232-0646
```

Page 2

```
 1            REMOTE VIDEOTAPED DEPOSITION of
 2  JEFFREY DANE, a witness on behalf of the Debtors in
 3  the above-titled action, held on Friday, December
 4  15, 2023, commencing at approximately 10:06 a.m.,
 5  before Eileen Mulvenna, CSR/RMR/CRR/RDR, Certified
 6  Shorthand Reporter, Registered Merit Reporter,
 7  Certified Realtime Reporter, Registered Diplomate
 8  Reporter, and Notary Public of the State of New
 9  York.
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 3

```
 1  A P P E A R A N C E S:
 2
 3  JOHN MORRIS, ESQUIRE
 4  Attorneys for Debtors
 5  PACHULSKI STANG ZIEHL & JONES LLP
 6  780 Third Avenue, 34th Floor
 7  New York, New York 10017-2024
 8  212.561-7700
 9  jmorris@pszjlaw.com
10
11  -AND-
12
13  MAXIM B.  LITVAK, ESQUIRE
14  One Sansome Street, Suite 3430
15  San Francisco, California 94104
16  415.263.7000
17  mlitvak@pszjlaw.com
18
19
20
21
22
```

Page 4

```
 1  A P P E A R A N C E S (Continued):
 2
 3  ANDREW K. GLENN, ESQUIRE
 4  MALAK S. DOSS, ESQUIRE
 5  KURT A. MAYR, ESQUIRE
 6  Attorneys for Official Committee of Unsecured
 7  Creditors
 8  GLENN AGRE BERGMAN & FUENTES LLP
 9  1185 Avenue of the Americas, 22nd Floor
10  New York, New York 10036
11  212.970.1600
12  aglenn@glennagre.com
13
14
15  LINDA RICHENDERFER, ESQUIRE
16  Office of The United States Trustee
17  844 King Street, Suite 2207
18  Lockbox 35
19  Wilmington, Delaware 19801
20  linda.richenderfer@usdoj.gov
21
22
```

Page 5

1  A P P E A R A N C E S (Continued):

2

3  ALEXANDER SCHWARTZ, ESQUIRE

4  Attorneys for Reverence Capital Partners

5  QUINN EMANUEL URQUHART & SULLIVAN LLP

6  51 Madison Avenue, 22nd Floor,

7  New York, New York 10010

8  212.849.7663

9  alexanderschwartz@quinnemanuel.com

10

11

12  JOSHUA LAW, ESQUIRE

13  PASHMAN STEIN WALKER HAYDEN, P.C.

14  101 Crawfords Corner Road, Suite 4202

15  Holmdel, New Jersey 07733

16  201.270.4931

17  jlaw@pashmanstein.com

18

19

20  ALSO PRESENT:

21  Eric Bowlby

22  Billy Fahnert, Videographer/Exhibit Tech

Page 6

1          I N D E X

2  WITNESS      EXAMINATION BY          PAGE

3

4  JEFFREY DANE

5

6          MR. GLENN          8

7          E X H I B I T S

8                  PAGE

9

10  Exhibit 1    No Bates numbers, 5/15/23   78

11          Letter from RCP to AFI

12  Exhibit 2    No Bates numbers, Weekly   112

13          Cash Budget

14

15

16

17

18

19

20

21

22

Page 7

1          THE VIDEOGRAPHER:  We are on the

2  record.

3          This is the remote video deposition of

4  Jeffrey Dane, in the matter of In Re

5  AmeriFirst Financial, Inc. et al., filed in

6  the United States Bankruptcy Court for the

7  District of Delaware.

8          My name is Billy Fahnert.  I am the

9  video technician today.  The court reporter

10  is Eileen Mulvenna.  We both represent

11  Digital Evidence Group.

12          Today's date is December 15, 2023.

13  The time is 10:06 a.m. Eastern Standard Time.

14          Counsel has stipulated to the witness

15  being sworn in remotely.

16          Will counsel please identify

17  yourselves for the record, and then the

18  witness will be sworn in.

19          MR. GLENN:  I'm Andrew Glenn, Glenn

20  Agre Bergman & Fuentes, special litigation

21  counsel to the Official Committee of

22  Unsecured Creditors.

Page 8

1          MR. MORRIS:  John Morris -- give me

2  one second.  John Morris, Pachulski Stang

3  Ziehl & Jones for the debtors.

4          MS. RICHENDERFER:  Linda Richenderfer,

5  trial attorney with the Office of the United

6  States Trustee.

7          MR. GLENN:  Anybody else?

8          Okay.  Let's get started.

9          THE VIDEOGRAPHER:  Eileen, can you

10  hear us?

11          THE REPORTER:  Yes.

12          THE VIDEOGRAPHER:  Are you going to

13  swear the witness in?

14          THE REPORTER:  Oh, sorry.

15  JEFFREY DANE,

16    having been duly sworn by Eileen Mulvenna,

17    a Notary Public of the State of New York,

18    was examined and testified as follows:

19  EXAMINATION

20  BY MR. GLENN:

21          Q.    I assume you've been deposed before

22  today?

Page 9

1    A.  I have.
2    Q.  Yes?
3    A.  Yes, I have.
4        Q.  Okay.  And if at any point today you
5    need a break, just let me know, and I will try to
6    accommodate you.  I do not expect to take the whole
7    day.  I don't know what others are going to do, if
8    anyone, but let's get started.
9            Are you familiar with a series of
10   transactions that were consummated on May 15th of
11   2023 involving the debtors and Reverence Capital
12   Partners?
13   A.  Yes.
14       Q.  Okay.  And I'm going to use the
15   acronym RCP to stand for Reverence Capital Partners.
16   Okay?
17   A.  Yep.
18       Q.  What happened in connection with that
19   settlement, those transactions on May 15th?
20           MR. MORRIS:  Objection to the form of
21   the question.
22           THE WITNESS:  Could you be a little

Page 10

1    more specific?
2    BY MR. GLENN:
3        Q.  What was the substance of the
4    transactions that occurred on May 15th of 2023 as
5    you understand it?
6        A.  It was a series of agreements signed
7    and amended and restated credit agreement,
8    settlement agreement, waivers, which were included
9    in the settlement agreement, and a couple of other
10   documents which amended the original -- which
11   amended the original April 2021 credit agreement.
12       Q.  And what consideration did the debtors
13   receive in connection with that series of
14   transactions, as you understand it?
15       A.  The debtors received -- RCP agreed to
16   waive millions of dollars of fees.  Their claim was
17   it was around 16 and a half million dollars of fees.
18           RCP agreed to reduce the principal
19   amount of their loan outstanding to 8 million for
20   28 million if certain milestones were met.  That
21   8 million was going to be in the form of either
22   preferred debt and Hope Notes.

Page 11

1            RCP -- in fact, by the time the
2    agreement was signed, it was 4 million, I think,
3    because RCP agreed to -- agreed to make 4 million of
4    their debt preferred right away.
5            Both sides signed releases.
6            You know, that's the -- those are the
7    major concessions that were given to the company.
8        Q.  And I didn't follow some aspects of
9    the answer.  So I'd like to follow up.
10           You testified that RCP agreed to
11   reduce the principal amount of its debt.  Is that
12   what I heard?
13       A.  Correct.  Assuming that milestones
14   were met and $20 million was paid down by
15   September 1st, they were going to convert the
16   difference, which is 8 million, into -- originally
17   it was contemplated to be a combination of
18   preferred -- preferred stock in what they call Hope
19   Notes, which are deeply subordinated instruments.
20           That was in the original term sheet.
21   By the time the agreement was signed, RCP agreed to
22   convert 4 million of their debt up front to

Page 12

1    preferred.
2        Q.  And do you know why that aspect of the
3    agreement was included?
4        A.  Well, I believe it was to lessen the
5    debt burden for the company.
6        Q.  To achieve any particular meaning?
7        A.  I think it's -- I think less debt is
8    self-explanatory.
9        Q.  But was that needed to comply with any
10   regulatory requirements or to obtain a warehouse
11   loan?
12       A.  Not that I'm aware.  It was a
13   concession that was asked for -- it was a concession
14   that was asked for by AFI.
15       Q.  Did RCP ever, in fact, reduce the
16   principal amount of its debt?
17       A.  Yes.
18       Q.  Okay.  And that was how much?
19       A.  4 million.
20       Q.  And do you know why that occurred?
21       A.  Why?
22       Q.  Yes.

12/15/2023                    In re AmeriFirst Financial, Inc., et al                    Jeffrey Dane

Page 13

```
 1        A.   Is that the question?  I think it's
 2  the same answer.  I think it was to help lessen the
 3  burden for the company.  There may have been some
 4  regulatory reasons, as well, in terms of, you
 5  know -- that I'm not aware of, but I'm not sure.
 6        Q.   Okay.  And you said something about
 7  reducing fees.
 8             Can you explain what you meant by
 9  that?
10        A.   Well, RCP was due prepayment
11  penalties, interest, and a variety of other fees,
12  given the initial default.
13        Q.   And how much -- how much would have
14  been --
15             (Discussion off the record.)
16  BY MR. GLENN:
17        Q.   What was the total amount of the fees
18  and other monetary amounts that you're testifying
19  that RCP gave up in connection with that settlement
20  agreement?
21        A.   RCP calculated them at 16 and a half
22  million dollars, if I remember correctly.
```

Page 14

```
 1        Q.   Okay.  Did you verify those amounts?
 2        A.   We did go through them on my interview
 3  call.  I did not calculate them separately.
 4        Q.   What amounts did RCP get as result
 5  of the May 15th, 2023, transactions that it would
 6  not have been able to get before those transactions
 7  were consummated?
 8        A.   What amounts?  I don't understand the
 9  question.
10        Q.   Well, did you --
11        A.   I'm not sure --
12        Q.   Did you analyze the economic impacts
13  to RCP of those transactions?
14        A.   Well, RCP was -- they were entitled to
15  what -- you know, they thought was 16 and a half
16  million dollars.  So, you know, a certain amount of
17  money there, and then the -- and then the difference
18  in the principal that they were owed was
19  subordinated.  So they may or may not have been able
20  to recover on the 8 million.
21        Q.   But have you -- have you actually gone
22  back and looked at -- well, I'll back up a second.
```

Page 15

```
 1             You're aware that RCP received liens
 2  and security interest as a result of the May 15th
 3  transactions; correct?
 4        A.   Yes.
 5        Q.   Okay.  And have you looked at the
 6  impact on RCP's recovery based on the fact that it
 7  was able to get those liens that it didn't have
 8  before?
 9        A.   No, we have not -- I did not do an
10  analysis on that point.
11        Q.   So don't know, as you sit here today,
12  how much RCP benefited from getting those liens;
13  correct?
14        A.   No, other than what you put in your --
15  other than what you put in your filings.
16        Q.   Fair enough.
17             And have you reviewed the impact of
18  the recoveries on general unsecured creditors as a
19  result of the grant of those liens to RCP?
20        A.   No.
21        Q.   So as you sit here today, you don't
22  know to what extent general unsecured creditors were
```

Page 16

```
 1  negatively impacted by the fact that RCP received
 2  those liens?
 3             MR. MORRIS:  Objection to the form of
 4  the question.
 5             THE WITNESS:  No.  It wasn't -- no is
 6  the answer.
 7  BY MR. GLENN:
 8        Q.   Okay.  Are you familiar with the term
 9  "reasonably equivalent value"?
10        A.   I am.
11        Q.   Okay.  Have you done any analysis
12  economically of the reasonably equivalent value --
13  strike that.
14             Have you done any economic analysis of
15  whether the debtors and their estates received
16  reasonably equivalent value in connection with the
17  May 15th, 2023, transactions?
18        A.   No, I don't believe it was -- it was
19  an economic analysis.
20        Q.   Okay.  Thank you.  Okay.  We'll come
21  back to that.  Okay.
22             Can you briefly describe for me your
```

4 (Pages 13 to 16)

Page 17

1    educational background following your graduation
2    from high school?
3         A.    I attended Emory University 1992 to
4    1996, graduated in '96 from the undergraduate
5    business school, got a BBA in finance and marketing.
6         Q.    Do you hold any accreditations, such
7    as a CPA or anything like that?
8         A.    No.
9         Q.    Okay.  Can you walk me through your
10   professional background following your graduation
11   from Emory?
12        A.    I worked at -- I spent, I guess,
13   from -- from the time I graduated, maybe it was
14   '97 or '98 to 2000 -- approximately 2016, I worked
15   at various investment firms, buy-side investment
16   firms, mainly specializing in distressed debt and
17   special situations, companies like Halcyon Partners,
18   Onyx Credit, Brownstone Investment Group,
19   Arrowgrass -- there may be one I'm forgetting.
20            In 2016, I believe it was 2016, I was
21   brought on by a company called Ocean Rig --
22   Ocean Rig was an offshore drilling company.  They

Page 18

1    were about to undertake restructuring.  They brought
2    me on as a senior restructuring advisor.  I worked
3    with them until -- I believe it was December of
4    2018.  We consummated a restructuring via a Cayman
5    Islands [inaudible] arrangement.
6            Since then I've sat on various boards.
7    I believe the number is ten now.  I also worked
8    doing financial consulting again for financial
9    firms, you know, doing what I did before.  That's
10   it.
11        Q.    Okay.  Thank you.
12            So have you ever been involved with a
13   company in AFI's line of business relating to
14   mortgages?
15        A.    No.
16        Q.    Okay.  Do you consider yourself an
17   expert in the field of valuation?
18            MR. MORRIS:  Objection to the form of
19   the question.
20   BY MR. GLENN:
21        Q.    I'm sorry.  Was there an answer?  I
22   didn't hear it.

Page 19

1         A.    No, I don't consider myself an expert
2    in valuation, although a significant portion of my,
3    you know, professional life has been to value
4    companies.  But the answer -- the specific answer
5    will be no.
6         Q.    Have you conducted any valuations of
7    AFI?
8         A.    No.
9         Q.    Do you know if anyone on the board or
10   management of AFI has conducted any valuations of
11   AFI?
12        A.    No, I don't believe so.
13        Q.    Okay.  Has anyone conducted any
14   analysis of the solvency of AFI, to your knowledge?
15            MR. MORRIS:  Objection to form of the
16   question.
17            THE WITNESS:  We did not do a specific
18   solvency review.
19   BY MR. GLENN:
20        Q.    But you used the qualifier "specific."
21   Why did you do that?
22        A.    Well, nothing official.  I mean, you

Page 20

1    know, we had our own opinion as to solvency at
2    certain points in time.
3         Q.    Okay.  So -- okay.  So what is that
4    opinion, sir, and whose is it?
5         A.    Well, the opinion of the board was
6    when we filed for bankruptcy, the company did not
7    have cash to meet its obligations.
8         Q.    And do you know when the company first
9    became in that condition, i.e., without sufficient
10   liquidity or resources to pay its obligation?
11        A.    No, I'm not going to have a specific
12   date.
13        Q.    Now, you testified earlier that this
14   is, I believe, the tenth board you've served on?
15        A.    Correct.
16        Q.    How many of those boards involved
17   companies either in bankruptcy or experiencing some
18   form of financial distress?
19        A.    I'd say they were all experiencing
20   some form of financial distress.  In terms of
21   bankruptcy, NBG Homes -- do you have my r sum  there
22   or no?

Page 21

```
1      Q.    I don't.
2      A.    Okay.  So I'd say a company called
3  NBG Homes, that was a Chapter 11.  A company called
4  BJ Services, that was a Chapter 11.  Apex Parks,
5  that was a Chapter -- a Chapter 7.  Nordic Aviation
6  was a Chapter -- was a Chapter 11.
7            So I think that's four.  One, two,
8  three, four.
9      Q.    Okay.  And then we have AFI now in
10 bankruptcy; correct?
11     A.    Five.  Yes.
12     Q.    Okay.  So were you focused on
13 NBG Homes to determine whether a DIP lender should
14 or should not get a release?
15     A.    I believe we did provide releases as
16 part of the final settlement, but it was no -- it
17 was not a -- not in the same way as here.  There was
18 no controversy.
19     Q.    Okay.  And in BJ Services, were you
20 called upon to give releasing to a DIP lender?
21     A.    Yes.
22     Q.    Okay.  And can you describe for me the
```

Page 22

```
1  circumstances of that matter?
2      A.    There were general -- there were
3  general releases -- there were general releases as
4  part of the settlement to the -- to various parties.
5      Q.    So in that matter, did you vote to
6  provide the DIP lender with a release the beginning
7  of the bankruptcy or some point later in terms of
8  the bankruptcy?
9      A.    No, it was later.
10     Q.    Okay.  So you didn't agree to give a
11 release, you know, when the DIP financing was
12 originally provided?
13     A.    Correct.
14     Q.    And that release was ultimately
15 provided as part of a global settlement?
16     A.    Correct.
17     Q.    Okay.  Apex 7, were you called upon in
18 that matter to give a release of a DIP lender?
19     A.    Well, I don't believe releases were
20 given, so no.
21     Q.    You think that was a Chapter 7?
22     A.    Correct.
```

Page 23

```
1      Q.    Did that company go immediately into
2  Chapter 7, or was it in Chapter 11 first and then
3  converted after some point period of time?
4      A.    It converted.
5      Q.    Okay.  Converted after some period of
6  time?
7      A.    Yes.
8      Q.    How much time?
9      A.    I don't remember specifically.  We
10 were in -- we were in proceedings for several
11 months.
12     Q.    Was there a DIP loan in that case?
13     A.    I believe there was.
14     Q.    Okay.  And your testimony is that that
15 DIP loan did not include a release or a waiver by
16 the debtor in claims against the lender?
17     A.    Not that I recall.
18     Q.    Okay.  Let's go to Nordic Aviation.
19 In that case, were you called upon to give a release
20 or a waiver of claims to a DIP lender?
21     A.    There was a global settlement to
22 provide releases.  That particular case had multiple
```

Page 24

```
1  boxes.  So I'm not -- I don't remember if our box
2  gave specific releases or not -- I mean, that we had
3  actually signed off on them.
4      Q.    The question I'm asking you, to make
5  sure we're on the same page, is:  When that DIP loan
6  was first filed, was there a release of claim and/or
7  a waiver of claim subject to a committee right to
8  challenge releases and waivers?
9      A.    Not that I recall.
10     Q.    Okay.  Now, let's talk about AFI.
11           So in AFI, you filed a DIP at the
12 beginning of the case; correct?
13     A.    Correct.
14           MR. MORRIS:  Objection to the form of
15 the question.
16 BY MR. GLENN:
17     Q.    Sorry.  I'm having some acoustic
18 problems again.
19           Was there a waiver of claims or
20 proposed release in the DIP loan that was filed at
21 the beginning of this case?
22     A.    At the beginning of the case, I don't
```

12/15/2023                    In re AmeriFirst Financial, Inc., et al                    Jeffrey Dane

Page 25

1   believe so.  There might have been.  But the
2   second -- the final order did have releases.
3        Q.    Are you aware that the original DIP
4   order included a challenge period?
5        A.    Yes.
6        Q.    And what is your understanding of the
7   reason for that challenge period?
8        A.    To provide the various parties with
9   time to -- time to examine if they agreed with the
10  releases or, you know, to make objections to the
11  judge.
12       Q.    And have you seen that structure and
13  process in prior DIP loans?
14       A.    Challenge periods?
15       Q.    Yes.
16       A.    Yes.
17       Q.    Okay.  And then at some point in time,
18  there was a determination made to give RCP a release
19  notwithstanding the challenge period; correct?
20       A.    Yes.
21       Q.    Okay.  When did that occur?
22       A.    When we went for the final -- when we

Page 26

1   went to put in the final DIP order.
2        Q.    Okay.  And was that before or after
3   the committee had filed its standing motion and
4   proposed complaint?
5        A.    I believe it was before.
6        Q.    Okay.  Did you consult with the
7   Official Committee of Unsecured Creditors before you
8   decided to provide that release to RCP?
9        A.    No.
10            MR. MORRIS:  Objection to the form of
11       the question.
12  BY MR. GLENN:
13       Q.    The answer was no?
14       A.    The answer is no.
15       Q.    Okay.  Why not?
16       A.    First of all, I'm not sure there was
17  an official committee yet.  I have to go back and
18  look at the timing.
19            Second of all, it was a unique
20  circumstance where we were basically told we were
21  going to be cut off from financing, and we made the
22  determination at that point, given the

Page 27

1   communications we had with the DIP lender, that it
2   was necessary to provide that release.
3        Q.    Okay.  So just so I can distill this,
4   you made the decision to provide a final release
5   based on the DIP lender's demand for that release
6   and your determination that the company needed the
7   DIP loan?
8        A.    Yes, if we did not -- if we did not
9   provide the release, it was our belief that we were
10  not going to get the -- the final DIP order -- DIP
11  finance.  We would not have any more money.
12       Q.    And if there was no need for that DIP
13  loan, were you willing to refuse to provide such a
14  release to the DIP lender?
15            MR. MORRIS:  Objection, calls for a
16       hypothetical.
17            THE WITNESS:  Yes, I think -- I think
18       if -- the reason that we did that was because
19       we felt like we needed the money to wind down
20       the operations of the estate or to
21       reorganize.  We needed access to the -- we
22       needed access to the DIP loan.

Page 28

1            If we had not needed access to the DIP
2       loan, we certainly would not have -- we
3       certainly would not have done it in the way
4       that we did.
5   BY MR. GLENN:
6        Q.    Now, you're aware that the creditors
7   committee does not want that release to go forward;
8   correct?
9        A.    Right.
10       Q.    Correct?
11       A.    Yes.
12       Q.    Okay.  Thank you.
13            Now, under what circumstances would
14  you be prepared -- or strike that.
15            Have you considered the circumstances
16  where you would be prepared to allow the creditors
17  committee to move forward and not to provide the
18  release to RCP?
19            MR. MORRIS:  Objection to the form of
20       the question.  To the extent it calls for
21       attorney-client communications, I direct the
22       witness not to answer.

7  (Pages 25 to 28)

12/15/2023                    In re AmeriFirst Financial, Inc., et al                    Jeffrey Dane

Page 29

1    But, otherwise, you go right ahead.
2        THE WITNESS:  Well, I think I'll take
3    your advice then.
4  BY MR. GLENN:
5        Q.    So the only circumstances where you've
6  considered not providing that release are in
7  conjunction with your communications with counsel.
8        Is that your testimony, sir?
9    A.    No.
10       MR. MORRIS:  You can answer the
11   question if it isn't privileged.
12       THE WITNESS:  Okay.  Say the question
13   again.
14  BY MR. GLENN:
15       Q.    Yes.  So the question I have is:  Have
16  you considered the circumstances where you may not
17  provide that release to RCP?
18           And I think there was an objection
19  that you're not supposed to answer based on
20  privileged communications.  And I'm asking you, have
21  you considered not providing that release in the
22  context of any nonprivileged communications or

Page 30

1  analysis?
2    A.    No, I believe the -- we believe -- I
3  believe that the release is appropriate at this
4  point.
5        Q.    Okay.  Why is that?
6    A.    Well, now we've met the requirements
7  of the challenge period.  The DIP lenders are
8  providing and have provided financial wherewithal to
9  get us through this case and to do it in the most
10  efficient manner possible.  And we investigated any
11  reasons not to provide the release, and we found
12  that it was appropriate to provide the release.
13       Q.    And who is "we"?
14   A.    Me.
15       Q.    Okay.  So -- and this is as a result
16  of your investigation?
17   A.    Well, my investigation determined that
18  there were no causes of action that would not allow
19  AFI to provide a release.
20       Q.    Let's talk about the investigation
21  that you're referring to.
22           What has been your role in this

Page 31

1  investigation?
2    A.    I led the investigation.
3        Q.    Okay.  Who else has worked on it?
4    A.    Well, I -- it's my investigation.  I
5  did it in conjunction with -- you know, with counsel
6  providing certain advice like any counsel would, but
7  it is my investigation.
8        Q.    Okay.  And have you employed the
9  services of anybody other than your counsel in this
10  investigation?
11   A.    No.
12       Q.    And when you say your counsel, you
13  mean the Pachulski law firm?
14   A.    Correct.
15       Q.    Okay.  Has Mr. Avila had a role in
16  this investigation?
17   A.    No.
18       Q.    Okay.  Has anybody else at AFI other
19  than you had a role in the investigation?
20   A.    No.
21       Q.    Okay.  Is it fair to say that the
22  division of labor between you in your role in the

Page 32

1  investigation and Pachulski' role is that you've
2  investigated the facts and they've investigated the
3  law?
4    A.    I would say it's fair to say that I
5  investigated the facts.  I investigated the law, and
6  if I had questions about certain aspects of the law,
7  I would consult with them.
8        Q.    And are you a lawyer?
9    A.    I'm not.
10       Q.    Do you have any formal legal training?
11   A.    No.
12       Q.    Okay.  And what makes you qualified to
13  do any legal investigation?
14   A.    I don't -- well, I wouldn't call it a
15  legal investigation.  I would call it an
16  investigation.  I spent many years, as I previously
17  explained, you know, about 20 years, on the
18  investment side where we looked at these sort of
19  issues all the time in terms of -- you know, in
20  conjunction with potential investments where we were
21  investing, you know, millions and tens of millions
22  of dollars.

8  (Pages 29 to 32)

12/15/2023                In re AmeriFirst Financial, Inc., et al                Jeffrey Dane

Page 33

```
1          I've sat on ten boards, including
2   boards where I have done other investigations.  So I
3   feel like I'm qualified to do what was required here
4   under this particular investigation.
5       Q.    And -- but you said that you
6   investigated the law but that if you had questions,
7   you consulted with the Pachulski law firm; is that
8   correct?
9       A.    Yes.
10      Q.    What legal matters did you investigate
11  without the participation of the Pachulski law firm?
12      A.    Well, I read through the various
13  documents.  I spoke to the various parties.  And,
14  you know, the vast majority of this investigation
15  was understanding the various aspects of the amended
16  credit agreement and its -- you know, and the other
17  documents that were signed in May.
18      Q.    Let's talk about your factual
19  investigation.
20          Can you describe for me what your
21  factual investigation has encompassed?  What have
22  you done?
```

Page 34

```
1       A.    Sure.  I started by reading the
2   various filings, for example, Mr. Bowlby's objection
3   to the initial first day motions, Mr. Bowlby's
4   declaration as part of his objection to the final
5   DIP order.
6           I read through the various Kasowitz
7   letters to the -- to Reverence, including the
8   December 2022 letter and the August 2023 letter.
9           I conducted phone -- Zoom calls,
10  interviews with the various parties, including
11  Mr. Bowlby, including the Kasowitz team, including
12  RCP.
13          I read through, you know, I guess
14  hundreds of e-mails that I was able to access via
15  the company's servers.
16          I read through all the various -- the
17  pertinent parts of the documents, including --
18  including the credit agreements, including -- and,
19  again, all the other various documents that were
20  signed alongside the credit agreement.
21          There may have been -- there may have
22  been other things, as well, that I may have just
```

Page 35

```
1   forgot, but that's the bulk of it.
2       Q.    So the e-mails that you referenced,
3   how were those selected?
4       A.    We did a search of -- I believe it was
5   a search of the e-mails that were Kasowitz and --
6   that had Kasowitz involved and the company or --
7       Q.    So e-mails --
8           (Cross talk.)
9   BY MR. GLENN:
10      Q.    I'm sorry.  E-mails coming from --
11      A.    I think the parameters.
12      Q.    -- Kasowitz?
13      A.    I believe the parameters were
14  Kasowitz.  I think that was the main parameter.
15      Q.    Okay.  Did you look at any
16  communications without Kasowitz involving Mr. Bowlby
17  and RCP?
18      A.    Well, that -- I looked at what I was
19  provided.  I can't remember every single e-mail, but
20  I told you the parameters.  So if there were e-mails
21  outside of those parameters, you know, I wouldn't
22  know how they got in there, but I -- whatever --
```

Page 36

```
1   whatever e-mails I had access to, I tried to go
2   through and look to see which ones were relevant.
3       Q.    Who selected the parameters for the
4   e-mail search?
5       A.    I believe it was the Paladin team.
6           THE REPORTER:  I'm sorry, the what?
7           THE WITNESS:  Paladin, P-A-L-A-D-I-N.
8           They're the ones -- I wouldn't say
9   they selected them.  They're the ones who --
10  I requested them, and they presented them to
11  me, presented a link.
12  BY MR. GLENN:
13      Q.    So that's what I'm trying to
14  ascertain.
15          Who determined the search terms or
16  search parameters for this set of e-mails that you
17  reviewed?
18      A.    I determined what I wanted -- I
19  determined I wanted to see the e-mails that involved
20  Kasowitz.  I requested, because they had access to
21  the servers and whatever else, that the Paladin team
22  provide them.
```

9  (Pages 33 to 36)

12/15/2023          In re AmeriFirst Financial, Inc., et al          Jeffrey Dane

Page 37

1    Q.   Okay.  And when did this occur?
2    A.   I mean, it must have been -- it was
3  either late September or early October or into
4  October.
5    Q.   Okay.  And when did you complete --
6    A.   And it may have been further than
7  that.  I'm not sure.
8    Q.   When did you complete the review of
9  those e-mails?
10      MR. MORRIS:  Objection to the form of
11  the question.
12      THE WITNESS:  Well, we completed the
13    investigation in October.  So I'd say
14    sometime in that time frame.
15 BY MR. GLENN:
16    Q.   Okay.  So you don't know exactly when
17  you completed the review of the Kasowitz e-mails,
18  but you're confident it was before the end of the
19  investigation?
20    A.   I'm not saying -- I don't remember --
21  I don't recall if I ever looked at e-mails after
22  that point, but the ones that I used specifically

Page 38

1  for the investigation and for -- you know, for the
2  filings that we used for the investigation were
3  concluded, obviously, in the time I did the
4  investigation.
5      I may have gone back and looked at
6  e-mails after that point for various other reasons,
7  but not for -- not for necessarily in terms of the
8  investigation.
9    Q.   Did you complete the review of those
10  e-mails before or after Kasowitz was disqualified as
11  the litigation counsel or committee counsel in this
12  case?
13    A.   What was the date that Kasowitz was
14  disqualified?
15    Q.   I don't have that handy.
16      MR. GLENN:  Does someone on the Zoom
17  recall?  We can get that date, if not.
18      THE WITNESS:  Well, the answer --
19 BY MR. GLENN:
20    Q.   One second, please.  Sorry?
21    A.   Again, for purposes of the
22  investigation, I concluded it in the time frame I

Page 39

1  stated.  So if the Kasowitz team was after that --
2  disqualified afterwards, then -- then it would be
3  before.  I just don't remember the date.
4    Q.   So Kasowitz was disqualified, I
5  believe, on or about October 25th or October 26th.
6      Did you complete your investigation
7  before then?
8    A.   I believe it was before then.
9    Q.   Now, you're aware that AmeriFirst has
10  waived the privilege now with respect to certain of
11  the Kasowitz communications that you reviewed?
12    A.   Yes.
13    Q.   When was the determination made to
14  waive that privilege?
15    A.   I think fairly recently.  I don't
16  know.  I think in the last -- the determination was
17  made in the last couple weeks.
18    Q.   And are you aware that Kasowitz could
19  not talk to the creditors committee after the
20  disqualification based on the fact that the company
21  was maintaining the privilege?
22    A.   At that point, yes.

Page 40

1    Q.   Okay.  Why was the determination made
2  to waive the privilege?
3      MR. MORRIS:  Objection to the form of
4    the question.  Direct the witness not to
5    answer to the extent that it reveals
6    attorney-client communications.
7      You can answer if you know and it's
8    not subject to that.
9      THE WITNESS:  Yeah, I think there
10    was -- I think there was various legal
11    strategies why we decided to do that, but I
12    do think that would fall under privileged
13    conversations with my counsel.
14 BY MR. GLENN:
15    Q.   What do you think the e-mails for
16  which the privilege has been waived establish in
17  connection with your investigation, if anything?
18    A.   What -- I'm sorry, what did they what?
19    Q.   What do they establish?  What facts or
20  legal principles do they establish?
21    A.   You know, they were mostly just
22  background filling in -- filling in holes.  I

Page 41

1  wouldn't say they established anything particularly
2  legal.  It just gave me insight into the thoughts
3  of, you know, specifically Mr. Bowlby and, you know,
4  AFI at that time.  That's it.
5      Q.    Who is Paladin?
6      A.    Paladin is the firm that Scott
7  Avila -- I believe he's the -- I don't know what his
8  title is, but he's the founder of Paladin.
9      Q.    What role, if any, did Paladin play in
10  the investigation other than providing you with
11  those e-mails?
12      A.    I asked for a search parameter.  They
13  had access to the e-mails, and they provided them.
14      Q.    And so --
15          (Cross talk.)
16  BY MR. GLENN:
17      Q.    -- that's all they did?
18      Just -- I just want to make sure I'm
19  clear that Paladin's only role in your investigation
20  concerned the search and recovery of the e-mails
21  that you've testified to?
22      A.    I'm not going to say "only."  I

Page 42

1  believe -- I mean, there may have been one or two
2  very small financial questions I asked them.  I
3  can't think of what those would be off the top of my
4  head, but they played a very minor role, if any,
5  besides what I just stated.
6      Q.    Now, we were talking about the
7  [inaudible] process of your investigation and you
8  had talked to me about the filings and letters and
9  e-mails that you reviewed.
10          Did you do anything else that you want
11  to add to describe, you know, the conduct of your
12  investigation?
13      A.    Well, like I said, I reviewed -- I
14  reviewed the e-mails.  I reviewed the various
15  filings, including the ones I mentioned and others,
16  as well.  I conducted in-depth interviews with the
17  various parties.  And that was the bulk of my
18  investigation.
19      Q.    Let's talk about the interviews that
20  you did.
21          Who did you interview?
22      A.    I interviewed Mr. Bowlby.  He was the

Page 43

1  first interview I conducted.  I interviewed
2  Kasowitz.  I interviewed Ed Filusch, if I'm
3  pronouncing his name correctly.  I think Matt Stein,
4  as well.  And then I interviewed RCP and their
5  counsel.
6      Q.    Who at RCP?
7      A.    Well, the bulk of the presentation was
8  provided by their counsel, which was the Quinn
9  Emanuel team, but the -- I believe Peter Aberg was
10  there.  Maybe Steven Herrup was there.  Theodore
11  Samets was present.  There may have been others.
12      Q.    What was the second name?  Can you
13  spell that because I didn't get that?  I know Aberg
14  and Samets.  What was the other name?
15      A.    Herrup is the last name, H-E-R-R-U-P.
16      Q.    Okay.  Thank you.
17          When did this meeting --
18      A.    I think that's how it's spelled.
19      Q.    When did this meeting occur?
20      A.    I don't remember the exact dates, but
21  I think the first interview I conducted was the
22  6th -- it was a Friday, I think -- of Eric, and then

Page 44

1  the other interviews occurred the next week.
2      Q.    6th of what?
3      A.    October.
4      Q.    Okay.  So you interviewed them twice
5  on the 6th and then the week after that?
6      A.    No.  I interviewed Eric on the 6th.  I
7  think it was the 6th.  Don't hold me to it, but
8  it --
9      Q.    Okay.
10      A.    I think it was Friday, the 6th.  And
11  then the other two parties individually the next
12  week.
13      Q.    I see.
14          And were these in person?
15      A.    Over Zoom.
16      Q.    Okay.  Who else participated in the
17  meetings other than you and the representatives of
18  RCP and their counsel?
19      A.    It was representative of Pachulski.
20  Either John Morris or Max Litvak was present, maybe
21  both, I don't remember, but at least one of them was
22  present.

12/15/2023              In re AmeriFirst Financial, Inc., et al              Jeffrey Dane

Page 45

1    Q.    How long did the meetings occur?
2    A.    How long did they last?
3    Q.    How long did they last?  Yes, thank
4    you.
5         A.    I'd say the meeting with Eric was
6    probably an hour to an hour and a half.  The same
7    with Kasowitz.  RCP was a little longer, maybe three
8    hours.
9    Q.    Did you take notes of those meetings?
10   A.    I did.
11   Q.    Are you still in possession of those
12   notes?
13        A.    I don't believe so.
14   Q.    Where are those notes now?
15        A.    I mean, they were very -- they weren't
16   what I would call notes.  They were just, you know,
17   pieces of information that I put on a piece of paper
18   and then were incorporated into the -- into the
19   final document.  So I don't have -- I did not keep
20   possession of those notes.
21   Q.    What document are you referring to?
22        A.    Well, we put -- as part of the final

Page 46

1    DIP order, we laid out our case as to -- you know,
2    in-depth as to what we did for the investigation and
3    what our conclusions were.
4    Q.    Are you referring to the objection to
5    the committee's standing motion?
6         A.    No.  No.  We filed this as part of the
7    final DIP order.  So it must have been the second or
8    third week of October.
9    Q.    Okay.  So your testimony is that you
10   discarded the notes and whatever work product or
11   information you derived from those meetings ended up
12   in the court filing that you're referring to?
13        A.    My conclusions did, yes.
14   Q.    Okay.  So if I wanted to know what was
15   said in these meetings, do you have any written,
16   audio, video record of those meetings?
17        A.    No.
18   Q.    Okay.  Do you know if the Pachulski
19   firm took notes of those meetings?
20        A.    I have no idea.
21   Q.    Okay.  Did you assess the credibility
22   of the parties to those meetings?

Page 47

1    A.    I tried to.
2    Q.    Okay.  And what was your assessment of
3    Mr. Bowlby's credibility?
4         A.    I believe he was overall fairly
5    honest.  You know, he stated his case as he believed
6    it.
7    Q.    Okay.  What was your assessment of the
8    credibility of the Kasowitz representatives that you
9    interviewed?
10        A.    I believe they were credible.
11   Q.    And what about the RCP
12   representatives?
13        A.    I believe they were credible, as well.
14   Q.    Now, you have not sat down with the
15   creditors committee and its representative to get
16   its perspective on providing the releases and the
17   path forward; correct?
18        MR. MORRIS:  Objection to the form of
19   the question.
20        THE WITNESS:  Well, I believe the
21   committee -- I think we've stated multiple
22   times that I've been open to speaking to the

Page 48

1    committee.  They never reached out to speak
2    to me.
3    BY MR. GLENN:
4    Q.    Have you ever had any communications
5    with Mr. Dundon?
6    A.    I don't believe directly.
7    Q.    Okay.  Have you ever had any
8    communications with Mr. Denick [ph]?
9    A.    Not directly, as far as I can recall.
10   Q.    Have you ever had any communications
11   at all with any members of the committee?
12   A.    No, not that I recall.
13   Q.    Okay.  Do you recall any efforts to
14   remove any members from the creditors committee in
15   this case?
16   A.    Yes, I wouldn't say officially -- I
17   mean, we -- we asked them to provide proof of
18   claims, and we did mention that we were not
19   convinced they were -- you know, they were actually
20   creditors.
21   Q.    When you say "we," who do you mean?
22   A.    Well, the -- AFI, the board, and Scott

Page 49

1  Avila.
2      Q.    Okay.  And did you work with RCP on
3  any effort to remove members from the creditors
4  committee?
5      A.    Personally.
6      Q.    Well, are you aware of any effort on
7  behalf of AFI to work with RCP to remove members
8  from the creditors committee?
9      A.    I don't know about -- what you mean by
10 "working with RCP."  The company had -- the company
11 had questions as to whether these were legitimate
12 creditors, and we put -- you know, we went through
13 the motions that we were supposed to with the court
14 to have them -- to have them show proof that they
15 were.
16         So I -- you know, I don't -- I don't
17 think it's a question of RCP.  I don't know what
18 their -- you know, they may have their own opinions.
19     Q.    Did you ever discuss -- strike that.
20         Are you aware of any discussions on
21 behalf of AFI, on the one hand, you know, including
22 its representatives, with RCP and its

Page 50

1  representatives concerning the potential removal of
2  any members from the creditors committee?
3      A.    Those are not -- those are not
4  conversations that I would have been privy to.
5      Q.    So the answer is you're not aware of
6  any of those communications?
7      A.    I'm not aware of any specific
8  communications.
9      Q.    Okay.  Are you aware generally that
10 those communications may have occurred?
11         MR. MORRIS:  Objection to the form of
12     the question.
13         THE WITNESS:  Again, I just don't know
14     exactly what occurred.
15 BY MR. GLENN:
16     Q.    Have you reviewed any documents
17 provided by RCP in connection with your
18 investigation?
19     A.    Yes.
20     Q.    What documents did you review?
21     A.    They went through -- they had a
22 presentation that they provided at the time of the

Page 51

1  call, and they sent it over electronically after the
2  call.
3      Q.    Was the purpose of that meeting for
4  them to walk you through their presentation?
5      A.    Well, the presentation was part of
6  their -- I was trying to -- I was trying to
7  ascertain -- you know, I heard certain allegations
8  from Eric and from Kasowitz, and I was trying to
9  ascertain -- and read the various allegations in the
10 various filings.  So I was trying to ascertain their
11 side of the story regarding those allegations.
12     Q.    Do you have a copy of the RCP
13 presentation?
14     A.    I believe it's a public -- I believe
15 it was filed as part of -- as part of the -- it's
16 definitely filed somewhere, at least I think it is,
17 but yes.
18     Q.    Other than that -- thank you.
19         So other than that presentation, did
20 RCP provide you with any documents?
21     A.    Documents, in terms of the
22 investigation, I don't believe directly.  I don't

Page 52

1  know if -- you know, I mean, we -- we, obviously --
2  we, obviously, received whatever was available to
3  everyone in terms of, you know, credit agreements
4  and settlement agreements and everything else.
5         I can't recall them sending anything
6  else, but the vast majority of their case -- the
7  vast majority of my interview was them walking me
8  through that presentation.
9      Q.    And you had, I think, two or three
10 different interviews with them?
11     A.    What was that?
12     Q.    You had two or three interviews with
13 RCP?
14     A.    Well, I mean, I interviewed them
15 formally once.  I had follow-up questions that I did
16 speak with them after that first call, but I
17 wouldn't call it an interview at that point.
18     Q.    Okay.  So the predominant time you
19 spent with them was the meeting in which the
20 presentation was provided to you?
21     A.    Yes.
22     Q.    Did you give them any questions in

Page 53

1  advance of that interview?
2      A.   I don't -- I don't think so.
3      Q.   Did you have any communications with
4  them about the interview before it occurred?
5      A.   I mean, not specific.  I mean, I have
6  talked to them in the past, I mean, but not specific
7  to this -- not specific to this investigation.
8      Q.   So who set up the interview?
9      A.   I can't recall if I set it up or if it
10  was done through Pachulski.  I don't remember.
11     Q.   What was the agenda for the interview?
12     A.   Well, the agenda was to hear -- I had
13  certain questions regarding, again, the allegations
14  that were laid out, first, in the filings.
15          Secondly, after having spoken to both
16  Mr. Bowlby and Kasowitz, so the intention was to
17  hear their side of the story and for them to provide
18  me with, you know, any materials or any information
19  that would help tell their side of the story in
20  terms of these allegations.
21     Q.   This was already after the debtor had
22  waived its right and released its claims against RCP

Page 54

1  subject to the committee's ability to seek standing;
2  correct?
3      A.   I'm sorry, say that again.  Yeah, I
4  don't understand the question.
5      Q.   So the interviews chronologically,
6  sequentially, the interviews you conducted are after
7  the bankruptcy filing, after your original DIP was
8  approved waiving claims against RCP, releasing
9  claims against RCP, subject to the committee's right
10  to get standing; correct?
11          MR. MORRIS:  Objection to the form of
12  the question.
13          THE WITNESS:  It was before we asked
14  the -- it was in conjunction with us putting
15  in the final DIP order, which did waive the
16  challenge period but did have releases,
17  meaning we wanted to put it -- we wanted the
18  investigation to conclude before we went in
19  front of the judge for the final DIP order.
20  BY MR. GLENN:
21     Q.   But I just want to make sure I'm
22  clear.

Page 55

1          So the interim DIP order that was
2  entered at the beginning of the case already
3  included a waiver of claims by the debtor; correct?
4      A.   Yes, but I -- yes.
5      Q.   Okay.  And then -- and then you
6  interviewed RCP after that but before the final DIP
7  order was proposed; correct?
8      A.   Yes.
9      Q.   So why did you do this investigation
10  when you had already waived claim against RCP
11  subject to the committee's standing?
12     A.   I'm sorry, I don't understand the
13  question.
14     Q.   Because the debtor had already waived
15  claims against RCP, why did you go about even having
16  this interview?  What was the purpose?
17     A.   Well, because we were going to be --
18  this was for the final waiver, and we -- that was
19  going to be provided in the final DIP order, and we
20  wanted to be able to go to the judge and -- you
21  know, and tell them with a straight face that we
22  believe that the -- that the waivers that were

Page 56

1  included in the final DIP order were appropriate.
2          And we had to do it in the time frame
3  that we did.  Because, as I said, at the time the
4  lender had threatened or told us that there was
5  going to be no more financing until the waiver was
6  approved as part of the final DIP order.
7      Q.   And when was that request made by
8  RCP -- or the demand made by RCP for the final
9  release?
10     A.   Sometime between the first DIP order
11  and the second.
12     Q.   Can you give me any further clarity
13  beyond that?
14     A.   I don't remember.  It was probably in
15  mid to late September.
16          MR. GLENN:  We've been going for about
17  an hour.  So let's take a 5- to 10-minute
18  break.
19          THE VIDEOGRAPHER:  Going off the
20  record.  The time is 11:05.
21          (Recess from the record.)
22          THE VIDEOGRAPHER:  We are back on the

12/15/2023                In re AmeriFirst Financial, Inc., et al                Jeffrey Dane

---

Page 57

1      record.  The time is 11:17.
2   BY MR. GLENN:
3        Q.    So, Mr. Dane, I'd like to ask you
4   about the discussions with RCP that you've
5   referenced.
6              Were those discussions about legal
7   defenses, factual issues, or both?
8        A.    Which discussions?
9        Q.    With RCP that you've testified to.
10       A.    Can you be more specific?
11       Q.    Yes.  I want to understand what you
12   discussed during these calls and interviews and
13   presentations and --
14       A.    Right.
15       Q.    I'll just break it down.
16             Did they talk about legal defenses
17   that they had to any claims that --
18             THE REPORTER:  I'm sorry, you're
19   breaking up again, Mr. Glenn.
20             MR. GLENN:  Let me see if I can fix
21   it.  My mic might have switched again.  Hold
22   on.

---

Page 58

1   BY MR. GLENN:
2        Q.    Okay.  So did you talk about their
3   legal defenses to any claims in that discussion?
4        A.    They gave me their view of why the
5   allegations, as laid out by Mr. Bowlby and the
6   Kasowitz legal team, were invalid.
7        Q.    Okay.  Can you describe for me in
8   general terms what they said?
9        A.    I mean, you're going to have to be a
10   lot more specific.  There was specific allegations,
11   and they went through the allegations one by one and
12   why they thought they -- their basic defense was
13   that they acted within the confines of the credit
14   agreement.
15       Q.    Now, I'd like to talk to you about
16   AFI's need for a warehouse line.
17             Are you familiar with that topic?
18       A.    Yes.
19       Q.    Okay.  And have you ever been involved
20   with a warehouse line during your career?
21       A.    I mean, I worked for a CLO shop.  So
22   we had warehouse lines.

---

Page 59

1        Q.    Okay.  And are you aware of the
2   importance of a warehouse line historically to AFI's
3   business?
4        A.    Yes.
5        Q.    Okay.  Did you discuss RCP's conduct
6   relating to any existing warehouse lines that the
7   company historically had had and negotiations about
8   replacing those warehouse lines in conversation with
9   RCP?
10       A.    Pre or post -- pre or post-credit
11   agreement -- amended credit agreement?
12       Q.    Both.  Both.
13       A.    Yes.  Yes, we did.  We discussed both.
14       Q.    Okay.  So let's discuss pre-credit
15   agreement.
16             When you say "pre-credit agreement,"
17   you're referring to May 15, 2023; correct?
18       A.    Yes.
19       Q.    What did you discuss with RCP about
20   the history of the warehouse lines and RCP's
21   involvement with them pre-credit line?
22       A.    The main topic of discussion was that

---

Page 60

1   they had sent a notice of default in early December
2   of 2022 where they had alerted the warehouse lenders
3   that there had been an event of default that could
4   lead to the loans being called early.
5        Q.    So that's a historical fact; correct?
6        A.    It's a what?
7        Q.    Historical fact; correct?
8        A.    What's a historical fact?
9        Q.    That they -- that they issued that
10   notice of default.
11       A.    Yes.
12       Q.    Okay.  So did they describe for you
13   why they did it?
14       A.    Yes.
15       Q.    Why did they do it?
16       A.    They felt they were obligated to alert
17   the warehouse lenders because they were a party --
18   they and AFI were party to a subordination -- a
19   subordination agreement.
20       Q.    Have you seen the --
21             (Cross talk.)
22

---

12/15/2023              In re AmeriFirst Financial, Inc., et al              Jeffrey Dane

---

Page 61

1  BY MR. GLENN:
2      Q.    Have you see the allegation --
3      A.    Go ahead.
4      Q.    Hello?
5      A.    Yes.
6          MR. GLENN:  Okay.  You ready?
7          THE WITNESS:  Yeah.
8          MR. GLENN:  The court reporter?
9          THE REPORTER:  Yeah, I'm ready.
10         MR. GLENN:  Okay.
11 BY MR. GLENN:
12     Q.    So have you seen the allegations in
13 the committee's proposed complaint concerning the
14 asset sales that were scuttled as a result of that
15 notice of default being issued?
16     A.    Yes.
17     Q.    Did you discuss that matter with RCP?
18     A.    I mean, to some extent.  I don't
19 remember the exact conversations in terms of -- they
20 certainly explained that that was an issue and that
21 it happened.
22     Q.    That it scuttled the asset sales?

---

Page 62

1      A.    I wouldn't put it in those terms.  I
2  don't remember the exact words that they used, but
3  that they were -- there had been talks to sell
4  certain assets.
5      Q.    And do you know what the impact was of
6  the issuance of that notice of default on the
7  proposed asset sales?
8      A.    No.  Mr. Bowlby would say that they
9  basically shut down at least -- any kind of viable
10 price, from his perspective, being able to make
11 those assets.
12     Q.    Did you discuss RCP's response to
13 that?  I'll rephrase that question.
14         Did you ask RCP whether they disagreed
15 with Mr. Bowlby's assessment?
16     A.    No, I didn't ask them that specific
17 question.
18     Q.    Do you understand that Mr. Bowlby
19 contends that prior to issuing that notice of
20 default, that RCP had given Mr. Bowlby certain
21 assurances that they -- RCP would let those sales go
22 through?

---

Page 63

1      A.    I -- that's what Mr. Bowlby -- that's
2  Mr. Bowlby's assertion.  I don't believe -- I mean,
3  I believe that RCP would agree that they -- that
4  they wanted those to go through.
5      Q.    But the question I'm asking is:  Did
6  you ask RCP whether they, in fact, gave Mr. Bowlby
7  assurances that they would let those asset sales go
8  through before they went ahead and issued the notice
9  of default?
10         MR. MORRIS:  Objection --
11         THE WITNESS:  No, I didn't --
12         MR. MORRIS:  -- to the form of the
13 question.
14         THE WITNESS:  I didn't ask them that
15 specific question.
16 BY MR. GLENN:
17     Q.    Did you do any factual investigation
18 otherwise on that issue?
19     A.    No, I don't find the relevance.  I
20 don't find the relevance in the question or the --
21     Q.    Why is that?
22     A.    I don't find the relevance in the --

---

Page 64

1  because -- because of what -- I just don't find the
2  relevance.  That has nothing to do with the notice
3  of default.
4      Q.    Are you familiar with the doctrine of
5  equitable estoppel?
6      A.    No.
7      Q.    And are you familiar with the doctrine
8  of reliance and promissory estoppel?
9      A.    No.
10     Q.    So is that the extent of all your
11 conversations with RCP concerning the historical
12 facts on the warehouse line prior to --
13         THE REPORTER:  I'm sorry, you're
14 breaking up.
15         MR. GLENN:  Okay.  I'll try again.  I
16 don't know why this is happening.
17         Is that better?
18         THE REPORTER:  Yes.
19         MR. GLENN:  You know, I moved, like,
20 2 inches to the side.  So -- hum, sensitive
21 mic.
22

---

16  (Pages 61 to 64)

12/15/2023                In re AmeriFirst Financial, Inc., et al                Jeffrey Dane

---

Page 65

1  BY MR. GLENN:
2      Q.    Okay.  Did you discuss anything
3  concerning RCP's conduct with respect to AFI's
4  warehouse line other than what you've testified to
5  that occurred before the May 15, 2023, credit
6  agreement?
7      A.    They explained why they felt that they
8  had no other choice but to send a notice of default
9  and alert the warehouse lenders.  That was their --
10 that was the main topic.  They went through -- they
11 provided the language of the subordination
12 agreement.
13          They showed that it was signed by both
14 Mr. Bowlby, AFI, and the warehouse lenders.  They
15 were all party to that agreement.  And that was
16 their defense.
17          They felt that they -- that they --
18 their opinion was they had no choice but to send it.
19 Mr. Bowlby's opinion was that they had the right to
20 send it, but they didn't -- they didn't have to.  So
21 those were the two competing stories.
22      Q.    And did you conduct any investigation

---

Page 66

1  whether with RCP or Mr. Bowlby concerning what
2  happened with the warehouse lines after the notice
3  of default was issued?
4      A.    Yes, I spoke with Mr. Bowlby and to
5  RCP, and Mr. Bowlby made it very clear that he felt
6  like the -- the notice of default had effectively
7  shut down the company.
8      Q.    And did you see any evidence
9  contradicting that?
10     A.    No, I mean, I think it was clear that
11 the -- that that had a -- that that definitely had a
12 large impact on the company's ability to continue
13 underwriting new loans.
14     Q.    What happened with the warehouse
15 lenders, if you know, once the default was issued?
16     A.    You broke up at the end.  What
17 happened what with the warehouse?
18         MR. GLENN:  Let me change microphones,
19 guys.  I'm sorry about this.  One second.
20         Can you hear me now?
21         MR. MORRIS:  I can hear you.
22

---

Page 67

1  BY MR. GLENN:
2      Q.    Okay.  What happened with the
3  warehouse lines after the notice of default was
4  issued, if you know?
5      A.    Effectively, they were shut off
6  from -- from receiving financing from those -- or
7  from those warehouse lines.
8      Q.    And do you agree that that had a
9  significant impact on the company's ability to
10 operate?
11     A.    Yes.
12     Q.    And it was a significant negative
13 impact on the company's ability to operate; correct?
14     A.    Yes.
15     Q.    Okay.  And were the warehouse lenders
16 ultimately repaid?
17     A.    I believe -- I believe they were.
18     Q.    Okay.  And what happened with the
19 company's ability to deal with the relevant
20 agencies, Fannie Mae, et cetera, after that notice
21 of default but before the May 15th settlement
22 agreement?

---

Page 68

1      A.    I mean, there was a communication from
2  one of the agencies, but I -- as far as I know, it
3  was -- it had to do with a -- the company's
4  performance during 2022 -- not their performance,
5  their tangible net worth, I think -- I believe.
6          I don't remember exactly, but it was
7  not -- it was specifically for the period of 2022.
8  I don't believe it was necessarily directly related
9  to what happened as a result of the notice of
10 default.  No one provided me evidence that that was
11 the case, as far as I remember.
12     Q.    Okay.  So you're not aware of any
13 regulatory difficulties or pressures that AFI
14 experienced during 2023 after the notice of default
15 was issued?
16     A.    I'm sure there could have been.  So --
17 but I'm just -- the actual direct communication that
18 I was made aware of was not necessarily a result of
19 what happened at the end of 2022.  It was a result
20 of --
21         MR. BOWLBY:  I've forgotten that
22 they're actually in court beating up on

---

17 (Pages 65 to 68)

12/15/2023                 In re AmeriFirst Financial, Inc., et al                 Jeffrey Dane

Page 69

1  Jeffrey Dane right now.
2       MR. GLENN:  Thanks, Mr. Bowlby.  You
3  may want to mute.
4       VOICE:  Sorry about that.
5       THE WITNESS:  So yeah.  No, I -- did
6  they have -- did they have issues with the
7  rating agencies?  It could be, but the direct
8  communication was -- the way I read it and
9  the way it was explained was not necessarily
10 a direct correlation to the -- to that
11 notice.  I'm not saying there were no issues
12 with the rating agencies.
13 BY MR. GLENN:
14      Q.    Did you review any communications to
15 and from the rating agencies as part of your
16 investigation in this case or your service as an
17 independent director?
18      A.    Yes, I did.  As I explained, there was
19 a communication where the rating agencies shut down
20 a portion of -- or put them on some kind of -- I
21 think it was they could not sell directly to the
22 window at -- I think it was -- I don't remember if

Page 70

1  it was Fannie or Freddie, but that was a
2  consequence.  They were going have to go through a
3  middleman, effectively.
4       And, again -- and then there were --
5  you know, there were references in some of the
6  e-mails.  I don't remember specifically what they
7  were.
8       Q.    Who gathered those e-mails for you?
9       A.    I think I answered that.
10      Q.    That's Mr. Avila's firm, Paladin?
11      A.    Yes.
12      Q.    Okay.  And what is Mr. Avila's
13 relationship with RCP?
14      MR. MORRIS:  Objection to the form of
15 the question.
16      THE WITNESS:  I mean, Mr. Avila is the
17 chief restructuring officer of AmeriFirst.
18 BY MR. GLENN:
19      Q.    Okay.  Does he have a relationship
20 with RCP?
21      A.    Not that I know of, besides his roles
22 in this case.

Page 71

1       Q.    Has he ever served as a CRO on any
2  other capacity with any company associated with RCP?
3       A.    You're going to have to ask him.  I
4  don't know.
5       Q.    Okay.  There came a time when there
6  was a term sheet that was agreed to in March of 2023
7  between RCP and AFI.
8       Are you familiar with that?
9       A.    Yes.
10      Q.    Okay.  And how did you become familiar
11 with that?
12      A.    I don't -- I mean, it definitely --
13 you know, it was discussed as part of the
14 investigation with Mr. Bowlby and the Kasowitz team
15 and RCP.
16      Q.    Okay.  So that came up in your
17 discussions with the interviews?
18      A.    Yeah.
19      Q.    Okay.  Let's start with RCP.
20      What were your discussions with RCP
21 about the purpose and negotiations underlying that
22 term sheet?

Page 72

1       A.    Well, the -- AmeriFirst was in
2  default, and AmeriFirst and RCP were attempting to
3  work out a solution that could put the company back
4  on its feet and take it out of its default,
5  effectively, you know, cure its default.
6       Q.    And who told you that at RCP?
7       A.    At RCP?
8       Q.    Yes.
9       MR. MORRIS:  Objection to the form of
10 the question.
11      THE WITNESS:  I don't remember the
12 exact person, but it's part of the
13 presentation.  So, you know, it's in the
14 presentation --
15 BY MR. GLENN:
16      Q.    Okay.
17      A.    -- from Quinn Emanuel.
18      Q.    What were your discussions with
19 Mr. Bowlby about that term sheet?
20      A.    The discussions were, you know, just
21 from his perspective what he was thinking in terms
22 of why did he sign it, given that he had made

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2023                 202-232-0646

12/15/2023    In re AmeriFirst Financial, Inc., et al    Jeffrey Dane

---

Page 73

1    certain allegations, so why then go ahead and sign a
2    term sheet and not pursue other avenues.
3        Q.    Can you elaborate on that?  I'm not
4    following you.
5        A.    Well, Mr. Bowlby could have gone down
6    the path of suing RCP.  He made -- you know, there
7    was letters back and forth.  He made various
8    demands.  Kasowitz sent out a letter demanding RCP
9    put in -- I think it was 15 million of capital and
10   take $10 million as final payment for their
11   outstanding loan.
12           You know, he seemed to believe that
13   RCP had caused him tens of millions of dollars of
14   damage.  So the question was:  Why didn't you pursue
15   that and instead why did you sign -- sign a document
16   which was, you know, first elaborated on the term
17   sheet, which would provide waivers for all that,
18   what he considered, you know, bad activity on the
19   part of RCP.
20       Q.    But those releases did not occur until
21   the May 15, 2023, transactions; correct?
22       A.    Well, they're in the term sheet.  They

---

Page 74

1    were contemplated.
2        Q.    Right.  But that term sheet wasn't
3    binding; was it?
4        A.    No.
5        Q.    Okay.  So what is your understanding
6    of what happened between March of 2023 and May 15th
7    of 2023 in the discussions with RCP and AFI?
8        A.    I think there were hard thought
9    negotiations between -- between the parties and
10   their counsel, which culminated in the agreements.
11       Q.    Okay.  And what did you do to
12   investigate what happened between March and May 15th
13   when the settlement agreement was issued?
14       A.    Well, we spoke extensively about this
15   topic with Mr. Bowlby.  We spoke extensively about
16   this topic with Kasowitz, who actually negotiated
17   the, you know, term sheet and then the
18   agreements.  And we spoke extensively to RCP and
19   their counsel about, you know, about the actual
20   negotiations that led to the signing of the
21   agreement.
22           Again, the e-mails did shed some light

---

Page 75

1    on what everyone's thinking was during that time
2    period, as well, but the vast majority was by
3    speaking to the parties.  I gave everyone the
4    opportunity to tell me exactly what they thought
5    happened during that time period, and they all
6    elaborated on that talk.
7        Q.    You've reviewed the May 15th, 2023,
8    series of agreements; correct?
9        A.    Yes.
10       Q.    What do you understand that -- strike
11   that.
12           Do you have an understanding of what
13   the parties' respective obligations were concerning
14   the implementation of a new warehouse line under
15   those agreements?
16       A.    Yes.
17       Q.    What is your understanding?
18       A.    Well, there were portions of the
19   credit agreement that specifically had limitations
20   on indebtedness, and there were certain carve-outs
21   to those limitations.
22           There was a second amended --

---

Page 76

1    amendment to the amended credit agreement which
2    specifically contemplated a warehouse line to a firm
3    called Customers -- Customers Bank.
4            And various portions of the credit
5    agreement spoke to the various rights of both
6    parties in terms of -- in terms of getting the
7    warehouse line accomplished.
8        Q.    Did you review the side letter that
9    was entered into in conjunction with the May 15th,
10   2023, agreement?
11       A.    Yes.
12       Q.    Okay.  And what is your understanding
13   of what that side letter accomplished?
14       A.    Well, AFI was concerned with
15   staying -- you know, it allowed AFI to propose
16   certain amendments which would put it in good
17   standing, for example, with the agencies.  That was
18   a concern of theirs.
19           (Discussion off the record.)
20           MR. GLENN:  I'm sorry, can you read
21   back the last answer?  Because I was
22   distracted by your comment.

---

Page 77

1          (Record read back.)
2  BY MR. GLENN:
3          Q.    Okay.  Of AFI's?
4          A.    That was a concern of AFI's.
5          Q.    Okay.  And did you ask Mr. Bowlby what
6  he thought that side letter accomplished relative to
7  a new warehouse line?
8          A.    The side --
9          Q.    The side letter.
10         A.    The side -- well, the new warehouse
11 line was more contemplated in the second amendment
12 and the credit agreement.
13         Q.    Okay.  But there was a reference to a
14 warehouse line in the side letter, no?
15         A.    Yeah, if you want to put it up in
16 front of me, I can take a look.
17         Q.    Sure.
18         A.    I don't remember the specifics.  I
19 mean, but the specifics were -- that I remember
20 them, you know, the real -- the real reason for the
21 side letter was, like I said, they wanted to be able
22 to make sure they were able to add certain

Page 78

1  amendments for various reasons, including staying in
2  good standing with the agencies.
3          Q.    Okay.
4          MR. GLENN:  Let's put the side letter
5  up, Malik.  I'm not sure how we're going to
6  accomplish that under the current state of
7  affairs.
8          Okay.  We put on the screen what we're
9  going to mark as Exhibit 1.  This is a
10 May 15, 2023, letter with the RCP entity in
11 the letterhead.
12         (Exhibit 1, No Bates numbers, 5/15/23
13 Letter from RCP to AFI, received and marked.)
14         MR. GLENN:  And if you could scroll
15 down to the next page, please.
16         And then the next page.
17         Okay.  And then you can go to the top.
18 BY MR. GLENN:
19         Q.    Okay.  So is this your understanding
20 of what the side letter we've been talking about is,
21 Exhibit 1?
22         A.    I believe so, yep.

Page 79

1          Q.    Okay.
2          MR. GLENN:  Now, can we blow up the
3  second paragraph a little more so it's easier
4  for everybody to read, please.  Yep.
5  BY MR. GLENN:
6          Q.    Okay.  So I've asked the video
7  director to blow up the second paragraph, and here
8  it is.  And the lead-in sentence of this says, "The
9  parties to the Credit Agreement hereby agree and
10 acknowledge that following the date hereof, they
11 will execute any and all amendments or waivers
12 applicable to the terms of the Credit Agreement or
13 other loan documents which were required to be
14 amended or waived to ensure that the Borrower (i)
15 remains compliant with all Agency requirements
16 applicable to the Borrower, and (ii) has the ability
17 to enter into warehouse financing documents for
18 Borrower's ongoing business operations in a manner
19 consistent with the budget and the Borrower's
20 projections [sic]."
21         Did I read that correctly?
22         A.    Yes.

Page 80

1          Q.    Okay.  Now, this is subject to certain
2  caveats below, and I'd like to direct your attention
3  underneath that where it says, "Provided further,
4  that the Administrative Agent and the Lender shall
5  not be required to execute amendments or waivers
6  which, in their reasonable good faith judgment, (x)
7  prior to the deemed repayment of the Loan pursuant
8  to Section 2.19(e) of the Credit Agreement would
9  have a Material Adverse Effect."
10         Do you see that?
11         A.    Yes.
12         Q.    Okay.  Are you aware in the course of
13 your investigation of any circumstance where RCP
14 notified AFI that a warehouse line that AFI proposed
15 would have a material adverse effect as described
16 here?
17         A.    No, I'm not aware.  It doesn't mean it
18 did or it didn't happen.
19         Q.    Okay.  So what did Mr. Bowlby tell you
20 about the negotiations concerning a replacement
21 warehouse line in your discussions with him, if
22 anything?

Page 81

1    A.    That they needed -- they needed a
2  warehouse line to restart the business.  It was very
3  important for them to get a warehouse line in order
4  to have any hope of restarting the business.
5    Q.    Okay.  And what did RCP tell you about
6  their perspective on any new warehouse line that
7  Mr. Bowlby had secured or proposed?
8    A.    That they also were anxious to get a
9  new warehouse line in place because without a new
10 warehouse line there was no hope of restarting the
11 business.
12    Q.    Okay.  So what happened -- well,
13 strike that.
14         Did you investigate what happened with
15 respect to the parties' negotiations of a
16 replacement warehouse line?
17    A.    Yes.
18    Q.    Okay.  What happened?
19    A.    Well, again, back to the second
20 amendment, it specifically mentions a Customers
21 Bank.  So it's clear that -- it clear that the
22 company AFI was in some kind of discussions to

Page 82

1  potentially open a new warehouse line -- open a new
2  warehouse line with Customers Bank.
3         And Mr. Bowlby explained that they
4  were trying to do that, that they were negotiating
5  various provisions for multiple weeks with Customers
6  Bank.  At the end of the day, the warehouse line was
7  not provided for various reasons.
8    Q.    What were those reasons?
9    A.    RCP who had the discretion to accept
10 certain terms of the warehouse line, there were
11 negotiations between -- between the parties, and
12 Customers Bank did not accept the conditions that
13 were acceptable to RCP and that were specifically
14 contemplated in the -- in various parts of the
15 credit agreement, specifically regarding
16 subordination agreement between any potential
17 warehouse lender and RCP.
18    Q.    Can you identify the provisions of the
19 credit agreement that provided the discretion that
20 you just referred to and consent rights over
21 subordination?
22    A.    Yeah, I think -- I think it was

Page 83

1  Section 6. -- it was in Section 6, maybe 6.04 that
2  specifically mentions that AFI must provide an
3  acceptable subordination agreement to RCP for
4  warehouse lines.
5         There's other provisions, it may be in
6  that same section, which specifically disallow any
7  liens.  There were contemplations for -- you know,
8  the big issue was these MSRs.  And in the second
9  amended credit agreement, there were -- there was
10 specific language that would allow Customers Bank
11 specifically to take liens on those MSRs under
12 certain conditions.
13    Q.    And what is the relationship between
14 the provisions that you're citing to and the side
15 letter?
16    A.    Well, I mean --
17         MR. MORRIS:  Objection to the form of
18 the question.
19         THE WITNESS:  I don't really
20 understand the question.  Can you be more
21 specific?
22

Page 84

1  BY MR. GLENN:
2    Q.    Sure.
3         So do you have any understanding of
4  the interplay between the credit agreement
5  provisions that you are citing to in the side
6  letter?
7    A.    The side letter allowed -- the side
8  letter allowed AFI to propose certain amendments and
9  waivers to the credit agreement, specifically, as
10 you can see here, to remain compliant with agency
11 requirements and to enter into -- enter into
12 warehouse financing.
13         So it was Mr. Bowlby's reasoning,
14 maybe, perhaps that the side letter is saying that
15 within reason he's allowed to suggest certain --
16 certain amendments such that they can -- they could
17 get the warehouse financing that they needed to
18 restart the company.
19    Q.    Isn't it fair to say that the side
20 letter overrides the credit agreement if the terms
21 and conditions in the side letter are satisfied?
22         MR. MORRIS:  Objection to the form of

12/15/2023                    In re AmeriFirst Financial, Inc., et al                    Jeffrey Dane

Page 85

1  the question.
2          THE WITNESS:  Well, you're skipping a
3  very important part of the side letter, which
4  is the definition of "material adverse
5  effect."
6  BY MR. GLENN:
7      Q.   No, I'm not.  I'm asking you -- I'm
8  asking you --
9          (Cross talk.)
10 BY MR. GLENN:
11     Q.    -- the side letter overrides the
12 credit agreement if the terms and conditions of the
13 side letter are satisfied; correct?
14     A.   I don't think it's -- I don't know
15 that the word is "override."  There are -- the side
16 letter does allow for certain -- for certain
17 amendments and waivers under certain conditions for
18 those specific reasons.
19         However, the definition in this case
20 of "material adverse effect" are incredibly
21 important.  Because it's an extremely wide
22 definition that effectively would allow, in my

Page 86

1  opinion, RCP to negate that if there was any
2  material impairment of AFI -- I think the language
3  was, you know, material impairment of AFI to perform
4  under the credit agreement or that any rights RCP
5  had under that credit agreement.  So I don't see how
6  they would get around that language.
7      Q.    You already testified that in your
8  investigation, you found no evidence of RCP ever
9  declaring that the warehouse line would have a
10 material adverse effect; correct?
11     A.   I said I don't know.  I don't know --
12     Q.    You don't know?
13     A.   I don't know the conversations that
14 they had within -- within those -- within the
15 context of those talks.  I didn't -- I don't recall
16 seeing them specifically saying that.  That doesn't
17 mean that they didn't say it.  I wasn't there.
18     Q.    Right.  So nothing in your
19 investigation has revealed any evidence that RCP, in
20 fact, did declare that Mr. Bowlby's prepared
21 warehouse -- strike that.
22         Nothing in your investigation revealed

Page 87

1  any evidence that RCP declared a material adverse
2  effect in response to Mr. Bowlby's proposal for a
3  replacement warehouse line; right?
4      A.    Specifically, I did not see that
5  language.  However, I will say that I also did not
6  see any formal, as far as I can remember -- I mean,
7  you know, there had to be formal requests to amend.
8  So, you know, I think it works both ways.
9          In either case, if you're asking me
10 did I specifically hear them say that the material
11 adverse effect was the reason, no, but they made it
12 quite clear that -- that the conditions of the
13 Customers warehouse line were going to impede
14 advisability to perform under the credit agreement
15 and was going to impede them pursuing their rights
16 under that same credit agreement.
17         So whether they used the words
18 "material adverse effect" or not, they specifically
19 said they did believe that it would impede the
20 ability of them to specifically, you know, with
21 their rights in terms of -- in terms of both the
22 second amended credit agreement, where it's laid out

Page 88

1  very specifically in Section 6.04 of the amended
2  credit agreement.
3      Q.    Can you identify any documents
4  specifically that reflect the testimony that you
5  just gave?
6      A.    I'm telling you what they expressed to
7  me.
8      Q.    Okay.  Thank you.
9          MR. GLENN:  We can take that down.
10 BY MR. GLENN:
11     Q.    Are you familiar -- and I might
12 mispronounce this -- to a warehouse lender called
13 Centier or Centier?
14     A.    Centier, yes.
15     Q.    Centier.  Okay.
16         And did you review that as part of
17 your investigation?
18     A.    Yes.
19     Q.    Okay.  And what did you learn in the
20 course of your investigation about the Centier
21 warehouse line discussions?
22     A.    Talks broke down with Customers at the

12/15/2023               In re AmeriFirst Financial, Inc., et al               Jeffrey Dane

---

Page 89

1  end of June.  I don't remember the exact date, late
2  June.  And then within a day or two, AFI was able to
3  secure a warehouse line from Centier.
4        Q.    How did the terms and conditions of
5  the Centier warehouse line compare to those with the
6  other warehouse line that you testified to?
7        A.    Well, the most important -- the most
8  important aspects from RCP's perspective, as they
9  laid out, was that it did not require a lien on the
10  MSRs.
11            They also did not require -- you know,
12  RCP had requested from Customers that they look to
13  their own collateral in terms of noncompliance first
14  and then to the MSRs, which Customers would not
15  agree to, and that was specifically laid out in the
16  second amendment.  That was not a condition of the
17  Centier line.
18            The Centier line required less
19  collateral.  I believe it was 1 million versus
20  2 million.  The Centier line was also larger.  I
21  think it was 50 million versus 20 or 25 million from
22  Customers.

Page 90

1        Q.    Why did you relate to me immediately
2  after I asked that question RCP's reaction to that
3  credit line?
4        A.    I don't understand the question.
5        Q.    I asked you what the differences were
6  between that warehouse line and the prior warehouse
7  line and you immediately gave me RCP's reaction to
8  that and you haven't really described what
9  Mr. Bowlby's reaction to that is.
10            And I'm just wondering, you know, are
11  you more concerned RCP's reaction to these warehouse
12  lines than AFI, the company that you are
13  representing as a director?
14        A.    No.
15        Q.    Okay.  So what was Mr. Bowlby's view
16  of the difference between the two credit lines?
17        A.    Mr. Bowlby -- and I'm not going to
18  remember the exact specifics, but he believed that
19  it was going to be long term.  I believe he thought
20  it was going to be more expensive somehow to use the
21  Centier line than the -- I'm sorry -- yeah, the
22  Centier line than the, I'm sorry the Centier line

Page 91

1  than the Customers line.
2            I don't recall -- I don't think I --
3  you know, I don't recall the specifics of why he
4  thought that, but in his mind -- although, to be
5  quite honest, he didn't articulate it, you know,
6  that specifically, he felt that the Centier line,
7  while in the best -- better interest of RCP, was not
8  necessarily in the better interest of AFI.
9        Q.    Do you have any documents in front of
10  you right now?
11        A.    No.
12        Q.    Do you have any electronic devices in
13  front of you right now?
14        A.    No.
15        Q.    Okay.  Is anybody else in the room
16  with you right now?
17        A.    Nope.
18        Q.    Okay.  All right.
19            So did the company close the Centier
20  warehouse line?
21        A.    They did.
22        Q.    Okay.  And did the company ever use

Page 92

1  the Centier credit line?
2        A.    I think they started to, if I remember
3  correctly, but not in any large capacity.
4        Q.    And do you know why that's the case?
5        A.    No, I just think conditions were --
6  still in the market were not great.
7        Q.    Okay.  Does the company have any
8  employees right now?
9        A.    Yes.
10        Q.    How many employees does the company
11  have right now?
12        A.    A handful.  I don't know the exact
13  number.  That's more a question for Mr. Avila.
14        Q.    Okay.  Were any of those individuals
15  involved in any of the discussions with RCP?
16            MR. MORRIS:  Objection to the --
17            THE WITNESS:  I'm sorry, could you --
18            MR. MORRIS:  -- form of the question.
19            THE WITNESS:  Could you repeat the
20  question?
21  BY MR. GLENN:
22        Q.    Do you know whether any of those

Page 93

1 individuals -- do you know if any of the individuals
2 that are -- that have been employed by the company
3 since you became independent director through today
4 historically had any role with RCP?
5        MR. MORRIS:  Objection to the form of
6    the question.
7        THE WITNESS:  I'm sorry, one more
8    time.  I'm not understanding.
9 BY MR. GLENN:
10     Q.   Okay.  So there are employees at AFI
11 right now; right?
12     A.   Yes.
13     Q.   Okay.  And there have been employees
14 at AFI since you became independent director?
15     A.   Yes.
16     Q.   Do you know what titles those folks
17 have?
18     A.   I don't know the titles.
19     Q.   Okay.  Do you know what roles they
20 have?
21     A.   Yeah, they're helping in the wind-down
22 of the business in various capacities.

Page 94

1     Q.   Okay.  Do you know --
2     A.   Some of them are helping service the
3 MSRs, for example.
4     Q.   Okay.  And do you know if any of those
5 people had any historical roles in the negotiation
6 of the relationship with RCP?
7     A.   I don't know the answer to that.
8     Q.   Do you know if any of those
9 individuals had any historical roles in the
10 company's warehouse lines?
11        MR. MORRIS:  Objection to the form of
12    the question.
13        THE WITNESS:  In the negotiation -- I
14    don't know the answer.
15 BY MR. GLENN:
16     Q.   Okay.  I want to go back to the
17 December notice of default by RCP.
18        Are you aware that Mr. Bowlby contends
19 that by delivering the notice of default and the
20 actions that RCP took surrounding that tainted AFI's
21 relationship with its existing warehouse lenders and
22 the warehouse lender market generally?

Page 95

1     A.   Yes.
2     Q.   Did you do any investigation to
3 validate or refute Mr. Bowlby's view?
4     A.   No.
5     Q.   Okay.  Did you go out and talk to any
6 warehouse lender representative or brokers or anyone
7 to investigate whether that view was correct or not?
8     A.   No.  I didn't have any reason to
9 dispute the view.
10     Q.   Okay.  And did you ask RCP whether it
11 understood at any point in time that the actions
12 that it took might have impaired AFI's ability to
13 get a warehouse line based on the perception of
14 existing warehouse lender to AFI and prospective
15 lenders to AFI?
16     A.   I don't remember if I asked them
17 specifically that question.  But, again, I accept
18 that -- I accept the premise.  I mean, I'm sure, you
19 know, a default is -- you know, it obviously -- you
20 know, the warehouse lenders shut off financing.  So
21 there was no reason to investigate it.  I accept it.
22     Q.   Okay.  Now, did you ask RCP about how

Page 96

1 Customers -- strike that.
2        Did you ask RCP if Customers expressed
3 reservations or concerns about RCP's conduct in
4 connection with the December 2022 notice of default?
5     A.   No.
6     Q.   Did you ask Mr. Bowlby his
7 understanding of how Customers viewed RCP's
8 historical conduct in the negotiations of that
9 agreement?
10     A.   I don't remember if we discussed that
11 specifically or not.
12     Q.   Have you tracked the hours you've
13 spent on this investigation?
14     A.   Not -- not specifically.
15     Q.   How are you compensated as an
16 independent director of AFI?
17     A.   Monthly.
18     Q.   What is your monthly payment?
19     A.   15,000.
20     Q.   Do you have any other compensation
21 that you're offered beyond that monthly payment?
22     A.   No.

24  (Pages 93 to 96)

12/15/2023                  In re AmeriFirst Financial, Inc., et al                  Jeffrey Dane

---

Page 97

1    Q.    Okay.  How were you introduced to this
2  opportunity?
3          MR. MORRIS:  Objection to the form of
4  the question.
5          THE WITNESS:  I was --
6  BY MR. GLENN:
7    Q.    To be an independent director of AFI.
8    A.    I received a call from a contact at
9  Kirkland & Ellis who I had worked with before
10  mentioning that they had been reached out to for a
11  recommendation for independent directors.  He put me
12  in touch with -- with -- with Reverence, and that's
13  how -- that's how it started.
14    Q.    Okay.  And is that Chris Greco of
15  Kirkland?
16    A.    Chris Greco put me in touch with
17  another colleague of his, who then put me in touch
18  with RCP.
19    Q.    Okay.  And who at RCP did you
20  communicate with about becoming independent
21  director?
22    A.    I think the first contact I had was

---

Page 98

1  Steven Herrup.
2    Q.    Okay.  And what was discussed in the
3  context of that conversation?
4    A.    He just gave me very brief background
5  information as to what was going on, and then they
6  set up a call for me to meet other people, also, I
7  think.  I don't remember if it was the same day or
8  the next day, but I spoke with him, and then we set
9  up a call with other members of the team.
10    Q.    How long was that before the
11  Chapter 11 filing?
12    A.    Not long.  Days.
13    Q.    And how many days was it,
14  approximately?
15    A.    I don't remember.  Days.  It was days.
16  Probably less than a week.
17    Q.    Okay.  And how many discussions did
18  you have?
19    A.    I don't remember specifically.  A
20  handful.
21    Q.    Okay.  How long did those discussions
22  take?

---

Page 99

1    A.    The first discussion was very brief.
2  I don't know, 20 minutes.  The Zoom call -- I had a
3  Zoom call that they set up.  That was probably 30 or
4  45 minutes.  And then once they -- once I was asked
5  to formally take on the role, I had another
6  conversation which lasted probably about an hour.
7    Q.    And then you became -- then you agreed
8  to the role?
9    A.    Yes.
10    Q.    And you became an independent
11  director, I believe, the day before or the day of
12  the Chapter 11 filing?
13    A.    No, I became independent the day of.
14    Q.    The day of.  Okay.
15          When did you first see the company's
16  proposed DIP financing arrangements?
17    A.    After -- probably in the next week.
18    Q.    Okay.  And between the time you became
19  independent director and the time you saw the first
20  DIP financing, had you done any investigation of the
21  historical relationship between RCP and AFI?
22    A.    Nothing other than the conversations.

---

Page 100

1    Q.    And so when you agreed to the DIP
2  financing, you hadn't done any meaningful factual
3  investigation of any claims involving or against
4  RCP?
5    A.    No.
6          MR. MORRIS:  Objection to the form of
7  the question.
8  BY MR. GLENN:
9    Q.    Okay.  And the first DIP that you saw
10  included the waiver of claims by the debtor with a
11  challenge period; correct?
12    A.    With the waiver -- no.  What do you
13  mean with the waiver of -- no.  The waiver of the
14  challenge period was in the final DIP order.
15    Q.    No.  No, no.  The waiver of claims by
16  AFI and the ability -- not the waiver, the ability,
17  the grant of the UCC to try to get standing within
18  some period of time, that was --
19    A.    Yes.
20    Q.    -- in the first --
21    A.    That was in the first --
22    Q.    Okay.

---

Page 101

1     A.    That was in the first reiteration.
2   The waiving of the challenge period was in the
3   final.
4     Q.    Okay.  And so when -- strike that.
5          Who told you that you needed to
6   perform an investigation after that?
7          MR. MORRIS:  Objection to the form of
8   the question.
9          THE WITNESS:  Nobody told me.  I mean,
10  it's -- it's obvious that we need to do an
11  investigation if we were going to be asking
12  for waivers, especially when we were asking
13  for the challenge period to be -- you know,
14  to be waived.
15  BY MR. GLENN:
16    Q.    Okay.  So it was important to you,
17  once the proposal was made, to give a final release
18  as a condition of the final DIP to perform this
19  investigation?
20    A.    If we were going to waive the
21  challenge period, we needed to have the
22  investigation conducted before it went in front of

Page 102

1   the judge.
2     Q.    Okay.  Was it important to you to
3   conduct that investigation before you agreed to the
4   release?
5     A.    Yes.
6     Q.    Okay.  Thank you.
7          Now, have you considered converting
8   this case to Chapter 7 liquidation?
9          MR. MORRIS:  Objection.  Direct the
10  witness not to answer to the extent that it
11  implicates the attorney-client privilege.
12         THE WITNESS:  Yeah, I mean, we -- as a
13  board, we don't -- we don't know.
14  BY MR. GLENN:
15    Q.    No, I'm asking you a different
16  question.
17         Have you considered Chapter 7 as an
18  alternative path in this Chapter 11 case?
19         MR. MORRIS:  Same instruction.
20         THE WITNESS:  Everything's considered.
21  BY MR. GLENN:
22    Q.    Okay.  Why shouldn't these cases be

Page 103

1   converted to Chapter 7?
2          MR. MORRIS:  Objection to the form of
3   the question.
4          THE WITNESS:  It's our belief, the
5   board's belief, that the most efficient way
6   to get this case out of -- and the least
7   extensive way to get this case out of -- out
8   of the proceedings are to do it the way we're
9   doing it, and we believe that a Chapter 7
10  would entail significant increased costs and
11  inefficiencies.
12  BY MR. GLENN:
13    Q.    What are the costs that you've
14  considered of a Chapter 11 case versus a Chapter 7
15  case?
16    A.    Chapter 7 -- it's unknowable.
17         MR. MORRIS:  Objection to the extent
18  it reveals attorney-client communications.
19         THE WITNESS:  The costs of a Chapter 7
20  cases are not knowable.  There'll be a
21  trustee.  They can burn through, you know --
22  they can burn through all the cash that's

Page 104

1   left, just don't know.  And, again, we
2   believe that this allows us as a board to
3   control process in the most efficient manner.
4   BY MR. GLENN:
5     Q.    Right.
6          And how do you know that the
7   Chapter 11 process is going to be the most
8   efficient?
9          MR. MORRIS:  Objection to the form of
10  the question.
11         THE WITNESS:  We don't know.  It's
12  just our -- it's our determination.
13  BY MR. GLENN:
14    Q.    And you said, you know, you want the
15  board to control the outcome of the case.
16    A.    We want --
17    Q.    Is that what your testimony --
18    A.    No, my testimony is we -- the board
19  believes that -- that a Chapter 11 -- we've spent a
20  lot of time and effort into understanding, you know,
21  the various pieces here.  A trustee would have to
22  come and be reeducated and there's a lot of moving

Page 105

1  parts and it's the board's determination that right
2  now we still believe that this is the best path.
3  That could change. That could definitely change.
4      Q.   And how could it change?
5      A.   There might come a point where the
6  upside/downside of doing it the way we are is not
7  worth it anymore, and at that point we may have to
8  consider a Chapter 7.
9      Q.   Okay. If the unsecured creditors in
10 this case wanted you to convert the case to
11 Chapter 7, would you take that into consideration?
12     A.   I would definitely listen to them and
13 hear their viewpoint.
14     Q.   Okay. Other than the cost
15 efficiencies that you've testified to, what other
16 considerations do you believe make Chapter 11 more
17 appropriate than a Chapter 7?
18         MR. MORRIS: Objection to the form of
19     the question. And direct the witness not to
20     answer to the extent it reveals any
21     attorney-client communications.
22         THE WITNESS: I think it's the same

Page 106

1      answer. A Chapter 7 -- I've been through
2      Chapter 7s, and there's a lot of variables
3      that are unknowable. And, you know, we'd
4      prefer to avoid it, but it's possible we may
5      have to go down that path at some point.
6  BY MR. GLENN:
7      Q.   Have you considered how RCP benefits
8  if we proceed under a Chapter 11 plan?
9      A.   My concern is not how RCP does or does
10 not benefit.
11     Q.   Okay. How do the general unsecured
12 creditors benefit if we proceed with a Chapter 11
13 plan versus a Chapter 7 liquidation?
14     A.   Well, from a strictly mathematical
15 point of view, there's very little to no recovery
16 for the unsecured creditors. That's just basic
17 math. So I do believe that the best way to maximize
18 value for the entire estate is still -- is still
19 Chapter 11.
20         In terms of the unsecured,
21 specifically, again, they're entitled to probably no
22 recovery, other than their causes of action, you

Page 107

1  know, if they are granted those. But in terms of,
2  you know, the math and in terms of what they are
3  owed, they're going to get -- their best -- in my
4  opinion, their best hope for recovery would be
5  through a negotiated settlement, which would take
6  place in a Chapter -- Chapter 11.
7      Q.   From a business perspective, what
8  operations need to be ongoing -- strike that.
9          Are there any business operations that
10 are going to be rehabilitated or continuing under
11 your Chapter 11 plan?
12         MR. MORRIS: Objection to the form of
13     the question.
14         THE WITNESS: No.
15 BY MR. GLENN:
16     Q.   Okay. And so your Chapter 11 plan
17 really is a liquidation. It's just not a Chapter 7
18 liquidation; correct?
19     A.   Well, we're still working on the
20 details. There are still some ongoing operations,
21 you know, specifically servicing of the MSRs, for
22 example.

Page 108

1          And the other consideration which I
2  didn't mention is, you know, we're very -- we are
3  very worried about in a Chapter 7 what the agencies
4  will do with these -- you know, I mean, we are
5  getting some money in the door with the MSRs, but if
6  we go into a Chapter 7, the agencies might strip the
7  company's rights -- servicing rights, which could
8  devalue whatever's left.
9          So that's the other -- that's the
10 other -- that's the other benefit to everyone. We
11 don't know what's going to happen in a Chapter 7
12 with the agencies and the MSRs.
13     Q.   Right. And when are the MSRs supposed
14 to be completed?
15     A.   It's still in process.
16         MR. MORRIS: Objection to the form of
17     the question.
18 BY MR. GLENN:
19     Q.   Did you understand my question, sir?
20     A.   Yeah, it's still in process. It's
21 still in process. It's going to take months to get
22 the final payments in.

27 (Pages 105 to 108)

Page 109

1    Q.    So can you project?  Is it
2  nine months?  Is it two months.  Give me any clarity
3  or range for that?
4    A.    Again, it's a better question for
5  Mr. Avila, but it could be -- it could be
6  significant amount of time.  It could be months.  It
7  depends.
8        MR. GLENN:  So let's go off the record
9    for a second.
10       THE VIDEOGRAPHER:  Okay.  Going off
11   the record the time is 12:17.
12       (Recess from the record.)
13       THE VIDEOGRAPHER:  We are back on the
14   record.  The time is 12:33.
15  BY MR. GLENN:
16    Q.    Sir, you have been testifying about
17  the relative costs and benefits of a Chapter 7
18  versus a Chapter 11.
19        How much administrative expense is
20  this Chapter 11 case going to cost?
21       MR. MORRIS:  Objection to the form of
22   the question.

Page 110

1        THE WITNESS:  I don't have the exact
2    number.
3  BY MR. GLENN:
4    Q.    Okay.  Do you have an approximate
5  number?
6    A.    No, I don't have an approximate
7  number, but I will say that the bulk of it is
8  already spent.
9    Q.    Okay.  How much more needs to be
10  spent?
11       MR. MORRIS:  Objection --
12       THE WITNESS:  I don't know.
13       MR. MORRIS:  -- to the form of the
14   question.
15       THE WITNESS:  Depends if we keep
16   funding.
17  BY MR. GLENN:
18    Q.    Okay.  At this point in time, what
19  negative effects, if any, will be suffered by AFI,
20  if RCP is not given a release?
21    A.    Well, I don't think it's -- listen,
22  given -- we're not -- I think the latest documents

Page 111

1  are allowing for the committee to -- you know, for
2  the judge to make his decision on standing, and
3  that's not a condition of the financing, but he has
4  produced -- has given us financing to get us to this
5  point, and I think a release as part of -- as part
6  of that is perfectly acceptable.
7    Q.    Okay.  But as we sit here today
8  looking forward, what is the downside to the
9  bankruptcy estate if RCP is not given a release?
10    A.    There's less downside than there was
11  before.  Now, I don't know the specific downside at
12  this point.
13    Q.    Can you identify any downside at all,
14  general, specific, or otherwise, if RCP is not given
15  a release today?
16    A.    It depends on if we need further use
17  of cash, but that's unlikely.
18    Q.    Okay.  So the only downside would be
19  if we need their DIP going forward, and if we don't
20  give them the release, we wouldn't have access to
21  that DIP; correct?  That's the downside?
22    A.    If we need further DIP going forward.

Page 112

1    Q.    Okay.  Okay.  So let's talk about
2  that.
3        Are you familiar with the company's
4  cash flow budget?
5    A.    Yes.
6    Q.    Okay.
7        MR. GLENN:  Malik, can you put on the
8    most recent cash flow report for Paladin,
9    please.
10       MS. DOSS:  Yes, just a moment.
11       Billy, can please you confirm that you
12   received -- oh, okay.  There we go.
13       (Exhibit 2, No Bates numbers, Weekly
14   Cash Budget, received and marked.)
15  BY MR. GLENN:
16    Q.    Okay.  So we put on the screen what
17  we're going to mark as Exhibit 2.  This is a
18  document bearing the -- bearing the legend
19  "AmeriFirst Financial, LLC, Weekly Cash Budget -
20  3 Weeks Ending December 22, 2023."
21       MR. GLENN:  Videographer, helper
22   person, is this only one page, or are there

Page 113

1   multiple pages?
2          THE VIDEOGRAPHER:  This is one page.
3          MR. GLENN:  Okay.
4   BY MR. GLENN:
5          Q.    So do you recognize this document,
6   sir?
7          A.    Yes.
8          Q.    Okay.  And is this the cash flow
9   projections that are prepared by Paladin for AFI?
10         A.    Yes.
11         Q.    Okay.  And there's a line here with
12  the word "DIP Draw/(Paydown)."
13             Do you see that?
14         A.    What's the line?
15         Q.    It's right above "Estimated, Available
16  Ending Cash" towards the bottom.
17         A.    Uh-huh.
18         Q.    And then right above that, it says,
19  "DIP Draw/(Paydown)."
20         A.    Right.  Yes.
21         Q.    Okay?  And it shows no DIP draw for
22  the remainder of this period; correct?

Page 114

1          A.    Yes.
2          Q.    Okay.  And it shows estimated
3   available cash, 5,169,000.
4             And then it says 4,000,743 [sic].
5             Then it says 4,583,000, and it's the
6   ending cash amount; correct?
7          A.    Yes.
8          Q.    Okay.  Do you have any budgets beyond
9   this?
10         A.    I don't remember if we put out a
11  further budget or not at this point.
12         Q.    But as we sit here today, it's your
13  testimony that there's no projected need for a DIP,
14  as we sit here today?
15         A.    No.  I mean, we still have to pay --
16  we still have to pay, you know, for work that's been
17  done to this point.  This is -- you know, there's
18  still -- there's still significant fees that have to
19  be paid, administrative fees, I mean, all sorts of
20  things that this is not showing.
21             For this period of time, we don't need
22  the DIP.

Page 115

1          Q.    Okay.  But you have --
2          A.    But we also have --
3          Q.    -- put in some time --
4          A.    We also have -- I mean, we also -- you
5   know, this is cash collateral; right?  So, you know,
6   it's not -- it's not just money sitting there.  It's
7   not -- it's pledged.
8          Q.    Okay.  I'm going to ask you a very
9   specific question.
10             Do you have any identified time frame
11  where you're going, necessarily, to draw on the DIP?
12         A.    We don't -- eventually, probably, but
13  we don't know yet.  It depends on all the costs.  I
14  can't tell you when.  But, again, it's not just the
15  DIP -- I mean, it's not just -- it's also cash
16  collateral.
17         Q.    Right.
18             Okay.  So have you done any analysis
19  about when the company may need a DIP draw beyond
20  now?
21         A.    I mean, that's more Scott Avila's
22  territory, you know, and it's hypothetical and

Page 116

1   depends on -- on legal fees.
2          Q.    Do you think it's appropriate to give
3   RCP a release now based on a hypothetical need for a
4   DIP?
5             MR. MORRIS:  Objection to the form of
6        the question.
7             THE WITNESS:  I think it's appropriate
8        to give them a release.
9   BY MR. GLENN:
10         Q.    Based on what?
11         A.    Based on the fact that they provided
12  us with the financing that we needed to wind down
13  this estate in the most efficient basis for the
14  benefit of everybody, for all stakeholders, and the
15  fact that we did an investigation and found no
16  reason not -- to cause not to provide them with the
17  release.
18         Q.    Okay.  But is it also your testimony
19  that they did not seek a complete release until
20  after the DIP draws had been concluded?
21         A.    I don't understand the question.
22  Well, they're asking for --

29 (Pages 113 to 116)

Page 117

1     Q.    When was the last -- when was the last
2  draw on the DIP?
3     A.    I don't know.  I'd have to look.
4     Q.    Do you have a general recollection of
5  when the last DIP draw was?
6     A.    Several weeks ago.  A few weeks ago.
7  I don't know.  I'd have to look.
8     Q.    Okay.  And do you know whether that
9  DIP draw occurred before or after the demand for a
10  release in the final DIP order?
11     A.    Again, it's not -- it's not just a
12  question of the cash flows.  It's also the cash
13  collateral.  So, I mean, you can't just ignore that.
14     Q.    I'd like an answer to my question.
15  It's a chronological question, sir.
16          Did they ask for a release after or
17  before the last DIP draw that the company took?
18     A.    I don't -- I don't -- I don't
19  remember.
20          MR. GLENN:  Okay.  We can take this
21     exhibit down.
22

Page 118

1  BY MR. GLENN:
2     Q.    So right now the company -- strike
3  that.
4          Right now the plan has a $250,000 fund
5  for general unsecured creditors; correct?
6          MR. MORRIS:  If you know.
7          Are you on mute, Jeff?
8  BY MR. GLENN:
9     Q.    If you know.
10     A.    No.  Yes.  I said yes.
11     Q.    Oh, I'm sorry.  No one heard you.
12          Okay.  So do you know how that
13  $250,000 number was determined?
14     A.    No, I mean, it's -- look, again,
15  mathematically the unsecureds are unlikely to
16  receive any recovery.  So -- but in the interest of
17  trying to get a consensual deal, we're trying to --
18  you know, trying to incentivize all parties and to
19  give everyone -- you know, to give everyone a stake
20  even if they're not theoretically entitled to it on
21  a waterfall basis.
22     Q.    Okay.  The question I'm going to ask

Page 119

1  you is:  How did that number get determined?
2          MR. MORRIS:  Objection to the form of
3     the question.
4          Direct you not to answer to the extent
5     it reveals attorney-client communications.
6     But, otherwise, feel free to answer.
7          THE WITNESS:  I think it's -- it's a
8     number that we felt comfortable would give
9     the committee -- give the unsecureds, you
10     know, some recovery.  It's not an exact
11     science.
12  BY MR. GLENN:
13     Q.    Okay.  When you say "we," do you mean
14  you and Mr. Avila?
15     A.    Well, it's part the board and part --
16  yeah, I mean, we discuss it.  I mean, he's -- you
17  know, he's in charge of those aspects, but we're
18  overseeing it.  So we do discuss it.
19     Q.    Was that number negotiated with RCP?
20     A.    Not that I'm aware, but I don't -- not
21  that I'm aware.  That wouldn't be a question for me.
22     Q.    Who is that a question for?

Page 120

1     A.    Scott.
2     Q.    Okay.  So as you sit here today,
3  you're not aware of any negotiations that led to
4  that 250,000 number being included in the plan?
5     A.    I don't -- I don't know -- I don't
6  know, in fact, where those -- whether there was
7  discussions at all with them or not.
8     Q.    So as far as you know, that number
9  might have just been dictated to the company by RCP
10  without any negotiations?
11     A.    No, I have no reason to believe that.
12     Q.    Okay.  But, on the other hand, you
13  have no reason to know about what negotiations
14  actually occurred?
15          MR. MORRIS:  Objection to the form of
16     the question, assumes a fact not in evidence.
17          THE WITNESS:  Well, I mean, Scott is
18     having discussions with Dundon and
19     representatives from the committee.  So, I
20     mean, part of it -- I don't know why you
21     think it's RCP.  I mean, there's discussions
22     going on with representatives of the

Page 121

1    committee and Scott, and there's been --
2    there's also been mediation sessions and all
3    sorts of things.
4    BY MR. GLENN:
5        Q.    But you're not a party to those
6    discussions; are you?
7        A.    Not a direct party, no.
8        Q.    Okay.  So have you considered paying
9    off the DIP balance as it now exists today with the
10   company's available cash?
11           MR. MORRIS:  Objection to the form of
12       the question.
13           Direct the witness not to answer to
14       the extent it would reveal attorney-client
15       communications.
16           THE WITNESS:  No, I don't think that's
17       feasible.
18   BY MR. GLENN:
19       Q.    Okay.  Why not?
20       A.    Because we're just not sure of our
21   cash needs.  We're not going to be sending cash out
22   the door.  And, again, there's cash collateral

Page 122

1    issues.  I mean, we're not just going to get rid of
2    the DIP if -- you know, it just doesn't make sense.
3        Q.    Okay.  Are you familiar with the term
4    "unencumbered assets"?
5        A.    Yes.
6        Q.    Okay.  As you sit here today, are you
7    aware of whether AFI has any assets that are not
8    subject to GCP's lien?
9            MR. MORRIS:  Objection to the form of
10       the question to the extent it calls for a
11       legal conclusion.
12           THE WITNESS:  Yeah, I think there's
13       some assets that are in dispute.  There may
14       be some small amount of uncovered assets.
15   BY MR. GLENN:
16       Q.    Can you describe those assets and
17   their values?
18       A.    No, I mean, it's not -- I don't know
19   the exact amounts, or if there are -- you know, if
20   there are, it's very small.  And, again, there
21   are -- there are some, obviously, disputed assets.
22       Q.    Okay.  But can you give me any further

Page 123

1    elaboration on the disputed assets and the
2    unencumbered collateral?
3        A.    The vast majority of assets are --
4    are -- have liens on them.
5        Q.    Okay.  I'm asking you, you know, to
6    describe for me as an independent director of AFI,
7    even in general terms, what assets do you understand
8    are unencumbered today?
9        A.    But you -- through your -- through the
10   committee's filings I've seen -- they believe that
11   there's certain cash that's in dispute as to whether
12   it was -- whether it was in a DACA account or
13   whether it was encumbered or not, for example.
14       Q.    And do you know how much money is
15   sitting in those accounts today?
16       A.    I don't know how much is sitting in the
17   accounts today.  I know that at the time of the
18   filing, the committee believes -- or I'm sorry, I
19   don't think it was the committee.
20           The understanding was that it was a
21   few hundred thousand dollars.
22       Q.    So as you sit here today, do you

Page 124

1    believe that the amount in those accounts is
2    approximately $300,000?
3            MR. MORRIS:  Objection to the form of
4        the question.
5            THE WITNESS:  I don't know the exact
6        number.  Three, $400,000.  I don't know.  And
7        I don't -- I also don't -- don't -- I'm not
8        saying that those are unencumbered.  I'm
9        saying that's what the certain parties
10       believe.
11   BY MR. GLENN:
12       Q.    Okay.  So do you have an opinion about
13   whether the accounts that the committee claims are
14   not subject to DACAs whether or not they are
15   encumbered by RCP's liens?
16           MR. MORRIS:  Objection to the form of
17       the question to the extent it calls for a
18       legal conclusion and to the extent --
19           THE WITNESS:  Yeah, I think it's --
20       (Cross talk.)
21           MR. MORRIS:  -- it reveals
22       attorney-client privileged communications.

31  (Pages 121 to 124)

Page 125

1        THE WITNESS:  I think it's unclear,
2    but it's a very small amount, and the fact is
3    that RCP does make up a majority of the
4    unsecured claim pool.
5        So the answer is it's possible, and
6    it's possible they're not.  You know, there's
7    going to have to be the legal conclusions
8    drawn about that small amount of assets.  I'm
9    just not going to be able to give you an
10   answer.
11 BY MR. GLENN:
12       Q.    Well, that's more than the entire
13 distribution to the unsecured creditors, is it not?
14       (Cross talk.)
15       MR. MORRIS:  Objection to the form of
16   the question.
17       THE WITNESS:  Yes, if it's -- if it's
18   determined that they are -- if it's
19   determined that they are unencumbered.
20 BY MR. GLENN:
21       Q.    Okay.
22       A.    And if they're determined --

Page 126

1        Q.    What other assets -- I'm sorry.  I'm
2    sorry, continue.
3        A.    If they're determined they're
4    unencumbered, then things will change.  That's a
5    legal conclusion that has to be determined.
6        Q.    Okay.  Fair enough.
7        And are you aware of any other
8    unencumbered assets as you sit here today -- or
9    alleged unencumbered assets?
10       A.    I mean, alleged, I mean, there's a lot
11   of alleged.  I mean, but in terms of what I believe
12   are unencumbered assets, I don't know, not much.
13       Q.    Okay.  What about Mr. -- is it
14 Mr. Bowlby's home?  Isn't there a description of
15 other assets involving a home?  Are you familiar
16 with that?
17       A.    Yes.
18       Q.    And does that constitute unencumbered
19 assets or encumbered assets?
20       MR. MORRIS:  Objection to the form of
21   the question to the extent it calls for a
22   legal conclusion.

Page 127

1        THE WITNESS:  I believe it's not
2    encumbered.
3 BY MR. GLENN:
4        Q.    Okay.  What about scratch and dents?
5 Are you familiar with that term?
6        A.    Yes.
7        Q.    Are those encumbered or unencumbered
8 assets?
9        MR. MORRIS:  Objection to the form of
10   the question.
11       THE WITNESS:  I believe it is
12   encumbered.
13 BY MR. GLENN:
14       Q.    Okay.  So are there any other assets
15 that you can identify other than those accounts that
16 are not subject to DACAs that you believe might be
17 unencumbered?
18       MR. MORRIS:  Objection to the form of
19   the question, mischaracterizes the testimony.
20       THE WITNESS:  Not off the top of my
21   head.
22

Page 128

1 BY MR. GLENN:
2        Q.    Okay.  For those non-DACA accounts,
3 have you reviewed the flow of funds in and out of
4 those accounts since May 15th of 2023?
5        A.    The non-DACA accounts, no, I did not.
6        Q.    Okay.  Do you know if any of those
7 accounts were ever used to pay any of the RCP debt?
8        A.    My understanding is that all the money
9    that was made paid for the RCP debt came out of the
10   DACA accounts.  That's my understanding.
11       Q.    Okay.  Okay.  So -- and have any of
12 those accounts -- the non-DACA accounts been used at
13 all since the petition date?
14       MR. MORRIS:  That's a question for
15   Mr. Avila.
16 BY MR. GLENN:
17       Q.    Okay.  Now, are you familiar with the
18 cash sweeps that occurred after the May 15th, 2023,
19 transactions?
20       A.    I am.
21       Q.    And did you interview Mr. Bowlby about
22 those cash sweeps?

32 (Pages 125 to 128)

Page 129

```
 1      A.   Yes.
 2      Q.   Okay.  And what did he tell you about
 3  his view about whether those cash sweeps were
 4  appropriate or not?
 5      A.   He believes that they were not
 6  appropriate.
 7      Q.   What did he tell you about that?
 8      A.   He believes that the cash sweeps left
 9  the company in potential breach of certain
10  requirements with the agencies and left the company
11  in an insolvent state, effectively.
12      Q.   Did you investigate those allegations?
13      A.   Yes.
14      Q.   What did you do to investigate those
15  allegations?
16      A.   I spoke to Mr. Bowlby.  I spoke to the
17  Kasowitz team.  I spoke to RCP.  And then I looked
18  and read the various provisions of the amended
19  credit agreement.
20      Q.   What did the Kasowitz firm tell you
21  about the propriety of those cash sweeps?
22      A.   I mean, I don't recall exactly what
```

Page 130

```
 1  Kasowitz said about the cash sweeps, to be honest.
 2      Q.   Do you have any general recollection
 3  about what they said about the cash sweeps?
 4      A.   No, I think it was nothing different
 5  than they put in their -- their various letters, you
 6  know, correspondence -- sorry, the correspondence on
 7  the -- on the -- I think it was the 22nd or 23rd of
 8  August they specifically mentioned.  You know, I
 9  think their take was similar to Mr. Bowlby's take.
10      Q.   Did you take notes of your interviews
11  with Kasowitz or Mr. Bowlby?
12      A.   I think I mentioned I took some minor
13  notes, scratches on pieces of paper.
14      Q.   Okay.  And those were the ones that
15  that ended up in the court-filed document that you
16  discarded?
17      A.   No, I said -- I said my findings from
18  the interviews are in the -- are in -- are in the
19  documents which describe our investigation.
20      Q.   Okay.  But the notes -- you did
21  discard the notes; right?
22      A.   I don't know if I discarded them or --
```

Page 131

```
 1  I don't have any idea where they are.
 2      Q.   And do you agree, putting aside
 3  whether those cash sweeps were proper or not, that
 4  they hurt the company's business and ability to
 5  operate?
 6      MR. MORRIS:  Objection to the form of
 7  the question.
 8      THE WITNESS:  No, I don't think that's
 9  a proper way to -- a proper way to say it.
10  BY MR. GLENN:
11      Q.   Well, I'm asking you the question.
12      Do you believe, putting aside whether
13  they were legal or not, that the fact that RCP took
14  those cash sweeps hurt AFI's ability to operate?
15      A.   Any time you take cash out of a
16  company it's going to hurt a company's ability to
17  operate.
18      Q.   Fair enough.
19      Now, you talked to RCP about those
20  cash sweeps; correct?
21      A.   Yes.
22      Q.   And what did they tell you about the
```

Page 132

```
 1  reasons and justification for taking those cash
 2  sweeps?
 3      A.   There's provisions in the credit
 4  agreement, first of all, regarding a paydown.  So,
 5  for example, I think it's Section 2.07 regarding
 6  prepayments of any -- of any -- of any sales of
 7  assets that -- those proceeds have to be put into a
 8  DACA account and have to be -- have to be paid to
 9  RCP within three business days.
10      And then the company was also entitled
11  to monthly -- they were entitled to monthly cash
12  sweeps minus a reserve amount.
13      Q.   So when you refer to credit agreement,
14  you're referring to the credit agreement from
15  May 15th, 2023?
16      A.   Yes.
17      Q.   Okay.  Now, did those cash sweeps
18  impair AFI's ability to comply with regulatory
19  requirements with the agencies?
20      A.   I don't know the answer to the --
21      MR. MORRIS:  Objection to the form of
22  the question.
```

33 (Pages 129 to 132)

Page 133

1  BY MR. GLENN:
2      Q.   I'm sorry, the answer was you don't
3  know the answer to that?
4      A.   I was never -- I don't know the answer
5  to that.
6      Q.   Okay.  And you did not examine whether
7  those cash sweeps might have violated a side letter?
8      A.   I asked Mr. Bowlby directly to provide
9  evidence that they did.  You know, he did mention
10  that, you know, very emphatically that it would put
11  them in breach of certain agreements, but I'm not
12  sure there was any communication -- I think the way
13  he described it was they had to walk them off a
14  ledge or -- you know, I'm putting a little bit of
15  words in his mouth, but he basically had to
16  sweet-talk them into not -- the agencies in to not
17  saying anything, but I don't think there was formal
18  communication.
19           The formal communication between the
20  agencies that had dealt with the tangible net worth
21  of the company occurred in 2022.  After that point,
22  it was never clear to me or established whether or

Page 134

1  not it did put them in violation of the -- of the
2  agency requirements.
3      Q.   So you don't know as you sit here
4  today?
5      A.   No, I'm not sure.
6      Q.   Now, are you aware of any creditor or
7  shareholder of AFI that supports giving releases to
8  RCP, other than RCP itself?
9      A.   I'm not aware or unaware.
10      Q.   You don't know one way or the other?
11           I'm sorry, I didn't hear that.  You
12  don't know one way or the other; correct?
13      A.   Right.
14      Q.   Okay.  And do you think it's important
15  as an independent director to take into account the
16  views of the relevant stakeholders?
17      A.   I do.
18      Q.   Okay.  And at this point, you are
19  adopting RCP's position on this release; correct?
20           MR. MORRIS:  Objection to the form of
21  the question.
22           THE WITNESS:  Yeah, I don't -- I don't

Page 135

1  characterize it that way.
2  BY MR. GLENN:
3      Q.   Okay.  And you're aware that the
4  unsecured creditors committee and Mr. Bowlby do not
5  want RCP to get the release; correct?
6      A.   Yeah, I'm aware they want to
7  investigate to see whether it's appropriate.
8      Q.   What is the downside to the bankruptcy
9  estate if the court grants the creditors committee
10  standing to prosecute the claims it wants to
11  prosecute against RCP?
12      A.   Time and money.
13      Q.   How much time, and how much money?
14      A.   No idea.  I mean, it -- but, you know,
15  I imagine hundreds of thousands of dollars.  And I
16  have no idea how much time.  And the fact is we
17  investigated the claims.
18      Q.   Okay.
19      A.   You know --
20      Q.   So other than time and money, can you
21  identify any downside or risk to the bankruptcy
22  estate by granting the UCC standing to prosecute the

Page 136

1  claims?
2      A.   I think time and money are pretty
3  important.
4      Q.   Okay.  Now, have you come to a view
5  about the UCC's ultimate chance of success in
6  prevailing on the claims in its complaint if it is
7  allowed standing?
8      A.   Yes.
9      Q.   Okay.  And what is the -- UCC's chance
10  of success?
11      A.   I think it's very low.
12      Q.   Can you quantify that?
13      A.   No.
14      Q.   Is it less than 25 percent?
15      A.   I would put it less than 25 percent,
16  yes.
17      Q.   Is it less than 10 percent?
18      A.   Yes, I believe it is.
19      Q.   Less than 5 percent?
20      A.   You know, we're splitting hairs.  I
21  don't think there's colorful claims.
22      Q.   Okay.  So we'll call it less than

Page 137

1  10 percent.
2          So is the basis of that view driven by
3  the Pachulski's firm legal analysis, your factual
4  analysis, or both?
5      A.    Well, I want to be very clear. It's
6  my investigation. Okay. You know, again, I have
7  a -- I have 20 years of experience invested in
8  dealing with lawyers. Okay. So I take their
9  advice, but it's my investigation. It's my
10  conclusions. So just to be clear.
11      Q.    Okay. Now, let's talk about the
12  release that was granted in conjunction with the
13  May 15th, 2023, transactions.
14          If the court determines that that
15  release and those transactions in May of 2023 would
16  be rescinded, to what extent would that change your
17  view about the committee's chances of success in
18  that litigation?
19          MR. MORRIS: Objection to the form of
20  the question.
21          THE WITNESS: Very little.
22

Page 138

1  BY MR. GLENN:
2      Q.    Very little. Okay. Thank you.
3          What is an insider?
4          MR. MORRIS: Objection to the form of
5  the question.
6          THE WITNESS: An insider are
7  directors, officers -- I think it's
8  determined by the SEC. I can't remember
9  which rule. But, basically, directors and
10  officers, board members of a company.
11  BY MR. GLENN:
12      Q.    Okay. You think it's an SEC rule that
13  determines whether someone's an insider or not?
14      A.    I think there's a definition, but --
15          MR. MORRIS: Objection to the form of
16  the question, mischaracterizes the testimony.
17          THE WITNESS: But for all intents and
18  purposes, it's the officers and directors and
19  board of directors, et cetera.
20  BY MR. GLENN:
21      Q.    Okay. Other than officers, directors,
22  do you have any understanding of what it means to be

Page 139

1  an insider?
2      A.    I mean, an insider or a nonstatutory
3  insider?
4      Q.    Well, let's start with insider,
5  generically.
6      A.    Yeah, I mean, someone who --
7  effectively, someone who has control -- voting
8  rights or control or, you know, a position of power
9  within the company.
10      Q.    Okay. And what is a nonstatutory
11  insider?
12      A.    I believe the definition is someone
13  who, you know, for all intents and purposes has the
14  same closeness to the company as the insider. I
15  think there's a second prong which means that any
16  transactions that are being referred to were not
17  done at arm's length. I think it has to be both.
18      Q.    Who did the investigation, if anyone,
19  about whether RCP is an insider?
20      A.    Well, look, I mean, you -- you know,
21  we -- the investigation that we did didn't just come
22  out of nowhere. There were certain allegations that

Page 140

1  were presented by Mr. Bowlby, by the Kazowitz team,
2  by the correspondence. And that was a roadmap, you
3  know, that I used -- that I used specifically to
4  determine what we were going to investigate.
5          So I investigated their allegations.
6  You know, did we take into consideration -- did I
7  take into consideration that there could be some
8  insider preference, fraudulent conveyance issues?
9  Yes, because that's always the case in these types
10  of situations.
11          So, you know, I did -- I did look at
12  that. But, you know, I determined that that wasn't
13  really an issue; and it also wasn't -- it wasn't a
14  specific allegation at the time. It only became an
15  allegation once the investigation was completed and
16  the committee put out new filings.
17      Q.    Okay. So I just want to be very clear
18  about this. Since the committee's filings, have you
19  done any factual or legal investigation over whether
20  RCP was ever an insider?
21          MR. MORRIS: Objection to the form of
22  the question.

35 (Pages 137 to 140)

12/15/2023                In re AmeriFirst Financial, Inc., et al                Jeffrey Dane

Page 141

1       THE WITNESS:  Not -- not anything
2   different -- no, not anything different than
3   I did before.  Because, again, I took it into
4   consideration at the time.
5   BY MR. GLENN:
6       Q.    Okay.  So to what extent would your
7   conclusions that you reached in your investigation
8   change if the court determined that RCP was an
9   insider since at least the time that it issued the
10  notice of default in December of 2022?
11      MR. MORRIS:  Objection to the form of
12  the question.
13      THE WITNESS:  Then you'd have to
14  examine certain preference issues, for
15  example, but even then, I don't think it
16  would be a very strong issue.
17  BY MR. GLENN:
18      Q.    What do you mean it wouldn't be a very
19  strong issue?
20      A.    Because -- because the amounts of
21  money that were sent to RCP were money that they
22  were entitled to under the -- under the amended and

Page 142

1   restated credit agreement.  So, you know, they
2   weren't receiving any more money than they would
3   have been entitled.  They're a secured lender.  So
4   there was nothing they received that they wouldn't
5   have been entitled to in a Chapter 7 liquidation.
6       Q.    Okay.  Assuming that their collateral
7   was, in fact, secure?
8       A.    But it is secure.
9       Q.    Okay.  And it was secured under the
10  May 15, 2023, transaction?
11      A.    Correct.
12      Q.    What is a colorable claim?
13      A.    A claim that has, you know, a decent
14  chance of success at the end of the day, or at least
15  it has a chance of withstanding, you know, like a
16  summary judgment or -- you know, I'm not a legal --
17  I'm not a lawyer, but, you know, that's my
18  understanding.
19      Q.    Okay.  So your position is that the
20  complaint -- the proposed complaint that the
21  committee filed would not pass a Motion for Summary
22  Judgment and go to trial; correct?

Page 143

1       A.    I believe it's -- I believe that it's
2   unlikely to succeed at the end of the day.
3       Q.    Okay.  Now, if there's no cost to the
4   bankruptcy estate in terms of an outlay of cash to
5   prosecute those claims, would your opinion change
6   about whether the claims should proceed?
7       MR. MORRIS:  Objection --
8       THE WITNESS:  No.
9       MR. MORRIS:  -- to the form of the
10  question.
11  BY MR. GLENN:
12      Q.    Okay.  And just so I'm correct, if the
13  committee gets contingency counsel and litigation
14  financing such that none of the cash currently in
15  the bankruptcy estate goes to those claims, would
16  that change your assessment about whether the
17  committee should have standing?
18      A.    No.
19      Q.    Why not?
20      A.    Because the committee only should have
21  standing if the estate is not willing to bring
22  claims and causes of action.  And I was perfectly

Page 144

1   willing to bring any claims for causes of action
2   that I believe were appropriate.
3       I did an investigation.  I determined
4   that those allegations and claims were not -- were
5   not appropriate.  So there's no reason for -- for
6   further investigation.
7       Q.    Okay.  So your assessment about
8   whether the claims shouldn't be brought doesn't
9   relate to, you know, the fact that the claims could
10  be financed outside of the current bankruptcy
11  estate.  It's solely with respect to the merits of
12  the claims themselves?
13      MR. MORRIS:  Objection to the form of
14  the question.
15      THE WITNESS:  You're asking two
16  different things.  Do I believe that they
17  should be provided standing?  That's up for
18  the judge.  But my personal opinion is no,
19  because these claims were investigated.  The
20  estate was willing to bring them.  We chose
21  not to because we did an investigation, we
22  found them not to have merit.

36 (Pages 141 to 144)

Page 145

1  BY MR. GLENN:
2      Q.    I'm confused.  I'm confused about
3  that.
4            You were willing to bring the claims?
5      A.    Absolutely.  We were willing to --
6      Q.    Explain to me how --
7      A.    Not willing -- we were willing to -- I
8  was willing to not provide releases, and I was
9  willing to pursue claims if there's something
10 that -- you know, if this is something that's going
11 to benefit the estate, then that's -- of course,
12 but, you know, it has to be something that's viable.
13           So I did the investigation to
14 determine whether it was viable.  I determined it
15 wasn't.  And if it was viable, then -- you know,
16 then we would discuss -- I would -- you know, we
17 would discuss, you know, who would get to -- you
18 know, to bring those claims.
19           You know, that -- but in order to get
20 standing, you know, my understanding -- again, I'm
21 not a lawyer -- is that you're going to have to show
22 that -- you know, that I was not willing to bring a

Page 146

1  claim that -- you know, that is viable.  I don't see
2  that.
3      Q.    Okay.  But by the time your
4  investigation even started, you had completely
5  waived the right to bring a claim as debtor;
6  correct?
7            MR. MORRIS:  Objection, asked and
8  answered.
9  BY MR. GLENN:
10     Q.    Correct?
11     A.    No.  No, we -- if I had found any --
12 if I had found any evidence of wrongdoing, I would
13 not have -- I would not have allowed the waiver to
14 be included in the DIP -- or in the DIP order.
15     Q.    You're sure about that, sir?
16     A.    Yes, I'm sure.  We put that in as a
17 placeholder.  If the investigation had -- you know,
18 there was -- there was notification time periods and
19 reasons that we had to -- we had to put filings.  So
20 we did include that.
21           However, once the investigation was
22 completed, if there had been any evidence of any

Page 147

1  viable claims, it was all subject to change.  And I
2  a hundred percent would have changed it.
3      Q.    Okay.  So even though the debtor had
4  waived the right to bring the claims and granted
5  only the committee the right to get standing in the
6  interim DIP order, your testimony is if you had
7  concluded that the claims were viable, you would
8  have rescinded that waiver?
9      A.    I would not have -- yes, I would have
10 not been able to go to the judge and say that we
11 should include a waiver with the final DIP.
12     Q.    Okay.  But you would -- you would
13 admit to me, sir, that you waived permanently -- the
14 debtor waived permanently the right to bring those
15 claims in the first interim DIP order?
16     A.    I'm just saying -- what I'm saying is
17 that as part of the final DIP hearing, I would not
18 have recommended that we put -- that we give a
19 waiver as part of the final DIP.
20     Q.    You gave a release in the final DIP,
21 not a waiver.
22     A.    That's what I meant.  I'm sorry.  Yes,

Page 148

1  a release.
2      Q.    Okay.
3      A.    That's what I meant.  I'm sorry I used
4  the wrong word.
5      Q.    Okay.  But you never -- but once you
6  waived the right to bring the claim, you, Mr. Dane,
7  and AFI could never bring that claim ever, only the
8  committee could; correct?
9      A.    Yes, but we can -- I'm sorry, I was
10 getting confused with the language.  I'm talking
11 about a release.
12     Q.    Okay.
13     A.    Not the waiver.  I -- not to be -- not
14 to be confused.  I would not -- we put that in as a
15 placeholder, the release.  And if any -- if any --
16 if there had been any evidence that -- you know of
17 wrongdoing, I would not have recommended the
18 release.
19     Q.    And, again, you only decided to do
20 this investigation after RCP told you that it wanted
21 a release in the final DIP order; correct?
22     A.    No, that's not correct.

12/15/2023                In re AmeriFirst Financial, Inc., et al                Jeffrey Dane

Page 149

1    Q.    Okay.  So when did you decide to do
2  the investigation if not after they asked you for
3  the release to be included in the final DIP order?
4    A.    That determined the timing at that
5  time, but we had to do it because we were requesting
6  the challenge period be waived.  But it was -- you
7  know, it was always contemplated that at some point
8  prior to -- if there were going to be a release --
9  if there was going to be a release offered, we would
10  have to do an investigation.
11    Q.    Have you done any additional
12  investigation of the claims in the committee's
13  complaint?
14    A.    You're -- if you'd like to bring up
15  the -- you know, your complaints one by one, we can
16  discuss it.  You know, you -- the way it was laid
17  out in those papers was a little differently than
18  the way I looked at it.
19       However, I think my investigation did
20  incorporate all -- you know, what I considered -- or
21  at least most of those claims.  You know, there was
22  a couple that I don't think were necessarily

Page 150

1  appropriate, but the -- if you'd like to pull them
2  up and discuss them, I'm more than willing to do
3  that.
4    Q.    I'm really talking more about the
5  process.
6       So after the committee filed its
7  standing motion, what investigation activities did
8  you undertake, if any?
9    A.    The investigation was completed.
10    Q.    So you haven't done any additional
11  investigation activities since the committee filed
12  its standing motion and proposed complaint; correct?
13    A.    In my -- in my opinion, there was
14  nothing new in the motions -- in the motion.
15    Q.    Okay.  So the answer's no.
16    A.    No.
17    Q.    Okay.  Have you ever been involved in
18  a fraudulent conveyance litigation?
19    A.    Yes.
20    Q.    In what context?
21    A.    Litigation?  Where we've investigated
22  fraudulent conveyance issues.

Page 151

1       As an investor, I've been involved in
2  fraudulent conveyance.
3       As a board member, you know, I have
4  been involved in investigations of fraudulent
5  conveyance issues.
6    Q.    Okay.  So how many investigations have
7  you been involved with fraudulent conveyance claims
8  as a board member?
9    A.    Actual investigations, one.  It's an
10  issue that comes up in almost every bankruptcy case,
11  as you know.  But in terms of an actual --
12    Q.    Which case --
13    A.    -- investigation, we did look at --
14  BJ Services.
15    Q.    Okay.  And what was the investigation
16  in BJ Services, and what was your role?
17    A.    I was one of two independent board
18  members.  We looked at a series of potential causes
19  of action.  One of which was fraudulent conveyance,
20  preference, tortious interference, lender liability,
21  et cetera.
22    Q.    And what was the conclusion of that

Page 152

1  investigation?
2    A.    In terms of the fraudulent conveyance,
3  we did not find it a colorable claim.  We did find
4  that there was a potential preference issue
5  regarding one of the -- one of the revolving credit
6  facility lenders.
7    Q.    And then as an investor, how many
8  fraudulent conveyance matters were you involved in?
9    A.    Multiple.  You know, we looked at it
10  all -- we looked at it all the time in one way or
11  another.  Again, like any time there's a bankruptcy,
12  the issue always comes up.
13    Q.    Were you ever a plaintiff in any
14  fraudulent conveyance case?
15    A.    A plaintiff -- I mean, myself
16  personally, no.
17    Q.    Okay.  Did you ever invest in any
18  company that was a plaintiff in a fraudulent
19  conveyance case?
20    A.    We invest- -- I invested in, yes,
21  several situations that there were fraudulent
22  conveyance allegations.

12/15/2023              In re AmeriFirst Financial, Inc., et al              Jeffrey Dane

Page 153

1      Q.    Okay.  And have you ever been involved
2  with a defense of a fraudulent conveyance claim as
3  an investor?
4      A.    No --
5      Q.    Okay.
6      A.    -- not that I --
7              (Cross talk.)
8  BY MR. GLENN:
9      Q.    So while you were an investor, you
10  only invested in those claims.  You never were
11  involved in the defense of those claims?
12      A.    Not that I remember.
13      Q.    Okay.  And have you ever provided
14  litigation financing for a fraudulent conveyance
15  claim?
16      A.    No.
17      Q.    Okay.  And how many companies have you
18  invested in for purposes of profiting off of
19  fraudulent conveyance claims?
20      A.    Several.
21      Q.    More than five?
22      A.    I don't -- I don't know the exact

Page 154

1  number.
2      Q.    Okay.  And how many of those cases
3  were successful?
4      A.    Well, it's not a question of success
5  or not success.  They last for a long time.  You
6  know, you're buying -- you're buying securities with
7  the hope that they go up in price, and that is
8  determined by rulings or, you know, by people's
9  perception of the strength of the claims.
10      Q.    Okay.  But can you recall any
11  circumstances where there was recovery on fraudulent
12  conveyance claims when you invested?
13      A.    Again, it depends what you mean by
14  "recovery."  I mean, they were usually settled --
15  these things were usually settled, or we were in and
16  out before the ultimate outcome was determined.
17      Q.    Okay.  How many investigations of
18  preference claims have you been involved with, other
19  than the one you just identified?
20      A.    Well, formal investigations, the one.
21      Q.    Okay.  And how many times as an
22  investor did you get involved in preference claims

Page 155

1  as an investment or as a plaintiff or otherwise?
2      A.    Say it again.
3      Q.    How many times, you know, as an
4  investor --
5      A.    Preference?
6      Q.    -- did you invest in a company -- yes.
7      A.    You know, preference, I'm trying to
8  think of specific examples.  You know, fraudulent
9  conveyance, I can.  Preference, I'm not sure, but,
10  you know, it happened from time to time.
11      Q.    What about fraud claims and lender
12  liability claims, have you ever investigated those
13  before this case?
14      A.    The same investigation that I did with
15  BJ Services did have elements.
16      Q.    Of fraud and lender liability?
17      A.    I did a second investigation for a
18  separate company called Vantage, which did have
19  breach of fiduciary duty characteristics.
20      Q.    Okay.  And what was the outcome of
21  that investigation?
22      A.    We determined that the claims were not

Page 156

1  colorable.
2      Q.    And what about as an investor, have
3  you ever invested in a company that's prosecuting a
4  fraud claim or a lender liability claim?
5      A.    I can't remember off the top of my
6  head.
7      Q.    Is it your testimony that the
8  experience that you have articulated qualifies you
9  to opine on the colorability of the claims before
10  the court?
11      A.    Yes --
12          MR. MORRIS:  Objection to the form of
13    the question.
14          THE WITNESS:  Yes, I do believe -- I
15    do believe I am.
16  BY MR. GLENN:
17      Q.    And do you --
18      A.    I'm not claiming to be a lawyer and
19  I'm not claiming to be an expert on the subject, but
20  I clearly have an understanding on what the issues
21  are.  I can read credit agreements.  I understand,
22  you know, the laws.  I've been involved in -- I've

39 (Pages 153 to 156)

12/15/2023                In re AmeriFirst Financial, Inc., et al                Jeffrey Dane

Page 157

1  been involved in situations, et cetera.  So yes.
2      Q.    And other than those matters, do you
3  have any other relevant expertise you can testify to
4  today that qualifies you to deliver an opinion on
5  the colorability of the claims before the court?
6      A.    I think I just answered.  I think --
7  you know, I've been dealing with these issues as an
8  investor for 20 years.  I've sat on, as I told you
9  before, I think at least five boards where there
10  were bankruptcies and, therefore, you know, at least
11  issues of fraudulent conveyance and preference, and
12  I've actually investigated them.  So yes.
13      Q.    Have you ever been sued for fraud or
14  any other intentional misconduct?
15      A.    No.
16      Q.    Do you have any criminal record?
17      A.    Just a caveat, the only -- I was a --
18  Apex Park, I was a Chapter 7.  So we were brought --
19  you know, all the board of directors were mentioned
20  in a claim, but it was dismissed.
21      Q.    Okay.  And no criminal record; right?
22      A.    No.

Page 158

1      Q.    Okay.  Would you investigate any
2  claims of any fraudulent misrepresentations made by
3  RCP in connection with any of the transactions where
4  we've alleged that that occurred in our complaint?
5          MR. MORRIS:  Objection to the form of
6      the question.
7          THE WITNESS:  As part of the -- as
8      part of the investigations, we interviewed
9      RCP, as I explained.  We interviewed
10      Mr. Bowlby.  And we interviewed Kasowitz
11      team.
12          We did ask them specifically about the
13      intent -- what they believed was the intent
14      at the time of the agreement, and we got
15      answers from each one of those in terms of
16      intent at the time of the agreement.
17  BY MR. GLENN:
18      Q.    Okay.  What do you mean by "intent"?
19  Whose intent?
20      A.    Meaning was there any -- at the time
21  the agreement was signed, was there any reason to
22  believe that RCP did not intend to fulfill its

Page 159

1  obligations under the agreement.
2      Q.    Okay.  And what did Mr. Bowlby say?
3      A.    Again, I don't want to put words in
4  his mouth, but I think his overall opinion was that
5  at the time of the agreement, he felt -- you know,
6  he felt that it had been a tough negotiation and he
7  wasn't a hundred percent happy, but he didn't have
8  reason to believe at that point that there were --
9  that RCP had, you know, intentionally defrauded him
10  in any way.
11      Q.    Okay.  And did you ask Mr. Bowlby
12  about whether he believes RCP overreached in its
13  dealings with AFI and the warehouse lenders?
14          MR. MORRIS:  I'm sorry, hold on one
15      second.  I apologize, Andrew.  I was
16      distracted by taking a note.
17          Can I just have that question read
18      back?
19          MR. GLENN:  Yeah, I'll rephrase it.
20  BY MR. GLENN:
21      Q.    Did Mr. Bowlby ever tell you that he
22  thought RCP did not comply with the terms of the

Page 160

1  May 15th, 2023, transaction documents in relation to
2  securing a new warehouse line and cash sweeps?
3      A.    Yeah, that Mr. Bowlby believed that it
4  was outside the intention -- that the -- both of
5  those issues were not handled correctly by RCP.
6      Q.    And what was your conclusion on those
7  allegations?
8      A.    I found that to not be the case.
9      Q.    And why is that?
10      A.    Because I didn't see any evidence
11  that -- that any of those issues were outside the
12  corners of the agreement.  There was no evidence
13  provided that the -- that the cash sweeps were
14  anything other than what was allowed under the
15  amended agreement, and the same with all those other
16  allegations.
17      Q.    Okay.  So your position is that RCP
18  was entitled to do what it did because the credit
19  agreement allowed it --
20      A.    Yes.
21      Q.    -- several points in time after the
22  May transactions?

12/15/2023                  In re AmeriFirst Financial, Inc., et al                  Jeffrey Dane

---

Page 161

1          Okay.  All right.
2          Was Mr. Avila and the Pachulski firm
3  involved with the Apex Parks case?
4      A.   They were.
5      Q.   Okay.  And were they involved with the
6  investigation in that case?
7      A.   We hired -- we hired outside counsel.
8      Q.   Okay.  And who was that?
9      A.   I think it was Gray Reed.
10      Q.   I just want to ask you again for the
11  $250,000.  As you sit here today, do you know who
12  picked that number, the COK [ph] in the plan, who
13  picked that number?
14      A.   Again, it's -- it's Mr. Avila who's
15  negotiating those issues.
16          MR. GLENN:  Let's go off the record.
17  I'd like to talk to my colleagues and see
18  what I need to do to finish up.
19          So let's take 15 minutes, but I don't
20  have all that much more.
21          MR. MORRIS:  So 1:45, Andrew?
22          MR. GLENN:  1:45, please.  1:45.

---

Page 162

1          And, Malik, can you send a Zoom to our
2  team so we can get on a separate Zoom and
3  we'll talk in that context and we'll get back
4  on at 1:45.
5          THE VIDEOGRAPHER:  Okay.  Going off
6  the record.  The time is 1:33.
7          (Recess from the record.)
8          THE VIDEOGRAPHER:  Okay.  We are back
9  on the record.  The time is 2 p.m.
10  BY MR. GLENN:
11      Q.   How did you prepare for today's
12  deposition, sir?
13      A.   What's that?
14      Q.   How did you prepare for today's
15  deposition?
16      A.   I just had conversations with counsel,
17  just basic deposition prep.
18      Q.   I don't want to talk about your
19  communications with counsel.  You're referring to
20  Mr. Morris?
21      A.   Yes.
22      Q.   Okay.  Were you involved in the

---

Page 163

1  document collection process for the requests that
2  were made by the creditors committee?
3      A.   What do you mean "involved"?
4      Q.   Well, did you help collect any
5  documents in response to the creditors committee's
6  document requests?
7      A.   I got e-mails.
8      Q.   Okay.  And you were made aware of
9  those document requests?
10      A.   I know there were documents requests.
11      Q.   Okay.  And are you aware of any
12  documents that have been requested responsive to our
13  document requests that have not been produced?
14      A.   Not that I'm aware.
15      Q.   Okay.  Did you ask the Pachulski
16  firms' views about any aspect of your investigation?
17          MR. MORRIS:  Objection.
18          Just a yes-or-no answer.
19          And object to the form of the
20  question.
21          THE WITNESS:  Well, it was my
22  investigation.

---

Page 164

1  BY MR. GLENN:
2      Q.   Okay.  But -- and, again, this is a
3  yes-or-no question in deference to Mr. Morris for
4  the moment.
5          Did you ask the Pachulski firm and its
6  lawyers their opinions on any aspects of your
7  investigation?
8      A.   On any aspects, yes.
9      Q.   Okay.  What aspects?
10          MR. MORRIS:  Objection.  Direct him
11  not to answer.
12          MR. GLENN:  Well, can he give me the
13  general topics, I mean, without divulging the
14  advice that was given?
15          I'll represent to you, Mr. Morris,
16  that's not a waiver.  And I won't contend
17  that it's a waiver, if that reassures you in
18  any way.
19          MR. MORRIS:  Okay.  And if you want to
20  know kind of broad topics, I'll allow it.
21  BY MR. GLENN:
22      Q.   Just broad topics.  Just broad topics.

---

41  (Pages 161 to 164)

Page 165

1  Don't give me any legal advice, sir.  I'm not asking
2  for that.
3       A.   Certain legal definitions --
4       Q.   Okay.
5       A.   -- I think would be the most --
6       Q.   Legal definitions -- okay.  Legal
7  definitions, like insider, that kind of a thing?
8       A.   No.  I mean, I may have told them my
9  understanding of those terms.
10      Q.   Okay.  Again, I don't want to get into
11 specifics for the moment.
12           So are you relying on any legal advice
13 that the Pachulski firm gave you as part of your
14 investigation or the testimony you're going to give
15 on Monday?
16      A.   Well, just like any -- any law firm I
17 use, obviously, they're there to help -- help me in
18 terms of things I don't understand or things, you
19 know, I need help with or to get certain legal
20 advice.
21           At the end of the day, the conclusions
22 were my own conclusions.  I led the investigation.

Page 166

1  I did the interviews.  I determined the questions
2  and came up with the conclusions myself.
3       Q.   To what extent did any legal advice
4  provided by the Pachulski firm affect your opinions
5  about the investigation?
6       A.   Not much.
7       Q.   And when you say "not much," what do
8  you mean?
9           MR. MORRIS:  Without disclosing any
10 attorney-client communications, if you can
11 answer that question, go ahead.
12           THE WITNESS:  Not much.  I think the
13 issues were for the most part issues I was
14 familiar with, and the investigation I was
15 able to do mainly on my own.
16 BY MR. GLENN:
17      Q.   You had mentioned that in the prior
18 matter you hired independent counsel as part of your
19 investigation and you did not use the Pachulski
20 firm.
21           Did you consider using independent
22 counsel in this case?

Page 167

1       A.   Yes, we considered it.
2       Q.   And why didn't you do it?
3       A.   I didn't feel it was necessary.  As we
4  started the investigation, if we had determined that
5  that were issues that were going to be more
6  complicated than we suspected or would have needed
7  it, then we would have considered it.
8           But, quite frankly, we didn't -- I
9  didn't feel like it was a good -- I didn't feel like
10 it was a good use of resources, nor did I see any
11 conflicts with using Pachulski for -- you know, for
12 purposes of this investigation.
13           So combination of no conflicts, trying
14 to save the estate some money, and the fact that the
15 issues involved were not overly complex, there was
16 no need for --
17           MR. MORRIS:  Even I could understand
18 them.
19           MR. GLENN:  Yeah, I was going to
20 say -- I was going to say, you know, I think
21 the Pachulski firm would tell you that they
22 can also handle complex matters, but that's

Page 168

1  something different.
2  BY MR. GLENN:
3       Q.   Okay.  So are you aware -- who hired
4  the Pachulski firm, to begin with?
5           MR. MORRIS:  Objection to the form of
6  the question.
7           You can answer, if you know.
8           THE WITNESS:  Yeah, I'm not sure how
9  that -- I'm not really sure.  I wasn't -- I
10 don't know.
11 BY MR. GLENN:
12      Q.   Okay.  You don't know whether RCP
13 recommended Pachulski?
14      A.   I don't know.  I have no idea their
15 relationship.  So I don't know about recommended.
16      Q.   And you had -- in your prior answer
17 when I asked you about hiring independent counsel,
18 you said the word "we."
19           Who did you mean by "we"?
20      A.   Oh, sometimes I'll say "we."  I mean,
21 in terms of the investigation, to be clear, I mean
22 I.  If I say "we," it's just because it's the

42  (Pages 165 to 168)

Page 169

1  comp- -- I meant the company, but I'm leading the
2  investigation.
3       So any time I've used the word "we," I
4  meant myself as a representative of the -- as the
5  independent board member of AmeriFirst.
6       **Q.   Okay.  Are you prepared --**
7       **(Cross talk.)**
8  BY MR. GLENN:
9       **Q.   Okay.  Are you prepared to come to**
10 **court on Monday?**
11      A.   I hope so.
12      **Q.   Okay.  And have we -- are there any**
13 **matters on which you expect to testify that we**
14 **haven't discussed so far today?**
15      MR. MORRIS:  Objection to the form of
16 the question.
17      THE WITNESS:  I don't -- I mean, I
18 don't know.  I think it's -- you know, I
19 think that -- the main focus of the testimony
20 will revolve around the investigation.
21      MR. GLENN:  Okay.  That concludes my
22 questioning for today.

Page 170

1       THE WITNESS:  Thank you.
2       MR. MORRIS:  Thank you, Andrew.
3       Anybody else?
4       Linda?
5       MS. RICHENDERFER:  No.  I have no
6  questions.  Thank you.
7       MR. MORRIS:  Okay.  Are we free to
8  sign off then?
9       MR. GLENN:  Thank you, Mr. Dane.
10      Yes, sir.  Thank you.
11      THE VIDEOGRAPHER:  We are going off
12 the record.  The time is 2:08.
13
14
15
16
17
18
19
20
21
22

Page 171

1  STATE OF NEW YORK          )
2                            ss:
3  COUNTY OF WESTCHESTER      )
4
5       I, EILEEN MULVENNA, CSR/RMR/CRR, a
6  Certified Court Reporter, Registered Merit Reporter,
7  Certified Realtime Reporter, and Notary Public in
   and for the State of New York, do hereby certify:
8
9       That I reported the taking of the
   deposition of the witness, JEFFREY DANE,
10 commencing on the 15th day of December, 2023, at the
   hour of 10:06 a.m.
11      That prior to being examined, the witness
   was duly sworn by me to testify to the truth, the
12 whole truth, and nothing but the truth.
   That I thereafter transcribed my said
13 shorthand notes into typewriting and that the
   typewritten transcript of said deposition is a
14 complete, true and accurate transcription of my
   said shorthand notes taken down at said time, and
15 that a request has been made to review the
   transcript.
16      I further certify that I am not a relative
   or employee of an attorney or counsel of any of the
17 parties, nor a relative or employee of any attorney
   or counsel involved in said action, nor a person
18 financially interested in the action.
   IN WITNESS WHEREOF, I have hereunto
19 set my signature this 17th day of December, 2023.
20
21      _____
22      EILEEN MULVENNA, CSR/RMR/CRR

Page 172

1  Jeffrey Dane, c/o
   PACHULSKI STANG ZIEHL & JONES LLP
2  780 Third Avenue, 34th Floor
   New York, New York  10017
3
   Case: In Re AmeriFirst Financial, Inc. et al.
4  Date of deposition: December 15, 2023
   Deponent: Jeffrey Dane
5
6  Please be advised that the transcript in the above
   referenced matter is now complete and ready for signature.
7  The deponent may come to this office to sign the transcript,
8  a copy may be purchased for the witness to review and sign,
   or the deponent and/or counsel may waive the option of
9  signing. Please advise us of the option selected.
10 Please forward the errata sheet and the original signed
11 signature page to counsel noticing the deposition, noting the
12 applicable time period allowed for such by the governing
13 Rules of Procedure. If you have any questions, please do
14 not hesitate to call our office at (202)-232-0646.
15
16
17
18 Sincerely,
19 Digital Evidence Group
20 Copyright 2023 Digital Evidence Group
21 Copying is forbidden, including electronically, absent
22 express written consent.

43  (Pages 169 to 172)

12/15/2023          In re AmeriFirst Financial, Inc., et al          Jeffrey Dane

Page 173

```
 1   Digital Evidence Group, L.L.C.
     1730 M Street, NW, Suite 812
 2   Washington, D.C. 20036
     (202) 232-0646
 3
 4   SIGNATURE PAGE
     Case: In Re AmeriFirst Financial, Inc. et al.
 5   Witness Name: Jeffrey Dane
     Deposition Date: December 15, 2023
 6
     I do hereby acknowledge that I have read
 7   and examined the foregoing pages
     of the transcript of my deposition and that:
 8
 9   (Check appropriate box):
     ( ) The same is a true, correct and
10   complete transcription of the answers given by
     me to the questions therein recorded.
11   ( ) Except for the changes noted in the
     attached Errata Sheet, the same is a true,
12   correct and complete transcription of the
13   answers given by me to the questions therein
14   recorded.
15
16   _____   _____
17     DATE              WITNESS SIGNATURE
18
19
20   _____   _____
21
22     DATE              NOTARY
```

Page 174

```
 1   Digital Evidence Group, LLC
 2   1730 M Street, NW, Suite 812
 3   Washington, D.C.  20036
 4   (202)232-0646
 5
 6            ERRATA SHEET
 7
 8   Case: In Re AmeriFirst Financial, Inc. et al.
 9   Witness Name: Jeffrey Dane
10   Deposition Date: December 15, 2023
11   Page No.   Line No.    Change
12
13
14
15
16
17
18
19
20
21   _____   _____
22     Signature              Date
```