**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMERIFIRST FINANCIAL, INC., <u>et al.</u>,[1] | Case No. 23-11240 (TMH) |
| Debtors. | (Jointly Administered) |

**MEMORANDUM OPINION**

This is the decision regarding the Motion (the "<u>Motion</u>") of the Official

Committee of Unsecured Creditors (the "<u>Committee</u>") of AmeriFirst Financial, Inc.,

<u>et al.</u> for an Order Granting (I) Leave, Standing, and Authority to Commence and

Prosecute Certain Claims on Behalf of the Debtors' Estates and (II) Exclusive

Settlement Authority in Respect of Such Claims [D.I. 470]. For the reasons, set

forth below, the Motion is granted in part and denied in part.

    I.    FACTUAL BACKGROUND

On April 2021, Reverence Capital Partners ("<u>RCP</u>") and AmeriFirst

Financial, Inc. ("<u>AFI</u>"), a retail mortgage lender, entered into a Credit Agreement

(the "<u>2021 Credit Agreement</u>") under which RCP loaned $50 million to AFI.[2] The

2021 Credit Agreement required the principal of the loan to "not be greater than

85% of AFI's 'Tangible Net Worth'" for the first eighteen months of the loan.[3] In

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557). The Debtor's service address is 575 W. Chandler Blvd, Suite 225, Unit 236, Chandler, AZ 85225.

[2] RCP Obj. [D.I. 509] ¶ 27.

[3] <u>Id.</u> ¶ 28.

connection with the 2021 Credit Agreement, AFI granted RCP a security interest in

an account at Western Alliance Bank—the "Collection Account" under the 2021

Credit Agreement; RCP executed a deposit-account control agreement ("DACA") on

the account on April 21, 2021.[4] The "Collection Account" was then moved to an

account at Veritex Community Bank (the "Veritex Account"), with RCP executing a

DACA on the account on August 18, 2022.[5]

The Committee contends that, in 2022, rising interest rates negatively

impacted the mortgage industry.[6] In August 2022, AFI defaulted on its net worth

covenant and "was required to pay down the loan in an amount sufficient to satisfy

its percentages by December 1, 2022" or else default on the loan.[7] AFI arranged a

non-core asset sale, including the sale of mortgage servicing rights ("MSRs"), to a

third-party to cure the default.[8] AFI confirmed its intended asset sale with its

senior warehouse lenders.[9] Through November 2022, AFI and RCP engaged in

discussions regarding the non-core asset sale, culminating in a letter of intent

signed by RCP on December 2, 2022 "memorializing AFI's commitment to the Asset

Sale."[10]

Also on December 2, 2022, RCP called a default (the "December 2022 NOD")

regarding AFI's default of the net worth covenant.[11] RCP issued written notices to

---

[4] RCP Obj. ¶ 29.
[5] Id.; Comm. Mot. for Leave [D.I. 470] (the "Comm. Mot.") Ex. B (the "Proposed Compl.") ¶ 84.
[6] Comm. Mot. ¶ 7; Proposed Compl. ¶ 5.
[7] RCP Obj. ¶ 30.
[8] Proposed Compl. ¶ 34.
[9] Id. AFI entered into loan agreements with lenders Texas Capital Bank, Origin Bank, Flagstar
Bank, Veritex Community Bank and Western Alliance Bank (collectively, the "Warehouse Lenders").
[10] Proposed Compl. ¶ 35.
[11] Proposed Compl. ¶ 36.

the Warehouse Lenders notifying them of the December 2022 NOD.[12] The Warehouse Lenders accelerated their loans, becoming "due immediately."[13] Fannie Mae, Freddie Mac, and Ginnie Mae, AFI's government sponsored enterprises (the "GSEs"), suspended AFI's ability to sell and service mortgages with those entities.[14] Fannie Mae imposed a March 31, 2023 deadline to waive defaults or otherwise have AFI's selling and servicing rights terminated.[15] AFI obtained a "backstop residential line of funding" from Oaktree Capital for the purposes of renting a "warehouse financing line for its business purpose lending division."[16]

On January 21, 2023, RCP issued a second notice of default (the "January 2023 NOD") "asserting substantially the same events of default as the December 2022 NOD."[17] By February 2023, AFI paid off the accelerated loans from the Warehouse Lenders, leaving RCP as the senior secured lender with "first-priority liens on all of AFI's assets."[18]

In March 2023, RCP contacted AFI to renegotiate financing, as AFI owed an outstanding $28 million balance of principal of the 2021 Credit Agreement.[19] On March 31, 2023, AFI and RCP agreed on a term sheet (the "March 2023 Term Sheet") to amend the 2021 Credit Agreement, with RCP agreeing to "take no action with respect to the December 2022 NOD or the January 2023 NOD, and otherwise

---

[12] Id.; RCP Obj. ¶ 31; see, e.g., RCP Obj. Ex. L.".
[13] Proposed Compl. ¶ 38.
[14] Id. ¶ 42.
[15] Id. ¶ 43.
[16] Id. ¶¶ 47-48.
[17] Id. ¶ 51.
[18] Id. ¶ 52.
[19] Id. ¶¶ 55-56.

forbear from exercising remedies for existing defaults under the [2021 Credit Agreement]."[20]

On May 15, 2023, AFI agreed to an Amended and Restated Credit and Security Agreement (the "May 2023 Credit Agreement"), a pledge agreement, the Limited Waiver and Second Amendment to Credit and Security Agreement (the "May 2023 Limited Waiver"), a security agreement (the "May 2023 Security Agreement"), a side letter (the "May 2023 Side Letter") and a settlement agreement (the "May 2023 Settlement Agreement" and collectively the "May 2023 Restructuring").[21]

Under the May 2023 Restructuring, RCP received releases for "any and all claims arising out of the [2021 Credit Agreement]," first-priority liens on all AFI assets, a conversion of $4 million of debt into preferred equity, "lockbox control over AFI's cash" through a new DACA, budget approval rights and the right to receive reporting obligations, consent rights to new warehouse loans, and a schedule to receive $20 million of payment to the principal of the outstanding loan.[22] In return, RCP agreed to waive the December 2022 NOD and January 2023 NOD, agreed to convert an additional $4 million of the outstanding loan principal to preferred equity contingent on AFI's timely payment of the $20 million principal, and "agreed to waive any other claims that they may otherwise have had under the Original Credit Agreement for prepayment fees and accrued interest."[23]

---

[20] Id. ¶ 57.
[21] Id. ¶ 58.
[22] Id. ¶ 59; Comm. Mot. ¶ 12; RCP Obj. ¶¶ 29, 36; Debtors' Obj. ¶ 30.
[23] Proposed Compl. ¶ 59; Debtors' Obj. ¶ 30.

Eric Bowlby, with the assistance of counsel, negotiated the May 2023 Restructuring on behalf of AFI in his capacity as CEO.[24] Mr. Bowlby testified that the negotiations leading up to the May 2023 Restructuring were conducted at arms-length and represented "the best deal in the time that was allowed left."[25]

On May 25, 2023, RCP swept $5 million from the Veritex Account.[26] On June 29, 2023, RCP swept $3,258,313.00 from the Veritex Account.[27] Following the June 29 sweep, AFI violated the liquidity covenants with the GSEs, "preventing it from complying with the GSEs' stipulated conditions for restoring AFI's selling and servicing rights."[28] In August 2023, AFI faced difficulty meeting payroll obligations and entered into negotiations with RCP for funding, though the parties never entered into an agreement.[29] In addition, various vendors never received payment for services provided to AFI.[30]

On August 22, 2023, AFI issued a notice of default to RCP, alleging breaches of sections 5.01(e) and 10.05(b) of the May 2023 Credit Agreement, violations of the May 2023 Side Letter, and breaches of RCP's fiduciary duties as an AFI equity holder.[31] On August 24, 2023, RCP issued a notice of default to AFI and "foreclosed against the stock the Bowlbys had pledged in the [May 2023 Restructuring]."[32] RCP alleged that AFI "failed to meet numerous milestones to sell non-core assets, e.g.,

---

[24] See Hr'g Tr. 216:3-4, 15-17, Dec. 18, 2023 [D.I. 565] (the "Dec. 18 Tr.").
[25] See id. 216:6-11, 216:23-217:5; RCP Obj. Ex. S (the "May 2023 Settlement Agreement") ¶ 16.
[26] Proposed Compl. ¶ 61; Debtors' Obj. ¶ 33.
[27] Proposed Compl. ¶ 62.
[28] Id. ¶ 62.
[29] Id. ¶¶ 63-65.
[30] See id. ¶ 66.
[31] Id. ¶ 68.
[32] RCP Obj. ¶¶ 37-38.

scratch and dent loans, and did not obtain new debt as it was required to do."[33] Upon taking control of AFI, RCP appointed Scott Avila as Chief Restructuring Officer and Jeffrey Dane as an independent board member.[34] Also on August 24, 2023, AFI filed a petition under chapter 11 in this Court.[35]

## II.    STANDARD OF REVIEW

A creditors' committee may "appear and be heard on any issue in a case."[36] The Bankruptcy Code, in conjunction with the Court's equitable powers, permits a creditors' committee to obtain derivative standing with the Court's approval.[37] To obtain standing, the Committee must demonstrate that "(i) the debtor-in-possession has unjustifiably refused to pursue the claim or refused to consent to the moving party's pursuit of the claim on behalf of the debtor-in-possession; (ii) the moving party has alleged colorable claims; and (iii) the moving party has received leave to sue from the bankruptcy court."[38]

The Court must first address the colorability of the claims.[39] To demonstrate a colorable claim, courts require a committee to meet the pleading standard of a Rule 12(b)(6) motion to dismiss.[40] Rule 8(a) requires a claimant to submit a pleading

---

[33] Id. ¶ 37.
[34] Id. ¶ 38.
[35] See Proposed Compl. ¶ 69.
[36] 11 U.S.C. § 1109(b).
[37] See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 567 (3d Cir. 2003).
[38] In re Optim Energy, LLC, Case No. 14-10262 (BLS), 2014 Bankr. LEXIS 2155, at *16, (Bankr. D. Del. May 13, 2014); see also In re Pack Liquidating, LLC, 658 B.R. 305, 333 (Bankr. D. Del. 2024).
[39] See Pack Liquidating, 658 B.R. at 333.
[40] Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC), 595 B.R. 631, 665 (Bankr. D. Del. 2018) ("A claim is colorable if it would survive a motion to dismiss."); Optim Energy, 2014 Bankr. LEXIS 2155, at *17-18.

that consists of a short and plain statement stating an entitlement to the relief

sought.[41] "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"[42] While a complaint need not contain detailed factual allegations,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."[43] While the Court's analysis is generally

---

[41] Fed. R. Civ. Pr. 8(a).

[42] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007))); see also Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) ("[O]n a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.").

The Committee alleges claims of fraud and fraudulent inducement, as well as two fraudulent transfer claims. Rule 9(b) requires a claimant to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. Pr. 9(b). However, this Court and other courts have held that constructive fraudulent conveyances under sections 544 and 548(a)(1)(B) need not meet the heightened pleading requirement of Rule 9(b). Kirschner v. J.P. Morgan Chase Bank, N.A. (In re Millennium Lab Holdings II, LLC), Case No. 15-12284, 2019 Bankr. LEXIS 636, at *13-14 (Bankr. D. Del. Feb. 28, 2019) (noting that the heightened standard does not apply in § 548(a)(1)(B) claims as they consider the debtor's financial state as opposed to acts of fraud); Miller v. Welke (In re United Tax Grp., LLC), Case No. 14-10486, 2016 Bankr. LEXIS 4322, at *7 (Bankr. D. Del. Dec. 13, 2016); see also China Resource Prods. v. Fayda Int'l, 788 F.Supp 815, 818 (D. Del. 1992) ("Despite the similarity in the terms 'fraud' and 'fraudulent conveyance,' the pleading requirements for fraud are not necessarily applicable to pleadings alleging a fraudulent conveyance."); Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom. Corp.), 327 B.R. 711, 718 (Bankr. D. Del. 2005) (quoting In re O.P.M. Leading Servs., Inc., 35 B.R. 854, 862-863 (Bankr. S.D.N.Y. 1983) ("[A] claim of constructive fraud 'need not allege the common variety of deceit, misrepresentation or fraud in the inducement . . . . This is because the transaction is presumptively fraudulent and all that need be alleged is that the conveyance was made without fair consideration' while the debtor was functionally insolvent.") (alteration in original). The Court assesses Counts I and III under the Rule 8(a) standard. Finally, the Court notes that the Committee erroneously labels the preference action claim in Count II under section 547(b) as avoidances for transfers made during the preference period "as [f]raudulent [t]ransfers[.]" The claims in Count II for preference transfers under section 547 contain no elements of fraud. Accordingly, the claims in Count II are assessed under the standard of Rule 8(a). The Court assesses the fraud and fraudulent inducement claims in Count V under the heightened Rule 9(b) standard.

[43] Iqbal, 556 U.S. at 678.

constrained to the four-corners of the complaint, the Court may consider "other documents referenced in the complaint."[44]

After the Court determines that a claim is colorable, the Court must apply a cost-benefit analysis to determine whether the debtor unjustifiably refused to prosecute the claim.[45] When conducting a cost-benefit analysis, the Court considers "(1) '[the] probabilities of legal success and financial recovery in event of success'; (2) the creditor's proposed fee arrangement; and (3) 'the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'"[46]

In its cost-benefit analysis, the Court is not strictly bound to the pleadings.[47] The Court may examine, "on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization of the estate."[48] The Court need not undertake a "mini-trial . . . . But it should assure itself that there is a sufficient likelihood of success to justify the

---

[44] Salus Capital Partners, LLC v. Std. Wireless Inc. (In re RadioShack Corp.), 550 B.R. 700, 710 (Bankr. D. Del. 2016).

[45] In re Centaur, LLC, Case No. 10-10799 (KJC), 2010 Bankr. LEXIS 3918, at *16 (Bankr. D. Del. Nov. 5, 2010) (citing Official Comm. Of Unsecured Creditors v. Clark (In re Nat'l Forge Co.), 326 B.R. 532, 548 (W.D. Pa. 2005)); see In re Diocese of Camden, Case No. 20-21257 (JNP), 2022 Bankr. LEXIS 814, at *26-27 (Bankr. D. N.J. Mar. 24, 2022) (noting that while the Third Circuit did not specifically adopt the requirement that Courts undertake a cost-benefit analysis, doing so ensures that the Court allows only colorable claims that may benefit the estate).

[46] PW Enters. v. N.D. Racing Comm'n (In re Racing Servs.), 540 F.3d 892, 901 (8th Cir. 2008) (quoting In re STN Enters., 779 F.2d 901, 905-06 (2d Cir. 1985)); see also G-I Holdings, Inc. v. Those Parties Listed On Ex. A (In re G-I Holdings, Inc.), 313 B.R. 612, 643 (Bankr. D. N.J. 2004) (providing additional factors).

[47] See In re MIG, Inc., Case No. 09-12118 (KG), 2009 Bankr. LEXIS 4313, at *4 (Bankr. D. Del. Dec. 18, 2009).

[48] Id. (quoting In re STN Enters., 779 F.2d at 905).

anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce."[49]

Here, the parties put on evidentiary presentations in support of their respective positions. The Committee presented the testimony of two witnesses, while the Debtors put on one witness. In addition, the parties introduced into evidence dozens of exhibits.

### III.   DISCUSSION

#### A.   *Counts I-IV: Fraudulent Transfers and Preferential Transfer*

The Committee asserts four claims regarding constructive fraudulent transfer, "preferential fraudulent transfer," "preferential insider fraudulent transfer," and fraud and fraudulent inducement.

The Committee asserts two counts seeking the avoidance and recovery of certain fraudulent transfers of assets and obligations incurred by AFI and one count seeking the avoidance and recovery of a preferential transfer.[50] The Committee alleges in Count I that the $5,000,000 transfer on May 25, 2023, the $3,258,313 transfer on June 29, 2023, and the $593,000 transfer occurring on August 17, 2023, constituted fraudulent transfers.[51] In Count II, the Committee challenges the June 29, 2023, transfer and the August 17, 2023, transfer as transfers that occurred

---

[49] In re STN Enters., 779 F.2d at 905-06.

[50] Count I seeks to avoid fraudulent transfers under section 544(b) of the Bankruptcy Code and under the relevant sections of the Uniform Fraudulent Transfer Act (UFTA) as enacted in Arizona, New York, and Delaware. Count II seeks to avoid certain preference transfers occurring during the preference period under section 547 of the Bankruptcy Code. Count III seeks to avoid fraudulent transfers under the insider preference period under sections 547 and 548(a)(1)(B) of the Bankruptcy Code and the relevant sections of the UFTA as enacted in Arizona, New York, and Delaware.

[51] Proposed Compl. ¶ 93.

within the ninety-day preference period.[52] Finally, the Committee asserts in Count

III that a total of $10,301,067.43 was transferred from AFI to RCP within the one-

year insider preference period.[53] The Court first determines the colorability of each

claim, and then considers the cost-benefit analysis to determine whether the debtor

unjustifiably refused to prosecute the claim

### 1.  Count I: Fraudulent Transfer Under Section 544

Regarding $10.3 million of the total transfers, RCP argues, as a threshold

issue, that the Committee cannot avoid transfers of collateral secured by RCP's

liens.[54] RCP argues that the $10.3 million of transfers from the Veritex Account

constituted a legitimate transfer of its own property. RCP provides evidence in the

form of bank records that demonstrate the entirety of the specific bank transfers

contested in Count I, Count II, and Count III were drawn from the Veritex

Account.[55]

The Court is careful to delineate between the transfers and obligations the

Committee seeks to avoid, and the transfers RCP claims as part of its secured

---

[52] Id. ¶ 104.

[53] Id. ¶ 117.

[54] RCP Obj. ¶¶ 42-45; see e.g., Richardson v. Huntington Nat'l Bank (In re CyberCo Holdings, Inc.), 382 B.R. 118, 139 (Bankr. W.D. Mich. 2008) ("[I]t now is [apparent] under the Bankruptcy Code that it is only the debtor's transfer of its own interest in property that can be avoided as a fraudulent conveyance . . . a debtor can fraudulently transfer only whatever he in fact owns."); Melamed v. Lake Co. Nat'l Bank, 727 F.2d 1399, 1402 (6th Cir. 1984) ("[B]ecause of the Bank's valid security interest in accounts receivable, that transfer did not diminish the assets of the debtor which were available to its creditors."); Ehrlich v. Commercial Factors of Atlanta, 567 B.R. 684, 696 (N.D.N.Y. 2017) (denying a constructive fraudulent transfer claim under § 548 because "the transfers at issue involved property in which CFA had a perfected security interest."); cf. Henry v. Lehman Commercial Paper, Inc. (In re First All. Mortg. Co.), 471 F.3d 977, 1008 (9th Cir. 2006) ("[P]ayment to a fully secured creditor does not hinder, delay or defraud creditors because it does not put assets otherwise available in a bankruptcy distribution out of their reach.").

[55] See generally RCP Obj. Ex. K.

collateral. The Committee confirms that RCP perfected its security interests in the

Veritex Account on August 18, 2022.[56] Further, the Committee omits the Veritex

Account from the group of accounts the Committee asks the Court to declare as

unperfected deposit accounts, <u>infra</u> Section III.E, and thus unencumbered by any

liens from RCP.[57]

The Committee asserts—as the crux of its complaint—that "if the May 2023

Agreements are avoided, RCP has no collateral and no preference defense."[58] The

Committee includes several obligations from the May 2023 Restructuring it seeks to

avoid other than the $10.3 million transferred to RCP from the Veritex Account.[59]

Of the obligations in the May 2023 Restructuring, the Committee asserts that AFI

ceded significant financial control to RCP.[60] The Committee refers to the May 2023

Amended Credit Agreement. Within the May 2023 Amended Credit Agreement, AFI

kept certain proceeds of non-core asset sales within the "Collection Account"—that

is the Veritex Account—for repayment of RCP's loan.[61] While RCP properly

perfected its interest in the Veritex Account, the financial concessions contained in

the May 2023 Amended Credit Agreement forced AFI to keep certain funds in the

Veritex Account that otherwise may have been outside of RCP's control.

---

[56] Proposed Compl. ¶¶ 83-84.
[57] <u>See</u> <u>Id.</u> ¶ 148.
[58] Comm. Reply [D.I. 538] ¶ 18.
[59] The Committee contends as obligations that AFI "(a) released any and all claims against RCP relating to the Credit Agreement, (b) provided RCP with first-priority liens on substantially all of AFI's assets, (c) incurred strict reporting obligations to RCP, (d) bestowed consent rights and control rights to RCP over AFI's operations and financial decisions, and (e) incurred mandatory Loan paydown obligations to RCP." Proposed Compl. ¶ 92.
[60] <u>Id.</u> ¶ 92.
[61] <u>Compare</u> RCP Obj. Ex. J (the "<u>May 2023 Amended Credit Agreement</u>") §§ 2.07(b), 10.03, 10.05(b) <u>with</u> RCP Obj. Ex. A (the "<u>March 2021 Credit Agreement</u>") §§ 10.02, 10.03.

To decide this issue, the Court must determine whether the Committee asserts colorable claims in Count I regarding the obligations AFI incurred. Put simply, the channeling of funds to a properly secured account by extracting unrequited obligations does not cleanse the subsequent transfer of funds solely because the account was subject to a perfected lien. If the Court determines that the Committee asserts a colorable claim that AFI received less than equivalent value for its obligations, then the avoidance of the transfers resulting from those concessions, whether or not from a secured account, would be an issue likewise reserved for another day.

The Court thus assesses the colorability of claims stemming from the obligations and transfers asserted in Count I by the Committee. Section 544(b) permits a trustee[62] to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."[63] In this case, the Committee cites Delaware, Arizona, and New York statutes as the "applicable law" governing the fraudulent transactions.[64]  Under Delaware law a creditor may seek "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."[65] A transfer made or obligation incurred with respect to present or future creditors is fraudulent when the debtor received less than "reasonably equivalent value in

---

[62] Cybergenics Corp., 330 F.3d at 567 (extending the section 544(b) powers to a creditors committee seeking to avoid fraudulent transfers).
[63] 11 U.S.C. § 544(b).
[64] Proposed Compl. ¶ 88. Delaware and Arizona have adopted the Uniform Fraudulent Transfer Act ("UFTA"). New York adopted the Uniform Voidable Transactions Act ("UVTA"). The Court uses Delaware statutes as all three statutes provide substantively  identical requirements.
[65] 6 Del. C. § 1307.

12

exchange for the transfer or obligation" and the debtor made the transaction with remaining assets "unreasonably small in relation to the business or transaction" or "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[66] A fraudulent transfer as to present creditors occurs when a transfer is made "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."[67] Whether or not the debtor received equivalent value is an issue of fact unsuitable for a motion to dismiss.[68]

First, the Committee asserts a colorable claim that AFI was insolvent under at the time of the May 2023 Restructuring. An entity is insolvent when the "debts [are] greater than all of such entity's property . . . ."[69] A debtor is insolvent under Delaware state law "if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."[70] Additionally, a debtor is presumed insolvent if the debtor "is generally not paying debts as they become due."[71]

The entire May 2023 Restructuring resulted from AFI's 2021 Credit Agreement default in December 2022. The Committee contends, and the Court

---

[66] 6 Del. C. § 1304(a)(2).
[67] 6 Del. C. § 1305.
[68] See Forman v. Jeffrey Matthews Fin. Group, LLC (In re Halpert & Co.), 254 B.R. 104, 115 (Bankr. D.N.J. 1999); Giuliano v. Delta Air Lines, Inc. (In re TransVantage Sols., Inc.), Case No. 13-19753, 2016 Bankr. LEXIS 3672, at *17 (Bankr. D.N.J. Oct. 6, 2016); 5 Collier on Bankruptcy P 548.05 (16th 2024) ("[W]hether the debtor received reasonably equivalent value is a question of fact for which the trier of fact is given broad leeway . . . .").
[69] 11 U.S.C. § 101(32).
[70] 6 Del. C. § 1302(a).
[71] 6 Del. C. § 1302(b).

takes as true for the purposes of a Rule 12(b)(6) inquiry, that the Warehouse Lenders accelerated their loans—cutting off financing and leaving AFI undercapitalized while AFI's mortgage assets diminished in value.[72] The GSEs suspended AFI's selling and servicing approvals.[73] AFI ultimately liquidated enough assets to pay off its warehouse lenders—despite previously defaulting on the net worth covenant by maintaining too few assets in relation to its debt.[74] The Committee contends that AFI needed further capital to survive, leading to the May 2023 Restructuring to continue operations.[75]

The Court must now determine whether the Committee asserts a colorable claim that AFI received less than equivalent value for the obligations and transfers provided to RCP. The Committee bases Count I on obligations and transfers resulting from the May 2023 Restructuring. The Committee alleges several obligations AFI undertook to RCP; AFI purportedly "(a) released any and all claims against RCP relating to the Credit Agreement, (b) provided RCP with first-priority liens on substantially all of AFI's assets, (c) incurred strict reporting obligations to RCP, (d) bestowed consent rights and control rights to RCP over AFI's operations and financial decisions, and (e) incurred mandatory Loan paydown obligations to RCP."[76] In addition, RCP effectuated three transfers of funds from the Veritex

---

[72] Proposed Compl. ¶¶ 38, 46, 53.

[73] Id. ¶ 42.

[74] Id. ¶ 52. RCP asserts that they released $2,080,120 from the Veritex Account to assist AFI in paying off one of their warehouse lines. RCP Obj. ¶ 77.

[75] Proposed Compl. ¶ 55.

[76] Id. ¶¶ 59, 92.

Account—a $5,000,000 transfer on May 25, 2023, a $3,258,313 transfer on June 29, 2023, and a $593,000 transfer on August 17, 2023.[77]

In return for the obligations and transfers, the Committee asserts that RCP "agreed to waive any previous defaults and effectively rescinded the December 2022 NOD and the January 2023 NOD" as well as, on the conditions of certain payments, "waive certain outstanding interest and penalties owed" and "convert the remaining $8 million principal amount of the Loan into a combination of preferred equity interests in AFI and certain 'hope notes.'"[78]

The Committee demonstrates a colorable claim that AFI received less than equivalent value for its transfers and obligations. Ultimately, whether AFI's transfers and obligations constitute reasonable or less than equivalent value is a fact-based inquiry unsuitable for determination on a motion to dismiss standard. The Court does not find that RCP's forbearances constitute less than equivalent value, merely that the Committee sets forth several transfers and obligations that create questions of fact warranting further scrutiny. If the Court later finds that certain obligations provided to RCP in the 2023 Amended Credit Agreement led to transfers of $10.3 million from the secured Veritex Account, then those transfers might be subject to avoidance notwithstanding RCP's perfected lien on the Veritex Account.

---

[77] Id. ¶ 93.
[78] Id. ¶ 59.

2.   Count II: Preferential Transfer Under Section 547(b)

The Committee seeks to avoid the transfer of $3,851,313 and any liens and encumbrances on certain assets as preferential transfers. Section 547(b) enables a trustee to avoid any transfer made on or within ninety days preceding the petition date from an insolvent debtor to or for the benefit of a creditor and which the creditor would have received lesser value in a chapter 7 liquidation.[79] A debtor is insolvent under the Bankruptcy Code when the sum of its debts "is greater than all of [it's] property . . . ."[80] A debtor "is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."[81]

The Committee asserts a colorable claim for avoidance of a preferential transfer. Neither the Debtor nor RCP rebuts the presumption under section 547(f) that AFI was insolvent within the ninety days preceding the petition date. The disputed transactions—$3,258,313 on June 29, 2023, and $593,000 on August 17, 2023—occurred within ninety days of the petition date of August 24, 2023.

The Committee asserts that the concessions AFI made to RCP in the May 2023 Restructuring led to additional liens and financial control, channeling the disputed $3,851,313 through the Veritex Account to RCP. The Committee argues that, absent the obligations created in favor of RCP through the May 2023 Restructuring, RCP never would have received the $3,851,313 transferred within the preference period. The Committee argues, in addition, that the May 2023

---

[79] 11 U.S.C. § 547(b).
[80] 11 U.S.C. § 101(32)(A).
[81] 11 U.S.C. § 547(f).

Restructuring provided RCP blanket liens over the entirety of AFI's assets. By avoiding the obligations of the May 2023 Restructuring, the Committee asserts that RCP would have received less in a chapter 7 liquidation. The Committee's allegations create questions of fact requiring further inquiry. Accordingly, the Committee asserts a colorable claim.

      3.   Count III: Fraudulent Transfer to Insiders Under Sections 547(b), 548(a)(1)(B), and the UFTA

The Committee asserts claims seeking the avoidance of transfers and associated liens and securities as preferential transfers to insiders. The Committee seeks relief under two sections of the Bankruptcy Code. Section 547(b) permits a trustee to avoid transfers of an antecedent debt made between ninety days and one year before the petition date by an insolvent debtor to or for the benefit of an insider creditor, and the insider creditor received more than they would have in a chapter 7 liquidation.[82] Section 548(a)(1)(B) enables a trustee to avoid transfers made by debtor within two years of the petition date to a creditor if such transfer was made by the debtor who was insolvent or became insolvent as a result of the transfer and the debtor received less than equivalent value from an insider creditor.[83]

Under the Delaware Fraudulent Transfer Act § 1305(b), "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was

---

[82] 11 U.S.C. § 547(b).
[83] 11 U.S.C. § 548(a)(1)(B).

insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."[84]

The Bankruptcy Code defines an insider of a corporation as, in part, a "person in control of the debtor."[85] Non-statutory insider status "deriv[es] from the same statutory definition as the enumerated insiders in § 101(31) . . . ."[86] Courts generally find a non-statutory insider when "'there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length.'"[87] When Courts apply an established legal test for insider status to a set of facts, the issue of insider status becomes a question of fact.[88]

The challenged transfers occurred within the one-year preference period. For the insider claims under section 547, neither the Debtors nor RCP rebut the presumption that AFI was insolvent or became insolvent; for the transfers challenged under section 548 and section 1305(b), the Court determines that, owing to the December 2022 NOD and claims by the Committee, discussed <u>supra</u> Section

---

[84] 6 Del. C. § 1305(b).

[85] 11 U.S.C. § 101(31)(B)(iii).

[86] <u>U.S. Bank N.A. v. Vill. at Lakeridge, LLC</u>, 583 U.S. 387, 403 (2018) (Sotomayor, S., concurring).

[87] <u>Shubert v. Lucent Techs. Inc. (In re Winstar Comms., Inc.)</u>, 554 F.3d 382, 396-97 (3d Cir. 2009) (quoting <u>Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)</u>, 531 F.3d 1272, 1277 (10th Cir. 2008)) (alteration in original); <u>see also</u> 2 Collier on Bankruptcy P 101.31 (16th 2024) (stating that non-statutory insiders include "those entities whose relationship with the debtor is so close that their conduct should be subject to closer scrutiny than those dealing with the debtor at arm's length.").

[88] <u>See</u> <u>U.S. Bank N.A.</u>, 585 U.S. at 397-98 (holding that appellate courts decide factual inquires of insider status under the clear-error standard); <u>Anstine</u>, 531 F.3d at 1275 (holding the determination of insider status is a question of fact except where the facts are "undisputed and the issue revolved around the legal conclusion drawn from the facts . . . ."); 2 Collier on Bankruptcy P 101.31 (16th 2024) ("[W]hether an entity is a nonstatutory insider depends on whether the principal issue in the determination depends on the application of settled law to the facts or whether it is a question of the extension or refinement of the legal standard.").

III.A.1, the Committee has at least created a question of fact regarding AFI's insolvency at the time of the transfers. Further, the Committee asserts that, pursuant to the Debtors' proposed Combined Disclosure Statement and Plan of Liquidation, RCP would have been entitled to "approximately 64% in relative recoveries" in a chapter 7 liquidation, as opposed to the "relative recoveries exceeding 82%" following the May 2023 Restructuring.[89]

The Committee alleges that RCP became an insider by exercising control over AFI; as a non-statutory insider, "RCP attended AFI board meetings, had unfettered access to any and all of AFI's confidential board materials and financial documents, and received highly detailed internal operating reports from AFI that far exceeded typical borrower reporting requirements."[90] When AFI paid off the accelerated loans of the senior warehouse lender, RCP maintained first-priority liens over all of AFI's assets.[91]

RCP contends that the Committee cannot establish that RCP was an insider because the dealings between RCP and AFI occurred at arms length.[92] RCP cites to several cases supporting their contention that RCP did not exercise the requisite control over AFI to constitute non-statutory insider status.[93]

The Committee's claim rests on RCP's alleged impropriety occurring at the December 2022 NOD—noticed after RCP signed a letter of intent for an asset sale

---

[89] Comm. Reply ¶ 14.
[90] Proposed Compl. ¶ 116.
[91] Id. ¶ 52.
[92] RCP Obj. ¶ 58; see May 2023 Settlement Agreement § 16 (stating that negotiations precipitating the May 2023 Restructuring occurred at arms-length).
[93] See RCP Obj.¶¶ 60-61.

to cure the default—that provided RCP with significant leverage over AFI in the ensuing months and resulted in the May 2023 Restructuring. The Committee contends that RCP extracted significant concessions from the Debtor—without regard to whether the text of the May 2023 Settlement provides that the May 2023 Restructuring was made at arms-length.[94] There is a question of fact as to whether RCP's actions following the December 2022 NOD give it insider status. Accordingly, the Court finds that the Committee asserts a colorable claim for a constructive fraudulent transfer of an insider.

4. Count IV: Recovery of Fraudulent Transfer Under Section 550(a)

The Committee asserts colorable claims to recover fraudulent transfers. Section 550(a) permits the trustee, upon an avoidance of a transfer under sections 544, 547, and 548, among others, to recover the transfer from the initial transferee or any immediate or mediate transferees.[95] To the extent that the Committee asserts colorable claims for fraudulent transfer under sections 544, 547, and 548, and the UFTA, the Committee maintains the ability to recover from those transfers should any be avoided.

5. The Debtors Were Unjustified in Their Refusal to Prosecute Claims I-IV

The Court now determines whether the Debtors unjustifiably refused to bring the fraudulent transfer, preferential transfer, and recovery claims asserted by the

---

[94] May 2023 Settlement Agreement § 16.
[95] 11 U.S.C. § 550(a).

Committee. As stated <u>supra</u> Part II, the Court conducts a cost-benefit analysis to determine whether the Debtor unjustifiably refused to prosecute the claims.

The Debtors and RCP offer several reasons why the Debtor refused to prosecute the claims. Principally, the Debtors and RCP assert that no wrongdoing occurred, and that the May 2023 Restructuring resulted from arms-length negotiations between RCP and AFI and its counsel. Eric Bowlby, the former CEO of the Debtor, testified as much—that the deal with RCP was the best possible outcome and was one negotiated through counsel.[96]

However, the defense presented by the Debtors and RCP, and Mr. Bowlby's testimony, does not excuse the Debtors from prosecuting these claims. Whether the May 2023 Restructuring was negotiated at arms-length is a relevant fact, but sections 544, 547, 548(b)(1), and in the corresponding sections of the UFTA do not provide that arms-length negotiations create a complete defense to fraudulent transfers. Rather, the analysis revolves around the factual question of whether the debtor received reasonably equivalent value for any transfers and obligations.

Certainly arms-length negotiations remain central to whether RCP is a non-statutory insider for the purposes of section 548 and the relevant insider sections of the UFTA.[97] However, the Court does not find the evidence presented by RCP—

---

[96] Dec. 18 Tr. 216:6-11, 216:23-217:5.

[97] <u>Shubert</u>, 554 F.3d at 396-97 (holding that an arm's length negotiation precludes a finding of insider status). While Third Circuit precedent dictates that an arm's length deal precludes the finding of a statutory insider, the Court recognizes that an arm's length deal does not preclude insider status among any of the enumerated definitions of an insider in section 101(31). To this end, Justice Sotomayor, joined by Justices Kennedy, Thomas, and Gorsuch, argues that a non-statutory insider could maintain insider status while still negotiating at arm's length. <u>See</u> <u>U.S. Bank N.A.</u>, 583 U.S. at 403. While the Court does not attempt to reformulate the

namely the May 2023 Settlement and Mr. Bowlby's testimony—as dispositive of the issue at this stage. A question exists regarding RCP's conduct following the December 2022 NOD. If that conduct precipitated the May 2023 Restructurings, then improper leverage could have been utilized to force concessions from AFI, with or without the representation of counsel. That the May 2023 Settlement states that it was made at arms-length does little to cleanse the agreement or any of the other agreements purportedly made under the significant pressure from RCP. Mr. Bowlby's testimony, while relevant, is not itself dispositive of whether the May 2023 Restructuring was negotiated at arms-length; the Debtors and RCP have themselves described Mr. Bowlby as a former employee with an axe to grind. Ultimately, this is an issue requiring factual development.

RCP also contends that any litigation will be fruitless for the estates because RCP maintains blanket liens on the entirety of the Debtors' assets. However, the Committee seeks to avoid the blanket liens and releases obtained from the May 2023 Restructuring. The Committee contends that the May 2023 Restructuring granted releases valued between $50-100 million.[98] The Committee asserts—and elicited testimony from financial advisor Matthew Dundon—that RCP "extracted a projected recovery of over 82% for itself, while general unsecured creditors will recover (at best) less than 2% on account of their claims."[99] The Committee contends

---

binding precedent established in <u>Shubert</u>, the Court recognizes that issues of fact may impact the status of an insider as well as the validity of an arm's length negotiation. Such issues make a factual determination of insider status unsuitable for a motion to dismiss and instead require the development of a complete and undisputed factual record.

[98] Proposed Compl. ¶ 11; Dec. 18 Tr. 60:17-19 ("There were releases given. We have to avoid those releases to recover on anything that happened before that.").

[99] Comm. Reply ¶ 6; Dec. 18 Tr. 13:10-16:10.

that, should certain liens be avoided, "all general unsecured creditors would have recovered approximately 64%."[100] The Debtors challenged the validity of these numbers on cross-examination, and the Court does not take these numbers at face-value. However, the Court finds that a question exists regarding the recovery of funds for the benefit of the estate.

B. *Count V: Fraud and Fraudulent Inducement*

The Court assesses the Committee's fifth proposed claim for fraud and fraudulent inducement. When asserting claims of fraud, a plaintiff must "state with particularity the circumstances constituting fraud."[101] However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[102]  A claimant must plead the circumstances of the alleged fraud to meet the heightened pleading standard.[103] While claims of fraud require a heightened pleading standard, "'[g]reater liberality should be afforded in the pleading of fraud in a bankruptcy case.'"[104]

To establish a claim for fraud and fraudulent inducement, a plaintiff must show "'a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other

---

[100] Comm. Reply ¶ 6.

[101] Fed. R. Civ. Pr. 9(b). Bankruptcy Rule 7009 requires bankruptcy courts to apply Federal Rule 9(b) in adversary proceedings.

[102] Fed. R. Civ. Pr. 9(b).

[103] Seville Indust. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984) (noting that while "allegations of 'date, place or time'" often adequately describe the circumstances, "nothing in [Rule 9(b)] requires them").

[104] Glob. Link Liquidating Tr. v. Avantel, S.A. (In re Glob. Link Telecom. Corp.), 327 B.R. 711, 717 (Bankr. D. Del. 2005) (quoting In re O.P.M. Leasing Servs., Inc., 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983)) (noting that third parties often plead fraud based on secondhand knowledge of the facts).

party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury . . . .'"[105]

The Committee alleges three material representations that RCP made to AFI during negotiations of the May 2023 Restructuring, among "other material representations."[106] The Committee alleges that RCP represented to AFI that, first, it would cooperate with AFI to establish a "reasonable path forward with the warehouse loans and the business generally[,]" second, "forbear from taking any more actions that would negatively impact AFI's business[,]" and third, "would be reasonable in its budget approvals."[107]

AFI asserts that RCP falsely represented to AFI its intention to assist the rebooting of AFI's operations. After the May 2023 Restructuring, RCP withdrew $8,258,313.00 from AFI's accounts; the Committee contends these cash sweeps left AFI undercapitalized and ultimately in violation of liquidity covenants with the GSEs.[108]

The Committee fails to assert a colorable claim for fraud and fraudulent inducement. The Committee accuses RCP of inducing AFI to agree to the May 2023 Restructuring by agreeing to behave in a "commercially reasonable manner" and forbear from taking actions "that would negatively impact AFI's businesses."[109]  But

---

[105] <u>Ambac Assur. Corp. v Countrywide Home Loans, Inc.</u>, 151 A.D.3d 83, 85 (N.Y. 2017) (quoting <u>Pasternack v Laboratory Corp. of Am. Holdings</u>, 27 N.Y.3d 817, 827 (N.Y. 2016) (alteration in original)); <u>see also</u> <u>Sokolow v. Lacher</u>, 299 A.D.2d 64, 70 (N.Y. App. Div. 2002) (holding that for claims of fraudulent inducement, "there must be a knowing misrepresentation of material fact, which is intended to deceive another party and to induce them to act upon it, causing injury.").
[106] Proposed Compl. ¶ 127.
[107] <u>Id.</u>
[108] <u>Id.</u> ¶¶ 61-62, 127-28.
[109] Proposed Compl. ¶¶ 60, 127.

the Committee fails to justify a reliance on those broad—and unspecified—promises. RCP swept the $8,258,313.00 from the Veritex Account. At the time of the sweeps, RCP maintained a properly perfected lien on the Veritex Account. The March 2023 Term Sheet dictated that the proceeds of sales of non-core assets would be applied to the outstanding principal of the loan balance that AFI owed RCP.[110] The May 2023 Amended Credit Agreement required AFI to deposit the proceeds of non-core asset sales into the Veritex Account.[111] AFI could not disburse any proceeds of non-core asset sales from the Veritex Account without the permission of RCP—the funds were specifically earmarked for paydown of the loan balance.[112] Any sweeps from the Veritex Account resulted from the specific terms of the May 2023 Restructuring. The Committee's allegations regarding RCP's promises do not provide particularized detail to justify a reliance on promises that counter the specific terms included in the March 2023 Term Sheet and in the May 2023 Restructuring.

The Committee argues that the Court may accept "averments based upon information and belief" because the particular facts necessary to prove fraud remain under the control of the Debtor.[113] Courts relax the particularity requirements under Rule 9(b) when factual information detailing the alleged fraud "is peculiarly within the defendant's knowledge or control."[114]

---

[110] RCP Obj. Ex. P (the "March 2023 Term Sheet") at 3.
[111] May 2023 Amended Credit Agreement § 10.03.
[112] Id. § 10.05(b).
[113] Comm. Reply ¶ 19.
[114] Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989).

But the Committee does not allege any necessary information held by either RCP or the Debtor.[115] The Committee asserts that RCP made illusory promises to AFI to induce it to agree to the May 2023 Restructuring. However, the Committee alleges no factual bases to demonstrate that RCP made promises to AFI that directly contravened the terms of the May 2023 Restructuring. Even considering the lower pleading standard, the Committee still has not adequately pled that AFI justifiably relied on these promises if they directly contravened the express terms of the May 2023 Restructuring.

## C.  *Count VI: Breach of Covenant of Good Faith and Fair Dealing*

The Committee asserts claims for breach of the covenant of good faith and fair dealing. The Committee bases its claim on several contracts, including but not limited to the 2021 Credit Agreement and the May 2023 Amended Credit Agreement.[116] The Committee contends that RCP breached the covenant of good faith and fair dealing in relation to the 2021 Credit Agreement and the May 2023 Amended Credit Agreement by "withholding AFI's access to cash and warehouse lines of credit."[117]

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance."[118] The covenant of good faith and fair dealing safeguards the right of each party to "receive the fruits of the contract" bargained

---

[115] Id. ("[E]ven under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based.").

[116] Comm. Mot. ¶ 107; Proposed Compl. ¶ 135. New York law governs both agreements.

[117] Proposed Compl. ¶ 136.

[118] 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 154 (N.Y. 2002).

for.[119] The covenant of good faith and fair dealing includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included . . . ."[120] Courts may not enforce the covenant of good faith and fair dealing in ways inconsistent with the specific contractual terms.[121]

The Committee does not assert a colorable claim for breach of good faith and fair dealing in relation to the 2021 Credit Agreement. The Committee asserts that the December 2022 NOD caused the Warehouse Lenders to accelerate their loans and left AFI without warehouse financing for months.[122] But the 2021 Credit Agreement required RCP to send notice of defaults to certain warehouse lenders upon AFI's failure to cure its default.[123] RCP's notice of default arose from the terms of RCP's subordination agreement.

Similarly, provisions of the May 2023 Credit Agreement required that revenue be held in a "cash collateral account subject to a [DACA]."[124] The Committee argues that the Court must "closely scrutinize" the actions of RCP as they "involve [an] insider[] with extraordinary influence over the vulnerable debtor."[125]   While the Court notes that RCP's status as an insider following the December 2022 NOD remains a question of fact, the basic terms of the contract demonstrate that RCP maintained the right to withdraw cash from the subject

---

[119] <u>Kirke La Shelle Co. v. Paul Armstrong Co.</u>, 263 N.Y. 79, 87 (N.Y. 1933).
[120] <u>Rowe v. Great Atlantic & Pacific Tea Co.</u>, 46 N.Y.2d 62, 69 (N.Y. 1978) (quoting 5 Williston, Contracts, § 1293 p 3682 (rev. ed., 1937)).
[121] <u>Murphy v. Am. Home. Prods. Corp.</u>, 58 N.Y.2d 293, 304 (N.Y. 1983).
[122] Proposed Compl. ¶¶ 38, 48.
[123] <u>See, e.g.</u>, RCP Obj. Ex. B (the "<u>Flagstar Subordination</u>") § 2.
[124] <u>See</u> May 2023 Amended Credit Agreement §§ 2.07, 10.02, 10.03, 10.05(b).
[125] Reply ¶ 22.

accounts. As noted in the discussion above of the alleged fraudulent transfers, <u>supra</u>
Sections III.A.1-3, there exists a question of fact as to whether AFI received
equivalent value in return for, in part, granting RCP with control over those
accounts. But the terms of the contract clearly provided RCP with certain control
over AFI's finances and the discretion to approve new warehouse lines of credit. The
Committee does not assert colorable claims for breach of the covenant of good faith
and fair dealing.

### D. *Count VII: Equitable Subordination of RCP's Claims Against Any Debtor*

The Committee asserts a claim for equitable subordination of RCP's claims to
all the Debtors' unsecured claims. Section 510(c)(1) enables the Court to
subordinate a claim for equitable considerations.[126] Equitable subordination is
appropriate when "(1) '[t]he claimant [] engaged in some type of inequitable
conduct;' (2) '[t]he misconduct [] resulted in injury to the creditors of the bankrupt
or conferred an unfair advantage on the claimant;' and (3) '[e]quitable subordination
of the claim [is not] inconsistent with the provisions of the Bankruptcy [Code].'"[127]
To make a proper claim for equitable subordination, the claimant must demonstrate
inequitable conduct that "relate[s] to damage that was caused to the relative
positions of creditors in a bankruptcy context."[128] Courts impose equitable

---

[126] 11 U.S.C. § 510(c)(1).
[127] <u>Shubert</u>, 554 F.3d 382, 411 (3d Cir. 2009) (quoting <u>Benjamin v. Diamond (In re Mobile Steel Co.)</u>, 563 F.2d 692, 699–700 (5th Cir. 1977).
[128] <u>In re M. Paolella & Sons, Inc.</u>, 161 B.R. 107, 117 (E.D. Pa. 1993) <u>aff'd</u> 37 F.3d 1487 (3d Cir. 1994); <u>see also</u> <u>Citicorp Venture Capital, Ltd.</u>, 323 F.3d 228, 233-34 (3d Cir. 2001).

subordination as a remedial doctrine to offset inequities; the Court does not impose equitable subordination as a punitive measure.[129]

Courts apply a rigorous level of scrutiny to insider conduct when considering equitable subordination.[130] The Bankruptcy Code defines an insider in relevant part as "a person in control of the debtor . . . ."[131]

The Committee claims RCP engaged in inequitable conduct as an insider by issuing a bad faith notice of default on December 2, 2022 and notifying AFI's senior warehouse lenders.[132] The Committee claims RCP issued the notice of default to extract leverage over AFI and pressure AFI into consenting to favorable terms for RCP in the May 2023 Restructuring.[133] The Committee maintains that RCP continued its inequitable conduct in its attempt to gain control over AFI by obtaining releases and improving its position among creditors, and by pushing AFI into liquidation.[134]

The Committee does not assert a colorable claim for equitable subordination regarding the December 2022 NOD. First, the Committee fails to plead adequately that, at the time of the December 2022 NOD, RCP was an insider of AFI. At the time of RCP's issuance of the December 2022 NOD, RCP's relationship with AFI

---

[129] Shubert, 554 F.3d at 411.
[130] Id. at 412. (citing In re Fabricators, Inc., 926 F.2d 1458, 1465 (5th Cir. 1991) (noting that insiders have greater opportunities to engage in inequitable conduct); In re Mid-American Waste Sys., 284 B.R. 53, 69 (Bankr. D. Del. 2002) ("The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider 24 or outsider in relation to the debtor at the time of the act.").
[131] 11 U.S.C. § 101(31)(B)(iii).
[132] Proposed Compl. ¶ 141; Comm. Mot. ¶ 7-8.
[133] Comm. Mot. ¶ 12.
[134] Proposed Compl. ¶¶ 141-42.

existed in the form of the 2021 Credit Agreement and related subordination agreements with the senior warehouse lenders.[135] The Committee does not plead a sufficient set of facts to demonstrate RCP engaged in inequitable conduct leading up to the December 2022 NOD. The 2021 Agreement created a covenant for AFI to ensure that the principal owed on the loan did not exceed 75% of AFI's "Tangible Net Worth."[136] If AFI did not meet the standards of the ratio covenant, AFI would have ninety days to reach compliance.[137] Failure to reach compliance constituted an event of default, enabling RCP to accelerate the payment of the principal on the loan.[138] AFI breached the covenant by failing to make adequate payment within the ninety-day period.[139]

The Subordination Agreement required RCP to notify Flagstar Bank of any event triggering an acceleration of the loan.[140] Flagstar Bank was one of AFI's warehouse lenders.[141] Under the terms of the Subordination Agreement, RCP properly notified Flagstar Bank of AFI's default. The Committee contends that RCP signed a letter of intent agreeing to an asset sale to cure AFI's default.[142] But agreeing to an asset sale does not obviate the need for RCP to provide notice of the loan default to the Warehouse Lenders. RCP maintained an obligation to notify

---

[135] <u>See generally</u> 2021 Credit Agreement; <u>see, e.g.,</u> Flagstar Subordination Agreement.
[136] 2021 Credit Agreement § 6.11(d)(ii).
[137] <u>Id.</u> § 6.11(d)(iii).
[138] <u>Id.</u> § VII(a).
[139] Proposed Compl. ¶ 36.
[140] Subordination Agreement § 2.
[141] Comm. Mot. ¶ 32.
[142] Proposed Compl. ¶ 6.

Flagstar Bank of AFI's default. The Committee does not assert a colorable claim of equitable subordination regarding the December 2022 NOD.

The Committee asserts a colorable claim of equitable subordination regarding RCP's conduct after the December 2022 NOD. RCP extracted significant obligations and concessions from AFI after the December 2022 NOD—including the release of claims against AFI.[143]  A question of fact exists whether AFI received reasonably equivalent value for those obligations and concessions. Similarly, the Court notes a question of fact exists regarding RCP's status as an insider after the December 2022 NOD.

The Committee alleges several instances of inequitable conduct that led to the May 2023 Restructuring, as well as inequitable conduct following those agreements. RCP engaged in negotiations with AFI while AFI faced significant pressure; the December 2022 NOD created significant monthly costs for AFI alongside a steep drop in monthly revenue and a fifty percent loss of its employed loan originators.[144] When AFI paid off the accelerated loans of its warehouse lenders, RCP became the senior lienholder.[145] RCP then engaged in financing negotiations with AFI resulting in the significant obligations and concessions mandated in the May 2023 Restructuring.[146]

---

[143] See supra Secs. I.A.1-3; see also Proposed Compl. ¶ 59.
[144] Proposed Compl. ¶ 49.
[145] See id. ¶ 52.
[146] Id. ¶ 59.

While undercapitalized, AFI had difficulty meeting its payroll obligations in August 2023.[147] The Committee contends that section 10.05(b) of the May 2023 Credit Agreement obligated RCP to allow AFI to utilize certain cash to meet operating expenses—including payroll obligations.[148] The Committee asserts that RCP agreed to fund AFI's payroll obligations in exchange for several concessions, including a universal mutual claims release—RCP's second claims release following the releases in the May 2023 Restructuring—and the removal of several employees in AFI's leadership from payroll.[149] RCP and AFI could not come to an agreement.[150]

On August 22, 2023, AFI served RCP with a notice of default for breaches of sections 5.01(e) and 10.05(b) of the May 2023 Credit Agreement, the breach of the Side Letter designed to ensure AFI remained in compliance with certain agency requirements, and for the breach of fiduciary duties as an AFI equity holder.[151] On August 24, 2023, RCP served AFI with a reciprocal notice of default, effectively taking control of AFI and, on the same day, directing AFI to file a chapter 11 petition.[152]

RCP and the Debtor contend that the May 2023 Restructuring resulted from arms-length negotiations between sophisticated parties.[153] In addition, the Debtors dispute the alleged breaches of sections 5.01(e) and 10.05(b) of the May 2023 Credit Agreement. The Debtor contends that section 5.01(e) provided RCP with the right to

---

[147] Id. ¶¶ 63-64.
[148] Id. ¶ 63.
[149] Id. ¶ 64.
[150] Id. ¶ 65.
[151] Id. ¶ 68.
[152] See id. ¶¶ 69, 72-73.
[153] Debtor's Obj. ¶ 25; RCP Obj. ¶ 33.

keep excess funds and no obligation to advance funds for AFI to meet expenses.[154] Similarly, the Debtor contends that section 10.05(b) does not mandate that RCP release funds "in excess of the Reserved Cash."[155]

The Committee's assertions of inequitable conduct ultimately rest on the conduct asserted in AFI's notice of default to RCP. Sections 5.01(e) and 10.05(b) of the May 2023 Credit Agreement dictate budget approval and the disbursement of funds for operations, respectively, though as the Debtors note these provisions contain limitations on RCP's obligations. The Court does not have in evidence the specific facts to determine whether RCP's actions comported with the terms of sections 5.01(e) and 10.05(b). Nor does the Court have the developed factual record to determine if RCP's actions comported with the requirements of the Side Letter, or if RCP breached its fiduciary duties as an equity holder in AFI. Factual questions exist regarding RCP's conduct as alleged in AFI's notice of default.

The Committee must also allege a colorable claim that RCP's inequitable conduct harms creditors. The Committee first alleges that RCP refused to fund payroll obligations in violation of the May 2023 Credit Agreement, and instead attempted to extract significant concessions—namely the universal claims release.[156] In addition, the Committee alleges that violations of the May 2023 Side Letter ensured AFI fell out of compliance with GSE liquidity covenants.[157] The Committee asserts that RCP's violations therefore enabled it to take control over

---

[154] Debtor's Obj. ¶ 43.
[155] Id.
[156] Proposed Compl. ¶ 64.
[157] See id. ¶ 68.

AFI and direct it into bankruptcy proceedings. Once in bankruptcy proceedings, RCP, as DIP-lender, obtained the releases previously sought in the payroll negotiations.

Taking the Committee's pleadings as true, the Committee asserts a colorable claim that the alleged inequitable conduct directly related to the damage to the relative positions of other creditors. The Committee therefore asserts a colorable claim for equitable subordination.

The Court must determine whether the Debtors unjustifiably refused to prosecute the claim for equitable subordination. RCP argues that it took actions consistent with its rights under the 2021 Credit and the May 2023 Restructuring agreements—actions far from any inequitable conduct alleged.[158] The Court agrees that the Committee does not adequately allege that AFI was an insider before the December 2022 NOD. But the Committee asserts specific violations of the May 2023 Restructuring by RCP—a time during which the Court recognizes a factual dispute regarding RCP's insider status. Further proceedings are necessary to fully determine the extent to which any inequitable conduct stemming from violations of the May 2023 Restructuring conferred an unfair advantage to RCP or harmed AFI or the creditors. Given that RCP cannot demonstrate that sections 5.01(e) and 10.05(b) were not violated, that RCP did not violate the May 2023 Side Letter, or that RCP did not breach its fiduciary duty as an equity holder of AFI, the Debtors were unjustified in their refusal to prosecute the claims.

---

[158] See RCP Obj. ¶¶ 6, 79.

E.  *Count VIII-IX: Declaratory Judgment that the Unperfected Deposit Accounts are Unencumbered and Avoidance of Unperfected Liens and Security Interests with Respect to the Unperfected Deposit Accounts*

The Committee seeks a declaratory judgment that RCP does not maintain a lien or security interest on certain deposit accounts. The Committee also seeks to have RCP's unperfected security interests avoided on the accounts.

The Court may issue a declaratory judgment "regarding the rights and legal relations of any interested party seeking such declaration."[159] The Court may order further necessary relief in connection with the declaratory judgment.[160] Under Arizona state law, a party perfects a security interest in a deposit account by exercising control; a party exercises control through agreement with the debtor and the bank in the form of a deposit account control agreement, or when the party "becomes the bank's customer with respect to the deposit account."[161] The Bankruptcy Code permits a trustee to avoid the transfer of unperfected liens on estate property.[162]

The Committee asserts a colorable claim that the accounts at issue were unperfected. RCP cedes that the accounts are unperfected, but contends the accounts are unperfected because AFI "failed to comply with its obligation in section 10.02 of the [May 2023 Amended Credit Agreement] to obtain [DACAs] for those accounts."[163] Regardless, the Committee cannot determine that Debtors were

---

[159] 11 U.S.C. § 2201(a).
[160] 11 U.S.C. § 2202.
[161] Ariz. Rev. Stat. §§ 47-9104, 47-9312, 47-9314.
[162] See 11 U.S.C. § 544.
[163] RCP Obj. ¶ 67.

unjustified in their refusal to bring the claim. According to the Debtors and RCP, the accounts contain a total of around $400,000, well below the total amount of RCP's claims.[164] The Committee does not allege a total amount held in the accounts. In addition, because any funds in the accounts serve as RCP's collateral as DIP-lender, any recovery from the accounts would end up with RCP to no additional benefit to the estate. The Debtors did not unjustifiably refuse to bring the claims.

F. *Counts X-XI: Tortious Interference with Contractual and Business Relationships*

The Committee asserts claims against RCP for both tortious interference with contractual relationships and tortious interference with business relationships under New York, Arizona, and Delaware law.

To obtain relief for tortious interference with contractual relationships, the claimant must demonstrate that "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was [improper or] without justification, and (5) it caused injury."[165]

To obtain relief for tortious interference with business relationships, the claimant must demonstrate "(1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered

---

[164] Id.; Debtor's Obj. ¶ 64.

[165] WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P., 49 A.3d 1168, 1174 (Del. 2012) (quoting Restatement (Second) of Torts § 767). The requirements under New York and Arizona law to sustain a claim for tortious interference with contractual relationships remain largely the same to those of Delaware. See Bradbury v. Cope-Schwarz, 20 A.D.3d 657, 659 (N.Y. App. Div. 2005); MDY Indus., LLC v. Blizzard Entm't, Inc., 629 F.3d 928, 955 (9th Cir. 2010); Safeway Ins. Co. V. Guerrero, 210 Ariz. 5, 10 (Ariz. 2005).

with it; (3) that the defendant acted solely out of malice or used improper or illegal

means that amounted to a crime or independent tort; and (4) that the defendant's

interference caused injury to the relationship with the third party."[166] Tortious

interference with business relations requires a higher level of culpable conduct by

the defendant.[167] A defendant engages in culpable conduct when the defendant

accomplishes the interference through wrongful means.[168]

The Committee alleges that RCP used its insider status to obtain a

controlling position over AFI.[169] The Committee asserts that RCP issued its notice

of default and subsequently "starved AFI of cash and refused to consent to new lines

of credit"—causing AFI to breach its contracts with its warehouse lenders and

critical vendors.[170]

The Committee does not allege colorable claims for tortious interference with

contractual or business relationships. RCP's initial action, the December 2, 2022

NOD, occurred pursuant to the 2021 Credit Agreement.[171] RCP was obligated under

the Subordination Agreement to notify Flagstar Bank occurred of an event of

default.[172] The Committee alleges no facts that demonstrate these actions were

either improper or without justification, or with actual malice. To the contrary, RCP

---

[166] Delaware provides a cause of action for the tortious interference of potential business
relations. See, e.g., U.S. Bank Nat'l Ass'n v. Gunn, 23 F.Supp.3d 426, 436 (D. Del. 2014) (citing De
Bonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1153 (Del. 1981)).
[167] Law Offs. Of Ira H. Leibowitz v. Landmark Ventures, Inc., 131 A.D.3d 583, 585 (N.Y. App. Div.
2015).
[168] Id.
[169] Comm. Mot. ¶ 110.
[170] Proposed Compl. ¶¶ 158, 160.
[171] See 2021 Credit Agreement §§ 6.11(d)(iii), VII(a).
[172] See Flagstar Subordination Agreement § 2.

took actions consistent with their contractual obligations. The Committee does not assert colorable claims for tortious interference of contractual or business relationships.

IV.    CONCLUSION

The Court determines that the Committee asserts colorable claims as to Counts I, II, III, IV, and VII. The Court also determines that the Debtors unjustifiably refused to prosecute those claims. In accordance with the Court's findings, the Committee's motion is granted in part to those claims, and denied as to the remaining claims.

Dated: August 14, 2024
Wilmington, Delaware

_____
Thomas M. Horan
United States Bankruptcy Judge