IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMERIFIRST FINANCIAL, INC., *et al.*,[1] | : | Case No. 23-11240 (TMH) |
| | : | |
| | : | **Obj. Deadline: Nov. 26, 2025 at 4:00 p.m. (ET)** |
| Debtors. | : | **Hearing Date: Dec. 4, 2025 at 2:00 p.m. (ET)** |

**OBJECTION OF UNITED STATES TRUSTEE TO DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) GRANTING CONDITIONAL APPROVAL OF THE ADEQUACY
OF DISCLOSURES IN THE AMENDED COMBINED DISCLOSURE STATEMENT
AND PLAN; (II) SCHEDULING A COMBINED CONFIRMATION HEARING AND
SETTING DEADLINES RELATED THERETO; (III) APPROVING SOLICITATION
PACKAGES AND PROCEDURES; (IV) APPROVING THE FORMS OF BALLOTS;
AND (V) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Regions 3 and 9 ("U.S. Trustee"), through

his undersigned counsel, hereby objects (the "Objection") to: (i) approval on an interim basis of

the disclosures in the *Amended Combined Disclosure Statement and Plan of Liquidation of*

*Amerifirst Financial Inc. and Phoenix 1040 LLC Under Chapter 11 of the Bankruptcy Code* [D.I.

1181] ("Combined Plan and Disclosure Statement" or, separately in relevant part, the "Disclosure

Statement" or the "Plan") and (ii) *Debtors' Motion for Entry of an Order (I) Granting Conditional*

*Approval of the Adequacy of Disclosures in the Amended Combined Disclosure Statement and*

*Plan; (ii) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto;*

*(iii) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots; and*

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax
identification number are: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557).  The Debtors'
service address is 575 W. Chandler Boulevard, Suite 225, Unit 236, Chandler, AZ 85225.

*(V) Granting Related Relief* [D.I. 1183] (the "<u>Procedures Motion</u>"),[2] and in support of this

Objection respectfully states:

## <u>PRELIMINARY STATEMENT</u>

1.      The Court should deny interim approval of the Combined Plan and Disclosure

Statement for the following reasons:

> (a) The Combined Plan and Disclosure Statement fails to provide adequate disclosures to creditors because it does not attach a separate liquidation analysis.

> (b) The Plan is unconfirmable and should not be solicited using procedures that facilitate the plan's defects. The court must deny approval of a disclosure statement if the proposed related plan is not confirmable on its face. Here, the Plan is unconfirmable for two separate and independent reasons. First, the Plan does not propose to pay administrative claims in full in cash as required by 11 U.S.C. 1129(a)(9). Second, the Combined Plan and Disclosure Statement imposes non-consensual third-party releases on holders of claims who are unimpaired, holders of claims who vote to accept the plan, as well as other holders of claims who vote to reject the Plan and do not opt out of the releases. Because the Plan's releases would be facilitated through the solicitation procedures, review of the scope and consensual nature of the releases is ripe at this stage.

> (c) At the confirmation stage, the U.S. Trustee anticipates objecting to certain Plan provisions which may render the Plan unconfirmable as drafted.

> (d) Assuming the above deficiencies are remedied, as set forth in further detail below, the proposed form of order, ballots and notices should be modified in several respects.

2.      Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee

respectfully requests that the Court enter an order or orders: (a) denying interim approval of the

disclosures in the Combined Plan and Disclosure Statement; and (b) denying approval of the

Procedures Motion.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Combined Plan and Disclosure Statement and the Procedures Motion, as applicable.

## JURISDICTION AND STANDING

3.      This Court has jurisdiction to hear and determine the Procedures Motion and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

4.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

5.      The U.S. Trustee has standing to be heard on the Procedures Motion pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND

### The Chapter 11 Cases

6.      On August 24, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**7.**      The U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") on September 15, 2023.

### The Global Settlement Motion

8.      On August 6, 2025, the Debtors filed the *Motion for Entry of Order (I) Approving Global Settlement Agreement with the Official Committee of Unsecured Creditors and RCP, and (II) Granting Related Relief* (the "9019 Motion") [D.I. 1059].

9.      Pursuant to the 9019 Motion, the Debtors sought approval of a global settlement between the Debtors, the Committee and RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. (the RCP entities together, "RCP"), which settlement would provide the framework for a plan of liquidation of the Debtors.

10.     On August 20, 2025, the U.S. Trustee filed an objection to the 9019 Motion at D.I. 1081 on the basis that because the proposed global settlement provided a maximum amount of $370,000 for funding unpaid administrative and priority claims, approval of the settlement agreement may result in a distribution being provided to general unsecured creditors without the payment in full of administrative and priority claims, in violation of *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).

11.     At a hearing held on August 21, 2025, the Court overruled the U.S. Trustee's objection and approved the 9019 Motion by order entered at D.I. 1090 (the "Settlement Agreement Order"). The principal terms of the settlement, as approved by the Settlement Agreement Order, are as follows:

- The Debtors, with RCP's consent, shall, within 5 days of the Settlement Effective Date, allocate $2.23 million of the Debtors' cash on hand into a segregated fund (the "Allowed Claims Fund") to be used by the Plan Administrator (selected by the UCC) for the sole purposes of paying (i) allowed General Unsecured Claims pursuant to, and in accordance with a liquidating plan (the "Plan"), (ii) the Plan Administrator's expenses, (iii) U.S. Trustee fees imposed after the Plan Effective Date, and (iv) professional fees incurred in connection with the evaluation and pursuit of the UCC Avoidance Actions.

- RCP waives any and all right to a distribution from the Allowed Claims Fund.

- RCP consents to the use of its cash collateral for the purpose of paying all (a) allowed but unpaid administrative claims (other than Professional Fee Claims, which Claims are compromised and addressed in paragraph 4 of the Settlement Agreement), (b) allowed but unpaid priority claims, and (c) all costs and expenses associated with reconciling and/or objecting to any Administrative Claims filed in connection therewith, in the aggregate maximum amount of

$370,000; and (d) all fees charged by the Office of the United States Trustee through the Plan Effective Date.

9019 Mot. ¶ 9.

**The Procedures Motion**

12.     On November 12, 2025, the Debtors filed the Procedures Motion.

13.     In the Procedures Motion, the Debtors request interim approval of the disclosures in the Combined Plan and Disclosure Statement and approval of procedures for the solicitation and tabulation of votes on the Combined Plan and Disclosure Statement.

14.     The Combined Plan and Disclosure Statement effectuates a liquidation of the Debtors and provides for the distribution of the Allowed Claims Fund to unsecured creditors.

15.     The Motion requests approval of the forms of Ballot for use in soliciting votes from Class 2 (Prepetition Lenders Secured Claims) and Class 4A (Amerifirst Unsecured Claims). Procedures Mot. ¶ 33. The forms of ballot are attached to the Procedures Motion as Exhibit C. Only the Class 4A ballot contains an opt-out provision, which states as follows:

> **Item 2.  (Optional) Plan Releases (Do not complete if you have accepted the Combined Plan).**
>
> Pursuant to the Combined Plan, if you return a Ballot and vote to REJECT the Plan, but do not elect to opt out of the third party release provision contained in Section 16.2(a).2 of the Plan, you are automatically deemed to have agreed to give the releases in Section 16.2(a).2 of the Plan. However, you may check the box below to opt out of, and therefore not give, the releases in Section 16.2(a).2 of the Combined Plan.
>
> ☐     I hereby ELECT TO OPT OUT of the release provision contained in Section 16.2(a).2 of the Combined Plan.

16.     The Motion also requests approval of (i) a Notice of Non-Voting Status for service on holders of Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) who are unimpaired under the Combined Plan and Disclosure Statement, and (ii) a Notice of Non-Voting Status for services on holders of Class 4B (Phoenix Unsecured Claims) and Class 6A and 6B (Interests) who are impaired and deemed to reject the Combined Plan and Disclosure Statement.

Procedures Mot. ¶ 39. These forms of Notice of Non-Voting Status are attached to the Procedures Motion as Exhibits D and E. The forms of Notice of Non-Voting Status do not contain any conspicuous reference to the Third-Party Release or its effect on unimpaired claimants other than repeating the exculpation, release, and injunction provisions verbatim from the Combined Plan and Disclosure Statement.  Procedures Mot. Ex. D.

**The Combined Plan and Disclosure Statement**

17.    The Combined Plan and Disclosure Statement includes the following provisions relevant to this Objection.

*Administrative Claim Provisions*

18.    The Combined Plan and Disclosure Statement provides the following definition for the term "Administrative-Priority Claims Reserve":

> "Administrative-Priority Claims Reserve" means "an amount of Cash not to exceed $370,000 from RCP's cash collateral set aside for the purpose of paying Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims as set forth in the Settlement Agreement."

Combined Plan and Discl. Stmt. § 3.2.

19.    The Combined Plan and Disclosure Statement provides for the following treatment of Administrative Claims:

> (a)    **Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive, without interest, Cash from the Administrative-Priority Claims Reserve equal to the Allowed amount of such Claim**: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or Post-Effective-Date Debtor(s), as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C.

§ 1930(a)(6), as and when due under applicable law.

(i) Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtors, the Post-Effective-Date Debtor(s), the Estates, or their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

(ii) All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date by the Debtors. **All fees due and payable under 28 U.S.C. § 1930 accruing after the Effective Date shall be paid by the Plan Administrator from the Allowed Claims Fund.**

*Id.* § 8.2 (emphasis added).

*Abstaining Classes Provision*

20.      The Combined Plan and Disclosure Statement provides the following with respect to abstaining classes: "If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtors and the Committee shall request the Bankruptcy Court deem the Plan accepted by the Holders of such Claims in such Class." *Id.* § 9.3

*Exculpation Provision*

21.      Section 16.1 of the Combined Plan and Disclosure Statement provides as follows:

1. Exculpation.

The (i) Debtors, (ii) the Debtors' directors, officers, managers, and employees that served in such capacity, (iii) the Committee and the members thereof, and (iv) each of their respective professionals retained during the Chapter 11 Cases, each solely in their capacities as such (collectively, the "Exculpated Parties"), will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or

7

Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided however,* that any Exculpated Party shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code. For the avoidance of doubt, Paladin, together with the personnel provided by it to furnish services to the Debtors during the Chapter 11 Cases, including T. Scott Avila, the Debtors' CRO, and the personnel of Paladin assisting the CRO, are Exculpated Parties.

Combined Plan and Discl. Stmt. § 16.1.

*Third Party Release Provisions*

22.     Section 16.2 (a) 2. of the Combined Plan and Disclosure Statement provides as follows (the "<u>Third-Party Release</u>"):

2. Third Party Release.

On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, **each Claimant (collectively, the "Releasing Parties") who (i) is not Impaired under the Plan; (ii) affirmatively votes to accept the Plan, or (iii) affirmatively votes to reject the Plan but who does not elect to "opt-out" by marking the appropriate box on such Releasing Party's respective Ballot, for themselves and their respective successors, assigns, transferees, and such Claimants' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), shall release (the "Third Party Release") each Released Party**, and each of the Released Parties shall be deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), **based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right,**

8

**or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases,** the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence; provided however, the foregoing Third Party Release shall not release any obligations of any party under the Plan, the Settlement Agreement, or any other document, instrument, or agreement executed to implement the Plan. For the avoidance of doubt, the Third Party Release is not intended to and shall not modify any and all of the releases set forth in the Settlement Agreement and the Settlement Agreement Order

Combined Plan and Discl. Stmt. 16.2(a) 2. (emphasis added).

23.     The Combined Plan and Disclosure Statement provides the following definition for the term "Releasing Parties": "'Releasing Parties' has the meaning set forth in Section 16.2(c) hereof." *Id*. § 3.110.

24.     The Combined Plan and Disclosure Statement provides the following definition for the term "Released Parties:"

"Released Partes" means, means, collectively, (a) the Debtors and Post-Effective-Date Debtors; (b) the Committee and the individual members thereof, solely in their capacity as such; (c) the Prepetition Lenders; (d) the Prepetition Agent; (e) the DIP Agent (as defined in the DIP Documentation) and DIP Lenders**;** and (e) each of such Entities' Related Persons.

*Id.* § 3.109.

25.      Based on the definition of Releasing Parties, the Combined Plan and Disclosure Statement would impose third-party releases on holders of claims who (i) are deemed to accept the Plan, (ii) vote to accept the Plan, or (iii) vote to reject the Plan, unless such rejecting claimants opt out of the third-party release.

## ARGUMENT

### I.   THE COMBINED PLAN AND DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION.

#### A.   Applicable Legal Standard

26.     The disclosure statement requirement of Bankruptcy Code section 1125 is "crucial to the effective functioning of the federal bankruptcy system" and, consequently, "the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*), 848 F.2d 414, 417-18 (3d Cir. 1988)). "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 100 (3d Cir. 1988). Further, section 1129(a)(2) of the Bankruptcy Code conditions confirmation upon compliance with applicable Code provisions. The adequate disclosure requirement of section 1125 is one of those provisions. *See* 11 U.S.C. § 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

27.     The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, *that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*[.]

*See* 11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

28.     To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan.  *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").  Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives so that they can intelligently accept or reject the plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

29.     Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors.  *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove*, 860 F.2d at 100).

30.     Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement if the information is accurate, and its inclusion is not misleading.  *See id.* The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan.  *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999).  The disclosure

11

statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

### B. The Combined Plan and Disclosure Statement Lacks Adequate Information Regarding Amounts Creditors Would Receive in a Chapter 7 Liquidation

31.    The Combined Plan and Disclosure Statement does not provide sufficient disclosures appropriate to the circumstances of these chapter 11 case because it does not attach a separate liquidation analysis.  As a result, the Combined Plan and Disclosure Statement does not contain adequate information to allow a creditor to make an informed judgment as to whether such creditor would receive at least as much as it would receive in a chapter 7 liquidation. The Combined Plan and Disclosure Statement provides only general statements that recoveries expected under the Combined Plan and Disclosure Statement will likely be greater than a chapter 7 liquidation, and that "the Debtors believe that holders of General Unsecured Claims would likely receive no recovery in a Chapter 7 proceeding." Combined Plan and Discl. Stmt. p. 31.  The Combined Plan and Disclosure Statement does not provide any estimate of the cost if the Debtors' remaining assets were liquidated by a chapter 7 trustee other than to state that the Debtors believe the costs would be higher in a chapter 7 scenario. *Id.*

32.    The application of the best interest test involves a hypothetical application of chapter 7 to a chapter 11 plan.  See *In re Stone & Webster, Inc*., 286 B.R. 532 (Bankr. D. Del. 2002).  If the plan fails the section 1129(a)(7) test, then the creditors are better off in a chapter 7 liquidation.  Here, the creditors are essentially being asked to accept a general statement from the Debtors without any comparative analysis demonstrating what they would receive in a hypothetical chapter 7 liquidation.

33.    Accordingly, the Combined Plan and Disclosure Statement fails to provide sufficient information for creditors and parties in interest to make an informed decision regarding

whether to vote in favor of or to reject the Plan.

## II.    THE PLAN MAY NOT PAY ADMINISTRATIVE CLAIMS IN FULL.

### A.   Introduction

34.    Interim approval of the Combined Plan and Disclosure Statement should be denied because the Combined Plan and Disclosure Statement is not confirmable.  *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable.").

35.    A plan proponent must establish compliance with all requirements set forth in section 1129(a) of the Code.  See 11 U.S.C. § 1129(a).  The plan proponent bears the burden of proof with respect to every element of section 1129(a).  *See In re Genesis Health Ventures, Inc*., 266 B.R. 591 (Bankr. D. Del. 2001).

36.    Among the requirements that must be met for a plan to be confirmed is that, "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that – (A) with respect to a claim of a kind specified in section 507(a)(2) or 507 (a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."  11 U.S.C. § 1129(a)(9)(A).  Section 507(a)(2) of the Code includes administrative expenses allowed under section 503(b) of the Code.  11 U.S.C. § 507 (a)(2).

37.    The Debtors' proposal to pay administrative claims only from the Administrative Priority Claims Reserve which is capped at $370,000 makes the Combined Plan and Disclosure

Statement unconfirmable under § 1129(a)(9)(A).  The First Administrative Bar Date[3] covers filed claims for the period from the Petition Date through December 15, 2023.  Combined Plan and Discl. Stmt. § 3.59.  The Second Administrative Bar Date[4] covers the time period from December 15, 2023 through the Effective Date.   The deadline for the Second Administrative Bar Date will not occur until 30 days after the Effective Date.  *Id.* § 3.112.  As a result, administrative priority claims may not be paid in full in cash because the Plan caps payment of such claims at $370,000 and it is not known if allowed administrative priority claims will exceed this amount since the Second Administrative Bar Date will not occur until after the Effective Date.

## II.   THE COURT SHOULD DENY APPROVAL OF THE COMBINED PLAN AND DISCLOSURE STATEMENT BECAUSE THE PLAN PROPOSES UNAUTHORIZED, NON-CONSENSUAL THIRD-PARTY RELEASES

### A. Introduction

38.     The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them. 603 U.S. 204, 209, 227 (2024). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did

---

[3]  The Combined Plan and Disclosure Statement defines "First Administrative Bar Date" as follows: "First Administrative Bar Date" means December 29, 2023, at 5:00 p.m. prevailing Eastern Time, which was the deadline set pursuant to the Bar Date Order for filing Administrative Claims (excluding Professional Fee Claims) arising between the Petition Date and December 15, 2023.  Combined Plan and Disclosure Statement at Sec. 3.59.

[4]  The Combined Plan and Disclosure Statement defines "Second Administrative Bar Date" as follows: "Second Administrative Claims Bar Date" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising **after *December 15, 2023* and through and including the Effective Date. The Second Administrative Claims Bar Date shall be thirty (30) days after the Effective Date, other than for Professional Fee Claims which shall be subject to the bar date for such Claims set forth in Section 8.2 hereof.** Combined Plan and Disclosure Statement at Sec. 3.112. (emphasis in original).

not "express a view on what qualifies as a consensual release." *Id.* at 226.

39.    A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in Purdue, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code. If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

40.    Here, there is no existing release agreement between non-debtors. Debtors instead seek approval of solicitation procedures that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent. This would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

**B. State Contract Law Applies**

41.    "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979). Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where

the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

42.     The rule is no different for third-party releases.  They are separate agreements between non-debtors governed by state law.   Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original); *see Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority").   Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

43.     Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors.   *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").   Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But the Code

16

does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law.  The Bankruptcy Code does not define a "consensual release."  *See* 11 U.S.C. § 101.  "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans.  *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  And no Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

44.    Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual.  But because there is no applicable Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law."  *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code).  Absent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims.  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity."  *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct."  *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return).  Courts thus may not invent their own

17

rule for when parties may be "deemed" to have given up property rights by releasing claims.

45.     Accordingly, state-law contract principles govern whether a third-party release is consensual.  *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223).  And "any such consensual agreement would be governed by state law." *Id.*

46.     Even if federal law applied, however, it would not lead to a different result.  That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up); *see Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the

common law of contracts that are in force in most states.' . . . These core principles can be derived

from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

### C.  Under State Law, Silence Is Not Acceptance

47.    Debtors bear the burden to prove that their plan is confirmable. *In re American Cap.

Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). They have not met this burden because they have

failed to establish that the third-party release is consensual under state law, nor have they

contended that consent exists under state law.

48.    Under Delaware law, like in other states, an agreement to release claims—like any

other contract—requires a manifestation of assent to that agreement.[5] *See, e.g.*, RESTATEMENT

(SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there

is manifestation of mutual assent to the exchange and a consideration."); *In re Hertz Corp.*, 120

F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not

make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) ("Under

Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (cleaned

up).

49.    Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the

---

[5] The Court may apply Delaware law because no party has suggested that any other state's law applies. Plan & Discl. Stmt. § 19.17 (with certain exceptions, Delaware law governs interpretation of the Plan); *see, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits."). Nor has anyone suggested there would be a different outcome under the law of any other jurisdiction, so no choice of law is required. *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014). Thus, the statement of one bankruptcy court that there is "no answer" to the choice of law question, *In re LaVie Care Cntrs., LLC*, No. 24-55507, 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024), is not true. Even if a choice of law had to be made, if such a choice is made difficult by the breadth of the third-party release that may be a reason not to approve the plan, but it is not an excuse to flout the court's obligation to make a choice of law if there is an actual conflict of laws. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985); *Cf. Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 669 (E.D. Va. 2022).

offeree to operate as acceptance."[6] RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).
*See Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot
prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*,
886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose
upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent
without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3
(E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes
silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D.
Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67
(4th ed.).

50.     There are only very limited exceptions to the "general rule of contracts . . . that
silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see, e.g.*, *McGurn v. Bell
Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in
response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases
where silence is acceptance fall into two main classes: those where the offeree silently takes
offered benefits, and those where one party relies on the other party's manifestation of intention
that silence may operate as acceptance. Even in those cases the contract may be unenforceable
under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

51.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited
offer does not impair the offeree's freedom of action or inaction or impose on him any duty to
speak." *Id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does

---

[6] Delaware, like many states, follows the Restatement (Second) of Contracts § 69. *See, e.g., Mack v. Mack*,
No. 4240, 2015 WL 1607797, at *2 n.6 (Del. Ch. Mar. 31, 2015); *Hornberger Mgmt. Co. v. Haws & Tingle
Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000).

not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

**D.  Merely Voting for a Plan Does Not Provide the Required Affirmative Consent**

52.     Under the proposed Plan, the non-debtor releases would bind all parties who vote to accept it.  Because the Plan would impose non-debtor releases on these parties based on their silence, the releases are not consensual under state law and thus cannot be approved under *Purdue*.

53.     Debtors mistakenly equate a vote for the Plan, which is governed by the Bankruptcy Code's provisions for adjusting relations between a debtor and its creditors, with acceptance of proposed third-party releases, which are contracts governed by state law dealing with relations between non-debtor parties.  Those are distinct legal constructs involving distinct parties: the Plan disposes of a creditor's claims against the debtor, while a third-party release disposes of a non-debtor's right to sue other non-debtors.  There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release.  "[A] creditor should not expect that [its] rights [against non-debtors] are even subject to being given away through the debtor's bankruptcy." *Smallhold,* 665 B.R. at 721.

54.     Debtors' conflation of voting for the Plan with acceptance of the third-party release violates black-letter contract law, which requires a manifestation of intent to be bound by the third-party release.  *See supra* Part III. C.  Voting to accept a plan does not manifest that intent.  A chapter 11 plan allocates how the bankruptcy estate will pay claims and interests against the debtor.  *See* 11 U.S.C. § 1123.  If the plan is confirmed, only claims and interests against the debtor are discharged.  11 U.S.C. § 524(e).  And it is "[b]ecause discharge affects a creditor's rights, [that] the Code generally requires a debtor to vie for the creditor's vote first." *Keystone Gas Gathering,*

21

*L.L.C. v. Ad Hoc Comm. (In re Ultra Petroleum Corp.)*, 943 F.3d 758, 763 (5th Cir. 2019).  The right to vote on a plan depends solely on how the plan treats claims and interests against the debtor.  *See* 11 U.S.C. §§ 1124, 1126, 502, 501, 101(10); *Ultra Petroleum Corp.*, 943 F.3d at 763; 7 Collier on Bankruptcy ¶ 1126.02 (16th 2025).  Claims and interests that are not impaired by the plan are deemed accept it.  *See* 11 U.S.C. §§ 1124, 1126; *Ultra Petroleum Corp.*, 943 F.3d at 763.  Because the purpose of a chapter 11 plan is to determine how claims and interests *against the debtor* will be treated, voting to accept a chapter 11 plan does not manifest an intent to be bound by the third-party release.  *See In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997); *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).

55.     Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan."  *Arrowmill*, 211 B.R. at 507 (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194 ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *Digital Impact, Inc.*, 223 B.R. at 14.  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt."  *Arrowmill*, 211 B.R. at 507.  The "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order."  *Id.* (citation and alterations omitted).

56.     In addition to the lack of consent under state law, imposing a third-party release on everyone who votes to accept the plan may discourage creditors from voting.  This would distort the voting process, which is intended to provide a valuable signal about the extent of creditor support, within each voting class, for the plan's treatment of creditors' allowed claims against the

debtor.  *Smallhold,* 665 B.R. 716.

57.     Further, for those who believe the plan is the best way to maximize the return of their money from the debtor, requiring them to vote "no" on the Plan or to refrain from voting solely because of an objectionable non-debtor release—thus raising the possibility that the Plan may not be confirmed and they thus cannot receive the economic benefit under the Plan—would be penalizing them for exercising their right to vote in favor of the Plan.  If an offeree is penalized unless an "offer" is accepted, that circumstance "preclud[es] an inference of assent."  *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022).

**E.  Failing to Opt Out Does Not Provide the Required Affirmative Consent**

58.     In addition to imposing a non-debtor release on parties who vote to accept Plan, the Debtors' Plan imposes a third-party release on all holders of claims and interest who are deemed to accept the plan, and all holders of claims that vote to reject the Plan and who do not opt out.  In other words, Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent.  But under black-letter law that silence is not acceptance of the offer to release non-debtors.  *See, e.g.*, *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

59.     A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a

Samsung phone and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage. *Id*. The customer did not opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

60.     The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate. The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." *Norcia*, 845 F.3d at 1284 (quotation marks omitted); *accord See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017)*. The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id*. at 1286 (quotation marks and citation omitted).

61.     The Ninth Circuit held that none of the exceptions to this rule applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id*. at 1286.

62.     Here, too, Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

**i.      Not voting and not opting out is not consent to release non-debtors**

63.     Third-party releases cannot be imposed on those who do not vote and do not opt out.  *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies to both those creditors who simply abstain from voting and those who are not entitled to vote on the plan because they are deemed to accept.  There is no basis to infer consent by those who do not vote and are taking no action with respect to the plan.

64.     Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61.  Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981).  Nor can it "impose on him any duty to speak."  *Id.* § 69 cmt. a.

65.     Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred."  *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D.

Tex. 2016).  Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases.[7]  *SunEdison*, 576 B.R. at 461.  This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt out that they must return to avoid being bound by the third-party release.[8]

66.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point."  *Chassix*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy."  *Smallhold*, 665 B.R. at 721; *see id.* at 719-20 (discussing *Chassix*).  "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent.  *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).  "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake."  *Id.*

---

[7]  Here, the Combined Plan and Disclosure Statement and associated materials run in excess of 65 pages.

[8]  In this case, the Debtors no longer propose to send an opt-out form to creditors deemed to accept the Plan. Instead, unimpaired creditors will have the Third-Party Release imposed on them with no ability to opt-out. The prior version of the Combined Plan and Disclosure Statement provided that unimpaired claimants would be bound unless they returned an opt-out form. *See Notice of Filing of Blackline of Amended Combined Plan and Disclosure Statement* [D.I. 1182] at Sec. 16.2 (a).2.

67.     Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see Chassix*, 533 B.R. at 81–82.

> ii.     **Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release**.

68.     Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*"  533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

> iii.    **Smallhold's conclusion that voting plus a failure to opt out equals consent to a non-debtor release is incorrect.**

69.     One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote.  *See Smallhold,* 665 B.R. at 723.  Notably, though, *Smallhold* did not allow a mere vote in favor of the plan to constitute consent to a third-party release.  Although stating it was applying "ordinary contract principles," *id*. at 724, the *Smallhold* decision did not correctly apply those principles to the question of when silence can constitute consent for those who vote on the plan.

70.     As an initial matter, the *Smallhold* court correctly recognized that a failure to opt out by those who do not vote does not constitute consent. *See Smallhold*, 665 B.R. at 721-23. The *Smallhold* court elucidated the point with a hypothetical: a chapter 11 plan requiring that any creditor that did not "check an 'opt out' box on a ballot . . . make a $100 contribution to the college education fund for the children of the CEO of the debtor." *Id*. at 710. As the court observed, "no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution." *Id*. None of the cases that allow imposing a non-debtor release based on a failure to opt out "provides any limiting principle that would distinguish the third-party release from the college education fund plan." *Id*.

71.     Contract law likewise does not support imputing consent to a third-party release based on a failure to opt-out by those who vote on the plan. Nevertheless, the *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release. *Smallhold*, 665 B.R. at 717, 723-724. But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).

72.     "The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box. Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the non-debtor release. Just like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children

merely because they failed to return a ballot with an "opt out" box, *Smallhold*, 665 B.R. at 710, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box.[9]

73.     State law affords no basis to conclude that consent to release *third-party* claims (which are governed by *nonbankruptcy* law) can properly be inferred from a party's failure to check an opt-out box on a ballot expressing its views about the proposed treatment of its claims against the *debtor* (governed by *bankruptcy* law). *See supra* Part II.C. As a result, the "general proposition" that *Smallhold* recognized continues to apply: "creditors must *affirmatively express consent to the release* in order to be bound by it." *Id.* at 717 (emphasis added).

74.     Notably, the Ninth and Second Circuit cases cited by *Smallhold* do not support its conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent. *Smallhold,* 665 B.R. at 724 n.60 (citing *Berman v. Freedom Financial Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)). Those cases emphasize that notice to the offeree is a prerequisite to consent "*regardless of apparent manifestation of his consent.*" *Meyer*, 868 F.3d at 74 (internal quotation marks omitted; emphasis added). But while notice of a contractual term is necessary for consent, notice alone is not sufficient.[10] *See, e.g., Meyer*, 868 F.3d at 74; *Norcia*, 845 F.3d at 1284;

---

[9] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *21 (Bankr. S.D.N.Y Mar. 7, 2025). That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan. Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *Id.* at *21. "When the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

[10] For this reason, cases that rely solely on notice to conclude that there is consent to a third-party release are likewise off base. *See, e.g., In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *9-*10, *12 (Bankr. S.D.N.Y Mar. 7, 2025) (collecting cases).

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  There must also be a manifestation of an intent to accept the offer.  *See, e.g., Berman*, 30 F.4th at 85; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  For the reasons discussed above, the failure to opt out of the third-party release is not such a manifestation of consent.

### F.  Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

75.     Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[11]  *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011).  These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release.  *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

76.     A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).  The *Mallinckrodt* court stated

---

[11]  Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines*, 2025 WL 737068, at *17, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond, *id.* at *9-*10, *12-*13.

that "the notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system." *Id*. "When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them." *Id*. at 879. The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *Id*.

77.     This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *Id*. at 733. *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

78.     Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731.

79.     And under *Purdue*, imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 603 U.S. at 215-227 & n.1; *see also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be

deemed to 'consent' to) such a third-party release." *Smallhold*, 665 B.R. at 719.

80.     The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *Smallhold*, 665 B.R. at 708-09; *see id*. at 708 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *Id*. at 717-18. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *Id*. at 709; *see id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

81.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *Id*. at *2; *see id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v.*

*Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

82.     "[After *Purdue*], that is no longer the case in the context of a third-party release." *Smallhold*, 665 B.R. at 722.  A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."  *Id*.  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment."  *Id*.  That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.  Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release."  *Id*. at 719-20.

83.     Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default."  *Id*. at 709.  And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny."  *Id*.  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[12]  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *Id*. at 720 (emphasis added).

---

[12]  For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

## III.    OBJECTIONS TO SPECIFIC PLAN PROVISIONS

84.    Without waiving the right to raise further issues at confirmation, the U.S. Trustee hereby gives notice of several problematic provisions that could ultimately make the Combined Plan and Disclosure Statement unconfirmable.

### A.  The Plan Deems Non-Voting Classes to be Accepting Classes.

85.    Section 1129(a)(8) of the Bankruptcy Code provides that a plan can only be confirmed if "[w]ith respect to each class of claims or interests . . . such class has accepted the plan." 11 U.S.C. § 1129(a)(8). Section 1126 governs acceptance of a plan by a creditor, providing that the holder of a claim "may accept or reject a plan" and Rule 3018(c) requires such acceptances or rejections to be in writing. 11 U.S.C. §1126; Fed. R. Bankr. Pro. 3018(c). Section 1126 also enumerates who may vote on a plan and the numerosity and debt thresholds that must be met for a class to accept a plan for purposes of § 1129(a)(8).

86.    Only a few courts have held that a non-voting class should be deemed to have accepted a plan. *See, e.g., In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988); *In re Cypresswood Land Partners I*, 409 B.R. 396, 430 (Bankr. S.D. TX 2009). The majority of courts that have considered the issue have held that a non-vote cannot be deemed to be an acceptance. *See, e.g.*, *In re M. Long Arabians*, 103 B.R. 211 (B.A.P. 9th Cir. 1989); *see also In re Vita Corp.*, 358 B.R. 749, 751-52 (Bankr. C.D. Ill. 2007), *aff'd*, 380 B.R. 525, 528 (C.D. Ill. 2008); *In re 7th Street and Beardsley P'ship*, 181 B.R. 426 (Bankr. D. Ariz. 1994); *In re Townco Realty, Inc.*, 18 C.B.C.2d 13, 81 B.R. 707 (Bankr. S.D. Fla. 1987) (section 1126(c) and Bankruptcy Rule 3018 require express acceptance).

87.    In both *In re Franco's Paving, LLC* and *In re Hot'z Power Wash, Inc.*, two recent Subchapter V cases from the Southern District of Texas, the bankruptcy court held that non-voting

classes should simply not be counted for purposes of § 1126 and plan confirmation. Discussing the issue, the *Hot'z* court concluded that "that the result of a § 1126(c) computation for a nonvoting class is absurd, unsolvable, and was not contemplated by Congress." *See In re Hot'z Power Wash, Inc.*, Case No. 23-30749 (TXSB November 7, 2023)(quoting *In re Franco's Paving, LLC*, 2023 Bankr. LEXIS 2505 at *8 ("a nonvoting class renders the mathematical calculation required by § 1126(c) as impossible to calculate. . . . the indeterminate result obtained by dividing zero by zero was absurd and could not have been intended by Congress.")). This, not presumed acceptance, is the more appropriate treatment of non-voting classes.

88.     Here, Section 9.3 of the Combined Plan and Disclosure Statement provides that, in the event that there are no votes cast with respect to a class entitled to vote on the Plan, that class is deemed to have accepted the Plan. But a "non-vote" does not satisfy the plain language of § 1126—it is neither an acceptance nor a rejection. Therefore, a class that does not vote cannot be deemed to accept the plan. Unless this provision is removed, the Combined Plan and Disclosure Statement may not be confirmed.

**B.  The Exculpation Provision Benefits Non-Estate Fiduciaries.**

89.     The definition of Exculpated Party contained in section 16.1 of the Combined Plan and Disclosure Statement is overbroad and thus impermissible.  The definition should be revised to remove the Debtors' employees and the professionals of all parties listed.  The definition should be limited to the Debtors' officers and directors, the Committee and its members, and the professionals retained in the case by the Debtors and Committee.   To the extent exculpation is permissible beyond the provisions of section 1125(e), this Circuit has only approved exculpations that are limited to estate fiduciaries. The Plan's definition of Exculpated Parties is inconsistent with controlling case law because it includes parties who are not estate fiduciaries. In *In re PWS Holding*

*Corp.*, the Third Circuit considered whether an official committee of unsecured creditors could be exculpated and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors' committee. 228 F.3d 224, 246 (3d Cir. 2000). This Court has repeatedly interpreted PWS Holding as requiring a party's exculpation to be based upon its status as an estate fiduciary. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011); *In re Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011); *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *12 (Bankr. D. Del. Nov. 10, 2011).

90.     Because the definition of Exculpated Parties is not limited to fiduciaries who have served during the chapter 11 cases, the Plan cannot be confirmed as written.

### C.  Payment of Statutory Fees Pursuant to 28 U.S.C. § 1930(a).

91.     The Combined Plan and Disclosure Statement provides for the payment of statutory fees at Sec. 19.1, but the language needs to be revised to clearly provide for the payment of statutory fees and filing of post-confirmation reports until entry of an order closing or converting the case.[13] In addition, Sec. 8.2 of the Combined Plan and Disclosure Statement improperly limits the payment of post-Effective Date quarterly fees by providing that they are only payable from the Allowed Claims Fund.

## IV. MISCELLANEOUS OBJECTIONS TO SOLICITATION PROCEDURES ORDER

92.     The U.S. Trustee has the following additional objections concerning the proposed form of order and exhibits attached to the Procedures Motion:

- Although the Local Rules may permit the filing of plan supplements no later than seven days prior to the voting deadline (*See* Del. L.R. 3016-3), this is an insufficient

---

[13] It appears that language included in the prior version of the Combined Plan and Disclosure Statement was inadvertently omitted from the current version. *See Notice of Filing of Blackline of Amended Combined Plan and Disclosure Statement* [D.I. 1182] at Sec. 19.1.  The U.S. Trustee will provide additional language modifications to the Debtors.

period of time in this case. The Debtors request a December 26, 2025 deadline to file the plan supplement with a proposed voting deadline is January 2, 2025. This proposed time frame is insufficient because it falls during the end of year holiday period. The Debtors should be required to file the plan supplement no later than December 19, 2025 to allow sufficient time for review prior to voting by the January 2, 2025 deadline.

- A deadline to object to claims for voting purposes should be added to the solicitation procedures timeline. This deadline should be December 9, 2025, which is two weeks before the proposed December 23, 2025 deadline to file 3018 motions to allow claims for voting purposes.

- The chart with the confirmation schedule on page 6 of the Motion should be included in the proposed order for ease of reference by parties in interest.

- The forms of ballot and non-voting status should be revised to include conspicuous language that advises claimants that the Third-Party Release provision should be carefully reviewed as it may affect their rights against non-Debtor third parties.

## <u>RESERVATION OF RIGHTS</u>

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order or orders: (i) denying interim approval of the disclosures in the Combined Plan and Disclosure Statement; (ii) denying the Procedures Motion; and (iii) granting such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

**By:**  _/s/ Jane M. Leamy_
    Jane M. Leamy (DE Bar #4113)
    Trial Attorney
    J. Caleb Boggs Federal Building
    844 King Street, Suite 2207, Lockbox 35
    Wilmington, DE 19801
    (302) 573-6491
    Jane.M.Leamy@usdoj.gov

Dated: November 26, 2025