**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMERIFIRST FINANCIAL, INC., *et al.,*[1] | : | Case No. 23-11240 (TMH) |
| | : | |
| | : | **Obj. Deadline: Jan. 6, 2026 at 4:00 p.m. (ET)** |
| Debtors. | : | **Hearing Date: Jan. 13, 2026 at 10:00 a.m. (ET)** |

**OBJECTION OF UNITED STATES TRUSTEE TO CONFIRMATION OF
AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN OF
LIQUIDATION OF AMERIFIRST FINANCIAL INC. AND PHOENIX
1040 LLC UNDER CHAPTER 11 OF THE BANKRUTCY CODE**

Andrew R. Vara, the United States Trustee for Regions 3 and 9 ("U.S. Trustee"), through

his undersigned counsel, hereby objects (the "Objection") to confirmation of the *Amended*

*Combined Disclosure Statement and Plan of Liquidation of Amerifirst Financial Inc. and Phoenix*

*1040 LLC Under Chapter 11 of the Bankruptcy Code* [D.I. 1196] ("Combined Plan and Disclosure

Statement" or, separately in relevant part, the "Plan" or the "Disclosure Statement"),[2] and in

support of this Objection respectfully states:

**PRELIMINARY STATEMENT**

1.      The U.S. Trustee objects to confirmation of the Combined Plan and Disclosure

Statement because the Plan does not propose to pay administrative claims in full in cash as required

by 11 U.S.C. 1129(a)(9).  The Plan is also unconfirmable because it imposes non-consensual third-

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax
identification number are: Phoenix 1040 LLC (2550) and AmeriFirst Financial, Inc. (4557).  The Debtors'
service address is 575 W. Chandler Boulevard, Suite 225, Unit 236, Chandler, AZ 85225.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Combined Plan and Disclosure Statement.

party releases on (i) holders of claims who are unimpaired and who do not return an opt out form and (ii) holders of claims who vote to accept or reject the plan, unless such holders opt out of the releases on their ballots.

2.      In addition, the U.S. Trustee objects to confirmation of the Plan because the Plan contains: (i) language that improperly deems non-voting classes to be accepting classes; (ii) an improper claims disallowance provision, (iii) a provision that extends exculpation to non-estate fiduciaries; (iv) language that improperly limits payment of statutory fees payable under 28 U.S.C. § 1930; and (v) language that seeks the waiver of the 14-day stay pursuant to Fed. R. Bankr. P. 3020(e).

3.      Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order denying confirmation of the Combined Plan and Disclosure Statement.

## JURISDICTION AND STANDING

4.      This Court has jurisdiction to hear and determine the Combined Plan and Disclosure Statement and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

5.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

6.      The U.S. Trustee has standing to be heard on confirmation of the Plan pursuant to

11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND

### The Chapter 11 Cases

7.      On August 24, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

8.      The U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") on September 15, 2023.

### The Global Settlement Motion

9.      On August 6, 2025, the Debtors filed the *Motion for Entry of Order (I) Approving Global Settlement Agreement with the Official Committee of Unsecured Creditors and RCP, and (II) Granting Related Relief* (the "9019 Motion") [D.I. 1059].

10.     Pursuant to the 9019 Motion, the Debtors sought approval of a global settlement between the Debtors, the Committee and RCP Credit Opportunities Fund Loan SPV (Fund III), L.P. and RCP Customized Credit Fund (Fund IV-A), L.P. (the RCP entities together, "RCP"), which settlement was intended to provide the framework for a plan of liquidation of the Debtors.

11.     On August 20, 2025, the U.S. Trustee filed an objection to the 9019 Motion at D.I. 1081 on the basis that because the proposed global settlement provided a maximum amount of $370,000 for funding unpaid administrative and priority claims, approval of the settlement agreement may result in a distribution being provided to general unsecured creditors without the payment in full of administrative and priority claims, in violation of *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).

12.     At a hearing held on August 21, 2025, the Court overruled the U.S. Trustee's objection and approved the 9019 Motion by order entered at D.I. 1090 (the "<u>Settlement Agreement Order</u>"). The principal terms of the settlement, as approved by the Settlement Agreement Order, are as follows:

- The Debtors, with RCP's consent, shall, within 5 days of the Settlement Effective Date, allocate $2.23 million of the Debtors' cash on hand into a segregated fund (the "Allowed Claims Fund") to be used by the Plan Administrator (selected by the UCC) for the sole purposes of paying (i) allowed General Unsecured Claims pursuant to, and in accordance with a liquidating plan (the "Plan"), (ii) the Plan Administrator's expenses, (iii) U.S. Trustee fees imposed after the Plan Effective Date, and (iv) professional fees incurred in connection with the evaluation and pursuit of the UCC Avoidance Actions.

- RCP waives any and all right to a distribution from the Allowed Claims Fund.

- RCP consents to the use of its cash collateral for the purpose of paying all (a) allowed but unpaid administrative claims (other than Professional Fee Claims, which Claims are compromised and addressed in paragraph 4 of the Settlement Agreement), (b) allowed but unpaid priority claims, and (c) all costs and expenses associated with reconciling and/or objecting to any Administrative Claims filed in connection therewith, in the aggregate maximum amount of $370,000; and (d) all fees charged by the Office of the United States Trustee through the Plan Effective Date.

9019 Mot. ¶ 9.

## **The Combined Plan and Disclosure Statement**

13.     On November 12, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Granting Conditional Approval of the Adequacy of Disclosures in the Amended Combined Disclosure Statement and Plan; (ii) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (iii) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots; and (V) Granting Related Relief* [D.I. 1183] (the "<u>Procedures Motion</u>").

14.     On November 25, 2025, the U.S. Trustee filed an Objection to the Procedures

4

Motion [D.I. 1185].  At the December 4, 2025 hearing, the Debtors agreed to revise the solicitation procedures to provide for an opt-out mechanism for those creditors upon whom the Debtors sought to impose a third-party release.  The parties reserved all rights to argue at the confirmation hearing whether the opt-outs rendered the third-party release consensual or non-consensual, as well as all other arguments regarding Plan confirmation.

15.     On December 5, 2025, the Court entered an order approving the Procedures Motion [D.I 1195].

16.     On December 5, 2025 the Debtors filed the Solicitation Version of the Combined Plan and Disclosure Statement [D.I. 1196].

17.     The Combined Plan and Disclosure Statement effectuates a liquidation of the Debtors and provides for the distribution of the Allowed Claims Fund to unsecured creditors.

**Specific Provisions of the Combined Plan and Disclosure Statement**

18.     The Combined Plan and Disclosure Statement includes the following provisions relevant to this Objection.

*Administrative Claim Provisions*

19.     The Combined Plan and Disclosure Statement provides for the following treatment of Administrative Claims:

> **(a)**     Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, **each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive, without interest, Cash from the Administrative-Priority Claims Reserve** equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or Post-Effective-Date Debtor(s), as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise

provided in the Plan; or (d) **with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.**

(i) Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtors, the Post-Effective-Date Debtor(s), the Estates, or their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

(ii) All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date by the Debtors. **All fees due and payable under 28 U.S.C. § 1930 accruing after the Effective Date shall be paid by the Plan Administrator from the Allowed Claims Fund.**

Combined Plan and Discl. Stmt. § 8.2 (emphasis added).

20.     The Combined Plan and Disclosure Statement provides the following definition for

the term "Administrative-Priority Claims Reserve":

"Administrative-Priority Claims Reserve" means "**an amount of Cash not to exceed $370,000** from RCP's cash collateral set aside for the purpose of paying Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims as set forth in the Settlement Agreement."

*Id.* § 3.2 (emphasis added).

21.     The Combined Plan and Disclosure Statement provides the following definition

for the term "Allowed Claims Fund":

"Allowed Claims Fund" means "**the segregated fund of $2,230,000 in Cash approved and established pursuant to the Settlement Agreement Order,** which consistent with the Settlement Agreement, the Settlement Agreement Order and in accordance with the Plan and the Plan Administrator Agreement, will be used by the Plan Administrator to fund the Plan Administrator's (a)(i) reconciliation of Unsecured Claims, (ii) objections to the allowance or disallowance of Unsecured Claims, and (iii) distributions to Holders of Allowed Unsecured Claims (excluding the Prepetition Lenders Deficiency Claim or any other Claims of the Prepetition Lenders) and, (b) **payment of all U.S. Trustee fees incurred after the Effective Date. The**

6

**Allowed Claims Fund will be held and administered by the Plan Administrator.**"

*Id.* § 3.5 (emphasis added).

*Third Party Release Provisions*

22.    Section 16.2 (a) 2. of the Combined Plan and Disclosure Statement provides as follows (the "Third-Party Release"):

2. Third Party Release.

On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, **each Claimant (collectively, the "Releasing Parties") who (i) is not Impaired under the Plan but who does not elect to "opt-out" by marking the appropriate box on such Releasing Party's Opt-Out Form; (ii) votes to accept or reject the Plan but does not elect to "opt-out" by marking the appropriate box on such Releasing Party's Ballot, for themselves and their respective successors, assigns, transferees, and such Claimants' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), shall release (the "Third Party Release") each Released Party,** and each of the Released Parties shall be deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtors or the Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), **based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases**, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence; provided however, the foregoing Third Party Release shall not release any obligations of any party under the Plan, the Settlement Agreement, or any other document, instrument, or agreement executed to implement the Plan. For the avoidance of doubt, the Third

7

> Party Release is not intended to and shall not modify any and all of the releases set forth in the Settlement Agreement and the Settlement Agreement Order

*Id.* § 16.2(a) 2. (emphasis added).

23.    The Combined Plan and Disclosure Statement provides the following definition for the term "Releasing Parties": "'Releasing Parties' has the meaning set forth in Section 16.2(c) hereof." *Id*. § 3.110.

24.    The Combined Plan and Disclosure Statement provides the following definition for the term "Released Parties:"

> "Released Partes" means, collectively, (a) the Debtors and Post-Effective-Date Debtors; (b) the Committee and the individual members thereof, solely in their capacity as such; (c) the Prepetition Lenders; (d) the Prepetition Agent; (e) the DIP Agent (as defined in the DIP Documentation) and DIP Lenders**;** and (e) each of such Entities' Related Persons.

*Id.* § 3.109.

25.     Based on the definition of Releasing Parties, the Combined Plan and Disclosure Statement would impose third-party releases on claimants who: (i) are deemed to accept the Plan unless such claimants return an opt out form or (ii) vote to accept or reject the Plan unless such claimants opt out of the third-party release.

*Abstaining Classes Provision*

26.    The Combined Plan and Disclosure Statement provides the following with respect to abstaining classes: "If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtors and the Committee shall request the Bankruptcy Court deem the Plan accepted by the Holders of such Claims in such Class." *Id*. § 9.3.

*Exculpation Provision*

27.    Section 16.1 of the Combined Plan and Disclosure Statement provides as follows:

8

1. Exculpation.

The (i) Debtors, (ii) the Debtors' directors, officers, managers, and employees that served in such capacity, (iii) the Committee and the members thereof, and (iv) each of their respective professionals retained during the Chapter 11 Cases, each solely in their capacities as such (collectively, the "Exculpated Parties"), will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided however,* that any Exculpated Party shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code. For the avoidance of doubt, Paladin, together with the personnel provided by it to furnish services to the Debtors during the Chapter 11 Cases, including T. Scott Avila, the Debtors' CRO, and the personnel of Paladin assisting the CRO, are Exculpated Parties.

*Id.* § 16.1.

*Claim Disallowance Provision*

28.     The Combined Plan and Disclosure Statement provides the following with respect to disallowance of claims:

Except as otherwise agreed or ordered by the Bankruptcy Court, any and all Proofs of Claim filed after the Bar Date shall be treated as a Disputed Claim for purposes of Distribution without any further notice or action, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

On the Confirmation Date, any Claim that is scheduled by the Debtors in the Schedules as disputed or listed at zero and as to which no Proof of Claim has been timely filed (or deemed timely filed by Final Order entered by the Bankruptcy Court) shall be deemed a Disallowed Claim.

> Any Claims held by Entities from which property is recoverable under Sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Plan Administrator or the Post-Effective-Date Debtor(s), as applicable, shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtors' Estates hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Debtors, the Plan Administrator or the Post-Effective-Date Debtor(s), as applicable.

*Id*. § 12.6.

*Statutory Fee Provision*

29.     The Combined Plan and Disclosure Statement provides the following with respect to payment of statutory fees: "All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on the Effective Date, or as soon as practicable thereafter, by the Debtors or Post-Effective Date shall be paid by the Plan Administrator and the Plan Administrator shall file reports to show the calculation of such fees until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code." *Id.* § 19.1

*Rule 3020(e) Waiver.*

30.     The Combined Plan and Disclosure Statement provides the following request for waiver of the 14 day stay: "The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14- day stay of Bankruptcy Rule 6004(g)." *Id*. § 19.16

## **ARGUMENT**

### I.     **CONFIRMATION STANDARD.**

31.     A plan proponent must establish compliance with all requirements set forth in section 1129(a) of the Code.  See 11 U.S.C. § 1129(a).  The plan proponent bears the burden of

proof with respect to every element of section 1129(a). *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001).

32.    For the reasons set forth more fully below, the Combined Plan and Disclosure Statement cannot be confirmed as currently drafted.

## II.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT DOES NOT PROVIDE FOR FULL PAYMENT OF ADMINISTRATIVE CLAIMS.

33.    Among the requirements that must be met for a plan to be confirmed is that, "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that – (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9)(A). Section 507(a)(2) of the Code includes administrative expenses allowed under section 503(b) of the Code. 11 U.S.C. § 507 (a)(2).

34.    The Debtors' proposal to pay administrative claims only from the Administrative Priority Claims Reserve -- which is capped at $370,000 -- makes the Combined Plan and Disclosure Statement unconfirmable under § 1129(a)(9)(A). The First Administrative Bar Date[3] covers filed claims for the period from the Petition Date through December 15, 2023. Combined Plan and Discl. Stmt. § 3.59. The Second Administrative Bar Date[4] covers the time period from

---

[3] The Combined Plan and Disclosure Statement defines "First Administrative Bar Date" as follows: "First Administrative Bar Date" means December 29, 2023, at 5:00 p.m. prevailing Eastern Time, which was the deadline set pursuant to the Bar Date Order for filing Administrative Claims (excluding Professional Fee Claims) arising between the Petition Date and December 15, 2023. Combined Plan and Disclosure Statement § 3.59.

[4] The Combined Plan and Disclosure Statement defines "Second Administrative Bar Date" as follows: "Second Administrative Claims Bar Date" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising **after *December 15, 2023* and through and including the Effective Date. The Second Administrative Claims Bar Date shall be thirty (30) days after the Effective Date, other than for Professional Fee Claims which shall be subject to the bar date for such Claims set forth in**

11

December 15, 2023 through the Effective Date.   The deadline for the Second Administrative Bar Date will not occur until 30 days after the Effective Date.  *Id*. § 3.112.  As a result, administrative priority claims may not be paid in full in cash.  The Plan caps payment of such claims at $370,000, and it is not presently known if allowed administrative priority claims will exceed this amount since the Second Administrative Bar Date will not occur until 30 days after the Effective Date.

### III. THE PLAN PROPOSES UNAUTHORIZED, NON-CONSENSUAL THIRD PARTY RELEASES THAT RENDER THE PLAN UNCONFIRMABLE

#### A. Introduction

35.     The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them. 603 U.S. 204, 209, 227 (2024). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id.* at 226.

36.     A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in Purdue, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code. If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property

---

**Section 8.2 hereof.** Combined Plan and Disclosure Statement § 3.112. (emphasis in original).

right.

37.     Here, there is no existing release agreement between non-debtors. Debtors instead seek approval of solicitation procedures that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent. This would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

### B.  State Contract Law Applies

38.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co*., 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979). Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

39.     The rule is no different for third-party releases.  They are separate agreements between non-debtors governed by state law.   Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*."  *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original); *see Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to

substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

40. Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But the Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

41. Some courts have held that federal rather than state law applies to determine

whether a third-party release is consensual.[5]  But because there is no applicable Code provision,

whether a non-debtor has consented to release another non-debtor is not, as one court concluded,

a "matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068,

at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see In re Robertshaw US Holding Corp.*, 662 B.R.

300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of

the Bankruptcy Code).  Absent express authority in the Code, federal courts cannot simply make

up their own rules for when parties have given up property rights by releasing claims.  Bankruptcy

courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor

do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*,

351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Indeed, nearly a hundred years ago, the

Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional

assumption of powers by the Courts of the United States which no lapse of time or respectable

array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord*

*Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation

of federal tax refund resulting from consolidated tax return).  Courts thus may not invent their own

rule for when parties may be "deemed" to have given up property rights by releasing claims.

42.    Accordingly, state-law contract principles govern whether a third-party release is

consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 684-85 (E.D.

Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the

principles of contract law rather than the bankruptcy court's confirmation authority to conclude

that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704,

---

[5] One court recently found that the releases are not consensual under either State or Federal law, and therefore it is not necessary to decide whether federal or state law controls. *In re Gol Linhas Aereas Inteligentes S.A.*, __ B.R. __, 2025 WL 3456675, *5 (S.D.N.Y. Dec. 1, 2025)

720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223).  And "any such consensual agreement would be governed by state law." *Id.*

43.     Even if federal law applied, however, it would not lead to a different result.  That is because "federal contract law is largely indistinguishable from general contract principles under state common law."  *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up);  *see Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

### C.  Under State Law, Silence Is Not Acceptance

44.     Debtors bear the burden to prove that their plan is confirmable. *In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). They have not met this burden because they have failed to establish that the third-party release is consensual under state law, nor have they

contended that consent exists under state law.

45.     Under Delaware law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[6] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *In re Hertz Corp.*, 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) ("Under Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (cleaned up); *see also In re Gol Linhas*, 2025 WL 3456675, at *5 ("Looking to the Restatement (Second) of Contracts for guidance, the New York Court of Appeals has 'repeatedly' held that 'a binding contract requires an objective manifestation of mutual assent, through words or conduct, to the essential terms of the agreement.'")..

46.     Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[7] RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot

---

[6] The Court may apply Delaware law because no party has suggested that any other state's law applies. Plan & Discl. Stmt. § 19.17 (with certain exceptions, Delaware law governs interpretation of the Plan); *see, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits."). Nor has anyone suggested there would be a different outcome under the law of any other jurisdiction, so no choice of law is required. *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014). Thus, the statement of one bankruptcy court that there is "no answer" to the choice of law question, *In re LaVie Care Cntrs., LLC*, No. 24-55507, 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024), is not true. Even if a choice of law had to be made, if such a choice is made difficult by the breadth of the third-party release that may be a reason not to approve the plan, but it is not an excuse to flout the court's obligation to make a choice of law if there is an actual conflict of laws. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985); *Cf. Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 669 (E.D. Va. 2022).

[7] Delaware, like many states, follows the Restatement (Second) of Contracts § 69. *See, e.g., Mack v. Mack*, No. 4240, 2015 WL 1607797, at *2 n.6 (Del. Ch. Mar. 31, 2015); *Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000).

prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

47.      There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent."  *Patterson*, 636 B.R. at 686; *see, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer").  "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

48.      But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  *Id.*  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  *Id.* § 69, cmt. c; *see Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

18

**D.  Failing to Opt Out Does Not Provide the Required Affirmative Consent**

49.     The Plan imposes a third-party release on all holders of claims who are deemed to accept the Plan and who do not return the opt-out form, and all holders of claims that vote to accept or reject the Plan and who do not opt out.  In other words, Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent.  But under black-letter law that silence is not acceptance of the offer to release non-debtors.  *See, e.g., Gol Linhas,* 2025 WL 3456675, at * 5 (under federal law, consent cannot be conferred by silence absent rare exceptions not applicable to third-party releases in a plan); *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

50.     A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282. The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage.  *Id*.  The customer did not opt out.  *Id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *Id*. at 1282-83.

51.     The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California

law, that "silence or inaction does not constitute acceptance of an offer." *Norcia*, 845 F.3d at 1284

(quotation marks omitted); *accord See Urban Green Techs., LLC v. Sustainable Strategies 2050

LLC,* No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017). The customer did

not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would

show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration

agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the

customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer

to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person

to whom it is made or sent makes no reply, even though the offer states that silence will be taken

as consent, unless an exception to this general rule applies." *Id*. at 1286 (quotation marks and

citation omitted).

52.    The Ninth Circuit held that none of the exceptions to this rule applied. *Norcia*, 845

F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the

offer, the parties did not have a prior course of dealing that might impose such a duty, and the

customer did not retain any benefits by failing to act given that the warranty applied whether or

not he opted out of the arbitration provision. *Id*. at 1286.

53.    Here, too, the Debtors' creditors have not signed an agreement to release the non-

debtor releasees nor acted in any other manner to suggest that their silence manifests an intention

to accept an offer to release the non-debtors.

i.    **Not voting and not opting out is not consent to release non-debtors**

54.    Third-party releases cannot be imposed on those who do not vote and do not opt

out. *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82;

*In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies to both those

creditors who simply abstain from voting and those who are not entitled to vote on the plan because they are deemed to accept.  There is no basis to infer consent by those who do not vote and are taking no action with respect to the plan.

55.    Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61.  Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *Gol Linhas*, 2025 WL 3456675, at * 6 ("[I]t is undisputed that the creditors had no duty to respond to the opt-out opportunity and courts do not enter default judgment when parties have no duty to respond."); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  Restatement (Second) Of Contracts § 69 cmt. c (1981).  Nor can it "impose on him any duty to speak."  *Id.* § 69 cmt. a.

56.    Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred."  *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016).  Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases.[8]  *SunEdison*, 576 B.R. at 461.  This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt out that they must

---

[8]  Here, the Combined Plan and Disclosure Statement and associated materials run in excess of 65 pages.

return to avoid being bound by the third-party release.

57.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see id.* at 719-20 (discussing *Chassix*).  "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

58.    Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see Chassix*, 533 B.R. at 81–82.

ii.    **Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release**.

59.    Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Voting to

approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors. The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Merely exercising that right does not manifest consent to release claims against non-debtors.

60.     Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan. As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

   iii.   ***Smallhold*'s conclusion that voting plus a failure to opt out equals consent to a non-debtor release is incorrect.**

61.     One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote. *See Smallhold,* 665 B.R. at 723. The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release. *Id*. But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance*"* of a third-party release. RESTATEMENT (SECOND) OF

23

CONTRACTS § 69 cmt. a (1981) (emphasis added). That is because "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *id.*—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.[9] Thus, consent to release *third-party* claims (which are governed by *nonbankruptcy* law) cannot properly be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the *debtor* (governed by *bankruptcy* law). *See supra* Part III. C.

### F.   Opt Outs Cannot Be Imposed Based on a Procedural Default Theory.

62.    Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[10] *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179,

---

[9] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *21 (Bankr. S.D.N.Y Mar. 7, 2025). That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan. Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *Id*. at *21. "When the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

[10] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines*, 2025 WL 737068, at *17, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond, *id*. at *9-*10, *12-*13.

218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

63.     A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022). The *Mallinckrodt* court stated that "the notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system." *Id*. "When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them." *Id*. at 879. The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *Id*.

64.     This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *Id*. at 733*; cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

25

65.     Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan.  No one has submitted the released claims for adjudication by the bankruptcy court.  *See Olano*, 507 U.S. at 731; *Gol Linhas*, 2025 WL 3456675, at * 6 (rejecting arguments that: (i) creditors who have consented to the bankruptcy court's jurisdiction also consent to the approval of releases; (ii) class action opt-out procedures applied to the third-party releases before it; and (iii) that consent may be imputed from the failure to opt out)

66.     And under *Purdue*, imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan.  *See Purdue,* 603 U.S. at 215-227 & n.1; *see also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Smallhold*, 665 B.R. at 719.

67.     The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights.  *Smallhold*, 665 B.R. at 708-09; *see id*. at 708 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing.").  The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *Id*. at 717-18.  As the *Smallhold* court explained, however, under the default theory,

26

a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *Id*. at 709; *see id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

68.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *Id*. at *2; *see id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

69.     "[After *Purdue*], that is no longer the case in the context of a third-party release." *Smallhold*, 665 B.R. at 722. A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Id*. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or

27

else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at 719-20.

70.    Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at 709. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[11] Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *Id*. at 720 (emphasis added).

## IV.    OBJECTIONS TO REMAINING PLAN PROVISIONS.

### A.    The Plan Cannot be Confirmed Because it Deems Non-Voting Classes to be Accepting Classes.

71.    Section 1129(a)(8) of the Bankruptcy Code provides that a plan can only be confirmed if "[w]ith respect to each class of claims or interests . . . such class has accepted the plan." 11 U.S.C. § 1129(a)(8). Section 1126 governs acceptance of a plan by a creditor, providing that the holder of a claim "may accept or reject a plan" and Rule 3018(c) requires such acceptances or rejections to be in writing. 11 U.S.C. §1126; Fed. R. Bankr. Pro. 3018(c). Section 1126 also enumerates who may vote on a plan and the numerosity and debt thresholds that must be met for a class to accept a plan for purposes of § 1129(a)(8).

72.    Only a few courts have held that a non-voting class should be deemed to have accepted a plan. *See, e.g., In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988); *In re*

---

[11] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

*Cypresswood Land Partners I*, 409 B.R. 396, 430 (Bankr. S.D. TX 2009). The majority of courts that have considered the issue have held that a non-vote cannot be deemed to be an acceptance. *See, e.g.*, *In re M. Long Arabians*, 103 B.R. 211 (B.A.P. 9th Cir. 1989); *see also In re Vita Corp.*, 358 B.R. 749, 751-52 (Bankr. C.D. Ill. 2007), *aff'd*, 380 B.R. 525, 528 (C.D. Ill. 2008); *In re 7th Street and Beardsley P'ship*, 181 B.R. 426 (Bankr. D. Ariz. 1994); *In re Townco Realty, Inc.*, 18 C.B.C.2d 13, 81 B.R. 707 (Bankr. S.D. Fla. 1987) (section 1126(c) and Bankruptcy Rule 3018 require express acceptance).

73.     In both *In re Franco's Paving, LLC* and *In re Hot'z Power Wash, Inc.*, two recent Subchapter V cases from the Southern District of Texas, the bankruptcy court held that non-voting classes should simply not be counted for purposes of § 1126 and plan confirmation. Discussing the issue, the *Hot'z* court concluded that "that the result of a § 1126(c) computation for a nonvoting class is absurd, unsolvable, and was not contemplated by Congress." *See In re Hot'z Power Wash, Inc.*, Case No. 23-30749 (TXSB November 7, 2023) (quoting *In re Franco's Paving, LLC*, 2023 Bankr. LEXIS 2505 at *8 ("a nonvoting class renders the mathematical calculation required by § 1126(c) as impossible to calculate. . . . the indeterminate result obtained by dividing zero by zero was absurd and could not have been intended by Congress.")). This, not presumed acceptance, is the more appropriate treatment of non-voting classes.

74.     Here, Section 9.3 of the Combined Plan and Disclosure Statement provides that, in the event there are no votes cast with respect to a class entitled to vote on the Plan, such class is deemed to have accepted the Plan. But a "non-vote" does not satisfy the plain language of § 1126—it is neither an acceptance nor a rejection. Therefore, a class that does not vote cannot be deemed to accept the plan. Unless this provision is removed, the Combined Plan and Disclosure Statement may not be confirmed.

**B.  The Exculpation Provision Benefits Non-Estate Fiduciaries.**

75.     The definition of Exculpated Party contained in section 16.1 of the Combined Plan and Disclosure Statement is overbroad and thus impermissible.  The definition should be revised to remove the Debtors' employees and the professionals of all parties listed.  The definition should be limited to the Debtors' officers and directors, the Committee and its members, and the professionals retained in the case by the Debtors and Committee.   To the extent exculpation is permissible beyond the provisions of section 1125(e), this Circuit has only approved exculpations that are limited to estate fiduciaries. The Plan's definition of Exculpated Parties is inconsistent with controlling case law because it includes parties who are not estate fiduciaries. In *In re PWS Holding Corp.*, the Third Circuit considered whether an official committee of unsecured creditors could be exculpated and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors' committee. 228 F.3d 224, 246 (3d Cir. 2000). This Court has repeatedly interpreted *PWS Holding* as requiring a party's exculpation to be based upon its status as an estate fiduciary. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011); *In re Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011); *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *12 (Bankr. D. Del. Nov. 10, 2011).

76.     Because the definition of Exculpated Parties is not limited to fiduciaries who have served during the chapter 11 cases, the Plan cannot be confirmed as written.

**C.  The Plan Cannot Be Confirmed Because its Automatic Claims Disallowance Provision Violates the Bankruptcy Code.**

77.     Automatic disallowance or expungement of a claim is contrary to § 502(a) of the Code, which provides that, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, . . . objects." 11 U.S.C. § 502(a).

78.     The language in Sec.12.6 of the Plan effectively disallows late filed claims if an order allowing such late filed claim has not been entered before the Confirmation Date. The claims proposed to be disallowed are the subject of a proof of claim, such claims are allowed under § 502(a) of the Bankruptcy Code unless or until an objection is filed.  Further, if the Debtors or Plan Administrator believes that a claimant is holding property that is recoverable by the estate, then the Plan Administrator must file a claim objection (to object to the claim) or an adversary proceeding (to recover property and disallow a claim). Such objection or adversary complaint must be served on the affected claimholder, who then must be provided with an opportunity to respond.

79.     The Plan should be amended to remove this provision, and the Plan Administrator should follow the claims resolution procedure contemplated by § 502. The Plan must provide for an objection to be filed as to any claim that the Debtors seek to have disallowed by the Court.

**D.     The Combined Plan and Disclosure Statement Does Not Properly Provide for Post-Confirmation Payment of Quarterly Fees.**

80.     The Court should deny confirmation because the Combined Plan and Disclosure Statement does not properly provide for the post-confirmation payment of quarterly fees.

81.     The Combined Plan and Disclosure Statement provides for the payment of statutory fees at Sec. 19.1, but the language needs to be revised to clearly provide for the payment in full of statutory fees and filing of post-confirmation reports until entry of an order closing or converting the case.  In addition, 8.2(a) of the Combined Plan and Disclosure Statement should be revised to provide for payment of pre-Effective Date statutory fees in full.  Finally, Sec. 8.2(a)(ii) of the Combined Plan and Disclosure Statement should be revised because it improperly limits the payment of post-Effective Date quarterly fees by providing that they are only payable from the Allowed Claims Fund.

82.    Section 1129(a)(12) of the Bankruptcy Code provides that the Court shall confirm a plan only if "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."  28 U.S.C. § 1930(a)(6) provides that "[e]xcept as provided in subparagraph (B), in addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 other than under subchapter V for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first."

83.    Under 28 U.S.C. § 1930(a)(6), quarterly fees are based on "disbursements."  As "disbursement" is not defined in the statute, it is interpreted "in accordance with its 'ordinary, contemporary, common meaning.'" *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 421 (3d Cir. 2005) (citations omitted).  "'Disburse' is defined as 'to expend' or 'to pay out.'"  *Id.* "Payments made on behalf of a debtor, whether made directly or indirectly through centralized disbursing accounts, constitute that particular debtor's disbursements for the purpose of quarterly fee calculations under § 1930(a)(6)."  *Id.* at 422.

84.    The Court should deny confirmation unless Sec. 19.1 of the Combined Plan and Disclosure Statement is revised as follows:

> All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Post-Effective-Date Debtors and the Plan Administrator shall be jointly and severally liable to pay Quarterly Fees when due and payable.  The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Each and every one of the Post-Effective-Date Debtors and the Plan Administrator shall remain

> obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

85.     Revisions to Sec. 8.2 of the Combined Disclosure Statement and Plan to provide for payment in full in cash of statutory fees are also necessary to properly implement Sec. 19.1.

### E.  The Court Should Not Waive the Rule 3020 Stay.

86.     The U.S. Trustee objects to the request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e). The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." Id.

87.     Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review. *See In re Chemtura Corp*. No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010). Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay. *Id.; see also In re Adelphia Comm. Corp*., 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review"). "An orderly bankruptcy process depends on a concomitantly efficient appeals process," *In re Syncora Guarantee Inc.,* 757 F.3d 511, 517

(6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay

88.     The Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review. The Court should thus deny their request to waive Rule 3020(e)'s stay.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order denying confirmation of the Combined Plan and Disclosure Statement and granting such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

**By:**  _/s/ Jane M. Leamy_
        Jane M. Leamy (DE Bar #4113)
        Trial Attorney
        J. Caleb Boggs Federal Building
        844 King Street, Suite 2207, Lockbox 35
        Wilmington, DE 19801
        (302) 573-6491
        Jane.M.Leamy@usdoj.gov

Dated: January 6, 2026