**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) |
| | ) Case No. 23-11069 (CTG) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON SFA MEPPS' AND
NON-SFA MEPPS' CLAIMS**

---

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES
LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
            tcairns@pszjlaw.com
            pkeane@pszjlaw.com
            ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in
Possession*

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Shirley Chan (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 W. Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    pnash@kirkland.com
            dseligman@kirkland.com
            shirley.chan@kirkland.com

Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:    michael.esser@kirkland.com
            john.christian@kirkland.com

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place
of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland
Park, Kansas 66211.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

PROCEDURAL HISTORY ........................................................................................ 2

STATEMENT OF UNDISPUTED FACTS ............................................................... 4

     **A.**     **ERISA ESTABLISHES A SPECIFIC FORMULA FOR CALCULATING WITHDRAWAL LIABILITY.** ............................... 4

     **B.**     **THE DEBTORS COMMENCED THESE CHAPTER 11 PROCEEDINGS, AND THE SFA MEPPS AND NON-SFA MEPPS FILED PROOFS OF CLAIM FOR WITHDRAWAL LIABILITY** ................ 5

     **C.**     **LOCAL 705 ASSERTS THAT IT DOES NOT NEED TO DISCOUNT ITS WITHDRAWAL LIABILITY CLAIM TO PRESENT VALUE.** ........................................................................... 6

     **D.**     **CENTRAL STATES AND LOCAL 641 ATTEMPT TO USE IMPROPER CONTRIBUTION RATES IN CALCULATING DEBTORS' WITHDRAWAL LIABILITY.** ....................................... 6

     **E.**     **CENTRAL STATES ALSO FILED PROOFS OF CLAIM SEEKING NEARLY $1 BILLION IN ALLEGED "CONTRIBUTIONS GUARANTEE."** ...................................................................... 10

LEGAL STANDARD .................................................................................................. 11

ARGUMENT ................................................................................................................ 12

     **A.**     **QUESTION NO. 1: WHILE THE MEPPS' WITHDRAWAL LIABILITY CLAIMS MAY BE ACCELERATED PURSUANT TO 11 U.S.C. § 502, THE DEBTORS ARE STILL ENTITLED TO PRESENT VALUE DISCOUNTING UNDER SECTION 502(B).** ................ 12

     **B.**     **QUESTION NO. 2: THERE IS NO EVIDENCE IN THE RECORD TO SUGGEST THAT THE MEPPS VALIDLY DECLARED A PRE-PETITION OR IPSO FACTO DEFAULT UNDER 29 U.S.C. § 1399(C)(5)(B).** ................................................................................ 15

     **C.**     **QUESTION NO. 3: EVEN IF THE REMAINING MEPPS' INSECURITY DEFAULT RULES ARE CONSIDERED TO BE IPSO FACTO PROVISIONS, SUCH PROVISIONS ARE LEGALLY UNENFORCEABLE IN BANKRUPTCY PROCEEDINGS.** ......................... 28

**D.      QUESTION NO. 4: WITHDRAWAL LIABILITY PAYMENT STREAMS SHOULD BE DISCOUNTED TO PRESENT VALUE** .............. 30

**E.      QUESTION NO. 4: THE MEPP'S WITHDRAWAL LIABILITY CLAIMS DO NOT IMPLICATE OAKWOOD HOMES.** .............................. 33

**F.      QUESTION NO. 5:  IF THE COURT FINDS THE WITHDRAWAL LIABILITY PAYMENT STREAMS AKIN TO AN INTEREST-FREE NOTE, THEY MUST STILL BE DISCOUNTED TO PRESENT VALUE.** ........................................................................... 39

**G.      1405(B) SUBORDINATION SHOULD BE APPLIED TO THE PROOFS OF CLAIM FOR WITHDRAWAL LIABILITY IF DEBTORS ARE INSOLVENT AT THE COMMENCEMENT OF LIQUIDATION** ................................................................................ 40

**H.      DEBTORS' WITHDRAWAL LIABILITY TO CENTRAL STATES AND LOCAL 641 MUST BE CALCULATED USING APPROPRIATE CONTRIBUTION RATES** .................................................... 43

**I.      CENTRAL STATES' CLAIMS FOR "CONTRIBUTIONS GUARANTEE" ARE NOT ENFORCEABLE** ................................................ 45

**CONCLUSION** ................................................................................................... 51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2336 North Clark, LLC v. Hair Fairies, Inc.*,
 2022 WL 17249039 (Ill. App. Ct. Nov. 28, 2022)...................................................................50

*In re Affiliated Foods*,
 249 B.R. 770 (Bankr. W.D. Mo. 2000)....................................................................................40

*Allied Painting & Decorating, Inc. v. Int'l Painters and Allied Trades Indus.
Pens. Fund*,
 107 F.4th 190 (3rd Cir. 2024) .........................................................................................17, 18

*Am. Newspaper Publishers Ass'n v. Nat'l Labor Rels. Bd.*,
 345 U.S. 100 (1953).................................................................................................................51

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).................................................................................................................11

*In re B456 Sys., Inc.*,
 2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017)........................................................ *passim*

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986).................................................................................................................12

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*,
 252 F.3d 911 (7th Cir. 2001) .............................................................................................29, 30

*Cent. States, Se. & Sw. Areas Pension Fund v. Dworkin, Inc.*,
 No. 19 C 06716, 2020 WL 5365968 (N.D. Ill. Sept. 8, 2020)...........................................23, 24

*Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage
Co.*,
 620 F.3d 766 (7th Cir. 2010) .............................................................................................23, 24

*Central States, Southeast and Southwest Areas Pension Fund v. Event Media,
Inc.*,
 2024 WL 1363542 (N.D. Ill. Mar. 29, 2024)...................................................................25, 44

*In re Chateaugay Corp.*,
 1996 WL 346010 (S.D.N.Y. June 24, 1996) ....................................................................13, 14

*Checkers Eight Ltd. P'ship v. Hawkins*,
 241 F.3d 558 (7th Cir. 2001) ..................................................................................................49

*In re Chemtura Corp.*,
    448 B.R. 635 (Bankr. S.D.N.Y. 2011) ................................................................37

*Chicago Regional Council of Carpenters Pension Fund v. Drive Constr., Inc.*,
    2023 WL 4760586 (N.D. Ill. July 26, 2023) .......................................................47

*Chicago Truck Drivers v. El Paso Co.*,
    525 F.3d 591 (7th Cir. 2008) ..............................................................................18

*Consol. Theatres, Inc. v. Theatrical Stage Emps. Union*,
    447 P.2d 325 (Cal. 1968) ....................................................................................51

*Cott Corp. v. New England Teamsters & Trucking Indus. Pension Fund*,
    26 B.R. 332 (Bankr. D. Conn. 1982) ..................................................................40

*In re CSC Indus., Inc.*,
    232 F.3d 505 (6th Cir. 2000) ..............................................................................31

*In re EBC I, Inc.*,
    356 B.R. 631 (Bankr. D. Del. 2006) ...................................................................29

*EBC Inc. v. Clark Bldg. Sys., Inc.*,
    618 F.3d 253 (3d Cir. 2010) ...............................................................................11

*Freeman Expositions, LLC v. Central States, Southeast, and Southwest Areas*
    *Pension Fund*,
    AAA Case No. 01-21-0003-5722 (Sept. 6, 2022) ..............................................45

*Gas Power Mach. Co. v. Wisconsin Trust Co. (In re Wisconsin Engine Co.)*,
    234 F. 281 (7th Cir. 1916) ..................................................................................14

*GCIU-Emp. Ret. Fund v. Quad/Graphics, Inc.*,
    909 F.3d 1214 (9th Cir. 2018) ............................................................................41

*GK Dev., Inc. v. Iowa Malls Fin. Corp.*,
    3 N.E.3d 804 (Ill. App. Ct. 2013) ...........................................................48, 49, 50

*Grossinger Motorcorp, Inc. v. Am. Nat'l Bank and Trust Co.*,
    607 N.E.2d 1337 (Ill. App. Ct. 1992) .................................................................48

*In re Hertz Corp.*,
    120 F.4th 1181 (3d Cir. 2024) ..............................................................36, 37, 38

*Kucin v. Devan*,
    251 B.R. 269 (D. Md. 2000) ..............................................................................14

*M. I. G. Invests., Inc. v. Marsala*,
    414 N.E.2d 1381 (Ill. App. Ct. 1981) .................................................................50

iv

*Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund,*
    331 F. Supp.3d 365 (D.N.J. 2018) ........................................................................38

*In re Mason & Dixon Lines, Inc.*,
    63. B.R. 176, 182 (Bankr. M.D. N.C. 1986) ...................................................38

*Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*,
    513 U.S. 414 (1995) ...................................................................................18

*In re Mirant Corp.*,
    2006 Bankr. LEXIS 221 (Bankr. N.D. Tex. Feb. 13, 2006) .......................32, 37

*In re Mirant Corp.*,
    332 B.R. 139 (Bankr. N.D. Tex. 2005) .....................................................37

*In re O.P.M. Leasing Services, Inc.*,
    79 B.R. 161 (S.D.N.Y.1987) ..........................................................13, 31, 32

*In re O.P.M. Leasing Servs., Inc.*,
    56 B.R. 678 (Bankr. S..D.N.Y. 1986) ..........................................................13

*In re Oakwood Homes*,
    449 F.3d 588 (3d Cir. 2006)...................................................... *passim*

*Parmac, Inc. v. I.A.M. Nat'l Pension Fund Benefit Plan A*,
    872 F.2d 1069 (D.C.Cir. 1989) ...................................................................46

*Matter of Penn Central Transp. Co.*,
    596 F.2d 1102 (3d Cir. 1979)......................................................................30

*Perfection Bakeries Inc. v. Retail Wholesale & Dep't Store Int'l Union & Indus.
    Pension Fund,*
    2023 WL 4412,165 (N.D. Ala. July 7, 2023) .......................................42

*In re Promise Healthcare Grp. LLC*,
    2023 WL 3026715 (Bankr. D. Del. Apr. 20, 2023) .................................12

*In re Public Service co. of New Hampshire*,
    114 B.R. 8800 ...........................................................................................38

*Rail Terminal Services, LLC v. Central States, Southeast, and Southwest Areas
    Pension Fund et al.*,
    AAA Case No. 01-19-0002-4493 (Jan. 31, 2020) ...................................44

*In re Rose*,
    21 B.R. 272 (Bankr. D.N.J. 1982) ...........................................................29

*Royal Ice Cream Co. & Midtown Transportation Company v. Central States,*
  *Southeast, and Southwest Areas Pension Fund,*
  AAA Case No. 01-21-003-7893 (July 5, 2023) ........................................................44

*Silgan Containers Manufacturing Corp. v. Central States, Southeast, and*
  *Southwest Areas Pension Fund,*
  AAA Case No. 01-20-0001-49194 (Sept. 30, 2022) ...............................................44

*SourceOne Events, Inc. v. Central States, Southeast, and Southwest Areas*
  *Pension Fund,*
  AAA Case No. 01-21-0002-7996 (Dec. 6, 2022) ....................................................45

*In re Stone & Webster, Inc.,*
  279 B.R. 748 (Bankr. D. Del. 2002) ........................................................................31

*In re Thomson McKinnon Sec., Inc.,*
  149 B.R. 61 (Bankr. S.D.N.Y. 1992) .......................................................................14

*Till v. SCS Credit Corp.,*
  541 U.S. 465 (2004) ...........................................................................................13, 30

*In re Trace Intern. Holdings, Inc.,*
  284 B.R. 32 (Bankr. S.D.N.Y. 2002) .......................................................................36

*TransCanada Pipelines Ltd. V. USGen New England, Inc.,*
  458 B.R. 195 (D. Md. 2011) ....................................................................................14

*Trustees of Loc. 813 Pension Tr. Fund v. A.A. Danzo Sanitation, Inc.,*
  No. 23-CV-08493 (LDH)(SIL), 2024 WL 4250355 (E.D.N.Y. Aug. 5, 2024) ...............23, 24

*In re U.S. Airways Grp., Inc.,*
  303 B.R. 784 (Bankr. E.D. Va. 2003) ......................................................................31

*In re Ultra Petroleum Corp.,*
  51 F.4th 138 (5th Cir. 2022) ..............................................................................36, 38

*In re Ultra Petroleum Corp.,*
  624 B.R. 178 (Bankr. S.D. Tex. 2020) ....................................................................14

*Ultra Petroleum Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors,*
  143 S. Ct. 2495, 216 L. Ed. 2d 454 (2023) .............................................................36

*Valley Exposition Services, LLC. v. Central States, Southeast, and Southwest*
  *Areas Pension Fund,*
  AAA Case No. 01-21-0002-7029 (Oct. 25, 2022) ...................................................45

*Vanston Bondholders Protective Comm. v. Green,*
  329 U.S. 156 (1946) .................................................................................................32

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)...........................................................................12, 28, 29

*Westrock Co. et al. v. Central States, Southeast, and Southwest Areas Pension Fund*,
    AAA Case No. 01-19-0001-7005 (Jan. 2, 2023) ....................................................45

*In re White Motor Corp.*,
    831 F.2d 106 (6th Cir.1987) .....................................................................................31

*Re: Withdrawal Liability*
    [ECF No. 4326]......................................................................................................2, 47

*In re: Yellow Corp.*,
    No. 23-11069 (CTG), 2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024)............19

**Statutes**

11 U.S.C. § 502 ............................................................................................... *passim*

11 U.S.C. § 502(b) ........................................................................................... *passim*

11 U.S.C. § 502(b) and 502(b)(2) ....................................................................36

11 U.S.C. § 1123(a)(4)................................................................................31, 32

29 U.S.C. at § 1393(c) .......................................................................................4

29 U.S.C. § 158(b)(6) .................................................................................50, 51

29 U.S.C. § 1085(f)(1)(B).......................................................................8, 43, 44

29 U.S.C. § 1085(g)(3)(A)................................................................................43

29 U.S.C. § 1085(g)(3)(B)...........................................................................8, 43

29 U.S.C. § 1381(b) .........................................................................................17

29 U.S.C. § 1381(b)(1) ...........................................................................4, 41, 42

29 U.S.C. § 1381(b)(1)(A)-(D) ........................................................................41

29 U.S.C. § 1381(b)(1)(D) ...............................................................................42

29 U.S.C. §§ 1381(b)(1)(D), 1405(b), 1405(d)...............................................40

29 U.S.C. §§ 1383 ................................................................................17, 45, 46

29 U.S.C. § 1383(a)(1)......................................................................................46

29 U.S.C. § 1383(a)(2)......................................................................................46

29 U.S.C. § 1383(a), 1392(a)(1) ......................................................................48

29 U.S.C. § 1383(a) and (e) .............................................................................46

29 U.S.C. § 1383(e) ..........................................................................................46

29 U.S.C. § 1385 ..............................................................................................47

29 U.S.C. § 1386 ..........................................................................4, 34, 35, 41

29 U.S.C. § 1389 ..........................................................................4, 34, 35, 41

29 U.S.C. § 1391 ..............................................................................4, 34, 35

29 U.S.C. § 1391(c)(1)(C)(i)(II) ......................................................................43

29 U.S.C. § 1391(c)(5)(A) ...................................................................................4

29 U.S.C. § 1392 ..............................................................................................47

29 U.S.C. § 1399 ..............................................................................................19

29 U.S.C. § 1399(b)(1) .......................................................................17, 23, 27

29 U.S.C. § 1399(b)(1), (c)(2), & (c)(5) ..........................................................22

29 U.S.C. § 1399(b)(1)'s................................................................................18, 19

29 U.S.C. § 1399(c)(1)(A)(i) ...........................................................................34

29 U.S.C. § 1399(c)(1)(A)(ii) ..........................................................................34

29 U.S.C. § 1399(c)(1)(B) ...........................................................................4, 41

29 U.S.C. § 1399(c)(1)(C) ..................................................................................7

29 U.S.C. § 1399(c)(1)(C)(i)............................................................................41

29 U.S.C. § 1399(c)(1)(C)(i)(I-II)....................................................................34

29 U.S.C. § 1399(c)(1)(E) ...............................................................................47

29 U.S.C. § 1399(c)(2)...................................................17, 18, 19, 24

29 U.S.C. § 1399(c)(5).................................................................... *passim*

29 U.S.C. § 1399(c)(5)(A) ..................................................16, 17, 19

29 U.S.C. § 1399(c)(5)(B) ........................................................................... *passim*

29 U.S.C. § 1401 ...................................................................................................42

29 U.S.C. § 1405(b) .......................................................................................5, 40, 42

29 U.S.C. § 1405(d)(1) ........................................................................................40

29 U.S.C. § 1405(d)(2) ..........................................................................................5

541 U.S.C. 465, 474 (2004) ...................................................................................13

Bankruptcy Code § 502(b)(2) ...................................................................... *passim*

Bankruptcy Code § 1124 .......................................................................................39

**Rules**

Fed. R. App. P. 9014 ..............................................................................................1

Fed. R. Civ. P. 56 ...................................................................................................1

Fed. R. Civ. P. 56(a) ............................................................................................11

Fed. R. Civ. P. 56(c)(1)(A) ..................................................................................12

**Other Authorities**

29 C.F.R. § 4211.11-13..........................................................................................4

BLACK'S LAW DICTIONARY, available at
    https://thelawdictionary.org/amortized/ (last visited December 10, 2024)............................35

Bryan A. Garner, Dictionary of Modern Legal Usage (2d ed. 1995) ............................................24

Restatement (Second) of Contracts: 'Damages section 356 ........................................................48

The above-captioned debtors and debtors-in-possession (collectively, "**Debtors**"), by and through their undersigned counsel, move this Court for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 and Federal Rules of Bankruptcy Procedure 7056 and 9014.

## INTRODUCTION

1.      The Debtors seek summary judgment that the SFA MEPPs'[2] and Non-SFA MEPPs'[3] (collectively, the "**MEPPs**") claims must be discounted to net present value. There is no evidence in the record to suggest that the MEPPs declared a pre-petition or *ipso facto* default, and discounting is appropriate even if there is acceleration of the withdrawal liability payments.

2.      Three other issues of law are also ripe for summary judgment: whether the MEPPs' withdrawal liability claims can evade subordination in these proceedings under ERISA, whether Central States and Local 641 can use statutorily disregarded contribution rate increases in their annual withdrawal liability payment calculations, and whether Central States' claims for almost $1 billion, representing a decades' worth of "contributions guarantee," are allowable.

---

[2]      These multi-employer pension plans (collectively, the "**SFA MEPPs**") include Central States Pension Fund ("**Central States**"), Freight Drivers and Helpers 557 Pension ("**Freight Drivers**"); International Association of Motor City Machinists Pension Fund ("**IAM**"); Management Labor Pension Fund Local 1730 ("**Local 1730**"); Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ("**Local 701**"); New York State Teamsters Conference Pension & Retirement Fund ("**New York Teamsters**"); Road Carriers Local 707 Pension Fund ("**Local 707**"); Teamsters Local 617 Pension Plan ("**Local 617**"); Teamsters Local 641 Pension Plan ("**Local 641**"); Trucking Employees of North Jersey Pension Fund ("**TENJ**"); Western Pennsylvania Teamsters and Employers Pension Fund ("**Western PA Teamsters**").

[3]      These multi-employer pension plans (collectively, the "**Non-SFA MEPPs**") include Central Pennsylvania Teamsters Defined Benefit Plan ("**Central Pennsylvania Teamsters**"), Teamsters Local 710 ("**Local 710**"), New England Teamsters Pension Plan ("**New England Teamsters**"), Teamsters Pension Trust Fund of Philadelphia & Vicinity ("**Philadelphia Teamsters**"), and Teamsters Joint Council # 83 of Virginia Pension Fund ("**Virginia Teamsters**"), and IBT Local 705 ("**Local 705**").

1

3.      As set forth more fully below and in the Debtors' previously-filed objections,[4] the answer to all of these questions is no, and the Court should grant partial summary judgment in favor of the Debtors.

## PROCEDURAL HISTORY

4.      On July 3, 2024, the Debtors filed a motion for partial summary judgment [ECF No. 3825] seeking, among other things, entry of summary judgment that the MEPPs are required to discount their withdrawal liability claims to net present value.  On September 13, 2024, the Court issued a Memorandum Opinion finding, in relevant part, that Debtors defaulted on their withdrawal liability obligations under 29 U.S.C. § 1399(c)(5). *Memorandum Opinion on Summary Judgment Motions Re: Withdrawal Liability* [ECF No. 4326] at 38-39. The Court further held that the Debtors' default accelerated the withdrawal liability payment streams and eliminated the need to discount those payment streams to present value. *Id*. Debtors filed a motion for reconsideration, arguing that the factual record did not support finding that a pre-petition withdrawal liability default occurred. *Debtors' Motion to Reconsider in Part the September 13, 2024 Memorandum Opinion Finding a Withdrawal Liability Default in Advance of a Withdrawal Liability Payment Obligation* [ECF No. 4461] at 6-12. The Debtors contended that the MEPPs only calculated and demanded withdrawal liability after the bankruptcy petition was filed, through their Proofs of Claim, and therefore no pre-petition default could have occurred. *Id*.

5.      On November 5, 2024, this Court granted the Debtors' motion for reconsideration, *Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to*

---

[4]      *Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund* [ECF No. 1322] ("**CSPF Objection**"); *Debtors' Second Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [ECF No. 1962] ("**Second Objection**"); *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [ECF No. 2595] ("**Seventh Objection**" and, together with the CSPF Objection and the Second Objection, the "**Objections**").

*Conside*r [ECF # 4771] ("**Reconsideration Order**"), and set forth several questions and observations for the parties to address:

1. Does it even matter whether a particular pension plan did or did not declare the 20-year stream of payments to be accelerated? There is certainly a view, reflected in the legislative history of § 502, that a bankruptcy filing "operates as the acceleration of the principal amount of all claims against the debtor." This view is also reflected in pre-Code practice. ("**Question No. 1**")

2. If the 20-year stream of payments was not automatically accelerated by the bankruptcy filing, then the parties need to resolve:

   a. The factual question of whether the plans have the right, under their plan documents, to assert an "insecurity default" pursuant to 29 U.S.C. § 1399(c)(5)(B) ("**Question No. 2**"); and

   b. The legal questions of whether such an *ipso facto* provision is enforceable in bankruptcy, and if it is, what effect the automatic stay may have on a creditor's right to declare an "insecurity default" after the petition date ("**Question No. 3**").

3. If, following resolution of the questions above, the Court were to conclude that the debtors owed a 20-year stream of payments that is not subject to acceleration, the Court would then need to address whether the claim should be discounted to present value. Under *Oakwood*, it is clear that when a debtor owes a stream of payments consisting of both principal and interest, any unmatured interest would need to be backed out of the claim under § 502(b)(2) of the Bankruptcy Code. As *Oakwood* explains, removing unmatured interest from a stream of payments does the same thing as discounting that stream of payments to present value (with the discount rate being the rate of interest reflected in the stream of payments). That is why the *Oakwood* court found that both disallowing unmatured interest and present discounting effectively operated to "double discount" the creditor's claim. ("**Question No. 4**").

4. That, however, leaves unresolved the question whether to discount a future payment stream that does not appear to include an interest component. The dissent in *Oakwood* would have held that payment streams that do not include interest should be subject to present discounting and criticized the majority for suggesting otherwise. In *B456 Systems*, Judge Carey, applying *Oakwood*, concluded that future damages for rejection of an executory contract are subject to being discounted to present value.16 But what is the right way to think about the 20-year stream of payment on withdrawal liability provided for under ERISA? Should it be viewed as, in effect, an interest-free loan? If so, one could argue that even if (a) the loan had not been accelerated on account of default and (b) bankruptcy does not automatically accelerate, the stream of payments still should not be present

discounted. The reason could be that the stream of payments set forth in ERISA provides, in effect, for an interest-free loan. In that case, the effective discount rate should then be zero. ("**Question No. 5**").

6.      The Debtors respectfully submit this motion for partial summary judgment to address the Court's questions and other issues pursuant to the parties' amended scheduling order [ECF No. 5156].

## STATEMENT OF UNDISPUTED FACTS

**A.      ERISA Establishes a Specific Formula for Calculating Withdrawal Liability.**

7.      ERISA provides a multi-step process for determining withdrawal liability. The first step requires MEPPs to determine the amount of their UVBs, 29 U.S.C. § 1381(b)(1), which ERISA defines as "an amount equal to [] the value of nonforfeitable benefits under the plan, less [] the value of the assets of the plan," *id.* at § 1393(c).

8.      If a MEPP has UVBs, the MEPP's next step in calculating withdrawal liability is to allocate a portion of its total UVBs to the withdrawn employer. *See id.* at § 1381(b)(1). ERISA requires a MEPP to use one of four different UVB allocation methods to do so, *see* 29 U.S.C. § 1391, 29 C.F.R. § 4211.11-13, unless the MEPP obtains authorization from PBGC to use an alternative allocation method, 29 U.S.C. § 1391(c)(5)(A).

9.      After the MEPP has allocated a portion of its UVBs to the withdrawn employer, the MEPP next step is to make certain final adjustments to the allocated UVBs as applicable, in the order specified in ERISA. *Id.* at § 1381(b)(1)(A)-(D). These adjustments include:

(A) *first*, by any *de minimis* reduction applicable under [29 U.S.C. § 1389],

(B) *next*, in the case of a partial withdrawal, in accordance with [29 U.S.C. § 1386],

(C) *then*, to the extent necessary to reflect the [20-year] limitation on annual payments under [29 U.S.C. § 1399(c)(1)(B)], and

4

(D) **finally**, in accordance with [29 U.S.C. § 1405].

*Id.* at § 1381(b)(1)(A)-(D) (emphases added) (together, the "**Applicable Adjustments**").

10.     Once a MEPP has made all Applicable Adjustments to the employer's allocable UVBs, the resulting amount is the employer's total withdrawal liability. 29 U.S.C. § 1381(b)(1).

11.     Relevant here, the fourth Applicable Adjustment—limitations on withdrawal liability set forth in 29 U.S.C. § 1405—provides that the UVBs allocable to an insolvent employer undergoing liquidation or dissolution shall not exceed the sum of:

> (1) 50 percent of the [UVBs] allocable to the employer (determined without regard to this section), and
>
> (2) that portion of 50 percent of the [UVBs] allocable to the employer (as determined under paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—
>
>> (A) as of the commencement of liquidation or dissolution, and
>>
>> (B) after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).

29 U.S.C. § 1405(b) (the "**1405(b) Subordination**").

12.     "[A]n employer is insolvent if the liabilities of the employer, including withdrawal liability under the plan (determined without regarding to [29 U.S.C. § 1405(b)]], exceed the assets of the employer (determined as of the commencement of the liquidation or dissolution)," and the "liquidation or dissolution value of the employer shall be determined without regard to such withdrawal liability." *Id.* at §§ 1405(d)(1) & (2).

**B.     The Debtors Commenced These Chapter 11 Proceedings, and the SFA MEPPs and Non-SFA MEPPs filed Proofs of Claim for Withdrawal Liability.**

13.     In July 2023, the Debtors commenced a permanent reduction of their workforce, began clearing their freight network, and ceased substantially all operations. On August 6, 2023, the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code.

14.     On or shortly before the claims bar date of November 13, 2023, the SFA MEPPs filed 195 Proofs of Claim seeking more than $6.5 billion in withdrawal liability. The Non-SFA MEPPs also filed 116 Proofs of Claim, seeking approximately $540 million in withdrawal liability. The Debtors objected to these Proofs of Claim, arguing (among other things) that the MEPPs failed to comply with ERISA in calculating their claims. *See generally* Debtors' Objections.

C.     **Local 705 Asserts That It Does Not Need to Discount Its Withdrawal Liability Claim to Present Value.**

15.     Two MEPPs filed proofs of claim containing amortization schedules regarding Debtors' alleged principal and interest withdrawal liability obligations. *See* 705 International Brotherhood of Teamsters Claim No. 19789 (assessing withdrawal liability for $17,830,282 comprised of principal and excluding nominal interest); Teamsters Local 710 Pension Fund Claim No. 19789 (assessing a withdrawal liability claim for $113,717,722, comprised of what the fund labels as principal and interest). As of the date of this filing, only Local 705 has asked this Court to hold that requesting amortization interest immunizes their claim from present value discounting. *See* Local 705 Pension Fund's Response to Debtors' Motion for Reconsideration [ECF No. 4538] at 11. Indeed, Local 705's proof of claim for $17,830,282 in withdrawal liability is the amount that Local 705 labeled as Debtors' principal withdrawal liability obligation on its amortization schedule. See Ex. X (Local 705 International Brotherhood of Teamsters Claim No. 19789).

D.     **Central States and Local 641 Attempt to Use Improper Contribution Rates in Calculating Debtors' Withdrawal Liability.**

16.     In November 2023, Central States and Local 641 filed Proofs of Claim which collectively sought $5 billion in withdrawal liability.  *See* Ex. 40, (Central States' Proof of Claim No. 4312) (seeking $4.8 billion); *see also* Debtors' Mot. for Partial Summary Judgment [ECF No. 3852], Exs. 11 (Local 641's Proof of Claim No. 5505) at 1 (seeking $217 million).

17.      These Proofs of Claim did not cap Debtors' withdrawal liability at 20 years of annual payments.  *Id*.  Instead, Central States and Local 641 sought Debtors' allocable share of UVBs, without reference to ERISA's 20-year cap, based on Debtors' alleged default.  *See* Ex. 1 (Central States' Am. Interrogatory Resp.) at 25 ("[A] defaulted employer (like the Debtors) is liable for the full, lump sum amount of withdrawal liability, not a lesser amount based on an [annual] payment schedule."); Ex. [2] (Local 641's Interrogatory Resp.) at 6 ("[T]he 20-year cap does not apply because Debtors are in default and the full outstanding amount of the withdrawal liability is due and owing in a lump sum.").  Following fact discovery, Debtors moved for summary judgment against Central States, Local 641, and the other SFA MEPPs, arguing that the funds should have applied ERISA's 20-year cap to Debtors' allocable share of UVBs, notwithstanding any alleged default.  *See* Debtors' Mot. for Partial Summary Judgment [ECF No. 3852] ¶¶ 75–81.

18.      The Court ultimately granted this motion.  On September 13, 2024, the Court issued a memorandum opinion holding, among other things, that "the plans' claims for withdrawal liability are limited to the amounts that would have been due over 20 years as calculated under ERISA."  *See* Mem. Op. [ECF No. 4326] at 38.  The Court entered an order consistent with this memorandum opinion on December 2, 2024.  *See* Order [ECF No. 5057] ¶ 3.

19.      Neither Central States nor Local 641 has amended its Proofs of Claim to account for the Court's order, but each has purported to calculate Debtors' annual payment.  *See* Debtors' Mot. for Partial Summary Judgment [ECF No. 3852], Ex. 8 (Local 641 Decl.) ¶¶ 37–50; Central States' Obj. to Debtors' First Am. Disclosure Statement (ECF No. 4777–1), Ex. A ¶ 12.

20.      Under ERISA, annual payments are the product of a withdrawn employer's "Highest Contribution Rate" and "Highest Average CBUs."  *See* 29 U.S.C. § 1399(c)(1)(C); Debtors' Mot. for Partial Summary Judgment [ECF No. 3852] ¶ 18 (defining terms).  The Highest

Contribution Rate is the amount "at which the employer had an obligation to contribute under the plan" during the relevant period, 29 U.S.C. § 1399(c)(1)(C), but does not include, for MEPPs subject to a rehabilitation plan, any rate increases after 2014, subject to two exceptions.  The first exception is for rate increases "due to increased levels of work, employment, or periods for which compensation is provided."  *Id*. § 1085(g)(3)(B).  The second is for plan amendments providing "an increase in benefits, including an increase in future benefit accruals," *id*., where the plan actuary has certified that such [benefit increases were] paid for out of additional contributions not contemplated by the rehabilitation plan," *id*. § 1085(f)(1)(B).

21.    Central States and Local 641 have, at all relevant times, been subject to rehabilitation plans.  *See, e.g.*, Debtors' Mot. for Partial Summary Judgment [ECF No. 3852], Ex. 8 (Local 641 Decl.) at 38 (describing rehabilitation plan history); Ex. 3 (A. Sprau Dep. Tr.) at 29:12–15 ("Q: During this entire time frame, 2012 to 2022, Central States had a rehabilitation plan in place, correct? A: Correct.").

22.    Debtors' contribution rate under Central States' rehabilitation plan was $70 per week as of December 31, 2014.  *See* Ex. 3 (A. Sprau Dep. Tr.) at 28:5–17.  Debtor's contribution rate had increased to $106.55 per week by Debtors' withdrawal from Central States in July 2023, and such increase is presumed to have been required by a rehabilitation plan notwithstanding the source of any such contribution rate increase.  Central States' Obj. to Debtors' First Am. Disclosure Statement (ECF No. 4777–1), Ex. A ¶ 12; 29 U.S.C. § 1085(g)(3)(B).  Central States has produced no evidence showing it adopted a plan amendment providing for increased benefits or accruals, or that its actuary certified Central States would pay for any increased benefits through additional employer contributions not otherwise required under its rehabilitation plan.

4934-1397-3766.1 96859.001

23.     Debtors' contribution rate under Local 641's rehabilitation plan was $2.15 as of December 31, 2014.  *See* Debtors' Mot. for Partial Summary Judgment [ECF No. 3852], Ex. 8 (Local 641 Decl.) ¶¶ 39–40.  This rate increased to $2.87 in 2019.  *See* Debtors' Mot. for Partial Summary Judgment [ECF No. 3852], Exs. 11 (Local 641's Proof of Claim No. 5505) at 11.  Local 641 did never adopted a plan amendment providing for increased benefits or benefit accruals, Ex. 4 (Local 641 Supp. Decl.) ¶ 3, and its actuary never certified that Local 641 would pay for any increased benefits through additional employer contributions not otherwise required under Local 641's rehabilitation plan, *id*.

24.     In calculating Debtors' annual payment, Central States and Local 641 used contribution rates that exceeded Debtors' required contribution rate as of December 31, 2014.  Central States used a rate of $106.55 per week, Central States' Obj. to Debtors' First Am. Disclosure Statement (ECF No. 4777–1), Ex. A ¶ 12, while Local 641 used a rate of $2.87 per hour, Debtors' Mot. for Partial Summary Judgment [ECF No. 3852], Ex. 8 (Local 641 Decl.) ¶ 41.

25.     The effect was to increase Debtors' annual payment and, by extension, Debtors' withdrawal liability.  If Central States and Local 641 were to use Debtors' required contribution rates as of December 31, 2014, holding everything else constant, Debtors' annual payment (and withdrawal liability) to the funds would be much lower, as summarized in the following table.

| MEPP | Contribution Rate | CBUs | Annual Payment | Withdrawal Liability |
|---|---|---|---|---|
| Central States | $70.00 | 741,345 | $51,894,161 | $1,037,883,220 |
| | $106.55 | 741,345 | $78,990,327 | $1,579,806,540 |
| Local 641 | $2.15 | 715,673 | $1,538,697 | $30,773,940 |
| | $2.87 | 715,673 | $2,053,982 | $41,079,630 |

*See* Ex. 5 (Hilco Report for Central States) at 35–36; Ex. 6 (Hilco Report for SFA MEPPs) at 47.

9

E.    **Central States also filed Proofs of Claim Seeking Nearly $1 Billion in Alleged "Contributions Guarantee."**

26.    In addition to its proofs of claim for withdrawal liability, Central States filed proofs of claim seeking more than $917 million for alleged damages in connection with a 2014 guarantee letter ("**2014 Guarantee Letter**"), in which Debtors agreed to participate in Central States for ten years after the date Debtors pay off the balance owed under a contribution deferral agreement. *See* Ex. 41, (Central States' Proof of Claim No. 4336).[5]

27.    The 2014 Guarantee Letter stated that Debtors would "continue to participate in and pay contributions to the Pension Fund pursuant to the collective bargaining agreements for a period of not less than 10 (ten) full years after all balances (including all principal, interest and applicable expenses or fees) owed to the Pension Fund under the CDA . . . are completely and fully paid and satisfied . . ." Ex. 42, (c) at §1(a). The 2014 Guarantee Letter is governed by Illinois law. *Id.* at § 2(f).

28.    The 2014 Guarantee Letter was a necessary condition for Central States to approve amending its contribution deferral agreement with Yellow. Ex. 3 (A. Sprau Dep. Tr.) at 65:2-8 ("There was negotiations, but ultimately there was the need for a side letter to gain the approval of Central States."); *see also* Ex. 42, (2014 Guarantee Letter) at 1.

29.    Debtors paid off the balance owed under the contribution deferral agreement in January 2023. Ex. 41, (Central States' Proof of Claim No. 4336) at 4 (noting there was a "January 3, 2023 payoff of the Contribution Deferral Agreement balance"). The balance that the Debtors owed to Central States as of January 31, 2014, when the parties amended the contribution deferral agreement, was $83 million plus pension interest rate. *See* Ex. 43 (2014 CDA), Schedule 2.01

---

[5]    Each of the exhibits cited herein is attached to the Declaration of Shirley Chan in Support of Debtors' Motion for Partial Summary Judgment, filed contemporaneously herewith as Exhibit A.

4934-1397-3766.1 96859.001

(showing that as of January 31, 2014, the Debtors' "deferred pension payments" to Central States was $83,857,675.39, and the "pension interest rate" was "0.25% plus the greater of (i) 7.5% and (ii) 2% plus the prime interest rate established by JPMorgan Chase Bank, N.A.").

30.     After January 2023, Debtors made several more months' worth of contributions to Central States.; Ex. 3 (A. Sprau Dep. Tr.) at 68:3-7 ("Q. So after Yellow finished paying its deferred contributions, it made maybe five or six more months worth of pension contributions to Central States; is that right? A. Correct."). In July 2023, Central States terminated Debtors' participation in the fund due to missed contributions, and Yellow's employees stopped accruing pension benefits from Central States. Ex. 3 (A. Sprau Dep. Tr.) at 68:8-18.

31.     In its Proofs of Claim, Central States relied on Section 2(a)(ii) of the 2014 Guarantee Letter to seek more than $917 million in damages for the remaining 113 months' worth of contributions that Debtors alleged owed the fund under to the 10-year guarantee, through January 3, 2033. *See* Ex. 41, (Central States' Proof of Claim No. 4336) at 4; Ex. 42, (2014 Guarantee Letter) at § 2(a)(ii). Central States also characterized its claim as one for "Services Performed," Ex. 41 (Central States' Proof of Claim No. 4336) at 1.

## LEGAL STANDARD

32.     Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" only if they could "alter the outcome," and a dispute is "genuine" only if "evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *EBC Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (cleaned-up); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In opposing a motion for summary judgment, a party "must set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, either through affidavits,

depositions, admissions, or similar record materials. Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## **ARGUMENT**

A.      **Question No. 1: While the MEPPs' Withdrawal Liability Claims May Be Accelerated Pursuant To 11 U.S.C. § 502, the Debtors Are Still Entitled to Present Value Discounting Under Section 502(b).**

33.      It is almost certain that 11 U.S.C. § 502(b) accelerates any and all claims upon filing a bankruptcy petition for the purpose of identifying allowable claims. However, this does not mean the Debtors are not entitled to present value discounting of their long-term withdrawal liability payment streams that—as explained below—were due and owing as of the date these bankruptcy proceedings were initiated. This is because Section 502(b) still allows for discounting these types of claims to present value.

34.      It is a core tenet of bankruptcy law that where, as here, claims for a long-term stream of payments were accelerated as due and owing as of the date of the petition, Section 502(b) contemplates that these claims should be present value discounted. Section 502(b)(1) provides that a claim should be allowed unless it "is unenforceable against the debtors…for a reason *other than* because such claim is contingent or unmatured." This Section functions to take a "snapshot" at the petition date for the claims allowance process, and "disregards a defense to a claim on the ground that it is unmatured." *In re Promise Healthcare Grp. LLC*, 2023 WL 3026715 (Bankr. D. Del. Apr. 20, 2023). Claims are thus accelerated under 11 U.S.C. § 502 so that all the debtor's obligations may be consolidated and resolved—effectuating the purpose of the Bankruptcy Code to provide the debtor with a "fresh start." *See In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012). The purpose of this acceleration, however, is unrelated to the issue of discounting claims to present value. Failing to discount the future stream of ERISA payments merely because they may be

accelerated would "swallow the general rule" of discounting claims to present value and would subvert the operation of section 502. *In re Oakwood Homes*, 449 F.3d 588 (3d Cir. 2006).

35.     It is also well-established in bankruptcy law that "future damage claims are typically discounted to present value." *In re B456 Sys., Inc.*, 2017 WL 6603817, at *22 (Bankr. D. Del. Dec. 22, 2017). This is because, as Justice Stevens explained, "[a] debtor's promise of future payments is worth less than an immediate payment of the same total amount because the credit cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment." *Till v. SCS Credit Corp.*, 541 U.S.C. 465, 474 (2004). Discounting claims to present value—even when they are accelerated under Section 502—thus ensures that creditors do not receive more than the value they bargained for and ensures debtors a fair fresh start. *See In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1300 (10th Cir.1998) ("[T]he Bankruptcy Code mandates that all claims for future payment must be reduced to present value."), *cert. denied*; *PBGC v. CF & I Fabricators of Utah, Inc.*, 526 U.S. 1145, (1999); *In re O.P.M. Leasing Servs., Inc.*, 56 B.R. 678, 684 (Bankr. S..D.N.Y. 1986) ("The discounting of claims to their present value has traditionally been followed when determining the amount of an unearned obligation which is due in the future."); *In re Chateaugay Corp.,* 1996 WL 346010, at *2 (S.D.N.Y. June 24, 1996) ("[I]n the case of discounting post-petition payments, the claimant receives a sum of money which, if held from the filing date, would, with interest, have equaled the post-petition payments when made. Discounting thus serves the underlying purpose of 11 U.S.C. § 502(b) by treating all claimants equally by fixing the amount of their claims as of the filing date."); *In re O.P.M. Leasing Services, Inc.,* 79 B.R. 161, 167 (S.D.N.Y.1987) ("*O.P.M. II*") ("To assure equality of treatment of creditors at distribution, therefore, the creditor [who, as

of the petition date, could claim only a future deprivation of money owed] should be entitled to collect from the debtor only the discounted value of his claim as of the petition date.").

36.     In line with this principle, a myriad of cases applying Section 502 have discounted claims to present value even though they were subject to acceleration. *See, e.g.*, *In re B456 Sys., Inc.*, 2017 WL 6603817, at *22–23 (discounting the amount of a creditor's claim for future damages payments owed under a contract to present value as of the petition date, and noting that this issue is subject to provisions in the Bankruptcy Code, not subject to state or other law); *TransCanada Pipelines Ltd. V. USGen New England, Inc.*, 458 B.R. 195, 223–25 (D. Md. 2011) (discounting claims for future payments owed under a rejected contract and holding that "failing to discount the payments due under the contract…[would be] at odds with usual present value concepts."); *In re Ultra Petroleum Corp.*, 624 B.R. 178, 188 (Bankr. S.D. Tex. 2020) (applying discount rate and holding that a future payment "came due because the Notes accelerated when [debtor] filed its chapter 11 petition. Because the Notes did not accelerate prior to the petition, the Make-Whole Amount's status under § 502(b) is determined without reference to the acceleration clause."); *Gas Power Mach. Co. v. Wisconsin Trust Co. (In re Wisconsin Engine Co.)*, 234 F. 281, 284 (7th Cir. 1916) (directing the discounting to present value of claim asserted in respect of payments under three promissory notes that were non-interest bearing until after their maturity); *Kucin v. Devan*, 251 B.R. 269, 273 (D. Md. 2000) (holding that claims for retirement benefits, asserted in respect of post-petition payments due under non-executory deferred compensation agreements, must be discounted to present value as of the petition date); *Aetna Casualty*, 1996 WL 346010 at *2 (remanding case to the Bankruptcy Court for the discounting of claims asserted in respect to post-petition payments made on pre-petition surety bonds); *In re Thomson McKinnon Sec., Inc.*, 149 B.R. 61, 75–76 (Bankr. S.D.N.Y. 1992) (holding that claims asserted in respect to

14

post-petition payments due under deferred compensation agreements must be discounted to present value).

37.     Indeed, even the court in *Oakwood Homes* agreed that "[t]he general rule of both the Bankruptcy Code and § 502(b)…is acceleration to the date of filing of the bankruptcy petition, for the purpose of filing a claim—not the lack of acceleration." 449 F.3d at 602.

38.     The Court should therefore still be able to discount Debtors' long-term streams of payments under 11 U.S.C § 502(b) despite this acceleration, in line with the weight of case law from the Third Circuit and others.

**B.     Question No. 2: There Is No Evidence In the Record to Suggest That the MEPPs Validly Declared a Pre-Petition or *Ipso Facto* Default under 29 U.S.C. § 1399(c)(5)(B).**

39.     Regardless of whether the claims in this case were accelerated pursuant to 11 U.S.C. § 502, the Court must still determine whether the MEPPs validly accelerated these claims either pre-petition or *ipso facto* pursuant to 29 U.S.C. § 1399(c)(5).  As explained below, the answer to this question is unequivocally no for all MEPPs.

40.     The summary judgment record establishes that there can be no genuine dispute of material fact on this point: as of the date the bankruptcy petition was filed, the Debtors owed a long-term stream of withdrawal liability payments to the MEPPs. This is because the Debtors' obligations to pay withdrawal liability did not arise until well after the bankruptcy was initiated, and the MEPPs cannot point to any evidence showing that they ever notified Debtors of these obligations, demanded payment from Debtors, or even declared Debtors were in default on these obligations at any point before the petition was filed.

41.     As the parties agree and as this Court has already determined, Debtors were not required to pay withdrawal liability until the MEPPs filed their Proofs of Claim—which was more than two months after the petition was filed in this case.  Because of this, there can be no dispute

that it is impossible for the MEPPs to declare Debtors defaulted on their withdrawal liability payments pre-petition under 29 U.S.C. § 1399(c)(5)(A) when such obligations did not arise until months after the petition was filed.  Consequently, the MEPPs cannot rely on this missed withdrawal liability payment provision to claim that they validly accelerated the Debtors' payment obligations pre-petition or *ipso facto*.

42.    This, of course, leaves the MEPPs with only one other option: declare a pre-petition or *ipso facto* insecurity default pursuant to 29 U.S.C. § 1399(c)(5)(B).  However, this misguided attempt must also fail for three reasons.

43.    *First*, at least five of the MEPPs—Freight Drivers 557, Local 617, Local 641, Local 701, and Philadelphia Teamsters—completely lack the authority under 29 U.S.C. § 1399(c)(5)(B) to declare an insecurity default pre-petition, *ipso facto*, or otherwise.  Section 1399(c)(5)(B) expressly requires pension plans to adopt rules by which to define qualifying insecurity default events and procedures by which to make such a declaration.  As one of these funds admits and as a review of the other plans' written documents reveals, none of them have any such plan rules, and none of their written plan documents even mention "insecurity default" or 29 U.S.C. § 1399(c)(5)(B). Thus, as a matter of law, Freight Drivers 557, Local 617, Local 641, Local 701, and Philadelphia Teamsters cannot validly declare an insecurity default or accelerate their withdrawal liability claims in this case.

44.    *Second*, while the remaining MEPPs do appear to have adopted specific plan rules by which to declare an insecurity default, a review of those rules shows that none of them are triggered automatically.  Indeed, each of the plan's rules require the MEPP to affirmatively declare that a default event has occurred and/or accelerate a withdrawal liability obligation following a default finding. This is where the timing of the default finding becomes key. Because it is

16

undisputed that these MEPPs either failed to make any such affirmative determinations at any point or only invoked their insecurity default provisions well after the bankruptcy petition was filed, they cannot be said to have validly declared an insecurity default or accelerated their withdrawal liability claims pre-petition or ipso facto.

45.     Third, even if the Court agrees that the remaining MEPPs' insecurity default rules allow the MEPPs to declare such a default *ipso facto*, such provisions are entirely unenforceable in bankruptcy actions and should be disregarded here.

46.     As such, Debtors are entitled to a finding as a matter of law that the MEPPs failed to validly accelerate their claims pursuant to 29 U.S.C. § 1399(c)(5) either pre-petition or ipso facto.  Because of this, these withdrawal liability claims must be considered a long-term stream-of-payment obligations as of the petition date that are thus subject to present value discounting.

> i.     **It is undisputed that the MEPPs cannot validly accelerate their withdrawal liability claims pre-petition or *ipso facto* pursuant to 29 U.S.C. § 1399(c)(5)(A).**

47.     It is well-settled under ERISA that a withdrawing employer has no obligation whatsoever to pay withdrawal liability unless and until a series of events takes place. First, a pension plan must determine that an employer has either completely or partially withdrawn from the plan under 29 U.S.C. §§ 1383 or 1385.  Second, the pension plan must then determine the amount of withdrawal liability the withdrawing employer owes to the plan.  See 29 U.S.C. § 1381(b).  Third, "[a]s soon as practicable after" the employer's withdrawal, the pension plan must notify the employer of the amount of withdrawal liability owed, furnish an annual payment schedule, and demand payment in accordance with that schedule.  29 U.S.C. § 1399(b)(1).  It is only after a MEPP provides the withdrawn employer a liability amount, payment schedule, and demand for payment in accordance with that schedule, that the withdrawn employer has any obligation to pay withdrawal liability under ERISA. 29 U.S.C. § 1399(c)(2); *see Allied Painting*

17

*& Decorating, Inc. v. Int'l Painters and Allied Trades Indus. Pens. Fund*, 107 F.4th 190, 198–99 (3rd Cir. 2024) (finding employer was under no obligation to pay a pension plan that failed to furnish a valid notice and demand for payment of withdrawal liability "'as soon as practicable'"); *see also Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 595 (7th Cir. 2008) ("[T]he withdrawing employer 'owes nothing' until the plan notifies it of its liability and demands payment.") (quoting *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 423 (1995)).

48.     Therefore, there can be no dispute that ERISA required the MEPPs in this case to determine that the Debtors had effectuated a complete or partial withdrawal, calculate the amount of withdrawal liability Debtors allegedly owed to the Funds, and satisfy 29 U.S.C. § 1399(b)(1)'s notice and demand requirements before Debtors' obligations to pay withdrawal liability under 29 U.S.C. § 1399(c)(2) were ever triggered.  *See Allied Painting & Decorating, Inc.*, 107 F.4th at 198–99; *see also Chicago Truck Drivers*, 525 F.3d at 595.

49.     It is also undisputed that the MEPPs did not satisfy their notice and demand requirements until well after the bankruptcy petition was filed in this matter.  *See, e.g.*, Central PA Teamsters Proof of Claim No. 17671 (filed Nov. 2023); Central States Proof of Claim No. 4320 (filed Nov. 2023); Freight Drivers 557 Proof of Claim No. 16705 (filed Nov. 2023); IAM Motor City Proof of Claim No. 16895 (filed Nov. 2023); Local 617 Proof of Claim No. 15728 (filed Nov. 2023); Local 641 Proof of Claim No. 5505 (filed Nov. 2023); Local 701 Proof of Claim No. 15001 (filed Oct. 2023); Local 705 Proof of Claim No. 15906 (filed Nov. 2023); Local 710 Proof of Claim No. 17473 (filed Nov. 2023); NETTI Proof of Claim No. 18617 (filed Nov. 2023); New York State Teamsters Proof of Claim No. 4489 (filed Nov. 2023); Philadelphia Teamsters Proof of Claim No. 13913 (filed Oct. 2023); Road Carriers 707 Proof of Claim No. 14941 (filed Oct.

2023); TENJ Proof of Claim No. 14722 (filed Oct. 2023); Virginia Teamsters Proof of Claim No. 4461 (filed Nov. 2023); Western PA Teamsters Proof of Claim No. 18200 (filed Nov. 2023).

50.     Indeed, this very point was already the subject of much consternation when the parties previously briefed whether arbitration of these withdrawal liability disputes was mandatory. *Compare* CSPF's Motion to Compel Arbitration [ECF No. 1665] ¶ 19; Other MEPPs' Joint Motion to Compel Arbitration [ECF No. 2180] ¶ 12; Philadelphia Teamsters' Joinder in the Motions to Compel Arbitration [ECF No. 2725] ¶¶ 5, 12; and Other Non-SFA MEPPs' Joinder in the Motions to Compel Arbitration [ECF No. 2747] ¶ 5; with Debtors' Opposition to CSPF's Motion to Compel Arbitration [ECF No. 1965] ¶¶ 28–30; and Debtors' Opposition to Other MEPPs' Joint Motion to Compel Arbitration [ECF No. 2438] n.2.

51.     There, the Court ultimately agreed with the MEPPs that their Proofs of Claim, which were all filed in either October or November 2023 (i.e., at least two to three months after the petition was filed), satisfied 29 U.S.C. § 1399(b)(1)'s notice and demand requirements. *In re: Yellow Corp.*, No. 23-11069 (CTG), 2024 WL 1313308, at *6  n.38 (Bankr. D. Del. Mar. 27, 2024) ("This Court, however, believes that the funds satisfied these [29 U.S.C. § 1399 notice] requirements through the filing of their proofs of claim."). Thus, the record clearly and definitively establishes that Debtors' withdrawal liability obligations to the MEPPs under 29 U.S.C. § 1399(c)(2) only arose after the MEPPs filed their Proofs of Claim.

52.     It is therefore impossible for the Debtors to have been in default pursuant to 29 U.S.C. § 1399(c)(5)(A)—the MEPPs do not and cannot dispute this. After all, a default under Section 1399(c)(5) is a default withdrawal liability payments, not on any other payment obligation an employer may have to a MEPP. And Section 1399(c)(5)(A) provides that a withdrawing employer defaults when that employer fails to make a payment on its outstanding withdrawal

19

liability obligation.  Here, that obligation did not arise until months after these bankruptcy proceedings were initiated, and the MEPPs can point to nothing in the record showing that they ever assessed withdrawal liability, properly notified the Debtors of their withdrawal liability obligations, provided the Debtors with a payment schedule, or demanded payment in accordance with that schedule prior to the petition being filed such that this obligation would have arisen pre-petition.

      ii.    **It is undisputed that the MEPPs cannot validly accelerate their withdrawal liability claims pre-petition or ipso facto pursuant to 29 U.S.C. § 1399(c)(5)(B).**

53.    Thus, the only avenue the MEPPs have to try and claim that they properly accelerated the Debtors' withdrawal liability payments pre-petition or ipso facto is through 29 U.S.C. § 1399(c)(5)(B).  However, because five of the MEPPs have no apparent authority under this provision to declare a default at any point and because the remaining MEPPs' plan rules require affirmative actions by the plans' trustees before any default or acceleration findings, this assertion too must fail.

      a.    *Freight Drivers 557, Local 617, Local 641, Local 701, and Philadelphia Teamsters lack any authority under Section 1399(c)(5)(B) to accelerate their withdrawal liability claims.*

54.    29 U.S.C. § 1399(c)(5)(B) defines an insecurity default as "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability."  In other words, before a MEPP can declare an insecurity default under this section of the statute, it must first necessarily adopt plan rules defining what those specific default events are.  *See id.*  Likewise, based on a plain reading of the provision, where a

MEPP does not adopt any plan rules by which to define those insecurity default events, it follows that the MEPP cannot declare such a default under Section 1399(c)(5)(B).  *See id.*

55.     At least five of the MEPPs in this case—Freight Drivers 557, Local 617, Local 641, Local 701, and the Philadelphia Teamsters—have entirely failed to adopt any plan rules or procedures by which to declare an insecurity default pursuant to Section 1399(c)(5)(B).  *See generally* Ex.16 (Freight Drivers 557 Plan Document); Ex. 17, (Freight Drivers 557 Trust Agreement); Ex. 18, (Local 617 Plan Document); Ex. 19, (Local 617 Trust Agreement); Ex. 20, (Local 641 Plan Document); Ex. 21, (Local 641 Trust Agreement); Ex. 22, (Local 701 Withdrawal Liability Rules), at YELLOW_701 000231 (defining default generally in Section 1.3, but failing to set forth any explicitly defined insecurity default events); Ex. 23, (Philadelphia Teamsters Plan Document), at Art. IX; Ex. 24, (Philadelphia Teamsters Decl.), ¶¶ 16, 35 (noting that Article IX of the plan document sets forth the Philadelphia Teamsters' complete rules and procedures relating to withdrawal liability).

56.     Indeed, as one of these MEPPs (Philadelphia Teamsters) readily admits, none of its written plan documents—including their plan documents, their withdrawal liability rules, and their trust agreements—defines any sort of insecurity default event or even outlines what its procedures are for declaring an insecurity default or finding acceleration upon said default. *See* Ex. 24, (Philadelphia Teamsters Decl.), ¶ 38.  The same is true for three of the other MEPPs, too—Freight Drivers 557, Local 617, and Local 641.  *See generally* Ex. 16, (Freight Drivers 557 Plan Document); Ex. 17, (Freight Drivers 557 Trust Agreement); Ex. 18, (Local 617 Plan Document); Ex. 19, (Local 617 Trust Agreement); Ex. 20, (Local 641 Plan Document); Ex. 21, (Local 641 Trust Agreement). In fact, not one of their plan documents makes any sort of explicit reference to

the term "insecurity default" or to Section 1399(c)(5)(B) for that matter.  *See id.*; *see also* Ex. 24, (Philadelphia Teamsters Decl.), ¶ 38.

57.    In the case of Local 701, the Fund appears to only generally define a default within the meaning of 29 U.S.C. § 1399(c)(5).  Ex. 22, (Local 701 Withdrawal Liability Rules), at YELLOW_701 000231.  Section 1.3(b) starts to define an insecurity default as "the occurrence of any of the following circumstances that the Trustees have determined, pursuant to [29 U.S.C. § 1399(c)(5)(B)], indicate a substantial likelihood that an Employer will not pay its Withdrawal Liability."  *Id.*  However, there is no mention of any defined triggering insecurity default events either in Section 1.3 or anywhere else in Local 701's withdrawal liability rules or written plan documents.  *See generally* Ex. 22, (Local 701 Withdrawal Liability Rules); Ex. 25, (Local 701 Trust Agreement); Ex. 26, (Local 701 Summary Plan Description).

58.    As such, these five MEPPs cannot claim to have authority under Section 1399(c)(5)(B) to declare the Debtors in default at any point in time, let alone pre-petition.  And because they lack the requisite statutory authority to declare an insecurity default here, they cannot, as a matter of law, validly accelerate Debtors' withdrawal liability obligations pursuant to ERISA.

59.    Accordingly, as to these five MEPPs, this Court should find that, as of the petition date, the Debtors' withdrawal liability obligations were a long-term stream of payments that must be discounted to present value.

        b.    *The remaining MEPPs cannot establish that they affirmatively declared Debtors to be in default under Section 1399(c)(5)(B) before the petition was filed.*

60.    For an insecurity default to occur under 29 U.S.C. § 1399(c)(5)(B), several things must happen.  First, a withdrawn employer must have already had its withdrawal liability assessed and must have already received notification and demand for payment before it can ever be deemed in default on that obligation.  *See* 29 U.S.C. § 1399(b)(1), (c)(2), & (c)(5).  Second, a MEPP must

have adopted plan rules defining certain insecurity default events and procedures by which to make insecurity default findings. *See* 29 U.S.C. § 1399(c)(5)(B).    Third, the MEPP must then affirmatively determine whether, under its plan rules, the employer triggered an insecurity event that indicates a substantial likelihood that the withdrawn employer will be unable to pay its assessed withdrawal liability. *See id.*; *see also Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 769, 771 (7th Cir. 2010) (noting that after withdrawing employer notified of termination, Central States deemed the notification a withdrawal, affirmatively determined an insecurity default, and later sent employer a letter demanding immediate payment of the entire withdrawal liability obligation); *Trustees of Loc. 813 Pension Tr. Fund v. A.A. Danzo Sanitation, Inc.*, No. 23-CV-08493 (LDH)(SIL), 2024 WL 4250355, at *2, *4 (E.D.N.Y. Aug. 5, 2024) (over a month after employer's termination, pension plan notified employer of its withdrawal liability obligation, the fund's affirmative determination of an insecurity default, and the fund's acceleration of the full obligation); *Cent. States, Se. & Sw. Areas Pension Fund v. Dworkin, Inc.*, No. 19 C 06716, 2020 WL 5365968, at *2, *4 (N.D. Ill. Sept. 8, 2020) (several months after employer ceased covered operations, Central States affirmatively determined employer had withdrawn and subsequently notified the employer of its withdrawal liability, the fund's insecurity default finding, and the fund's acceleration of the full obligation).

61.    Based on the existing evidence in the record, the remaining 11 MEPPs cannot find the relief they seek pursuant to 29 U.S.C. § 1399(c)(5)(B).    At the outset, there is no way the MEPPs could have made any insecurity default determinations pre-petition because, as explained *supra*, the MEPPs did not assess withdrawal liability and did not fulfill their notice and demand obligations pursuant to 29 U.S.C. § 1399(b)(1) until months after the bankruptcy proceedings were

initiated.  It cannot be that the Debtors defaulted on any withdrawal liability obligation before they ever received the notice and demand ERISA requires, let alone before any of the MEPPs declared an insecurity default.  This is because a "default is a failure to act **when an action is required**." *See* Bryan A. Garner, Dictionary of Modern Legal Usage (2d ed. 1995) (emphasis added); *see also* In re Metromedia Fiber Network, Inc., 335 B.R. 41, 49 (Bankr. S.D.N.Y. 2005), a*ff'd sub nom. Abovnet, Inc. v. SBC Telecom, Inc.*, 2007 WL 636602 (S.D.N.Y. Feb. 27, 2007) ("The term 'default' in common parlance and as used by lawyers and judges is not arcane or controversial. Simply stated, it means the failure to perform or fulfill some obligation or duty imposed by law or contract.").  And the Debtors cannot have defaulted on withdrawal liability obligations before they even existed—that is, before the MEPPs filed their Proofs of Claim—because the Debtors were under no obligation to pay the MEPPs any withdrawal liability unless and until those statutory requirements were satisfied.  *See* 29 U.S.C. § 1399(c)(2).

62.    Furthermore, while each of the remaining 11 MEPPs has plan rules defining specific triggering insecurity default events, they are each required to make an affirmative determination as to whether a default event occurred and whether, based on that default finding, to accelerate the full amount of withdrawal liability owed.  Put another way, none of these plan provisions are automatic—the MEPPs' trustees must first decide whether a withdrawing employer has triggered an insecurity default event indicating substantial likelihood that the withdrawn employer will be unable to pay its assessed withdrawal liability before acceleration can occur.  *See* 29 U.S.C. § 1399(c)(5)(B); *see also O'Neill Bros.*, 620 F.3d at 769, 761; *A.A. Danzo Sanitation, Inc.*, 2024 WL 4250355, at *2, *4; *Dworkin, Inc.*, 2020 WL 5365968, at *2, *4.  By way of example, the 11 MEPPs' plan rules relating to insecurity defaults are summarized below:

- Central PA Teamsters:  Article XI, Section 9.4(h)(2) of Central PA Teamsters' plan document defines various insecurity default events as contemplated in 29 U.S.C. §

24

1399(c)(5)(B). *See* Ex. 27, (Central PA Teamsters Withdrawal Liability Rules), at Central PA 000136. Key here is the statement that the "Board of Trustees *shall have the authority to find* an Employer in default" under Section 1399(c)(5)(B), clearly indicating a need for an affirmative decision by the trustees to declare a default finding. *Id.* (emphasis added).

- Central States: Section 5(e)(2) of Appendix E to Central States' plan document sets forth the procedures by which the Fund can declare an insecurity default. *See* Ex. 28, (Central States Withdrawal Liability Rules), at CS-0034827–28. Before acceleration can occur under Central States' plan rules, the trustees must, "in their discretion, deem" the Fund insecure as a result of any of the listed insecurity default events. *Id.*

- IAM Motor City: Section 1.9 of IAM Motor City's Employer Withdrawal Liability Rules outlines the Fund's procedures for declaring insecurity defaults under 29 U.S.C. § 1399(c)(5)(B). *See* Ex. 29, (IAM Motor City Withdrawal Liability Rules), at YELLOW_IAMMC 000576–78. Section 1.9(d) provides, in relevant part, that the Fund "*may declare the Employer in default*" in the event that it "*determines* that there is a substantial likelihood an Employer will be unable to pay" their withdrawal liability. *Id.* at YELLOW_IAMMC 000578 (emphases added). Once this determination is made, Section 1.9(c) states that the Fund "may require" acceleration of the outstanding amount. *Id.* at YELLOW_IAMMC 000577.

- Local 705: Section 16.5(d) of Local 705's plan document outlines general default procedures. *See* Ex. 30, (Local 705 Withdrawal Liability Rules), at 705 Pension 000164. Section (d)(4) provides that an employer will be in default if the employer files a bankruptcy action. *Id.* However, section (d)(3) provides that where there is a default, the Fund "may require" that some or all of the withdrawal liability obligation be accelerated, indicating a need for an affirmative determination. *Id.*

- Local 710: Section 13(c)(5) of Local 710's Withdrawal Liability Rules and Procedures sets forth the procedures by which the Fund can declare an insecurity default. *See* Ex. 31, (Local 710 Withdrawal Liability Rules), at TUL No. 710 PF- 00000008. The trustees must first declare an insecurity default occurrence from the list provided, and then, "at their option," require acceleration of the outstanding amount of withdrawal liability. *Id.*

- NETTI: In section 15.06(e)(ii) of NETTI's plan document, the trustees must first "deem" the Fund insecure as a result of one of the listed insecurity default events before acceleration can occur. Ex. 32, (NETTI Withdrawal Liability Rules), at NETTI_0001513.

- New York State Teamsters: Section E.2 of Appendix C to New York State Teamsters' plan document provides that the Fund's trustees must "in their discretion, deem the Fund insecure" as a result of one of the listed triggering events caused by the withdrawing employer. Ex. 33, (New York State Teamsters Withdrawal Liability Rules), at YELLOW_NYST 000326–27.

- Road Carriers 707: Section 6(d)(2) of the Road Carriers 707's Trust Agreement provides that the Fund's trustees "***may determine*** that an Employer is in default" if the employer, among other things, files for bankruptcy. Ex. 34, (Road Carriers 707 Withdrawal Liability Rules), at YELLOW_RC707 000493 (emphasis added). Upon an affirmative insecurity default finding, the trustees may then require immediate acceleration of the withdrawal liability obligation. *Id.* at § 6(d)(3).

- TENJ: Section 8(j)(b) of TENJ's Withdrawal Liability Policy defines an insecurity default as "any other event that the Trustees ***deem*** to demonstrate a substantial likelihood that an Employer will be unable to pay its withdrawal liability." Ex. 35, (TENJ Withdrawal Liability Rules), at YELLOW_TENJ 000448 (emphasis added). In the event of a default finding, the trustees may then, in their discretion, accelerate the employer's withdrawal liability obligation. *Id.* at YELLOW_TENJ 000447–48.

- Virginia Teamsters: Article VI, section 10(d)(3) of the Virginia Teamsters' Trust Agreement provides that an employer will be in default if the employer files a bankruptcy action. Ex. 36, (Virginia Teamsters Withdrawal Liability Rules), at TJC83_0009035. However, section 10(d)(2) states that where there is a default, the Fund "may require" that some or all of the withdrawal liability obligation be accelerated, indicating a need for an affirmative determination. *Id.*

- Western PA Teamsters: Western PA Teamsters' Withdrawal Liability Rules explicitly provide that whether an insecurity event, as defined further in the rules, has occurred "is at the discretion of the Trustees." Ex. 37, (Western PA Teamsters Withdrawal Liability Rules), at 13. After making a default finding, the Fund may then require acceleration of the outstanding amount of withdrawal liability.

63. Of course, the timing of these affirmative determinations is critical: if the MEPPs made the determination that the Debtors were in default *before* the petition date, then as this Court previously recognized, the Debtors would not be entitled to present value discounting on the MEPPs' withdrawal liability claims. *See* Original Mem. Op. [ECF No. 4326], at 38–39 (finding that, because Debtors' default occurred "before the petition date," "the entire amount" of Debtors' withdrawal liability obligations was "due and owing" by the time of the bankruptcy, such that no further discounting was required). However, if Debtors can establish that (1) none of the MEPPs ever formally made these determinations at any point, or (2) any default decisions were made *post-petition*, then what was owed as of the petition date was a long-term stream of payments that had not yet been validly accelerated. As it turns out, Debtors can do just that.

26

64.     As of the date the instant motion was filed with the Court, the only MEPP to provide any evidence that it had affirmatively declared Debtors in default pursuant to 29 U.S.C. § 1399(c)(5)(B) was Central States.  In its opposition response to Debtors' motion to reconsider, Central States claimed that it declared Debtors in default based on their alleged pre-petition failure to pay contributions as allowed in Appendix E, section 5(e)(2)(F) of the Fund's withdrawal liability rules.  *See* Central States' Resp. to Mot. to Reconsider [Dkt. 4541], ¶ 6; *see also* Ex. 28, (Central States Withdrawal Liability Rules), at CS-0034828.  The Fund also admitted in its response that its trustees did not make this default finding until a September 12, 2023 board meeting.  *See* Ex. 38, (Central States Board of Trustees Meeting Minutes, Sep. 12, 2023).  All this evidence shows is that (1) Central States' plan document required the Fund to make an affirmative insecurity default declaration, (2) the declaration did not happen until more than a month *after* the bankruptcy proceedings were initiated, and (3) probably most glaring is the fact that the declaration was made *before* Central States ever notified Debtors of their withdrawal liability obligations as required under 29 U.S.C. § 1399(b)(1).

65.     Meanwhile, no other MEPPs have made such a finding against the Debtors.  At least one MEPP, NETTI, has admitted that it never in fact affirmatively declared the Debtors to be in default as required by 29 U.S.C. § 1399(c)(5)(B) and its own plan rules.  *See* Ex. 39, (NETTI 30(b)(6) Decl.), ¶ 40 ("To date, the Fund's trustees have not declared the Fund insecure pursuant to section 15.06(e)(ii) of the Plan with respect to Yellow, nor have they memorialized any such declaration.").  Despite Debtors' attempts to obtain additional agreed-upon discovery from the remaining MEPPs as to whether and when they allegedly declared any insecurity defaults against Debtors, these MEPPs have either failed or refused to provide said information.  As such, the Debtors will thus infer from this failure that none such discovery exists and that these remaining

MEPPs have also failed to affirmatively declare any sort of insecurity default involving the Debtors either pre- or post-petition.[6] *See Travelers Ins. Co.*, 2012 WL 13134024, at *3 (applying an adverse inference against plaintiff on key issue after plaintiff repeatedly withheld discovery on that issue).

66.      Simply put, the record is devoid of any evidence establishing that these MEPPs validly declared the Debtors in default under 29 U.S.C. § 1399(c)(5)(B) such that their withdrawal liability obligations were accelerated pre-petition or ipso facto.

**C.      Question No. 3: Even If the Remaining MEPPs' Insecurity Default Rules Are Considered To Be *Ipso Facto* Provisions, Such Provisions Are Legally Unenforceable In Bankruptcy Proceedings.**

1.      If the Court decides that the MEPPs' insecurity default and acceleration provisions are *ipso facto* clauses (which Debtors deny as Section 1399(c)(5)(B) requires a MEPP to adopt plan rules by which to affirmatively determine insecurity defaults and that the event created a substantial likelihood that the employer would be unable to pay its withdrawal liability, and no MEPP has adopted such plan rules), the MEPPs will still fail to succeed.

67.      It is a well-settled principle that *ipso facto* clauses are wholly unenforceable in bankruptcy actions.  *See e.g., In re W.R. Grace & Co.*, 475 B.R. 34, 152 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) ("[I]t is well-established that *ipso facto* clauses are unenforceable as a matter of law under the Bankruptcy Code.") (collecting cases); *id.* at 153 ("Courts have interpreted this legislative history [the legislative history of the Bankruptcy Code sections explicitly prohibiting ipso facto clauses] as 'indicat[ing] that ***bankruptcy-default clauses are to be invalid in all types of contracts, without limitation*....** The only congressional

---

[6]      To be clear, should these MEPPs decide to include any of this information along with their summary judgment briefing, the Debtors reserve their rights to supplement these facts and address any new issues related to those facts in their reply brief.

4934-1397-3766.1 96859.001

statement is clear that in most, if not all, instances, such clauses are not enforceable.... Thus, there is simply no reason to assume that Congress intended to make these clauses enforceable only in non-executory contracts.' As such, the Court agrees with the general trend of the federal courts that the prohibition against ipso facto clauses is not limited to actions based upon §§ 541(c) and 365(e)." (emphasis added)); *In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("*Ipso facto* clauses . . . are generally disfavored, if not expressly void, under the Bankruptcy Code.") (collecting cases); *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 917 (7th Cir. 2001) (expressly noting that Central States' plan rules declaring insecurity defaults are likely unenforceable ipso facto clauses).

68.     This is because the whole purpose of filing for bankruptcy is to provide the debtor with a "fresh start," and enforcement of *ipso facto* clauses would punish debtors by negating this central purpose.  *In re W.R. Grace & Co.*, 475 B.R. at 152 (citing *In re Rose,* 21 B.R. 272, 276–77 (Bankr. D.N.J. 1982)).

2.     At least one circuit court agrees that Central States' acceleration provision would be considered an *ipso facto* clause that would likely not be enforceable in a bankruptcy proceeding due to the generally accepted prohibition on such provisions.  *Basic Am. Indus., Inc.*, 252 F.3d at 917.  There, the Seventh Circuit said of Central States' plan rules relating to insecurity default determinations and automatic acceleration (*i.e.*, one of the exact provisions at issue here):

> The plan in this case contains an ipso facto clause. For it permits Central States to treat a member's declaration of bankruptcy as a default upon the occurrence of which "the outstanding amount of the withdrawal liability shall immediately become due and payable." . . . [E]ven read permissively, the default clause in the Central States plan is an ipso facto clause; and it is highly doubtful in light of the cases and considerations marshaled above that the MPPAA authorizes such clauses.

> So by filing a proof of claim for the entire withdrawal liability that [debtor] would owe if it withdrew (remember that the declaration of bankruptcy was not itself a withdrawal), Central States was jumping the gun. ***No withdrawal liability had yet***

***arisen or could be precipitated by the bankruptcy (because ipso facto clauses are
unenforceable).***

*Id.* (emphasis added).

69.     The same should hold true for the remaining MEPPs' rules and procedures relating
to insecurity default and acceleration findings, should this Court find that those provisions are in
fact *ipso facto* clauses.

70.     If, however, the Court decides that the *ipso facto* provisions of the MEPPs' plan
rules are enforceable, the next step is to determine what effect, if any, the automatic stay has on
the MEPPs' ability to declare insecurity defaults and accelerate Debtors' obligations post-
petition.  The short answer is that it is largely irrelevant because if there is a post-petition default
finding, what matters is that as of the petition date, the Debtors owed a long-term stream of
payments spread out over years.  Put differently, post-petition conduct has no bearing on what was
actually due and owing as of the date the petition was filed.  If the Court finds that the automatic
stay issue is relevant to this analysis, then Debtors would argue that the stay applies, and that any
attempts by the MEPPs to accelerate their withdrawal liability obligations post-petition would
violate the stay requirement. *See In re W.R. Grace & Co.*, 475 B.R. at 147-48 (the automatic stay
is to "to protect the debtor from an uncontrollable scramble for its assets in a number of
uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to
the disadvantage of other creditors, and to provide the debtor ... with a reasonable respite from
protracted litigation").

**D.     Question No. 4: Withdrawal Liability Payment Streams Should Be Discounted to
Present Value**

71.     If the Court concludes that Debtors owed 20-year payment streams to the MEPPs
as of the petition date, the Court should discount those payment streams to their present value.

72.     As explained above, *see supra* Section A, It is blackletter law that a long-term payment obligation is worth less than that same payment obligation owed in a lump sum, because "the promise of a dollar payable in several years is not worth 100 cents today." *Matter of Penn Central Transp. Co*., 596 F.2d 1102, 1316 (3d Cir. 1979); *see also, e.g.*, *Till v. SCS Credit Corp*., 541 U.S. 465, 474 (2004) ( "A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment."). The same reasoning applies here: a lump sum (of withdrawal liability payments) today is worth more than that sum spread out over 20 years of payments.

73.     In this case, it is undisputed that the MEPPs' Proofs of Claim seek withdrawal liability that Debtors are entitled to amortize over the course of 20 years, see Mem. Op. [ECF No. X] at X, and that the MEPPs did not discount those claims to present value.  Instead, they sought all 20 years' worth of payments in a lump sum, payable now, without any discount for the time value of money.  They sought, in other words, a bankruptcy premium—the kind of premium that bankruptcy courts consistently reject.  As one court has explained:

> [B]ankruptcy courts must value present claims and reduce claims for future payment to present value, while also keeping in mind that a fundamental objective of the Bankruptcy Code is to treat similarly situated creditors equally. In order for the PBGC's claim to receive preferential treatment in a bankruptcy proceeding, there must be a clear authorization for such treatment from Congress.

*In re CSC Indus., Inc.*, 232 F.3d 505, 508 (6th Cir. 2000) (citing 11 U.S.C. § 1123(a)(4); *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir.1987)).[7]  This is consistent with the Court's prior

---

[7]     The Sixth Circuit is by no means alone.  *See also, e.g., In re Stone & Webster, Inc*., 279 B.R. 748, 806 (Bankr. D. Del. 2002) (finding that all damages estimates based on a future payment stream must be reduced by use of a present value adjustment); *In re U.S. Airways Grp., Inc.*, 303 B.R. 784, 793 (Bankr. E.D. Va. 2003) ("In fixing the amount of a claim 'as of the date of the filing of the petition,' there is no dispute that the court must discount future damages to present value."); *In re O.P.M Leasing Servs,* 79 B.R. at 167 (S.D.N.Y. 1987) ("Any valuation of a claim is necessarily embodied in § 502(b) so that the amount of the claim to be allowed in the reorganization or liquidation proceedings is properly ascertained. The language of § 502(b) does not prohibit the mechanism of

holding in this case—namely, that "if what the debtors owed on the petition date was a stream of payments that would be made over time, bankruptcy law would typically provide that the allowed claim would be discounted to its present value." Mem. Op. [ECF No. 4326] at 38; *see also In re B456 Sys., Inc.*, 2017 WL 6603817, at *22 (Bankr. D. Del. Dec. 22, 2017) ("future damage claims are typically discounted to present value") (citations omitted).

74.     And that is what Debtors owed.  Because withdrawal liability payment streams represent long-term payment obligations, and because nothing in ERISA grants withdrawal liability claimants special treatment in bankruptcy, the Court must discount the MEPPs' Proofs of Claim to present value.

75.     This outcome is consistent with basic bankruptcy principles, which balance competing creditor interests through long-established principles of fairness. *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 165 (1946) ("It is manifest that the touchstone of each decision on allowance of interest in bankruptcy … has been a balance of equities between creditor and creditor or between creditors and the debtor").  One of those principles, essential to the bankruptcy system and codified in the Bankruptcy Code, is the equal treatment of creditors of the same class. 11 U.S.C. § 1123(a)(4) ("a plan shall … provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest"). Present valuing long-term payment obligations under Section 502(b) preserves creditor equality. *In re O.P.M Leasing Servs,* 79 B.R. at 167 (S.D.N.Y. 1987) ("Any valuation of a claim is necessarily embodied in § 502(b) so that the amount of the claim to be allowed in the reorganization or liquidation proceedings is properly

---

present valuing claims and it is indeed needed to assure the equal treatment of similarly Code-classified creditors.").

4934-1397-3766.1 96859.001

ascertained. The language of § 502(b) does not prohibit the mechanism of present valuing claims and it is indeed needed to assure the equal treatment of similarly Code-classified creditors.").

76.     As a matter of law, the MEPPs' proofs of claim for long-term withdrawal liability payments must be discounted to present value to ensure equal treatment of creditors in the same class.  *See e.g., In re Mirant Corp.*, 2006 Bankr. LEXIS 221, at *16-17 (Bankr. N.D. Tex. Feb. 13, 2006) ("To allow Movants a higher claim in chapter 11 than that on which they could recover absent bankruptcy would disadvantage other creditors whose claims would be the same in or outside of bankruptcy. This is particularly true where, as here, under Debtors' plan Movants will share pro rata with other unsecured creditors").

77.     Fundamentally, the MEPPs request that the Court to disregard the long-term nature of their withdrawal liability claims.  The Court should deny this request.

**E.     Question No. 4: The MEPP's Withdrawal Liability Claims Do Not Implicate *Oakwood Homes*.**

78.     The Court asked why discounting the MEPPs' Proofs of Claim to present value would not implicate *Oakwood Homes* or the general rule against double discounting.  *See* Reconsideration Order [ECF No. 4771] at 7.  The answer is simple: ERISA does not provide for interest on annual withdrawal liability payments where it would take more than 20 years of such payments to amortize the employer's allocable share of UVBs. And even where the 20-year cap would not apply, *Oakwood Homes* is not implicated because the interest rates selected by the funds are too low.

79.     In *In re Oakwood Homes*, the issue confronting the Third Circuit was how to calculate guaranty claims arising from an asset securitization. *In re Oakwood Homes Corp.*, 449 F.3d 588, 590 (3d Cir. 2006). The debt instruments underlying these guaranty claims represented interest in securitized mortgage obligations that the debtor acquired via the sale of prefabricated

homes. *Id* at 590-91.  The certificate holders' claims on the cash flow from the securitized assets were organized in priority classes, and the debtor guaranteed payment of only a subset of those certificates. *Id*. The certificates at issue before the Third Circuit called for the distribution of both principal and interest the mortgagors paid on the securitized mortgages. *Id*. The bankruptcy court disallowed the guarantee claims for post-petition interest payments, but then, months later, went on to discount the principal portion of the claim to present value. *Id*. JP Morgan, a creditor bank that represented holders of certificates the debtor guaranteed appealed the latter decision to discount the principal component of the proof of claim to present value, but the district court affirmed the bankrutpcy court. *Id*.  The Third Circuit reversed the district and bankruptcy court, holding that the bankrutpcy court's excision of post-petition interest pursuant to Section 502(b)(2) precluded any further discounting of the claim pursuant to Section 502(b). *Id* at 601 ("We wholeheartedly agree that future liabilities must be reduced in some way to reflect the time value of money, but doing so twice is the 'double discounting' complained of by JP Morgan in this case.").

80.    Here, Local 705 is the only fund that has sought to invoke *Oakwood Homes* or otherwise argued that valuing the Proofs of Claim as of the petition date would constitute double discounting.[8] Specifically, in prior briefing, Local 705 asserted that it formally structured its Proofs of Claim such that it contains both principal and excised interest. *Local 705 Pension Fund's Response to Debtors' Motion for Reconsideration* [ECF No. 4538] at 11.  On this basis, Local 705 urges the Court to hold that its claims need not be discounted because *Oakwood Homes* precludes further discounting.

---

[8] Local 710 has filed proofs of claim assessing interest, but they have not requested a bankrutpcy premium on that basis. *See Teamsters Local 710 Pension Fund* [Claim # 19789] (assessing a withdrawal liability claim for $113,717,722).

4934-1397-3766.1 96859.001

81.    This argument fails for at least two reasons.

82.    *First*, ERISA defines how MEPPs must calculate a withdrawn employer's annual payment and does not mention amortization interest.[9] 29 U.S.C. § 1399(c)(1)(A)(i) ("an employer shall pay the amount determined under section 1391 of this title, adjusted if appropriate first under section 1389 of this title and then under section 1386 of this title over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C)").   An amortized payment structure, is a series of regular (that is, fixed in sum and frequency) payments over a specified period.   BLACK'S LAW DICTIONARY, available at https://thelawdictionary.org/amortized/ (last visited December 10, 2024) ("Liquidating regular payments at an interval over a specific period of time.").   In other words, amortized payments mean flattened payments over a fixed period, nothing more.

83.    *Second*, and notwithstanding the lack of statutory authority, Local 705 is nothing like the creditor in *Oakwood Homes*.  Local 705 did not negotiate an annual payment schedule with the Debtors. Nor did Local 705 negotiate an interest rate on the Debtors' annual payments. Instead, Local 705 unilaterally selected, imposed, and then excised an interest rate—all in the name

---

9       ERISA defines how amortization payments are to be calculated in 29 U.S.C. § 1399(c)(1)(A)(ii) and 29 U.S.C. § 1399(c)(1)(C)(i)(I-II).

    [A]n employer shall pay the amount determined under section 1391 of this title, adjusted if appropriate first under section 1389 of this title and then under section 1386 of this title over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C), calculated as if the first payment were made on the first day of the plan year following the plan year in which the withdrawal occurs and as if each subsequent payment were made on the first day of each subsequent plan year. Actual payment shall commence in accordance with paragraph (2). … (C)(i) Except as provided in subparagraph (E), the amount of each annual payment shall be the product of-- (I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and (II) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

of claiming that it has already present value discounted its Proofs of Claim. This purported interest is illusory because ERISA does not call for it, it was imagined only for the purposes of a proof of claim that itself excises the interest, and thus could not and would not and was never contemplated to ever mature.

84.     Even if the unilateral imposition of amortization interest without permission of either ERISA or Debtors were valid (it is not), Local 705's reliance on *In re Oakwood Homes* would still be misplaced. In *In re Oakwood Homes*, the Third Circuit confirmed that 11 U.S.C. § 502(b) and 502(b)(2) work together to ensure the fair treatment of creditors of the same class by ensuring a creditor's claim was worth just as much in bankrutpcy as outside it.[10] *Oakwood Homes*., 449 F.3d at 601. The Third Circuit rejected a bankruptcy court that double-discounted guarantee claims composed of principal and *bargained for* interest by first disallowing the bargained-for interest that was unmatured under Section 502(b)(2) and then subjecting the claims to further discounting under 502(b). *Id* ("We wholeheartedly agree that future liabilities must be reduced in some way to reflect the time value of money, but doing so twice is the "double discounting" complained of by JP Morgan in this case."); *See B456*, 2017 WL 6603817, at *22 ("[Creditor's] reliance on *Oakwood Homes* is misplaced. *Oakwood Homes* is limited to claims based on interest-

---

[10]   Together, 11 USC § 502(b) and 502(b)(2) ensure creditors in the same class equal treatment. 11 USC § 502(b) requires bankrutpcy courts to value a long-term payment as of the bankrutpcy petition date, thus ensuring long-term claims do not receive a bankrutpcy premium. *In re Trace Intern. Holdings, Inc.*, 284 B.R. 32, 38 (Bankr. S.D.N.Y. 2002) (present valuing a claim under 502(b) because "a sum of money received today is worth more than the same amount received tomorrow"). And 11 USC § 502(b)(2) requires bankrutpcy courts excise unmatured interest and/or equivalents, ensuring that creditors with long-term claims do not benefit from receiving compensation in a lump sum while also retaining their compensation for having agreed to receive payment over time. *In re Hertz Corp.,* 120 F.4th 1181, 1197 (3d Cir. 2024) (discounting a claim to eliminate the benefit of an early redemption fee because "[i]f early payments were not discounted, lenders would receive an unjustified windfall. In other words, accounting for present value makes the Applicable Premiums even more mathematically equivalent to the disallowed unmatured interest by correctly pegging its actual worth.") (citing *In re Ultra Petroleum Corp*., 51 F.4th 138, 148 (5th Cir. 2022), cert. denied sub nom. *Ultra Petroleum Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors*, 143 S. Ct. 2495, 216 L. Ed. 2d 454 (2023)).

bearing debt, and [creditor's] underlying claim is not based upon an interest-bearing instrument and *did not include any bargained-for* right to interest.") (emphasis added).

85.      *Oakwood Homes* concerned a bargained for debt instrument that included an agreed upon interest rate. *Oakwood Homes*., 449 F.3d at 601.  The *Oakwood Homes* court made clear that the fact that the unmatured interest attendant to the note before it was the product of fair bargaining and thus reflective of a present value discount was integral to its conclusion. *Id* at 599 ("A buyer of a note that includes interest surely knows he is bargaining for a more valuable instrument, as does the seller." … "The point is to recognize what the creditor bargained for, while avoiding a windfall."). The *Oakwood Homes* court was unequivocal: it stood against granting long-term creditor windfalls.

> We emphasize that our holding in this case in no way yields a windfall for creditors such as JP Morgan. Instead, the interplay between § 502(b) and § 502(b)(2), as reflected in both the legislative history and basic economics, acknowledges that once unmatured interest has been disallowed, discounting the remainder of the claim to present value would inequitably twice penalize the creditor for the time value of money.

Here, Local 705 did not bargain for the interest it imposed and then excised.  Moreover, the interest rate it chose was, according to Debtors' and SFA Funds' experts, too law and not representative of Debtors' cost of debt[11].  *Compare* Ex.14, *Expert Report of Professor Amit Seru* at p.15 (expert report for Debtors' contending that the correct present value rate is between 13-18%); Ex.15,

---

[11]    *In re B456 Sys., Inc*., 2017 WL 6603817, at *25 (Bankr. D. Del. Dec. 22, 2017) ("I agree with the analyses of the courts in *Chemtura* and *Mirant* that the appropriate discount rate should reflect the risk associated with Old A123 at the time the parties entered into the Contract.") (citing *In re Chemtura Corp*., 448 B.R. 635, 673 (Bankr. S.D.N.Y. 2011) ("The basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed. But there is a tension, many might agree, between trying to match the original bargain in the damages award, on the one hand, and requiring the prevailing party to endure market risk to get the benefits of its damages award, on the other. Ultimately, however, I believe that existing case law and common sense require that the discounting to fix the damages award must reflect the same payment risk ... as the original contract did."); *In re Mirant Corp*., 332 B.R. 139, 158 (Bankr. N.D. Tex. 2005) ("By taking into account in the discount rate the risk of non-performance faced by Kern River *before* bankruptcy, the court will ensure that the discounted Claim is quantified similarly to, and will thus be treated on a parity with, other claims."))

4934-1397-3766.1 96859.001

*Expert Report of Denis O'Connor* at p.14 (expert for other MEPPs contending that the correct present value rate is between 8.98-12.75%).[12]

86.     Notably, Local 705 has not cited a single case or statutory provision that actually support its position.  Instead, Local 705 cites two cases describing the latitude ERISA grants funds in calculating the principal amount of withdrawal liability a fund can claim.  *Local 705 Pension Fund's Response to Debtors' Motion for Reconsideration* ECF No. 4538 at 10 (citing *In re Mason & Dixon Lines, Inc.,* 63. B.R. 176, 182 (Bankr. M.D. N.C. 1986) (explaining that withdrawal liability creditors need to estimate future benefits, investment practices of individual funds, business failures of other contributing employers, the number of active participating employees, and the unilaterally adopted actuarial assumptions of each fund in calculating "Payments of withdrawal claims" that "are made over a period of time designated by statute"); *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp.3d 365, 375 (D.N.J. 2018) (explaining that withdrawal liability payments are to be paid in amortized installments of "$99,640.50 over eight years, with a final payment of $78,662.04", without considering the imposition of an

---

[12]     Even if this court were to indulge Local 705, its claims would still be subject to further discounting under 502(b)(2) because "[s]elf-imposed discounts do not defeat § 502(b)(2)".  *In re Hertz Corp.*, 120 F.4th at 1197. Debtors are prepared to show at trial that the rate Local 705 unilaterally affixed to its proof of claim does not reflect the claim's present value and thus calls for discounting under 502(b)(2). When creditors file proofs of claim with unaccounted for unmatured interest in make-whole or original issue discount cases, bankruptcy courts regularly apply 502(b)(2) to ensure that creditors do not pay more for a claim in bankruptcy than what those claims would be worth outside of bankrutpcy as of the petition date. *In re Hertz Corp.*, 120 F.4th at 1197 (discounting a claim to eliminate the benefit of an early redemption fee because "[i]f early payments were not discounted, lenders would receive an unjustified windfall. In other words, accounting for present value makes the Applicable Premiums even more mathematically equivalent to the disallowed unmatured interest by correctly pegging its actual worth.") (citing *In re Ultra Petroleum Corp.*, 51 F.4th at 148; *In re Public Service co. of New Hampshire*, 114 B.R. 8800, 803 (Bankr. D. N.H. 1990 ("The word 'interest' in the statute is clearly sufficient to encompass variation in the method of providing for and collecting what in economic fact is interest to be paid to compensate for the delay and _risk_ involved in the ultimate repayment of monies loaned") (emphasis added).  Just as the losing creditors in the make-whole and original issue discount case lines seek more for their claims in bankruptcy than they were worth as of the petition date, so too does Local 705.  And for this reason, this court is empowered to apply 11 USC § 502(b)(2) to ensure Local 705's claim is only allowed for its present value.

amortization interest rate)). These cases are inapposite and do not implicate Section 502(b)(2) or *Oakwood Homes*.

**F.      Question No. 5:  If the Court finds the Withdrawal Liability Payment Streams Akin to an Interest-Free Note, They Must Still Be Discounted to Present Value.**

87.      Finally, this Court asked the parties to consider whether *Oakwood Homes*' double discounting prohibition would apply were it to find that the withdrawal liability obligations were akin to an interest free note: it does not for two reasons.

88.      *First*, and most importantly, *Oakwood Homes* was clear that it is appropriate to present value discount non-interest-bearing claims.  *Oakwood Homes*., 449 F.3d at 601 n.17 (justifying its double-discounting holding on the basis that it does not apply to non-interest-bearing instruments: "*Loewen* understood the crucial economic distinction, concluding that it was economically appropriate to discount the non-interest-bearing claims because the parties had bargained to receive less than the face value of the notes by not building interest into the bargain. Here, *in contrast*, the parties bargained to receive interest.") (emphasis added).

89.      *Second*, as this Court noted in its order, the fact that this is a liquidating Chapter 11 renders this case a particularly bad set of facts to break away from *Oakwood Homes'* explicit cabining of its holding to interest-bearing debt instruments. *Order Granting motion for Reconsideration and Posing Further Questions for the Parties to Consider* [ECF No. 4771] at 8 f.17 ("It may bear note that when a debtor comes into bankruptcy as a party to a below-market rate loan, reorganizing debtors will commonly seek to obtain the time benefit of money by another means – decelerating the loan by curing any default and reinstating the prior maturity date under § 1124 of the Bankruptcy Code.").  Here, because Debtors are liquidating, they are unable to retain the withdrawal liability payment stream obligation post-petition.  If this Court does not present value the withdrawal liability payment streams, Debtors' unsecured creditors will be forced to pay

the additional dollars awarded to these claims above what they were *actually* worth outside of bankruptcy.

90.     For these reasons, if this Court finds the withdrawal liability payment streams akin to an interest free note, they must still be discounted to present value.

**G.     1405(b) Subordination Should Be Applied to the Proofs of Claim for Withdrawal Liability If Debtors are Insolvent at the Commencement of Liquidation**

91.     If at the time of liquidation, Debtors are insolvent as defined in 29 U.S.C. § 1405(d)(1)—meaning Debtors' liabilities (including withdrawal liability determined without regard to 29 U.S.C. § 1405(b)) are greater than Debtors' assets—1405(b) Subordination must apply to limit the SFA MEPPs' and Non-SFA MEPPs' claims for withdrawal liability, as required under ERISA. *See* 29 U.S.C. §§ 1381(b)(1)(D), 1405(b), 1405(d).

92.     Indeed, "[s]ection 1405 is generally accepted to mean that 'in liquidation proceedings under the Bankruptcy Code, the multi-employer plan will have the status of a creditor with respect to the first 50% of its withdrawal liability claim; after all creditor claims have been satisfied in full, the remaining 50% of withdrawal liability claim will be satisfied ahead of equity security holders." *In re Affiliated Foods*, 249 B.R. 770, 785 (Bankr. W.D. Mo. 2000) (proposal to treat fifty percent of Central States' withdrawal liability claim as a general unsecured claim, and to subordinate the other fifty percent to claims of general unsecured creditors, is proper) (citing *Cott Corp. v. New England Teamsters & Trucking Indus. Pension Fund*, 26 B.R. 332, 335 (Bankr. D. Conn. 1982)).

93.     In these proceedings, Central States has argued that 1405(b) Subordination would not affect its withdrawal liability claim. *See Central States Pension Funds' Objection to Debtors' First Amended Disclosure Statement* [ECF No. 4777] at 5-7. According to Central States, this is

because 1405(b) Subordination would not affect the amount of Debtors' withdrawal liability capped at 20 years of annual payments.  Central States' theory is as follows:

(1) Debtors' unadjusted allocable share of Central States' UVBs is approximately $4.8 billion;

(2) 50% of Debtors' unadjusted allocable share of Central States' UVBs is approximately $2.4 billion;

(3) The annual payment Debtors would owe under 29 U.S.C. § 1399(c)(1)(C)(i) is $78,990,326.84;[13]

(4) Amortizing approximately $2.4 billion over annual payments of $78,990,326.84 would result in more than 20 annual payments of $78,990,326.84, just as amortizing approximately $4.8 billion would;

(5) Either way, the 20-year cap applies, so 1405(b) Subordination does not affect the amount of Central States' withdrawal liability claim.

*Central States' Obj. to First Am. Disclosure Statement* [ECF No. 4777] at 6-7.

94.    Central States' logic is wrong because 1405(b) Subordination reduces an employer's allocable UVBs *after* the allocable UVBs have already been limited by the 20-year cap, not *before*.  ERISA makes that clear: the Applicable Adjustments to an employer's allocable UVBs are applied in the following order, with Section 1405 adjustments applied at the very end, after the 20-year cap is applied:

(A) first, by any *de minimis* reduction applicable under [29 U.S.C. § 1389],

(B) next, in the case of a partial withdrawal, in accordance with [29 U.S.C. § 1386],

(C) **then**, to the extent necessary to reflect the [20-year] limitation on annual payments under [29 U.S.C. § 1399(c)(1)(B)], and

(D) **finally**, in accordance with [29 U.S.C. § 1405].

29 U.S.C. § 1381(b)(1)(A)-(D) (emphases added).

---

[13]    Debtors separately dispute Central States' annual payment calculations. *See infra* Section H.

95.     Courts interpreting 29 U.S.C. § 1381(b)(1) similarly agree that the statute provides a specific mathematical formula for calculating withdrawal liability. *See GCIU-Emp. Ret. Fund v. Quad/Graphics, Inc.*, 909 F.3d 1214, (9th Cir. 2018) (affirming lower court's decision that the partial withdrawal adjustment precedes the 20-year cap adjustment because "[t]he [Multiemployer Pension Plan Amendment Act] provides step-by-step instructions for calculating employer withdrawal liability in 29 U.S.C. § 1381(b)(1)" and "Section 1381(b)(1) plainly dictates the order of operations in calculating withdrawal liability."); *Perfection Bakeries Inc. v. Retail Wholesale & Dep't Store Int'l Union & Indus. Pension Fund*, 2023 WL 4412,165, at *9 (N.D. Ala. July 7, 2023); *appeal filed on other grounds*, Case No. 23-12533 (11th Cir. 2023) ("the fourth potential adjustment is described as being the 'final' adjustment'") (citing 29 U.S.C. § 1381(b)(1)(D)).

96.     Central States itself has admitted that withdrawal liability is a claim "calculated in accordance with the precise formula set forth in the statute." *Central States Funds' Resp. to Debtors' Obj. to the Funds' Proofs of Claims* [ECF No. 1833] at ¶ 5.

97.     In sum, there is no authority in the statute or otherwise that would support Central States' position that 1405(b) Subordination would not apply if the 20-year cap applies. Section 1405(b) is clear that it is just another adjustment to an employer's allocable share of UVBs. *See id.* at § 1405(b)(1) ("In the case of an insolvent employer undergoing liquidation or dissolution, the [UVBs] allocable to that employer shall not exceed an amount equal to the sum of—(1) 50 percent of the *[UVBs] allocable to the employer (determined without regarding to this section [1405]*, and . . .") (emphasis added).

98.     Further, it is no response for any MEPP to say that because Debtors did not initiate arbitration under 29 U.S.C. § 1401, Debtors are barred from challenging the MEPPs' withdrawal liability assessment or raising a challenge under Section 1405(b). This Court has already denied

the MEPPs' motion to compel arbitration and held that the "withdrawal liability claims will be liquidated in this Court through the claims allowance process." *Opinion* [ECF No. 2765] at 28.

99.     For these reasons, Central States' withdrawal liability claims (and all such claims by the SFA MEPPs and Non-SFA MEPPs) should be limited by 1405(b) Subordination, which limitation is applied if necessary as the final Applicable Adjustment.

**H.      Debtors' Withdrawal Liability to Central States and Local 641 Must Be Calculated Using Appropriate Contribution Rates.**

100.    There is no genuine dispute that Central States and Local 641 calculated Debtors' annual payment unlawfully.   Under ERISA, the general rule is that MEPPs must calculate a withdrawn employer's annual payment using "the highest contribution rate at which the employer had an obligation to contribute" during the relevant period, 29 U.S.C. § 1391(c)(1)(C)(i)(II), but there is one exception: any contribution rate increases after 2014 that are "required or made in order to enable the plan to meet [rehabilitation plan requirements]" "***shall be disregarded***" in calculating annual payments.  29 U.S.C. § 1085(g)(3)(A) (emphasis added).

101.    The question thus becomes: when is a contribution rate increase "required or made in order to enable" a MEPP to meet its rehabilitation plan requirements?  The answer is simple: any such rate increases are ***presumed*** "required or made" for this purpose, unless a MEPP can make one of two showings: (1) the rate increases were "due to increased levels of work, employment, or periods for which compensation is provided," *id*. § 1085(g)(3)(B); *or* (2) the MEPP amended its plan to "to provide an increase in benefits, including an increase in benefit accruals," *id*. §§ 1085(g)(3)(B), 1085(f)(1)(B), and (2) the plan actuary "certifie[d] that such [benefit increases were] paid for out of additional contributions not contemplated by the rehabilitation plan," *id*. § 1085(f)(1)(B).

43

102.    In this case, it is undisputed that Central States and Local 641 are subject to rehabilitation plans.  It is undisputed that Central States and Local 641 calculated Debtors' annual payment using contribution rates that were higher than the rates Debtors were obligated to pay in 2014.  *Id*.  And it is undisputed that the rate increases were not due to increased levels of work; that the funds did not amend their plans to provide increased benefits; and that their actuaries did not provide the certifications required in Section 1085(f)(1)(B).  *Id*.; *see also, e.g.*, *Central States, Southeast and Southwest Areas Pension Fund v. Event Media, Inc.*, 2024 WL 1363542, at *5 (N.D. Ill. Mar. 29, 2024) ("Congress enacted the actuary certification [in 29 U.S.C. § 1085(f)(1)(B)] as an apparent guardrail for plan amendments, and no nod to [ERISA's] overall purpose [by Central States] can overcome that statutory text. ***[Central States] did not obtain the actuary certification***.") (emphasis added).

103.    This is unlawful under ERISA—but the funds already know that.  In the last five years alone, Central States has lost on this issue seven times at arbitration and/or on appeal.  See, e.g., Event Me This is unlawful under ERISA—but the funds already know that.  In the last five years alone, Central States has lost on this issue ***seven times*** at arbitration and/or on appeal.  *See, e.g.*, *Event Media*, 2024 WL 1363542, at *5 (because Central States' actuary did not provide the certification required under 29 U.S.C. § 1085(f)(1)(B), "the post-2014 contribution increases made pursuant to the 2008 rehabilitation plan must be disregarded"); Ex. 6, *Royal Ice Cream Co. & Midtown Transportation Company v. Central States, Southeast, and Southwest Areas Pension Fund*, AAA Case No. 01-21-003-7893 (July 5, 2023) at 10 ("This is not the first proceeding addressing [Central States'] failure to disregard post-2014 contribution rate increases when determining the Highest Contribution Rate. . . . In three [other] decisions . . . the Arbitrator[s] had little problem finding for the employer.") (rejecting use of post-2014 contribution rate increases);

44

Ex. 8 *Rail Terminal Services, LLC v. Central States, Southeast, and Southwest Areas Pension Fund et al.*, AAA Case No. 01-19-0002-4493 (Jan. 31, 2020) at 24 (similar); Ex. 9, *Silgan Containers Manufacturing Corp. v. Central States, Southeast, and Southwest Areas Pension Fund*, AAA Case No. 01-20-0001-49194 (Sept. 30, 2022) at 21–22 (similar); Ex. 10, *Freeman Expositions, LLC v. Central States, Southeast, and Southwest Areas Pension Fund*, AAA Case No. 01-21-0003-5722 (Sept. 6, 2022) at 28 (similar); Ex. 11, *Valley Exposition Services, LLC. v. Central States, Southeast, and Southwest Areas Pension Fund*, AAA Case No. 01-21-0002-7029 (Oct. 25, 2022) at 16 (similar); Ex. 12, *Westrock Co. et al. v. Central States, Southeast, and Southwest Areas Pension Fund*, AAA Case No. 01-19-0001-7005 (Jan. 2, 2023) at 30 (similar); Ex. 13, *SourceOne Events, Inc. v. Central States, Southeast, and Southwest Areas Pension Fund*, AAA Case No. 01-21-0002-7996 (Dec. 6, 2022) at 16 (similar).

104.    Central States now hopes to succeed where it has previously (and repeatedly) failed. But the result in this case should be no different.  Because Congress has prohibited plans like Central States and Local 641 from using contribution rate increases to calculate Debtors' withdrawal liability (subject to exceptions not present here), the Court should find Central States' and Local 641's attempt to use such rate increases unlawful.  Debtors are entitled to summary judgment on this issue.

## I.    Central States' Claims for "Contributions Guarantee" Are Not Enforceable

105.    Central States asserts that under a side letter to the parties' contribution deferral agreement, the Debtors promised to continue making pension contributions through January 2033, a promise the Debtors allegedly breached in the summer of 2023 when they were forced to close their business, terminate employees and fail to make their monthly contributions. Central States' arguments do not justify yet another $1 billion claim in addition to its withdrawal liability claims.

106. *First*, Central States' withdrawal liability and contributions guarantee claims are, by their definition, mutually exclusive. According to Central States, its withdrawal liability claims are based on the Debtors "effect[ing] a complete withdrawal from [the fund] pursuant to 29 U.S.C. § 1383" when Debtors "permanently ceased to have an obligation to contribute to [the fund]." *See Central States Funds' Resp. to Debtors' Objs. To the Funds' Proofs of Claims* [ECF No. 1833] ¶ 18; *Central States Mot. to Compel Arb.* [ECF No. 1665] ¶ 12 (same); *see also* Ex. 40 (Central States' Proof of Claim No. 4312) at 4 ("type of calculation" is "2023 Complete Withdrawal"). Indeed, Section 1383 defines "complete withdrawal" to mean "permanently ceas[ing] to have an obligation to contribute under the plan[.]" *See* 29 U.S.C. § 1383(a)(1) (emphasis added). And the date of a complete withdrawal is the first day that an employer has no obligation to contribute. 29 U.S.C. § 1383(e), *see Parmac, Inc. v. I.A.M. Nat'l Pension Fund Benefit Plan A*, 872 F.2d 1069, 1072 (D.C.Cir. 1989). In other words, by definition, an employer has not "completely withdraw[n]" under ERISA, such that it is subject to withdrawal liability, unless the employer is no longer obligated to make contributions to a pension plan at all.

107. Central States will likely argue that under 29 U.S.C. § 1383(a)(2), a complete withdrawal also occurs when a contributing employer permanently ceases covered operations, and that Debtors' operations have permanently ceased. Under that theory, a withdrawal could have occurred despite the 2014 Guarantee Letter. But that theory does not work. The only reasonable interpretation of 29 U.S.C. § 1383 is that the "permanent cessation of operations" language refers to a scenario where (1) an employer's contribution obligation is based on the amount of work performed but (2) if no work is performed, there would be no contributions owed despite their still being an obligation to contribute under the collective bargaining agreement. To illustrate, imagine an employer has a collective bargaining agreement requiring contributions for covered work

46

performed that expires in 2025, but the employer permanently ceases covered operations in 2023. In such a case, the employer's contribution obligation under the agreement continues until 2025, but the employer would owe no contributions after 2023 because of the cessation of covered operations. In that scenario, under 29 U.S.C. § 1383(a) and (e), the employer completely withdraws in 2023. But here, under Central States argument, the cessation of Debtors' operations did not end Debtors' requirement to contribute because of the 2014 Guarantee Letter (if it was enforceable, which it is not). And under Central States' theory, it would collect both contributions and withdrawal liability payments simultaneously.

108.    ERISA does not permit MEPPs to double recover for contributions simultaneously with withdrawal liability. Indeed, and as another illustration, when an employer partially withdraws from a MEPP, it will owe partial withdrawal liability. *See* 29 U.S.C. § 1385. But the amount of the annual withdrawal liability payments for such withdrawal liability is reduced based on the amount of contributions that an employer contributes in the year after the partial withdrawal. *See* 29 U.S.C. § 1399(c)(1)(E). In short, the amount of the employer's continuing contributions in the year after the withdrawal, and the amount of the annual withdrawal liability payment, will approximate the amount of contributions prior to the withdrawal. And if the amount of contributions the employer owes in the year after the withdrawal is equal to or greater than in the years before the withdrawal, the withdrawal liability payment would be zero. *Id.*

109.    Central States cannot have it both ways. It cannot say, on one hand, that the Debtors have a contribution obligation under the 2014 Guarantee Letter, and, on the other, that the Debtors no longer have any such obligation, such that the Debtors have incurred withdrawal liability.[14] In

---

[14]    Unlike Debtors' agreements with Western PA Teamsters and New York State Teamsters regarding alternative *withdrawal liability* calculations, the 2014 Guarantee Letter is an agreement regarding *contribution obligations*. ERISA clearly distinguishes between withdrawal liability and obligations to contribute. *See, e.g.*, 29 U.S.C. § 1392 (distinguishing between obligation to contribute under a collective bargaining agreement and withdrawal

reality, the reasonable interpretation of the 2014 Guarantee Letter is that it is inapplicable to the present circumstances. Had Debtors not ceased operations, but instead just bargained out of the obligation to contribute to Central States while continuing in business, the 2014 Guarantee Letter would have required Debtors to continue making contributions to Central States until the ten years were satisfied. And no withdrawal would have occurred because Debtors would still owe contributions under a written agreement. *See* 29 U.S.C. § 1383(a), 1392(a)(1). The withdrawal would not occur until the obligation under the 2014 Guarantee Letter ceased. But because Debtors did permanently cease operations, the 2014 Guarantee Letter is inapplicable. And because a complete withdrawal did occur, instead of owing contributions under the 2014 Guarantee Letter, Debtors owe Central States withdrawal liability.

110.    *Second*, even if its withdrawal liability and contributions guarantee claims were reconcilable (they are not), Central States would still be unable to show that the liquidated damages provision of the 2014 Guarantee Letter, purportedly entitling Central States to a decade's worth of future contributions, is anything other than an unenforceable penalty.

111.    "The determination of whether a contractual provision for damages is a valid liquidated damages provision or a penalty clause is a question of law." *Grossinger Motorcorp, Inc. v. Am. Nat'l Bank and Trust Co.*, 607 N.E.2d 1337, 1345 (Ill. App. Ct. 1992). "The test for determining whether a liquidated-damages clause is valid as such or is void as a penalty is stated in section 356 of the Restatement (Second) of Contracts: 'Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.'" *GK Dev., Inc. v. Iowa*

---

liability); *Chicago Regional Council of Carpenters Pension Fund v. Drive Constr., Inc.*, 2023 WL 4760586, at *9 (N.D. Ill. July 26, 2023) ("Withdrawal liability assessed against an employer under the MPPAA is distinct from contributions obligated by CBAs.").

*Malls Fin. Corp.*, 3 N.E.3d 804, 816 (Ill. App. Ct. 2013). "A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *Id.* So too is a contract term that "operates as a penalty for nonperformance or as a threat to secure performance." *Id.* In doubtful cases, Illinois courts are "inclined to construe the stipulated sum as a penalty," *id.*, even if both parties are economically sophisticated, *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 563 (7th Cir. 2001) (citations omitted).

112.    For these reasons, three elements must be met before a liquidated damages provision can be enforced: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained, and (3) actual damages would be uncertain in amount and difficult to prove." *GK Dev.*, 3 N.E.3d at 816.

113.    The liquidated damages provision in the 2014 Guarantee Letter is unenforceable because there is nothing in the record to suggest that, at the time of contracting, the parties reasonably believed Central States would suffer $1 billion in damages if the Debtors were to discontinue operations. That is not surprising, because if the Debtors were to terminate their employees and cease operations, those employees would stop accruing any benefits by virtue of their employment with the Debtors for which Central States would actually be liable, and for which continuing contributions would be required. Any amount that the Debtors pay towards Central States "contributions guarantee" claims would not be based on any Debtor employee's work or be otherwise attributable to such employee's benefit calculation under ERISA.

114.    At most, Central States may argue that it could suffer "increased exposure to economic volatility" and "increased administrative costs" as a result of the Debtors' breach. *See*

*Central States Funds' Resp. to Debtors' Objs. To the Funds' Proofs of Claims* [ECF No. 1833] ¶ 82. But again, there is no such evidence in the record, and in any event these kinds of vague, conclusory theories of harm bear no relationship to the whopping $1 billion Central States seeks.

115.    Illinois courts have struck liquidated damages provisions as unenforceable under similar circumstances, and the Court should reject Central States' claims. *See, e.g.*, *GK Dev.*, 3 N.E.3d at 816 (contract provision that required $4.3 million in liquidated damages was unenforceable because it bore no relation to anticipated damages or 91-day delay of performance); *.M. I. G. Invests., Inc. v. Marsala*, 414 N.E.2d 1381, 1386 (Ill. App. Ct. 1981) (contractual provision that required, in the event of breach, monthly payments of $800 for the remainder of contract term was unenforceable penalty where counterparty's actual damages were potentially "very small" and ascertainable); *2336 North Clark, LLC v. Hair Fairies, Inc.*, 2022 WL 17249039, at *6 (Ill. App. Ct. Nov. 28, 2022) (liquidated damages clause unenforceable where it entitled nonbreaching party to recover five years' worth of rent payments for any defaults, where there was no evidence that such amounts corresponded to actual damages).

116.    *Finally*, even if the liquidated damages provision were not an unenforceable penalty (it is), Central States efforts to enforce such provision would still violate the National Labor Relations Act. As relevant here, the NLRA specifically provides that "[i]t shall be an unfair labor practice for a labor organization or its agents . . . to cause or attempt to cause an employer to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed." 29 U.S.C. § 158(b)(6).

117.    That is precisely what is happening here. Central States seeks, as an agent of International Brotherhood of Teamsters,[15] to have the Debtors pay a liquidated, nine-figure lump

---

[15]    *See* Ex. 43 (2014 CDA), Recitals (recital clauses for "the Primary Obligors and certain of their employees who are represented by the International Brotherhood of Teamsters"); *Central States Funds' Resp. to Debtors' Obj. to*

sum for future services that the Debtors will never have to render and/or for future labor the Debtors' former employees will never have to provide (because Debtors terminated their operations and employees). *See, e.g.*, Ex. 41, (Central States' Proof of Claim No. 4336) at 1 (CSPF seeks $917,028,151.83 for "Services Performed"). This kind of "featherbedding" is impermissible under federal law, void against public policy, and should be rejected here. *See, e.g.*, *Am. Newspaper Publishers Ass'n v. Nat'l Labor Rels. Bd.*, 345 U.S. 100, 110 (1953) (noting that the NLRA prohibits a labor organization or its agent from exacting pay for services not performed); *Consol. Theatres, Inc. v. Theatrical Stage Emps. Union*, 447 P.2d 325, 338 (Cal. 1968) (holding that the union had "arguabl[y]" violated 29 U.S.C. § 158(b)(6) because there was "a substantial volume of evidence which tended to show" that the union was seeking to compel a theater to hire maintenance men who would do "little or no actual work" but "merely [be] present on the premises during working hours").

118.    For these reasons, the Court should disallow Central States' proofs of claim for guarantee contributions.

## **CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that the Court grant partial summary judgment to the Debtors, consistent with the Debtors' Motion.

---

the Funds' Proofs of Claims [ECF No. 1833] at ¶ 7 ("Central States Funds are primarily funded by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements with local unions affiliated with the International Brotherhood of Teamsters ("IBT") on behalf of employees of those same employers.").

4934-1397-3766.1 96859.001

Dated:  December 14, 2024
Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:              ljones@pszjlaw.com
                        tcairns@pszjlaw.com
                        pkeane@pszjlaw.com
                        ecorma@pszjlaw.com


Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Shirley Chan (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 W. Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:              pnash@kirkland.com
                        dseligman@kirkland.com
                        shirley.chan@kirkland.com

-and-

Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:      (415) 439-1500
Email:              michael.esser@kirkland.com
                        john.christian@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*