Case 23-11069-CTG   Doc 5316   Filed 01/02/25   Page 1 of 2



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

December 2, 2024

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

12/2/2024, NY/NATL, pg B3

*Larnyce Tabron*

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2024.12.03 09:52:36 -05'00'



KELSEY McCLELLAN FOR THE NEW YORK TIMES

For retailers, the slow growth of the nation's E.V. charging infrastructure has presented an opportunity to attract more traffic by installing public chargers.

# E.V. Chargers Finally Pay Off for Retailers

**FROM FIRST BUSINESS PAGE**

were installed. The effects were most pronounced for retailers within 150 meters. The researchers also found a 5 percent increase in spending.

Another recent study, published in Nature Communications, analyzed data from California, where E.V. ownership and charging infrastructure are more widespread than in other states. It found that installing chargers brought more modest increases in foot traffic and spending but that public E.V. stations "tend to attract higher-income, exploratory visitors and local residents," and in low-income areas they "enhance businesses."

Some companies — notably Walmart, the largest retailer in the United States — are seeing charging as a potentially profitable business in and of itself, not just as a spur for foot traffic and sales. They have begun building charging stations under their own brand names rather than relying on providers that lease a part of their parking lots to install and maintain the stations.

"Companies are beginning to see charging as something that can potentially help the bottom line," said Graham Evans, a director at S&P Global Mobility, an automotive market research firm. "It's going to become more ubiquitous rather than a token gesture."

The embrace of charging comes as more Americans — many of whom are worried about a warming planet — trade in their gas-powered cars. In 2023, 1.4 million plug-in electric vehicles were sold in the United States, more than 9 percent of all car sales that year and an increase of over 50 percent from 2022, according to Argonne National Laboratory, a federally funded research center.

And although the growth of E.V. sales has slowed this year, an estimated 346,309 of the vehicles were sold in the third quarter, nearly 9 percent of sales, according to Cox Automotive, a market research firm. (It is too soon to say what impact Donald J. Trump's election will have on sales, but during his campaign he vowed that if he became president he would end the Biden administration's policies that encourage E.V. manufacturing and sales.)

Some of the slowdown in E.V. sales this year can be chalked up to drivers who hesitate to trade in their gas-powered cars because of concerns about E.V. charging infrastructure, which has grown more slowly than E.V. sales. Broken chargers have been a problem: One in five ports does not work when motorists pull up, according to recent research led by a Harvard Business School fellow.

In total, over 200,000 public chargers are spread across about 74,000 stations, but more than a million public chargers will be needed by 2030 to keep up with E.V. sales, researchers at the National Renewable Energy Laboratory have estimated.

Even with the Biden administration's $5 billion plan to fill in the infrastructure gap, a robust national network is still years away. Under that plan, states are required to submit proposals for charging operators and site hosts. Nearly 60 percent of the grants have gone to fuel and convenience stores, rest stops and service plazas, according to EVAdoption, a data and analytics firm. Still, only one in every 14 big-box locations offers charging, while one in every 15 grocery stores and one in every 40 department stores do, a Consumer Reports analysis found.

For many retailers, charging deficiencies present an opportunity: Truckers, ride-hailing drivers and people on long-distance trips



RICHARD BEAVEN FOR THE NEW YORK TIMES

An estimated 346,309 electric vehicles were sold in the third quarter.

rely on public chargers, as do the 5 percent of E.V. owners who are not able to charge at home, many of whom live in apartment buildings and park on the street. The most frequently used public chargers are at retailers, according to a 2024 study of usage data by J.D. Power, a data analytics company.

Some landlords of shopping centers and malls have found that installing chargers on their properties has helped to attract new tenants, said Jim Hurless, a managing director who oversees the E.V. business at the real estate firm CBRE.

But installing the chargers is complicated and expensive. The process involves surveying, engineering, permitting, connecting with local utilities, testing and inspection — and can take up to 18 months from start to finish. Slower chargers — considered a good fit for cinemas and hotels, where a customer parks for a few hours or overnight — can cost up to $7,000 to install. Fast chargers, which can provide a significant charge in 20 minutes, can cost as much as $175,000.

Many retailers turn the project over to a charging company that pays them a monthly fee for the parking spaces used while retaining any revenue from customers. And those providers have been installing more, and faster, chargers and promising a more reliable, and in some cases plusher, customer experience than in the past.

Mercedes-Benz is investing $1 billion on the first phase of a new network of high-speed chargers that can accommodate all brands of vehicles. Its charging stations will have lounges — and landscaping — at some locations. The automaker has installed charging hubs at a dozen Buc-ee's gas and convenience stores in the Southeast, with plans to expand to more than 40 additional sites. Starbucks, which had Volvo install 15 stations on properties between Seattle and Denver, will work with Mercedes to add 100 more, including on Interstate 5 on the West Coast.

Some charging companies are developing methods to speed up installations. EVgo has begun to experiment with a prefabricated model, with its first installation at a site in League City, Texas, in March.

But some retailers, like the convenience-store chains 7-Eleven and RaceTrac, are seeking to take control over — and monetize — charging by building their own networks.

For several years, Walmart has worked with Electrify America, a division of Volkswagen, and now has Electrify America stations at 280 of the retailer's stores. When Walmart tested its own network at stores near its Bentonville, Ark., headquarters and in a town near Dallas, it found demand surprisingly strong, said Vishal Ka-

padia, the company's senior vice president for energy transformation.

"There is a need for this infrastructure in many pockets," he said.

The company is rolling out 15 stations in the Dallas-Fort Worth area and 10 in Phoenix, and it plans to have thousands across the country by 2030. Walmart expects to spend $1 million to $1.5 million at each site.

"Charging can be a profitable stand-alone business," Mr. Kapadia said. "The ancillary benefits are driving traffic to our locations."

Even Costco, one of the first retailers to install charging stations in the 1990s, before ripping them out in 2011 because the company said they were rarely used, has recently returned to E.V. charging.

Hannaford, a Northeast grocer with charging stations at 24 of 189 stores — including the one Ms. Leary frequents — got into the charging business because it was "how we want to present ourselves," said George Parmenter, health and sustainability lead at Hannaford.

Mr. Parmenter said he did not know to what extent charging led to in-store sales, but he noted that a Tesla charging station at a Hannaford store in Portland, Maine, averaged about 2,000 charging sessions a month.

"I don't know what else you could do to get that many people to show up," he added.

Brent Gruber, executive director of E.V. practice at J.D. Power, said: "Fifteen years ago it may have not made the most sense to add charging. Now it makes sense."

# New Space Age Material Luckily Grows on Trees

**FROM FIRST BUSINESS PAGE**

word for wood, lignum, could open the door to other uses for wood in space. The idea originated in 2017 from a question posed by Takao Doi, a Japanese engineer and former NASA astronaut: Could a human society living in space grow trees as renewable building material?

"We were trying to think about how to build something on the moon with wood," Mr. Murata said in an interview. But they needed to verify whether wood could be used in space. The following year, Mr. Doi began talking about how, about a hundred years ago, airplanes had been built with wood. "So why not make a satellite with wood, too?" Mr. Murata said.

What began as an impulsive idea evolved into a serious scientific endeavor, he said. Mr. Doi and a group of scientists at Kyoto University and Sumitomo Forestry, one of Japan's oldest timber companies, set out to determine the best wood to send to space.

They tested three types: birch, cherry and magnolia. The samples were sent in 2022 to the International Space Station, where they spent nearly eight months and were exposed to extreme temperatures, "intense cosmic rays and dangerous solar particles."

"Tests confirmed no decomposition or deformations, such as cracking, warping, peeling or surface damage," the researchers wrote in January.

The team selected magnolia for its lightweight properties and resistance to cracking. The wood was processed using a centuries-old Japanese woodworking technique called "sashimono," which uses intricate joints instead of screws, nails or glue to assemble furniture and wooden buildings.

Two master carpenters in Kyoto, who usually restore historical buildings like Nijo Castle, were enlisted to work on the satellite, Mr. Murata said. Using traditional tools, like saws and chisels, they crafted the wooden components that would eventually orbit Earth.

"Nobody had ever thought about using wood for rocket science before," Mr. Murata said. "Many engineers thought wood was old technology and couldn't be applied to cutting-edge technology."

A group of researchers in Finland said in 2021 that it was on a similar mission to launch a wooden satellite, using birch plywood. But their satellite has not yet been sent to space.

The Japanese project wasn't

without its challenges, either. Wood's tendency to shrink and deform unevenly when it loses moisture required careful engineering considerations. The final design also needed to be approved by both the Japan Aerospace Exploration Agency and NASA, which was involved in launching the satellite.

"There was a lot of debate because this material had never been used before," Mr. Murata said.

Once in orbit, LignoSat's wood will be tested for six months before it burns up in Earth's atmosphere, he said. Scientists will monitor how much the wood expands and contracts in space and how accurately the geomagnetic field can be measured inside a wooden structure.

The project could also help ad-

> 'Nobody had ever thought about using wood for rocket science before.'
>
> Koji Murata, a professor of forest and biomaterials science at Kyoto University.

dress a growing problem in space exploration: environmental impact. When metal satellites burn up in the atmosphere, they release pollutants like aluminum oxide that damage the ozone layer. But burning wood simply produces water vapor and carbon dioxide, a cleaner byproduct, Mr. Murata said.

A lot can go wrong while the satellite is in space. Its solar panels may stop operating, and the batteries may overheat or freeze in an environment where temperatures can fluctuate from 212 degrees to minus 148 degrees Fahrenheit every hour or so.

But as far as the wood is concerned, Mr. Murata isn't worried. He said that tests had already shown that wood does not deteriorate in space.

Looking ahead, Mr. Murata said the team envisioned larger wooden satellites. Farther in the future, he said his ambitions extended beyond Earth's orbit.

"I am hoping to grow wood on Mars," he said.

The goal appears far-fetched today. But he is no stranger to achieving the implausible.

"I used to think it was impossible to send anything made of wood to space," he said.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re: ) Chapter 11
YELLOW CORPORATION, et al.,[1] ) Case No. 23-11069 (CTG)
Debtors. ) (Jointly Administered)

NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN AND RELATED VOTING AND OBJECTION DEADLINES

PLEASE TAKE NOTICE THAT on November 22, 2024, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order [Docket No. 5024] (the "Disclosure Statement Order") (a) authorizing Yellow Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the Second Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 5028] (as may be altered, amended, modified, or supplemented from time to time, the "Plan")[2] (b) approving the Second Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 5027] (as may be amended, supplemented, or modified from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Bankruptcy Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on February 4, 2025, at 2:00 p.m., prevailing Eastern Time, before the Honorable Craig T. Goldblatt, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market St., Third Floor, Wilmington, DE 19801.

PLEASE BE ADVISED: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE. ANY SUCH NOTICES OF ADJOURNMENT ARE AVAILABLE FREE OF CHARGE ON THE DEBTORS' CASE WEBSITE AT HTTPS://DM.EPIQ11.COM/YELLOWCORPORATION.

CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

Voting Record Date. The voting record date is November 14, 2024, which is the date for determining which Holders of Claims in Class 5 are entitled to vote on the Plan.

Voting Deadline. The deadline for voting on the Plan is January 21, 2025, at 4:00 p.m., prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you must: (a) follow the instructions carefully; (b) complete all of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is actually received by the Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC (the "Claims and Noticing Agent") on or before the Voting Deadline. A failure to follow such instructions may disqualify your vote.

CRITICAL INFORMATION REGARDING OBJECTING TO THE CONFIRMATION OF THE PLAN

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE IX.C CONTAINS A THIRD-PARTY RELEASE. YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

Plan Objection Deadline. The deadline for filing objections to confirmation of the Plan is January 21, 2025, at 4:00 p.m., prevailing Eastern Time (the "Plan Objection Deadline"). All such objections must: (a) be in writing; (b) conform to the Bankruptcy Code, Bankruptcy Rules, the Local Rules, and any orders of the Bankruptcy Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the following notice parties so as to be actually received on or before the Plan Objection Deadline: (i) Debtors: Yellow Corporation, 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211, Attention: Yellow Legal legal@myyellow.com; (ii) Counsel for the Debtors: Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attention: Patrick J. Nash Jr., P.C., David Seligman, P.C., Patrick.nash@kirkland.com, David.seligman@kirkland.com -and- Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attention: Allyson B. Smith, Allyson.smith@kirkland.com; (iii) Counsel for the Debtors: Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19801, Attention: Laura Davis Jones, Timothy P. Cairns, Peter J. Keane, and Edward Corma, ljones@pszjlaw.com, tcairns@pszjlaw.com, pkeane@pszjlaw.com, ecorma@pszjlaw.com; (iv) Counsel for the Committee: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Philip C. Dublin, Meredith A. Lahaie, and Kevin Zuzolo, pdublin@akingump.com, mlahaie@akingump.com, kzuzolo@akingump.com -and- Benesch, Friedlander, Coplan, Aronoff LLP, 1313 North Market Street, Suite 1201, Wilmington, DE 19801, Attention: Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile, jhoover@beneschlaw.com, kcapuzzi@beneschlaw.com, jgentile@beneschlaw.com; and (v) United States Trustee: Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801, Attention: Jane M. Leamy, Richard Schepacarter, Jane.M.Leamy@usdoj.gov, richard.schepacarter@usdoj.gov. Please be advised that Article IX of the Plan contains the following release, exculpation, and injunction provisions:

Article IX.B of the Plan provides for a release by the Debtors (the "Debtor Release"): [Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, the Liquidating Trust, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted

or assertable on behalf of any of the Debtors, the Liquidating Trust, or their Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, the Liquidating Trust, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, the Liquidating Trust, or any other Entity could have asserted on behalf of the Debtors or the Liquidating Trust, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Liquidating Trust (including the Debtors' and the Liquidating Trust's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transaction or event giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Liquidating Trust and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Liquidating Trust, any intercompany transactions, the Chapter 11 Cases, the Plan (including, for the avoidance of doubt, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, the Financing Documents and any other Definitive Document or any Liquidation Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Document, the Chapter 11 Cases, the Canadian Recognition Proceedings, the filing of the Chapter 11 Cases, the commencement of the Canadian Recognition Proceedings, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (2) any matters retained by the Debtors and the Liquidating Trust pursuant to the Schedule of Retained Causes of Action.]

Article IX.C of the Plan provides for the following third-party release (the "Third Party Release"): [Except as otherwise expressly set forth in the Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Liquidating Trust, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors or the Liquidating Trust (including the Debtors' and the Liquidating Trust's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transaction or event giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Liquidating Trust and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the Canadian Recognition Proceedings, the Plan (including, for the avoidance of doubt, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Document, the Chapter 11 Cases, the Canadian Recognition Proceedings, the Chapter 11 Cases, the commencement of the Canadian Recognition Proceedings, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release: (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date, of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (2) the rights of any Holder of Allowed Claims or Interests, if applicable, to receive distributions under the Plan.]

Definitions related to the Third-Party Release:

UNDER THE PLAN, "AVOIDANCE ACTIONS" MEANS ANY AND ALL ACTUAL OR POTENTIAL CLAIMS OR CAUSES OF ACTION TO AVOID A TRANSFER OF PROPERTY OR AN OBLIGATION INCURRED BY THE DEBTORS, INCLUDING AVOIDANCE, RECOVERY, OR SUBORDINATION ACTIONS OR REMEDIES THAT MAY BE BROUGHT BY OR ON BEHALF OF THE DEBTORS, THEIR ESTATES,

OR OTHER AUTHORIZED PARTIES IN INTEREST UNDER THE BANKRUPTCY CODE OR APPLICABLE NON-BANKRUPTCY LAW INCLUDING ACTIONS OR REMEDIES UNDER SECTIONS 544, 547, 548, 549, 550, 551, 552, OR 553 OF THE BANKRUPTCY CODE, OR ANY SIMILAR FEDERAL, STATE OR COMMON LAW CAUSES OF ACTION, INCLUDING FRAUDULENT TRANSFER LAWS.

UNDER THE PLAN, "DEBTOR RELEASE" MEANS THE RELEASES GIVEN ON BEHALF OF THE DEBTORS AND THEIR ESTATES AS SET FORTH IN ARTICLE IX.B OF THE PLAN.

UNDER THE PLAN, "RELATED PARTY" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, INVESTMENT COMMITTEE MEMBERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, MANAGED ACCOUNTS OR FUNDS, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS OR MANAGERS, EMPLOYEES, AGENTS, TRUSTEES, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.[3]

UNDER THE PLAN, "RELEASED PARTY" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE LIQUIDATING TRUSTEE; (C) ALL HOLDERS OF CLAIMS; (D) ALL HOLDERS OF INTERESTS; (E) THE COMMITTEE AND ITS MEMBERS (INCLUDING ANY EX-OFFICIO MEMBER(S)); (F) EACH RELEASING PARTY; (G) THE INFORMATION OFFICER; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (B); AND (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH CLAUSE (H); PROVIDED THAT WITH RESPECT TO ANY ENTITY IN CLAUSE (C) OR (D), SUCH ENTITY SHALL NOT BE A RELEASED PARTY IF IT ELECTS NOT TO OPT INTO THE RELEASES DESCRIBED IN ARTICLE IX OF THE PLAN.[4]

UNDER THE PLAN, "RELEASING PARTY" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE LIQUIDATING TRUSTEE; (C) ALL HOLDERS OF CLAIMS; (D) ALL HOLDERS OF INTERESTS; (E) THE COMMITTEE AND ITS MEMBERS (INCLUDING ANY EX-OFFICIO MEMBER(S)); (F) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (H); AND (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH CLAUSE (H); PROVIDED THAT WITH RESPECT TO ANY ENTITY IN CLAUSE (C) OR (D), SUCH ENTITY SHALL NOT BE A RELEASING PARTY IF IT ELECTS NOT TO OPT INTO THE RELEASES PROVIDED BY THE PLAN; (B) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (C) ALL HOLDERS OF CLAIMS AND WHO ARE DEEMED TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (D) ALL HOLDERS OF INTERESTS WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (H) THE COMMITTEE AND ITS MEMBERS (INCLUDING ANY EX-OFFICIO MEMBER(S)); (I) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (J) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH AFFILIATE TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE NON-BANKRUPTCY LAW; AND (J) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH CLAUSE (I) FOR WHICH SUCH AFFILIATE OR ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE NON-BANKRUPTCY LAW; PROVIDED THAT EACH RELEASING PARTY SHALL NOT BE A RELEASING PARTY IF IT ELECTS NOT TO OPT INTO THE RELEASES CONTAINED IN THE PLAN.

Article IX.D of the Plan provides for an exculpation of certain parties (the "Exculpation"): [Except as otherwise specifically provided in the Plan or the Confirmation Order, and to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be exculpated from any Cause of Action for any claim related to any act or omission in connection between the Petition Date and the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases or the Canadian Recognition Proceedings prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Third-Party Sale Transactions, the Plan, the Plan Supplement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Document, or any Liquidation Transaction, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.]

Article IX.E of the Plan establishes an injunction (the "Injunction"): [In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code Section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Except as otherwise expressly provided in the Plan or the Confirmation Order issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims, Interests, or Causes of Action in the Debtors and the Liquidating Trust shall be precluded and permanently enjoined on and after the Effective Date, from taking any of the following actions against the Debtors, the Liquidating Trust (but solely to the extent such action is brought against the Debtors or the Liquidating Trust to directly or indirectly recover upon any property of the Estates upon the Effective Date), the Excluded Parties, the Released Parties, and any successors, assigns or representatives of such entities or entities, solely with respect to any Claims, Interests or Causes of Action that will be or are treated by the Plan: (a) commencing or continuing in any manner any action, or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order; (c) creating, perfecting or enforcing any encumbrance of any kind; (d) asserting any right of setoff, subrogation, or recoupment

of any kind against any obligation due from such Entities or against the property of such Entities unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims, Interests, or Causes of Action released or settled pursuant to the Plan. All Persons or Entities who directly or indirectly have held, hold, or may hold, or seek to assert Claims or Causes of Action that have been released in the Plan (the "Released Claims") or that are subject to exculpation (the "Exculpated Claims"), shall be enjoined from (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (iii) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (iv) asserting any right of subrogation on account of or in connection with or with respect to the Released Claims and Exculpated Claims, unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; provided, however, that the foregoing injunction shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by the Plan until the closing of these Chapter 11 Cases. Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each Holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX.E.

ADDITIONAL INFORMATION

Obtaining Solicitation Materials. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials), please feel free to contact the Debtors' Claims and Noticing Agent, by: (a) calling (866) 641-1076 (domestic) or +1 (503) 461-4134 (international); or (b) emailing yellowballots@epiqglobal.com and referencing "Yellow" in the subject line. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: https://ecf.deb.uscourts.gov, or (b) at no charge by accessing the Debtors' restructuring website at https://dm.epiq11.com/YellowCorporation.

Please be advised that the Claims and Noticing Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may not advise you as to whether you should vote to accept or reject the Plan.

The Plan Supplement. The Debtors will file documents constituting the Plan Supplement (as defined in the Plan) on or prior to January 14, 2025 and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

BINDING NATURE OF THE PLAN: IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND/OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM OR INTERESTS IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs.

Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&Os.

Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&Os.

Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&Os.

Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&Os.

Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&Os.