**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Related to D.I. 5217** |
|  | ) |

**OPPOSITION OF THE TEAMSTERS PENSION TRUST FUND OF**
**PHILADELPHIA AND VICINITY TO DEBTORS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT ON SFA MEPPS' AND NON-SFA MEPPS' CLAIMS**

The Teamsters Pension Trust Fund of Philadelphia & Vicinity (the "Philadelphia Fund"),

by and through its undersigned counsel, hereby submits this Opposition to the *Debtors' Motion*

*for Partial Summary Judgment on SFA MEPPS' and Non-SFA MEPPS' Claims* (the "Motion").[2]

[Docket Item No. 5217].

**A. INTRODUCTION**

1. The arguments raised by the Debtors underscore the glaring need for an *equitable*

*reconciliation* of ERISA and the Bankruptcy Code.  Throughout this claims litigation, the

Debtors arbitrarily have vacillated between the provisions of these federal laws to artificially

construct the lowest possible withdrawal liability calculations.  The Debtors selectively

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place
of business and the Debtors' service address in these chapter 11 cases is:  10990 Roe Avenue, Overland Park,
Kansas 66211.

[2]  The Philadelphia Fund incorporates by reference the: (i) *Opposition of the Teamsters Pension Trust Fund of*
*Philadelphia and Vicinity to Debtors' Motion for Summary Judgment on Non-SFA MEPP's Withdrawal Liability*
*Claims* (the "Opposition") [Docket Item No. 5039]; and (ii) *Response of the Teamsters Pension Trust Fund of*
*Philadelphia and Vicinity to Order Granting Motion for Reconsideration and Posing Further Questions* (the
"Response") [Docket Item No. 5162].  Capitalized terms not otherwise defined herein shall have the same meaning
as set forth in the Response.

01/07/2025 SL1 2557304v1 027202.00304

alternated between the most favorable provisions of both laws in an effort to bind the MEPPs

into a Catch-22 scenario.

2.    For example, the Debtors first advance ERISA by faulting the MEPPs for failing to

declare a pre- or post-petition default as a predicate to the acceleration of the 20-year

amortization schedules.  *See* Motion, p. 16.  Then, the Debtors champion the Bankruptcy Code,

arguing that if the MEPPs had declared defaults under 29 U.S.C. § 1399, such defaults would

have been invalid exercises of *ipso facto* clauses, *see* Motion, p. 28, or barred by the automatic

stay.  *Id.* at p. 30.

3.    Further, the Debtors charged the MEPPs with strict compliance with the ERISA

withdrawal liability provisions even if such actions may have been barred by the automatic stay,[3]

while simultaneously excusing the Debtors from compliance with their obligations as a

contributing employer under that statute.[4]

4.    The adjudication of these withdrawal liability claims requires a consistent and fair

application of ERISA and the Bankruptcy Code to avoid the inequitable and inconsistent results

sought by the Debtors.

5.    Among the issues presented in the Motion is whether the amortized payments must be

discounted to present value.  There are three potential legal bases that must be examined to

determine whether a discount is authorized or warranted: (i) ERISA; (ii) the Bankruptcy Code;

and (iii) Third Circuit precedent.  None justifies a present value discount in this context.  Indeed,

while ERISA allows a contributing employer to prepay its amortized withdrawal liability

---

[3] *See* Motion, p.15. (faulting MEPPs for failing to issue notice and demand for payment outside of the proof of claim process).
[4] 29 U.S.C. §1401(b)(1) (providing for a waiver of challenges if arbitration is not initiated).

2

payments, a discount is not offered to employers who elect to do so.  In fact, the statute merely states that the employer will not be penalized for making the prepayment.[5]

6.   Nor does section 502 of the Bankruptcy Code expressly require a discount.  In fact, Congress addressed instances (such as landlord and employment contract claims) where long term payment streams must be capped; withdrawal liability was not among the enumerated claims.  Lastly, in *Oakwood, infra*, the Third Circuit held that section 502 did not mandate discounting payment streams and further instructed that the creditor's economic realities must be considered when contemplating a discount.  Here, the economic realities – in the form of myriad potential reductions and limited Class 5 distributions under the Plan – militate against a present value discount.

## B.  BACKGROUND

### (a)  The Philadelphia Fund

7.   The Philadelphia Fund is an "employee pension benefit plan" within the meaning of § 3(2)(A) of the Employee Retirement Security Income Security Act ("ERISA"), 29 U.S.C. § 1002(2)(A), and a "multiemployer plan" within the meaning of § 3(37) of ERISA, 29 U.S.C. § 1002(37).[6]

8.   The Philadelphia Fund was established pursuant to § 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5).  The Philadelphia Fund exists for the exclusive purpose of providing benefits to its participants and beneficiaries in accordance with § 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), and ERISA.[7]

---

[5] 29 U.S.C §1399(c)(4).(authorizing employer to prepay; however, no statutory discount offered for lump sum payment).
[6] Opposition, ¶ 26.
[7] Opposition, ¶ 27.

9.   The Philadelphia Fund is administered by Trustees in accordance with the LMRA Section 302(c)(5), 29 U.S.C. § 186(c)(5), and ERISA.  The Trustees of the Philadelphia Fund are appointed in equal numbers by management and labor and owe their exclusive fiduciary obligations to the participants and beneficiaries of the Philadelphia Fund.[8]

10.   The Philadelphia Fund is a not-for-profit multiemployer pension plan which is operated in accordance with a trust agreement under ERISA.  Significantly, all contributions received by the Philadelphia Fund (including any contributions that were previously made by the Debtors) are used for the exclusive purpose of providing pension benefits to beneficiaries of the Philadelphia Fund and for paying administrative expenses.[9]

11.   The Philadelphia Fund is governed by a plan document (the "Plan Document").  The remedies section in the Plan Document authorizes the Philadelphia Fund to exercise any post-default remedies authorized by law.[10]  Specifically, the Plan Document provides:

Section F Remedies

In litigation, the Trust Fund shall be entitled to all remedies permitted by law.

See Response, ¶ 5.

**(b)  The Debtors' Obligation to Contribute to The Philadelphia Fund**

12.   Prior to the Petition Date, certain Debtors, including, without limitation, YRC Inc., USF Holland, LLC and New Penn Motor Express, LLC, entered into a collective bargaining agreement with the Teamsters National Freight Industry Negotiating Committee entitled "YRCW National Master Freight Agreement" (together with all amendments, supplements, addenda, exhibits and related agreements and collective bargaining agreements, the "Collective

---

[8]  Opposition, ¶ 28.
[9]  Opposition, ¶ 29.
[10]  Response, ¶ 5

4

Bargaining Agreement") pursuant to which certain Debtors were obligated to, among other things, make monthly pension fund contributions to the Philadelphia Fund.[11]

13.    Specifically, the Collective Bargaining Agreement provides that, in consideration for the services rendered by covered fund participants, those participants would receive bargained-for compensation in the form of: (i) present income paid in wages; (ii) deferred retirement income through a pension administered by the Philadelphia Fund; and (iii) other benefits.[12]

### (c)  The Debtors' Cessation of Business Operations and Bankruptcy Filing

14.    On or about July 31, 2023, the Debtors terminated their business operations.  As a result, the Debtors triggered an event of withdrawal from the Philadelphia Fund.[13]

15.    On August 6, 2023 and continuing on August 7, 2023 (collectively, the "Petition Date"), Yellow Corporation and certain affiliated companies (collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").[14]

16.    The Philadelphia Fund timely filed Proofs of Claim in each of the jointly-administered bankruptcy cases (collectively, the "Claims") asserting claims for, *inter alia,* withdrawal liability under the Multiemployer Pension Plan Amendments Act, 29 U.S.C. §§ 1381, *et seq.*, ("MPPAA") in the liquidated amount of $36,794,461.38 that accrued as a result of the Debtors' withdrawal from the Philadelphia Fund and due and owing to the Philadelphia Fund.[15]

---

[11] Opposition, ¶ 34.

[12] Opposition, ¶ 35.

[13] Opposition, ¶36.

[14] The automatic stay triggered by the Debtors' bankruptcy filing precluded the Philadelphia Fund from issuing a Notice and Demand for payment of withdrawal liability.

[15] Opposition, ¶38.  The Claims were filed against each of the Debtors as members of a controlled group pursuant to 29 U.S.C. § 1301(b)(1) because the Debtors are under common control within the meaning of 29 U.S.C. § 1301(14)(A),(B); 26 U.S.C. §414(b), (c); 26 C.F.R. §§ 1.414(b)-1.1.414(c)-2.

01/07/2025 SL1 2557304v1 027202.00304

17.   On March 13, 2024, the Debtors filed *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* asserting, *inter alia*, that the Claims should be substantially reduced.  [Docket Item No. 2595].

18.   On December 14, 2024, the Debtors filed the Motion.

## C. <u>ARGUMENT</u>

### (a)  Summary Judgment Standard

19.   Federal Rule of Civil Procedure 56(a) provides that the Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a); *see also Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000).  In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party.  Fed.R.Civ.P. 56(a).

20.   The moving party bears the burden of establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23,106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence supporting the non-moving party's case."  *Celotex,* 47 U.S. at 325.

21.   In deciding a motion for summary judgment, the court's role is not to evaluate evidence and decide the truth of the matter but to determine only whether there is a genuine issue of fact for trial.  *Anderson*, 477 U.S. at 249.

(b)  **Present Value Discounting is Not Supported by Section 502, ERISA or Third Circuit Precedent**

22.  As stated in the Response, the Philadelphia Fund disputes the contention that the 20-year cap is applicable in bankruptcy cases.  The application of the 20-year cap is premised upon the issuance of an amortization schedule providing for immediate interim payments.  Because the issuance of an amortization schedule is barred by the automatic stay, and withdrawal liability is satisfied in accordance with the Plan, the calculation of withdrawal liability begins and ends with the determination of the employer's proportionate share of the fund's unfunded vested benefits.

23.  Even assuming, *arguendo*, that the amortization schedule applies in bankruptcy cases, the Debtors readily concede that claims for withdrawal liability must be accelerated for purposes of allowance and distribution.  *See* Motion, p. 12.  Notwithstanding this concession, the Debtors assert that the text of section 502(b) of the Bankruptcy Code "still allows for discounting these types of claims to present value."  *Id*.  It does not.

24.  Close scrutiny of section 502 fails to identify any support, either express or implied, for the Debtors' contention.  Indeed, section 502 outlines a detailed framework of claim-limiting provisions.  Congress expressly enumerated instances where claims comprised of long-term payments should be reduced.  Withdrawal liability was not among the claims identified.

25.  For example, section 502(b)(6) imposes a "rent cap" on a landlord's damages for the loss of rent following the termination of lease.  The purpose of the rent cap is to allow a landlord reasonable damages for the loss of future rent while preventing the landlord from asserting a claim so large that other creditors are left uncompensated.  *In re PPI Enterprises, Inc.,* 324 F.3d 197, 207 (3d Cir. 2003) (section 502(b)(6) reflects Congressional intent to prevent landlords from receiving a windfall over other unsecured creditors); *In re Kupfer*, 852 F.3d 853,

7

856 (9th Cir. 2016) (rent cap balances interest in allowing landlord to recover claims against

significant depletion of bankruptcy estate).

26.    Similarly, section 502(b)(7) is interpreted broadly to limit claims resulting from the

termination of an employment contract.  *In re 21st Century Oncology Holdings, Inc.,* 597 B.R.

217, 226 (Bankr. S.D.N.Y. 2019).  Section 507(b)(7) limitations were imposed by Congress "to

protect a debtor's estate, and in particular creditors of a debtor, from being burdened by

exorbitant breach of employment claims."  *Belson v. Olson Rug Company*, 483 B.R. 660, 669

(N.D.Ill. 2012) *quoting In re FairPoint Communications, Inc*., 445 B.R. 271, 273-74 (Bankr.

S.D.N.Y. 2011).

27.    Presumably, the Debtors' motivation in prosecuting this litigation is to reduce the

pool of withdrawal liability claims thus ensuring that they do not "swamp" the general unsecured

class.  Withdrawal liability claims have played a prominent role in Chapter 11 cases across the

country.  The limitations embodied in subsections (b)(6) and (b)(7) highlight that Congress was

well aware of how to impose limitations on categories of claims that could potentially

overwhelm a bankruptcy estate.  Congress refused to impose such limitations on withdrawal

liability.

28.    Indeed, section 502 offers no basis for capping withdrawal liability claims, either

through present value discounting or otherwise.  Section 502 makes no reference to discounting

withdrawal liability payments or, for that matter, any other general category of long-term

payments other than those expressly enumerated.

29.    Faced with this textual deficit, the Debtors argue that the reference in

section 502(b)(1) providing that "a claim should be allowed unless it is *unenforceable"* against

8

the Debtors supports their position.  *See* Motion, p. 12.  However, the Debtors offer no basis or context as to why withdrawal liability claims are "unenforceable against the debtors."  *Id.*

30.  Moreover, Debtors' reference to *In re Oakwood Homes Corp.*, 449 F.3d 588 (3d Cir. 2006), as presenting a "general rule" of discounting claims to present value contradicts the Third Circuit's holding and rationale in that case.  *See* Motion, pp. 12-13.  The Third Circuit in *Oakwood* examined whether a present value reduction would be appropriate in light of the basic economic factors at issue in that case.  *Oakwood* stands for the proposition that section 502(b) does not require a present value discount for all claims evaluated under section 502.  *Id.* at 598. In considering whether a present value discount should be applied, *Oakwood* invites a deeper examination into the economic realities of the claim.  In that case, the Third Circuit guarded against a "double discount" that would be triggered if a present value discount were applied.  *Id.* at 592.

31.  Here, the economic considerations that compelled the *Oakwood* Court to reject a present value discount strongly militate against a discount of the withdrawal liability claims. Indeed, the Debtors are seeking a multitude of reductions of those claims:

> (i)  application of the 20-year cap;[16]
>
> (ii)  discounting withdrawal liability payments to present value at astronomical interest rates ranging from 13% to 18%;[17]
>
> (iii)  elimination of blended interest rates and calculation of unfunded vested benefits at a rate selected by the Debtors;[18]
>
> (iv)  application of insolvent liquidating employer reduction to reduce withdrawal liability claims by 50% percent;[19]

---

[16]  See Memorandum Opinion, pp. 34-38. [Docket Item No. 4326 pp. 34-38].
[17]  See Amended Memorandum Opinion, pp. 38-40. [Docket Item No. 4770].
[18]  See Motion for Summary Judgment. [Docket Item No. 4871]
[19]  See Chapter 11 Plan, Article III, B.

9

32.   Were these downward adjustments implemented, the MEPPs would have allowed Class 5 General Unsecured Claims which under the Disclosure Statement are projected to receive only minimal distributions.[20]

33.   If a present value discount were applied on top of these reductions, the Third Circuit's concerns regarding creditors being penalized multiple times would certainly be implicated.

34.   Further, the *Oakwood* Court contemplated the time value of money concept and considered the present value discount as a means to avoid windfalls to those creditors who would benefit from a lump sum distribution.  *Id.* at 598.  In light of the potential withdrawal liability reductions discussed above, including application of the 20-year cap, it is a safe assumption that the MEPPs are not at risk for any windfalls.  This is particularly true given the low projected distributions to unsecured withdrawal liability claims.

35.   Faced with this dearth of support from the text of section 502 and the Third Circuit's directive that present value discounting is not required under section 502 -- and indeed should be rejected if unwarranted by the economic circumstances -- the Motion places heavy reliance on cases from outside of the Third Circuit in support of the Debtors' argument.

36.   As an initial matter, these cases contradict the Third Circuit's directive that present value discounting is not required.  *Compare*, *Oakwood*, 449 F.3d at 598 (stating that section 502 does not require present value discounting) with *In re CF&I Fabricators of Utah, Inc.,* 150 F.3d 1293, 1300 (10th Cir. 1998) ("[T]he Bankruptcy Code mandates that all claims for future payment must be discounted to present value.").[21]

---

[20]   See *Second Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,* pp. 11-12.  [Docket Item No. 5027].
[21]   See Motion, p. 13

37.   Second, and equally important, the cases referenced in the Motion do not involve withdrawal liability claims and the unique economic circumstances in which such claims are adjusted under ERISA.   Indeed, none of the claims discussed in those cases faced the myriad downward adjustments that are being asserted against the MEPPs.

**(c)   The Philadelphia Fund Held Withdrawal Liability Claims as of the Petition Date**

38.   The Debtors' concession that the withdrawal liability claims are accelerated upon a bankruptcy filing seemingly moots the issue of whether an *ipso facto* default was triggered. Indeed, the Motion candidly acknowledges that:

> It is almost certain that 11 U.S.C. § 502(b) accelerates any and all claims upon filing of a bankruptcy petition for purposes of identifying allowable claims.

Motion, p. 12.

39.   Given that the Reconsideration Order [Docket Item No. 4771 at 5-6], presents the questions relating to *ipso facto* defaults as an alternative to claim acceleration under section 502, a question arises as to whether the *ipso facto* issues must be resolved.[22]   Nevertheless, the Philadelphia Fund will endeavor to address the various *ipso facto* arguments raised by the Debtors.

40.   The Debtors begin their analysis with the statement that:

> The summary judgment record establishes that there can be no genuine dispute of material fact on this point:  as of the date the bankruptcy petition was filed, the Debtors owed a long term stream of withdrawal liability payments to the MEPPs.  This is because the Debtors' obligations to pay withdrawal liability did not arise until well after the bankruptcy was initiated and the MEPPs cannot point to any evidence showing that they ever notified Debtors of these obligations, demanded payment from the Debtors, or even

---

[22]   At page 5 of the Reconsideration Order, the Court inquires: "Does it even matter whether a particular pension plan did or did not declare a 20-year stream of payments accelerated?  There is certainly a view, reflected in the legislative history of §502, that a bankruptcy filing operates as the acceleration of the principal amount of all claims against the debtor."  This view is also reflected in pre-Code practice."  Reconsideration Order, pp. 5-6 (citations omitted).

> declared Debtors were in default on these obligations before the
> petition was filed.

Motion, p. 15.

41.  This is not correct.  All parties have recognized throughout this case that the Debtors

ceased operations immediately prior to the Petition Date.  Motion, p. 5.  By doing so, the Debtors

withdrew from the MEPPs within the meaning of 29 U.S.C. § 1383(a);(e), which provides in

relevant part:

> (a)  Determinative Factors
>
>> For purposes of this part, a complete withdrawal from
>> a multiemployer plan occurs when an employer—
>>
>> (1)  permanently ceases to have an obligation to contribute under
>> the plan, or
>>
>> (2)  ***permanently ceases all covered operations*** under the plan . . .
>
> (e)  Date of complete withdrawal
>
>> For purposes of this part, the date of a ***complete withdrawal*** is the
>> date of the cessation of the obligation to contribute or the ***cessation
>> of covered operations***.

29 U.S.C. § 1383(a);(e)(emphasis added).

42.  In other words, an event of withdrawal occurred pre-petition.  Immediately upon the

Debtors' pre-petition withdrawal, they became liable for withdrawal liability pursuant to

29 U.S.C. § 1381 which provides in relevant part:

> (a)  If an employer withdraws from a multiemployer plan in a complete
> withdrawal or a partial withdrawal, then the employer ***is liable to the plan***
> in the amount determined under this part to be the withdrawal liability.

29 U.S.C.§ 1381(a) (emphasis added).

43.  In short, when these provisions are read together, it is clear that an employer's

*liability* is triggered *immediately* upon the cessation of operations.

01/07/2025 SL1 2557304v1 027202.00304

44.   Thus, as of the Petition Date, the Philadelphia Fund possessed a "claim" for withdrawal liability within the meaning of section 101(5)(A) of the Bankruptcy Code which provides, in relevant part:

> (5)  The term "claim" means-
>
> (A)  right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . .

11 U.S.C. § 101(5)(A)

45.   More specifically, as of the Petition Date, the Philadelphia Fund held a claim for withdrawal liability by virtue of the Debtors' cessation of covered operations within the meaning of 29 U.S.C. §1383(a) and (e) which triggered withdrawal liability.  This held true regardless of whether the claim was unliquidated and disputed.  11 U.S.C. §101(5)(A).

46.   Moreover, the contention that the Philadelphia Fund never notified the Debtors of the withdrawal liability obligations and never demanded payment is equally unavailing.  *See* Motion, p. 15.  To the contrary, the Philadelphia Fund pursued the only logical enforcement mechanism available in light of the Debtors' bankruptcy filing:  submission of proofs of claim for withdrawal liability.  Those claims were for the total amount of withdrawal liability and did not: (i) include an amortization schedule; and (ii) apply a 20-year cap, because neither requirement is applicable in a post-petition claim submission.

47.   In sum, the Debtors' contention that their obligation to pay withdrawal liability did not arise until after the bankruptcy was initiated, *see* Motion, p. 15, ignores the facts that:  (i) an event of withdrawal occurs after a contributing employer ceases operations; (ii) withdrawal liability arises immediately upon the event of withdrawal; and (iii) the withdrawal liability that was triggered upon the Debtors' cessation of operations constituted a "claim" as of the Petition

13

Date.  In short, the Philadelphia Fund held a claim for withdrawal liability as of the Petition

Date.

   **(d)  The Philadelphia Fund's Plan Document Authorized Insecurity Defaults**

   48.  The Debtors contend that the Philadelphia Fund was precluded from declaring an

"insecurity default" under 29 U.S.C. § 1399(c)(5)(B) because the fund did not adopt rules that

authorized such action.  Section 1399 (c)(5) provides, in relevant part:

> In the event of a default, a plan sponsor may require immediate payment of
> the outstanding amount of an employer's withdrawal liability, plus accrued
> interest on the total outstanding liability from the due date of the first
> payment which was not timely made.  For purposes of this section, the term
> default means:
>
> (A)   the failure of an employer to make, when due, any payment under this
> section, if the failure is not cured within 60 days after the employer
> receives written notification from the plan sponsor or of such failure;
> and
>
> (B)   any other event defined in the rules adopted by the plan which
> indicates a substantial likelihood that the employer will be unable to
> pay its withdrawal liability.

29 U. S. C.§ 1399(c)(5)(A) and (B).

   49.  The Debtors' allegation is directly refuted by Philadelphia Fund's Plan Document,

which provides:

> Section F.  Remedies
>
> In litigation, the Trust Fund shall be entitled to all remedies
> permitted by law.

  See Response, ¶ 5.

   50.  Among the "remedies permitted by law" is the acceleration of withdrawal liability

obligations pursuant to 29 U.S.C. § 1399(c)(5).

   51.  The Debtors are correct in that the Plan Document does not utilize the phrase

"insecurity default" or outline proceedings to declare an insecurity default.  *See* Motion, p. 16.

However, section 1399(c)(5)(B) does not impose any requirements as to what terms or provisions must be included in a plan document to trigger an insecurity default. Hence, absent any controlling authority to the contrary, the default provision in the Plan Document satisfies section 1399(c)(5)(B)'s requirement.

52. The Debtors further argue that the MEPPs cannot establish that they affirmatively declared the Debtors in default under section 1399(c)(5)(B). However, the Debtors read into this provision obligations that do not exist. This subsection does not require a formal declaration of an insecurity default. Rather, the provision simply states that in the event of a default under 1399(c)(5)(B) (insecurity defaults), a fund may require immediate payment of the outstanding amount of an ***employer's withdrawal liability.*** See 29 U.S.C. § 1399(c)(5)(B) (emphasis added).

53. Absent from the insecurity default provision is any requirement of a formal declaration of default by the fund trustees. Nor is there any requirement that the fund provide the contributing employer of formal notice of an insecurity default as is the case in subsection (A). Rather, the fund must simply make a demand for payment of the full withdrawal liability which is precisely what the Philadelphia Fund did when it filed Proofs of Claim for the full amount of the withdrawal liability, without regard to the 20-year cap.

54. The Debtors also argue that there is no way an insecurity default could have been declared pre-petition because "the MEPPs did not assess withdrawal liability…until months after the bankruptcy proceeding…" *See* Motion, p. 23

55. The Debtors are conflating two concepts. At the time of the event of withdrawal, again defined as the pre-petition cessation of Debtors' operations, it was clear that there was a substantial likelihood that the Debtors would be unable to pay their obligations. In other words,

01/07/2025 SL1 2557304v1 027202.00304

the factual circumstances that gave rise to the Debtors' financial insecurity existed prior to any

formal withdrawal liability assessment.

**(e) The Amount of the Accelerated Indebtedness upon Default is the Debtors' Allocable Unfunded Vested Benefits, Without Regard to the 20-Year Cap.**

56.   The Debtors argue that, even assuming that a default triggered the acceleration of the

obligations, the debt that is accelerated is the 20 years of amortized payments, not the Debtors'

allocable unfunded vested benefits.

57.   This position contradicts the express language of 29 U.S.C. § 1399(c)(5), which

provides that upon a default under that section, the MEPPs may "require immediate payment of

the outstanding amount of an **employer's withdrawal liability**…" *Id.* (emphasis added).  In

this section, Congress utilized the phrase "withdrawal liability."  However, in other sections of

this provision, Congress employed the phrase "***outstanding amount of the unpaid annual***

***withdrawal liability payments***[.]"  Indeed, in the immediately preceding provision,

section 1399(c)(4), the statute provides:

> **(4)** The employer shall be entitled to prepay the outstanding *amount of the*
> *unpaid annual withdrawal liability payments* determined under
> paragraph (1)(C), plus accrued interest, if any, in whole or in part, without
> penalty.  If the prepayment is made pursuant to a withdrawal which is later
> determined to be part of a withdrawal described in paragraph (1)(D), the
> withdrawal liability of the employer shall not be limited to the amount of
> the prepayment.

29 U.S.C. § 1399(c)(4) (emphasis supplied).

58.   Had Congress intended to establish the accelerated debt as the aggregate amount of

the annual payments, as opposed to the employer's withdrawal liability, it would have used the

same language employed in subsection (c)(4) in subsection (c)(5).  The distinction between these

two provisions makes clear that Congress intended any debt that is accelerated under an

16

"insecurity default" arising under subsection (c)(5)(B) to mean the accelerated amount of the employer's allocable unfunded vested benefits, without regard for the 20-year cap.

**(f)** ***Ipso Facto*** **Provisions That Authorized Acceleration are Enforceable**

59.   The Debtors assert that *ipso facto* provisions are categorically unenforceable in bankruptcy proceedings.  However, as recognized by the Third Circuit in *In re Energy Future Holdings Corp*., 842 F.3d 247 (3d Cir. 2016), obligations could be accelerated pursuant to an acceleration provision in a contract.  *Id*. at 254-255.

60.   In *Energy Futures*, a first lien indenture contained an acceleration provision providing that all outstanding notes were immediately due and payable if the borrower filed for bankruptcy.  At the outset of its analysis, the Court recognized that post-petition acceleration of the principal was permissible, noting that the bankruptcy filing caused the first lien note to become immediately due and payable.  *Id*. at 252.

61.   The Third Circuit did not belabor the propriety of the principal acceleration.  As such, *Energy Future* logically stands for the proposition that post-petition acceleration of principal based on a bankruptcy *ipso facto* provision is enforceable.  *Id*. at 254-55.  Notably, the *Energy Future* Court also held that the accelerated principal authorized the triggering of the make whole premium.  *Id*. at 261.[23]

**(g)  Present Value Discounting of Withdrawal Liability is Not Appropriate**

62.   The discounting of the annual payments to present value is not expressly authorized under ERISA nor is it mandated by the Bankruptcy Code.  Moreover, the proposed discounting ignores the economic realities that are faced by the MEPPs.

---

[23]  The Second Circuit also followed this reasoning in *In re AMR Corporation*, 730 F.3d 88,112 (2d Cir. 2013), where the Court held that a clause in a trust indenture providing that a borrower's bankruptcy filing would be an event of default and trigger acceleration was not an impermissible *ipso facto* provision.

63.  By seeking to apply a discount rate to the accelerated amortized payments, Debtors are requesting a reduction that is at odds with ERISA.  This is evident from section 1399, which provides, in relevant part:

> The employer shall be entitled to prepay the outstanding amount of the unpaid annual withdrawal liability payments determined under paragraph (1)(C), plus accrued interest, if any, in whole or in part, without penalty.  If the prepayment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in paragraph (1)(D), the withdrawal liability of the employer shall not be limited to the amount of the prepayment.

29 U.S.C. § 1399(c)(4)

64.  ERISA provides that pre-payment of the withdrawal liability may be done without penalty to the contributing employer.  Congress said nothing about affording the employer a discount if it elects to make a lump sum payment.

65.  Further, as discussed above, the Bankruptcy Code outlined detailed claim-reduction provisions in section 502 to limit certain classes of claims that Congress believed should be capped or limited.  Withdrawal liability claims were not among those expressly enumerated claims.

66.  The Debtors' contention that *Oakwood* is not implicated in this context is incorrect.  Two principles of the *Oakwood* decision compel a finding that discounting is not appropriate in this context.  First, as discussed above, discounting is not mandatory under section 502 of the Bankruptcy Code.

67.  Second, the economic realities faced by the MEPPs militates against present value discounting.  Indeed, discounting is not appropriate where, as here, the MEPPs already face a multitude of downward claim reductions pursued by the Debtors as well as low projected distributions to general unsecured creditors.

18

68. The driving force behind the Debtors' present value argument is that present value discounts are necessary to "treat similarly situated creditors equally" and to ensure fairness. Motion, p. 31-32. The truth is that the creditors in Class 5 are not being treated equally. The MEPPs are the only Class 5 creditors that are subject to the onslaught of potential reductions being pursued by the Debtors. Adding a present value discount to the existing patchwork of claims reductions championed by the Debtors would only serve to exacerbate that inequity.

**(h)  The Reduction Stated in 29 U.S.C. §1405 does not Apply in this Reorganization Proceeding**

69. As discussed in the Response, because this is a reorganization proceeding under Chapter 11, the reductions contemplated in 29 U.S.C. § 1405 do not apply. The Plan asserts that the MEPPs' withdrawal liability claims are subject to reduction or subordination under section 1405, which provides, in relevant part:

(a)  Unfunded vested benefits allocable to employer in bona fide sale of assets of employer in arms-length transaction to unrelated party; maximum amount; determinative factors

(1)  In the case of bona fide sale of all or substantially all of the employer's assets in an arm's-length transaction to an unrelated party (within the meaning of section 1384(d) of this title), the unfunded vested benefits allocable to an employer (after the application of all sections of this part having a lower number designation than this section), other than an employer undergoing reorganization under title 11 or similar provisions of State law, shall not exceed the greater of—

(A)  a portion (determined under paragraph (2)) of the liquidation or dissolution value of the employer (determined after the sale or exchange of such assets), or

(B)  in the case of a plan using the attributable method of allocating withdrawal liability, the unfunded vested benefits attributable to employees of the employer . . .

01/07/2025 SL1 2557304v1 027202.00304

(b)  Unfunded vested benefits allocable to insolvent employer undergoing liquidation or dissolution; maximum amount; determinative factors

In the case of an insolvent employer undergoing liquidation or dissolution, the unfunded vested benefits allocable to that employer shall not exceed an amount equal to the sum of—

(1)  50 percent of the unfunded vested benefits allocable to the employer (determined without regard to this section), and

(2)  that portion of 50 percent of the unfunded vested benefits allocable to the employer (as determined under paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—

(A)  as of the commencement of liquidation or dissolution, and

(B)  after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).

29 U.S.C. § 1405(a);(b)(emphasis added).

70.  It is clear that section 1405(a) does not apply as that provision expressly excludes "an employer undergoing reorganization under title 11 . . . ."  Additionally, section 1405(b) only applies to insolvent employers undergoing liquidation or dissolution, which is not the case here.  Indeed, these Chapter 11 bankruptcy cases are reorganization proceedings, not liquidation or dissolution proceedings.

71.  In *Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund,* 748 F.2d 42, 45 (1st Cir. 1984), the First Circuit held that section 1405(b) did not apply to reorganizations under Chapter 11.  In *Granada*, the First Circuit explained its reasoning as follows:

Since § 4225(b) governs only liquidations, and § 4225(a) governs sales of assets, but excludes title 11 reorganizations, it appears that Congress equated reorganizations with asset sales, rather than liquidations, and decided that that type of asset sale needed no withdrawal liability limitation.

*Granada*, 748 F.2d at 45.

01/07/2025 SL1 2557304v1 027202.00304

72.    The *Granada* Court observed that Congress drafted MPPAA with the Bankruptcy Code in mind insofar as section 4225(a) includes an express reference to the Bankruptcy Code. *Id*. at 45.  *Granada* instructs that those provisions must be viewed as Congress's effort to balance the policies of the Bankruptcy Code with the goal of shoring up multiemployer pension plans. *Id*.  Any inconsistencies in the application of this section are the province of Congress and not the courts.  *Id*.

73.    The *Granada* Court's recognition that assets sales conducted within Chapter 11 proceedings are considered "reorganizations" and not "liquidations" is consistent with the classification of liquidating Chapter 11 proceedings.  This distinction was discussed by the Ninth Circuit BAP in *In re Deer Park, Inc.,* 136 B.R. 815, 818 (B.A.P. 9th Cir. 1992), where the Court observed:

> Liquidation under a Chapter 11 plan is not the same as a Chapter 7 liquidation.  A liquidation under Chapter 11 allows the debtor in possession, one who is presumably more familiar with the assets of the debtor's organization and its respective values, the ability to plan for an orderly divestiture of the assets over a period of time as opposed to a Chapter 7 trustee, who is generally less familiar with the debtor's assets. A liquidating plan is desirable when the debtor in possession can bring about a greater recovery for the creditors than would a straight liquidation under Chapter 7.

*In re Deer Park, Inc.,* 136 B.R. 815, 818, (B.A.P. 9th Cir. 1992).

74.    The Ninth Circuit BAP explained the distinction between "liquidation" and "reorganization" as follows:

> The Bankruptcy Code recognizes this in § 1129(a)(11), by providing that liquidation may be contemplated in a valid Chapter 11 plan of reorganization, despite the label "reorganization."  Although the word "reorganization" might commonly bring to mind ongoing operations, Congress explicitly placed language providing for liquidation within Chapter 11, which is titled "Reorganization."  Had Congress not intended to include liquidation as an acceptable type of reorganization plan, then presumably all provisions dealing with liquidation would fall within

21

> Chapter 7, which is specifically titled "Liquidation."  We must therefore
> assume Congress placed this provision in Chapter 11 intentionally.

*Id.*

75.  *Granada* makes clear that neither section 1405(a) nor section 1405(b) applies in this reorganization proceeding.  As such, the Philadelphia Fund's claims cannot be discounted under that section.

## D.  CONCLUSION

76.  In sum, the present value discounting proposed by the Debtors is not authorized under ERISA or section 502 of the Bankruptcy Code.  Furthermore, as the Third Circuit instructed in *Oakwood*, discounting is not required and not appropriate where it is not justified by the economic circumstances.  The Philadelphia Fund's Plan Document includes a provision that authorizes insecurity defaults within the meaning of 29 U.S.C. §1399(c)(5)(B) and the Philadelphia Fund timely and properly demanded payment of the entire withdrawal liability.  Lastly, the reductions proposed by the Debtors under 29 U.S.C. §1405 are not authorized because the asset sales were conducted in the context of reorganization proceedings.  Accordingly, the Philadelphia Fund is entitled to judgment on the issues raised in the Motion and Response as a matter of law.

01/07/2025 SL1 2557304v1 027202.00304

Dated:  January 10, 2025                STEVENS & LEE, P.C.

*/s/ Joseph H. Huston, Jr.*
Joseph H. Huston, Jr. (No. 4035)
919 North Market Street, Suite 1300
Wilmington, DE 19801
Telephone:  (302) 425-3310
Fax:  (610) 371-7972
Email:  joseph.huston@stevenslee.com

John C. Kilgannon, Esquire
1500 Market Street, East Tower, Suite 1800
Philadelphia, PA 19012
Telephone:  (215) 751-1943
Fax:  (610) 371-7954
Email:  john.kilgannon@stevenslee.com

*Counsel for the Teamsters Pension Trust Fund of*
*Philadelphia & Vicinity*