## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

----------------------------------------------------------------- x

In re:                                          :    Chapter 11
                                                :
YELLOW CORPORATION, *et al.*,[1]                :    Case No. 23-11069 (CTG)
                                                :
                                   Debtors.      :    (Jointly Administered)
                                                :

----------------------------------------------------------------- x

## THE FUNDS' RESPONSE IN OPPOSITION TO DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Mark D. Collins
Cory D. Kandestin
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

Dennis F. Dunne
(admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

Andrew M. Leblanc
(admitted *pro hac vice*)
Erin E. Dexter
(admitted *pro hac vice*)
Melanie Westover Yanez
(admitted *pro hac vice*)
Riah Kim
(admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

*Counsel for the Funds*

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

I.  THE FUNDS' CLAIMS HAVE BEEN ACCELERATED AS A MATTER OF LAW
    AND DISCOUNTING TO PRESENT VALUE IS INAPPROPRIATE ............................ 3

II. THE DEBTORS' ARGUMENTS REGARDING ERISA SECTION 1405 ARE
    UNSUPPORTED ................................................................................................... 6

    A.  The Debtors' Assertion That the Funds' Claims Should Be Halved and
    Subordinated is Incorrect .......................................................................... 6

    B.  The Debtors Have Made No Evidentiary Showing That Section 1405
    Applies ..................................................................................................... 8

    C.  The Debtors Have Waived Their Section 1405(b) Arguments ...................... 10

III. TEAMSTERS LOCAL 641'S CONTRIBUTION RATES ARE APPROPRIATE, AND
    THE DEBTORS WAIVED THIS PREVIOUSLY-ABANDONED OBJECTION ........ 11

CONCLUSION ..................................................................................................................... 14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Affiliated Foods*, *Inc.*,
   249 B.R. 770 (Bankr. W.D. Mo. 2000)............................................................................7, 8, 10

*Aiellos v. Zisa*,
   2010 WL 421083 (D.N.J. Feb. 2, 2010) ...............................................................................11

*In re B456 Sys., Inc.*,
   No. 12-12859 (KJC), 2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017)............................3, 4

*In re Chateaugay Corp.*,
   1996 WL 346010 (S.D.N.Y. June 24, 1996) ............................................................................4

*In re CSC Indus., Inc.*,
   232 F.3d 505 (6th Cir. 2000) ..................................................................................................4

*Gas Power Mach. Co. v. Wisconsin Trust Co.* (*In re Wisconsin Engine Co.*),
   234 F. 281 (7th Cir. 1916) ......................................................................................................4

*Kucin v. Devan*,
   251 B.R. 269 (D. Md. 2000) ....................................................................................................4

*Markert v. PNC Financial Servs. Grp., Inc.*,
   828 F.Supp.2d 765 (E.D. Pa. 2011) .....................................................................................11

*In re O.P.M. Leasing Servs, Inc.*,
   79 B.R. 161 (S.D.N.Y. 1987)...................................................................................................4

*In re O.P.M. Leasing Servs., Inc.*,
   56 B.R. 678 (Bankr. S.D.N.Y. 1986) .......................................................................................4

*In re Oakwood Homes Corp.*,
   449 F.3d 588 (3d Cir. 2006)..............................................................................................3, 5

*In re Stone & Webster, Inc.*,
   279 B.R. 748 (Bankr. D. Del. 2002) ........................................................................................4

*In re Thomson McKinnon Sec., Inc.*,
   149 B.R. 61 (Bankr. S.D.N.Y. 1992) .......................................................................................4

*Till v. SCS Credit Corp.*,
   541 U.S. 465 (2004)................................................................................................................4

*TransCanada Pipelines Ltd. v. USGen New England, Inc.*,
  458 B.R. 195 (D. Md. 2011) ........................................................................................4

*In re U.S. Airways Grp., Inc.*,
  303 B.R. 784 (Bankr. E.D. Va. 2003) ..........................................................................5

*In re Ultra Petroleum Corp.*,
  624 B.R. 178 (Bankr. S.D. Tex. 2020) ........................................................................4

*In re White Motor Corp.*,
  831 F.2d 106 (6th Cir. 1987) ......................................................................................4

**Statutes**

11 U.S.C. § 502(b) ........................................................................................................3

29 U.S.C. § 1085(g)(3)(A) ..........................................................................................12

29 U.S.C. § 1085(g)(3)(B) ..........................................................................................13

29 U.S.C. § 1399(c)(1)(A)(i) ....................................................................................5, 7

29 U.S.C. § 1399(c)(1)(C)(i) .......................................................................................11

29 U.S.C. § 1401(a)(3)(A) ............................................................................................8

29 U.S.C. § 1405 ................................................................................................ *passim*

**Other Authorities**

126 Cong. Rec. 23,038 (Aug. 25, 1980) ......................................................................8

The Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan ("Central PA Teamsters"), the International Brotherhood of Teamsters Union No. Local 710 Pension Fund ("Teamsters Local 710"), the New England Teamsters Pension Fund ("NETTI"), the Teamsters Joint Council No. 83 of Virginia Pension Fund ("Virginia Teamsters"), and the holder of the claims of the Teamsters Local 641 Pension Plan[2] ("Teamsters Local 641" and, together with Central PA Teamsters, Teamsters Local 710, NETTI, and Virginia Teamsters, the "Funds"), by and through their undersigned counsel, hereby oppose the *Debtors' Motion for Partial Summary Judgment on SFA MEPPs' and Non-SFA MEPPs' Claims* [Dkt. No. 5181] (the "Debtors' Motion" or "Motion").

## PRELIMINARY STATEMENT

1.    The Motion is but the latest of the Debtors' transparent attempts to reduce the MEPPs' withdrawal liability claims to the lowest possible amount by any, and even by meritless, means. It should be denied on three grounds.

2.    First, the Debtors are incorrect that the Funds' claims should be discounted to present value. The Funds' claims were accelerated by the Debtors' bankruptcy filing, which triggered the acceleration of the full principal amount of the claims—as the Debtors acknowledge. Discounting the claims any further would constitute an improper double-discount. Because the Debtors agree that the bankruptcy petition accelerated the withdrawal liability claims, the Court need not examine whether any defaults occurred under ERISA—that the claims were accelerated by virtue of a bankruptcy filing renders that inquiry moot.

---

[2]    A notice of transfer of Teamsters Local 641's proofs of claim was filed at Dkt. No. 4965.

3.    Second, the Debtors attempt to wield ERISA section 1405(b) in a manner entirely unsupported by law, and they do so far too late.  Section 1405(b) discusses certain conditional adjustments to unfunded vested benefits ("UVBs").  But the Debtors neither establish that the relevant conditions have been met (alone fatal to their position), nor do they in fact seek to adjust UVBs—instead, they seek to adjust the Debtors' annual payment obligations (the "Annual Payments").  This reading of the statute finds no support in any statute or case.  And in any event, the Debtors have waived their right to pursue their section 1405 arguments.  Section 1405 was first mentioned, without any indication of how it might actually apply, in a final footnote of the Debtors' claim objections.  Nearly a year of summary judgment briefing on all MEPP claims followed in which these arguments were never raised; not even when section 1405 was next mentioned—in the Debtors' disclosure statement filed in late November—did the Debtors articulate how the section would affect MEPP claims.  Nearly a year later, the Debtors seek to invoke this provision, having belatedly determined how they would like it to apply.  The Court should reject the Debtors' untimely and unsupported attempt to use ERISA section 1405(b) to affect the Funds' withdrawal liability claims.

4.    Finally, the Debtors have failed to establish any legitimate factual dispute regarding the inputs used by Teamsters Local 641 to calculate the Debtors' Annual Payments.  Attempting to dispute the inputs to Teamsters Local 641's calculations, the Debtors offer only conclusory statements that Teamsters Local 641 improperly relied on a contribution rate based on a rehabilitation plan.  Previously submitted evidence firmly contradicts this position; the Debtors decline to acknowledge this or to engage with that evidence.  Moreover, the Debtors raised this argument once before, yet failed to pursue it and have waived their right to (again) challenge Teamsters Local 641's Annual Payment calculation.

5.    For these reasons, and as set forth fully herein, the Debtors' Motion should be denied on these issues.

## ARGUMENT

### I.    THE FUNDS' CLAIMS HAVE BEEN ACCELERATED AS A MATTER OF LAW AND DISCOUNTING TO PRESENT VALUE IS INAPPROPRIATE

6.    The Debtors are correct that bankruptcy operates to accelerate pre-petition claims. Debtors' Motion ¶ 33 ("It is almost certain that 11 U.S.C. § 502(b) accelerates any and all claims upon filing a bankruptcy petition[.]").  But the Debtors' next conclusion—that the Funds' claims must be discounted to present value—does not follow.  As explained in *The Funds' Motion for Partial Summary Judgment* [Dkt. No. 5175] (the "Funds' MSJ"), the Debtors' withdrawal liability cannot be discounted to present value because the bankruptcy petition accelerated only the principal amount of the Debtors' obligations.  The Debtors' attempt to portray the Annual Payments as obligations akin to claims for future damages ignores the essence of what Annual Payments are:  a statutorily-created mechanism designed to amortize allocable UVBs in satisfaction of withdrawal liability, for which the Debtors became liable pre-petition.  Thus, any discounting of Annual Payments would amount to improper double-discounting under *Oakwood Homes*.

7.    The Debtors cite a number of cases purportedly supporting that present value discounting is appropriate for pre-petition claims.  *See* Debtors' Motion ¶¶ 35, 36, 72, 73.  But all of those cases are inapposite; each pertains to discounting of claims for *future payments* that arose *post-petition*.  For example, one such case the Debtors cite, *B456 Systems*, centered around a claim for rejection damages.  The court in *B456 Systems* noted that a claim for rejection damages was to be discounted to present value because a "rejection damages claim seeks recovery of *future damages*, which is not akin to a claim for principal."  *In re B456 Sys., Inc.*, No. 12-12859 (KJC),

2017 WL 6603817, at *22 (Bankr. D. Del. Dec. 22, 2017) (emphasis added).   The court emphasized that rejection damages claims must be discounted to accord with the purpose of section 365, which is to ensure that the "post-petition claimant is treated the same as the pre-petition claimant." *Id*. at 22, n. 189.   Here, the same fairness concerns in fact tilt in the opposite direction, as the Debtors' liability to the Funds arose pre-petition.   Accordingly, the Debtors' cited cases concerning claims for future damages or recoveries are inapplicable.   *See, e.g.*, *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) (discounting future payments under a repayment plan after the debtor filed for bankruptcy); *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1293 (10th Cir. 1998) (discounting a claim for future payments); *In re O.P.M. Leasing Servs., Inc.*, 56 B.R. 678 (Bankr. S.D.N.Y. 1986) (discounting damages claim of post-petition payments); *In re Chateaugay Corp.*, 1996 WL 346010 (S.D.N.Y. June 24, 1996) (discounting claim for reimbursement of post-petition payments); *In re O.P.M. Leasing Servs., Inc.*, 79 B.R. 161 (S.D.N.Y. 1987) (discounting claim for post-petition payment); *TransCanada Pipelines Ltd. v. USGen New England, Inc.*, 458 B.R. 195 (D. Md. 2011) (concerning claim for rejection damages); *In re Ultra Petroleum Corp.*, 624 B.R. 178 (Bankr. S.D. Tex. 2020) (concerning allowance of make-whole premium as compensation for future liquidated damages); *Gas Power Mach. Co. v. Wisconsin Trust Co.* (*In re Wisconsin Engine Co.*), 234 F. 281 (7th Cir. 1916) (concerning post-petition payments for promissory notes); *Kucin v. Devan*, 251 B.R. 269 (D. Md. 2000) (concerning claims for post-petition retirement benefits); *In re Thomson McKinnon Sec., Inc.*, 149 B.R. 61 (Bankr. S.D.N.Y. 1992) (same); *In re CSC Indus., Inc.*, 232 F.3d 505 (6th Cir. 2000) (discounting claim for future payments); *In re White Motor Corp.*, 831 F.2d 106 (6th Cir. 1987) (concerning post-petition expenses owed to creditor); *In re Stone & Webster, Inc.*, 279 B.R. 748 (Bankr. D. Del. 2002) (discounting damages claim with future

payment stream); *In re U.S. Airways Grp., Inc.*, 303 B.R. 784 (Bankr. E.D. Va. 2003) (concerning the value of future benefit payments).

8.     The Debtors appear to forget the purpose of the Annual Payments.  ERISA provides quite plainly that Annual Payments are intended to "amortize . . . in level annual payments" the withdrawn employer's allocable UVBs, subject to the 20-year cap.  29 U.S.C. § 1399(c)(1)(A)(i). It is no matter that absent acceleration by virtue of the bankruptcy filing, the Annual Payments would have been paid over a period of time.  The Debtors' obligation to the MEPPs arose pre-petition, and the principal amount of that obligation was admittedly accelerated by the bankruptcy filing.  Discounting the Annual Payments further would therefore constitute a double-discount, which the Third Circuit expressly forbids.  *In re Oakwood Homes Corp.*, 449 F.3d 588, 600 (3d Cir. 2006).

9.     The Debtors' responses to Questions 2 and 3 need not be addressed.  The bankruptcy petition's acceleration of the Annual Payments ends the inquiry, as this Court has correctly observed.  *See Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider* [Dkt. No. 4771] (the "Reconsideration Order") at 6 (noting that if the Debtors' bankruptcy filing accelerated its withdrawal liability, the factual question of whether insecurity defaults occurred under plan documents, and the legal question of whether ipso facto concerns exist, need not be resolved).  Yet the Debtors claim that this Court must still decide these questions without ever providing a clear answer as to why.  Debtors' Motion ¶ 39.  This Court should follow the course charted in its Reconsideration Order and decline to entertain the Debtors' arguments on Questions 2 and 3, as the Debtors concede that the 20-year streams of payments were accelerated by the bankruptcy filing.

## II.    THE DEBTORS' ARGUMENTS REGARDING ERISA SECTION 1405 ARE UNSUPPORTED

10.    The Debtors offer an interpretation of ERISA section 1405(b) that is contradicted by a prior ruling of this Court and finds no support in their cited cases (or in any case).  They also fail to meet their statutory burden to establish that section 1405(b) applies to the Funds at all, for they present *no* evidence that its application is warranted despite the clear conditions precedent set forth in ERISA.  And finally, the Debtors have waived their section 1405(b) arguments by failing to sufficiently articulate them in their claim objections and declining to raise them until nearly a year later, despite many opportunities to do so.  Each of these reasons compels denial of summary judgment on this issue.

### A.    The Debtors' Assertion That the Funds' Claims Should Be Halved and Subordinated is Incorrect

11.    The Debtors assert that, for purposes of calculating the allowed amount of their general unsecured claims for withdrawal liability, ERISA section 1405(b) requires the total Annual Payments owed to each MEPP to be *halved*, full stop.  The remaining half, they argue, should be allowed only as a claim subordinated to other general unsecured claims.  This position finds no support in any authority, and in fact contradicts previous rulings of this Court.

12.    To begin with: Annual Payments are not the same thing as "unfunded vested benefits," and this statute refers to the latter, not the former.  This distinction—no doubt apparent to the Debtors, who argued this very point to the Court—immediately renders the Debtors' reading of section 1405(b) incorrect.  At the Debtors' urging, the Court held that withdrawal liability refers to the Debtors' total Annual Payment obligations to its MEPPs (as limited by the 20-year cap),

rather than the amount of UVBs allocated to the Debtors.[3] Yet by its plain language, section 1405(b) (when in fact applicable) adjusts not "withdrawal liability," but "unfunded vested benefits." The Debtors' argument—that section 1405 requires subordination of withdrawal liability claims calculated from the total *Annual Payments* owed—directly contradicts the statute's explicit statement that only "unfunded vested benefits," *not* "withdrawal liability," could, in certain circumstances, be subject to adjustment.

13. The Debtors attempt to sidestep the Court's prior ruling by arguing that ERISA "reduces an employer's allocable UVBs *after* the allocable UVBs have already been limited by the 20-year cap, not *before*." Debtors' Motion ¶ 94. These attempted textual gymnastics prove how tortured the argument is. Annual Payments are not UVBs, but a statutorily-created payment that amortizes the allocable UVBs, subject to the 20-year cap. *See* 29 U.S.C. § 1399(c)(1)(A)(i). Adjusting *Annual Payments* is not an adjustment to UVBs, and is not contemplated within section 1405. As withdrawal liability is not equivalent to UVBs, the Debtors' presentation of how section 1405 might operate to affect the MEPPs' claims for Annual Payment amounts is nonsensical. Section 1405(b) does not require that the Annual Payments owed be cut in half.

14. It necessarily follows that the Debtors' next argument—that the remaining half of the Annual Payments must be subordinated—cannot hold, either. The Debtors cite to a single out-of-circuit case, *Affiliated Foods*, for this proposition. *See* Debtors' Motion ¶ 92 (citing *In re Affiliated Foods, Inc.*, 249 B.R. 770, 785-87 (Bankr. W.D. Mo. 2000)). The court in *Affiliated Foods* based its analysis on a fundamentally different analysis of "withdrawal liability," treating the withdrawing employer's share of allocable UVBs and "withdrawal liability" as interchangeable

---

[3]    *See* Memorandum Opinion [Dkt. No. 4769] ("Amended September Ruling") at 37 (explaining that "withdrawal liability" is "best read to mean the amount the employer owes after the application of the 20-year cap," not "the employer's full share of the plan's unfunded vested benefits").

concepts. *Id.* at 786. That analysis is inconsistent with the Amended September Ruling's direction that the 20-year "capped" amount of Annual Payments is, instead, the better understanding of "withdrawal liability." Amended September Ruling at 37. The Amended September Ruling controls. No party to this case has sought reconsideration of or appealed that portion of the ruling. The Debtors' invocation of *Affiliated Foods* compares apples to oranges; the case is neither binding nor persuasive here.

15. The Debtors offer no other support for their position—and the Funds are unaware of any. The Debtors' arguments regarding how section 1405(b) should operate are inconsistent with previous Court rulings and unsupported by any authority. For this reason alone, summary judgment on this point must be denied.

### B.    The Debtors Have Made No Evidentiary Showing That Section 1405 Applies

16. Even were the Debtors' interpretation of section 1405 correct (it is not), its application is expressly conditional—and the Debtors make no showing that those conditions are met here. Unless the withdrawing employer provides a "clear showing" that a limitation under section 1405 applies, "a plan may assume that the limitations do not apply." *See* 126 Cong. Rec. 23,038, 23,039 (Aug. 25, 1980); *see also* 29 U.S.C. § 1401(a)(3)(A) (explaining that the withdrawing employer must show by a preponderance of the evidence that determinations by a plan sponsor, including with respect to section 1405, are incorrect).

17. What evidence would be required to make such a "clear showing"? First, at bare minimum, the plain language of section 1405(b) requires establishing the employer's "liquidation or dissolution value" to determine whether, or to what extent, the UVBs should be reduced at all. *Id.* § 1405(b)(2). The statute further requires this "liquidation . . . value" to be "determined as of the commencement of liquidation," and then offers several instructions for adjustments to asset and liability values in arriving at this value determination. *Id.*; *see also id.* § 1405(d)(2).

18.  But no liquidation value is given here.  One sympathizes, as the calculation is likely to be complex—it would involve detailed analysis of the asset value of the Debtors as of July 2023[4] with complex counterfactual adjustments, including the inclusion of hundreds of millions of asset value now eroded by advisor fees incurred during these chapter 11 cases.  Yet this value must be established to determine whether adjustments under section 1405(b) are appropriate.  Without it, there is no indication that section 1405(b) applies at all.

19.  A second evidentiary showing is also necessary.  The employer undergoing liquidation must be "insolvent."  Again, the statute provides instructions for determining whether this condition is met:  "an employer is insolvent if the liabilities of the employer, including withdrawal liability under the plan (determined without regard to subsection (b)), exceed the assets of the employer (determined as of the commencement of the liquidation or dissolution)."  29 U.S.C. § 1405(d)(1).  But the Debtors provide no evidence that they have met this condition— and again, the showing is unlikely to be a simple one.  To state the obvious, the quantum of the Debtors' aggregate "withdrawal liability" has been a source of extensive litigation (and estate expense), and for that reason remains unknown even now.  Various parties in these cases have contended that with the "right" calculation of withdrawal liability, the Debtors are near-solvent or solvent (leaving section 1405(b) either with a *de minimis* effect or plainly inapplicable).  With the disputes on how to appropriately calculate "withdrawal liability" unresolved, the suggestion that section 1405(b) subordination necessarily applies as a matter of law is disingenuous and absurd.

20.  Applying section 1405(b) to adjust or subordinate the claims here requires a detailed factual showing, compliant with ERISA's specific and unique statutory directions and definitions,

---

[4]    The Debtors have argued in the WARN act proceedings that their liquidation commenced as of on July 26, 2023.  *See Debtors' Opposition to Plaintiffs' Motion for Partial Summary Judgment*, Adv. Pro. No. 23-50761 [Dkt. No. 84] at 10.

that is entirely absent here.   The Debtors supply no evidence of "liquidation value" or "insolven[cy]," as those terms are carefully defined in the very statutory section they would invoke.  It is not enough to make conclusory assertions about insolvency and value, and it is not enough to borrow from separate reports and analyses that might be submitted for other purposes elsewhere in these cases.[5]  ERISA provides express instructions that are prerequisites to section 1405(b)'s application, and the Debtors have not followed them here.  The absence of the necessary evidence of "liquidation value" and an "insolvent" employer is enough to defeat the Motion.

### C.      The Debtors Have Waived Their Section 1405(b) Arguments

21.  Finally, even if legal support and a sufficient factual record were presented (they have not been), the Debtors' subordination argument should be denied as prejudicially belated, particularly in light of the multiple opportunities to raise it in these cases.[6]  This argument first appeared in fleeting, final footnotes in the Debtors' objections to the SFA and Non-SFA MEPP claims.  *Debtors' Second Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Dkt. No. 1962] at 32 n. 65; *Debtors' Seventh Omnibus Objection to Proofs of Claim for Withdrawal Liability* [Dkt. No. 2595] at 13 n.24.  Intensive summary judgment briefing followed the filing of these objections with respect to the claims of SFA and non-SFA MEPPs alike, which

---

[5]   For example, the liquidation analysis presented in the Disclosure Statement does not suffice to establish the "liquidation value" of section 1405(b), for several reasons.  Foremost among them is that it estimates value as of the "Effective Date" of the plan; it does not estimate value at the commencement of liquidation, as section 1405(b)(2)(A) requires.  *See Second Amended Disclosure Statement* [Dkt. No. 5027], Ex. B.  Nor does it satisfy the remaining adjustments to "liquidation value" required by the statute.  *See* 29 U.S.C. §§ 1405(b)(2)(B), (d)(2).

[6]   It is notable that the Official Committee of Unsecured Creditors in these cases has *never* taken the position, nor endorsed the Debtors' position, that section 1405(b) subordination applies here.  (This is yet a further distinction from *Affiliated Foods*, where the creditors' committee itself, as a plan sponsor, proposed the section's application. *Cf. Affiliated Foods*, 249 B.R. at 784-87.)  Yet the applicability of section 1405(b) is purely a question of value allocation among similarly-situated, unsecured creditors—it cannot, as a matter of law, be used to drive value to equity holders (and no equity holder has raised this argument).   Why the Debtors have decided it is in the best interest of the estates and consistent with their fiduciary role to belatedly pursue this argument is not clear, particularly as its primary effect is only to diminish aggregate creditor recoveries through additional litigation expense.

spanned nearly all of 2024.  But section 1405(b) was never raised, and accordingly was waived.  *See Aiellos v. Zisa*, 2010 WL 421083 at *3 n.6 (D.N.J. Feb. 2, 2010) ("A throw-away argument left undeveloped is waived") (citing *Conroy v. Leone*, 316 Fed. Appx. 140, 144 n. 5 (3d. Cir. 2009) (finding that "one conclusory sentence" in a brief is insufficient to preserve an argument); *Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F.Supp.2d 765, 773 (E.D. Pa. 2011) (same).

22.   The Debtors never again raised section 1405(b) until filing their amended Disclosure Statement and Plan at the end of November 2024—after all opening motions for summary judgment with respect to all MEPP claims had been filed.  *Second Amended Joint Chapter 11 Plan* [Dkt. No. 5028] at 22; *Second Amended Disclosure Statement* [Dkt. No. 5027] at 9.  Yet even in these documents, the Debtors failed to explain why, or how, section 1405 affects the MEPPs' claims.  Not until the Motion's filing in mid-December did the Debtors attempt to articulate how the section might apply—and even in that pleading, the argument remains woefully underdeveloped.  The Debtors failed to preserve the argument in their claim objections, passed many opportunities to raise it, and cannot support it even now.  For this independent reason, the issue should be deemed waived, and the Motion should be denied in this respect.

III.   **TEAMSTERS LOCAL 641'S CONTRIBUTION RATES ARE APPROPRIATE, AND THE DEBTORS WAIVED THIS PREVIOUSLY-ABANDONED OBJECTION**

23.   Annual Payments are derived from two inputs:  (1) the highest consecutive three-year average of the employer's required contributions in the ten years before the withdrawal, and (2) the highest contribution rate at which the employer was obligated to contribute during that same period.  *See* 29 U.S.C. § 1399(c)(1)(C)(i).  As only these two inputs drive the Annual Payment calculation, changes to either component will necessarily impact an employer's payment obligations.  The Debtors take issue with one of the inputs used by Teamsters Local 641:  the highest contribution rate.  According to the Debtors, Teamsters Local 641 used a contribution rate

that was put in place in order to meet rehabilitation plan requirements, rather than a contribution rate set by a collective bargaining agreement that correlated to benefits earned.  *See* Debtors' Motion ¶ 100.  The Debtors are wrong.

24.  Teamsters Local 641 does not dispute that it was subject to a rehabilitation plan, nor does it dispute that *if* its contribution rate increases were in fact the result of a rehabilitation plan *only*—meaning that the increase did not translate into increases in benefits paid to beneficiaries, but was instead solely a surcharge designed to bring the plan into a better funding position—those increases should indeed be disregarded when calculating the Annual Payment.  *See* 29 U.S.C. § 1085(g)(3)(A) ("Any increase in the contribution rate. . . that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded . . . in determining the highest contribution rate under section 1399(c) of this title[.]").

25.  But that is not what happened here.  The contribution rate used by Teamsters Local 641 reflects an increase in the rate resulting from benefits accrued, and not from rehabilitation plan mandates.  Teamsters Local 641 has already put in considerable evidence so confirming.  *See* Funds' Opposition [Dkt. No. 3975], Sullivan Decl., Ex. D (Supplemental Teamsters Local 641 Declaration) at ¶ 3 ("YRC's post-2014 contribution rate increases were not required by the Local 641 Pension Fund's rehabilitation plan.  Under the plan's benefit formula, participants earned benefit accrual on the increased contributions."); Debtors' Motion [Dkt. No. 3852], Ex. 8 (Teamsters Local 641 Declaration) at ¶¶ 42 ("contributions that increase benefits . . . may be included in the annual payments"), 48 ("In calculating the contribution rate, the Fund did not apply a contribution rate that Debtors paid only because the Fund was owed rehabilitation plan rates.").

26.   Teamsters Local 641's actuary used the highest contribution rate of $2.87 because it was benefit-bearing.   Rates that increase future benefit accruals are properly included when calculating Annual Payments.   *See* 29 U.S.C. § 1085(g)(3)(B) ("[A]ny increase in the contribution rate (or other increase in contribution requirements) shall be deemed to be required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan *except for* increases in contribution requirements due to increased levels of work, employment, or periods for which compensation is provided or *additional contributions are used to provide an increase in benefits, including an increase in future benefit accruals*[.]") (emphasis added).   Because Teamsters Local 641's contribution increases were not the result of rehabilitation plan mandates, but rather were the result of increases in benefit accruals, it was entirely appropriate for Teamsters Local 641 to use those rates to calculate the Debtors' Annual Payments.   The Debtors' failure to engage with this uncontroverted evidence precludes summary judgment on this issue.

27.   If the Court finds these arguments familiar, it is because this is the second time the Debtors have moved for summary judgment on this issue.   Teamsters Local 641 opposed the Debtors' prior summary judgment motion on this question, and submitted all of the above-cited evidence the Debtors requested (including a second, supplemental declaration, submitted at the Debtors' request on the eve of the summary judgment motion's filing).   *See Multiemployer Pension Plans' Opposition* [Dkt. No. 3975] at ¶¶ 140, 141.   Yet the Debtors declined to engage with Teamsters Local 641's opposition entirely in their reply, thereby dropping the argument.   *See Debtors' Omnibus Reply* [Dkt. No. 4011].   Much as with their undeveloped arguments regarding section 1405(b), the Debtors have waived this issue, and should be precluded from pursuing their

previously-abandoned argument.  *See supra* ¶ 21.  The Debtors are not entitled to summary judgment on Teamsters Local 641's calculation of Annual Payments.

## **CONCLUSION**

For the foregoing reasons, the Funds respectfully request that the Court deny the Debtors' Motion.

[*The remainder of the page is intentionally left blank.*]

Dated:    January 10, 2025        */s/ Cory D. Kandestin*
         Wilmington, Delaware     Mark D. Collins (No. 2981)
                                   Cory D. Kandestin (No. 5025)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701
Email:  collins@rlf.com
        kandestin@rlf.com

-and-

Dennis F. Dunne (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
Melanie Westover Yanez (admitted *pro hac vice*)
Riah Kim (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100,
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

*Counsel for the Funds*